UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

UNITED INDUSTRIAL WORKERS
PENSION PLAN, Individually and on Behalf
of All Others Similarly Situated,

                           Plaintiff,

       vs.

WASTE MANAGEMENT, INC., JAMES C.
FISH, JR., DEVINA A. RANKIN, JOHN J.
MORRIS, and LESLIE K. NAGY,

                         Defendants.

——————————————————————— x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff United Industrial Workers Pension Plan ("plaintiff"), individually and on behalf of all others similarly situated, by and through its undersigned counsel, for plaintiff's Complaint against defendants, alleges the following based upon personal knowledge as to plaintiff's own acts, and upon information and belief as to all other matters, based on the investigation conducted by and under the supervision of plaintiff's counsel, which included, among other things, a review of Waste Management, Inc.'s ("WM" or the "Company") public documents, conference call transcripts, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WM, industry and analysts' reports about the Company, and publicly available information about Advanced Disposal Services, Inc. ("ADS") and its senior executives. Plaintiff's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody and control of, defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of certain WM redeemable senior notes (the "Notes") between February 13, 2020 and June 23, 2020, both dates inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against WM and certain of the Company's senior officers and directors.[1]

2.      The case arises from defendants' materially false and misleading statements regarding the regulatory antitrust review of the merger between WM and ADS (the "Merger"), which caused

---

[1]      The Notes include the following senior redeemable notes issued by WM in May 2019: (i) 2.95% Senior Notes due 2024; (ii) 3.20% Senior Notes due 2026; (iii) 3.45% Senior Notes due 2029; and (iv) 4.00% Senior Notes due 2039.

the prices of the Notes to trade at artificially inflated levels during the Class Period.  As described in detail below, as a result of defendants' wrongful acts and omissions and the precipitous declines in the market value of the Notes, plaintiff and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

3.      The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

4.      Venue is proper in this District pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), since the Company conducts significant business in this District and a substantial part of the relevant events occurred in this District.  As described in ADS's Proxy Statement dated July 24, 2020 (the "ADS Proxy Statement"), in March 2019 WM senior management and ADS senior management met in New York City, along with their advisors Centerview Partners LLC and UBS, to negotiate the Merger Agreement (as defined herein).  In addition, WM was advised in the Merger by New York-based advisors, including its law firm, Simpson Thacher & Bartlett LLP.  ADS also retained New York advisors, including Shearman & Sterling LLP, a New York law firm.  Furthermore, the fairness opinion was rendered by a New York investment bank, UBS.  In addition, the Notes were offered pursuant to an Indenture between WM and a New York bank, the Bank of New York Mellon Trust Company, N.A.; WM agreed that New York law would govern the indenture, the underwriting agreement, and the Notes; and all five managing underwriters of the Notes offering were based in New York.

## PARTIES

5.      Plaintiff United Industrial Workers Pension Plan, as set forth in the accompanying certification, which is incorporated herein by reference, purchased WM Notes during the Class Period and was damaged thereby.

6.      Defendant Waste Management, Inc. is a waste management and environmental services company.  WM shares trade on the NYSE under the ticker symbol "WM."

7.      Defendant James C. Fish, Jr. ("Fish") was the President and Chief Executive Officer ("CEO") of WM and a member of its Board of Directors during the Class Period.

8.      Defendant Devina A. Rankin ("Rankin") was the Chief Financial Officer ("CFO") of WM during the Class Period.

9.      Defendant John J. Morris ("Morris") was the Chief Operating Officer ("COO") of WM during the Class Period.

10.     Defendant Leslie K. Nagy ("Nagy") was the Chief Accounting Officer ("CAO") of WM during the Class Period.

11.     The defendants referenced above in ¶¶7-10 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants possessed the authority to control the contents of statements made by WM in the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  The Individual Defendants made the misstatements and omissions alleged herein and were provided with copies of the Company's reports and press releases alleged herein to be materially false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Due to their participation in the wrongful acts alleged herein, their positions with the Company, and their access to WM's material information that was unavailable to

the public, the Individual Defendants knew, or were reckless in not knowing, that the adverse facts described herein were not disclosed to and were being concealed from investors.  The Individual Defendants are therefore liable for the false statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

**The Merger Agreement**

12.     WM is the largest waste management and environmental services company in the United States.  Prior to its acquisition by WM, ADS was the fourth-largest waste management and environmental services company in the United States.  Although they did not overlap in certain areas, WM and ADS competed against each other in 57 geographical markets covering 10 states in the eastern half of the United States, including Florida, where ADS was headquartered.

13.     Small container commercial waste ("SCCW") collection is the business of collecting municipal solid waste ("MSW") from commercial and industrial accounts, usually in small containers (*i.e.*, dumpsters with one to ten cubic yards capacity), and transporting or hauling that waste to a disposal site.  Typical SCCW collection customers include office and apartment buildings and retail stores and restaurants.  Commercial customers typically generate substantially more MSW than a residential customer.  To handle this high volume of waste efficiently, haulers often provide commercial customers with dumpsters for storing the waste.  Haulers organize their commercial accounts into routes, using a single driver/operator who collects and transports the MSW in front-end load trucks ("FEL") to a disposal facility, such as a transfer station, landfill, or incinerator, where the FEL truck operator empties the waste.

14.     Unlike a SCCW collection route, a residential waste collection route is highly labor intensive.  A residential customer's MSW is typically stored in small containers (*e.g.*, garbage bags or trash cans) and instead of using an FEL manned by a single operator, residential waste collection haulers routinely use rear-end load or side-load trucks manned by two or three-person teams who

hand load the customer's MSW by tossing bags and emptying trash cans into the vehicle's storage section.  In light of those differences, haulers typically organize commercial customers into separate routes from residential customers.

15.     On April 14, 2019, WM entered into an agreement and plan of merger (the "Merger Agreement") to acquire ADS for $4.9 billion, or $33.15 per share.  The Merger was conditioned upon, among other things:  (i) the affirmative vote of the holders of a majority of the outstanding shares of ADS at a special meeting of ADS shareholders to be held on June 28, 2019 (which was ultimately obtained); and (ii) obtaining antitrust clearance from regulators, including the U.S. Department of Justice ("DOJ").

16.     Knowing that the transaction posed significant antitrust concerns, WM agreed in the Merger Agreement to divest up to $200 million in revenue-producing assets of the combined companies over a prior 12-month period (the "Antitrust Revenue Threshold").  Under the Merger Agreement, WM maintained full control over the negotiating strategy for obtaining antitrust consent from the DOJ and was not obligated to divest assets that exceeded the Antitrust Revenue Threshold. Rather, WM had a right to terminate the deal for failure to obtain antitrust approval.

**The Notes**

17.     Thirty days after entering into the Merger Agreement, on May 14, 2019, WM issued $4 billion worth of senior notes in a public offering to finance the Company's acquisition of ADS. All series received an investment grade rating.  As described in the final prospectus for the Notes (the "Notes Prospectus"), four of the five series, totaling $3 billion in principal, were subject to a special mandatory redemption ("SMR") clause in the Merger Agreement.  The SMR clause required WM to repurchase the Notes for 101% of par in the event the Merger was not completed by July 14,

2020, the end date under the Merger Agreement (the "End Date").[2]  The Notes subject to the SMR were issued as follows:

| Face Amount ($) | Interest Rate | Due Date | CUSIP |
|---|---|---|---|
| 750,000,000 | 2.95% | June 15, 2024 | 94106LBF5 |
| 750,000,000 | 3.20% | June 15, 2026 | 94106LBH1 |
| 1,000,000,000 | 3.45% | June 15, 2029 | 94106LBG3 |
| 500,000,000 | 4.00% | July 15, 2039 | 94106LBJ7 |

18.     In the Notes Prospectus, WM represented that the "Merger will close by the first quarter of 2020."

**Unsuccessful Efforts to Obtain DOJ Antitrust Approval**

19.     As subsequently described in the ADS Proxy Statement, WM, ADS, and their respective antitrust counsel began working with DOJ staff shortly after the announcement of the original Merger Agreement in mid-2019 and remained in constant communication with DOJ personnel in the months leading up to the Class Period.

20.     On October 25, 2019, WM, ADS, and the DOJ entered into a timing agreement that provided for a minimum 70-day settlement period during which the parties would attempt to reach an agreement on DOJ approval for the Merger, which included DOJ approval of the amount of WM's asset divestures.  Unbeknownst to investors, during this process the DOJ informed WM that the assets to be divested in accordance with the $200 million Antitrust Revenue Threshold would be insufficient for regulatory approval.  As later memorialized in documents filed by the DOJ in *United States of America, et al. v. Waste Management, Inc.*, No. 1:20-cv-03063 (D.D.C. Oct. 23, 2020) (collectively, the "Consent Order Documents"), the DOJ concluded that the combination of WM and ADS would, without divestures significantly in excess of the $200 million Antitrust Revenue

---

[2]     The Merger Agreement provides for the completion of the Merger by April 14, 2020 (one year from the Merger Agreement), subject to an automatic 90-day extension in the event antitrust approval had not yet been obtained or certain other conditions were not yet satisfied.

Threshold, cause harm to MSW disposal in 24 geographic markets across 8 states, and cause harm to SCCW collection in 33 geographic markets located in 6 states.

21.     To address the concerns raised by the DOJ, WM and ADS engaged in extensive negotiations with several potential divesture buyers, including GFL Environmental, Inc. ("GFL"), for the divesture of assets well in excess of the Antitrust Revenue Threshold.  Moreover, given the reduced financial outlook for ADS resulting from COVID-19's disruption of the waste management industry, WM was not prepared to increase asset divestitures above $200 million unless ADS agreed to a reduced Merger price.  Although not disclosed to investors, these adverse facts were highly material to Notes investors because they revealed a significant risk that the Merger would not close by the End Date (if at all), triggering the SMR and the forced redemption of the Notes at 101% of par.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

22.     During the Class Period, rather than disclose the truth, defendants stated that the Merger was on track to obtain antitrust approval and that the Merger would close prior to July 14, 2020, causing the Notes to trade at artificially inflated prices.

23.     The Class Period begins on February 13, 2020.  On that date, WM filed with the SEC the Company's annual report on Form 10-K for the year ended December 31, 2019, which was signed by defendants Fish, Rankin, and Nagy.  Defendants Fish and Rankin also provided signed certifications attesting to the Form 10-K's accuracy and completeness.  The Form 10-K stated: "***We anticipate that we will obtain antitrust regulatory approval by the end of March 2020 and close the Advanced Disposal transaction soon thereafter***."[3]

---

[3]     Emphasis added unless otherwise indicated.

24.     That same day, WM held an earnings call with analysts and investors hosted by defendants Fish, Morris, and Rankin.  During the call, defendant Fish stated: "***We anticipate that we will obtain antitrust regulatory approval by the end of March and close soon thereafter***."  Defendant Fish also noted that there was a "***high level of interest from other companies in acquiring any potential businesses we might be required to divest***."

25.     Later during the call, defendant Morris stated:  "[W]e are approaching the close of the transaction and the start of the integration."  Later in response to an analyst question, defendant Morris stated:  "[W]e're on a trajectory, we think, to get clearance from DOJ right toward the end of the quarter.  And obviously we're going to move to close quickly after that."

26.     Defendants' statements referenced in ¶¶23-25 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, as follows:

        (a)     that the DOJ had indicated to WM that it would require the Company to divest significantly more assets than the $200 million Antitrust Revenue Threshold;

        (b)     that, as a result of (a) above, the Merger would not be completed by the End Date; and

        (c)     that, as a result of (a)-(b) above, the Notes would be subject to mandatory redemption at 101% of par.

27.     Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and

prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk." The failure of the Company's 2019 Form 10-K to disclose that the DOJ was requiring divestures in excess of the Antitrust Revenue Threshold and that the Merger would not be completed by the End Date violated Item 303, because these undisclosed facts were known to defendants and were likely to have a material impact on the Company's sales, revenues, and income from continuing operations. The failure to disclose that the DOJ was requiring divestures in excess of the Antitrust Revenue Threshold and that the Merger was unlikely to be completed by the End Date also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in the Notes speculative or risky.

28.      Then, on March 18, 2020, WM filed a current report on Form 8-K which stated that the Merger was now expected to receive regulatory approval and close "in the second quarter of 2020" rather than in the first quarter as previously represented by defendants. As a result of this disclosure, the prices of the Notes fell significantly. For example, the 3.45% Notes fell from 104% on March 17, 2020 to just 98% of par on March 18, 2020. However, because defendants failed to disclose the full truth and continued to make materially false and misleading statements, the prices of the Notes continued to trade at artificially inflated levels.

29.      On the same day that WM filed the March 18, 2020 Form 8-K, a Company spokesperson, Janette Micelli, told waste and recycling news service *WasteDive* that "'*[w]e continue to work with the Department of Justice and expect to close within the original 12 to 15-month timeline as we originally guided . . . . Everything is progressing as expected*.'"

30.      On May 6, 2020, WM filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2020, which was signed by defendants Rankin and Nagy. Defendants Fish and

Rankin also provided signed certifications attesting to the Form 10-Q's accuracy and completeness. The Form 10-Q stated:  "*[W]e continue to make progress and currently anticipate being in a position to receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020*."

31.     That same day, WM held an earnings call with analysts and investors hosted by defendants Fish, Morris, and Rankin.  During the call, defendant Fish stated: "*We're looking forward to completing this transaction, integrating the ADS team and operations and creating long-term value for our shareholders*."  In response to a question by an Oppenheimer & Co. Inc. analyst on whether he expected the Merger to close "by the end of the second quarter or subsequent to that," defendant Fish responded in pertinent part as follows:

> *I just said we anticipate being in a position to close by the end of the second quarter*. . . .  [W]hen we first announced this deal . . . it was like the middle of April 19 or something else . . . we thought, between 12 and 15 months to close.  We're at 13.5 or we will be, next week, so – or 12.  *So we're within that window in terms of this being in anticipation or anticipating being in a position to close, so we're not worried about that*.

32.     On June 10, 2020, defendant Rankin presented on behalf of WM at the Stifel 2020 Cross Sector Insight Conference.  At the conference, moderator Michael Hoffman, Stifel's Head of Industrial Research, asked defendant Rankin whether the "deal naturally terminates" if DOJ approval was not obtained by July 13.  In response, Rankin referenced the Merger Agreement and referred investors to the Company's prior guidance, stating: "*[W]hat I would say is reminding everyone that what we've mentioned before is the Waste Management team works closely with the DOJ to continue to move the transaction forward, and the statement that we made about expected timing [i.e., end of Q2 2020] is the best that I have at this time*."

33.     Defendants' statements referenced in ¶¶28-32 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, as follows:

(a)     that the DOJ had indicated to WM that it would require the Company to divest significantly more assets than the $200 million Antitrust Revenue Threshold;

(b)     that, as a result of (a) above, the Merger would not be completed by the End Date; and

(c)     that, as a result of (a)-(b) above, the Notes would be subject to mandatory redemption at 101% of par.

34.     Furthermore, the failure of the Company's first quarter 2020 Form 10-Q to disclose that the DOJ was requiring divestures in excess of the Antitrust Revenue Threshold and that the Merger was unlikely to be completed by the End Date violated Item 303, because these undisclosed facts were known to defendants and were likely to have a material impact on the Company's sales, revenues, and income from continuing operations.  The failure to disclose that the DOJ was requiring divestures in excess of the Antitrust Revenue Threshold and that the Merger was unlikely to be completed by the End Date also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in the Notes speculative or risky.

35.     On June 24, 2020, WM shocked investors by announcing that the Company and ADS had revised the terms of the Merger and that WM needed to divest substantially more assets than previously disclosed to receive DOJ approval for the deal.  Under the revised Merger terms, WM had agreed to purchase ADS for $4.6 billion, or $30.30 per share, thereby reducing WM's acquisition cost by approximately $300 million to $4.6 billion.  In addition, WM and ADS had

agreed to sell $835 million worth of assets in an attempt to satisfy antitrust regulators, which assets were responsible for generating approximately $345 million in 2019 revenue. Notably, approximately $300 million of the total revenue related to assets and businesses being sold to GFL, with whom WM had been in extended negotiations for months prior to the Class Period. Furthermore, WM revealed that the deal was now not expected to close until "the end of the third quarter of 2020" – *six months later* than had been represented by defendants at the start of the Class Period and, critically, after the End Date which triggered the SMR redemption feature of the Notes.

36.     As a result of this disclosure, the prices of the Notes fell significantly. For example, the 3.45% Notes fell from 109% on June 23, 2020 to just 103% of par on June 24, 2020. However, because defendants failed to disclose the full truth, the Notes continued to trade at artificially inflated levels. For example, investors were still unsure whether WM planned to voluntarily waive the SMR feature, and, in the June 24, 2020 press release, WM stated: "This press release does *not* constitute a notice of redemption under the indenture governing such senior notes."

37.     By letter dated June 29, 2020, The Credit Roundtable ("CRT"), a group of unaffiliated institutional fixed income investors and managers with $3.8 trillion in assets under their supervision, stated that the revised Merger terms and resulting delay that triggered the SMR "came as a surprise to many bond investors, who have noted that on WM's first quarter earnings call on May 6th and, as late as June 10th, your public statements were that the transaction was 'still on track to close by the end of the quarter.'" CRT faulted WM, claiming that its actions were "inconsistent with [its] recent guidance" and "caused the prices of these Notes to decline sharply." CRT further "strongly recommend[ed] that WM attempt to pursue alternative courses before redeeming these bonds if the [ADS] acquisition is still pending," such as extending the SMR trigger date.

38.     On July 8, 2020, WM publicly responded to CRT, stating as reported by Bloomberg News that "[u]pon conferring internally and with our counsel, we expect to proceed with the planned redemption of the SMR notes, which is clearly and fully in compliance with the terms of the notes." WM's email comments set forth several reasons for its position, including that "[w]e believe that taking another approach could subject Waste Management to legal risks and other uncertainties."

39.     On this news, the prices of the Notes ultimately fell to the 101% redemption price, causing investors to suffer significant losses.  The market pricing of the Notes during the Class Period is illustrated in the graph below:



**ADDITIONAL ALLEGATIONS REGARDING DEFENDANTS' SCIENTER**

40.     As alleged herein, defendants acted with scienter since defendants knew or recklessly disregarded that the public documents issued or disseminated in the name of the Company were

materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As further detailed herein, WM and the Individual Defendants, by virtue of their participation in the negotiations with the DOJ to obtain antitrust approval, their continuing evaluation of ADS's financial condition and prospects, their efforts to renegotiate the Merger or allow it to terminate for failure to obtain antitrust approval, their receipt of information regarding the status of DOJ approval, their control over and receipt or modification of WM's allegedly materially misleading misstatements, and their associations with the Company which made them privy to confidential proprietary information concerning the Merger, knew or recklessly disregarded the adverse facts detailed herein and directly participated in the fraudulent scheme alleged herein.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least the reckless disregard, of the Company and the Individual Defendants.

41.     The Individual Defendants, because of their positions as senior executives with WM, made and/or controlled the contents of the Company's public statements during the Class Period.  Each defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading.  As a result, each of these defendants is responsible for the accuracy of WM's corporate statements and other

statements alleged herein to be actionable that they made or controlled, and is therefore responsible and liable for the representations contained therein.

## LOSS CAUSATION

42.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of the Notes and operated as a fraud or deceit on Class Period purchasers of the Notes by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of the Notes declined significantly as the prior artificial inflation came out of the market prices for the Notes.

43.     As a result of their purchases of the Notes during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused the Notes to trade at artificially inflated levels throughout the Class Period, including, at times, more than 120% of par.

44.     The truth was partially revealed on March 18, 2020, when defendants acknowledged that their prior statements about obtaining antitrust approval and closing the Merger by the end of the March 2020 quarter were materially false and misleading.  The prices of the Notes declined significantly, but soon rebounded based upon defendants' assurances that DOJ approval and the Merger closing would be completed by the end of the June 30, 2020 quarter – which would have remained well before the End Date.  The truth partially emerged again on June 24, 2020, when WM announced the revised the Merger terms and that the Merger's closing would be delayed past the End Date, triggering the SMR clause.  However, the truth was not fully revealed until WM confirmed in the lead up to the End Date that the Company would enforce the mandatory redemption clause, causing the prices of the Notes to ultimately fall to their 101% of par redemption price.

45.     The decline in the prices of the Notes after the corrective disclosures came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in the Notes negates any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

46.     The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of the Notes and the subsequent significant declines in the value of the Notes when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE ESTABLISHED BY THE FRAUD ON THE MARKET DOCTRINE

47.     The market for the Notes was open, well-developed, and efficient at all relevant times for the following reasons, among others:

(a)     the Notes were issued in a $4 billion public offering conducted by WM;

(b)     the Notes were liquid and traded with significant volume during the Class Period;

(c)     as a regulated issuer, WM filed periodic public reports with the SEC;

(d)     WM regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)     WM was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

48.     As a result of the foregoing, the market for the Notes promptly digested current information from all publicly available sources and reflected such information in the prices of the Notes.  Under these circumstances, all purchasers of the Notes during the Class Period suffered similar injury through their purchases of the Notes at artificially inflated prices and a presumption of reliance applies.

49.     Accordingly, plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.  In the alternative, plaintiff and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because defendants omitted material information during the Class Period violating a duty to disclose such information as described above.  Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

50.     The statutory safe harbor provided for forward-looking statements does not apply to the allegedly false statements and omissions pled in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they

were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, WM and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of WM who knew that those statements were false and misleading when made.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on its own behalf and as representative of a Class consisting of all purchasers of the Notes during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

52.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.  Throughout the Class Period, the Notes were actively traded on bond markets.  While the exact number of Class members is unknown to plaintiff at this time and can be ascertained only through appropriate discovery, $3 billion worth of the Notes had been issued and was outstanding during the Class Period, and plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be readily identifiable from information and records in the possession of WM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions.  In addition, the identities of members of the Class are ascertainable through information collected by third parties, including data supplied by broker-dealers to FINRA's Trade Reporting and Compliance Engine ("TRACE") and available through Bloomberg's Trade History Function.

53.     Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff and members of the Class sustained damages from the same wrongful conduct of defendants, including the same misstatements and omissions of material fact made during the Class Period.  The injuries and damages of each member of the Class were directly caused by defendants' wrongful conduct in violation of the laws described herein.

54.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class.  Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

55.     Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class.  These common questions of law include, without limitation:

(a)     whether the 1934 Act was violated by defendants and the Company's acts as alleged herein;

(b)     whether defendants' statements during the Class Period were materially false and misleading;

(c)     whether WM and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements; and

(d)     whether plaintiff and Class members have sustained damages and the proper measure of damages.

56.     A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

57.     Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for WM and the Individual Defendants.

58.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

59.     Plaintiff incorporates and realleges each allegation set forth above as if it were set forth herein.

60.     During the Class Period, WM and the Individual Defendants individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or deliberately disregarded in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

61.     WM and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making false statements of material facts or omitting state material facts needed to make the statements not misleading; or (c) engaging in acts and practices that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with purchases of the Notes during the Class Period.

62.     WM and the Individual Defendants acted with scienter because they knew or recklessly disregarded that the statements issued in the name of WM were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws.  WM and the Individual Defendants, through receipt of information reflecting true facts about WM and the Merger, their control over, and/or receipt of or modification to WM's allegedly materially misleading statements, which made them aware of WM's confidential proprietary information, participated in the fraudulent scheme complained of herein.

63.     The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by WM, and intended to deceive plaintiff and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other WM employees to investors, including plaintiff and Class members.

64.     Pursuant to the foregoing, the prices of the Notes were artificially inflated during the Class Period.  Due to their lack of knowledge of the false nature of statements made by WM and the Individual Defendants, plaintiff and Class members relied on the integrity of the market prices of the Notes during the Class Period in purchasing the Notes at prices that were artificially inflated due to the false and misleading statements made by WM and the Individual Defendants.

- 21 -

65.     Were plaintiff and Class members made aware that the market prices of the Notes were artificially inflated by misleading statements made by WM and the Individual Defendants, and by material adverse information that WM and the Individual Defendants failed to disclose, they would not have purchased the Notes at the prices paid, if at all.

66.     Based on the wrongful conducted alleged herein, plaintiff and Class members have suffered damages in an amount to be determined at trial.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against the Individual Defendants**

67.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

68.     During the Class Period, the Individual Defendants were involved in the management and operation of WM's business affairs.  Due to their senior positions, they had knowledge of adverse non-public information regarding the likelihood that the Merger would not be completed by the End Date and that the SMR would be triggered.

69.     As senior officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding WM's financial condition and results of operations, and to correct any public statements issued by WM which were materially false or misleading.

70.     Due to their positions of authority at WM, the Individual Defendants controlled the contents of various public filings, press releases, and reports which WM disseminated in the market during the Class Period.  During the Class Period, the Individual Defendants utilized their authority to cause WM to execute the wrongful acts alleged herein.  In addition, the Individual Defendants

were culpable participants in the unlawful conduct as alleged herein.  The Individual Defendants

were therefore "controlling persons" at WM pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully demands relief as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead

Plaintiff and as Class representative under Rule 23 of the Federal Rules of Civil Procedure and

plaintiff's counsel as Lead Counsel;

B.      Awarding damages in favor of plaintiff and other members of the Class against WM

and the Individual Defendants, jointly and severally, for all damages sustained as a result of

defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and members of the Class their costs of suit, including reasonable

attorneys' fees and expenses and expert fees; and

D.      Directing such further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  June 9, 2022                        ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                            SAMUEL H. RUDMAN


                                            _s/ Samuel H. Rudman_
                                            SAMUEL H. RUDMAN

                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)
                                            srudman@rgrdlaw.com

- 23 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

LOWEY DANNENBERG, P.C.
DAVID HARRISON
ANDREA FARAH
LUKE GOVEAS
44 South Broadway, Suite 1100
White Plains, NY  10601
Telephone: 914/997-0500
dharrison@lowey
afarah@lowey.com
lgoveas@lowey.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

UNITED INDUSTRIAL WORKERS PENSION PLAN ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below: None.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___1__ day of June, 2022.

UNITED INDUSTRIAL WORKERS
PENSION PLAN

By: *Margaret R. Bowen*
    Margaret R. Bowen, Administrator

WASTE MANAGEMENT

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Bond**

| Date Acquired | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 05/21/2020 | 2.95% due 06/15/2024 | 400,000 | $106.88 |

Price listed is rounded to two decimal places.