UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————— x

In re WASTE MANAGEMENT SECURITIES
LITIGATION

———————————————— x

: Civil Action No. 1:22-cv-04838-LGS
:
: <u>CLASS ACTION</u>
:
: AMENDED COMPLAINT FOR
: VIOLATIONS OF THE FEDERAL
: SECURITIES LAWS
:
:
: <u>DEMAND FOR JURY TRIAL</u>

Lead Plaintiff Seafarers Officers & Employees Pension Plan, Seafarers Money Purchase Pension Plan, and United Industrial Workers Pension Plan, (together "Lead Plaintiff") by and through the undersigned counsel, alleges the following based upon personal knowledge as to Lead Plaintiff's own acts, and upon information and belief as to all other matters, based on the investigation conducted by and under the supervision of Lead Plaintiff's counsel, which included, among other things, a review of public documents, conference call transcripts, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases of Waste Management, Inc. ("Waste Management," "WM" or the "Company"), industry and analysts' reports about the Company, and publicly available information about Advanced Disposal Services, Inc. ("Advanced Disposal" or "ADS") and its senior executives.[1]

## NATURE OF THE ACTION

1.    This is a securities class action on behalf of all purchasers of certain Waste Management redeemable senior notes (the "Notes") between February 13, 2020 and June 23, 2020, both dates inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Waste Management and certain of the Company's senior officers and directors ("Defendants").[2]

2.    This action on behalf of Notes investors arises from Defendants' material misrepresentations and omissions concerning the time for completion of Waste Management's

---

[1]    All emphasis herein is added unless otherwise noted.  As used herein the terms CEO, COO, and CFO mean Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer respectively.

[2]    The Notes include the following senior redeemable notes issued by WM in May 2019: (i) 2.95% Senior Notes due 2024; (ii) 3.20% Senior Notes due 2026; (iii) 3.45% Senior Notes due 2029; and (iv) 4.00% Senior Notes due 2039.

acquisition of its competitor, ADS.  Information concerning the time for completion of the acquisition was highly material to Notes investors because Waste Management was required to redeem the Notes at a fixed price if it did not complete the ADS acquisition by a specified date. Throughout the Class Period, Defendants repeatedly and falsely assured investors that Waste Management was on track to complete the ADS acquisition, while materially misrepresenting and omitting to disclose the true facts concerning the U.S. Department of Justice's ("DOJ") antitrust review and the resulting renegotiation of the transaction, which threatened to – and ultimately did – delay completion of the transaction, causing significant damage to Notes investors.

3.      Waste Management issued the Notes in May 2019 to finance its acquisition of ADS. The Notes included a "special mandatory redemption" ("SMR") feature requiring Waste Management to redeem the Notes at 101% of par if the Company did not complete the acquisition by July 14, 2020 (the "End Date").  According to the DOJ, Waste Management's acquisition of ADS presented "the most significant consolidation in the waste industry in over a decade" and the transaction therefore required regulatory antitrust approval.  In light of these antitrust concerns, the merger agreement specified that, Waste Management was entitled to control the strategy for obtaining DOJ approval, and had the authority to agree to divestments from the combined companies of assets contributing up to $200 million in annual revenues (the "Antitrust Revenue Threshold").

4.      Any requirement to divest more than the Antitrust Revenue Threshold had material implications for Waste Management's ability to close the ADS merger by the End Date.  Selling more assets would naturally require more time.  Moreover, if the DOJ required divestitures above the $200 million Antitrust Revenue Threshold, Waste Management could terminate or renegotiate the merger, in either case preventing completion by the End Date and triggering the SMR, as ultimately occurred.

5.      As is now known – including based on ADS's later-filed proxy statement (the "ADS Proxy") – by February 2020 (when the Class Period begins), Waste Management knew, but did not disclose, that the $200 million Antitrust Revenue Threshold did not satisfy the DOJ's concerns regarding the ADS acquisition.  As a result, Waste Management had already begun "work[] to establish a divestiture framework that it believed would potentially satisfy the DOJ staff's questions about the transaction."  This work with the DOJ continued undisclosed "[o]ver the course of the next several months" and, by late April 2020, Waste Management was actively renegotiating the transaction, requesting updated financial projections from ADS "to facilitate Waste Management's continued consideration of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ."

6.      By May 13, 2020, "after a series of general discussions with the board of directors of Waste Management," the Company's CEO – Defendant Fish – called ADS's CEO to propose a reduction in merger consideration in light of "the fact [that] the DOJ indicated it was not likely to approve the merger prior to the July 13 end date without divestitures in excess of the Antitrust Revenue Threshold."  Days later, on May 19, 2020, Defendant Fish and the Company's COO – Defendant Morris – together called ADS's CEO to "reiterate[] Waste Management's desire to reduce the original merger consideration" because of "the fact that the DOJ staff was requiring assets to be divested in order to grant approval of the merger that would result in a reduction of revenue in excess of the Antitrust Revenue Threshold[.]"

7.      Thereafter, as later detailed in the ADS Proxy, Waste Management continued to renegotiate the terms of the acquisition with ADS, making no disclosure concerning any of these material facts until June 24, 2020 (the end of the Class Period), when the Company announced a

revised merger agreement with divestitures far in excess of the $200 million Antitrust Revenue Threshold that would not be completed by the End Date and would therefore trigger the SMR.

8.      In contrast to these undisclosed material facts, throughout the Class Period, Defendants materially misrepresented the status of this antitrust review, repeatedly assuring investors that the DOJ's antitrust review was proceeding as planned and that Waste Management was therefore on track to complete the ADS acquisition by the End Date.  "We anticipate that we will obtain antitrust regulatory approval by the end of March [2020] and close [the Advanced Disposal transaction] soon thereafter," the Company announced on February 13, 2020 (the start of the Class Period), falsely reassuring investors that the DOJ's review was proceeding as anticipated without disclosing that the Company was at that time working with the DOJ on an alternative divestiture framework to the Antitrust Revenue Threshold.  "[W]e're on a trajectory," Defendant Morris stated falsely that day, "to get clearance from DOJ right towards the end of the quarter.  And obviously, we're going to move to close quickly after that."

9.      Weeks later, on March 18, 2020, Defendants "update[d] [their] prior timing expectations," announcing that "subject to obtaining final regulatory approval from the DOJ (which is currently anticipated in the second quarter of 2020), the Company now anticipates closing the Merger mid to late second quarter 2020."  Defendants thus continued to mislead investors, advising the market that antitrust approval was expected by the End Date with no disclosure concerning the DOJ's objections to the Antitrust Revenue Threshold or the Company's ongoing work to obtain DOJ approval for a new divestiture framework.  Indeed, the Company even misleadingly stated that the delay was the "result of, and subject to any further effects from, the COVID-19 (coronavirus) outbreak" – at best a half-truth attempting to lay blame for the Company's "update[d] timing" on the

pandemic, while concealing the Company's undisclosed ongoing work with the DOJ on an alternative divestiture framework, and the resulting renegotiation of the transaction.

10.    Defendants continued to mislead investors for the duration of the Class Period, reaffirming the Company's guidance regarding the regulatory approval process and expected time to complete the ADS acquisition, while failing to disclose the true facts of the DOJ's antitrust review, the resulting renegotiation of the transaction, or the delays these processes necessitated.  On May 6, 2020, Waste Management assured investors that "we continue to make progress and currently anticipate being in a position to receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020."  Waste Management made this statement without disclosing the fact that (as investors would later learn in the ADS Proxy) by this time Waste Management was already engaged in "continued consideration of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ" and had requested updated financial information from ADS for that purpose.  Asked that same day whether Waste Management would complete the ADS acquisition "by the end of the second quarter or subsequent to that," Defendant Fish reiterated the misrepresentation: "I just said we anticipate being in a position to close by the end of the second quarter . . . so we're not worried about that."

11.    Just days later, on May 13, 2020, Defendant Fish called ADS's CEO to discuss changing the deal price because "the DOJ indicated it was not likely to approve the merger prior to the July 13 end date without divestitures in excess of the Antitrust Revenue Threshold."  Defendants nevertheless made no timely disclosure of these material facts and instead continued to mislead the market by reaffirming their earlier guidance about the antitrust review process and the timing for completing the ADS acquisition.  As late as June 10, 2022, in response to a question about whether the transaction "naturally terminates" absent DOJ approval prior to the End Date, the Company's

CFO, Defendant Rankin, told an investor conference that "the Waste Management team works closely with the DOJ to continue to move the transaction forward, and the statement that we made about expected timing [*i.e.*, end of Q2 2020] is the best that I have at this time."

12.    On June 24, 2020, Waste Management stunned the market by announcing a revised agreement to acquire ADS, and that, as a result, the "outstanding senior notes issued in May 2019 with a special mandatory redemption feature will be redeemed pursuant to their terms" – *i.e.*, the Company would trigger the SMR requiring a mandatory redemption at 101% of par.  Among other things, the revised merger agreement eliminated the $200 million Antitrust Revenue Threshold and reduced the purchase price of ADS by approximately $300 million.  At the same time, Waste Management and ADS announced the sale to Canadian waste company, GFL Environmental Inc. ("GFL"), of $835 million in assets, representing $345 million in combined annual revenues – a divestment far in excess of the Antitrust Revenue Threshold that took months to plan.  Waste Management admitted that, contrary to its numerous earlier misrepresentations concerning the DOJ's antitrust review, "[a]pproximately $300 million of the total [$345 million in] revenue [wa]s related to assets and businesses . . . sold to GFL . . . to address substantially all of the divestitures expected to be required by the U.S. Department of Justice."

13.    Throughout the Class Period, Notes investors had been willing to pay premium prices well above par value, with the Notes assigned investment grade ratings and trading as high as 121 cents on the dollar based on Defendants' repeated assurances about the status of the DOJ's antitrust review and consequent timing to complete the ADS acquisition.  The June 24, 2020 announcement revealed to Notes investors that these assurances were false and misleading and that Defendants had misrepresented the true facts of the DOJ's antitrust review, repeatedly and falsely stating that the DOJ's review was proceeding as anticipated, omitting to disclose known material facts to the

contrary, and falsely reassuring investors that Waste Management was therefore "on a trajectory" to complete the ADS acquisition by the End Date. The June 24, 2020 announcement thus eviscerated the Notes' premium, causing the price to drop to approximately 103 cents on the dollar in anticipation of the SMR, and continuing to decline until the Notes' redemption at 101% of par on July 20, 2020.

14.     By letter dated June 29, 2020, the Credit Roundtable ("CRT"), a group of unaffiliated institutional fixed income investors and managers with $3.8 trillion in assets under their supervision, expressed their shock regarding the revised merger agreement and resulting delay triggering the SMR. According to the Credit Roundtable, this "came as a surprise to many bond investors, who have noted that on WM's first quarter earnings call on May 6th and as late as June 10th, your public statements were that the transaction was 'still on track to close by the end of the quarter.'" The Credit Roundtable laid blame squarely on Waste Management, declaring that the Company's June 24, 2020 announcement was "inconsistent with [its] recent guidance" and "caused the price of these Notes to decline sharply."

15.     On July 24, 2020, Advanced Disposal filed the ADS Proxy with the SEC. Lead Plaintiff respectfully submits excerpts of the ADS Proxy herewith as Exhibit 1.[3]

16.     As a result of the foregoing, and as detailed below, Lead Plaintiff and other Class members have suffered significant damages. This action seeks recovery on their behalf.

### JURISDICTION AND VENUE

17.     The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

---

[3]     A complete version of the ADS Proxy can be found at the SEC's website at the following address: https://www.sec.gov/Archives/edgar/data/1585790/000104746920004238/a2242105zdefm1 4a.htm. Lead Plaintiff will submit a complete copy of the ADS Proxy at the Court's request.

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

18.    Venue is proper in this District pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), since the Company conducts significant business in this District and a substantial part of the relevant events occurred in this District.  As described in the ADS Proxy, in March 2019 WM senior management and ADS senior management met in New York City, along with their advisors Centerview Partners LLC and UBS Securities LLC ("UBS"), to negotiate the merger.  In addition, WM was advised in the merger by New York-based advisors, including WM's law firm, Simpson Thacher & Bartlett LLP.  ADS also retained New York-based advisors, including the law firm Shearman & Sterling LLP.  Furthermore, the fairness opinion was rendered by the New York-based investment bank, UBS.  In addition, the Notes were offered pursuant to an Indenture between WM and a New York bank, the Bank of New York Mellon Trust Company, N.A.; WM agreed that New York law would govern the indenture, the underwriting agreement, and the Notes; and all five managing underwriters of the Notes offering were based in New York.

## PARTIES

19.    Lead Plaintiff Seafarers Officers & Employees Pension Plan, Seafarers Money Purchase Pension Plan, and United Industrial Workers Pension Plan, purchased WM Notes as set forth in the previously filed certifications (ECF No. 15-2) and were damaged thereby.

20.    Defendant Waste Management, Inc. is a waste management and environmental services company whose shares trade on the NYSE under the ticker symbol "WM."  WM is the largest solid waste hauling and disposal company in the United States and provides waste collection, recycling, and disposal (including transfer) services.

21.    Defendant James C. Fish, Jr. ("Fish") was the President and CEO of WM and a member of its Board of Directors during the Class Period.

22.     Defendant Devina A. Rankin ("Rankin") was the CFO of WM during the Class Period.

23.     Defendant John J. Morris ("Morris") was the COO of WM during the Class Period.

24.     Defendant Leslie K. Nagy ("Nagy") was the Chief Accounting Officer ("CAO") of WM during the Class Period.

25.     The defendants referenced above in ¶¶21-24 are collectively referred to herein as the "Individual Defendants." The Individual Defendants possessed the authority to control the contents of statements made by WM in the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. The Individual Defendants made and are responsible for the misstatements and omissions alleged herein and had the ability and opportunity to cause their issuance and the ability and opportunity to prevent their issuance or cause them to be corrected. Due to their participation in the wrongful acts alleged herein, their positions with the Company, and their access to WM's material information that was unavailable to the public, the Individual Defendants knew, or were reckless in not knowing, that the adverse facts described herein were not disclosed to and were being concealed from investors. The Individual Defendants are, therefore liable for the false statements and omissions alleged herein.

### SUBSTANTIVE ALLEGATIONS

**A.    The Merger Agreement and Antitrust Revenue Threshold**

26.     On April 14, 2019, Waste Management entered into an agreement and plan of merger (the "Merger Agreement") to acquire ADS for $4.9 billion, or $33.15 per share.

27.     The transaction was conditioned upon, among other things, obtaining antitrust clearance from regulators, including the DOJ.

28.     The transaction raised serious antitrust concerns. According to the DOJ, the merger of Waste Management and ADS represented "the most significant consolidation in the waste

industry in over a decade." Waste Management and ADS were respectively the largest and fourth-largest waste management companies in the U.S. The two companies competed aggressively to provide waste collection and waste disposal services in 57 geographical markets covering 10 states in the eastern half of the United States. In each of these markets, Waste Management and ADS were either the only two or two of only a few significant providers of small container commercial waste ("SCCW") collection and municipal solid waste ("MSW") disposal, which are essential for businesses, municipalities, and towns throughout the country.[4]

29.     Recognizing the significant antitrust issues facing the transaction and the need for antitrust clearance from the DOJ, the Merger Agreement gave control over the regulatory strategy to Waste Management and required the Company, in order to obtain antitrust approval, to agree to divestments from the combined companies up to the $200 million Antitrust Revenue Threshold. In other words, in order to obtain regulatory antitrust clearance, Waste Management was required to agree to divestments of assets contributing up to $200 million in annual revenues.

30.     As the ADS Proxy explained:

> Waste Management was entitled to control the strategy for obtaining DOJ approval. While Waste Management was specifically required to sell or divest assets (belonging to Waste Management or Advanced Disposal or any of their respective subsidiaries) if required in order to obtain antitrust approval, it was not, however, required to sell assets that would, individually or in the aggregate, result in a reduction of revenue (without duplication and net of any intercompany revenues) in excess of $200,000,000 (for any rolling 12-month period ending the last full month prior to any date between the date of the original merger agreement and the closing date) to Waste Management, Advanced Disposal and their respective subsidiaries (taken as a whole after giving effect to the merger) if such actions had been taken at the beginning of any such rolling 12-month period (which we refer to as the "Antitrust Revenue Threshold").

---

[4]     Specifically, Waste Management's merger with ADS presented competitive risks in 33 local markets for SCCW collection, in six states: Alabama, Florida, Georgia, South Carolina, Minnesota, and Wisconsin; and competitive risks in 24 local markets for MSW disposal, in eight states: Alabama, Florida, Georgia, Illinois, Indiana, Michigan, Pennsylvania, and Wisconsin.

31.    Under the terms of the Merger Agreement, if the DOJ required divestment of assets in excess of the Antitrust Revenue Threshold, Waste Management had the right to terminate the transaction (paying a $150 million termination fee).  Unbeknownst to investors, Defendants knew since at least February 2020 that the DOJ would require substantially more divestment than the Antitrust Revenue Threshold, and used this leverage to renegotiate a lower acquisition price in secret, while repeatedly and falsely reassuring investors that the transaction would close on time.

### B.    The Notes and the Special Mandatory Redemption

32.    Thirty days after entering into the Merger Agreement, on May 14, 2019, Waste Management issued $4 billion worth of debt in five series of senior notes in a public offering to finance the Company's acquisition of ADS.  All series received an investment grade rating.

33.    The Notes at issue in this action constituted four of the five series of senior notes, totaling $3 billion in principal.[5]  The Notes were all subject to a SMR clause requiring Waste Management to redeem the Notes for 101% of par, plus accrued and unpaid interest, in the event the merger was not completed by the End Date of July 14, 2020.  As Waste Management explained:

> [T]hese senior notes due 2024, 2026, 2029 and 2039 with an aggregate principal amount of $3.0 billion, include a special mandatory redemption feature.  This feature provides that if the acquisition of Advanced Disposal is not completed on or prior to July 14, 2020, or if, prior to such date, the Merger Agreement is terminated for any reason, we will be required to redeem all of such outstanding notes equal to 101% of the aggregate principal amounts of such notes, plus accrued but unpaid interest.

---

[5]    The Company also issued $1.0 billion principal amount of 4.15% notes due July 15, 2049 (the "4.15% Notes").  The 4.15% Notes were not subject to the SMR and were therefore expected to remain outstanding even if the Company did not complete the merger.

34.     The Notes subject to the SMR were issued as follows:

| Face Amount ($) | Interest Rate | Due Date | CUSIP |
|---|---|---|---|
| 750,000,000 | 2.95% | June 15, 2024 | 94106LBF5 |
| 750,000,000 | 3.20% | June 15, 2026 | 94106LBH1 |
| 1,000,000,000 | 3.45% | June 15, 2029 | 94106LBG3 |
| 500,000,000 | 4.00% | July 15, 2039 | 94106LBJ7 |

35.     In the Notes prospectus, WM represented that the "Merger will close by the first quarter of 2020."

### C.     Waste Management Fails to Obtain Antitrust Approval and Renegotiates the Deal in Secret

36.     On May 9, 2019, Waste Management and ADS filed their respective premerger notification and report with the DOJ and the U.S. Federal Trade Commission under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act").  The initial waiting period under the HSR Act expired on June 9, 2020.

37.     In order to provide the DOJ with additional time for review, Waste Management and ADS voluntarily withdrew the premerger notification and report on June 10, 2019 and then refiled the premerger notification and report on June 12, 2019.

38.     On July 12, 2019, Waste Management and ADS each received a second request for information and documentary materials from the DOJ in connection with the DOJ's review of the merger (the "Second Request").  The effect of the Second Request was to extend the waiting period imposed under the HSR Act until the 30th day after substantial compliance by Waste Management and ADS with the Second Request, unless the waiting period was terminated earlier by the DOJ.

39.     Throughout this period, and thereafter, Waste Management, ADS, and their respective antitrust counsel "had extensive discussions with the DOJ staff, either telephonically or in person, on a range of topics, including the merits of the transaction, the proposed synergies, potential

remedies, and divestitures, as well as each company's respective data systems, document collections, and document retention policies."  Waste Management and ADS also "provided data and documents on a continuous basis to the DOJ in response to the Second Request and various other requests from the DOJ staff."

40.    On October 25, 2019, Waste Management, ADS, and the DOJ entered into a timing agreement that provided for a minimum 70-day settlement period, during which the parties would attempt to reach an agreement on DOJ approval for the transaction.

41.    From October 2019 until February 2020, Waste Management and its representatives communicated with numerous potential buyers concerning the assets to be divested under the Merger Agreement and Antitrust Revenue Threshold.  By February 2020, however, it was clear that the DOJ was not satisfied with this divestiture framework and thus, starting in February 2020 and proceeding "[o]ver the course of the next several months," Waste Management worked to establish an alternative divestiture framework other than the proposed Antitrust Revenue Threshold.  As the ADS Proxy explains in detail:

> Between October 2019 and February 2020, Advanced Disposal, Waste Management and their respective advisors negotiated confidentiality agreements with potential divestiture buyers relating to the assets of Advanced Disposal and Waste Management to potentially be divested based on discussions with the DOJ.  Waste Management advised Advanced Disposal that it received inbound interest from more than 50 parties regarding interest in a potential acquisition of some or all of the assets to potentially be divested and conducted management presentations and business diligence with multiple selected parties.  Advanced Disposal and Waste Management also prepared drafts of purchase agreements and ancillary documents in anticipation of the divestiture process.
>
> ***Over the course of the next several months, Advanced Disposal, Waste Management and their respective antitrust counsel continued to respond to the DOJ staff, and Waste Management worked to establish a divestiture framework that it believed would potentially satisfy the DOJ staff's questions about the transaction.***  As in all mergers that require a remedy, the DOJ staff typically analyzes whether the proposed transaction will have anticompetitive effects in specific product and geographic markets in violation of Section 7 of the Clayton Act.  Once the DOJ staff determines that anticompetitive effects are likely, it will discuss

with the parties its findings. Typically, the parties then propose an acceptable remedy that will maintain or restore competition in the markets in which the DOJ has expressed competition concerns. In this case, Waste Management proposed the divestiture of certain landfills, transfer stations, other facilities and hauling routes of both Waste Management and Advanced Disposal as a cure to maintain or restore competition in certain areas. Pursuant to the terms of the original merger agreement, Waste Management was . . . required to sell or divest assets . . . if required in order to obtain antitrust approval, [but] was not, however, required to sell assets that would . . . result in a reduction of revenue . . . in excess of $200,000,000 (for any rolling 12-month period ending the last full month prior to any date between the date of the original merger agreement and the closing date) . . . (which we refer to as the "Antitrust Revenue Threshold").

42.     Waste Management's work with the DOJ on a new divestiture framework thus continued undisclosed for several months, during which the Company, in conjunction with its ongoing discussions with ADS's senior management, significantly reduced its outlook for the combined companies and the solid waste industry, "discuss[ing] the financial outlook of Advanced Disposal in light of COVID-19 (coronavirus) and the steps that Advanced Disposal implemented, or was planning to implement, to mitigate the impact."

43.     By late April, Waste Management requested updated financial data from ADS "to facilitate Waste Management's *continued consideration* of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ." As set forth in the ADS Proxy:

On April 29, 2020 and May 6, 2020, in response to a request made by Waste Management (and as further discussed between representatives of Centerview and representatives of UBS on May 4, 2020) pursuant to the original merger agreement and to facilitate Waste Management's continued consideration of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ, Advanced Disposal provided updated financial forecasts to Waste Management[.][6]

44.     On May 13, 2020, "after a series of general discussions with the board of directors of Waste Management," Defendant Fish called ADS's CEO, Richard Burke, to discuss reducing the merger consideration because the "DOJ indicated it was not likely to approve the merger prior to the

---

[6]     Centerview Partners LLC and UBS Securities LLC (previously defined as "UBS") acted as financial advisors for the transaction to Waste Management and ADS, respectively.

July 13 end date without divestitures in excess of the Antitrust Revenue Threshold." As set forth in the ADS Proxy:

> On May 13, 2020, Mr. Burke received a call from Mr. Fish, who stated that, in light of the impact of COVID-19 (coronavirus) on the solid waste industry generally and on Advanced Disposal and the fact the DOJ indicated it was not likely to approve the merger prior to the July 13 end date without divestitures in excess of the Antitrust Revenue Threshold, after a series of general discussions with the board of directors of Waste Management, Waste Management proposed a reduction in the original merger consideration to $28.00 per share in cash (which we refer to as the "May 13 proposal"). Mr. Fish also informed Advanced Disposal that they would engage actively with one of the divestiture bidders, GFL, on purchase agreement documentation, and discuss with the DOJ staff GFL's ability to purchase the divested assets being discussed.

45.    As described in the ADS Proxy, "following the initial indication by Waste Management that it was considering terminating the original merger agreement," Waste Management and ADS entered into "extensive negotiations" to reach a new merger consideration.

46.    On May 15, 2020, members of the board of directors evaluated Waste Management's May 13, 2020 proposal. As set forth in the ADS Proxy, the board of directors discussed "the likelihood of obtaining approval of the merger by stockholders of Advanced Disposal at a decreased merger consideration," and "the need to couple any potential decrease in the per share merger consideration with changes to an amended merger agreement."

47.    Several days later, on May 19, 2020, Defendants Fish and Morris called Mr. Burke together to discuss reducing the merger consideration because "the DOJ staff was requiring assets to be divested in order to grant approval of the merger that would result in a reduction of revenue in excess of the Antitrust Revenue Threshold." As set forth in the ADS Proxy:

> On May 19, 2020, Messrs. Fish and Morris telephoned Mr. Burke and other senior management of Advanced Disposal and reiterated Waste Management's desire to reduce the original merger consideration in light of the impact of COVID-19 (coronavirus) on the solid waste industry generally and on Advanced Disposal and the fact that the DOJ staff was requiring assets to be divested in order to grant approval of the merger that would result in a reduction of revenue in excess of the

- 15 -

Antitrust Revenue Threshold, such that Waste Management would not be obligated to close the merger.

48.     Thereafter, as set forth in the ADS Proxy, Waste Management and its representatives continued to renegotiate the terms of the acquisition with ADS, making no disclosure concerning the DOJ's rejection of the Antitrust Revenue Threshold, Waste Management's effort since February 2020 to obtain DOJ approval of an alternative divestiture framework, or the resultant renegotiation of the merger with ADS, until June 24, 2020 (the end of the Class Period), when the Company announced a revised merger requiring divestments well in excess of the Antitrust Revenue Threshold that would not be completed by the End Date.

### D.     Defendants' Materially False and Misleading Representations and Omissions

49.     In contrast to the foregoing undisclosed material facts, throughout the Class Period, Defendants materially misrepresented the status of the DOJ's antitrust review, repeatedly assuring investors that the DOJ's antitrust review was proceeding as anticipated and that Waste Management was therefore on track to complete the ADS acquisition by the End Date, even as Defendants renegotiated the transaction in secret.

50.     On February 13, 2020, Waste Management filed with the SEC the Company's annual report on Form 10-K for the year ended December 31, 2019 (the "Form 10-K"), which was signed by Defendants Fish, Rankin, and Nagy.  Defendants Fish and Rankin also provided signed certifications attesting to the Form 10-K's accuracy and completeness.

51.     The Form 10-K described Waste Management's pending acquisition of ADS and stated that the Company anticipated it would obtain antitrust regulatory approval by the end of March 2020 and close the ADS transaction soon thereafter.

52.     The Form 10-K stated in relevant part:

On April 14, 2019, we entered into an Agreement and Plan of Merger (the "Merger Agreement") to acquire all outstanding shares of Advanced Disposal for $33.15 per

share in cash, representing a total enterprise value of $4.9 billion when including approximately $1.9 billion of Advanced Disposal's net debt. Advanced Disposal's solid waste network includes 95 collection operations, 73 transfer stations, 41 owned or operated landfills and 22 owned or operated recycling facilities. On June 28, 2019, Advanced Disposal announced that 85.9% of the outstanding shares of its common stock entitled to vote were voted in favor of the proposal to adopt the Merger Agreement at a special meeting of stockholders held that day. ***We anticipate that we will obtain antitrust regulatory approval by the end of March 2020 and close the Advanced Disposal transaction soon thereafter***.

53.    This statement was materially false and misleading. By February 2020, Waste Management knew that the $200 million Antitrust Revenue Threshold did not satisfy the DOJ's concerns regarding the ADS acquisition and that, as a result, Waste Management had already begun work to establish a divestiture framework as an alternative to the Antitrust Revenue Threshold in an effort to obtain antitrust approval from the DOJ. Contrary to these material facts, Defendants falsely reassured investors that the DOJ's review was proceeding as anticipated and that the ADS transaction would timely close without disclosing that the Company was at that time working with the DOJ on an alternative divestiture framework to the Antitrust Revenue Threshold.

54.    The Form 10-K also provided a description of the Notes and the Company's obligation to redeem the Notes at 101% of par if it did not complete the acquisition by the End Date. Specifically, the Form 10-K stated:

The newly-issued senior notes due 2024, 2026, 2029 and 2039 include a special mandatory redemption feature, which provides that if the acquisition of Advanced Disposal is not completed on or prior to July 14, 2020, or if, prior to such date, the Merger Agreement is terminated for any reason, we will be required to redeem all of such outstanding notes equal to 101% of the aggregate principal amounts of such notes, plus accrued but unpaid interest.

55.    This description of the Notes and SMR was materially misleading because it omitted then-existing material facts concerning the SMR and the increasing likelihood that it would be triggered by a failure to complete the ADS acquisition by the End Date. To disclose in general terms contingencies regarding "if the acquisition of Advanced Disposal is not completed on or prior to" the

End Date or "if, prior to such [End Date], the Merger Agreement is terminated for any reason," without disclosing the DOJ's rejection of the Antitrust Revenue Threshold or the Company's ongoing effort to obtain DOJ approval of an alternative divestiture framework, was materially misleading to any reasonable investor.

56.    The Form 10-K likewise included materially misleading risk disclosures describing in general terms potential risks concerning the planned acquisition of ADS without disclosing material facts already in existence that greatly exacerbated those risks.  Specifically, the Form 10-K stated in relevant part:

> The planned acquisition of Advanced Disposal is subject to a number of risks and uncertainties, including general economic and capital markets conditions; the effects that the pending merger may have on us, Advanced Disposal and our respective businesses; inability to obtain required regulatory or government approvals or to obtain such approvals on satisfactory conditions; inability of Advanced Disposal to satisfy other closing conditions; the occurrence of any event, change or other circumstance that could give rise to the termination of the Agreement and Plan of Merger, several of which could require us to pay a termination fee of $150 million to Advanced Disposal; legal proceedings that may be instituted related to the proposed acquisition and the legal expenses and diversion of management's attention that may be associated therewith; and unexpected costs, charges or expenses.  If the planned acquisition of Advanced Disposal is not completed, if there are significant delays in completing the planned acquisition or if the planned acquisition involves an unexpected amount of required divestitures, it could negatively affect the trading price of our common stock and our future business and financial results.

> Additionally, in May 2019, we issued senior notes with an aggregate principal amount of $3 billion that include a special mandatory redemption feature. This feature provides that if the acquisition of Advanced Disposal is not completed on or prior to July 14, 2020, or if, prior to such date, the Agreement and Plan of Merger is terminated for any reason, we will be required to redeem all of such outstanding notes equal to 101% of the aggregate principal amounts of such notes, plus accrued but unpaid interest.

57.    These risk disclosures were materially misleading.  It was materially misleading to discuss in general the potential risk of an "inability to obtain required regulatory or government approvals" without disclosing that the DOJ had already objected to a divestiture framework based on the Antitrust Revenue Threshold and that the Company was then engaged in an ongoing effort to

obtain DOJ approval for an alternative divestiture framework.  It was materially misleading to discuss in general the potential risk of events that "could give rise to the termination of the [Merger Agreement,] which could require us to pay a termination fee of $150 million to Advanced Disposal" without disclosing that the alternative divestiture framework already under negotiation with the DOJ exceeded the Antitrust Revenue Threshold, which would give Waste Management the right to terminate the transaction.  It was materially misleading to discuss in general terms risks concerning "[i]f the planned acquisition of Advanced Disposal is not completed, if there are significant delays in completing the planned acquisition or if the planned acquisition involves an unexpected amount of required divestitures," without disclosing the true then-existing facts regarding the DOJ's antitrust review, its requirement of divestitures over the Antitrust Revenue Threshold, and the likely resultant delays in completing the transaction.  It was materially misleading to discuss in general terms the risk of the SMR being triggered "if the acquisition of Advanced Disposal is not completed on or prior to [the End Date], or if, prior to such date, the [Merger Agreement] is terminated for any reason" without disclosing the DOJ's rejection of the Antitrust Revenue Threshold or the Company's ongoing effort to obtain DOJ approval of an alternative divestiture framework, which substantially raised the chances of missing the End Date and triggering the SMR, as ultimately occurred.

58.    On February 13, 2020, the same day the Form 10-K was issued, Waste Management held its Q4 2019 earnings call with analysts and investors hosted by Defendants Fish, Morris, and Rankin.  During the call Defendant Fish spoke encouragingly about nearing the close of the transaction and continued to assure investors that the DOJ's antitrust review was proceeding as planned and that Waste Management was therefore on track to complete the ADS acquisition by the End Date.  "We are excited as we near the close of this transaction," said Defendant Fish, assuring investors that "[w]e anticipate that we will obtain antitrust regulatory approval by the end of March

and close soon thereafter."  "[T]he integration team has been working hard preparing for this close," Defendant Fish continued, "and the team is positioned to move quickly to integrate ADS operations and to achieve our targeted synergies."

59.     Later during the call, Defendant Morris likewise stated:  "[W]e are approaching the close of the transaction and the start of the integration."

60.     One analyst on the conference call asked for some "updated color on the ADS transaction," noting that the ADS transaction seems to be taking "a little bit longer."  In response Defendant Morris stated: "[A]s Jim [Fish] mentioned in his prepared comments, we're on a trajectory, we think, to get clearance from DOJ right towards the end of the quarter.  And obviously, we're going to move to close quickly after that."

61.     The foregoing statements by Defendants Fish and Morris during the Q4 2019 earnings call were materially false and misleading, advising the market untruthfully that antitrust approval was expected by the End Date and that completion of the transaction was near, with no disclosure concerning the DOJ's objections to the Antitrust Revenue Threshold or the Company's ongoing work to obtain DOJ approval for a new divestiture framework.

62.     Based upon Defendants' repeated assurances, industry analysts and commentators understood Defendants' statements to signify that there were no current impediments to delay the completion of the ADS acquisition beyond the End Date.  RBC Capital Markets' analyst "came away increasingly confident with WM's progress surrounding the closing of the pending ADSW acquisition," and reported that "[m]anagement provided largely upbeat commentary on progress surrounding the pending acquisition of Advanced Disposal, noting that they expect DOJ clearance by the end of March with anticipated closing shortly thereafter."  Similarly, Oppenheimer & Co. Inc. reported that "WM sees DOJ approval by March end, closing shortly thereafter. Market appetite for

divestitures appears robust, and sales are expected to be completed quickly."  On February 21, 2020, *WasteDive*, a leading waste industry publication, also reported "per recent comments from Waste Management executives," that the regulators "could approve the deal by late March [2020]."

63.    Then, on March 18, 2020, WM filed a current report on Form 8-K to "update [its] prior timing expectations," announcing that "the Company now anticipates closing the Merger mid to late second quarter 2020."  The Form 8-K stated:

> As a result of, and subject to any further effects from, the COVID-19 (coronavirus) outbreak, and subject to obtaining final regulatory approval from the DOJ (which the Company currently anticipates receiving in the second quarter of 2020), the Company now anticipates closing the Merger mid to late second quarter 2020.

64.    Defendants' March 18, 2020 Form 8-K continued to mislead investors, advising the market that despite a modest delay, the Company was still on track to receive antitrust approval by the End Date, with no disclosure concerning the DOJ's objections to the Antitrust Revenue Threshold or the Company's ongoing work to obtain DOJ approval for a new divestiture framework  Nor did they disclose the Company's intent to renegotiate the merger price in light of ADS's declining prospects.  This statement also materially misrepresented the cause of the delay by pointing solely to processing delays resulting from the Covid-19 pandemic, while concealing and failing to disclose the substantive issues relating to obtaining DOJ approval that caused the Company to develop an alternative divestiture framework.

65.    On March 18, 2020, a Company spokesperson, Janette Micelli, also told *WasteDive* that "we continue to work with the Department of Justice and expect to close within the original 12 to 15-month timeline as we originally guided."  Ms. Micelli assured the market that "[e]verything is progressing as expected."  This assurance was likewise materially misleading, affirming that the Company expected to complete the ADS acquisition by the End Date while failing to disclose material facts to the contrary.

66.    As a result of the Company's March 18, 2020 disclosures, the prices of the Notes fell significantly.  For example, the 3.45% Notes fell from 104% on March 17, 2020 to just 98% of par on March 18, 2020.  Nevertheless, the Company's false reassurances continued to mislead investors, reaffirming the Company's guidance regarding the regulatory approval process and expected time to complete the ADS acquisition, while failing to disclose the true facts of the DOJ's antitrust review or the delays that process necessitated.  As a result, the prices of the Notes continued to trade at artificially inflated levels.

67.    On May 6, 2020, Waste Management filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2020 (the "Form 10-Q"), which was signed by Defendants Rankin and Nagy.  Defendants Fish and Rankin also provided signed certifications attesting to the Form 10-Q's accuracy and completeness.

68.    The Form 10-Q assured investors that WM "anticipate[d] being in a position to receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020."  As the Form 10-Q stated:

> On April 14, 2019, we entered into an Agreement and Plan of Merger to acquire all outstanding shares of Advanced Disposal for $33.15 per share in cash, representing a total enterprise value of $4.9 billion when including approximately $1.9 billion of Advanced Disposal's net debt.  Advanced Disposal's solid waste network includes 95 collection operations, 73 transfer stations, 41 owned or operated landfills and 22 owned or operated recycling facilities.  On June 28, 2019, Advanced Disposal announced that 85.9% of the outstanding shares of its common stock entitled to vote were voted in favor of the proposal to adopt the Merger Agreement at a special meeting of stockholders held that day.  Despite the general business disruption caused by COVID-19, *we continue to make progress and currently anticipate being in a position to receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020*.

69.    This statement was materially false and misleading.  As investors would later learn, by this time, Waste Management had been working on an alternative divestiture framework instead of the Antitrust Threshold for months and was already renegotiating the deal and requesting updated

financial information from ADS as part of the Company's "continued consideration of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ." Defendants made no disclosure of these material facts, instead falsely and misleadingly assuring investors that the DOJ's antitrust review remained on track and the transaction was therefore expected to close by the End Date.

70.      The Form 10-Q also provided a description of the Notes and in general terms described the SMR and the Company's obligation to redeem the Notes at 101% of par if it did not complete the acquisition by the End Date, while omitting to disclose the Company's ongoing "continued consideration of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ." As the Form 10-Q stated:

> Certain of these senior notes due 2024, 2026, 2029 and 2039 with an aggregate principal amount of $3.0 billion, include a special mandatory redemption feature. This feature provides that if the acquisition of Advanced Disposal is not completed on or prior to July 14, 2020, or if, prior to such date, the Merger Agreement is terminated for any reason, we will be required to redeem all of such outstanding notes equal to 101% of the aggregate principal amounts of such notes, plus accrued but unpaid interest.

71.      The Form 10-Q also referred investors to the risk disclosures in the Form 10-K, which were materially false and misleading as described *supra*.

72.      On May 6, 2020, Waste Management also held a conference call hosted by Defendants Fish, Morris, and Rankin. During the call, Defendant Fish stated: "We're looking forward to completing this transaction, integrating the ADS team and operations and creating a long-term value for our shareholders." In response to a question by an Oppenheimer & Co. Inc. analyst regarding whether he expected the merger to close "by the end of the second quarter or subsequent to that," Defendant Fish responded:

> ***I just said we anticipate being in a position to close by the end of the second quarter.*** . . . [W]hen we first announced this deal . . . it was like the middle of April 19 or something else . . . we thought, between 12 and 15 months to close. We're at

13.5 or we will be, next week, so – or 12.5. So we're within that window in terms of this being in anticipation or anticipating being in a position to close, ***so we're not worried about that***.

73.     Defendant Fish's foregoing statements at the May 6, 2020 conference call were materially false and misleading. By this time, Waste Management had been working with the DOJ on an alternative divestiture framework instead of the Antitrust Threshold for months and had already requested updated financial information from ADS to renegotiate the transaction as part of the Company's "continued consideration of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ." Defendant Fish made no disclosure of these material facts, and instead falsely and misleadingly told the market that Defendants expected to close on schedule by the End Date and were "not worried about that."

74.     In accordance with these assurances, industry analysts and commentators understood that Waste Management was on track to complete the ADS acquisition by the End Date. For example, an analyst at UBS reported that "[m]anagement continues to expect regulatory approval for the ADSW merger by the end of 2Q20 and to move towards close thereafter." Another analyst at BMO Capital Markets reported that "[d]espite the business disruption caused by COVID-19, Management stated they are in a position to receive final antitrust regulatory approval, closing the deal by the end of 2Q20."

75.     On May 22, 2020, Waste Management represented in a 30-page Investor Presentation that we "continue to work with the DOJ and are making progress toward receiving the final antitrust regulatory approval required for closing." Defendants Fish and Morris had both just days earlier called ADS's CEO to discuss renegotiating the transaction because "the DOJ indicated it was not likely to approve the merger prior to the July 13 end date without divestitures in excess of the Antitrust Revenue Threshold" and because "the DOJ staff was requiring assets to be divested in order to grant approval of the merger that would result in a reduction of revenue in excess of the

Antitrust Revenue Threshold." Defendants made no disclosure concerning these material facts even as they touted their "progress" with the DOJ towards closing.

76.    On June 10, 2020, Defendant Rankin presented on behalf of Waste Management at the Stifel 2020 Cross Sector Insight Conference. At the conference, the moderator, Stifel's Head of Industrial Research, asked Defendant Rankin about the Advanced Disposal deal structure: "I mean correct me – if I got the right numbers. Divestment of – sales of assets – revenues of assets sold greater than $200 million, that is a point in which you could revisit with Advanced Disposal and either change the terms or walk away from the deal. That's correct?" In response, Defendant Rankin stated: "That's correct. The $200 million reference point on divestitures is correct[.]"

77.    The moderator then asked Defendant Rankin whether the "deal naturally terminates" if DOJ approval were not obtained by July 13. In response, Rankin referenced the Merger Agreement and reaffirmed the Company's prior guidance, stating: "[W]hat I would say is reminding everyone that what we've mentioned before is the Waste Management team works closely with the DOJ to continue to move the transaction forward, and the statement that we made about expected timing [*i.e.*, end of Q2 2020] is the best that I have at this time."

78.    Defendant Rankin's June 10, 2020 statements were materially false and misleading. Defendant Rankin affirmed that the "$200 million reference point on divestitures is correct" without informing investors that, by this time, Defendants were well aware that the DOJ was requiring divestments in excess of that $200 million Antitrust Revenue Threshold. Defendant Rankin's reaffirmation that the ADS acquisition was expected to close by the End Date was likewise materially false and misleading, because by this time Defendants were already well into the process of renegotiating the ADS transaction to satisfy the DOJ's antitrust concerns and knew the transaction would not be completed by the End Date.

- 25 -

E.    **The Announcement of the Revised Merger Causes the Notes to Decline in Price**

79.    On June 24, 2020, just two weeks after CFO Rankin reassured investors that the Merger was expected to close by the end of the second quarter, Waste Management stunned the market by announcing a revised agreement to acquire ADS for $4.6 billion, or $30.30 per share, and that as a result, the "outstanding senior notes issued in May 2019 with a special mandatory redemption feature will be redeemed pursuant to their terms" – *i.e.*, the Company would trigger the SMR requiring a mandatory redemption at 101% of par.

80.    Among other things, the revised merger agreement eliminated the $200 million Antitrust Revenue Threshold and reduced the purchase price of ADS by approximately $300 million.

81.    The Form 8-K in which Waste Management announced a revised deal with ADS stated:

*Amendment to Merger Agreement*

On June 24, 2020, Waste Management, Inc., a Delaware corporation (the "Company"), entered into Amendment No. 1 (the "Amendment") to the Agreement and Plan of Merger, dated as of April 14, 2019 . . . previously announced on April 15, 2019.

\*        \*        \*

Under the terms of the Amended Merger Agreement, the Company, Advanced Disposal and Merger Sub have agreed to reduce the merger consideration to be paid by the Company for each share of Advanced Disposal common stock, par value $0.01 per share ("Advanced Disposal Common stock"), such that each share of Advanced Disposal Common Stock issued and outstanding immediately prior to the effective time of the Merger . . . will be converted into the right to receive $30.30 per share in cash, without interest.

Under the Amended Merger Agreement, the Company has agreed, among other things, to: (i) use best efforts to obtain approval under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") and remove the limitations set forth in the Merger Agreement on the Company's obligation to divest or sell assets and take other actions in connection with using its best efforts to obtain antitrust approval; [and] increase the termination fee from $150,000,000 to $250,000,000, which the Company will be required to pay to Advanced Disposal

under certain circumstances specified in the Amended Merger Agreement if the Amended Merger Agreement is terminated because . . . the Transactions have not been consummated by the End Date (as defined below).

The Amendment also changes the date after which the Company and Advanced Disposal will have a mutual right to terminate the Merger Agreement from July 13, 2020 to September 30, 2020 (the "End Date"), which date will automatically extend to November 30, 2020 [under] Specified Conditions[.]

82.    The same day, WM and ADS issued a joint press release (the "June 24 Release") announcing that they had entered into a "Definitive Agreement to sell to GFL Environmental Substantially All Anticipated Divestitures."  The June 24 Release specified that the agreement entered into was for GFL "to acquire a combination of Advanced Disposal and Waste Management assets for $835 million, representing approximately $345 million in total revenue based on 2019 results," which was a divestment far in excess of the Antitrust Revenue Threshold.  The June 24 Release admitted further that, "[a]pproximately $300 million of the total [$345 million in] revenue [wa]s related to assets and businesses . . . sold to GFL . . . to address substantially all of the divestitures expected to be required by the U.S. Department of Justice."

83.    Further, the June 24 Release represented that the Company was "on track to receive final regulatory approval in a timeframe that is complementary to the expected completion of the Advanced Disposal shareholder vote by the end of the third quarter of 2020," and that "[a]s a result of the updated transaction timing, Waste Management expects that its outstanding senior notes issued in May 2019 with a special mandatory redemption feature will be redeemed pursuant to their terms."  Waste Management clarified, however, that "[t]his press release does not constitute a notice of redemption under the indenture governing such senior notes."

84.    On this news, the market realized that the Notes were no longer a premium investment and Notes prices dropped to approximately 103 cents on the dollar in anticipation that they would likely be redeemed.

85.     By letter dated June 29, 2020, the Credit Roundtable, a group of unaffiliated institutional fixed income investors and managers with $3.8 trillion in assets under their supervision, stated in no uncertain terms that the Revised Merger and resulting delay that triggered the SMR "came as a surprise to many bond investors, who have noted that on WM's first quarter earnings call on May 6th and as late as June 10th, your public statements were that the transaction was 'still on track to close by the end of the quarter.'"  The Credit Roundtable stated that Waste Management's actions were "inconsistent with [its] recent guidance" and "caused the price of these Notes to decline sharply."

86.     The Credit Roundtable "strongly recommend[ed] that WM attempt to pursue alternative courses before redeeming these bonds if the [ADS] acquisition is still pending.  Two potential alternative courses are a consent solicitation to modify the expiration of the SMR to move in lock step with dates in the amended ADSW merger agreement or an exchange offer to accomplish a similar outcome."  The Credit Roundtable further represented that "CRT members and institutions friendly to CRT are in a position to act quickly and efficiently to accomplish such a change prior to July 14, 2020."

87.     On July 8, 2020, Waste Management publicly responded to the Credit Roundtable, stating via email to Bloomberg News that "upon conferring internally and with our counsel, we expect to proceed with the planned Redemption of the SMR notes, which is clearly and fully in compliance with the terms of the Notes."

88.     On this news, the prices of the Notes continued to slide toward the 101% of par SMR price.  The market pricing of the Notes during the Class Period in response to Defendants' disclosures is illustrated in the graph below:



89.    On July 20, 2020, Waste Management redeemed the Notes at 101% of par pursuant to

the SMR.

90.    On October 23, 2020, the DOJ (along with five state Attorneys General) filed a civil

antitrust complaint in the U.S. District Court for the District of Columbia concerning the merger (the

"DOJ Complaint").[7]   The DOJ Complaint alleged that the merger presented "the most significant

consolidation in the waste industry in over a decade and would eliminate critical competition in over

50 local markets in ten states in the eastern half of the United States."   At the same time, the DOJ

filed a proposed settlement that would resolve the competitive harm alleged in the DOJ Complaint

(the "Proposed Settlement").   In pertinent part, the terms of the Proposed Settlement required Waste

---

[7]     *See United States of America, et al. v. Waste Management, Inc., et al.*, No. 1:20-cv-03063
(D.D.C. Oct. 23, 2020).

Management and ADS to divest assets covering over 50 local markets including landfills, transfer stations, hauling locations, and waste collection routes to GFL, or to an alternate acquirer approved by the DOJ. The District Court granted final approval to the Proposed Settlement on May 3, 2021.

## DEFENDANTS ACTED WITH SCIENTER

91.    As alleged herein, the facts detailed in the ADS Proxy establish Defendants' scienter at all relevant times during the Class Period.

92.    The ADS Proxy shows that, by February 2020, Defendants knew (or recklessly disregarded) that the DOJ was not satisfied with the Company's previously proposed divestiture framework – including the $200 million Antitrust Revenue Threshold – and that, as a result, the Company had by that time already begun "work[] to establish a divestiture framework that it believed would potentially satisfy the DOJ staff's questions about the transaction" – *i.e.*, a divestiture framework requiring divestitures in excess of the Antitrust Revenue Threshold. The ADS Proxy demonstrates further that this work continued "[o]ver the course of next several months" and that, by late April 2020, Waste Management had already begun renegotiating the transaction, requesting updated financial projections from ADS "to facilitate Waste Management's continued consideration of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ."

93.    The ADS Proxy establishes further that on May 13, 2020, "after a series of general discussions with the board of directors of Waste Management" had already taken place, Defendant Fish called ADS's CEO to propose a reduction in merger consideration in light of "the fact that the DOJ indicated it was not likely to approve the merger prior to the July 13 end date without divestitures in excess of the Antitrust Revenue Threshold." The ADS Proxy likewise establishes that, on May 19, 2020, Defendants Fish and Morris jointly called ADS's CEO to "reiterate[] Waste Management's desire to reduce the original merger consideration" because of "the fact that the DOJ staff was requiring assets to be divested in order to grant approval of the merger that would result in

a reduction of revenue in excess of the Antitrust Revenue Threshold[.]" The ADS Proxy shows that, thereafter, Defendants and their representatives continued to actively renegotiate the terms of the ADS acquisition with no disclosure until the end of the Class Period on June 24, 2020.

94.    The ADS Proxy thus demonstrates Defendants' knowledge (or reckless disregard) throughout the Class Period of material undisclosed facts contrary to Defendants' Class Period misrepresentations concerning the status of the DOJ's antitrust review and the Company's supposed ability to complete the ADS acquisition by the End Date.

95.    In addition to the ADS Proxy, the Company's June 24, 2020 announcement of the sale to GFL of over $835 million in assets from the combined companies to satisfy the DOJ's antitrust concerns further demonstrates Defendants' scienter during the Class Period. On June 24, 2020, the Company disclosed a fully executed definitive agreement for the sale to GFL of a portfolio of waste collection, transfer, recycling, and disposal assets, including 36 transfer stations, 18 landfills, 380 collection vehicles, and approximately 900 employees, all spread through 10 states in the U.S. A transaction involving the sale of $835 million in physical assets across multiple jurisdictions necessitates months of negotiation, due diligence, and comprehensive planning, strongly supporting that Defendants knew the DOJ required divestitures exceeding the Antitrust Revenue Threshold months before the June 24, 2020 announcement. Furthermore, the Company revealed that the deal was now not expected to close until "the end of the third quarter of 2020" – *six months later* than represented at the start of the Class Period.

96.    GFL's own disclosures likewise show that the transaction announced on June 24, 2020 was planned for months. During a June 25, 2020 conference call about the transaction, GFL's CEO, Patrick Dovigi, stated that "from an integration standpoint . . . all of the planning and preplanning has been sort of done over the previous sort of 3 months" – *i.e.*, since at least March

2020.  If Waste Management was working with GFL on the integration of an $835 million asset divestiture since March, Waste Management was necessarily negotiating and planning that asset sale, far in excess of the Antitrust Revenue Threshold, since well before.  Notably, GFL's CFO, Luke Pelosi, emphasized Waste Management's significant contribution to the integration planning during this period:  "I'd just say, to echo some of the things that Patrick said on integration, near and dear to my heart, our team has been deep in the weeds in relation to that.  I tip my hat to the Waste Management-ADS folks who have been very prepared and very helpful in ensuring that collectively, we get to a place where there's a smooth transition."  Mr. Pelosi explained further that "[f]rom an integration perspective, I do just want everyone to appreciate the sort of nuance of having not only are we preparing to integrate them on our side, but we also have, again, these great teams at ADS and WM that are equally preparing to divest of the stuff."  If Waste Management teams had been "preparing to divest of the stuff" for at least "the previous . . . 3 months" before the June 24, 2020 announcement, it is clear that Defendants were aware the DOJ was requiring them to "divest of the stuff" for at least as long.

97.    The significant disparity between the $200 million Antitrust Revenue Threshold and the more than $300 million in revenue divestments that the DOJ required to clear the merger is a further indication of scienter.  The huge gulf between the DOJ's actual requirements and the Antitrust Revenue Threshold shows – consistent with the ADS Proxy – that Defendants knew throughout the Class Period that their proposed $200 million divestiture framework was woefully inadequate.  Furthermore, the DOJ required Waste Management to have "up front" buyers for the required divestitures.  As explained in *Bloomberg*, "typically the DOJ doesn't require 'upfront buyers' to be 'in hand' for the waste industry, but it's requiring them in this deal" – underscoring the gravity of the DOJ's antitrust concerns with the merger and strengthening further the inference that

Defendants knew that their divestiture framework built around the $200 million Antitrust Revenue Threshold was inadequate.

98.    Defendants also had a significant financial motive to renegotiate the merger to reduce the acquisition price and trigger the SMR because doing so allowed Waste Management to save hundreds of millions of dollars.  The revised merger lowered the purchase price from $33.15 to $30.30 per share, reducing Waste Management's total acquisition cost by $300 million.  Moreover, triggering the SMR allowed Waste Management to replace the Notes with new debt at a substantially lower cost.  As *Bloomberg* explained in an article entitled "Waste Management Scores Cheap Debt Months After Burning Traders," "after a shock debt redemption angered [Notes] investors, the company was able to return to the bond market and score some of its cheapest borrowing costs ever."  As the article explained:

> [Waste Management] originally sold $3 billion of bonds last year to finance the purchase [of ADS], but when the deal was delayed, it took advantage of so-called special mandatory redemption language to call the debt, a move market watchers say was made to cut borrowing costs after rates plunged at the onset of the pandemic.

> The maneuver trigged widespread losses for investors who'd purchased the notes well above their call price, including one notable holder – the Federal Reserve. [The] offering, which doesn't include SMR provisions, will let Waste Management borrow for 30 years at a spread of 100 basis points over Treasuries.  Last May, it paid 130 basis points.

As shown below, by triggering the SMR and subsequently replacing the Notes with cheaper debt, Waste Management was able to lock in significantly cheaper interest costs, implying tens of millions in annual savings as a result of "burn[ing] investors four months ago in [its] $3 billion redemption":

| | 2019 Notes | | | Replacement Notes | |
|---|---|---|---|---|---|
| **Amount ($$) Interest Maturity** | | | **Amount ($$) Interest Maturity** | | |
| 750,000,000 | 2.95% | 2024 | 500,000,000 | 0.75% | 2025 |
| 750,000,000 | 3.20% | 2026 | 500,000,000 | 1.15% | 2028 |
| 1,000,000,000 | 3.45% | 2029 | 1,000,000,000 | 1.50% | 2031 |
| 500,000,000 | 4.00% | 2039 | 500,000,000 | 2.50% | 2039 |

99.     The inference of scienter is strengthened further because, during the Class Period, the Individual Defendants (along with another senior executive) sold over $25 million worth of Company common stock while in possession of the numerous material and undisclosed facts alleged herein concerning the true status of the DOJ's antitrust review and the time for completion of the ADS merger:

**Insider Stock Sales Between February 13, 2020 and March 4, 2020**

| Insider | Date | Price | Number of Shares | Proceeds |
|---|---|---|---|---|
| James C. Fish | 2/14/20 | $125.09 | 1,217 | $152,237 |
| Fish | 2/18/20 | $125.79 | 67,425 | $8,481,330 |
| Fish | 3/4/20 | $118.4 | 50,320 | $5,957,828 |
| **Fish Totals:** | | | **118,962** | **$14,591,395** |
| Devina A. Rankin | 2/14/20 | $125.10 | 1,216 | $152,123 |
| Rankin | 2/25/20 | $125.14 | 8,000 | $1,001,125 |
| **Rankin Totals:** | | | **9,216** | **$1,153,248** |
| John J. Morris | 2/14/20 | $125.12 | 1,216 | $152,149 |
| Morris | 2/18/20 | $125.62 | 13,535 | $1,700,275 |
| Morris | 3/2/20 | $112.30 | 16,100 | $1,808,099 |
| Morris | 3/2/20 | $113.21 | 3,330 | $377,006 |
| **Morris Totals:** | | | **34,181** | **$4,037,529** |
| Leslie K. Nagy | 2/21/20 | $124.66 | 145 | $18,076 |
| Nagy | 2/21/20 | $124.71 | 1,312 | $163,625 |
| Nagy | 2/25/20 | $122.69 | 840 | $103,063 |
| Nagy | 2/25/20 | $122.77 | 50 | $6,138 |
| **Nagy Totals:** | | | **2,347** | **$290,902** |
| Steve Batchelor (SVP, Operations) | 2/13/20 | $124.96 | 530 | $66,226 |
| Batchelor | 2/20/20 | $123.71 | 41,463 | $5,129,396 |
| Batchelor | 3/2/20 | $113.23 | 88 | $9,964 |
| **Batchelor Totals:** | | | **42,081** | **$5,205,586** |
| **Insider Totals:** | | | **206,787** | **$25,278,660** |

100.    Notably, the Company's February 13, 2020 Form 10-K stated that "[i]f the planned acquisition of Advanced Disposal is not completed, if there are significant delays in completing the planned acquisition or if the planned acquisition involves an unexpected amount of required divestitures, it could negatively affect the trading price of our common stock and our future business and financial results."  By selling Company common stock while in possession of material non-public information indicating that such delays were likely, the Individual Defendants attempted to avoid any such losses.

101.    Finally, the Individual Defendants, because of their positions as senior executives with Waste Management, were aware of and had access to material facts alleged herein, and made and/or controlled the contents of the Company's public statements during the Class Period.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading.  As a result, each of these Defendants is responsible for the accuracy of the Company's statements alleged herein to be actionable that they made or controlled, and is therefore responsible and liable for the representations contained therein.

## DUTY TO DISCLOSE

102.    SEC Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. §240.10b-5.  As set forth herein, Defendants made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

103.    Further, Item 303(a)(3) of Regulation S-K requires that a company's periodic filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

104.    Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

105.    Defendants violated the affirmative disclosure duties imposed by Item 303 of Regulation S-K by failing to disclose in the Company's 2019 Form 10-K, and the Company's first quarter 2020 Form 10-Q, among other things, that the $200 million Antitrust Revenue Threshold did not satisfy the DOJ's antitrust concerns regarding the ADS acquisition and that, as a result, by February 2020 Waste Management had already begun "work[] to establish a divestiture framework that it believed would potentially satisfy the DOJ staff's questions about the transaction," involving a material disposition of revenue producing assets.  Nor did the Company disclose that, by the May 6, 2020 issuance of the first quarter 2020 Form 10-Q, it was already engaged in "continued consideration of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ."

106.    The undisclosed material facts described herein were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and/or (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

107.    In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), requires, in the "Risk Factors" section of certain of Waste Management's SEC filings, including quarterly and annual reports, that "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."  Defendants violated the affirmative disclosure duties under Item 105 by issuing materially misleading risk disclosures in the Company's 2019 Form 10-K and the Company's first quarter 2020 Form 10-Q, as alleged herein.

## LOSS CAUSATION

108.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of the Notes and operated as a fraud or deceit on Class Period purchasers of the Notes by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of the Notes declined significantly as the prior artificial inflation came out of the market prices for the Notes.

109.    As a result of their purchases of the Notes during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

Defendants' false and misleading statements had the intended effect and caused the Notes to trade at artificially inflated levels throughout the Class Period, including, at times, more than 120% of par.

110.    On March 18, 2020, Defendants acknowledged that their prior statements about obtaining antitrust approval and closing the merger by the end of the March 2020 quarter were materially false and misleading, causing the prices of the Notes to decline significantly.  These prices soon rebounded based upon Defendants' assurances that DOJ approval and the merger closing would be completed by the End Date.  On June 24, 2020, WM announced the revised merger terms and that the merger's closing would be delayed past the End Date, causing the prices of the Notes to decline significantly.

111.    The decline in the prices of the Notes after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in the Notes negates any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

112.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of the Notes and the subsequent significant declines in the value of the Notes when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE ESTABLISHED BY THE FRAUD ON THE MARKET DOCTRINE

113.    The market for the Notes was open, well-developed, and efficient at all relevant times for the following reasons, among others:

(a)      the $3 billion worth of Notes were issued in a public offering conducted by WM;

(b)      the Notes were liquid and traded with significant volume during the Class Period;

(c)      as a regulated issuer, WM filed periodic public reports with the SEC;

(d)      WM regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)      WM was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

114.    As a result of the foregoing, the market for the Notes promptly digested current information from all publicly available sources and reflected such information in the prices of the Notes.  Under these circumstances, all purchasers of the Notes during the Class Period suffered similar injury through their purchases of the Notes at artificially inflated prices and a presumption of reliance applies.

115.    Accordingly, Lead Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.  In the alternative, Lead Plaintiff and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above.  Because this action involves Defendants' failure to disclose material adverse information regarding the

Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

116.    The statutory safe harbor provided for forward-looking statements does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, WM and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of WM who knew that those statements were false and misleading when made.

## CLASS ACTION ALLEGATIONS

117.    Lead Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on its own behalf and as representative of a Class consisting of all purchasers of the Notes during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

118.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.  Throughout the Class Period, the Notes were actively traded on bond markets.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, $3 billion worth of the Notes had been issued and was outstanding during the Class Period, and Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be readily identifiable from information and records in the possession of WM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  In addition, the identities of members of the Class are ascertainable through information collected by third parties, including data supplied by broker-dealers to FINRA's Trade Reporting and Compliance Engine ("TRACE") and available through Bloomberg's Trade History Function.

119.    Lead Plaintiff's claims are typical of the claims of the other members of the Class. Lead Plaintiff and members of the Class sustained damages from the same wrongful conduct of Defendants, including the same misstatements and omissions of material fact made during the Class Period.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

120.    Lead Plaintiff will fairly and adequately protect and represent the interests of members of the Class.  Lead Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members.  Lead Plaintiff has retained counsel

competent and experienced in class action litigation, including class actions in the financial services industry.

121.    Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class.  These common questions of law include, without limitation:

        (a)    whether the 1934 Act was violated by Defendants and the Company's acts as alleged herein;

        (b)    whether Defendants' statements during the Class Period were materially false and misleading;

        (c)    whether WM and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements; and

        (d)    whether Lead Plaintiff and Class members have sustained damages and the proper measure of damages.

122.    A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

123.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of

inconsistent or varying adjudications establishing incompatible standards of conduct for WM and the Individual Defendants.

124.    Lead Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

125.    Lead Plaintiff incorporates and realleges each allegation set forth above as if it were set forth herein.

126.    During the Class Period, WM and the Individual Defendants individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or recklessly disregarded that they contained misrepresentations and failed to disclose material facts necessary to make the statements made not misleading.

127.    WM and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making false statements of material facts or omitting to state material facts needed to make the statements not misleading; or (c) engaging in acts and practices that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with purchases of the Notes during the Class Period.

128.    WM and the Individual Defendants acted with scienter because they knew or recklessly disregarded that the statements issued in the name of WM were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws.  WM and the Individual Defendants, through receipt of information reflecting true facts about WM and the merger with ADS, and their control over and/or

receipt of or modification to WM's allegedly materially misleading statements, participated in the fraudulent conduct complained of herein.

129.    The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by WM, and intended to deceive Lead Plaintiff and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other WM employees to investors, including Lead Plaintiff and Class members.

130.    Pursuant to the foregoing, the prices of the Notes were artificially inflated during the Class Period.  Due to their lack of knowledge of the false nature of statements made by WM and the Individual Defendants, Lead Plaintiff and Class members relied on the integrity of the market prices of the Notes during the Class Period in purchasing the Notes at prices that were artificially inflated due to the false and misleading statements made by WM and the Individual Defendants.

131.    Had Lead Plaintiff and Class members been made aware that the market prices of the Notes were artificially inflated by misleading statements made by WM and the Individual Defendants, and by material adverse information that WM and the Individual Defendants failed to disclose, they would not have purchased the Notes at the prices paid, if at all.

132.    Based on the wrongful conduct alleged herein, Lead Plaintiff and Class members have suffered damages in an amount to be determined at trial.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

133.    Lead Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

134.    During the Class Period, the Individual Defendants were involved in the management and operation of WM's business affairs.  Due to their senior positions, they had knowledge of adverse non-public information regarding the likelihood that the merger would not be completed by the End Date and that the SMR would be triggered.

135.    As senior officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding WM's financial condition and results of operations, and to correct any public statements issued by WM which were materially false or misleading.

136.    Due to their positions of authority at WM, the Individual Defendants controlled the contents of various public filings, press releases, and reports which WM disseminated in the market during the Class Period.  During the Class Period, the Individual Defendants utilized their authority to cause WM to execute the wrongful acts alleged herein.  In addition, the Individual Defendants were culpable participants in the unlawful conduct as alleged herein.  The Individual Defendants were therefore "controlling persons" at WM pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully demands relief as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Defendants are liable pursuant to the 1934 Act;

C.    Awarding damages in favor of Lead Plaintiff and other members of the Class against WM and the Individual Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding Lead Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses and expert fees; and

E.    Directing such further relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

DATED: January 17, 2023           ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                              CHAD JOHNSON
                              NOAM MANDEL
                              DESIREE CUMMINGS
                              JONATHAN ZWEIG
                              CHRISTOPHER GILROY

                                      */s/ Noam Mandel*
                                    NOAM MANDEL

                              420 Lexington Avenue, Suite 1832
                              New York, NY  10170
                              Telephone:  (212) 432-5100
                              chadj@rgrdlaw.com
                              noam@rgrdlaw.com
                              dcummings@rgrdlaw.com
                              jzweig@rgrdlaw.com
                              cgilroy@rgrdlaw.com

                              *Lead Counsel for the Class*

                              LOWEY DANNENBERG, P.C.
                              DAVID HARRISON
                              ANDREA FARAH
                              LUKE GOVEAS
                              44 South Broadway, Suite 1100
                              White Plains, NY  10601
                              Telephone:  (914) 997-0500
                              dharrison@lowey
                              afarah@lowey.com
                              lgoveas@lowey.com

                              *Additional Counsel*