**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re WASTE MANAGEMENT SECURITIES LITIGATION | Case No.  1:22-cv-04838-LGS |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT**

David D. Sterling
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
Tel: (713) 229-1946

Jessica B. Pulliam
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Tel: (214) 953-6677

Brendan Quigley
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 408-2520

*Counsel for Defendants*

April 5, 2023

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 3

ARGUMENT ................................................................................................................................ 9

I.   LEAD PLAINTIFF HAS NOT PLED ANY ACTIONABLE STATEMENTS OR
     OMISSIONS. ...................................................................................................................... 9

     A.   Defendants' Forward-Looking Statements Are Not Actionable. ........................ 9

     B.   The AC fails to plead with particularity falsity or any actionable omission. ................... 12

II.  LEAD PLAINTIFF HAS NOT PLED ANY INFERENCE OF SCIENTER, MUCH
     LESS THE REQUISITE "STRONG INFERENCE" OF SCIENTER. ........................ 16

     A.   The AC does not allege a motive to defraud. .................................................... 17

     B.   The AC's recklessness allegations are inadequate. ........................................... 18

III. THE AC FAILS TO STATE A CLAIM AGAINST THE INDIVIDUAL
     DEFENDANTS. ................................................................................................................ 27

CONCLUSION ........................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) ........................................................................5, 14, 19

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)........................................................................19

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)........................................................27

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018)....................................................27, 28

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)........................................................................16

*Elliott Assocs., L.P. v. Covance, Inc.*,
    No. 00-4115-SAS, 2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ..........................12

*Epstein v. Washington Energy Co.*,
    83 F.3d 1136 (9th Cir. 1996) ........................................................................21

*Faulkner v. Verizon Commc'ns, Inc.*,
    156 F. Supp. 2d 384 (S.D.N.Y. 2001)........................................................12

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018)........................................................13

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016)....................................................20, 21

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)........................................................18

*Glickman v. Alexander & Alexander Servs., Inc.*,
    No. 93 CIV. 7594 (LAP), 1996 WL 88570 (S.D.N.Y. Feb. 29, 1996)..................18

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020)....................................................10, 11

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir.2002)........................................................................11

*In re Adient plc Sec. Litig.*,
No. 18-CV-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) .........................10, 11, 15

*In re Agnico-Eagle Mines Ltd. Securities Litigation* ..........................................................16, 25, 26

*In re AstraZeneca Sec. Litig.*,
559 F. Supp. 2d 453 (S.D.N.Y. 2008)........................................................................................25

*In re Barrick Gold Corp. Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018)......................................................................................9, 11

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
No. 21-CV-8255 (JMF), 2023 WL 2308151 (S.D.N.Y. Mar. 1, 2023) ....................................10

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)........................................................................................14

*In re Centerline Holding Co. Sec. Litig.*,
380 F. App'x 91 (2d Cir. 2010) ..................................................................................................19

*In re Citigroup Inc. S'holder Derivative Litig.*,
No. 07 CIV.9841, 2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009) .............................................12

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009)........................................................................................................27

*In re DRDGOLD Ltd. Sec. Litig.*,
472 F. Supp. 2d 562 (S.D.N.Y. 2007)........................................................................................24

*In re GeoPharma, Inc. Sec. Litig.*,
411 F. Supp. 2d 434 (S.D.N.Y. 2006).....................................................................................19, 20

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998)....................................................................................................12, 14

*In re Merrill Lynch Auction Rate Sec. Litig.*,
851 F. Supp. 2d 512 (S.D.N.Y. 2012)........................................................................................19

*In re Molycorp, Inc. Sec. Litig.*,
No. 13-cv-5697-PAC, 2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015)......................................24

*In re Philip Morris Int'l Inc. Sec. Litig.*,
No. 18-CV-08049 (RA), 2020 WL 5632901 (S.D.N.Y. Sept. 21, 2020) .................................26

*In re Pretium Res. Inc. Sec. Litig.*,
256 F. Supp. 3d 459 (S.D.N.Y. 2017)........................................................................................26

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015)...............................................................11, 13, 14, 22

*In re Sanofi-Aventis Sec. Litig.*,
  774 F. Supp. 2d 549 (S.D.N.Y. 2011)...............................................................................23

*In re Skechers USA, Inc. Sec. Litig.*,
  444 F. Supp. 3d 498 (S.D.N.Y. 2020).................................................................................18

*In re Sotheby's Holdings, Inc.*,
  No. 00 CIV. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ............................29

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  195 F. Supp. 3d 528 (S.D.N.Y. 2016)...................................................................................27

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)...............................................................................................................27

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)...........................................................................................19, 23

*Kusnier v. Virgin Galactic Holdings, Inc.*,
  No. 21-CV-03070-ARR-TAM, 2022 WL 16745512 (E.D.N.Y. Nov. 7, 2022).....................26

*L.L. Cap. Partners, L.P. v. Rockefeller Ctr. Props., Inc.*,
  939 F. Supp. 294 (S.D.N.Y. 1996) ......................................................................................20

*Lea v. TAL Educ. Grp.*,
  2019 WL 4688691 (S.D.N.Y. Sept. 25, 2019)......................................................................15

*Martin v. Quartermain*,
  732 F. App'x 37 (2d Cir. 2018) ....................................................................................12, 15

*Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
  951 F. Supp. 2d 479 (S.D.N.Y. 2013)...................................................................................12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)...............................................................................................................13

*Plumbers & Steamfitters Loc. 137 Pension Fund v. Am. Express Co.*,
  No. 15 CIV. 5999 (PGG), 2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017) .......................17, 19

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)...........................................................................................15, 30

*Russo v. Bruce*,
  777 F. Supp. 2d 505 (S.D.N.Y. 2011)...................................................................................24

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009)..................................................................................19

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994)............................................................................24, 29

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)...............................................................................9, 11

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
412 F. Supp. 3d 353 (S.D.N.Y. 2019)
................................................................................................................................9

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015).............................................................................23, 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...........................................................................................16, 17

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016).........................................................12, 13, 16, 21, 22

*Venkataraman v. Kandi Techs. Grp., Inc.*,
No. 20 CIV. 8082 (LGS), 2022 WL 4225562 (S.D.N.Y. Sept. 13, 2022)..............................27

**OTHER AUTHORITIES**

17 C.F.R. § 229.105 ...........................................................................................15

v

**PRELIMINARY STATEMENT**

In connection with its proposed merger with competitor Advanced Disposal Services ("ADS"), Waste Management ("WM") issued in May 2019 certain debt instruments to finance that transaction ("Notes"). The putative class members purchased these Notes in the secondary market at prices above 101% of their par value between February 13 and June 23, 2020—the very height of market volatility and uncertainty associated with the COVID-19 pandemic. Because the Notes were subject to a mandatory redemption feature requiring WM to redeem them at 101% of par if the transaction failed to close by July 14, 2020 (the "End Date"), the success of the putative class members' investments depended *entirely* upon whether the acquisition closed by that date.

The risk these putative class members knowingly undertook cannot be understated. They purchased knowing the significance of the End Date, and the need for WM to obtain antitrust clearance from the Department of Justice ("DOJ") and that they would necessarily lose money if the transaction did not close for any reason by the End Date. Yet WM never guaranteed that it would (or could) close the merger by that date. Instead, WM warned investors from the outset of the significant risks that it may not close the merger in this timeframe, including as a result of the DOJ review, and later supplemented its warnings as the COVID-19 pandemic injected increasing uncertainty into the process. Notwithstanding its decision to invest in the face of these known risks, Lead Plaintiff attempts to cobble together claims of fraud by asserting that the Defendants' heavily-caveated predictions about when it anticipated obtaining DOJ approval and closing the transaction were misleading because Defendants were aware of, but failed to disclose, two alleged facts: (1) that, to approve the merger, the DOJ would require the divestiture of assets valued in excess of the $200M level defined in the merger agreement as the Antitrust Revenue Threshold ("ART"), and (2) that, in later portions of the class period, WM was attempting to renegotiate with ADS the terms of purchase. *See* Amended Complaint ("AC") ¶ 5. While WM made clear it would

1

not disclose the details of its confidential negotiations with either the DOJ or ADS, neither of these alleged nondisclosures made anything Defendants stated misleading. Indeed, market analysts were reporting that the DOJ was likely requiring divestitures in excess of the ART and predicted that COVID's economic impact on ADS's business would lead WM to recut the merger terms. In the end, as WM had warned could happen, the rapidly developing uncertainties associated with a global pandemic and an extended regulatory review process ultimately resulted in a closing after the End Date. As a result, WM did what it was contractually required to do—it redeemed the Notes at 101% of par.

Having lost a knowingly risky wager, Lead Plaintiff now asserts a claim for securities fraud that does not come close to satisfying the pleading rigors of the Private Securities Litigation Reform Act ("PSLRA") or Rule 9(b). In addition to failing to plead falsity with the requisite particularity, the AC fails to give rise to *any* inference, much less the requisite *strong* inference, that any Defendant made any challenged statement with scienter. Conspicuously absent from the AC is any plausible motive to commit securities fraud—no Defendant is alleged to have purchased or sold Notes during the class period, nor does the AC allege any benefit to any Defendant from inflating or maintaining an elevated post-issuance price for the Notes. Similarly absent is any particularized allegation that any Defendant publicly said anything about the anticipated timing of the merger's completion known to be false at the time. Lead Plaintiff instead simply demands, with the benefit of hindsight, that WM should have disclosed more behind-the-scenes details contained in the proxy statement ADS filed after the class period for the purpose of obtaining shareholder approval of the revised merger price ("ADS Proxy"). Lead Plaintiff ignores that as the class period progressed, Defendants went from making heavily-qualified predictions about merger timing to making statements that would give no reasonable investor confidence the merger

2

would close by the End Date.  Factual allegations leading to a strong inference that Defendants' failure to say more about their confidential negotiations amounted to an intent to defraud or conscious recklessness are nowhere to be found.

**FACTUAL BACKGROUND**

*The Merger Agreement and the ART.*  On April 14, 2019, WM executed a merger agreement and announced it would acquire ADS for $4.9 billion, or $33.15 per share, subject to a number of closing conditions, including the DOJ's approval.  AC ¶¶ 26–27.  The merger agreement required WM to sell or divest assets of the combined companies up to the ART if necessary to obtain DOJ approval.  But if the DOJ required divestiture of assets that would exceed the ART (by resulting in a reduction of revenue in excess of $200 million), AC ¶¶ 29–30, WM had the contractual right, but not the obligation, to terminate the merger agreement by paying ADS a $150 million termination fee.  AC ¶ 31.

*The Notes and The Special Mandatory Redemption.*  To finance its acquisition of ADS, WM issued $4 billion worth of debt in a public offering on May 14, 2019.  AC ¶ 32.  Four of the five series of notes issued were subject to a special mandatory redemption ("SMR") feature *requiring* WM to redeem them at 101% of their par value if, for any reason, the merger did not close by the July 14, 2020 End Date.  AC ¶ 33.  Accordingly, Notes purchasers who bought at prices above 101% of par would lose money if the transaction failed to close by the End Date.  From the outset, WM cautioned notes purchasers that it could not "assure you that we will complete the [m]erger on the terms contemplated . . . or at all," and that "[i]f we redeem th[e] series of notes pursuant to the [SMR], you may not obtain the return that you expected on your investment . . . ."  Ex. A at 4, 7.

*The February 13, 2020 statements.*  On February 13, 2020, WM filed its 10-K for the year ended December 31, 2019, issued an earnings release, and held a conference call.  AC ¶¶ 50, 58;

3

*see also* Exs. B–D.  With respect to the ADS merger, WM stated: "We anticipate that we will obtain antitrust regulatory approval by the end of March 2020 and close the [ADS] transaction soon thereafter," but also cautioned that "[o]ur planned acquisition of [ADS] may not occur at all, ***may not occur in the expected time frame*** or may involve the divestiture of certain businesses and assets, which may negatively affect the trading price of our common stock and our future business and financial results."  Ex. B at 3–4 (emphasis added).[1]  WM specifically identified the "timing and closing of the [ADS] acquisition" as a forward-looking statement that was subject to risks and uncertainties, including the "failure to consummate" the transaction.  Ex. C at 5.  During the press conference, WM's COO John Morris stated: "we're on a trajectory, we think, to get clearance from DOJ right towards the end of the quarter.  And obviously, we're going to move to close quickly after that."  AC ¶ 60.  As to the required divestitures, Morris explained: "we've had a really robust lineup of suitors, . . . So as we progressed with our conversations with the [DOJ], we've obviously continued to move that process along at the same pace."  Ex. D at 8.[2]

***The March 18, 2020 statements.***  On March 11, 2020, the World Health Organization designated COVID-19 as a global pandemic, and on March 17, 2020, the DOJ announced new procedures for the crisis, which signaled potential delays in the length of DOJ antitrust reviews. *See* Ex. M at 6.  On March 18, 2020, WM filed a Form 8-K to "[u]pdate [its] prior timing expectations" with respect to the ADS transaction, stating: "As a result of, and subject to any further effects from, the COVID-19 (coronavirus) outbreak, and subject to obtaining final

---

[1]    The Form 10-K also disclosed that "[t]he planned acquisition of [ADS] is subject to a number of risks and uncertainties, including . . . inability to obtain required regulatory or government approvals or to obtain such approvals on satisfactory conditions . . . ."  AC ¶ 56.

[2]    Relying solely on an ADS Proxy filed after the class period, the AC merely concludes that the DOJ's requirement of divestitures exceeding the ART would necessarily delay the consummation of the merger.  *See* AC ¶¶ 61–62.  The ADS Proxy, however, does not support this conclusory claim.  Instead, it corroborates WM's statements about extreme interest in the potential divestitures by noting that WM communicated with over 50 parties interested in purchasing the assets to potentially be divested.  *See* AC ¶ 41.

regulatory approval from the DOJ (which the Company currently anticipates receiving in the second quarter of 2020), the Company now anticipates closing the Merger mid to late second quarter 2020."[3]  AC ¶ 63.  Although WM did not publicly disclose the details of its confidential negotiations with the DOJ, by March, market analysts publicly reported their expectation that the DOJ was requiring divestitures exceeding the ART.[4]

*The May 6, 2020 Statements.*  On May 6, 2020, WM filed its 10-Q for the first quarter of 2020, issued a press release, and held an analyst call.  AC ¶¶ 67, 72; *see also* Exs. F–H.  As to the ADS transaction, WM updated the market in the 10-Q:

> [W]e continue to make progress and currently anticipate ***being in a position to receive*** final antitrust regulatory approval and ***proceed toward*** closing ***by the end of the second quarter*** of 2020.[5]

AC ¶ 68 (emphasis added).  WM communicated a change from its prior anticipation that the merger would close "mid to late second quarter 2020" and given the delays and disruption stemming from COVID, stated instead that it anticipated that it would "proceed toward" closing by June 30, 2020.[6]

---

[3]     The AC further alleges that on March 18, 2020 a "Company spokesperson" told *WasteDive* that "we continue to work with the [DOJ] and expect to close within the original 12 to 15-month timeline as we originally guided," and that "[e]verything is progressing as expected."  AC ¶ 65.  However, the *WasteDive* article was originally published with the spokesperson's comments on January 28, 2020, and the article was updated on March 18 only to reflect that WM had filed its Form 8-K shifting the predicted timetable for closing to "mid to late second quarter 2020."  *See* Ex. M at 1, 8–9.

[4]     One analyst assumed a "base case" scenario that would require asset divestitures of $300 million, and another assumed $350 million in required divestitures.  Ex. J (3/4/20 UBS) at 2; Ex. J (3/16/20 Stifel) at 4.  And, in the very *WasteDive* article on which the AC mistakenly relies, AC ¶ 65, *WasteDive* reported as far back as January 2020 that "[i]t's now considered possible that [the divestiture] package could be worth more than the projected $200 million[.]"  *See* Ex. M at 2, 8; *see also Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022) ("The district court properly took judicial notice of investment analyst reports . . . 'It is proper to take judicial notice of the *fact* that press coverage . . . contained certain information, without regard to the truth of their contents.' . . . The Complaint refers to analyst reports that predicted a variety of possible [gene] expression thresholds higher than 5%, to argue that [defendant] misled the market by describing a 5% threshold as capturing a population of strong expressors.  The fact that other reports, relying on the same public information, correctly predicted [defendant's] use of a 5% threshold is relevant to that argument and properly considered on this motion to dismiss.").

[5]     The Form 10-Q also referred investors to the risk disclosures in WM's Form 10-K for the year ended December 31, 2019.  Ex. F at 3, 5–6.

[6]     RBC, for example, reported that it had "elected to shift up contribution from the acquisition into Q3/20 (from Q2/20) to reflect our belief that official closing will likely occur in the beginning of the third quarter . . . [and] to better reflect commentary from management on the anticipated closing timeline."  Ex. K (5/6/20 RBC) at 5, 6.  J.P. Morgan

AC ¶ 68.  Examining this shift, an analyst asked on the conference call: "I wanted to clarify from the prepared remarks on the ADSW timing, *you said you're expecting receipt of regulatory approvals by the end of the second quarter and then moving to closing.  Did you say you expect closing to occur [] by the end of the second quarter* or subsequent to that?"  Ex. H at 5 (emphasis added).  James Fish, WM's CEO,  responded:

> *Well, no,* I just said we anticipate being in a position to close by the end of the second quarter.  I think it's important to point out that, look, when we first announced this deal . . . we said that it would take, we thought, between 12 and 15 months to close.  We're at 13.5 [months] or we will be, next week, so – or 12.5 [months].  So we're within that window in terms of this being in anticipation or anticipating being in a position to close, so we're not worried about that.  By the way, certainly, and I'm not going to blame anything on this pandemic, but look, we were moving 20,000 people to work from home.  That included [] attorneys who were working on this.  That included DOJ attorneys.  Credit to both sides for doing a nice job continuing to work even though we weren't traveling anymore.  But no question, there was some impact from COVID-19 on this.  We did not contemplate, when we closed this deal, any type of major economic disruption when we went about this in April of '19.

Ex. H at 5–6 (emphasis added).  No reasonable investor could interpret these statements as providing assurance, much less a guarantee, that the merger would close by the End Date.  To the contrary, both before and after the May 6 disclosures, analysts had widely reported their expectation that WM would "ultimately seek a reduced purchase price" and that required divestitures were "believe[d]" to be "greater than $200mm."[7]

---

likewise reported that "the timing around closing the [ADS] deal has slipped to early Q3 from Q2."  Ex. K (5/8/20 J.P. Morgan) at 8.

[7]     *See* Ex. J (4/12/20 Stifel) at 5; *see also* Ex. J (4/23/20 Jefferies) at 13 (reporting "chances are very high [WM] recut[s] the deal given divestitures are now likely [greater than] $200mm since the time line has been so stretched," noting the merger was "one of the longest deals in the last decade or more to still be not solidified since announcement"); Ex. K (5/3/20 Stifel) at 1 ("WM would like to own ADSW.  But at what price, if divestments exceed $200mm?  There appears to be no consent order with the DOJ.  Does that suggest divestments will exceed $200mm?"); Ex. K (5/6/20 Jefferies) at 3 (noting that WM "not surprisingly did not comment in a public forum whether they were looking to re-cut th[e] deal"); Ex. K (5/6/20 RBC) at 5 ("No commentary was provided on the magnitude of potential divestitures[.]"); Ex. K (5/6/20 Stifel) at 7 ("If [WM] wants to own [ADS], fine, but re-trade the deal . . . We get why WM would like to own ADSW (even if the divestments are more than $200mm sales).  What we do not get is why it would not seek to re-trade the price if divestments exceed the $200mm sales limit in the merger agreement."); Ex. K (5/10/20 Stifel) at 11 ("If the returns principals hold then WM should either walk or retrade to a lower price . . . [WM] declined to comment one way or another.  [WM] [b]elieves there is a path to a consent order with DOJ.  [WM] [w]ould

Well after May 6, WM's CEO called ADS's CEO for the first time on May 13 with an opening proposal to reduce the merger price to $28 per share. Dkt. 40-1 at 15–16. ADS refused to "entertain any changes" to the merger agreement for weeks and the parties "continu[ed] to work towards obtaining antitrust approval of the merger to permit a closing . . . as promptly as practicable." Dkt. 40-1 at 16–17. It was not until May 26 that ADS even responded to WM's revised $28 per share offer, with a counter-offer of $31.45 per share coupled with a "hell or high water" obligation on WM to obtain antitrust approval by July 13, 2020. Dkt. 40-1 at 17.[8] When ADS dropped its offer to $31.15, WM rejected ADS's proposal as unacceptable both as to price and certain other proposed terms. Dkt. 40-1 at 18.

*The June 10, 2020 Statements.* On June 10, 2020, WM's CFO, Devina Rankin, presented at an investor conference. As set forth in the ADS Proxy, at that time, WM and ADS had opened discussions about renegotiated merger terms, but the parties were far from agreement. Thus, at the conference, responding to questions, Rankin did not disclose details of any DOJ or ADS negotiations but confirmed that the merger agreement allowed WM to "revisit with [ADS]" the merger if divestments exceeded the $200 million ART. AC ¶ 76. The moderator then followed up by asking: "[D]o I understand the other part of the terms that if the consent order couldn't be reached [by] July 13, that the deal naturally terminates and there are no fees on either party's side?

---

not indicate if divestments are more than $200mm."); Ex. K (5/10/20 Jefferies) at 9 ("We believe that there could be a higher likelihood that the timeline gets shifted to the right, a higher chance [divestitures go] to one buyer, and also potential for WM to use this opportunity for longer time frame to potentially re-cut the deal with ADSW."); Ex. K (5/19/20 Stifel) at 13 ("divestments are now nearing $350mm"); Ex. M (5/20/20 WasteDive) at 9 ("[The deal's] extended length to completion has not gone unnoticed. Many analysts, brokers and industry sources Waste Dive has spoken to in recent weeks are wondering whether a price cut might be attempted, and why a divestiture agreement isn't finalized yet."); Ex. K (5/28/20 Baird) at 15 ("The merger agreement with ADSW contemplates divestitures of no more than $200 million in revenue, but management has not characterized this as 'red line' that could prevent the deal from getting done."); Ex. L (6/2/20 Stifel) at 1 (reporting "[i]t appears there are more divestments" and "the purchase price would need to come down").

8        The ADS Proxy also notes that in subsequent board meetings, ADS's "[b]oard noted that during these *preliminary discussions* on revised terms, [ADS] and [WM] were *continuing to work* towards obtaining antitrust approval *on the terms and conditions agreed in the existing* original merger agreement . . . including with respect to advancing documentation with GFL[.]" Dkt. 40-1 at 17–18 (emphasis added).

Is that an accurate understanding of it?" Ex. I at 11.  In response, Rankin indicated the parties were actively working with each other and the DOJ but that she could not disclose more details "at this time":

> Yes.  That's not how I would describe it. . . . I would point investors back to the agreement because it settles everything out as clearly as possible in this.  But basically, what I would say is reminding everyone that what we've mentioned before is the Waste Management team works closely with the DOJ to continue to move the transaction forward, and the statement that we made about expected timing is the best that I have at this time.

Ex. I at 11.  Finally, when asked whether the DOJ had "given you an approval of potential buyer groups?", Rankin answered that she "can't speak to that at this time."  Ex. I at 11.  Following these statements, market analysts continued to express their belief that the ART had been exceeded and that market conditions would compel WM to renegotiate its merger with ADS.[9]

**_WM and ADS negotiate revised merger terms._**  At the time of the June 10 statement, WM and ADS were in active discussions but had not reached agreement on revised merger terms.  According to the ADS Proxy, they were in the midst of continued negotiations with WM reiterating the importance "of finalizing the terms of the merger agreement amendment and GFL divestiture agreement in the coming days."  Dkt. 40-1 at 19–20.  Over June 22-23, the ADS board convened and on June 23 determined to accept WM's $30.30 per share proposal.  Dkt. 40-1 at 20.  As a result of the revised merger terms, ADS was required to solicit shareholder approval of the new agreement, thereby necessarily extending closing beyond the End Date.  On June 24, the parties executed the revised merger agreement, as well as the GFL divestiture agreement, and issued a joint press release publicly announcing those agreements the same day.  Dkt. 40-1 at 21.

---

[9]    Ex. L (6/16/20 Stifel) at 3 ("Time has passed to get a shareholder vote done to approve a lower price from WM before the July 13 termination date. . . . WM should walk or recut ADSW deal to maintain high quality cash-on-cash returns."); Ex. M (6/23/20 WasteDive) at 10 ("The [DOJ] could potentially require anywhere from $250 million to $370 million worth of divestitures from [WM]").

On July 20, 2020 Waste Management redeemed the Notes at 101% of par value, as it was contractually required to do.  AC ¶ 89.

<u>ARGUMENT</u>

**I.    LEAD PLAINTIFF HAS NOT PLED ANY ACTIONABLE STATEMENTS OR OMISSIONS.**

The AC must be dismissed because it fails to plead particularized facts demonstrating how *any* of the challenged statements were misleading or otherwise actionable.

**A.    Defendants' Forward-Looking Statements Are Not Actionable.**

The challenged statements are archetypal forward-looking statements statutorily protected by the PSLRA safe harbor and the judicially created "bespeaks caution" doctrine.

***The PSLRA safe harbor requires dismissal.***  Under the safe harbor, a party is not liable (1) "if the forward-looking statement is identified and accompanied by meaningful cautionary language" *or* (2) "the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

As to the first prong, WM's SEC filings expressly identified forward-looking statements about the merger as such.[10]  *See In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018).  The Defendants' statements on analyst calls and in the June 10 conference referred listeners to WM's SEC filings, which "is sufficient to trigger the PSLRA's safe harbor provision."[11]  *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 362 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020).  Statements that "merely endorse or state the speaker's belief in

---

[10]    AC ¶¶ 50–57, 63–64, 67–71.  Each of the challenged SEC filings (including the May 6 statements to which the June 11 statements point) contained language stating that the filing contained forward-looking statements and that words such as "anticipate"—which all the SEC filings contained—were intended to identify such statements as forward-looking.  *See* Ex. B at 2, 4; Ex. E at 2; Ex. F at 3–4.

[11]    Ex. D at 2; Ex. H at 2; Ex. I at 11.

9

a certain future outlook satisfy the PSLRA forward-looking requirement." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020) (collecting cases).[12]  The forward-looking statements were also accompanied by meaningful cautionary language.  To be meaningful, cautionary language must "directly relate to the risks" alleged to have in part caused the losses but need not "predict correctly the particular factor that ultimately causes [the] projection not to come true" or "specifically reference the business practices that plaintiffs themselves have targeted."  *In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at \*\*18, 21 (S.D.N.Y. Apr. 2, 2020) (quotations and citations omitted).  In *In re Adient*, for example, the defendants made statements that a "projected market expansion" was "on track," while failing to disclose significant operational issues in the company's critical "Metals" business that plaintiffs contended rendered the defendants' projections unachievable.  *Id.* at \*14.  The court held that cautionary language about "program launch difficulties" and "the potential failure to attract and retain qualified personnel" was meaningful, even though it did not specifically reference the "Metals" business.  *Id.* at \*21.  Here, WM disclosed the ***precise risk*** that materialized when it cautioned investors that the "planned acquisition of [ADS] . . . ***may not occur in the expected time frame***."  Ex. B at 3 (emphasis added).  Further, WM specifically disclosed that "the timing and approvals of the proposed acquisition" were subject to "risks and uncertainties," including the "inability to obtain required regulatory or government approvals . . . on satisfactory conditions."  Ex. E at 2.  WM need not have disclosed a "particular factor," including that the DOJ required divestitures

---

[12]     The AC's argument that the statements were not forward-looking because they "relate to then-existing facts," AC ¶ 116, "confuses the question of whether a statement is forward-looking with the applicability of the safe harbor's 'actual knowledge' prong."  *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, No. 21-CV-8255 (JMF), 2023 WL 2308151, at \*8 (S.D.N.Y. Mar. 1, 2023).  Similarly, those allegations are irrelevant to the "meaningful cautionary language" prong of the safe harbor's disjunctive test. *See Gray*, 454 F. Supp. 3d at 394 ("If the Court were to accept [plaintiff's argument], an allegation of actual knowledge of falsity would suffice to deprive a forward-looking statement of the protections of the safe harbor even if there were meaningful cautionary language otherwise.  Such a result would be contrary to the disjunctive nature of the safe harbor elements.").

10

exceeding the ART, for this very specific cautionary language to be meaningful. *See In re Adient*, 2020 WL 1644018, at \*21.

The forward-looking statements are also independently protected under the alternative "actual knowledge" prong. *Slayton*, 604 F.3d at 766. The Second Circuit has "emphasize[d] that under this prong of the statutory safe harbor, the plaintiffs must show more than recklessness—an objective inquiry—they must show actual subjective knowledge." *Id.* at 776 n.9; *see also In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 530 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). The AC does not come close to "surmount[ing] the high bar of actual knowledge." *Gray*, 454 F. Supp. 3d at 395. The AC contains only conclusory allegations that Defendants subjectively disbelieved their heavily caveated opinion statements. *See* AC ¶ 78.

*The bespeaks caution doctrine also requires dismissal.* A party is not liable where in light of adequate cautionary language, no reasonable investor "could have been misled into thinking" the allegedly undisclosed "risk that materialized and resulted in his loss did not actually exist." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir.2002). Under the doctrine, "courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" *In re Barrick Gold*, 341 F. Supp. 3d at 377. Here, the AC alleges that Defendants failed to disclose the risk that the DOJ's requirement of divestitures exceeding the ART and the decision to try to renegotiate in light of COVID's impact on ADS's business could delay the Merger's closing. But Defendants cautioned that closing "may not occur in the expected time frame" both due to the inability to obtain regulatory approval on "satisfactory conditions" and also because of

11

COVID impacts, and no reasonable investor could have been misled into thinking that supposed undisclosed risk did not exist.  Ex. B at 3; Ex. E at 2.

## B.     The AC fails to plead with particularity falsity or any actionable omission.

The AC is not clear as to which statements, among the lengthy quotations it references, are allegedly false or misleading.[13]  The AC appears to contend that all the statements were misleading because they conveyed WM's anticipation about merger timing without disclosing that the DOJ was requiring divestitures exceeding the ART and that, starting in April, WM was taking steps to try to renegotiate the merger terms.  *See* AC ¶¶ 53, 69, 73.  However, impressions Defendants conveyed concerning anticipated merger timing were a matter of opinion.[14]  The AC does not satisfy the requirements for alleging the falsity of an opinion.  Opinions may be actionable in only three situations: (i) if "the speaker does not hold the belief professed"; (ii) if "the facts supplied in support of the belief professed are untrue"; or (iii) "the speaker omits information that makes the statement misleading to a reasonable investor."  *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)).

Here, the AC pleads only conclusory allegations that Defendants did not believe in their statements of opinion at the time they made them.  *See Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 498 (S.D.N.Y. 2013) (dismissing where plaintiff "relie[d] on conclusory allegations to mask the legally insufficient contention . . . that defendants could not possibly have believed their own [opinions], since plaintiffs interpret those [opinions] to

---

[13]     *See In re Citigroup Inc. S'holder Derivative Litig.*, No. 07 CIV.9841, 2009 WL 2610746, at *10 (S.D.N.Y. Aug. 25, 2009) ("[S]ome of the complaint's allegations do not even identify specific statements, and other allegations set out lengthy quotations without specifying which of the scores of statements contained in the quotations plaintiffs allege to be fraudulent.").

[14]     AC ¶¶ 52–61, 63–65, 67–69, 72–73, 77–78.  *See In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("[E]xpressions of optimism or projections about the future" are opinions.); *see also Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 400 (S.D.N.Y. 2001); *Elliott Assocs., L.P. v. Covance, Inc.*, No. 00-4115-SAS, 2000 WL 1752848, at **2, 9 (S.D.N.Y. Nov. 28, 2000) (statements about mergers "remain[ing] on track to close" were "merely opinions").

have proven [incorrect]").  Nor does the AC allege that Defendants supplied any untrue facts.  Defendants did not, for example, ever state that the DOJ was requiring divestitures below the ART or that, despite the impact of the COVID pandemic on ADS's business, that it would not attempt to reduce the merger price.[15]  That leaves only the third omission prong, and the Supreme Court in *Omnicare* recognized that pleading liability under this prong is "no small task," *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015), and the Second Circuit has "cautioned against an overly expansive reading of this standard."  *Sanofi*, 816 F.3d at 210.  Indeed, "it is clear" from Second Circuit decisions post-*Omnicare* "that omitting even significant, directly contradictory information from opinion statements is not misleading, 'especially' when there are countervailing disclosures."  *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 229 (S.D.N.Y. 2018).  None of the opinion statements is misleading when viewed in the appropriate "broader frame."  *Omnicare*, 575 U.S. at 190.

*February 13, 2020.*  On this date, WM expressed a heavily caveated opinion that the merger would close "soon []after" March 2020.  The AC fails to allege with any particularity, however, that the allegedly undisclosed fact—the DOJ's requirement of divestitures exceeding the ART—"conflict[ed] with what a reasonable investor would take" from WM's qualified statements.  *Sanofi*, 816 F.3d at 210.  There is no allegation that WM believed at the time of the statements that excess divestitures would render impossible its view that the merger could close "soon []after" March 2020.[16]

---

[15]    To the contrary, market analysts repeatedly acknowledged that WM declined to comment on the level of divestitures or a potential renegotiation with ADS.  *See* Ex. K (5/6/20 Jefferies) at 3 (WM "not surprisingly did not comment in a public forum whether they were looking to re-cut [the ADS] deal."); Ex. K (5/6/20 RBC) at 5 ("No commentary was provided on the magnitude of potential divestitures"); Ex. K (5/6/20 Stifel) at 7 (WM provided "[n]o comment on whether it will retrade the price, given the clear business model pressure the Great Shutdown has perpetuated."); Ex. K (5/10/20 Stifel) at 11 (WM "declined to comment, one way or another" on whether it would "retrade to a lower price" and "[w]ould not indicate if divestments are more than $200mm").

[16]    *See In re Sanofi*, 87 F. Supp. 3d at 531 ("Plaintiffs recite no facts indicating that defendants did not in fact expect FDA approval within the timeframe their statements articulated.  And, absent concretely pled facts to this

13

***March 18, 2020.*** There are no particularized allegations that the DOJ's undisclosed divestiture requirement conflicted with what a reasonable investor would take from WM's updated announcement in March reflecting even more uncertainty given the impacts of the COVID pandemic.[17] Indeed, market analysts predicted in early March 2020 that the divestitures would exceed the ART.[18] *See Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 352 (noting that some analysts "correctly predicted" the company's threshold for "strong" gene expression undercut plaintiff's argument that the market was misled). Further, investors understood that Defendants "not surprisingly [would] not comment in a public forum whether they were looking to re-cut" the merger and also that Defendants had not "comment[ed]" on the "magnitude of potential divestitures."[19] *See id.* at 353 (company's omission of its threshold for "strong" expression of a gene in clinical trial was not misleading where defendant "made clear at all times that it would not disclose the exact threshold").

***May 6, 2020.*** Contrary to the AC's allegation, by May 6, WM did not announce that it expected to close the merger by the end of the second quarter. *See* AC ¶ 74. WM made no such assurances. Indeed, WM's CEO made clear that "no," he had ***not*** made that prediction, and instead clarified that WM had represented only that it anticipated being in a "position to" close by then.[20]

---

effect, the inference that . . . [defendant] . . . continued to fund the [] clinical trials while secretly believing that FDA approval was unlikely [or] impossible . . . is implausible and conjectural."), *aff'd sub nom. Sanofi*, 816 F.3d 199.

[17] As explained, *supra* n. 3, the additional statements from "a Company Spokesperson" were made in January 2020 before the class period—not on March 18, 2020. AC ¶ 65; *see* Ex. M at 1, 8; *see also In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("A defendant [may be] liable only for those statements made during the class period."). The January article also reported ***before the class period*** that "[i]t's now considered possible that [the divestiture] package could be worth more than the projected $200 million." *See* Ex. M at 2, 8.

[18] *See, e.g.*, Ex. J (3/4/20 UBS) at 2 (assuming "base case" scenario that "$300mn of revenue is divested"); Ex. J (3/16/20 Stifel) at 4 (assuming "WM is required to divest $350mm of annual revenue"); Ex. J (4/12/20 Stifel) at 5 ("We also believe DOJ will require divestments greater than $200mm."); Ex. J (4/23/20 Jefferies) at 13 ("divestitures are now likely [greater than] $200mm").

[19] Ex. K (5/6/20 Jefferies) at 3; Ex. K (5/6/20 RBC) at 5.

[20] The AC manipulates WM's CEO's statement by selectively omitting the words "[w]ell, no" from the AC's quotation of his remarks. *See* AC ¶ 72; *see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 558 (S.D.N.Y. 2004) ("Plaintiffs' selective quotations from the referenced conference call distort [defendant's]

14

Ex. H at 5.  After that point, a reasonable investor could have no confidence whatsoever that the merger would thus close by the End Date.  The market was further aware that the COVID-19 pandemic had injected immense uncertainty into the timetable.[21]  *See Martin*, 732 F. App'x at 42 (the "inherently risky" nature of investing in a gold mine was "part of the 'broader frame'" relevant to an *Omnicare* analysis).  That WM was attempting to renegotiate with ADS because the ART had been exceeded did not conflict with what a reasonable investor would (and indeed did) take from the representations.[22]

*June 10, 2020.*[23]  At the June conference, WM's CFO conveyed at least twice that "at this time" she could not give more details about confidential discussions, implying that at a later time WM may have more information to report.  Instead, she pointed back to the prior May 6 statements, in which WM conveyed no confidence and provided no assurances that the merger would close by the End Date.  Although Note purchasers "would have been interested in knowing about [WM's

---

statement[.]"); *Lea v. TAL Educ. Grp.*, 2019 WL 4688691, at *6 (S.D.N.Y. Sept. 25, 2019) ("[T]he Court is not impressed by Plaintiffs' selective quotation," which "do[es] not mention that [defendant] qualified this [statement.]").

[21]    *See* Ex. E at 2 (updating prior timing expectations due to the effects of COVID-19); Ex. J (4/12/20 Stifel) at 5 ("In our view, [WM] will use all options at hand and ultimately seek a reduced purchase price . . . We believe WM will . . . wait and see how much Covid-19 impacts 2Q at ADSW.  We believe 2Q will be the hardest hit for sales and profits across all of solid waste"); Ex. J (4/14/20 Jefferies) at 7 ("[W]e worry that the timing of the ADSW deal in the middle of the COVID-19 crisis along with higher leverage carries execution risk."); Ex. J (4/23/20 Jefferies) at 13 ("ADSW results have underperformed vs. the industry . . . chances are very high they re-cut the deal given divestitures are now likely [greater than] $200mm").

[22]    There is no other adequately pleaded independent duty to disclose this fact at any point, including under Item 303 or Item 105 of SEC Regulations S-K, which require, *inter alia*, disclosure of "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations," disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," 17 C.F.R. § 229.303, and a "discussion of the material factors that make an investment in the registrant or offering speculative or risky . . . that adequately describes the risk," 17 C.F.R. § 229.105. *See infra* n. 35.

[23]    There is no allegation that the statement in an investor presentation on May 22, 2020 was false or misleading, as it did not even make a prediction concerning the timing of the merger.  The AC is replete with statements like this one that are non-actionable puffery.  These include statements WM "works closely with the DOJ to move the transaction forward," that the antitrust review process was "progressing as expected," the Company was "excite[d]" about "near[ing] the close of" the merger, "achiev[ing] targeted synergies," and "creating long-term value for [the] shareholders."  AC ¶¶ 58–59, 72; *see Rombach v. Chang*, 355 F.3d 164, 172, 174 (2d Cir. 2004) (statements that an integration was "well underway" and "progressing smoothly" were inactionable puffery); *In re Adient*, 2020 WL 1644018, at *19 n.14 ("Statements about [defendant's] progress with respect to certain goals, including it being 'on track,' also constitute inactionable puffery.").

confidential DOJ and ADS negotiations], and perhaps would have acted otherwise had [those details] been disclosed," "*Omnicare* does not impose liability merely because an issuer failed to disclose information that ran counter to an opinion." *Sanofi*, 816 F.3d at 212.  This is particularly true as to the May and June statements.  In May and June, the key predictive opinion for Note purchasers—when WM anticipated the merger to close—was so indefinite that it hardly suffices as a prediction. The AC also fails to allege any duty to disclose the confidential merger negotiations, given the context of public market commentary acknowledging that the merger was likely to be recut given the effects of COVID on ADS's business.  *See infra* p. 25–26.  Given the rapidly developing negotiations, WM did not have a duty to disclose until it had a complete story to tell, which it did on June 24, 2020 before market open the day after it reached a deal with ADS on a revised merger price.  *See In re Agnico-Eagle*, 2013 WL 144041, at *21 ("Defendants were not obliged to provide continuous disclosure" regarding an "evolving situation").

## II.    LEAD PLAINTIFF HAS NOT PLED ANY INFERENCE OF SCIENTER, MUCH LESS THE REQUISITE "STRONG INFERENCE" OF SCIENTER.

The AC does not state "with particularity facts giving rise to a strong inference" of scienter—a mental state embracing an "intent to deceive, manipulate, or defraud" that is "more than merely plausible or reasonable" and is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).  Far and away, the more "compelling" and "cogent" inference to be drawn from the AC's allegations is that Defendants were attempting in good faith to provide updates to investors concerning the progress of the ADS-WM merger without

16

unnecessarily disclosing confidential communications. *Tellabs*, 551 U.S. at 314.[24]  While WM did not provide the quantity and quality of disclosures that the AC now in hindsight demands, the allegations do not support an inference that Defendants knowingly or recklessly misled investors, but instead that they endeavored to reasonably update investors while wrestling with a rapidly unfolding chain of events.  The AC's preference for WM to have disclosed additional detail concerning its discussions with the DOJ and with ADS does not support an inference of an intent to defraud that is more compelling than non-fraudulent inferences, including negligence.

### A.  The AC does not allege a motive to defraud.

The AC does not assert the primary method for alleging scienter—a motive to defraud the Note purchasers.  As a threshold matter, the AC doesn't allege that WM or any Defendant bought or sold any of the Notes during the class period, or even that any Defendant had the slightest reason to care at what price the Notes traded.  While the AC mentions "motives," none of the alleged "motives" are what is required to be alleged—a motive to defraud Note purchasers.  Indeed, the AC does not identify any benefit whatsoever to Defendants from the Notes trading above 101% of their par value, nor any alleged motive for Defendants to inflate the trading price of the Notes through misleading statements.

Instead, the AC alleges that Defendants "had a significant financial motive" to (1) renegotiate the merger purchase price thereby saving WM $300 million in total acquisition costs, and (2) trigger the SMR thereby enabling WM to replace the Notes and "lock in significantly cheaper interest costs."  AC ¶ 98.  But pleading a plausible motive "requir[es] some coherent nexus

---

[24]    *See also Plumbers & Steamfitters Loc. 137 Pension Fund v. Am. Express Co.*, No. 15 CIV. 5999 (PGG), 2017 WL 4403314, at *23 (S.D.N.Y. Sept. 30, 2017) ("Accepting Plaintiff's factual allegations as true, and assuming *arguendo* that the non-renewal of the Costco U.S. Agreement was 'reasonably likely' prior to February 12, 2015, Plaintiff's allegations are nonetheless insufficient to present an inference of 'conscious recklessness' 'approximating actual intent' that is 'at least as cogent and compelling' as Defendants' explanation that they believed that ultimately non-renewal was 'not reasonably likely' to transpire."), *aff'd sub nom. Pipefitters Union Loc. 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630 (2d Cir. 2019).

between the alleged fraudulent conduct and its alleged purpose." *Glickman v. Alexander & Alexander Servs., Inc.*, No. 93 CIV. 7594 (LAP), 1996 WL 88570, at *12 (S.D.N.Y. Feb. 29, 1996). The AC does not come close to pleading any such coherent nexus. The SMR was a contractual right, permitting WM to redeem the Notes if the Merger failed "***for any reason***" to close by July 14, 2020. AC ¶ 33 (emphasis added). The AC does not allege any connection whatsoever between inflating the Note price and renegotiating the merger or replacing the Notes with ones with a lower interest rate.

Further, the AC's allegations that certain individuals sold WM ***stock*** during the class period, AC ¶ 99, are incapable of alleging an intent to defraud Note purchasers. The AC doesn't allege that the challenged statements somehow inflated WM's ***stock*** price, so the insider stock sale allegation, which is not relevant to the Note purchasers in any event, lacks any foundation. Moreover, even if it did, "[t]he mere fact that insider stock sales occurred," however, "does not suffice to establish scienter" when, like here, there is no allegation "that the sales at issue were 'unusual' or suspicious." *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 523 (S.D.N.Y. 2020).[25] What's more, the AC does not even plead that WM's stock price dropped after the June 24, 2020 announcement of the revised merger agreement. The AC fails to plead any viable "motive" to defraud Note purchasers.

### B.    The AC's recklessness allegations are inadequate.

The AC attempts to allege scienter through recklessness, AC ¶¶ 92, 94, which in the context of securities fraud is a state of mind "approximating actual intent, and not merely a heightened

---

[25]    The AC does not, for example, allege the individual Defendants' "***net profits*** as opposed to ***gross proceeds***" garnered from the sales, nor does the AC allege the "overall percentage changes in defendants' holdings" as a result of the sales. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (emphasis in original). The AC is silent as to "the change in volume," if any, of the individual Defendants' stock sales and pleads no information addressing whether the sales were made "pursuant to trading plans such as Rule 10b5-1 plans." *Id.*

form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Yet the AC fails to allege conduct that is "highly unreasonable" or that "evinces an extreme departure from the standards of ordinary care." *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 355; *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269–70 (2d Cir. 1996) (noting the "extreme departure" standard places a "significant burden on the plaintiff in stating a fraud claim based on recklessness"); *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 530, 538 (S.D.N.Y. 2012) (Because recklessness "is not merely a heightened form of negligence," there is a "substantially higher bar set for recklessness allegations"). "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious misbehavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

Even the AC acknowledges that WM disclosed to investors uncertainties surrounding whether and when the ADS merger may close. AC ¶¶ 56–57. Faced with the disclosure of those risks, the AC attempts to plead recklessness by claiming WM should have disclosed additional details giving rise to the uncertainty. To allege recklessness as to misrepresentations, however, a plaintiff must state with particularity that defendants knew facts or had access to information "contradicting their public statements." *Kalnit*, 264 F.3d at 142. And to allege recklessness as to an omission, a plaintiff must plead "a reckless disregard of a known or obvious duty to disclose." *Plumbers & Steamfitters*, 2017 WL 4403314, at *21; *see also In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91, 93 (2d Cir. 2010) (distinguishing misstatements and omissions). Because it is "entirely possible for a defendant to make an honest but negligent mistake in judging how much" to disclose to avoid misleading the market, it is "especially important to rigorously apply the standard for pleading intent" in cases alleging omissions. *In re GeoPharma, Inc. Sec. Litig.*,

19

411 F. Supp. 2d 434, 436–37 (S.D.N.Y. 2006).[26]   The AC asserts two categories of alleged nondisclosures, but with both categories the AC fails to adequately plead (1) a "contradiction" with Defendants' public statements or (2) a "known" or "obvious" duty to disclose.

***ART-related alleged nondisclosures.***   The AC first alleges that Defendants failed to disclose for the duration of the putative class period that the DOJ had informed WM that it would not approve the merger without divestitures exceeding the ART.[27]

This alleged nondisclosure, however, does not "contradict" any of Defendants' public statements.   WM never claimed that the DOJ had approved divestitures under the $200 million threshold.   Indeed, Defendants declined to comment publicly on the DOJ's view of the ART.[28]

*Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557 (S.D.N.Y. 2016), is instructive.   There, the plaintiffs alleged failure to disclose that the FDA had given the defendant a "Superiority Requirement" necessary to satisfy the FDA's approval of a drug.   The defendant allegedly gave investors the "false impression that [it] had a clear path to getting [the drug] approved" knowing it was "virtually certain" that the FDA would reject the application because of defendant's inability to satisfy the "Superiority Requirement."   *Id.* at 567.   The court dismissed, noting:

---

[26]   *See L.L. Cap. Partners, L.P. v. Rockefeller Ctr. Props., Inc.*, 939 F. Supp. 294, 299 (S.D.N.Y. 1996) ("[I]t would be folly to hold, as plaintiff would have the Court do, that the knowing failure to disclose a material fact in and of itself necessarily gives rise to a strong inference of fraud.  There are far too many circumstances in which a material omission would evidence no such mental state.  The person or entity responsible might have held a perfectly reasonable and good faith, if ultimately mistaken, belief that the fact omitted was not material, to name but one."); *see also In re Geopharma*, 411 F. Supp. 2d at 446 ("[A] failure to disclose particular information, by itself, can only constitute recklessness if there was an obvious duty to disclose that information.").

[27]   *See* AC ¶¶ 5–6, 8–11, 31, 41–44, 47–48, 53, 55, 57, 61, 64, 69–70, 73, 75, 78, 92–93, 95–97, 105.  The AC's GFL allegations assert the same point—that WM was aware that the DOJ would not approve the merger without divestitures exceeding the ART.  *See* AC ¶ 95 ("A transaction involving the sale of $835 million in physical assets across multiple jurisdictions necessitates months of negotiation, due diligence, and comprehensive planning, strongly supporting that Defendants knew the DOJ required divestitures exceeding the Antitrust Revenue Threshold months before the June 24, 2020 announcement.").

[28]   *See* Ex. D at 8, 12 ("what I can tell you is . . . we've had a really robust lineup of suitors" and "details are still being worked out"); Ex. H at 7 ("we really don't talk about [] details on any acquisition"); Ex. I at 11 ("I can't speak to that at this time."); *see also* Ex. K (5/6/20 RBC) at 5 (WM provided "no commentary" on "magnitude" of divestitures); Ex. K (5/10/20 Stifel) at 11 (WM "[w]ould not indicate if divestments are more than $200mm.").

20

> To be sure, [the FDA] surely alerted defendants that [they] would have to prove [the drug's] superiority to comparable doses of its components.   But that information did not ***contradict*** the Company's statements.  [The company] never thereafter represented that the FDA would ***not*** impose a Superiority Requirement on [the drug].  Instead, it informed investors that it believed its study data would satisfy the agency's Combination Rule, however construed.  There was nothing actionable about that statement of belief. . . . Significant, too, the difference between the two regulatory standards was not one which [the company], at the time of the [statements], perceived as outcome-determinative.

*Id.* at 602–03 (emphasis in original).  Here, as in *Gillis*, the AC does not and cannot plead that the DOJ's requirement of more than $200 million in divestitures was determinative of merger timing. As a threshold matter, exceeding the ART provided WM the right, but not the obligation, to terminate the merger by paying ADS $150M.  Moreover, there was a "robust lineup" of potential buyers, as WM communicated with over 50 parties interested in purchasing the assets to potentially be divested.  AC ¶ 41; Ex. D at 8.  The AC's allegation that "[s]elling more assets would naturally require more time," AC ¶ 4, is conclusory and insufficient to plead with particularity the kind of "contradiction" necessary to infer scienter.  In any event, Defendants never represented the merger was without risk of taking "more time."

Likewise, to the extent the AC asserts omission liability with respect to the ART allegations, it does not plead a "clear" or "obvious" duty to disclose necessary to infer scienter. Determining whether there is a duty to disclose requires examining the context, including reasonable investors' understanding that obtaining regulatory approval is an uncertain process. *Sanofi*, 816 F.3d 199 at 211.[29]  In *Sanofi*, the plaintiffs alleged that a pharmaceutical company

---

[29]     The Second Circuit is not alone in observing that the regulatory process serves as important context.  *See Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1141 (9th Cir. 1996) ("In this unique context, the kind of information claimed to be fraudulent, such as misleading predictions about [a regulatory] decision, awaits a different kind of arbiter than the unseen hand of the market.  As such, anyone—including research analysts—attempting to predict the judgment of that intermediate arbiter engages, by definition, in a problematic exercise distinguishable from the normal investment decision. . . . [R]eliance on predictive statements in the context of regulatory proceedings is inherently unreasonable.  Basing an investment decision on an anticipated and contingent outcome of a [] regulatory proceeding . . . is tantamount to sheer speculation; and guessing wrong hardly suggests fraud. . . .").

21

failed to disclose that the FDA had "repeatedly expressed concern" about the design of studies the company used in its clinical trials for a new drug.  *Id.* at 202.  In affirming the district court's dismissal of the complaint, the Second Circuit emphasized the need to examine the context of the statements.  *Id.*  The court reasoned that the plaintiff investors would "fully expect" that the company and the FDA "were engaged in a dialogue . . . about the sufficiency of [] the clinical trials and that inherent in the nature of a dialogue are differing views."  *Id.* at 211.  Such ongoing dialogue did not prevent the company from "expressing optimism, even exceptional optimism, about the likelihood of drug approval."  *Id.*  Moreover, the statements had to be considered "in light of all surrounding text," including the company's "hedges," "disclaimers," and "caveats."  *Id.*

Here, as in *Sanofi*, investors knew that WM was "engaged in a dialogue" with the DOJ about the "sufficiency of" the divestitures that would be required for antitrust approval.  *Sanofi*, 816 F.3d at 211.  Investors were also fully aware, because WM specifically disclosed, that the planned acquisition of ADS "may not occur in the expected time frame" and was "subject to a number of risks and uncertainties, including . . . inability to obtain required regulatory or government approvals or to obtain such approvals on satisfactory conditions."  Ex. B at 3.  As the COVID-19 pandemic wore on in the spring and early summer 2020, investors also noted that a divestiture agreement had not yet been finalized, that the deal was "one of the longest [] in the last decade or more to still be not solidified since announcement," that WM had not "comment[ed]" on the "magnitude of potential divestitures," and that divestitures were "likely [going to be greater than] $200mm."[30]  WM did not have a "clear" or "obvious" duty to disclose the details of confidential negotiations with the DOJ in this context, especially given that the market was well aware of the possibility, and indeed surmised, that the DOJ was requiring divestitures exceeding

---

[30]    Ex. M (5/20/20 WasteDive) at 9; Ex. J (4/23/20 Jefferies) at 13; Ex. K (5/6/20 RBC) at 5; *see also* Ex. L (6/2/20 Stifel) at 1 (reporting "[i]t appears there are more divestments").

the ART and that, given COVID-19's impact on ADS's business, WM may try to recut the deal.[31] *See Kalnit*, 264 F.3d at 143 (affirming dismissal based on lack of adequately pleading scienter because the duty to disclose a shareholder's release from a standstill restriction, which enabled the shareholder to put together a superior merger proposal, "was not so clear, especially given that the public was aware that [the acquiree] could accept a superior proposal within forty-five days"); *cf. Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015) (holding company breached duty to disclose but there was no basis to infer anything more than "a heightened form of negligence (if that)" and noting "[the complaint] is silent about when employees realized that the more pessimistic assessments of the market were likely to come to fruition").

***Post-April 29, 2020 renegotiation-related alleged nondisclosures.*** The AC also alleges that WM failed to disclose that on and after April 29, 2020, when WM requested "updated financials" from ADS, WM "was actively renegotiating" the ADS transaction.[32] As with the ART allegations, the AC fails to plead either a "contradiction" or a "known or obvious duty to disclose." *See supra* p. 15–16.

The "renegotiation" facts do not contradict Defendants' statements on May 6, May 22, or June 11, 2020. Attempting to renegotiate the merger price hardly means that WM had determined not to close the deal if ADS held firm, and the AC does not allege that WM had, in fact, made any such determination. And in any event, on May 6, Defendants made clear to investors that the timing of closing of the ADS transaction was in flux. WM stated: that it "continue[d] to ***make***

---

[31]     *See, e.g.*, Ex. J (3/4/20 UBS) at 2 (assuming $300 million in divestitures); Ex. J (4/12/20 Stifel) at 5 (divestitures were "believe[d]" to be "greater than $200mm"); Ex. J (4/23/20 Jefferies) at 13 (reporting "chances are very high [WM] re-cut[s] the deal given divestitures are now likely [greater than] $200mm since the time line has been so stretched").

[32]     AC ¶¶ 5, 9–11, 92–93. The AC's "renegotiation" allegations cannot support any inference of scienter prior to April 29, 2020, rendering those allegations irrelevant for the February 13 and March 18, 2020 statements. Because the "omission of facts that may be material or significant [at one time] does not render their omission at a prior time misleading," courts "must engage in a statement-by-statement analysis" at the pleading stage. *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 565 n.15 (S.D.N.Y. 2011).

*progress* and currently anticipate[d] ***being in a position to receive*** final antitrust regulatory approval and ***proceed toward*** closing ***by the end of the second quarter*** of 2020."   AC ¶ 68 (emphasis added).  When asked expressly whether the company was predicting both DOJ approval and a closing by the end of the second quarter or thereafter, the CEO responded "[w]ell, ***no***."  Ex. H at 5.  The subsequent May 22 statement did not make any predictions on merger timing and instead reported that the company was "continu[ing] to work" and was "making progress."  AC ¶ 75.  These inconclusive statements, while generally positive,[33] projected no confidence whatsoever concerning the key metric for Note purchasers—that the transaction would close by the July 14 End Date.  Accordingly, after May 6, Note purchasers were on notice that if they purchased at above 101% of par, the already substantial risk that they would lose money was even further heightened, as WM declined to predict closing would occur by the end of the second quarter.

That WM had requested updated financials from ADS before May 6 does not contradict the May 6 inconclusive statements on merger timing.  The AC fails to plead any facts indicating that, at that time, Defendants knew the request would result in a renegotiated transaction or meant that it would be impossible to be in a "position to . . . proceed toward" closing by the end of the second quarter 2020.[34]  Indeed, the ADS Proxy on which the AC relies indicates that, as of May

---

[33]    Companies are "not required to take a gloomy, fearful or defeatist view of the future," *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994), and "corporate officials do not act recklessly simply by making optimistic projections that ultimately fail to materialize," *Russo v. Bruce*, 777 F. Supp. 2d 505, 521, 523 (S.D.N.Y. 2011) (dismissing where plaintiffs alleged company knew or should have known that a government permit was not forthcoming but nevertheless "continued touting its imminent receipt" because "[k]nowledge of the need to supplement a permit application is not equivalent to knowledge that the permit application is unlikely to succeed").

[34]    *See In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 572–73 (S.D.N.Y. 2007) ("Plaintiffs argue that 'Defendants knew, or were reckless in not knowing, that it was highly unlikely—if not impossible—for the restructuring of the [mine] to be successful due to economic realities and the impairment of the [mine].' As in *Shields*, '[t]he pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud.'") (quoting *Shields*, 25 F.3d at 1129); *In re Molycorp, Inc. Sec. Litig.*, No. 13-cv-5697-PAC, 2015 WL 1097355, at *11 & n.8 (S.D.N.Y. Mar. 12, 2015) ("Plaintiffs argue that Defendants must have known of the delay in completion of Phase 1 prior to its announcement . . . Just because something is wrong or incorrect as a matter of fact does not mean it was reckless.  Plaintiffs have failed to show that any facts existed at the time Defendants made the challenged statement that demonstrated that the schedule was ***impossible*** to meet.").

13, the parties "continue[d] to work towards a closing on the terms and conditions agreed in the existing original merger agreement," Dkt. 40-1 at 16, and that later on May 29, the parties were still "continu[ing] to work towards obtaining antitrust approval on" the original terms even while having "preliminary discussions" about altered terms.  Dkt. 40-1 at 17.  Even later, according to the ADS Proxy, a revised draft agreement on June 2 still contemplated obtaining DOJ approval by July 13.  Dkt. 40-1 at 17–18 (draft contained "hell or high water" provision requiring WM to obtain DOJ approval by July 13); *see also In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 471 (S.D.N.Y. 2008) ("Nothing appears in the complaint showing that there was a consensus of the management that . . . the drug [was] unlikely to be approved.").

In the June 10 statement, Rankin pointed back to the May 6 representations and noted that those representations about expected timing, which were at best inconclusive, were the "best that I have at this time," suggesting additional developments may be reported.  Ex. I at 11.  Rankin also acknowledged that under the original terms of the merger agreement, WM "could revisit with [ADS] and either change the terms or walk away from the deal" if the requisite divestitures exceeded the ART.  *Id.*  Rankin's statements were consistent with—and not contradicted by—the facts set forth in the ADS Proxy on which the AC relies.  As the ADS Proxy details, WM was in the middle of rapidly developing and very uncertain negotiations with ADS, and it was unclear as of June 10 whether WM and ADS would be able to reach alternative terms at all.  *See* Dkt. 40-1 at 17–20.  Indeed, WM and ADS did not agree to a revised merger price until June 23, the day before the pre-market announcement of the revised agreement on June 24.  Dkt. 40-1 at 20.  There is no particularized allegation of a "contradiction" supporting an inference of scienter.

Further, Defendants did not have an "obvious" duty to disclose the renegotiation discussions with ADS.  For example, in *In re Agnico-Eagle Mines Ltd. Securities Litigation*, the

plaintiffs alleged that a mining company misled investors with statements related to the "steady state" and "economic prospects" of a gold mine without disclosing significant ongoing problems at the mine that eventually resulted in the mine's shutdown.  2013 WL 144041, at *18, 21 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013).  In dismissing for lack of scienter, the court held that the company "was not obliged to provide continuous disclosure" regarding the "evolving situation" at the mine and was "entitled to devote a reasonable amount of time to investigation and remediation" before disclosing the issues.  *Id.* at *21; *see also In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 479 (S.D.N.Y. 2017) ("Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention.  Taking the time necessary to get things right is both proper and lawful.").  The "essential flaw" in the plaintiffs' position was that it "would impose too high a burden of [] continuous disclosure on corporate officials."  *In re Agnico-Eagle*, 2013 WL 144041, at *19.

Like the defendants in *In re Agnico-Eagle*, WM did not have a duty to give investors— already aware of the likelihood of divestitures exceeding the ART and that the deal could be recut—a play-by-play as it navigated the possibility of revising the merger terms in real-time.[35] WM promptly disclosed the revised merger agreement to the market the day after the parties agreed on a revised price and it had a "full story" to tell.  *In re Agnico-Eagle*, 2013 WL 144041, at *21.

---

[35]     There was not a known or obvious duty to disclose under Item 303 or Item 105 of SEC Regulations S-K, either, because WM disclosed the ***precise risk*** that the Note purchasers now contend harmed them—that the "planned acquisition of [ADS] . . . [did] not occur in the expected time frame."  Ex. B at 3.  The AC's Item 303 and Item 105 allegations do not suffice in the face of WM's disclosure of the precise risk at issue.  *See Kusnier v. Virgin Galactic Holdings, Inc.*, No. 21-CV-03070-ARR-TAM, 2022 WL 16745512, at *15 (E.D.N.Y. Nov. 7, 2022) (granting motion to dismiss 10b-5 claims based on alleged violations of Item 303 and Item 105 where defendant disclosed "the exact risk plaintiffs contend was not disclosed to the market."); *In re Philip Morris Int'l Inc. Sec. Litig.*, No. 18-CV-08049 (RA), 2020 WL 5632901, at *5 (S.D.N.Y. Sept. 21, 2020) (declining to find Item 303 and 503 violations where Defendants' disclosures conveyed "the precise risk that Plaintiffs contend Defendants failed to disclose").

Because WM was "at worst negligent as to the effect of [that modest] delay on investors," the AC fails to plead the required "strong inference" of scienter.  *Stratte-McClure*, 776 F.3d at 107.

Viewing all the scienter allegations as a whole, there is no allegation of either intent to defraud Note purchasers or recklessness approximating such intent that is at least as compelling as alternative inferences, which include Defendants' good faith effort to convey to investors uncertainty surrounding the timing of the merger or, at worst, their negligence in carrying out this effort.

## III.    THE AC FAILS TO STATE A CLAIM AGAINST THE INDIVIDUAL DEFENDANTS.

The claims against the individual Defendants should be dismissed for all the reasons discussed above.  In addition, in cases with multiple defendants, the complaint must allege that each particular defendant made the material misstatements because defendants are only liable for alleged misrepresentations or omissions that they themselves made.  *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011) ("To be liable [under Rule 10b-5, the defendant] must have 'made' the material misrepresentations" at issue).  While defendants who sign relevant SEC forms are deemed to have "made" the statements in those documents, *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 541 (S.D.N.Y. 2016), individuals are not liable for the oral statements of others, *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 375 (S.D.N.Y. 2012); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 805 (S.D.N.Y. 2018) (the group pleading doctrine "applies only to written documents, not to oral statements").  "[P]laintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *Venkataraman v. Kandi Techs. Grp., Inc.*, No. 20 CIV. 8082 (LGS), 2022 WL 4225562, at *4 (S.D.N.Y. Sept. 13, 2022) (Schofield, J.) (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009)).  Moreover,

27

signing securities certifications, without more, is insufficient to infer scienter.  *See Das*, 332 F. Supp. 3d at 816 ("Plaintiff 'cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements.'").   The AC fails to satisfy the PLSRA requirements and Rule 9(b) for each of the individual Defendants.

*James Fish.*  The AC alleges that Fish made two sets of oral statements—on the February 13, 2020 earnings call, and his statements on the May 6, 2020 conference call.  AC ¶¶ 58, 72.  The AC is absent of particularized allegations that, in February—when Fish reported predictions on the timing of the transaction, along with cautionary statements about the uncertainty—he did not actually believe what he was saying or he consciously disregarded any known or obvious duty to disclose.  By May 6, 2020, WM had repeatedly updated investors concerning merger timing. Fish's statements at that time provided no assurances that the transaction would close by the End Date and instead referenced the uncertainties that the COVID pandemic had presented.  While Fish did not disclose confidential communications with the DOJ, his statements were not inconsistent with the DOJ requiring divestitures exceeding the ART, something market analysts had long predicted.  Further, at that time, Fish understandably did not disclose any renegotiations with ADS because WM had not yet even proposed to ADS a reduction in the purchase price of the merger. The AC also alleges that Fish signed the February 13, 2020 Form 10-K and the May 6, 2020 Form 10-Q, but as discussed above, the AC's allegations as to the statements made in those filings fail to state a claim.

*John Morris.*  The AC does not allege that Morris signed any of the SEC filings at issue, but rather only alleges that Morris made oral statements on the February 13, 2020 earnings call when Morris stated: "we're on a trajectory, we think, to get clearance from DOJ right towards the

28

end of the quarter.  And obviously, we're going to move to close quickly after that."  AC ¶¶ 59–60.  Again, there is no allegation that in February, Morris did not hold the opinions expressed or believed that the divestitures required by the DOJ made the cautious predictions impossible.

*Devina A. Rankin.*  The AC alleges that Rankin made oral statements only at the June 10, 2020, Stifel 2020 Cross Sector Insight Conference.  AC ¶¶ 76–77.  In those statements, Rankin pointed to the prior May 6 statements, which provided no assurances that the closing would occur before the End Date.  Further, Rankin cautioned repeatedly that she could not go into further detail "at this time" concerning divestitures or the potential for a recut deal with ADS.  No reasonable investor could conclude from her commentary that she was assuring a closing by the End Date.  The AC also alleges that Rankin signed the February 13, 2020 Form 10-K and the May 6, 2020 Form 10-Q, but as discussed above, the AC does not adequately plead a claim as to those statements.

*Leslie K. Nagy.*  The AC utterly fails to allege any particularized factual basis that would support Nagy's liability.  The AC only alleges that Nagy signed the 2019 Form 10-K and the May 2020 Form 10-Q, which as discussed above, cannot form the basis for a claim.  And, there are no allegations of scienter as to Nagy apart from conclusory allegations regarding the individual Defendants as a group, which is insufficient under the PLSRA and Rule 9(b).  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[C]onclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b).  We have held in the context of securities fraud claims that such allegations are 'so broad and conclusory as to be meaningless.'"); *In re Sotheby's Holdings, Inc.*, No. 00 CIV. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of

fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter."). Accordingly, the Section 10(b) allegations as to Nagy fail.

Further, because the AC does not suffice to plead a primary violation under 10(b), the court must also dismiss the Section 20(a) claim against each of the individual Defendants. *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004) (explaining that Section 20(a) "control person" claims are "secondary claims" that are "necessarily predicated on a primary violation of securities law").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the AC in its entirety and with prejudice.

Dated: April 5, 2023

*/s/ David D. Sterling*

David D. Sterling
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
Tel: (713) 229-1946
Fax: (713) 229-7946
david.sterling@bakerbotts.com

Jessica B. Pulliam
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Tel: (214) 953-6677
Fax: (214) 661-4677
jessica.pulliam@bakerbotts.com

Brendan Quigley
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 408-2520

*Counsel for Defendants*