UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x
In re WASTE MANAGEMENT SECURITIES : Civil Action No. 1:22-cv-04838-LGS
LITIGATION                         :
                                   :
                                   :
                                   :
————————————————————— x  CLASS ACTION

# LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND.......................................................................................................5

ARGUMENT...............................................................................................................................10

I.      PLAINTIFFS STATE A SECTION 10(b) CLAIM.........................................................11

      A.      Defendants' Material Misrepresentations and Omissions ....................................11

            1.      There Is No Safe Harbor for Defendants' Misrepresentations ..................14

                  a.      The Safe Harbor Is Inapplicable .......................................................15

                  b.      The Statements Lacked Meaningful Cautionary Language...........16

                  c.      Defendants Had Actual Knowledge of Facts that Rendered Their Statements Misleading .........................................................18

            2.      Defendants' *Omnicare* Argument Is Unavailing. ......................................19

            3.      Defendants' Truth on the Market Defense Has No Merit.........................21

            4.      Defendants' Misrepresentations Are Not Puffery....................................22

      B.      The Complaint Raises a Strong Inference of Scienter .........................................23

            1.      Defendants Knew (or Recklessly Disregarded) the Truth .......................23

            2.      Defendants Had Motive and Opportunity....................................................28

II.      PLAINTIFFS STATE A CLAIM AGAINST THE INDIVIDUAL DEFENDANTS ...............................................................................................................30

III.      PLAINTIFFS STATE A SECTION 20(a) CLAIM.........................................................30

CONCLUSION...........................................................................................................................30

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..................................................................................19, 20

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
2023 WL 2585942
(S.D.N.Y. Mar. 21, 2023) ...........................................................................................20

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009)................................................................................................10

*Baliga v. Link Motion, Inc.*,
2022 WL 16707361
(S.D.N.Y. Nov. 4, 2022) .............................................................................................15

*Barron v. Helbiz, Inc.*,
2021 WL 4519887
(2d Cir. Oct. 4, 2021)..................................................................................................27

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ......................................................................................15

*Bishins v. CleanSpark, Inc.*,
2023 WL 112558
(S.D.N.Y. Jan. 5, 2023)...............................................................................................15

*Christine Asia Co. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) ...................................................................................25

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013)..........................................................................17

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755
(S.D.N.Y. Mar. 25, 2013) ......................................................................................15, 16

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)............................................................................22

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020).....................................................................20, 29

**Page**

*Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018)......................................................................21

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)................................................................15, 22

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)........................................................................11, 21, 28

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016)....................................................................26

*Glob. Network Commc'ns, Inc. v. City of N.Y.*,
    458 F.3d 150 (2d Cir. 2006)..................................................................................10

*Hering v. Rite Aid Corp.*,
    331 F. Supp. 3d 412 (M.D. Pa. 2018).............................................................13, 24

*In re Agnico-Eagle Mines Ltd. Securities Litigation*,
    2013 WL 144041
    (S.D.N.Y. Jan. 14, 2013).....................................................................................28

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
    2023 WL 2601472
    (S.D.N.Y. Mar. 22, 2023) ..............................................................................20, 24

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005).............................................................12, 26

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2018 WL 2382600
    (S.D.N.Y. May 24, 2018)...............................................................................14, 16

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2021 WL 3727095
    (S.D.N.Y. Aug. 23, 2021) .........................................................................20, 21, 22

*In re Delcath Sys., Inc. Sec. Litig.*,
    36 F. Supp. 3d 320 (S.D.N.Y. 2014)..............................................................12, 26

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)...................................................................10

**Page**

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013)...............................................................17, 18

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
   20 F.4th 131 (2d Cir. 2021) ...........................................................................29

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................................23

*In re Pareteum Sec. Litig.*,
   2021 WL 3540779
   (S.D.N.Y. Aug. 11, 2021) ...............................................................................23

*In re Romeo Power Inc. Sec. Litig.*,
   2022 WL 1806303
   (S.D.N.Y. June 2, 2022)..............................................................................15, 27

*In re Romeo Power Inc. Sec. Litig.*,
   2022 WL 3701095
   (S.D.N.Y. Aug. 25, 2022) ..........................................................................14, 19, 24

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341
   (S.D.N.Y. Apr. 22, 2016)................................................................................15

*In re Tenaris S.A. Sec. Litig.*,
   493 F. Supp. 3d 143 (E.D.N.Y. 2020) ...................................................................17

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   2022 WL 4085677
   (S.D.N.Y. Sept. 2, 2022)................................................................................26

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016).......................................................................11, 12, 16

*In re Wells Fargo & Co. Sec. Litig.*,
   2021 WL 4482102
   (S.D.N.Y. Sept. 30, 2021)...........................................................................13, 20

*Karimi v. Deutsche Bank Aktiengesellschaft*,
   607 F. Supp. 3d 381 (S.D.N.Y. 2022)...............................................................21, 22

**Page**

*Kasilingam v. Tilray, Inc.*,
    2022 WL 4537846
    (S.D.N.Y. Sept. 28, 2022) ........................................................................................................29

*Kusnier v. Virgin Galactic Holdings, Inc.*,
    2022 WL 16745512
    (E.D.N.Y. Nov. 7, 2022) ...........................................................................................................28

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ......................................................................................................27

*Moshell v. Sasol Ltd.*,
    481 F. Supp. 3d 280 (S.D.N.Y. 2020) .......................................................................................17

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) .................................................................................................10

*Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013) .......................................................................................21

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015) ........................................................................................................3, 19, 20

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012) ......................................................................................................11

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821
    (S.D.N.Y. Apr. 14 2020) ...........................................................................................................17

*Rubinstein v. Gonzalez*,
    2016 WL 1213931
    (N.D. Ill. Mar. 29, 2016) ...........................................................................................................13

*SEC v. Sheinfeld*,
    2021 WL 1103567
    (M.D. Pa. Mar. 23, 2021) ...........................................................................................................13

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
    348 F. Supp. 3d 313 (S.D.N.Y. 2018) .......................................................................................28

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ....................................................................................18, 23

**Page**

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)..................................................................................16, 17, 18

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)................................................................................................28

*Tecku v. Yieldstreet, Inc.*,
2022 WL 1322231
(S.D.N.Y. May 3, 2022).....................................................................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................................18, 19, 23

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)...................................................................................3, 19, 27, 28

*Venkataraman v. Kandi Techs. Grp., Inc.*,
2022 WL 4225562
(S.D.N.Y. Sept. 13, 2022) ................................................................................................30

*Wang v. Cloopen Grp. Holding Ltd.*,
2023 WL 2534599
(S.D.N.Y. Mar. 16, 2023) ................................................................................................11

*Wilson v. LSB Indus., Inc.*,
2017 WL 7052046
(S.D.N.Y. Mar. 2, 2017) ..................................................................................................15

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78j(b)................................................................................................................. *passim*
§78t(a)..................................................................................................................30
§78u-5(i)(1)(A)-(F) ...............................................................................................15
§78u-5(c)(1)(B).....................................................................................................18

Federal Rules of Civil Procedure
Rule 12(b)(6)...................................................................................................10, 27

17 C.F.R.
§240.10b–5.......................................................................................................11, 20
§240.10b-5(b)..................................................................................................11, 25
§229.303..............................................................................................................11

**Page**

Private Securities Litigation Reform Act of 1955 ("PSLRA")
  Pub. L. No. 104-67, 109 Stat. 737 (1995)...................................................................10, 15, 16

Lead Plaintiff Seafarers Officers & Employees Pension Plan, Seafarers Money Purchase Pension Plan, and United Industrial Workers Pension Plan (together "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss the Amended Complaint filed by defendant Waste Management, Inc. ("Waste Management," "WM" or the "Company"), and individual defendants James C. Fish, Jr. ("Fish"), WM's CEO; Devina A. Rankin ("Rankin"), WM's CFO; John J. Morris ("Morris"), WM's COO; and Leslie K. Nagy ("Nagy"), WM's Chief Accounting Officer ("CAO") (the "Individual Defendants" and, with WM, "Defendants"). [1]

## PRELIMINARY STATEMENT

This case arises from Defendants' material misrepresentations about the time for completion of Waste Management's acquisition of its competitor, ADS. WM issued the Notes to finance the ADS acquisition, and the Notes were subject to a special mandatory redemption ("SMR") clause requiring Waste Management to redeem the Notes at 101% of par if the Company did not complete the acquisition by the "End Date" of July 14, 2020. As a result of the SMR, any information that could affect the time for completion of the ADS acquisition was highly material to Notes investors.

Throughout the Class Period, Defendants repeatedly and falsely represented that Waste Management was on track to complete the ADS acquisition by the End Date, while misrepresenting and concealing the truth about the DOJ's antitrust review and resultant renegotiation of the transaction. These undisclosed facts ultimately delayed completion beyond the End Date, triggering the SMR and inflicting significant harm on Notes investors.

Waste Management's acquisition of ADS was "the most significant consolidation in the waste industry in over a decade" and required regulatory antitrust approval. Accordingly, the

---

[1] "Class Period" refers to the period from February 13, 2020 and June 23, 2020. Unless stated otherwise, Plaintiffs use the following conventions: (i) capitalized terms not defined herein have the same meaning as those used in the Amended Complaint (ECF No. 40; the "Complaint"); (ii) "¶__" references are to paragraphs in the Complaint; (iii) all emphasis is added and all internal quotation marks and citations are omitted unless otherwise noted; and (iv) Defendants' brief in support of their motion (ECF No. 49) is cited as "MTD."

Merger Agreement specified a $200 million Antitrust Revenue Threshold authorizing WM to agree to divestments worth up to $200 million in combined annual revenues to obtain antitrust approval.

As is now evident (based *inter alia* on ADS's later-filed proxy statement), throughout the Class Period, Waste Management knew, but did not disclose: that the DOJ had serious concerns with the Antitrust Revenue Threshold; that by February 2020 (when the Class Period begins) Waste Management was already working with the DOJ on an alternative divestiture framework involving asset sales far above the Antitrust Revenue Threshold; and that, by late-April 2020, Waste Management was actively renegotiating the terms of the merger with ADS, which continued in secret until the end of the Class Period. In contrast to this undisclosed reality, Defendants repeatedly represented that the DOJ's antitrust review was progressing on the expected schedule and that the ADS acquisition would close on time, assuring that Waste Management was "approaching the close of the transaction" and "on a trajectory" to "receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020," and that Defendants were "not worried about" their ability to complete the ADS acquisition by the End Date. Ultimately, Defendants shocked the market on June 24, 2020 (the end of the Class Period) by announcing a renegotiated ADS acquisition agreement that would not be completed by the End Date, and that, as a consequence, Waste Management would trigger the SMR, causing the Notes to crash.

The Court should reject Defendants' meritless arguments for dismissal. Defendants argue that their misrepresentations are protected by the safe harbor for forward-looking statements. That is wrong. The thrust of the allegations is that Defendants concealed and omitted to disclose contemporaneous facts – *i.e.*, the true facts concerning the DOJ's objection to the Antitrust Revenue Threshold and resulting renegotiation – and it is well-settled that the safe harbor does not apply to omissions or to misrepresentations about then-existing facts. Further, even if applicable in theory,

the boilerplate language Defendants cite is not "meaningful cautionary language" sufficient for safe harbor protection, particularly where, as here, the language is itself materially misleading because it speaks in contingent terms about the *possibility* of not completing the ADS acquisition on schedule without disclosing known facts that were highly material to whether that schedule would (or even could) hold.

Defendants' safe harbor argument also ignores that the allegations demonstrate their actual knowledge of the material facts they omitted from their repeated misrepresentations. Indeed, the later-filed ADS proxy statement sets forth a detailed timeline – including descriptions of specific Class Period conversations involving Waste Management's senior-most officers – demonstrating that Waste Management was, from the outset of the Class Period, negotiating with the DOJ an alternative divestment framework requiring greater divestment than the Antitrust Revenue Threshold, and that by late-April 2020 Defendants were actively engaged in renegotiating the terms of the ADS merger – all while continuing to repeat that the ADS transaction would close on time.

Defendants also assert that their misrepresentations were mere "opinions" protected by *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 183 (2015). The Court should reject this argument. Many of the alleged misrepresentations are on their face not statements of opinion – *e.g.*, "we are approaching the close of the transaction and the start of the integration"; the Company is "making progress toward receiving the final antitrust regulatory approval"; "[t]he $200 million reference point on divestitures is correct." Moreover, to the extent any of the alleged misrepresentations are fairly analyzed as opinions under *Omnicare*, the principal allegations in this case concern omissions of material fact, and opinions "may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).

The Court should also reject Defendants' contention that investors made a "risky wager" during a period of high "market volatility and uncertainty associated with the COVID-19 pandemic." MTD at 1-2. This argument ignores the well-pled allegations demonstrating the opposite – *i.e.*, that investors relied to their detriment on WM's misleading assurances. Indeed, the Credit Roundtable, a consortium of institutional investors holding trillions of dollars in fixed income debt, went on the record laying the blame squarely on Waste Management for misleading investors, stating that Waste Management's "public statements were that the transaction was 'still on track to close by the end of the quarter,'" while the Company's secret renegotiation and ultimate redemption of the Notes was "inconsistent with recent guidance" and "caused the price of these Notes to decline sharply." ¶85. The Court should similarly reject Defendants' "truth on the market" and "puffery" arguments.

The allegations also raise a strong inference of Defendants' scienter. As noted above, the allegations based on the ADS proxy are alone sufficient to establish Defendants' actual knowledge that the DOJ opposed a transaction within the Antitrust Revenue Threshold, that Waste Management had been working on an alternative divestment framework since February 2020, and that, as a result, Defendants secretly renegotiated the ADS transaction through the end of the Class Period. The strong inference of Defendants' scienter is enhanced further by the allegations concerning the sale to GFL of over $835 million in assets from the combined companies (representing approximately $345 million in combined annual revenues) to satisfy the DOJ's antitrust concerns (which Waste Management announced at the same time as renegotiated ADS transaction). GFL executives have confirmed that the integration process for GFL's acquisition of these assets was underway since at least March 2020, and the GFL transaction would have in all events required months of planning, negotiations, and diligence, substantially enhancing the strong inference of Defendants' scienter throughout the Class Period. The significant gap between the $200 million Antitrust Revenue

Threshold and the nearly $350 million in divestments that the DOJ ultimately required also contributes to a finding of scienter, demonstrating that Defendants knew throughout the Class Period that the Antitrust Revenue Threshold was woefully inadequate to address the DOJ's concerns. So too does the fact that, as investors would learn at the end of the Class Period, the DOJ was requiring Waste Management to have "upfront" buyers for its asset divestments, an unusual requirement indicating the gravity of the DOJ's antitrust concerns. Defendants also had a clear financial motive to save hundreds of millions of dollars in merger consideration and carrying costs for the refinanced Notes, contrary to their public statements during the Class Period. The Individual Defendants' substantial personal stock sales heighten the strong inference of scienter even further.

For these reasons, and those set forth below, the Court should deny the motion.

## FACTUAL BACKGROUND

On April 14, 2019, Waste Management entered into an agreement and plan of merger (the "Merger Agreement") to acquire ADS for $4.9 billion, or $33.15 per share. ¶26. Waste Management and ADS were respectively the largest and fourth largest waste management companies in the U.S. ¶28. According to the DOJ, Waste Management's acquisition of ADS presented "the most significant consolidation in the waste industry in over a decade" and the transaction therefore required regulatory antitrust approval. ¶¶2, 90. In light of these antitrust concerns, the Merger Agreement specified that, WM was entitled to control the strategy for obtaining DOJ approval, and that WM had authority to agree to divestments from the combined companies of assets contributing up to $200 million in annual revenues, *i.e.*, the Antitrust Revenue Threshold. ¶¶29-30. Under the terms of the Merger Agreement, if the DOJ required divestment of assets in excess of the ART, WM had the contractual right to terminate the transaction. ¶31.

On May 14, 2019, Waste Management issued $4 billion worth of debt in five series of senior notes in a public offering to finance the Company's acquisition of ADS. ¶32. The Notes at issue in

this action constituted four of the five series of senior notes, totaling $3 billion in principal.[2]  ¶33. The Notes included the SMR requiring Waste Management to redeem them at 101% of par if the Company did not complete the acquisition by the End Date.  ¶¶33-34.  The Notes prospectus represented that the "Merger will close by the first quarter of 2020."  ¶35.

Leading into the Class Period, Waste Management, ADS, and their respective antitrust counsel "had extensive discussions with the DOJ staff, either telephonically or in person, on a range of topics, including . . . proposed . . . divestitures."  ¶¶38-42.  As investors would later learn, the Company was also required to find up front buyers for these divestitures – an atypical requirement mandated by the DOJ in this case.  ¶97.  On October 25, 2019, WM, ADS, and the DOJ entered into a timing agreement, extending the time to reach an agreement with the DOJ concerning the ADS acquisition.  ¶40.  Thereafter, between October 2019 and February 2020, Waste Management and its representatives communicated with numerous potential buyers regarding potential divestments, consistent with the Antitrust Revenue Threshold.  ¶41.

By February 2020, however, it was clear that the DOJ was not satisfied with the divestment framework contemplated by the Antitrust Revenue Threshold and, as a result, starting in February 2020, and proceeding "[o]ver the course of the next several months," Waste Management worked to establish an alternative divestiture framework in excess of the $200 million Antitrust Revenue Threshold.  ¶41.  This work continued undisclosed for several months, and by late April 2020, Waste Management had requested updated financial data from ADS "to facilitate Waste Management's *continued consideration* of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ."  ¶¶41-43.  In other words, by late-April 2020, the Company was already engaged in renegotiating the ADS transaction.

---

[2]    The Company also issued $1.0 billion principal amount of 4.15% notes due July 15, 2049 not subject to the SMR.  ¶33 n.5.

In contrast to these undisclosed material facts, Defendants' statements during the Class Period falsely assured investors that the DOJ's antitrust review was proceeding as anticipated and that the ADS acquisition was on track to be completed by the End Date. *See, e.g.*, ¶¶51-52, 58-60, 63, 68, 72, 75-77. These assurances not only assuaged investors in the face of the heightened "volatility and uncertainty" that Defendants cite (MTD at 1) but they also enabled Waste Management to secretly use its right to terminate as leverage to renegotiate a lower price in view of acknowledged industry-wide deterioration.

On February 13, 2020 (the start of the Class Period), Waste Management filed with the SEC the Company's annual report on Form 10-K for the year ended December 31, 2019 (the "Form 10-K"), which was signed by Defendants Fish, Rankin, and Nagy. ¶50. The Form 10-K stated that the Company anticipated it would obtain antitrust regulatory approval by the end of March 2020 and close the ADS transaction soon thereafter. ¶51. The same day, Defendants Fish, Morris, and Rankin held an earnings call. ¶58. During the call, Defendant Fish advised that "[w]e anticipate that we will obtain antitrust regulatory approval by the end of March and close soon thereafter." *Id*. Defendant Morris likewise stated: "[W]e are approaching the close of the transaction and the start of the integration." ¶59. Defendant Morris further stated that "as Jim [Fish] mentioned in his prepared comments, we're on a trajectory, we think, to get clearance from DOJ right towards the end of the quarter. And obviously, we're going to move to close quickly after that." ¶60. Defendants' work on an alternative, larger, ART framework continued undisclosed over the course of the next several months. ¶92.[3]

---

[3]    The Form 10-K also contained misleading descriptions of the Notes and the SMR because it omitted the then-existing material fact that the DOJ's rejection of the ART meant it was increasingly likely that the SMR was going to be triggered by a failure to complete the merger by the End Date. ¶¶54-55. The Form 10-K similarly contained misleading risk disclosures about the merger because it only generally discussed the potential risks of "delays" and an "inability to obtain required regulatory or government approvals" without disclosing that the DOJ had already objected to a divestiture framework, which substantially raised the chances of missing the End Date and triggering the SMR, which ultimately occurred. *See* ¶¶56-57.

On March 18, 2020, WM filed its Form 8-K to "update [its] prior timing expectations," announcing that "the Company now anticipates closing the merger mid to late second quarter 2020," because of the COVID-19 outbreak. ¶63. Defendants' reassurances caused the market prices of the Notes to quickly recover to their premium price levels well above the 101 redemption price. *See* ¶88 (Notes Pricing Chart). By April 2020, Defendants began renegotiating the merger "to facilitate Waste Management's continued consideration of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ." ¶43.

On May 6, 2020, Waste Management filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2020 (the "Form 10-Q"), which was signed by Defendants Rankin and Nagy. ¶67. The Form 10-Q reiterated that WM "anticipate[d] being in a position to receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020." ¶68. Later that day, Waste Management held a conference call hosted by Defendants Fish, Morris, and Rankin. During the call, Defendant Fish stated (¶72):

> I just said **we anticipate being in a position to close by the end of the second quarter**. . . So we're within that window in terms of this being in anticipation or anticipating being in a position to close, so we're not worried about that.

One week later, on May 13, 2020, "after a series of general discussions with the board of directors of Waste Management," Defendant Fish called ADS's CEO to propose a reduction in merger consideration in light of "the fact [that] the DOJ indicated it was not likely to approve the merger prior to the July 13 end date without divestitures in excess of the Antitrust Revenue Threshold." ¶44. Then, on May 19, 2020, Defendants Fish and Morris called ADS to reiterate reducing the merger consideration because "the DOJ staff was requiring assets to be divested in order to grant approval of the merger that would result in a reduction of revenue in excess of the Antitrust Revenue Threshold." ¶47. By contrast, on May 22, 2020, Waste Management issued an

Investor Presentation stating that we "continue to work with the DOJ and are making progress toward receiving the final antitrust regulatory approval required for closing." ¶75.

On June 10, 2020, Defendant Rankin presented on behalf of WM at the Stifel 2020 Cross Sector Insight Conference. ¶76. At the conference, Defendant Rankin affirmed that the "$200 million reference point on divestitures is correct." *Id*. Defendant Rankin was also asked whether the "deal naturally terminates" if DOJ approval were not obtained by July 13. ¶77. In response, Rankin referenced the Merger Agreement and reaffirmed the Company's prior guidance, stating: "[W]hat I would say is reminding everyone that what we've mentioned before is the Waste Management team works closely with the DOJ to continue to move the transaction forward, and the statement that we made about expected timing [*i.e.*, end of Q2 2020] is the best that I have at this time." *Id*.

On June 24, 2020, Waste Management stunned the market by announcing a revised agreement to acquire ADS, and that, as a result, the "outstanding senior notes issued in May 2019 with a special mandatory redemption feature will be redeemed pursuant to their terms" – *i.e.*, the Company would trigger the SMR requiring a mandatory redemption at 101% of par. ¶¶79-84. Among other things, the revised Merger Agreement eliminated the $200 million Antitrust Revenue Threshold and reduced the purchase price of ADS by approximately $300 million. ¶¶80-81. At the same time, Waste Management and ADS announced the sale to Canadian waste company, GFL Environmental Inc. ("GFL"), of $835 million in assets, representing $345 million in combined annual revenues – a divestment far in excess of the Antitrust Revenue Threshold that took months to plan. Waste Management admitted that, contrary to its numerous earlier misrepresentations concerning the DOJ's antitrust review, "[a]pproximately $300 million of the total [$345 million in] revenue [wa]s related to assets and businesses . . . sold to GFL . . . to address substantially all of the divestitures expected to be required by the U.S. Department of Justice." ¶82.

On this news, the market realized that the Notes were no longer a premium investment and Notes prices dropped to approximately 103 cents on the dollar in anticipation that they would likely be redeemed.  ¶84.  In a letter dated June 29, 2020, the Credit Roundtable, a group of institutional fixed income investors with $3.8 trillion in assets under their supervision, expressed shock at Waste Management's delay triggering the SMR.  The group noted that as late as June 10th, Waste Management had publicly stated that the merger was "still on track to close by the end of the quarter."  The Credit Roundtable stated that Waste Management's actions were "inconsistent with [its] recent guidance" and "caused the price of these Notes to decline sharply."  ¶85.

On July 20, 2020, Waste Management redeemed the Notes at 101% of par pursuant to the SMR. ¶89.  On July 24, 2020, Advanced Disposal filed the ADS Proxy with the SEC, setting forth a detailed previously undisclosed timeline of Defendants' conduct during the Class Period.  ¶15.

## ARGUMENT

In ruling on a Rule 12(b)(6) motion, the Court must accept as true the facts alleged and draw all reasonable inferences in the nonmoving parties' favor.  *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 154 (2d Cir. 2006).  A plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face," meaning that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 1960 (2009).  The Court's function is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 456 (S.D.N.Y. 2017).[4]

---

[4]     *See also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) ("Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation.").

## I.    PLAINTIFFS STATE A SECTION 10(b) CLAIM

Under Section 10(b) and Rule 10b-5(b), "a plaintiff must plead that the defendant . . . made a materially false statement or omitted a material fact, with scienter, and that . . . defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). Defendants argue that Plaintiffs fail to plead: (1) any actionable misstatements or omissions; and (2) scienter.  As explained below, Defendants are incorrect.

### A.    Defendants' Material Misrepresentations and Omissions

The Complaint alleges with particularity – based, *inter alia*, on the specific disclosures detailed in the later-filed ADS Proxy – that Defendants knew, but did not disclose, that the DOJ had serious concerns with the Antitrust Revenue Threshold and that, by February 2020 (the start of the Class Period), Waste Management had already started working with the DOJ on a divestment framework requiring greater divestment as an alternative to the Antitrust Revenue Threshold.  ¶41. The Complaint also alleges with particularity – likewise based, *inter alia*, on the ADS Proxy – that by late-April 2020, Waste Management was actively engaged in renegotiating the ADS acquisition. Defendants' repeated reassurances throughout the Class Period that Waste Management was on schedule to complete the ADS acquisition by the End Date stand in stark contrast to these undisclosed facts.  ¶¶51-52, 58-60, 65, 68, 72, 75-77.

Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R §240.10b-5(b).[5]  Accordingly, statements may be "misleading under . . . Rule 10b-5 by virtue of what they omit to disclose."  *In re Vivendi,*

---

[5]    As detailed in the Complaint, Defendants also had a freestanding duty to disclose the omitted material information under Items 303 and 105 of SEC Regulation S-K.  ¶¶102-107.  Item 303 of Regulation S-K, 17 C.F.R. §229.303, imposes a disclosure duty in Annual and Quarterly Reports "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *see also Wang v. Cloopen Grp. Holding Ltd.*, 2023 WL 2534599, at *13 (S.D.N.Y. Mar. 16, 2023) (duty to disclose under Item 105).

*S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016) ("The rule against half-truths, or statements that are misleading by omission, comports with the common-law tort of fraudulent misrepresentation, according to which a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue."). "A statement or omission is materially misleading when there is a substantial likelihood that the disclosure of the omitted . . . fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available to the market." *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 331 (S.D.N.Y. 2014); *see also In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) ("The omission of adequate disclosure . . . affirmatively creat[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed], and therefore it is actionable.").

The allegations of the Complaint are more than sufficient to demonstrate that Defendants' alleged Class Period misrepresentations were materially misleading to any reasonable investor because the statements conveyed that the ADS acquisition was progressing to completion by the End Date as expected, while omitting to disclose material information showing that, in reality and contrary to Defendants' assurances, the ADS acquisition was likely to be delayed due to the DOJ's objections to the Antitrust Revenue Threshold and resulting renegotiation of the transaction. Indeed, the Complaint quotes each alleged misrepresentation in full and, for each such statement, provides a detailed explanation concerning how and why the statement was materially misleading in light of the undisclosed information. ¶¶49-78.

It was, for example, highly misleading to tell investors on one hand: that the Company was "on a trajectory" to "receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020"; "approaching the close of the transaction and the start of the

integration"; or that "[w]e anticipate being in a position to close by the end of the second quarter . . . so we're not worried about that" – while on the other hand failing to disclose the DOJ's objections to the Antitrust Revenue Threshold or the resulting renegotiation of the transaction with ADS, *i.e.*, material information directly relevant to the transaction's timing and contrary to Defendants' assurances. As the Credit Roundtable put it, Defendants' "public statements were that the transaction was 'still on track to close by the end of the quarter.'" ¶14. Defendants' omission of the material facts concerning the DOJ's antitrust review and renegotiation with ADS rendered those public statements materially misleading to any reasonable investor. *See, e.g.*, *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *14 (S.D.N.Y. Sept. 30, 2021) (statements misleading where predicted timeline for compliance with consent order omitted "specific material facts" regarding regulators objection to compliance plans).

*Hering v. Rite Aid Corp.*, 331 F. Supp. 3d 412 (M.D. Pa. 2018) is instructive. In *Hering*, the court held that defendants' statements expressing confidence that a transaction would close and questioning newspaper reports of regulatory problems could have misled a reasonable investor "into thinking that the review process was progressing better than it was," when at the time "approval of the transaction may have been legitimately in doubt." *Id*. at 427. Similarly, in *SEC v. Sheinfeld*, the court held that omitted facts indicating that the "FTC remained concerned about the antitrust implications of the merger" were material. 2021 WL 1103567, at *2 (M.D. Pa. Mar. 23, 2021). Here, Waste Management's renegotiation of the transaction would have significantly altered the total mix of information for Notes investors. *See, e.g.*, *Rubinstein v. Gonzalez*, 2016 WL 1213931, at *10 (N.D. Ill. Mar. 29, 2016) ("AbbVie's omission of the fact that it was reconsidering the merger rendered misleading Gonzalez's statement about the continued planning for the transaction.").

- 13 -

In short, Plaintiffs have pleaded the falsity and omissions of these statements with the specificity required under the law. None of Defendants' miscellaneous defenses have merit.

### 1.    There Is No Safe Harbor for Defendants' Misrepresentations

The Court should reject Defendants' request for safe harbor protection. Many of the statements are clearly in the present tense and therefore not forward-looking statements entitled to safe harbor protection. *See, e.g.*, ¶59 ("we are approaching the close of the transaction and the start of the integration"); ¶65 ("we continue to work with the Department of Justice and expect to close within the original 12 to 15-month timeline"); ¶68 ("we continue to make progress and currently anticipate being in a position to receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020"); ¶72 ("I just said we anticipate being in a position to close by the end of the second quarter . . . so we're not worried about that."); ¶76 ("$200 million reference point on divestitures is correct"); *see also In re Romeo Power Inc. Sec. Litig.*, 2022 WL 3701095, at *4 (S.D.N.Y. Aug. 25, 2022) (no safe harbor for "present-tense statements"); *see also In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *3, *8 (S.D.N.Y. May 24, 2018) (statement regarding "good progress" towards completion of project actionable).

Regardless, the PSLRA's safe harbor is inapplicable in this case because the allegations arise from material omissions, as well as because the allegations concern misrepresentations of present facts (*i.e.*, the omitted true contemporaneous facts regarding the DOJ's rejection of the Antitrust Revenue Threshold and consequent renegotiation of the transaction). Further, Defendants' supposed cautionary language was insufficient to invoke the safe harbor, particularly because, as detailed in the Complaint, this language was itself materially misleading. Defendants' misrepresentations are also not entitled to safe harbor protection because of Defendants' actual knowledge concerning the material omissions.

### a.    The Safe Harbor Is Inapplicable

The safe harbor is inapplicable here because this case is based on Defendants' omissions of material fact, as well as because it is based on misrepresentations concerning then-existing facts. Neither is protected by the PSLRA safe harbor.[6]

The PSLRA safe harbor does not protect material omissions. *See, e.g.*, *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *9 (S.D.N.Y. Jan. 5, 2023) ("Defendants assert that the Estimates fall within the PSLRA's safe harbor.  The Court disagrees. The Estimates are best characterized as material omissions, which the PSLRA's safe harbor does not protect."); *see also Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) (no safe harbor for omissions); *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017) (same); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016) (safe harbor "does not protect material omissions").  There is no reasonable dispute that the principal allegations of the Complaint concern material omissions and the safe harbor is therefore inapplicable. *See, e.g.*, ¶¶49-78; ¶116.

The safe harbor is also inapplicable to misrepresentations concerning present facts.  The principal allegations of the Complaint involve Defendants' misrepresentations and omissions concerning then-existing material facts – *i.e.*, the true facts concerning the DOJ's rejection of the Antitrust Revenue Threshold, the resulting renegotiation of the transaction, and the delays these processes necessitated. *See, e.g.*, *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12

---

[6]    As a threshold mater, it is not even clear that Waste Management's alleged misrepresentations and omissions fall within the definition of forward-looking statements under the PSLRA.  The statute defines forward-looking statements as limited to certain categories, including projections of financial items, statements of management's plans and objectives, and statements of future economic performance. *See* 15 U.S.C. §78u-5(i)(1)(A)-(F).  Defendants have not specified which provision of the PSLRA definition of forward-looking statements applies here, and the alleged misrepresentations and omissions do not readily fit within any of the statutory definitions.  Notably, a recent decision in this District held that statements about contractual performance did not fall within the PSLRA's definition of forward-looking statements. *See Baliga v. Link Motion, Inc.*, 2022 WL 16707361, at *10 (S.D.N.Y. Nov. 4, 2022) citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir. 2008); *see also In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at *4 (S.D.N.Y. June 2, 2022) (discussing statutory definition of forward-looking statements).

(S.D.N.Y. Mar. 25, 2013) ("the safe harbor does not apply to material omissions" or "statements of current or historical fact"); *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010); *Chi. Bridge*, 2018 WL 2382600, at *8. The safe harbor is thus inapplicable to Defendants' misrepresentations for this reason as well.

Moreover, it "is well recognized that even when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *Chi. Bridge*, 2018 WL 2382600, at *8 (conference call statements that nuclear projects were meeting milestones "without delay" not subject to safe harbor protections because they had "both a forward looking aspect and an aspect that encompasses a representation of present fact"). Thus, even if any of the challenged statements also arguably involved forward-looking representations, it is also clear that the substance of the alleged misrepresentations concerned contemporaneous but undisclosed material facts about the DOJ's then-existing opposition to the Antitrust Revenue Threshold and the resulting renegotiation of the transaction. *See, e.g.*, *Aeropostale*, 2013 WL 1197755, at *12 (failure to disclose in May 2011 that unpopular designs that were likely to sell poorly were ordered through summer 2011 was not protected by safe harbor "regardless of whether the [sales forecasts] thereby rendered misleading were forward-looking"). The safe harbor is therefore inapplicable to the alleged misrepresentations and omissions at issue in this case.

### b.   The Statements Lacked Meaningful Cautionary Language

Even if the PSLRA's safe harbor applied to Defendants misrepresentations and omissions (it does not), it would still not protect Defendants because of the absence of meaningful cautionary language. The safe harbor applies only when forward-looking statements are accompanied by "meaningful cautionary language." *Vivendi*, 838 F.3d at 247. Here, Defendants issued a generic list

of hypothetical risks without disclosing existing material facts that (at the very least) greatly exacerbated those risks. Defendants' boilerplate warning language falls short of the mark required for safe harbor protection. As in *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 288 (S.D.N.Y. 2020) (quoting *Slayton*, 604 F.3d at 770), "[e]ven assuming the [cautionary] language was not boilerplate, . . . the complaint alleges that it suffers from the more fundamental problem that it was misleading in light of historical fact and thus cannot be meaningful."[7]

To avail themselves of safe harbor protection, Defendants must do more than just parrot a generic list of hypothetical risks. Rather, they must demonstrate that their cautionary language contained "the major factors that the defendants faced at the time the statement was made." *Slayton*, 604 F.3d at 771. Here, obtaining antitrust regulatory approval, was a major factor, if not the most important factor to ensure completion of the transaction by the End Date. Yet none of the "risk warnings" cited by Defendants actually warned investors about the risks created by the true then-existing facts regarding the DOJ's antitrust review, and the likely resultant delays in completing the transaction; instead, all such warnings were misleadingly presented as hypothetical. *See, e.g.*, ¶¶56, 65 (March 18, 2020 Form 10-K stating "[t]he planned acquisition of Advanced Disposal is subject to a number of risks and uncertainties, including general economic and capital markets conditions; the effects that the pending merger may have on us, Advanced Disposal and our respective businesses; inability to obtain required regulatory or government approvals…").[8] The risk warnings cited by Defendants were vague, generic, and misleadingly presented as hypothetical, without providing any

---

[7]    *See also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *12 (S.D.N.Y. Apr. 14 2020) (warning that company "may" experience excess inventory misleading where plaintiffs plausibly alleged defendants already knew about inventory build); *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143 (E.D.N.Y. 2020) (hypothetical risk factors that failed to state contingent events had already occurred were actionable).

[8]    *Facebook*, 986 F. Supp. 2d at 515 ("[t]o be 'meaningful,' a 'cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil'"); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013) ("generic and mere boilerplate words of caution" like "a statement at the beginning of a conference call that states merely that forward-looking statements are 'subject to certain risks and uncertainties' are insufficient").

meaningful information about the contemporaneous facts regarding the DOJ's antitrust review or the ensuing renegotiation of the transaction.  As a result, none of this supposed "cautionary language" comes close to meeting the standards required for safe harbor protection.

Notably, the Complaint specifically pleads as material misrepresentations the same language that Defendants now cite as "cautionary language" in an attempt to shield themselves from liability. *Compare* ¶¶54-57, 70-71 *with* MTD at 10-11.  A reasonable investor, equipped with the true contemporaneous (but undisclosed) facts concerning the DOJ's objections to the Antitrust Revenue Threshold and resulting renegotiation of the transaction would have concluded that the warned-of prospective risks had in fact already materialized.  *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("[A] company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized."); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 88 (S.D.N.Y. 2015) ("It is black letter law that the disclosure of a mere possibility of a problem does not absolve defendants who failed to disclose that the problem was actually occurring.").  Accordingly, the absence of meaningful cautionary language defeats the safe harbor.

### c.      Defendants Had Actual Knowledge of Facts that Rendered Their Statements Misleading

Finally, the safe harbor does not apply because Defendants had actual knowledge of the material facts that rendered their statements misleading.  15 U.S.C. §78u-5(c)(1)(B).  The Second Circuit has held that actual knowledge precludes the safe harbor if "a reasonable person would…deem an inference that the defendants (1) did not genuinely believe the [ ] statement, (2) actually knew that they had no reasonable basis for making the statement, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement, 'cogent and at least as compelling as any opposing inference.'"  *Slayton*, 604 F.3d at 775 (citing *Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)).  Here, the allegations – particularly those based on the ADS proxy – establish Defendants' actual knowledge of the material omitted facts – *i.e.*, that the DOJ was rejecting a transaction within the Antitrust Revenue Threshold, that Waste Management had been working on an alternative divestment framework since February 2020, and that, as a result, Defendants secretly renegotiated the ADS transaction through the end of the Class Period.  Indeed, the ADS Proxy establishes direct knowledge of an involvement in the negotiations with the DOJ and with ADS by Waste Management (including its senior-most officers and its board of directors).  *See* ¶¶43-47.  These allegations are more than sufficient to raise an inference of Defendants' actual knowledge and defeat application of the safe harbor.  *See, e.g.*, *Romeo Power*, 2022 WL 3701095, at *3 (allegations of defendants' "aware of undisclosed facts tending to seriously undermine the accuracy" of projections satisfies the actual knowledge requirement for scienter).

### 2.    Defendants' *Omnicare* Argument Is Unavailing.

Defendants attempt to characterize virtually all of the misstatements alleged in the Complaint as protected opinions under *Omnicare*.  MTD at 12-16.  But the Complaint challenges statements of fact that are not opinions.  *See, e.g.*, ¶59 ("we are approaching the close of the transaction and the start of the integration"); ¶75 (WM is "making progress toward receiving the final antitrust regulatory approval required for closing"); ¶76 ("[t]he $200 million reference point on divestitures is correct").  These are "categorical proposition[s]," not opinions.  *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176-77 (2d Cir. 2020) (statement not opinion given "specificity of the representation and the authority with which it was made").  These statements are not opinions under *Omnicare*.

Moreover, to the extent any of the alleged misstatements are properly viewed as opinions, opinions are readily "actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Sanofi*, 816 F.3d at 210; *see also Omnicare*, 575

- 19 -

U.S. at 188-89 ("A reasonable investor expects [that] the opinion . . . fairly aligns with the information in the issuer's possession at the time."); *Wells Fargo*, 2021 WL 4482102, at *9 (opinion statements actionable "if they contain false embedded statements of fact or if they omit material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion").  In other words, "when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b–5 may follow."  *In re Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at *11 (S.D.N.Y. Mar. 22, 2023) (citing *Abramson*, 965 F.3d at 175); *see also Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 2023 WL 2585942, at *14 (S.D.N.Y. Mar. 21, 2023) ("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable.").

Here, as alleged in the Complaint, Defendants' Class Period statements repeatedly assured investors that the ADS transaction was progressing to a timely close by the End Date, even as their statements omitted material facts concerning the DOJ's objection to the Antitrust Revenue Threshold, the resultant renegotiation of the ADS transaction, and the delays these facts would necessitate.  Thus, even if treated as opinions, Defendants' statements "did not fairly align with the information in [their] possession at the time" and their opinions are therefore not protected under *Omnicare*.  *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 134 (S.D.N.Y. 2020); *see generally* ¶¶92-96.

Finally, regardless of whether the statements in the Complaint are "assessed as a misstatement of fact or opinion," the ADS Proxy demonstrates that Defendants' "arguments at most show that a material dispute of fact exists" as to whether or not they materially misrepresented the status of the DOJ's antitrust review and negotiations with ADS during the Class Period.  *In re Chi.*

*Bridge & Iron Co. N.V. Sec. Litig.*, 2021 WL 3727095, at *5 (S.D.N.Y. Aug. 23, 2021) (rejecting

similar *Omnicare*-based argument on these grounds).[9]

### 3.    Defendants' Truth on the Market Defense Has No Merit

The Court should reject Defendants' so-called "truth on the market defense" as a blatant

request to ignore the allegations of the Complaint, draw inferences in favor of Defendants, and

prematurely weigh evidence and decide factual disputes.[10] Defendants submit several analyst reports

that (according to Defendants' dubious interpretation) reveal that the market knew the truth all along.

MTD at n.15, n.18, n.19, n.21.  Not only is this defense inappropriate at the pleading stage, but the

materials Defendants' cite do not even support their contention that investors were aware of the

undisclosed reality concerning the DOJ's antitrust review and resulting renegotiation.

"The Second Circuit has held that [t]he truth-on-the-market defense is intensely fact-specific

and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Karimi v. Deutsche Bank*

*Aktiengesellschaft*, 607 F. Supp. 3d 381, 395 (S.D.N.Y. 2022) (citing *Ganino*, 228 F.3d at 167).

Here, the allegations of the Complaint demonstrate clearly that, contrary to Defendants' position,

investors were in fact unaware of the undisclosed truth and stunned by its revelation.  *See* ¶14

(Credit Roundtable stating the news "came as a surprise to many bond investors, who have noted

that on WM's first quarter earnings call on May 6th and as late as June 10th, your public statements

---

[9]    Plaintiffs' allegations stand in stark contrast to the alleged accounting misstatements in *Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.*, 951 F. Supp. 2d 479 (S.D.N.Y. 2013), relied on by Defendants. *See* MTD at 12-13.  There, the plaintiffs failed to state a claim for allegedly false and misleading loan loss reserve estimates (which are defined as subjective under GAAP) because they failed to allege the statements were knowingly misleading when made. *Student Loan.*, 951 F. Supp. 2d at 497-98.  Defendants also do not contest that information regarding the ADS acquisition was material, which was the basis for dismissal in *Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*, 336 F. Supp. 3d 196, 229-30 (S.D.N.Y. 2018); *cf.* MTD at 13.  Finally, Defendants' competing inference about the date of the *WasteDive* article – which Plaintiffs allege was March 18, 2020 (*see* ¶65) but Defendants contest is January 28, 2020 because of a similar (but not identical) earlier article (*see* MTD n.3;n.17) – simply raises a factual issue for a later stage in the litigation.

[10]    Defendants argue that the Complaint quotes Defendant Fish's May 6, 2020 statement out of context.  MTD at 14-15.  Plaintiffs submit respectfully that the statement speaks for itself and the Court should reject Defendants' further request to interpret the allegations and draw inferences in their favor.  There is no ambiguity around Defendant Fish's statement that "we anticipate being in a position to close by the end of the second quarter."  ¶72.

were that the transaction was 'still on track to close by the end of the quarter.'"). The Complaint likewise cites analyst reports showing that the market accepted the Company's representations about the timing of the ADS transaction as truthful and understood that WM was on track to complete the ADS acquisition by the End Date. *See* ¶¶62, 74. The fact that Defendants may cite different analyst reports that Defendants' argue (unreasonably) revealed the entire undisclosed truth to the market raises obvious questions of fact not properly decided at this stage. *Karimi*, 607 F. Supp. 3d at 395 (truth on the market defense rejected as "fact-specific and so an inappropriate basis to grant a motion to dismiss").[11]

Regardless, Defendants' interpretation of the analyst reports they cite makes no sense on its own terms. A fair review of Defendants' analyst reports shows, at best, analyst speculation concerning the amount of divestitures. MTD at n.18. These analyst reports do not even raise an inference – much less prove – that investors unequivocally knew the full undisclosed truth. Indeed, in one instance, Defendants cite an analyst report from May 2020 to argue that the market supposedly knew the truth as early March 2020. *Id*. at n.19. The Court should reject Defendants' meritless attempt to contest the factual allegations.

### 4. Defendants' Misrepresentations Are Not Puffery

There is no credible argument that the challenged misrepresentations are mere "puffery." "Puffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." *OneMain*, 348 F. Supp. 3d at 297-98; *see also Chi. Bridge*, 2021 WL 3727095, at *4 ("[g]eneric, indefinite statements of corporate optimism typically are not actionable" as "puffery").

---

[11] Moreover, Defendants' statements about the transaction proceeding as expected blunted the intensity and credibility of any speculative statements in Defendants' analyst reports. *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 82 (S.D.N.Y. 2022) ("the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements").

Defendants' statements concerning the progress of the DOJ's antitrust review and resultant timing to complete the ADS acquisition are not generic optimistic statements, but rather concrete and specific disclosures concerning (and concealing the truth about) the timing and status of one particular transaction. *See, e.g.*, ¶¶52, 59, 65, 77. The Court should also reject Defendants' effort to cherry-pick irrelevant snippets from the Complaint in service of their puffery argument. *See, e.g.*, MTD at n.23 (Waste Management "works closely with the DOJ to move the transaction forward"; the Company was "excite[d]" about "achiev[ing] targeted synergies," and "creating long-term value for [the] shareholders"). Moreover, to the extent that Defendants argue that no reasonable investor would have relied on Defendants' misrepresentations because they were mere "puffery," this assertion is directly contradicted by the allegations of the Complaint showing that the Credit Roundtable – a consortium of actual fixed-income investors – did in fact rely on and believe Defendants' misrepresentations. *See* ¶14.

### B.    The Complaint Raises a Strong Inference of Scienter

Scienter can be pled alleging "either (1) . . . motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *14 (S.D.N.Y. Aug. 11, 2021). The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences," but only "as compelling as any opposing inference[.]" *Tellabs*, 551 U.S. at 324; *see also Credit Suisse*, 127 F. Supp. 3d at 101-02 (scienter analysis must consider "whole factual picture painted by" the complaint).

### 1.    Defendants Knew (or Recklessly Disregarded) the Truth

"[A] complaint sufficiently pleads scienter where it alleges defendants had knowledge of facts or access to information contradicting their public statements." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 306 (S.D.N.Y. 2013). As described above, the ADS Proxy

demonstrates Defendants' actually knew (or reckless disregarded) that the DOJ would not approve a transaction within the Antitrust Revenue Threshold; that Defendants had been working on an alternative divestiture framework since February 2020; and that, as a result, Defendants secretly renegotiated the transaction with ADS beginning in April 2020 and through to the end of the Class Period.  These allegations alone are more than sufficient to plead a strong inference of Defendants' actual knowledge.  *See, e.g.*, ¶¶91-101 (establishing Defendants' knowledge of material undisclosed facts at the time of each alleged misrepresentation); *Romeo Power*, 2022 WL 3701095, at *3 (allegations that defendants were "aware of undisclosed facts tending to seriously undermine the accuracy" of their projections satisfies the actual knowledge requirement for scienter).  These allegations are also sufficient to establish a strong inference of Defendants' reckless disregard for the truth.  *See, e.g.*, *Hering*, 331 F. Supp. 3d at 427-28 (strong inference of recklessness drawn from company's "inside knowledge" of internal discussions with the FTC during proposed merger at issue).

The inference of scienter is strengthened further by revelations concerning GFL, the acquirer of the assets divested in the transaction.  After the Class Period, GFL's CEO revealed that GFL was working on the integration of its $835 million asset acquisition since at least March 2020. ¶96.  This revelation supports the common sense reality that, given the size and scope of GFL's acquisition, that aspect of the transaction necessarily took months of negotiation, due diligence, and comprehensive planning, strongly supporting that Defendants knew the DOJ required divestitures exceeding the Antitrust Revenue Threshold months before the June 24, 2020 announcement.  ¶¶95-96.  There is thus no serious argument that Defendants did not know the true facts, much less that they had no access to information contradicting their many public statements.  *See, e.g.*, *Alibaba Grp.*, 2023 WL 2601472, at *12 (strong inference of scienter where "defendant knew facts or had

access to information suggesting that their public statements were not accurate"); *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (finding scienter when it was "virtually inconceivable" that executives did not receive information).

The significant disparity between the DOJ's actual divestment requirement (nearly $350 million in divestment) vs. and the $200 million in divestments authorized by the Antitrust Revenue Threshold further enhances the strong inference of scienter, demonstrating that – even as they described their "continue[d] work with the Department of Justice and expect[ation] to close within the original 12 to 15-month timeline" – Defendants were well aware of the DOJ's serious but undisclosed antitrust concerns and objection to the Antitrust Revenue Threshold. ¶¶65, 97. The DOJ also required Waste Management to have "up front" buyers for the required divestitures – an atypical requirement for a waste industry merger, underscoring the gravity of the DOJ's known but undisclosed objection to Antitrust Revenue Threshold. *See* ¶97.

Defendants' principal response does little more than reiterate their earlier arguments regarding falsity. *See, e.g.*, MTD at 19-25. Specifically, Defendants argue wrongly that there can be no scienter because there was no duty to disclose the omitted information, including because (according to Defendants) the omitted information did not directly contradict their statements. These arguments fail. As discussed above, Defendants had a clear duty to disclose the true facts concerning the DOJ's rejection of the Antitrust Revenue Threshold and resulting renegotiation of the ADS transaction because they had a duty not to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R §240.10b-5(b).[12] Defendants' disclosures obviously failed this duty. For example, telling investors that the Company was "on a trajectory" to close by the End Date created

---

[12] As noted above and in the Complaint, Defendants had an independent duty to disclose under Items 303 and 105 of Regulation S-K. ¶¶103-107.

an unequivocal duty to disclose known material facts that could (and likely would) prevent the Company from closing by the End Date – *i.e.*, the omitted facts concerning the DOJ's antitrust review and the resulting renegotiation of the transaction would necessarily alter the "total mix" of information because it would reveal that, contrary to Defendants' statement, the Company was in fact *not* "on a trajectory" to close by the End Date. *See, e.g.*, *Delcath*, 36 F. Supp. 3d at 331; *see also Alstom SA*, 406 F. Supp. 2d at 445 ("A statement or omission is materially misleading when there is a substantial likelihood that the disclosure of the omitted . . . fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available to the market.").

Defendants also contort the allegations. Defendants misconstrue the Complaint by arguing "WM never claimed that the DOJ had approved divestitures *under* the $200 million threshold." MTD at 20. But the Complaint makes no such allegation and the argument is beside the point. *Cf.* ¶31 ("[u]nbeknownst to investors, Defendants knew since at least February 2020 that the DOJ would require substantially *more* divestment than the Antitrust Revenue Threshold, and used this leverage to renegotiate a lower acquisition price in secret, while repeatedly and falsely reassuring investors that the transaction would close on time.").[13]

Defendants also argue that they "declined to comment publicly on the DOJ's view of the ART." MTD at 20. The Complaint alleges otherwise in great detail. *See, e.g.*, ¶¶76,78 ("Defendant

---

[13] Defendants' reliance on *Gillis v. QRX Pharma Ltd*., 197 F. Supp. 3d 557 (S.D.N.Y. 2016) (MTD at 20, 21) is inapposite. There, the court rejected a plaintiff's theory that defendants knew or were reckless in advising the market that their drug would be approved by the FDA, when defendants had allegedly known for years that the drug was going to be rejected. *See Gillis*, 197 F. Supp. 3d at 567, 600. The court held that it was implausible for defendants to harbor the requisite state of mind for so long, particularly when they invested significant resources and time towards the FDA approval process. *See id.* Here, by contrast, the Defendants' alleged misconduct began once they knew the DOJ was unlikely to accept the ART in February 2020 and continued through the end of the Class Period in June 2020 – or just roughly four months. ¶¶1-2; *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *50-*51 (S.D.N.Y. Sept. 2, 2022) (contemporaneous documentary evidence, taken collectively, sufficient to create a "strong inference" of scienter that defendant knew facts that contradicted statements about a mining project being "on plan," "on budget," and "progressing nicely[.]").

Rankin affirmed that the '$200 million reference point on divestitures is correct' without informing investors that, by [June 10, 2020] Defendants were well aware that the DOJ was requiring divestments in excess of that $200 million Antitrust Revenue Threshold."); *see also* ¶67 (May 6, 2020 Form 10-Q signed by Fish and Rankin affirming that "we continue to make progress and currently anticipate being in a position to receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020"); ¶60 (February 13, 2020 conference call statement from Morris stating "as Jim [Fish] mentioned in his prepared comments, we're on a trajectory, we think, to get clearance from DOJ right towards the end of the quarter. And obviously, we're going to move to close quickly after that."). Defendants' revisionist view of the Complaint does not entitle them to a non-fraudulent inference. *See Romeo Power*, 2022 WL 1806303, at *4-*5 (plausible allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate" supports a culpable inference of conscious misbehavior or recklessness.); *see also id*. at *5 (acknowledging "the Court would need to assume or infer improperly" facts supporting defendants' non-fraudulent inferences).[14]

Defendants' reliance on *Sanofi* (MTD at 21-22) also misconstrues the allegations. In *Sanofi*, the court held that a party's later failure to obtain FDA approval for a drug does not render earlier statements actionable for expressing optimism about that drug's prospects prior to FDA rejection. 816 F.3d at 213-14. The *Sanofi* court also noted that the alleged omitted information - that the FDA favored double blind clinical trials, was "belied by the fact that the FDA has long made public its

---

[14]     Nor can Defendants rely on analyst reports not attached to the Complaint to absolve them of scienter liability. *See, e.g.*, MTD at n.28, n.30, n.31 (collecting analyst reports speculating on size of divestitures); *see also Barron v. Helbiz, Inc*., 2021 WL 4519887, at *4 (2d Cir. Oct. 4, 2021) (reversible error to rely on non-integral documents not attached to complaint on a Rule 12(b)(6) motion). But even if investors reviewed these reports (or the risk of a larger ART was publicly known), they would not know how to interpret it without guidance from WM—including how it might affect WM's business, operations, financial condition, and, of course, the End Date and SMR. ¶¶14, 102-107; *see also Litwin v. Blackstone Grp., L.P*., 634 F.3d 706, 719 (2d Cir. 2011) (requiring disclosure under Item 303 where real estate trends were public but their "potential future impact [on the company] was certainly not public knowledge").

preference for double-blind trials." *Id*. at 212-13. At issue here are not Defendants' optimistic opinions about their dialogue with the DOJ (or longstanding public information about DOJ policy), but rather, their false and misleading statements concerning their progress with the DOJ while omitting to disclose known contemporaneous facts to the contrary. *See* ¶¶49-90. These are the exact kind of misstatements constituting actionable misrepresentations under Section 10(b). *See Shanawaz v. Intellipharmaceutics Int'l Inc*., 348 F. Supp. 3d 313, 324-25 (S.D.N.Y. 2018) (rejecting similar *Sanofi*-based argument).[15]

### 2.    Defendants Had Motive and Opportunity

Plaintiffs need not allege motive and opportunity when, as here, conscious misbehavior or recklessness has been established. *See Ganino*, 228 F.3d at 170. The Complaint nonetheless pleads Defendants' motive and opportunity to commit fraud. *See, e.g.*, *Tecku v. Yieldstreet, Inc.*, 2022 WL 1322231, at *11 (S.D.N.Y. May 3, 2022) ("A complaint has sufficiently alleged a strong inference of a motive and opportunity to commit fraud if it pleads facts showing that the defendant benefited in some concrete and personal way from the purported fraud.").

First, the Individual Defendants' substantial personal stock sales heighten the strong inference of scienter. During the Class Period, the Individual Defendants (along with another senior executive) sold over $25 million worth of Company common stock while in possession of the

---

[15]    Defendants' reliance on *In re Agnico-Eagle Mines Ltd. Securities Litigation*, 2013 WL 144041 (S.D.N.Y. Jan. 14, 2013) to disavow scienter is equally misplaced because it ignores that the Complaint alleges Defendants had already been working on an alternative ART framework by February 2020. ¶31; *cf.* MTD at 25-26. In *Agnico-Eagle*, the court found that scienter was not sufficiently pleaded because the plaintiffs "allege[d] no facts suggesting that Defendants knew or should have known prior to October 2011 that any safety or structural risks associated with the water flow generated by the March 2010 blast would—or even *might*—require suspension (or diminution) of mining efforts at Goldex." 2013 WL 144041, at *19. Defendants' other authorities are equally unavailing. For example, in *Kusnier v. Virgin Galactic Holdings, Inc.*, 2022 WL 16745512 (E.D.N.Y. Nov. 7, 2022) (MTD at n.35), the defendants disclosed the precise risk alleged to have been omitted, unlike here. *See* 2022 WL 16745512, at *15. In any event, the court sustained certain Section 10(b) claims on motive and opportunity grounds, *e.g.*, stock sales. *Id.* at *23; *see also* ¶99 (alleging Defendants' suspicious stock sales). And in *Stratte-McClure v. Morgan Stanley* (MTD at 27), the court found that assessing the impact of the 2008 subprime mortgage crisis in the second and third quarters of 2007 was an insufficient basis to establish scienter. 776 F.3d 94, 106-07 (2d Cir. 2015). Defendants here, by contrast, were not subjected to any such uncertainty about negotiations with the DOJ or the End Date. Notably, the *Stratte-McClure* court also stated that the non-disclosure of adverse developments in the subprime market breached defendants' Item 303 duty. *Id*. at 104.

numerous material and undisclosed facts alleged herein concerning the true status of the DOJ's antitrust review and the time for completion of the merger. ¶¶99-100. Notably, the Company's February 13, 2020 Form 10-K stated that "[i]f the planned acquisition of Advanced Disposal is not completed, if there are significant delays in completing the planned acquisition or if the planned acquisition involves an unexpected amount of required divestitures, it could negatively affect the trading price of our common stock and our future business and financial results." ¶56; MTD at 4. By selling Company common stock while in possession of material non-public information indicating that such delays were likely, the Individual Defendants attempted to avoid any such losses. ¶100. This supports scienter. *See Kasilingam v. Tilray, Inc.*, 2022 WL 4537846, at \*10 (S.D.N.Y. Sept. 28, 2022) (timing and magnitude of sales alone are indicative of scienter).

Second, Defendants' financial motive to save hundreds of millions of dollars in merger consideration (by leveraging the DOJ's objections to negotiate a lower transaction price) and carrying costs (by refinancing the Notes) also heightens the inference of scienter. As described in the Complaint, Defendants' exercise of the SMR triggered widespread losses for investors who purchased the Notes well above their call price, including the Federal Reserve. ¶98. The subsequent note offering enabled Waste Management to borrow the same amounts with materially cheaper interest obligations. *Id.* These financial motivations establish a clear motive to defraud. *See, e.g.*, *World Wrestling Ent.*, 477 F. Supp. 3d at 138 (allegations of motive and opportunity, combined with actual knowledge of falsity, "perfectly [and] plausibly supports an inference of scienter[.]").

Moreover, whether or not these allegations are sufficient by themselves to plead scienter, at a minimum they strongly support the Complaint's other allegations of scienter. *See, e.g.*, *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137-38 (2d Cir. 2021) (the Court must "assess the total weight of the circumstantial allegations *together with* the allegations of motive and opportunity")

(emphasis in original).  Viewed together, the allegations of motive and opportunity along with the clear showing of Defendants' knowledge, raise a strong inference of scienter at least as strong as (and indeed far stronger than) any competing nonculpable inference.

## II.    PLAINTIFFS STATE A CLAIM AGAINST THE INDIVIDUAL DEFENDANTS

Defendants argue the Complaint fails to state a claim against the Individual Defendants. MTD at 27-30.  This argument fails.  Each Defendant alleged in the Complaint either: (1) made allegedly misleading statements on conference calls, *e.g.*, ¶¶58-62, 72-74, 76-78 (Fish, Morris, Rankin); (2) directly engaged with the DOJ and ADS, *e.g.*, ¶¶44, 47 (Fish, Morris); (3) made suspicious stock sales, *e.g.*, ¶99 (each Individual Defendant); and/or (4) signed the Company's Forms 10-K and 10-Q containing allegedly misleading statements, *e.g.*, ¶¶52-57, 67-71 (Fish, Rankin, Nagy).

Defendants' briefing confirms that each Individual Defendant made a statement that the Complaint challenges as false and misleading.  *See* AC §D; *cf.* MTD at 28-29.  As described above, the Complaint pleads scienter against all of the Defendants because it plausibly alleges that they "knew facts or had access to information suggesting that their public statements were not accurate." *Venkataraman v. Kandi Techs. Grp., Inc.*, 2022 WL 4225562, at *7 (S.D.N.Y. Sept. 13, 2022), also cited at MTD at 27.

## III.    PLAINTIFFS STATE A SECTION 20(a) CLAIM

Because Plaintiffs plead primary liability against the Defendants under Section 10(b) of the Exchange Act, including by adequately pleading the Individual Defendants' scienter (and thus culpable participation), Plaintiffs state a claim against each Defendant under Section 20(a).

## CONCLUSION

Plaintiffs respectfully request that Defendants' motion be denied.

DATED:  May 3, 2023

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON
NOAM MANDEL
DESIREE CUMMINGS
JONATHAN ZWEIG
CHRISTOPHER T. GILROY


*/s/ Noam Mandel*
NOAM MANDEL

420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  (212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
dcummings@rgrdlaw.com
jzweig@rgrdlaw.com
cgilroy@rgrdlaw.com

*Lead Counsel for the Class*

LOWEY DANNENBERG, P.C.
DAVID HARRISON
ANDREA FARAH
44 South Broadway, Suite 1100
White Plains, NY  10601
Telephone:  (914) 997-0500
dharrison@lowey
afarah@lowey.com

*Additional Counsel*

- 31 -