**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re WASTE MANAGEMENT SECURITIES
LITIGATION

Case No.  1:22-cv-04838-LGS

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT

David D. Sterling
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
Tel: (713) 229-1946

Jessica B. Pulliam
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Tel: (214) 953-6677

Brendan Quigley
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 408-2520

*Counsel for Defendants*

May 16, 2023

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT........................................................................................................................... 2

I.    THE OPPOSITION DEMONSTRATES LEAD PLAINTIFF'S FAILURE TO
      PLEAD ANY ACTIONABLE STATEMENTS OR OMISSIONS. ............................. 2

      A.    The Opposition Shows that Lead Plaintiff Cannot Avoid the Safe Harbor. ........... 3

      B.    The Opposition Demonstrates Lead Plaintiff's Failure to Plead Falsity. ............... 7

II.   THE OPPOSITION DEMONSTRATES LEAD PLAINTIFF'S FAILURE TO
      PLEAD THE REQUISITE STRONG INFERENCE OF SCIENTER. ..................... 10

      A.    The Opposition Confirms the Deficiencies in the AC's Motive Allegations. ...... 10

      B.    The Opposition Confirms that the AC Fails to Sufficiently Plead Recklessness.  11

CONCLUSION ..................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)...................................................................................................11

*Arbitrage Event-Driven Fund v. Trib. Media Co.*,
2020 WL 60186 (N.D. Ill. Jan. 6, 2020) ............................................................................4

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ..............................................................................................10

*Burges v. BancorpSouth, Inc.*,
2015 WL 4198795 (M.D. Tenn. July 10, 2015) .................................................................4

*Chapman v. Fennec Pharms.*,
2021 WL 7209981 (M.D.N.C. Dec. 16, 2021) ...................................................................4

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ....................................................................4

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..............................................................................................10

*Elliott Assocs., L.P. v. Covance, Inc.*,
2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000)....................................................................8

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018).................................................................................9

*Gissin v. Endres*,
739 F. Supp. 2d 488 (S.D.N.Y. 2010).................................................................................5

*Gray v. Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020).................................................................................6

*Hering v. Rite Aid Corp.*,
331 F. Supp. 3d 412 (M.D. Pa. 2018) ....................................................................2, 3, 4, 13

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)........................................................................5

*In re Barrick Gold Sec. Litig.*,
2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)..................................................................6

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
2023 WL 2308151 (S.D.N.Y. Mar. 1, 2023) ...............................................................4

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2021 WL 3727095 (S.D.N.Y. Aug. 23, 2021)...........................................................4, 9

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ...........................................................11

*In re Discovery Labs. Sec. Litig.*,
2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) ...............................................................13

*In re DRDGOLD Ltd. Sec. Litig.*,
472 F. Supp. 2d 562 (S.D.N.Y. 2007)........................................................................12

*In re GeoPharma, Inc. Sec. Litig.*,
411 F. Supp. 2d 434 (S.D.N.Y. 2006)...................................................................11, 13

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)..........................................................................11

*In re Medimmune, Inc. Sec. Litig.*,
873 F. Supp. 953 (D. Md. 1995) ................................................................................13

*In re Romeo Power Inc. Sec. Litig.*,
2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022)..............................................................7

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015)....................................................................12, 13

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011).........................................................................2

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022)............................................................3, 5

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998)........................................................................................8

*In re Wells Fargo & Co. Sec. Litig.*,
2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021).............................................................3

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)............................................................................................3

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)........................................................................................11

*L.L. Cap. Partners, L.P. v. Rockefeller Ctr. Props., Inc.*,
    939 F. Supp. 294 (S.D.N.Y. 1996) .............................................................................13

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)......................................................................................................9

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114,120 (2d Cir. 2012)................................................................................13

*Plumbers & Steamfitters Loc. 137 Pension Fund v. Am. Express Co.*,
    2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017)..........................................................12

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)........................................................................................15

*Rubinstein v. Gonzalez*,
    2016 WL 1213931 (S.D.N.Y. Mar. 29, 2016) ...........................................................3

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)..........................................................................................12

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
    75 F.3d 801 (2d Cir. 1996)..........................................................................................11

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)..................................................................................5, 6, 7

*Vladimir v. Bioenvision Inc.*,
    606 F. Supp. 2d 473 (S.D.N.Y. 2009).......................................................................15

*Wang v. Cloopen Grp. Holding Ltd.*,
    2023 WL 2534599 (S.D.N.Y. Mar. 16, 2023) ..........................................................13

**STATUTES**

15 U.S.C. § 78u-5 .............................................................................................................3

**OTHER AUTHORITIES**

17 C.F.R. § 229.105, .303 ................................................................................................13

Lead Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Opposition") is predicated on foundational ***assumptions*** for which the Amended Complaint ("AC") offers no particularized facts of the type the PSLRA requires. According to the Opposition, Defendants necessarily knew that their heavily caveated predictions about the merger's timing could not be satisfied because the Department of Justice ("DOJ") was insisting on divestitures exceeding the $200 million Antitrust Revenue Threshold ("ART"), and because, later in the class period, Waste Management ("WM") began trying to renegotiate the terms of the merger with ADS. But, the inference Lead Plaintiff seeks to draw from these two allegedly undisclosed facts—that Defendants could not have believed the projections about merger timing—is wholly unsupported.

The AC contains no allegations that at each point in the class period when Defendants assessed and revised their cautious projections about the merger's anticipated timing that they had information showing those projections could not be achieved. Despite the prominence attached to the ART, there is no allegation that the DOJ's position on the requisite extent of divestitures had ***any impact*** on the merger timing, or that any Defendant believed it would. And, there is no allegation that, when WM took steps to renegotiate the transaction with ADS later in the class period, Defendants believed WM would necessarily reach a revised deal (or, that failing to do so, exercise its contractual right to pay the termination fee and walk away). Indeed, the ADS Proxy on which the AC heavily relies, demonstrates that even after WM reopened negotiations, the parties were always working on parallel paths to be in a position to close the original transaction by the End Date, until the very end of the class period.

The Opposition's treatment of Defendants' challenged statements is similarly cavalier. The disclosed risk to the putative class members—Note purchasers who bought at a price above 101% of par value—was significant: WM disclosed that it was required to redeem the Notes at

1

101% of par if the transaction did not close for any reason by the End Date.  And Defendants made no guarantees as to the timing of closing; instead, they regularly updated and extended their projections as COVID became a pandemic, as its impact on businesses and the economy grew murkier, and as ongoing discussions between the parties to adjust the merger valuation to this new environment advanced.  The claims cannot survive dismissal because Defendants' projections are protected by the safe harbor and are not actionable under *Omnicare* and because the AC contains no allegation creating a strong inference of scienter.

## I.    THE OPPOSITION DEMONSTRATES LEAD PLAINTIFF'S FAILURE TO PLEAD ANY ACTIONABLE STATEMENTS OR OMISSIONS.

Nowhere does the Opposition individually assess the challenged statements as required. The "omission of facts that may be material or significant [at one time] does not render their omission at a prior time misleading," and for this reason courts "must engage in a statement-by-statement analysis" at the pleading stage.  *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 565 n.15 (S.D.N.Y. 2011).  Failing this requirement, the Opposition offers no rebuttal to Defendants' statement-by-statement analysis demonstrating why none of the challenged statements were false or misleading.  In that manner, the Opposition glosses over the significant and unpredictable impact that COVID had on the waste industry, Memo. at 14-15, that Defendants' statements communicated increasing uncertainty over time, *id.*, and that market commentators were aware of significant risks that the ADS merger would not close by the End Date, *id.* at 7 n.7.

The Opposition's marquee cases only confirm the AC's failure to allege any actionable statements or omissions in this case.  *See* Opp. at 13.  In *Hering*, for example, the district court dismissed ***all*** the challenged statements except for statements that flatly denied reports from journalists about regulatory obstacles to a merger.  *See Hering v. Rite Aid Corp.*, 331 F. Supp. 3d 412, 427–28 (M.D. Pa. 2018) ("Defendants ventured into actionable territory when they openly

2

contradicted news reports of regulatory trouble" and "alluded to secret" or "non-public inside knowledge of the FTC's review.").[1]  Here, by contrast, Defendants made no such categorical statement; rather, the statements challenged here are at least as cautious as those the *Hering* court found not to be actionable.  *See, e.g.*, *id*. at 427 (statements estimating timetable for closing the merger and statements that regulatory review was progressing as expected did not create a false impression in part because reasonable investors "would understand these statements, which evolved over time, as best estimates and nothing more").[2]  The AC must be dismissed both because of the safe harbor and because the failure to plead falsity with particularity.

### A.        The Opposition Shows that Lead Plaintiff Cannot Avoid the Safe Harbor.

***The Challenged Statements are Forward-Looking and Protected.***  The Opposition's claim—that Defendants' statements were misleading in light of what they omitted—falls squarely within the protections of the safe harbor.  *See* 15 U.S.C. § 78u-5 ("in any private action . . . based on an . . . omission of a material fact necessary to make the statement not misleading, a person . . . shall not be liable with respect to any forward-looking statement").  Lead Plaintiff's contention that the safe harbor does not apply to "material omissions," Opp. at 15, directly conflicts with the statutory language and is illogical.  As courts in this district and elsewhere have recognized, the safe harbor must remain available in these circumstances; otherwise, it would serve no purpose.[3]

---

[1]        Similarly, the Opposition does not come close to pleading facts like those in *In re Wells Fargo*, where statements that the defendants were in the "last mile" of complying with a consent order and reaffirming their projected timeline for compliance were verifiably false when made.  The consent order process there was divided into three stages.  At the time of the statements, defendants had not even cleared the first stage because the regulator had found their submissions "so materially incomplete" that they could not even "be evaluated."  *See In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at **3, 14 (S.D.N.Y. Sept. 30, 2021).

[2]        In *Rubinstein*, the court dismissed the complaint in its entirety because the more "cogent and compelling inference" was that the defendant believed his statements at the time he made them.  *See Rubinstein v. Gonzalez*, 2016 WL 1213931, at **11, 13 (N.D. Ill. Mar. 29, 2016).

[3]        *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *30 n.17 (S.D.N.Y. Sept. 2, 2022) ("[W]hile it is true that courts 'in this circuit have consistently held that neither the PSLRA safe harbor, nor the bespeaks caution doctrine protects material omissions,' Plaintiffs may not recharacterize their false-statement claims as material-omission claims on the basis that the statements were false because they omitted material contrary information.  Otherwise, the PSLRA would have no force."); *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 256

3

***The Challenged Statements are Forward-Looking.***  The Opposition's suggestion that the challenged statements are not forward-looking within the meaning of the statute, Opp. at 15 n.6, is likewise meritless.  Statements predicting regulatory approval and the timing of a merger are well-recognized to fall within the safe harbor's definition of forward-looking statements.[4]  And while the Opposition seeks to characterize Defendants' predictive statements as statements concerning "present facts," "whether a statement is forward-looking is determined by examining the statement, not the fact allegedly omitted."  *Chapman v. Fennec Pharms.*, 2021 WL 7209981, at *7 (M.D.N.C. Dec. 16, 2021).  The Opposition's "present facts" are just another way of asserting that Defendants "knew, based on present conditions, that the statements were false when made," which "confuses the question of whether a statement is forward-looking with the applicability of the safe harbor's 'actual knowledge' prong."  *In re Bristol-Myers*, 2023 WL 2308151, at *8.[5]

The Opposition further recites the rule regarding mixed present and future statements, Opp. at 16, but fails to identify any such mixed statement.  Instead, it suggests that Defendants' future-oriented statements somehow contained inherent assertions of current fact regarding "the DOJ's then-existing opposition to the [ART] and the resulting renegotiation of the transaction."  *Id.*  But the AC does not and cannot allege that Defendants falsely told investors that the DOJ approved

---

(3d Cir. 2009) ("[S]uch a view would divest the Safe Harbor of any function, since there is no potential liability—and thus no need for Safe Harbor protection—where there is nothing false or misleading about a firm's statements.").

[4]    *See, e.g.*, *Burges v. BancorpSouth, Inc.*, 2015 WL 4198795, at *3 (M.D. Tenn. July 10, 2015) ("The statements . . . which announced that the Bank expected the mergers to close in the second quarter of 2014 are forward-looking statements and are protected by the Safe Harbor provisions."); *Hering*, 331 F. Supp. 3d at 423 ("[T]he statements simply attempt to predict a time table for completing the [merger] transaction and, thus, are forward-looking."); *Arbitrage Event-Driven Fund v. Trib. Media Co.*, 2020 WL 60186, at *8 (N.D. Ill. Jan. 6, 2020), *aff'd sub nom.*, 39 F.4th 402 (7th Cir. 2022) (Defendant's "predictions regarding the merger's closing date satisfy both conditions for protection under the Safe Harbor provision.").

[5]    The "present facts" statements at issue in the Opposition's authorities look nothing like Defendants' predictions about the future timing of the merger's closing. *See In re Chi. Bridge*, 2018 WL 2382600, at *8 (statements that nuclear projects "were achieving important milestones and [had] passed [regulatory] investigations successfully" were representations of present fact); *Aeropostale, Inc.*, 2013 WL 1197755, at *13 (statements that "the company . . . was 'appropriately attacking the inventory problem' . . . and that Defendants 'know the mistakes that we made and have taken steps to rectify those'" were representations of present fact).

4

(or would approve) of the merger without divestitures exceeding the ART.  Likewise, the AC does not allege Defendants represented that WM would never seek to renegotiate the transaction in the event the DOJ-required divestitures triggered its option to terminate the merger by paying the $150M breakup fee.  To the contrary, the litany of analyst reports correctly predicting these events (and noting Defendants declined to comment on them), *see* Memo. at 5 n.4, 6 n.7, 13 n.15, confirms that the market did not understand Defendants to have made any contrary assertions.[6]

***The Meaningful Cautionary Language Prong Warrants Dismissal.***  The Second Circuit has rejected the Opposition's argument that the cautionary language prong does not apply due to historical facts.  Opp. at 17.  In *Slayton v. Am. Exp. Co.*, the plaintiffs argued that cautionary language concerning loss projections was misleading in light of deterioration in the debt market that had already transpired, but the Second Circuit noted that these facts merely "demonstrate[d] the defendants knew [their] portfolio ***would very likely*** deteriorate due to rising defaults on the bonds . . . a future projection that was not a historical fact."  604 F.3d 758, 770 (2d Cir. 2010) (emphasis added).  Similarly, the Opposition makes only a conclusory claim that Defendants knew the merger would "very likely" be delayed due to greater than anticipated divestitures and the ADS renegotiations.  That argument, as in *Slayton*, focuses on a future prediction, not a past event.[7]  The

---

[6]     At most, Defendants' statements could be understood as merely stating that, regardless of the required divestitures, Defendants still believed the merger would proceed as predicted.  Such "mixed" statements are not actionable.  *See In re Adient*, 2020 WL 1644018, at *19 ("[W]hen the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection."); *In re Turquoise Hill*, 2022 WL 4085677, at *25 (Statements that "the schedule was 'on track' and that capital costs were 'in line' on their own contain no details about [defendant's] current situation . . . These statements say very little about [defendant's] current situation apart from the future projections of which they are a part."); *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) (same).

[7]     The Opposition cites authorities where the risk warnings were deemed inadequate because at the time of those warnings the projections were no longer possible to achieve.  In *Moshell*, cautionary language that a construction project estimated to cost $8.9 billion "may be affected by delays or cost overruns" was not meaningful where, at the time the estimate was announced, the defendants had already received a change order that guaranteed the project would cost at least $11.7 billion.  481 F. Supp. 3d at 288–89.  In *In re Facebook*, the company disclosed that "increased mobile usage and product decisions 'may negatively affect Facebook's revenue' when, in fact, these factors allegedly '***had*** [already] negatively impacted the Company's revenue."  986 F. Supp. 2d at 514.  Finally, in *Plumbers &*

AC contains no allegation that, at the time of its caveated predictions, WM had decided it would terminate the deal in light of the DOJ's position on required divestitures in excess of the ART, or that WM had concluded it would proceed with a renegotiated deal, the result of which would necessarily delay the transaction.

Nor was Defendants' cautionary language "generic" or "boilerplate." Opp. at 17. Cautionary language need only "identify[] important factors that could cause actual results to differ materially from those in the forward-looking statements." *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *6 (S.D.N.Y. Apr. 1, 2015) (cautionary language that construction cost and schedule estimates were subject to "the risks of obtaining necessary licenses and permits" and "operating or technical difficulties in connection with mining or development activities" was meaningful). Here, Defendants' risk disclosures included specific warnings throughout the class period that "the planned acquisition of [ADS] . . . may not occur in the expected time frame" and that "the timing and approvals of the proposed acquisition" were subject to "risks and uncertainties," including the "inability to obtain required regulatory or government approvals . . . on satisfactory conditions."[8]

***The Actual Knowledge Prong Independently Warrants Dismissal.*** The Opposition cites case law that serves only to illustrate why Lead Plaintiff has not cleared "the high bar of actual knowledge." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 395 (S.D.N.Y. 2020). In *Slayton*, the Second Circuit affirmed dismissal based on the safe harbor's "actual knowledge" prong even where (i) "the defendants were presented with the highly likely risk that [their] high-yield portfolio would deteriorate," (ii) the defendants "had no reasonable basis for predicting" the projected range of portfolio losses, and (iii) the defendants had received "many warnings and 'red

---

*Pipefitters*, cautionary language that the company "may experience excess inventory levels" was not meaningful where "Defendants had actual knowledge" of excessive levels of inventory. 2020 WL 1877821, at *12.

[8]    Ex. B at 3; Ex. E at 2.

flags'" described as a "huge alarm ringing."  *See Slayton*, 604 F.3d at 775.  Accordingly, knowledge of risks that could cause the forward-looking statement not to come true cannot be equated with actual knowledge the forward-looking statement is false.[9]  The Opposition asserts that Defendants knew the DOJ was requiring divestitures exceeding the ART and, later in the class period, knew that WM was attempting to renegotiate with ADS.  Opp. at 19.  Absent from the AC, however, are any well-pleaded facts supporting that Defendants "subjectively believed" the merger's closing would be delayed as a result.  *See Slayton*, 604 F.3d at 776.  There are no allegations that WM had concluded it would pay the $150M breakup fee to walk away from the deal if the DOJ insisted on divestitures above the ART or, later in the class period, that WM had decided to go forward with a renegotiated deal.  The AC merely asserts in conclusory fashion that "[s]elling more assets would naturally require more time," AC ¶ 4, but pleads no facts supporting that Defendants "actually knew they could not" close the merger by the End Date, *Romeo Power*, 2022 WL 3701095, at *3.  Indeed, the facts alleged support the opposite inference.[10]

**B.      The Opposition Demonstrates Lead Plaintiff's Failure to Plead Falsity.**

Attempting to avoid the demands of *Omnicare*, Lead Plaintiff cites only three supposed "statements of fact that are not opinions."  Opp. at 19.  As to the first two, there is no particularized pleading whatsoever that they were false when made.  *Id.* (citing AC ¶ 59 ("we are approaching the close of the transaction and the start of the integration") and AC ¶ 75 (WM is "making progress

---

[9]      This Court's decision in *Romeo Power* only highlights the AC's deficiencies.  There, the facts raised a strong inference the defendants "actually knew they could not approach [their] projections" concerning how quickly backlog orders could be converted into revenue. 2022 WL 3701095, at *3.  The complaint alleged facts supporting "long lead times" on components necessary to fulfill the backlog orders and the defendants, when questioned about supply chain issues, concealed the shortage—even at a time where the company's production had not "ramp[ed] up at all."  *Id.*  Given the long lead times for components and the facts concerning when production "ramped up," the defendants' claim that the supply chain disruption "caught them by surprise" was implausible.  *Id.*

[10]      *See, e.g.*, AC ¶ 31 (Defendants were not obligated to terminate the merger if divestitures exceeded the ART); AC ¶ 41 (there was a robust lineup of over 50 parties interested in purchasing the divested assets); Dkt. 40-1 at 17–18 (June 2, 2020 draft renegotiated agreement still expressly contemplated DOJ approval before the End Date).

7

toward receiving the final antitrust regulatory approval required for closing")).  There can be no dispute that, during the class period, the close was "approaching" and that WM was "making progress" because the transaction *did* receive regulatory approval, and WM *did* integrate ADS into WM.  As to the third alleged fact—Rankin's statement that "[t]he $200 million reference point on divestitures is correct," AC ¶ 76—it is undisputedly true.  Rankin merely confirms the very terms of the merger agreement's ART provision on which Lead Plaintiff relies.  The analyst's question and Ms. Rankin's answer demonstrates that market analysts were aware that the merger agreement's ART provision gave WM the right to either terminate the merger by paying ADS a $150 million breakup fee and/or opened the possibility for WM to seek to renegotiate with ADS.[11]

Apart from these three facts, the Opposition does not dispute that Defendants' remaining statements were cautiously optimistic predictions about the expected merger timing.  Courts have repeatedly found nearly identical statements to be opinions because they are "merely expressions of optimism concerning an uncertain future event."  *Compare* AC ¶¶ 52, 58, 60, 63, 68, 72 ("We anticipate that we will obtain antitrust regulatory approval by the end of March 2020 and close the [ADS] transaction soon thereafter" and "we're on a trajectory, we think, to get clearance from DOJ right towards the end of the quarter") with *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 388–89, 398 (S.D.N.Y. 2001) (statements that company "expect[ed] the deal to close by mid–2001" and "continue[d] to be on track for a closing in the first half of 2001" were "mere opinions and predictions of future performance").[12]  The Opposition fails even to address this authority.[13]

---

[11]      AC ¶ 76 ("I mean correct me – if I got the right numbers.  Divestment of – sales of assets – revenues of assets sold greater than $200 million, that is a point in which you could revisit with Advanced Disposal and either change the terms or walk away from the deal.  That's correct?"  In response, Defendant Rankin stated: "That's correct.  The $200 million reference point on divestitures is correct[.]").

[12]      *See also Elliott Assocs.*, 2000 WL 1752848, at **2, 9 (statements that merger "was on track to close in late August or early September" and merger "remained on track to close by September" "were merely opinions"); *Int'l Bus. Machines Corp.*, 163 F.3d at 107 ("[E]xpressions of optimism or projections about the future" are opinions.).

[13]      The Opposition relies only on *Abramson*, which did not involve a merger and addressed a specific categorical statement that "Resected pancreatic cancer patients live 15 months, 19 months .... 20 months.  That's it," and the

Lead Plaintiff argues that Defendants' opinions run afoul of *Omnicare* because Defendants "repeatedly assured investors that the ADS transaction was progressing to a timely close by the End Date" while omitting allegedly material facts. Opp. at 19-20. But Defendants never "assured investors" that the transaction would close by the End Date. Instead, Defendants expressed at most cautious optimism, *see* AC ¶¶ 52, 58, 60, 63, 68, 72 ("[W]e're on a trajectory, *we think*, to get clearance from DOJ right towards the end of the quarter") (emphasis added), and repeatedly warned investors that the "planned acquisition of [ADS] . . . *may not occur in the expected time frame*." Ex. B at 3 (emphasis added). In *Frankfurt-Tr. Inv. Luxemburg AG*, for example, the defendant's risk disclosures "render[ed] any optimistic opinion statements as insufficiently misleading to satisfy the *Omnicare* standard, even recognizing that analysts were surprised by" the outcome. 336 F. Supp. 3d at 231, *aff'd sub nom.*, 779 F. App'x 69 (2d Cir. 2019).

The Opposition merely repeats the AC's conclusory, insufficient refrain that, from the outset, the DOJ was requiring divestitures in excess of the level WM was required to accept, and that, later in the class period, WM was taking steps to potentially recut its deal with ADS. But the AC needed to allege how these undisclosed facts would "conflict with what a reasonable investor would take from the statement[s] [themselves]." *Sanofi*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 189).[14] Lead Plaintiff cannot point to any particularized allegation that satisfies this standard. Conclusory allegations that "[s]elling more assets would naturally require more time," AC ¶ 4, is a far cry from the kind of particularized allegations that the PSLRA demands. There is no allegation that a greater level of divestitures made even Defendants' cautious predictions

---

speaker's citation to the results of "'all the major [American] studies' from 'the last 30 years' in direct support of this categorical proposition." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020).

[14] Contrary to the Opposition's one-sentence argument that relies on a procedurally inapposite case regarding GAAP compliance and a review by external auditors, *In re Chi. Bridge*, 2021 WL 3727095, at *5, there is no material fact dispute at this stage regarding Defendants' optimistic statements about the timing of the merger. The AC fails to allege that the omitted facts about the DOJ requiring divestitures in excess of the ART or that WM later sought to possibly recut the deal rendered Defendants' statements false or misleading. This failure dooms the AC.

impossible to achieve.  Nor is there any allegation that WM had decided that it would walk away from the deal if the required divestitures exceeded the ART or that, if it took steps to renegotiate, it would or could reach new deal terms with ADS.  Lead Plaintiff's failure to allege facts that would contrast with what a reasonable investor would take from WM's statements stands most starkly when contrasted with analyst commentary following WM's public statements.  Throughout the class period, analysts concluded that the DOJ had likely required divestitures in excess of the ART, and later, went so far as to advocate for WM to renegotiate the deal with ADS.[15]

## II.    THE OPPOSITION DEMONSTRATES LEAD PLAINTIFF'S FAILURE TO PLEAD THE REQUISITE STRONG INFERENCE OF SCIENTER.

### A.    The Opposition Confirms the Deficiencies in the AC's Motive Allegations.

The Opposition's arguments do not address the AC's failure to allege a motive to defraud ***Note purchasers***.  *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) ("[T]he facts alleged must support an inference of an intent to defraud the *plaintiffs* rather than some other group.") (emphasis added).  Lead Plaintiff has never alleged *any* benefit to Defendants of the Notes trading above their par value on the secondary market.

The alleged "financial motive" to reduce the merger consideration and interest carrying costs does not lead to a plausible inference of scienter.  WM had a contractual right to redeem the Notes at 101% of par value if the merger failed "***for any reason***" to close by July 14, 2020.  AC

---

[15]    Contrary to Lead Plaintiff's contention, reference to such analyst reports does not constitute a "truth on the market defense."  These reports are not referenced for their truth but instead for the fact that they were made.  The Opposition ignores the Second Circuit's recent decision ***requiring*** analysis of this market context in considering whether a plaintiff adequately pleaded falsity.  *See Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352, 353–54 (2d Cir. 2022) (that some analysts "correctly predicted" company's threshold for "strong" gene expression undercut plaintiff's argument that the market was misled, where company "made clear at all times that it would not disclose the exact threshold").

¶ 33 (emphasis added). WM had no plausible motive to conceal from Note purchasers that it could be required to exercise that right; the right existed by contract.[16]

The Opposition's resort to individual Defendants' stock sales fares no better. The AC fails to plead even the most rudimentary facts necessary to make the stock sales relevant. There are no allegations (i) that the challenged statements somehow inflated WM's *stock* price, nor (ii) that the sales were "unusual" or "suspicious"—as required in this Circuit[17]—nor (iii) that WM's stock price dropped following the announcement of the revised merger agreement. Motive cannot be inferred from the bare fact that stock sales occurred.

**B.     The Opposition Confirms that the AC Fails to Sufficiently Plead Recklessness.**

Given the holes in the AC's motive allegations, the Opposition focuses on recklessness.[18] But the Opposition ignores the exacting standard for pleading securities fraud by alleging recklessness for each of the challenged statements and as to each Defendant. Memo. at 18-19, 27.

***The February 13, 2020 Statements.*** The AC alleges that on February 13, Defendants (WM, Fish, Morris, Rankin, and Nagy) cautiously predicted that they anticipated obtaining

---

[16]     These allegations fail to demonstrate that Defendants "benefited in some concrete and personal way from the purported fraud." Opp. at 28. The Second Circuit has instructed that "generalized motives" are not "sufficiently concrete for purposes of inferring scienter." *Kalnit*, 264 F.3d at 140. Here, the AC's "financial motives" are motives the Second Circuit has held are too generic to pass muster under the PSLRA. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813–14 (2d Cir. 1996) (as to allegations "that an inflated stock price . . . maintained the company's bond or credit ratings at the highest possible level" to minimize interest costs, the Court held "[w]e do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud"); *In re GeoPharma*, 399 F. Supp. 2d at 450 ("[C]ourts in this Circuit have consistently held that allegations that a defendant was motivated to commit securities fraud by a desire to reduce its debt burden, or otherwise reduce borrowing costs, are insufficient to raise a scienter inference.").

[17]     *See, e.g.*, *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("While unusual insider trading activity during the class period may permit an inference of bad faith and scienter, plaintiffs have failed to establish that [defendant's] stock sales were 'unusual.'"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 584–85 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ("While 'unusual' executive stock trading . . . may give rise to an inference of fraudulent intent, executive stock sales, standing alone, are insufficient to support a strong inference" of scienter.).

[18]     The holistic analysis this Court must undertake in assessing the scienter allegations, "does not permit," as Lead Plaintiff suggests, the Court "to combine inadequate allegations of motive with inadequate allegations of recklessness to demonstrate scienter." *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021) (citing *Kalnit*, 264 F.3d at 141).

11

regulatory approval by the end of March 2020.  AC ¶¶ 58-60.[19]  The Opposition's only argument as to recklessness is that Defendants knew then that the DOJ was requiring divestitures exceeding the ART.  Opp. at 24.  According to Lead Plaintiff, the DOJ's position "could (and likely would) prevent the Company from closing by the End Date."  *Id.* at 26.  These allegations do not plead a strong inference that any Defendant possessed a state of mind "approximating actual intent." Memo. at 18.  An undisclosed fact that "could" render a statement false does not "contradict[]" that statement for purposes of alleging recklessness.  *See, e.g.*, *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 573 (S.D.N.Y. 2007) (rejecting argument that the complaint sufficiently alleged recklessness where "it was highly unlikely—if not impossible—for" an event to occur because a defendant "should not be charged with recklessness unless it [is] clear the endeavor could not possibly succeed").  At most, failure to disclose a fact that "could" render a prediction false constitutes an allegation of negligence, which is insufficient to plead recklessness.  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  The AC contains no allegations supporting an inference that Defendants were aware as of February 13, 2020 that the transaction could not close by the End Date, regardless of the DOJ's divestiture requirements.  To the contrary, the Opposition acknowledges that the primary buyer for the divested assets, GFL, was fully engaged in integrating the divested assets since "at least March 2020."  Opp. at 24.

Further, the Opposition cannot explain how Defendants were under any "known or obvious duty to disclose" the DOJ's position on February 13, 2020.  *Plumbers & Steamfitters*, 2017 WL 4403314, at *21, *aff'd sub nom.*, 773 F. App'x 630 (2d Cir. 2019).  The Opposition ignores that

---

[19]     The AC alleges that Fish, Rankin, and Nagy signed the Form 10-K and that Fish and Morris made statements on the earnings call.  AC ¶¶ 50, 58, 60.  The AC makes no individualized scienter allegations as to Leslie Nagy whatsoever.  *See* AC ¶¶ 24, 50, 67.  It is well established that scienter "cannot be inferred solely from" a defendant's "board membership or executive managerial position."  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016).

"the law does not require blow-by-blow disclosures of conversations with regulatory agencies."[20] Indeed, the Opposition's only effort to distinguish *Sanofi* is to reiterate the conclusory allegation that Defendants violated the duty "not to 'omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"[21]  Opp. at 25-27.  But this argument improperly conflates the scienter requirement with the falsity requirement.  *See L.L. Cap. Partners, L.P. v. Rockefeller Ctr. Props., Inc.*, 939 F. Supp. 294, 299 (S.D.N.Y. 1996) ("[I]t would be folly to hold, as plaintiff would have the Court do, that the knowing failure to disclose a material fact in and of itself necessarily gives rise to a strong inference of fraud"); *GeoPharma*, 411 F. Supp. 2d at 446 (to plead recklessness, a plaintiff must allege that "defendants intended to confuse the market by omitting material information").

**The March 18, 2020 Statements.**  The Opposition acknowledges that its recklessness argument concerning the March 18 statements rests solely on Defendants' alleged knowledge that the DOJ was requiring divestitures exceeding the ART.  On March 18, 2020, WM "[u]pdate[d] [its] prior timing expectations" and stated that it anticipated receiving regulatory approval "in the second quarter of 2020" due, in part, to disruptions from the COVID pandemic.[22] AC ¶ 63.  Again,

---

[20]    *See In re Discovery Labs. Sec. Litig.*, 2006 WL 3227767, at *12 (E.D. Pa. Nov. 1, 2006) (company's "involve[ment] in a complex negotiation with two different agencies . . . were just the sort of 'ongoing discussions' with regulatory agencies" that need not be disclosed) (quoting *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995)); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 542 (S.D.N.Y. 2015) ("Defendants had no duty to disclose these ongoing discussions with the FDA"), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

[21]    Additionally, there was no known or obvious duty to disclose under Item 303 and Item 105 of SEC Regulations S-K.  17 C.F.R. § 229.303; 17 C.F.R. § 229.105.  Lead Plaintiff's cases do not hold that there is a duty under those regulations to disclose confidential communications with a regulatory agency or the possibility of renegotiating a merger agreement prior to reaching a definitive agreement.  *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (concluding that company had a duty under Item 303 to disclose microchip defect rate that "was, in essence, 100% for all chips sold to clients representing 72% of revenues"); *Wang v. Cloopen Grp. Holding Ltd.*, 2023 WL 2534599, at *13 (S.D.N.Y. Mar. 16, 2023) (concluding company had a duty under Items 105 and 303 to disclose loss of $26 million from exercise of Series F Warrant that contributed to a net loss "of 466.9% year-over-year in the fourth quarter ('4Q') of 2020").  In addition, the AC's Item 303 and Item 105 allegations do not suffice in the face of WM's disclosure of the precise risk at issue.  *See* Memo. at 26 n.35.

[22]    The WM spokesperson statement that "[e]verything is progressing as expected" is "non-specific enough as to be immaterial and, thus, not actionable."  *Hering*, 331 F. Supp. 3d at 427.

Lead Plaintiff offers no allegations that WM was aware of information showing that the DOJ's position on required divestitures made WM's newly extended timeline impossible to meet. For example, there is no allegation that WM's work with the DOJ or with the buyer of the divested assets, GFL, towards the newly anticipated timeline had halted. To the contrary, the most plausible inference from the facts alleged is that WM reassessed the previously announced projected timing in light of the impacts from COVID and the status of DOJ negotiations, and gave investors a revised opinion based on a good-faith belief about when it expected DOJ approval. And WM was likewise under no "known or obvious" duty to disclose the DOJ's position on divestiture negotiations, particularly after revising its projection about when it would obtain DOJ approval.

***The May 6, 2020 Statements.*** The Opposition misconstrues Defendants' May 6, 2020 statements. On that date, Defendants (WM, Fish, Rankin, and Nagy)[23] revised their cautious prediction to state only that they "anticipate[d] being ***in a position to*** receive final antitrust regulatory approval and ***proceed toward closing*** by the end of the second quarter of 2020." AC ¶ 68 (emphasis added). In other words, Defendants expressly told all investors that they were no longer predicting that DOJ ***would act*** or that the transaction ***would close*** by the End Date. To any reasonable investor, this was a huge red flag: WM was no longer willing to predict that the transaction would close by the End Date, and thus, could trigger its obligation to redeem the Notes for 101% of par value. Memo. at 23-24.[24] The Opposition fails to explain how these cautious comments were reckless. There is no allegation that Defendants believed at this time that the DOJ's position on divestitures made their revised predictions impossible to achieve. Indeed, Lead

---

[23] The AC alleges that Fish, Rankin, and Nagy signed the Form 10-Q and that Fish made statements on the conference call. AC ¶¶ 67, 72.

[24] Attempting to obscure this red flag, the Opposition doubled down on the AC's selective and misleading quotation from Fish's comments on the May 6 analyst call. Opp. at 8, 14. The actual question and answer was: "Did you say you expect closing to occur by the end of the second quarter or subsequent to that," Fish responded "Well, ***no***, I just said we anticipate being in a ***position to close*** by the end of the second quarter."

14

Plaintiff cites the fact that the divestiture buyer, GFL, already had been working on the purchase for several months.  Opp. at 24.  And Lead Plaintiff fails to explain how WM's review of ADS's financials in April 2020, and ultimate efforts to revise the merger terms "contradict[ed]" Defendants' cautious predictions.[25]  The mere assertion that renegotiation of the transaction "could (and likely would) prevent the Company from closing by the End Date," Opp. at 26, does not suffice: that an undisclosed fact that "could" change a projection does not mean that it "contradicts" it.  *See supra* p. 12.  Further, as detailed in the ADS Proxy (on which the AC relies), on May 6, it was far from clear that WM and ADS would be able to reach alternative terms; indeed, Defendants had not even broached the topic to ADS as of that date.  *See* Dkt. 40-1 at 17-20.

***The June 10, 2020 Statements.***  As with the prior statements, the Opposition fails to explain how Rankin was reckless by referring analysts back to WM's May 6 statement and stating she could not disclose more details "at this time."  WM and ADS did not agree to a revised merger price until June 23, the day before it announced the revised agreement on June 24.  Dkt. 40-1 at 20.  Further, as discussed above, her statements concerning the $200 million ART threshold were consistent with, not contrary to, the alleged truth and create the opposite inference of scienter.

Finally, because the AC does not sufficiently plead a primary violation under 10(b), the Court must also dismiss the Section 20(a) claim against each of the individual Defendants.  *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004).

**CONCLUSION**

For these reasons, the AC should be dismissed in its entirety and with prejudice.

---

[25]     Lead Plaintiff also makes no argument that Defendants recklessly disregarded a duty—let alone an obvious duty—to disclose preliminary merger renegotiations.  *See* Opp. 23-28.  Lead Plaintiff's omission is fatal as there is no "specific duty to disclose merger negotiations under SEC rules until they become definitive agreements."  *See Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009), *aff'd sub nom.*, 374 F. App'x 141 (2d Cir. 2010).

15

Dated: May 16, 2023

*/s/ Jessica B. Pulliam*

David D. Sterling
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
Tel: (713) 229-1946
Fax: (713) 229-7946
david.sterling@bakerbotts.com

Jessica B. Pulliam
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Tel: (214) 953-6677
Fax: (214) 661-4677
jessica.pulliam@bakerbotts.com

Brendan Quigley
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 408-2520
Fax:  (212)-259-2520
brendan.quigley@bakerbotts.com

*Counsel for Defendants*

16