UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
UNITED INDUSTRIAL WORKERS PENSION          :
PLAN,                                                         :
                                         Plaintiff,           :          22 Civ. 4838 (LGS)
                                                              :
                    -against-                                 :          **OPINION AND ORDER**
                                                              :
WASTE MANAGEMENT, INC., et al.,            :
                                         Defendants.  :
------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

Lead Plaintiff Seafarers Officers & Employees Pension Plan, Seafarers Money Purchase

Pension Plan and United Industrial Workers Pension Plan (together, "Lead Plaintiff") brings this

putative class action against Defendants Waste Management, Inc. ("WM"), James C. Fish, Jr.,

John J. Morris, Devina A. Rankin and Leslie K. Nagy.  Lead Plaintiff alleges securities fraud in

violation of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"),

codified at 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R.

§ 240.10b-5 ("Rule 10b-5").  Defendants move to dismiss the Amended Complaint (the

"Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the following reasons,

the motion is denied, except as to Defendant Nagy, who is dismissed.

**I.      BACKGROUND**

The following facts are taken from the Complaint and documents referenced in the

Complaint.  *See Dixon v. von Blanckensee*, 994 F.3d 95, 101-02 (2d Cir. 2021).

A.      **The Parties**

Defendant Waste Management, Inc. is a waste management and environmental services company.  WM is the largest solid waste hauling and disposal company in the United States and provides waste collection, recycling and disposal services.

Lead Plaintiff purchased certain WM redeemable senior notes (the "Notes") during the proposed class period beginning February 13, 2020, and ending June 23, 2020 (the "Class Period").

Defendants James C. Fish, Jr., John J. Morris, Devina A. Rankin and Leslie K. Nagy (together, "Individual Defendants") were officers of WM in executive positions during the Class Period.  Defendant Fish was the President and Chief Executive Officer ("CEO") of WM and a member of WM's Board of Directors.  Defendants Morris, Rankin and Nagy were WM's Chief Operating Officer ("COO"), Chief Financial Officer ("CFO") and Chief Accounting Officer ("CAO"), respectively.

B.      **The Alleged Fraud and Ultimate Disclosure**

The Complaint alleges that Defendants made false and misleading statements concerning the completion time of WM's acquisition of its competitor, Advanced Disposal Services, Inc. ("ADS"), that inflated the price of the Notes.  The Complaint alleges material omissions and misstatements made during the Class Period in WM's forms filed with the U.S. Securities and Exchange Commission ("SEC") and in conferences with investors and analysts.

In April 2019, WM entered into an agreement and plan of merger (the "Merger Agreement") to acquire ADS.  As ADS was the fourth-largest waste management company in the United States, the acquisition was conditioned upon obtaining antitrust clearance from regulators, including the U.S. Department of Justice ("DOJ").  The Merger Agreement required

WM to agree to divest assets contributing up to $200 million in annual revenues (the "Antitrust

Revenue Threshold") if needed to obtain antitrust approval.  If the DOJ required divestment of

assets in excess of the Antitrust Revenue Threshold, WM had the right to terminate the

transaction and pay a termination fee.

In May 2019, WM issued the Notes to finance its acquisition of ADS.  The Notes

included a "special mandatory redemption" feature that required WM to redeem the Notes at

101% of par if WM did not complete the acquisition by July 14, 2020 (the "End Date").

The Complaint alleges that Defendants made false and misleading statements beginning

on February 13, 2020, the first day of the Class Period.  That day, WM filed its 2019 Form 10-K

with the SEC, which was signed by Defendants Fish, Rankin and Nagy.  The Form 10-K states,

"We anticipate that we will obtain antitrust regulatory approval by the end of March 2020 and

close the Advanced Disposal transaction soon thereafter."  During a conference call with

investors and analysts that day, WM's CEO Defendant Fish stated, "We are excited as we near

the close of this transaction" and "[w]e anticipate that we will obtain antitrust regulatory

approval by the end of March and close soon thereafter."  "Our integration team has been

working hard preparing for this close," Defendant Fish continued, "and the team is positioned to

move quickly to integrate ADS operations and to achieve our targeted synergies."  On the same

call, Defendant Morris stated, "[W]e are approaching the close of the transaction and the start of

the integration" and "we're on a trajectory, we think, to get clearance from DOJ right towards the

end of the quarter.  And obviously, we're going to move to close quickly after that."

On March 18, 2020, WM filed a Form 8-K to "update [its] prior timing expectations."

The Form 8-K states, "As a result of, and subject to any further effects from, the COVID-19

(coronavirus) outbreak, and subject to obtaining final regulatory approval from the DOJ (which

the Company currently anticipates receiving in the second quarter of 2020), the Company now anticipates closing the Merger mid to late second quarter 2020."

On May 6, 2020, WM filed its Form 10-Q for the first quarter of 2020, which was signed by Defendants Rankin and Nagy.  The Form 10-Q states, "[W]e continue to make progress and currently anticipate being in a position to receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020."  During a conference call that day, when asked by an analyst whether Defendant Fish expected closing to occur "by the end of the second quarter or subsequent to that," Defendant Fish stated, "Well, no, I just said we anticipate being in a position to close by the end of the second quarter. . . . [W]hen we first announced this deal . . . we said that it would take, we thought, between 12 and 15 months to close.  We're at 13.5 or we will be, next week, so -- or 12.5.  So we're within that window in terms of this being in anticipation or anticipating being in a position to close, so we're not worried about that."

On May 13, 2020, Defendant Fish called ADS's CEO to propose a reduction in the merger price in light of "the fact the DOJ indicated it was not likely to approve the merger prior to the July 13 end date without divestitures in excess of the Antitrust Revenue Threshold."  On May 19, 2020, Defendants Fish and Morris jointly called ADS's CEO to "reiterate[] Waste Management's desire to reduce the original merger consideration" because of "the fact that the DOJ staff was requiring assets to be divested in order to grant approval of the merger that would result in a reduction of revenue in excess of the Antitrust Revenue Threshold, such that Waste Management would not be obligated to close the merger."

At a June 10, 2020, presentation on behalf of WM at the Stifel 2020 Cross Sector Insight Conference, WM's CFO, Defendant Rankin, stated, "[W]hat I would say is reminding everyone that what we've mentioned before is the Waste Management team works closely with the DOJ to

continue to move the transaction forward, and the statement that we made about expected timing [i.e., end of Q2 2020] is the best that I have at this time."

On June 24, 2020, one day after the end of the Class Period, WM announced a revised merger agreement with ADS that it expected to trigger the special mandatory redemption feature of the Notes that required WM to redeem the Notes at 101% of par.  At the same time, WM and ADS announced the sale to a Canadian waste company of $835 million in assets, representing $345 million in combined annual revenues, to address divestures expected to be required by the DOJ.  In response, the price of the Notes dropped from approximately 111 cents on the dollar to 103 cents on the dollar in anticipation that the Notes would likely be redeemed.

On July 20, 2020, WM redeemed the Notes at 101% of par pursuant to the special mandatory redemption feature.  On July 24, 2020, ADS filed a proxy statement ("ADS Proxy") that described previously undisclosed conduct by Defendants during the Class Period, including the calls between WM and ADS.

## II.    STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570; *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021).  To survive dismissal, a complaint's "factual allegations must be enough to raise a right to relief above the speculative

level." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 306 (2d Cir. 2022).[1]  On a Rule

12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences

are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d

Cir. 2016); *accord Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021).  However,

a court does not consider "conclusory allegations or legal conclusions couched as factual

allegations." *Dixon*, 994 F.3d at 101.

      "A complaint alleging securities fraud must also satisfy heightened pleading requirements

set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act

of 1995 (PSLRA)." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021).

"Rule 9(b) requires litigants to state with particularity the circumstances constituting fraud." *Id.*

"To do so, a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent." *Id.*  "The PSLRA, in turn, requires a plaintiff alleging securities

fraud to (1) specify each misleading statement, (2) set forth the facts on which a belief that a

statement is misleading was formed, and (3) state with particularity facts giving rise to a 'strong

inference' that the defendant acted with scienter -- the required state of mind." *Id.* (citing 15

U.S.C. § 78u-4(b)(2)(A)).

## III.    DISCUSSION

      The Complaint asserts a claim of securities fraud under § 10(b) of the Exchange Act and

its implementing rule, Rule 10b-5.  That rule makes it unlawful "[t]o make any untrue statement

of a material fact or to omit to state a material fact necessary in order to make the statements

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R.
§ 240.10b-5(b).  The Complaint also asserts a claim of control person liability under § 20(a) of
the Exchange Act.

### A.      Section 10(b) Violation

To support a claim for securities fraud, "a plaintiff must plead: (1) a material
misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or
omission and the purchase or sale of a security, (4) reliance on the misrepresentation or
omission, (5) economic loss, and (6) loss causation." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th
95, 102 (2d Cir. 2022).  "The first two elements must be pled with heightened specificity
pursuant to the Private Securities Litigation Reform Act of 1995 and Federal Rule of Civil
Procedure 9(b)." *Id.* at 102-03.  Principally at issue on this motion is whether the Complaint
sufficiently pleads the first two elements of securities fraud -- a material misrepresentation or
omission and scienter.

### 1.   Material Misrepresentations or Omissions

The Complaint adequately alleges that, under the circumstances, Defendants made
material misrepresentations and omissions about the merger completion time in SEC filings and
during investor calls during the Class Period.  "[Section] 10(b) and Rule 10b-5(b) do not create
an affirmative duty to disclose any and all material information.  Disclosure is required under
these provisions only when necessary 'to make . . . statements made, in the light of the
circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v.
Siracusano*, 563 U.S. 27, 44 (2011) (quoting Rule 10b-5); *accord Ark. Pub. Emps. Ret. Sys. v.
Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022).  "Even when there is no existing
independent duty to disclose information, once a company speaks on an issue or topic, there is a

duty to tell the whole truth." *Noto*, 35 F.4th at 105.  A statement or omission is material when

"there is a substantial likelihood that the disclosure of the omitted fact would have been viewed

by the reasonable investor as having significantly altered the total mix of information made

available" to the market.  *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d

Cir. 2021).

The Complaint sufficiently pleads that Defendants made material omissions when they

made certain statements about the acquisition completion time but failed to disclose that the $200

million Antitrust Revenue Threshold likely would not, and eventually did not, satisfy the DOJ's

antitrust concerns, thereby necessitating the renegotiation of the merger.  These statements were

misleading because they created an impression that the acquisition would be approved before the

End Date when Defendants knew the acquisition was likely to be delayed due to the DOJ's

objections.  These statements were material to Notes investors because a merger delay would

trigger the special mandatory redemption feature of the Notes that required WM to redeem the

Notes at 101% of par, thus affecting the trading price of the Notes.

For example, WM's 2019 Form 10-K, which was published on February 13, 2020, states,

"We anticipate that we will obtain antitrust regulatory approval by the end of March 2020 and

close the Advanced Disposal transaction soon thereafter."  However, the Complaint plausibly

alleges that Defendants knew about the DOJ's objections when the statement was made.  As

recounted in the later ADS Proxy, starting in February 2020, "[o]ver the course of the next

several months, Advanced Disposal, Waste Management and their respective antitrust counsel

continued to respond to the DOJ staff, and Waste Management worked to establish a divestiture

framework that it believed would potentially satisfy the DOJ staff's questions about the

transaction."  In April 2020, ADS provided updated financial forecasts to WM "to facilitate

Waste Management's *continued consideration* of agreeing to divestitures in excess of the

Antitrust Revenue Threshold at the request of the DOJ." (Emphasis added.) In May 2020, "after

a series of general discussions with the board of directors of Waste Management," Defendants

Fish and Morris made calls to ADS's CEO to propose a reduction in the original merger

consideration given that the DOJ was requiring a divestiture of assets in excess of the Antitrust

Revenue Threshold. In June 2020, WM and ADS announced the sale to a Canadian waste

company, GFL Environmental Inc. ("GFL"), of assets representing $345 million in combined

annual revenues, a divestment well above the Antitrust Revenue Threshold and one that

plausibly would take months to plan. The assets included "36 transfer stations, 18 landfills, 380

collection vehicles, and approximately 900 employees, all spread through 10 states in the U.S."

As alleged in the Complaint, "[a] transaction involving the sale of $835 million in physical assets

across multiple jurisdictions necessitates months of negotiation, due diligence, and

comprehensive planning, strongly supporting that Defendants knew the DOJ required

divestitures exceeding the Antitrust Revenue Threshold months before the June 24, 2020

announcement." Indeed, during a June 25, 2020, conference call about the transaction, GFL's

CEO stated that the integration planning and pre-planning "has been sort of done over the

previous sort of three months," i.e., since at least March 2020, meaning that WM had likely been

planning that asset sale beforehand. Further, the ADS Proxy states that "Waste Management and

Advanced Disposal executed the GFL divestiture agreement in order to address *substantially all*

of the divestitures anticipated to be required by the DOJ to obtain antitrust approval in

connection with the transactions." (Emphasis added.) Taken together, these allegations support

the inference that WM knew since as early as February 2020 that asset sales up to the Antitrust

Revenue Threshold would not be sufficient to obtain DOJ approval. For similar reasons, the

9

February 13, 2020, oral statements by Defendants Fish and Morris, the March 18, 2020,

statement on WM's Form 8-K and the May 6, 2020, statement on the Form 10-Q concerning the

anticipated merger closing date, as described above, are actionable as misleading.

Contrary to Defendants' arguments, the challenged statements are not protected by the

PSLRA's safe harbor for forward-looking statements under 15 U.S.C. § 78u-5(c).  "Under that

provision a defendant is not liable if (1) the forward-looking statement is identified and

accompanied by meaningful cautionary language, (2) the forward-looking statement is

immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with

actual knowledge that it was false or misleading.  Because the safe harbor is written in the

disjunctive, a forward-looking statement is protected under the safe harbor if any of the three

prongs applies."  *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 245-46 (2d Cir. 2016).

Conversely, the safe harbor does not apply when, as here, a misleading and material forward-

looking statement is unaccompanied by meaningful cautionary language, and is made with actual

knowledge that it is misleading.

First, even if the challenged statements qualify as forward-looking statements,

Defendants point to cautionary language that is merely "boilerplate," such as the language in the

2019 Form 10-K that states, "Our planned acquisition of Advanced Disposal Services, Inc.

('Advanced Disposal') may not occur at all, may not occur in the expected time frame or may

involve the divestiture of certain businesses and assets, which may negatively affect the trading

price of our common stock and our future business and financial results."  *See Vivendi*, 838 F.3d

at 247 ("To avail themselves of safe harbor protection under the meaningful cautionary language

prong, defendants must demonstrate that their cautionary language was not boilerplate and

conveyed substantive information."); *accord Gluck v. Hecla Mining Co.*, No. 19. Civ. 4883,

2023 WL 2161958, at \*6 (S.D.N.Y. Feb. 22, 2023).  The warning in the 2019 Form 10-K lists only vague and generic risks when the Complaint plausibly alleges that, by then, a reasonable investor with the same information Defendants had at the time would have concluded that the risks had already materialized.  *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("[A] company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.").

Similarly, the statements are not protected by the judicially created bespeaks caution doctrine.  Under this doctrine, a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading."  *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010).  For the same reasons discussed above, this doctrine does not apply.  *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006) (the bespeaks caution doctrine "applies only where the cautionary language is reasonably specific as opposed to generic or boilerplate so as to constitute a real warning to investors").

Second, Defendants do not dispute the materiality of the challenged statements.  Third, as discussed below regarding scienter, the Complaint also sufficiently alleges the "actual knowledge" prong.  The Complaint raises a strong inference that Defendants knew about undisclosed objections from the DOJ that would seriously undermine WM's ability to close the merger on the original timeline, given the timing of the merger renegotiations recounted in the ADS Proxy.  *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 775 (2d Cir. 2010) (actual knowledge

precludes the safe harbor if "a reasonable person would . . . deem an inference that the

defendants . . . were aware of undisclosed facts tending to seriously undermine the accuracy of

the statement, cogent and at least as compelling as any opposing inference").

Defendants also argue that the challenged statements are unactionable opinions.  Rule

10b-5 prohibits statements of opinion when such statements, without the contextualization of

material facts, would be misleading.  The Supreme Court has "established two principal ways of

challenging statements of opinion that do not require plaintiffs to show that the speaker

subjectively disbelieved the statement."  *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165,

175 (2d Cir. 2020).  Under one method, "when a statement of opinion implies facts or the

absence of contrary facts, and the speaker knows or reasonably should know of different material

facts that were omitted, liability under Rule 10b-5 may follow."  *Id.*  Here, even if the challenged

statements were opinions, they would be actionable under this method for the reasons discussed

above.

Finally, the analyst reports submitted by Defendants do not require a different result.

This case is distinguishable from *Arkansas Public Employees Retirement System*.  There, the

Second Circuit stated that the "fact that [some analyst] reports, relying on the same public

information, correctly predicted [the undisclosed fact] is relevant" to whether the defendant's

public statements were misleading.  28 F.4th at 352.  But the Second Circuit affirmed dismissal

of the complaint because of the nature of the alleged misstatement.  The court found it was not

misleading for the defendant to state that its clinical trial would target patients "strongly

expressing" a certain protein, which affected the new drug's likelihood of success.  *Id*. at 347,

352-55.  The plaintiffs alleged that the characterization of "strong" was false, or at least required

disclosure of the percentage.  *Id*. at 350-51.  The court held that the defendant's statement was

12

not misleading because there was no consensus about the meaning of "strong" in this context, the complaint alleged no facts that would give rise to an obligation to disclose the percentage, and the defendant cautioned the public that it would not do so. *Id*. at 348. In contrast, Defendants here repeatedly and specifically stated the expected merger timetable, such as the statement in the May 6, 2020, Form 10-Q that WM anticipated being in a position to "proceed toward closing by the end of the second quarter of 2020." This statement was misleading if, behind the scenes, Defendants knew otherwise.

### 2. Scienter

The Complaint sufficiently pleads scienter as to Defendants Fish, Rankin and Morris but not as to Defendant Nagy. Consequently, the § 10(b) claim against Defendant Nagy is dismissed.

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "This standard requires courts to take into account plausible opposing inferences." *Matrixx Initiatives, Inc.*, 563 U.S. at 48. "For an inference of scienter to be strong, a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (emphasis omitted). "In making this determination, the court must review all the allegations holistically." *Matrixx Initiatives, Inc.*, 563 U.S. at 48.

A plaintiff may satisfy the scienter requirement by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020). "Circumstantial evidence can support an inference

of scienter in a variety of ways, including where defendants . . . knew facts or had access to information contradicting its public statements" or "failed to review or check information that it had a duty to monitor." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015); *accord Denny v. Canaan Inc.*, No. 21 Civ. 3299, 2023 WL 2647855, at *12 (S.D.N.Y. Mar. 27, 2023).

### a. Defendant Fish

The Complaint sufficiently pleads Defendant Fish's scienter.  At all relevant times, Fish was WM's President and CEO and a member of its Board of Directors.  Fish signed the February 13, 2020, Form 10-K, signed a certification attesting to the accuracy and completeness of the May 6, 2020, Form 10-Q and spoke publicly to investors.  Fish took an active role in the merger negotiations and knew about the DOJ's concerns, as evidenced by his May 13, 2020, and May 19, 2020, calls to ADS's CEO proposing a reduction in the original merger consideration because of the DOJ's objections.  On May 6, 2020, only a week before his first call to ADS's CEO, Fish continued to state that he "anticipate[d] being in a position to close by the end of the second quarter" and was "not worried" about closing by the End Date.  The Complaint sufficiently pleads that Fish "had access to information contradicting [his] public statements." *See Blanford*, 794 F.3d at 306.

Contrary to Defendants' argument, this case is distinguishable from *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).  The court in *Sanofi* found that statements from a pharmaceutical company projecting Food and Drug Administration ("FDA") approval by a certain date were not materially misleading because the plaintiff investors "would fully expect that Defendants and the FDA were engaged in a dialogue." *Id.* at 211.  In this case, while investors would have expected that WM and the DOJ were engaged in a dialogue about the sufficiency of the divestures

14

required for antitrust approval, investors could not have known that WM already knew the outcome of that dialogue.  Similarly, Defendants' argument that they did not have a duty to disclose the renegotiation discussions with ADS is unavailing.  While the court in *In re Agnico-Eagle Mines Ltd. Sec. Litig.* found the defendants there were "not obliged to provide continuous disclosure" regarding problems at a gold mine because they were "entitled to devote a reasonable amount of time to investigation and remediation before disclosing an assessment," according to the Complaint, Defendants here faced significantly less uncertainty regarding their negotiations with the DOJ and the likelihood of completing a merger before the End Date.  *See* No. 11 Civ. 7968, 2013 WL 144041, at *21 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013).  The Complaint adequately alleges facts constituting strong circumstantial evidence of Defendant Fish's actual knowledge that his statements were misleading.

### b.  Defendant Morris

The Complaint also sufficiently pleads Defendant Morris acted with scienter.  Morris was WM's COO throughout the Class Period.  During a February 13, 2020, conference call with investors and analysts, Defendant Morris stated, "[W]e are approaching the close of the transaction and the start of the integration" and "we're on a trajectory, we think, to get clearance from DOJ right towards the end of the quarter.  And obviously, we're going to move to close quickly after that."  On May 19, 2020, Defendants Morris and Fish together called ADS's CEO about WM's desire to reduce the original merger consideration because of the DOJ's concerns.  This call indicates Morris played a key role in the merger negotiations and, taking the Complaint's allegations as a whole, likely knew of the DOJ's concerns as they were expressed, for the reasons discussed previously involving the timing of WM's work to obtain DOJ approval

for a new divestiture framework.  Therefore, the Complaint adequately alleges Defendant

Morris's scienter through actual knowledge.

### c.   Defendant Rankin

The Complaint sufficiently pleads Defendant Rankin's scienter.  The Complaint alleges

that Rankin was WM's CFO throughout the Class Period, signed the February 13, 2020, Form

10-K and May 6, 2020, Form 10-Q and spoke at a June 10, 2020, investor conference on behalf

of WM, in which she stated that the expected closing date by the end of the second quarter of

2020 was "the best that [she had] at this time."  Rankin's appearance as WM's representative and

detailed answers to questions regarding the merger at the June 2020 conference point at least to

her knowledge of -- if not outright involvement in -- the merger negotiations.  Taken together

with the allegations that she held the CFO role at WM, co-signed the SEC filings with Defendant

Fish and spoke at both of the earnings calls described in the Complaint with Defendants Fish and

Morris, the Complaint supports a cogent inference of scienter that is "at least as compelling as

any opposing inference one could draw from the facts alleged."  *See ATSI Commc'ns, Inc.*, 493

F.3d at 99 (emphasis omitted).

### d.   Defendant Nagy

The Complaint does not sufficiently plead that Defendant Nagy acted with scienter.  The

only allegations concerning Nagy are that she was WM's CAO at the relevant times, signed the

February 13, 2020, Form 10-K and May 6, 2020, Form 10-Q and sold WM common stock on

February 21, 2020, and February 25, 2020, shortly after the beginning of the Class Period.

Nothing in the Complaint suggests that, when Nagy signed these SEC filings, she knew or

should have known that the completion time for the ADS merger would extend beyond the End

Date.  The allegations taken as a whole do not imply that Nagy knew about the fraud, had access

to information about it, or failed to check information she had a duty to monitor.  *See Blanford*, 794 F.3d at 306.  It is unclear from the Complaint whether Nagy was involved in the merger negotiations.  The more compelling inference from the limited allegations in the Complaint is that Nagy did not know about the DOJ's antitrust concerns.

The Complaint fails to allege that Nagy made "unusual stock trades as necessary to raise an inference of bad faith or scienter."  *See Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355.  "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  *Id.*  That the Complaint alleges stock sales by all four Individual Defendants shortly after the start of the Class Period is outweighed by the Complaint's failure to allege any information regarding the profits (rather than proceeds), percentage change in Nagy's holdings, change in volume of insider sales or whether the sales were made pursuant to a trading plan such as a Rule 10b5-1 plan.  *See, e.g.*, *id.* at 355-56 (finding insufficient motive based on stock sales); *Kasilingam v. Tilray, Inc.*, No. 20 Civ. 3459, 2023 WL 5352294, at *4 (S.D.N.Y. Aug. 21, 2023) (same); *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 463 (S.D.N.Y. 2022) (same); *In re Plug Power, Inc. Sec. Litig.*, No. 21 Civ. 2004, 2022 WL 4631892, at *13-14 (S.D.N.Y. Sept. 29, 2022) (same).  Taken together, the Complaint's allegations do not support a cogent inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged."  *See ATSI Commc'ns, Inc.*, 493 F.3d at 99 (emphasis omitted).  The securities fraud claim against Nagy is therefore dismissed.

### e.  Corporate Scienter

A complaint may satisfy the scienter requirement as to a corporation "by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to

the corporation acted with the requisite scienter or (2) that the statements would have been

approved by corporate officials sufficiently knowledgeable about the company to know that

those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,

797 F.3d 160, 177 (2d Cir. 2015); *accord UA Loc. 13 Pension Fund v. Sealed Air Corp.*, No. 19

Civ. 10161, 2021 WL 2209921, at *7 (S.D.N.Y. June 1, 2021).  Courts will then "look to the

discrete roles played by the corporate actors who are connected to the alleged misrepresentation

to determine which (if any) fall within the locus of a company's scienter." *Jackson v. Abernathy*,

960 F.3d 94, 98 (2d Cir. 2020).  "Under this approach, the most straightforward way to raise a

strong inference of corporate scienter is to impute it from an individual defendant who made the

challenged misstatement." *Id.*  "The scienter of the other officers or directors who were involved

in the dissemination of the fraud may also be imputed to the corporation, even if they themselves

were not the actual speaker." *Id.*  Because the Complaint adequately alleges scienter as to WM's

CEO (Fish), COO (Morris) and CFO (Rankin), WM's scienter is inferred.  *See id.*

   **B.       Section 20(a) Violation**

       Section 20(a) imposes joint and several liability on control persons for underlying

violations of the Exchange Act.  *See* 15 U.S.C. § 78t(a).  "To state a claim of control person

liability under § 20(a), "a plaintiff must show (1) a primary violation by the controlled person,

(2) control of the primary violator by the defendant, and (3) that the defendant was, in some

meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension

Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).  Because the Complaint

pleads a primary violation under § 10(b) and the Complaint otherwise adequately alleges a

control person violation, Defendants' motion to dismiss the § 20(a) claim is denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **DENIED in part and**

**GRANTED in part**.

The Clerk of Court is respectfully directed to close the motion at Dkt. 48 and to terminate

Leslie K. Nagy as Defendant.

Dated:  March 27, 2024
       New York, New York

                                       LORNA G. SCHOFIELD
                                 UNITED STATES DISTRICT JUDGE