UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | | x |
| In re WASTE MANAGEMENT SECURITIES LITIGATION | : : x | Civil Action No. 1:22-cv-04838-LGS <br><br> CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS
REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

I. PRELIMINARY STATEMENT ...................................................................................1

II. CLASS DEFINITION ..............................................................................................2

III. FACTUAL AND PROCEDURAL BACKGROUND..................................................2

IV. THE PROPOSED CLASS SATISFIES RULE 23 ......................................................4

    A. The Proposed Class Satisfies the Requirements of Rule 23(a)...........................5

        1. Numerosity: The Proposed Class Is So Numerous that Joiner of All Members Is Impracticable..........................................................................5

        2. Commonality: There Are Questions of Law and Fact Common to the Class ...............................................................................................6

        3. Typicality: Lead Plaintiffs' Claims Are Typical of the Claims of the Class ...............................................................................................7

        4. Adequacy: Lead Plaintiffs Will Fairly and Adequately Protect the Class ...............................................................................................8

    B. Certification Is Proper Under Rule 23(b)(3).....................................................10

        1. Predominance: Common Questions of Law and Fact Predominate Over Individual Questions .........................................................................10

            a. Fraud-on-the-Market: Reliance Is Presumed Under *Basic* Because the Notes Traded in an Efficient Market ........................11

                (1) *Cammer* Factor 1: The Notes Experienced a High Volume and Frequency of Trading....................................13

                (2) *Cammer* Factor 2: Extensive Analyst, Rating Agency, and Other Sources of Coverage and Information ....................................................................14

                (3) *Cammer* Factor 3: Underwriters and Market Makers........16

                (4) *Cammer* Factor 4: Form S-3 Eligibility.............................16

                (5) *Cammer* Factor 5: The Notes Reacted to Company-Specific Information .........................................................17

                (6) *Krogman* Factor 1: Outstanding Par Value........................18

                (7) *Krogman* Factor 2: Narrow Bid-Ask Spread ....................19

**Page**

(8)     *Krogman* Factor 3: Float......................................................20

b.     *Affiliated Ute*: Lead Plaintiffs Are Entitled to a
Presumption of Reliance Pursuant to *Affiliated Ute* .......................21

c.     Damages Are Measurable on a Class-Wide Basis.........................22

2.     Superiority: A Class Action Is Superior to Other Available
Methods for the Fair and Efficient Adjudication of This Action...............23

C.     The Court Should Appoint Robbins Geller as Class Counsel ..............................24

V.     CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972).................................................................................................11, 21

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)..........................................................................................................23

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013).....................................................................................................11, 12

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)......................................................................................................2, 11

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
   2023 WL 2932485
   (D. Conn. Apr. 13, 2023) ...............................................................................................22

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ............................................................................ *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ...............................................................................9, 15, 22

*Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   2020 WL 1329354
   (S.D.N.Y. Mar. 23, 2020) ........................................................................................ *passim*

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   296 F.R.D. 261 (S.D.N.Y. 2014) ....................................................................................22

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011)..........................................................................................................11

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017)...............................................................................................22

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
   594 U.S. 113 (2021)..........................................................................................................12

*Gruber v. Gilbertson*,
   2019 WL 4439415
   (S.D.N.Y. Sept. 17, 2019)..................................................................................................6

**Page**

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)...............................................................................................11

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
  338 F.R.D. 205 (S.D.N.Y. 2021) ..........................................................................10

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
  281 F.R.D. 134 (S.D.N.Y. 2012) .............................................................................7

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) .............................................................................22

*In re Dynex Cap., Inc. Sec. Litig.*,
  2011 WL 781215
  (S.D.N.Y. Mar. 7, 2011) ............................................................................... *passim*

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009).......................................................................................7

*In re HealthSouth Corp. Sec. Litig.*,
  261 F.R.D. 616 (N.D. Ala. 2009)......................................................................18, 20

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017).........................................................................5, 12, 17

*In re Petrobras Sec. Litig.*,
  312 F.R.D. 354 (S.D.N.Y. 2016) ................................................................. *passim*

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084
  (S.D.N.Y. July 10, 2019) ........................................................................................22

*In re Vale S.A. Sec. Litig.*,
  2022 WL 122593
  (E.D.N.Y. Mar. 31, 2022) ...................................................................13, 16, 18, 22

*In re Winstar Commc'ns Sec. Litig.*,
  290 F.R.D. 437 (S.D.N.Y. 2013) ................................................................. *passim*

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ................................................................ *passim*

*Martínek v. AmTrust Fin. Servs., Inc.*,
  2022 WL 326320
  (S.D.N.Y. Feb. 3, 2022) ....................................................................................19, 20

**Page**

*Pearlstein v. BlackBerry Ltd.*,
    2021 WL 253453
    (S.D.N.Y. Jan. 26, 2021)................................................................................6, 19, 21

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)....................................................................................22

*Scheufele v. Tableau Software, Inc.*,
    2020 WL 2553100
    (S.D.N.Y. Feb. 13, 2020) ...........................................................................................9

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
    2024 WL 1497110
    (S.D.N.Y. Apr. 5, 2024)............................................................................................17

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) .......................................................................13, 20

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) .................................................................................9

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)...........................................................................12, 13, 21

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
    §78j(b)............................................................................................... *passim*
    §78(t)(a) ...............................................................................................1, 4, 8

Federal Rules of Civil Procedure
    Rule 23 ...............................................................................................1, 4, 24
    Rule 23(a)............................................................................................... *passim*
    Rule 23(a)(1)................................................................................................5
    Rule 23(a)(2)................................................................................................6
    Rule 23(a)(3)................................................................................................7
    Rule 23(a)(4)................................................................................................8
    Rule 23(b) ................................................................................................25
    Rule 23(b)(3)............................................................................................... *passim*
    Rule 23(g) ...............................................................................................1, 24
    Rule 23(g)(1)................................................................................................24
    Rule 23(g)(1)(A)(i) ................................................................................................24
    Rule 23(g)(1)(A)(ii) ................................................................................................24
    Rule 23(g)(1)(A)(iii) ................................................................................................24
    Rule 23(g)(1)(A)(iv) ................................................................................................24

Court-appointed Lead Plaintiffs Seafarers Officers & Employees Pension Plan, Seafarers Money Purchase Pension Plan, and United Industrial Workers Pension Plan (together, "Lead Plaintiffs") respectfully submit this memorandum of law in support of their motion pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) to certify this action as a class action and to appoint Lead Plaintiffs as Class Representatives, and pursuant to Rule 23(g), to appoint Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.[1]

## I.    PRELIMINARY STATEMENT

The Court should certify this securities case as a class action under Rule 23 of the Federal Rules of Civil Procedure.  This action asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of purchasers of certain Waste Management redeemable senior notes (the "Notes") between February 13, 2020 and June 23, 2020.  This action satisfies each of the requirements of Rule 23(a) and Rule 23(b)(3) for certification.  *See* Fed. R. Civ. P. 23(a), (b)(3).  The Court should therefore grant the Motion.

In support of the Motion, Lead Plaintiffs respectfully submit the Declaration of Margaret Bowen, a Trustee and Administrator of Lead Plaintiffs, attesting to Lead Plaintiffs' oversight of and commitment to prosecuting this action in the interests of all class members.[2]  Lead Plaintiffs also submit the Report on Market Efficiency and Damages Methodology of Professor Steven P.

---

[1]    All defined terms have the same meanings as in the Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 40) unless otherwise noted.  References to "¶" and "¶¶" are to the Complaint.  All emphasis is added and all internal citations and quotation marks are omitted unless otherwise noted.

[2]    *See* Declaration of Margaret Bowen in Support of Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel  ("Bowen Declaration" or "Bowen Decl."), attached hereto as Ex. A to the Declaration of Noam Mandel in Support of Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel.  References to the exhibits attached thereto appear herein as "Ex."

Feinstein,[3] demonstrating, *inter alia*, that the market for the Notes was efficient at all relevant times, establishing the presumption of class-wide reliance under *Basic Inc. v. Levinson*, 485 U.S. 224, 241-50 (1988). *See generally Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *3 (S.D.N.Y. Mar. 23, 2020).

For these reasons, and those set forth below, Lead Plaintiffs respectfully ask the Court to grant the Motion.

## II.    CLASS DEFINITION

As set forth in the Notice of Motion for Class Certification, Lead Plaintiffs respectfully request an order certifying this action as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class as defined below (the "Class Definition"):

> All persons who purchased or otherwise acquired any of the following Waste Management redeemable senior notes (the "Notes"), between February 13, 2020 and June 23, 2020, inclusive (the "Class Period") and were damaged thereby: (i) 2.95% Senior Notes due 2024; (ii) 3.20% Senior Notes due 2026; (iii) 3.45% Senior Notes due 2029; or (iv) 4.00% Senior Notes due 2039 (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

## III.    FACTUAL AND PROCEDURAL BACKGROUND

On April 14, 2019, Waste Management entered into an agreement and plan of merger (the "Merger Agreement") to acquire Advanced Disposal Services, Inc. ("ADS") for $4.9 billion, or $33.15 per share.  ¶26.  Since Waste Management's acquisition of ADS presented "the most significant consolidation in the waste industry in over a decade," the transaction required regulatory antitrust approval.  ¶¶3, 90.  The Merger Agreement required Waste Management to

---

[3]    *See* Report on Market Efficiency and Damages Methodology of Professor Steven P. Feinstein, Ph.D., CFA ("Feinstein Rpt." or "Feinstein Report"), attached hereto as Ex. B.

agree to divest assets representing up to $200 million in annual revenues (the "Antitrust Revenue Threshold" or the "ART"), if needed, to obtain antitrust approval. ¶¶29-30. If the Department of Justice ("DOJ") required divestment of assets in excess of the ART, Waste Management had the right to terminate the transaction and pay a termination fee. ¶31. In May 2019, Waste Management issued $4 billion worth of debt in five series of senior notes in a public offering to finance the ADS acquisition.[4] ¶32. The Notes included a special mandatory redemption ("SMR") that required Waste Management to redeem the Notes at 101% of par if the Company did not complete the acquisition by July 14, 2020 (the "End Date"). ¶¶33-34.

By February 13, 2020 (the start of the Class Period), it became clear to Defendants that the DOJ was not satisfied with the divestment framework contemplated by the ART. ¶¶50-53. As a result, WM began working to establish an alternative divestiture framework in excess of the $200 million ART. ¶41. This work remained undisclosed throughout the Class Period. ¶¶41-43. Nonetheless, Defendants' statements during the Class Period falsely assured investors that the DOJ's antitrust review was proceeding as anticipated and that the ADS acquisition was on track to be completed by the End Date. *See, e.g.*, ¶¶51-52, 58-60, 63, 68, 72, 75-77. As this Court stated:

> These statements were misleading because they created an impression that the acquisition would be approved before the End Date when Defendants knew the acquisition was likely to be delayed due to the DOJ's objections. These statements were material to Notes investors because a merger delay would trigger the special mandatory redemption feature of the Notes that required WM to redeem the Notes at 101% of par, thus affecting the trading price of the Notes.

ECF No. 58 at 8.

---

[4]     The Notes at issue in this action constituted four of the five series of senior notes, totaling $3 billion in principal. ¶33. The Company also issued $1.0 billion principal amount of 4.15% notes due July 15, 2049 not subject to the SMR. *Id.* at n.5.

On June 24, 2020 (at the end of the Class Period), Waste Management announced a revised agreement to acquire ADS, and that, as a result, it expected to trigger the SMR feature of the Notes that required Waste Management to redeem the Notes at 101% of par. ¶¶79-84. At the same time, Waste Management and ADS announced the sale to a Canadian waste company of $835 million in assets, representing $345 million in combined annual revenues – a divestment far in excess of the ART that took months to plan. ¶12. On this news, the price of the Notes dropped from approximately 111 cents on the dollar to 103 cents on the dollar in anticipation that the Notes would likely be redeemed. ¶84. On July 20, 2020, Waste Management redeemed the Notes at 101% of par pursuant to the SMR. ¶89.

## IV.    THE PROPOSED CLASS SATISFIES RULE 23

The Court should certify the proposed Class because the requirements of Rule 23 are readily satisfied in this case. *See* Fed. R. Civ. P. 23(a), (b)(3). Rule 23(a) "has four prerequisites: numerosity, commonality, typicality and adequacy of representation." *Chicago Bridge*, 2020 WL 1329354, at *1. In addition, an action should be certified as a class action under Rule 23(b)(3) where a plaintiff also shows that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id*. (quoting Fed. R. Civ. P. 23(b)(3)). The "party seeking certification must prove these requirements by a preponderance of the evidence." *Id*. at *2.

The Second Circuit has instructed "district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions." *Id*. Moreover, "[c]ourts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification." *Id*. "[I]f there is to be

an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *Id*.

As explained below, all of the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied here.

### A.      The Proposed Class Satisfies the Requirements of Rule 23(a)

#### 1.      Numerosity: The Proposed Class Is So Numerous that Joiner of All Members Is Impracticable

This action satisfies the numerosity requirement of Rule 23(a) because the proposed Class is "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). "In the Second Circuit, numerosity is presumed for a class of forty or more plaintiffs." *Chicago Bridge*, 2020 WL 1329354, at *10; *see also In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 358 (S.D.N.Y. 2016) (same); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 442 (S.D.N.Y. 2013) (same); *In re Dynex Cap., Inc. Sec. Litig.*, 2011 WL 781215, at *1 (S.D.N.Y. Mar. 7, 2011) (same).[5] Here, data obtained by counsel from the Financial Industry Regulatory Authority ("FINRA") and incorporated into the Feinstein Report indicates that during the Class Period at least 121 financial institutions held one or more of the Notes during the Class Period. Feinstein Rpt. ¶97. *See, e.g.*, *Dynex*, 2011 WL 781215, at *1 (numerosity satisfied because at least 56 different institutions purchased bonds during the class period). Moreover, during the Class Period there were $3 billion in face value of Notes outstanding, comprised of millions of individual Notes that were actively traded throughout the Class Period. Feinstein Rpt. ¶¶79-71, 127. *See, e.g.*, *Winstar*, 290 F.R.D.

---

[5]      The District court's *Petrobras* decision was affirmed in part and vacated in part by the Second Circuit. *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017). The vacature involved the narrow issue of the "domesticity" of claims regarding the securities of a non-U.S. issuer, which is not relevant here. *Id*. at 261-74. The Second Circuit affirmed the remainder of the district court's class certification analysis, including its holding that the *Petrobras* bonds traded in an efficient market under the *Cammer* and *Krogman* factors. *Id*. at 275-79 (discussed *infra*).

at 443 (numerosity satisfied where there were "over $1.88 billion in Winstar bonds outstanding during the class"). Numerosity is satisfied here.

### 2. Commonality: There Are Questions of Law and Fact Common to the Class

The commonality requirement under Rule 23(a) is satisfied here because "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A question is common to a class if it is capable of classwide resolution [--] which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Chicago Bridge*, 2020 WL 1329354, at *10. "In the context of a securities class action, [c]ommon questions of law and fact include whether certain statements were false and misleading, whether those statements violated the federal securities laws, whether those statements were knowingly and recklessly issued, and ensuing causation issues." *Petrobras*, 312 F.R.D. at 359; *see also Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *7 (S.D.N.Y. Jan. 26, 2021) ("This case – as is typical of most securities fraud putative class actions – raises common questions of law and fact, including whether (i) Defendants' public statements during the Class Period misrepresented or omitted material facts; (ii) the alleged fraud was material; and (iii) Defendants acted with scienter."). The "satisfaction of this requirement has been described as a 'low hurdle.'" *Gruber v. Gilbertson*, 2019 WL 4439415, at *3 (S.D.N.Y. Sept. 17, 2019). Even "a single common question may be sufficient" to establish commonality. *Dynex*, 2011 WL 781215, at *2.

This action involves questions of law and fact that are common to all Class members because the Class members' claims are based on the same legal theories and arise out of the same course of conduct. These common questions include, but are not limited to: (i) whether Defendants violated the Exchange Act; (ii) whether Defendants' statements during the Class Period were materially false and misleading; (iii) whether Defendants acted knowingly or recklessly in issuing

their false and misleading statements and/or omitting material information; and (iv) whether Class members sustained damages and the proper measure of those damages. *See, e.g.*, *Dynex*, 2011 WL 781215, at \*2 ("The proposed class satisfies commonality because putative class members have been injured by similar material misrepresentations and omissions. Indeed the putative class members here are alleged to have been impacted by the same misrepresentations and omissions, and all will be required to show that Defendants committed fraud with the requisite mental state."); *Winstar*, 290 F.R.D. at 443 ("Lead Plaintiffs claim that the same misstatement . . . caused injury to all . . . bondholders by artificially inflating the price of Winstar's securities. Such a common course of conduct routinely satisfies the commonality requirement."). The commonality requirement is therefore satisfied here.

### 3.    Typicality: Lead Plaintiffs' Claims Are Typical of the Claims of the Class

Typicality is also satisfied here because "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied where "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *see also Chicago Bridge*, 2020 WL 1329354, at \*11 (same). The typicality "standard is not demanding, as the claims only need to share the same essential characteristics, and need not be identical." *Id.*; *see also In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012) ("In a securities class action, when plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements underlying their claims, the claims and nature of evidence are generally considered sufficient to satisfy the typicality requirement.").

Lead Plaintiffs' claims are based on the same course of events and involve the same legal theories as the claims of every other Class member.  Like all other members of the Class, Lead Plaintiffs purchased Notes during the Class Period, while Defendants made material misrepresentations and omissions in violation of Section 10(b) and 20(a) of the Exchange Act, which created and maintained artificial inflation of the Notes' prices, and ultimately caused damage to Lead Plaintiffs and Class members.  ¶¶117, 126, 130; *see, e.g.*, *Chicago Bridge*, 2020 WL 1329354, at *11 (typicality satisfied "because all potential class members were allegedly injured by the same alleged misrepresentations and omissions . . . and all claim securities law violations based on the same federal statutes and nucleus of facts"); *Winstar*, 290 F.R.D. at 444 ("Lead Plaintiffs' claims are typical of the class because they arise out of the same alleged public misstatement that caused injury to all . . . bondholders alike."); *Dynex*, 2011 WL 781215, at *3 ("Lead Plaintiff's proof and legal theories will be identical to those of the proposed class. All of the allegedly false and misleading statements applied to both the Series 12 and Series 13 Bonds because the statements about . . . both offerings were identical.").  Typicality is satisfied.

### 4. Adequacy: Lead Plaintiffs Will Fairly and Adequately Protect the Class

Lead Plaintiffs "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Adequacy entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *Petrobras*, 312 F.R.D. at 361; *Winstar*, 290 F.R.D. at 444-45 (same); *Dynex*, 2011 WL 781215, at *2 (same).

As purchasers of artificially inflated Notes during the Class Period who suffered damage as a result, Lead Plaintiffs' interests are directly aligned with those of all Class members and are in no way antagonistic to those interests.  As the Court previously held, Lead Plaintiffs, "like other

members of the proposed class, claim that Defendants issued false and misleading statements that inflated the price of WM notes, and the . . . claims arise from the same course of conduct. There is no indication that [Lead Plaintiffs] have a conflict of interest with the proposed class members." ECF No. 33 at 3-4 (citations omitted). That conclusion remains true. Moreover, Lead Plaintiffs respectfully submit herewith the Bowen Declaration, which demonstrates that Lead Plaintiffs stand ready to protect the interests of all Class members, and to continue to monitor, oversee, and participate in this litigation as they have done throughout. *See* Bowen Decl.

Lead Plaintiffs have also engaged competent and experienced counsel to represent the Class. The Robbins Geller firm has an extensive and successful record litigating securities class actions in courts throughout the country, including in this District.[6] In light of this record, "[c]ourts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 100 (S.D.N.Y. 2015) (collecting cases).[7]

Lead Plaintiffs therefore satisfy the adequacy requirement.

---

[6]      *See* Robbins Geller Firm Résumé, attached hereto as Ex. C.

[7]      *See also Scheufele v. Tableau Software, Inc.*, 2020 WL 2553100, at *3 (S.D.N.Y. Feb. 13, 2020) (Robbins Geller is "a firm that courts within this circuit have found to be adequate and well qualified"); *In re Am. Realty Cap. Props., Inc. Litig.*, No. 1:15-mc-00040-AKH, ECF No. 1316 at 55:14-18 (S.D.N.Y. Jan. 21, 2019) (concerning Robbins Geller's role as sole lead counsel in recovering $1.025 billion for the class in a securities case, stating: "the role of lead counsel was fulfilled in an extremely fine fashion by [Robbins Geller]. At every juncture, the representations made to me were reliable, the arguments were cogent, and the representation of their client was zealous"); *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 59 (S.D.N.Y. 2019) ("[Robbins Geller] has extensive experience in securities class actions and complex litigation, as well, indicating its ability to manage this litigation and ably apply the applicable law."); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 1:08-cv-10783, ECF No. 243 at 10:10-11:6 (S.D.N.Y. May 2, 2016) (concerning Robbins Geller's role as sole lead counsel in recovering $272 million for the class of MBS purchasers, stating: "Counsel, thank you for your papers. They were, by the way, extraordinary papers," and acknowledging "plaintiffs' counsel's success in the Second Circuit essentially changing the law. I will also note what counsel have said, and that is that this case illustrates the proper functioning of the statute. . . . Counsel, you can all be proud of what you've done for your clients. You've done an extraordinarily good job.").

**B.    Certification Is Proper Under Rule 23(b)(3)**

Class certification is also proper under Rule 23(b)(3) because:(1) common questions of law or fact "predominate" over any questions affecting only individual members; and (2) a class action is "superior" to other methods of adjudication.  *See* Fed. R. Civ. P. 23(b)(3); *see also Chicago Bridge*, 2020 WL 1329354, at *1 ("Plaintiffs here are proceeding under Rule 23(b)(3), which requires that Plaintiffs prove that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.")

### 1.    Predominance: Common Questions of Law and Fact Predominate Over Individual Questions

The predominance requirement is satisfied in this case because questions of law and fact common to Class members "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Petrobras*, 312 F.R.D. at 364; *see also Winstar*, 290 F.R.D. at 445 ("Common questions of law or fact predominate when they are issues subject to generalized proof, applicable to the class as a whole, and more substantial than potential individualized issues."); *Dynex*, 2011 WL 781215, at *3 (same).  "This requirement is often readily met in certain cases alleging . . . securities fraud."  *Winstar*, 290 F.R.D. at 445; *see also Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 214 (S.D.N.Y. 2021) ("[T]he Supreme Court has noted that the predominance requirement is a test readily met in certain cases alleging . . . securities fraud.").

The elements of materiality, loss causation, falsity, and scienter are all common questions that predominate over individualized ones and are therefore not at issue on class certification. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 473-74 (2013) (materiality); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) ("*Halliburton I*") (loss causation); *Basic*, 485 U.S. at 242 (falsity and scienter). Accordingly, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810.

Reliance in this case is established on a class-wide basis under the "fraud on the market" presumption because the Notes traded in an efficient market in which the Notes' prices reflected public information. Reliance in this case is also established under the *Affiliated Ute* presumption because the claims arise from Defendants' material omissions.

### a.    Fraud-on-the-Market: Reliance Is Presumed Under *Basic* Because the Notes Traded in an Efficient Market

The fraud-on-the-market doctrine establishes "a rebuttable presumption of reliance on material misrepresentations aired to the general public." *Amgen*, 568 U.S. at 461 (citing *Basic*, 485 U.S. at 241-49). The rationale for this presumption is that "market prices generally respond to new, material information." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014) ("*Halliburton II*"). Thus, "if plaintiffs can show that the market for defendant's [security] was efficient, plaintiffs are entitled to the rebuttable presumption that the market price reflects all public information, and that they therefore relied on defendant's misrepresentation(s) in trading[.]" *Chicago Bridge*, 2020 WL 1329354, at *3; *see also Petrobras*, 312 F.R.D. at 364 ("[W]hile reliance may be an individual phenomenon, here plaintiffs argue that reliance will be established on a common basis under a fraud-on-the-market theory.").

"To avail themselves of the fraud-on-the-market presumption, plaintiffs must demonstrate that (1) the alleged material misstatements were publically known, (2) that the security traded on an efficient market, and (3) that the plaintiff purchased his shares between the time the misleading statement was made and the time the truth was revealed." *Winstar*, 290 F.R.D. at 445; *see also Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021) (citing *Amgen*, 568 U.S. at 466-68) (same). It is clear in this case that Defendants' alleged misrepresentations were communicated publicly, and that Class members who purchased Notes during the Class Period did so between the time of Defendants misrepresentations and the revelation of the truth. *See* ¶¶113-114; Lead Plaintiffs' Certifications (ECF No. 15-2).

There also can be no reasonable dispute that the Notes traded in an efficient market. Lead Plaintiffs respectfully submit herewith the Feinstein Report, which demonstrates that the market for the Notes was efficient by every applicable measure.

The burden to prove market efficiency "is not an onerous one." *Petrobras*, 862 F.3d at 278. To determine market efficiency, district courts in this and other Circuits consider several factors first set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*"), and supplemented by *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*"). *See Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017). The *Cammer* and *Krogman* factors are "simply tools" for analyzing market efficiency, and must be viewed "holistic[ally]" and not as a checklist of "distinct requirements[.]" *Id*. at 97-98. The *Cammer* and *Krogman* factors include: (1) the average weekly trading volume of the security; (2) the number of securities analysts following and reporting on it; (3) the extent to which market makers traded in the security; (4) the issuer's eligibility to file an SEC registration Form S-3; (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the security price; (6) market

capitalization; (7) the bid-ask spread; and (8) the percentage of the security not held by insiders (*i.e.*, the "float"). *See id.*

These factors have "routinely been applied to bond markets with a recognition of the differences in market behavior for debt bonds and equity securities." *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *5 (E.D.N.Y. Mar. 31, 2022); *see also Petrobras*, 312 F.R.D. at 366 ("To analyze the Petrobras debt markets, Feinstein omitted some *Cammer* factors, modified others, and considered additional debt-specific factors. The Court agrees that the modified *Cammer* factors provide a useful rubric to evaluate debt markets."); *Winstar*, 290 F.R.D. at 446 ("Because the *Cammer* factors were created in the context of the stock markets, courts adjust them for the realities of the over the counter bond market.").

An evaluation of these factors overwhelmingly supports a finding that the Notes traded in an efficient market during the Class Period. Lead Plaintiffs and the proposed Class are therefore entitled to the fraud-on-the-market presumption.

### (1)    *Cammer* Factor 1: The Notes Experienced a High Volume and Frequency of Trading

The Notes traded at a very high volume during the Class Period. Feinstein Rpt. ¶¶79-81. This is indicative of an efficient market. *Id.* The existence of an actively traded market, as evidenced by large weekly trading volume, "suggests efficiency 'because it implies significant investor interest in the company . . . [which], in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.'" *Strougo v. Barclays PLC*, 312 F.R.D. 307, 316 (S.D.N.Y. 2016). "[A]verage weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." *Petrobras*, 312 F.R.D. at 365 (quoting *Cammer*, 711 F. Supp. at 1286).

During the Class Period, the Notes' average weekly turnover ranged between 4.86% and 7.93% — multiples above the 2% threshold for a "strong presumption" of efficiency:

| Note | Average Weekly Par Value Trading Volume | Average Weekly Turnover |
|---|---|---|
| LBF5 Notes | $59.48 Million | 7.93% |
| LBH1 Notes | $47.26 Million | 6.30% |
| LBG3 Notes | $48.29 Million | 4.83% |
| LBJ7 Notes | $24.32 Million | 4.86% |

**Source:** TRACE data obtained from FINRA.

**Note:** Calculations performed by Crowninshield Financial Research.

Feinstein Rpt. ¶79.

The Notes also traded very frequently, which is another important indication of an efficient market. *Id*. ¶¶82-85. Relatively few debt securities trade more frequently than 200 days per year; typically, they trade once every 12-14 days. *Id.* ¶82. By contrast, the Notes here traded every 0.04 to 0.32 days on average, placing them in the first decile of most frequently traded debt securities. *Id.* ¶84. In other words, the Notes typically traded numerous times per day rather than once every few days (as most other debt securities trade). *Id*. This conclusion further supports a finding of market efficiency. *See, e.g.*, *Petrobras*, 312 F.R.D. at 366-67 (finding efficiency where "the average number of days between successive trades in the Notes ranged from 0.020 and 0.418").

        **(2)**      ***Cammer* Factor 2: Extensive Analyst, Rating Agency, and Other Sources of Coverage and Information**

At least 17 analyst firms – including Argus, BMO, Bank of America, CFRA, CIBC, Deutsche Bank, Jefferies, JPMorgan, Morningstar, Oppenheimer, RBC Capital Markets, Scotiabank, and UBS covered Waste Management during the Class Period. This indicates an efficient market. Feinstein Rpt. ¶¶88-92. Analyst coverage "supports a finding of market

efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market." *Winstar*, 290 F.R.D. at 446.  The analyst firms tracked the status of the pending acquisition of ADS as well as the Company's leverage, liquidity, and ability to service debt.  Feinstein Rpt. ¶93.  Dr. Feinstein obtained and reviewed 56 analyst reports covering Waste Management published during the Class Period by 13 analyst firms.  Feinstein Rpt. ¶¶88, 93.  All of these 13 analyst firms issued reports that mentioned the ADS acquisition, and six of the 13 analyst firms issued reports that discussed the debt raised to finance the ADS acquisition (*i.e.*, the Notes).  Feinstein Rpt.  ¶93.  This level of analyst coverage is more than sufficient for market efficiency.  *See, e.g.*, *Winstar*, 290 F.R.D. at 446 (finding an efficient market where three analysts reported on the bonds at issue).[8]  Further, the fact that all three major credit rating agencies (Fitch, Moody's and Standard & Poor's) provided credit ratings for the Notes during the Class Period also indicates an efficient market.  Feinstein Rpt. ¶109.  *See, e.g.*, *Petrobras*, 312 F.R.D. at 366 (market for debt securities efficient where "Petrobras was covered by the major credit rating agencies, Fitch, Moody's, and Standard & Poor's"); *Dynex*, 2011 WL 781215, at *5 ("Moreover, it is undisputed that Moody's and Fitch rated all the Bonds.").  In addition, at least 121 institutional investors held one or more of the WM Notes during the Class Period.  Feinstein Rpt. ¶¶96-97.  Such "wide institutional ownership [of debt securities] indicates market efficiency because institutional investors often conduct their own research on securities and make investment decisions based on that research." *Petrobras*, 312 F.R.D. at 366.

---

[8]        Courts also recognize that significant media coverage supports a finding of market efficiency.  *See Barclays*, 310 F.R.D. at 92 ("regular press coverage throughout the Class Period" weighed in favor of finding market efficiency). Dr. Feinstein identified at least 285 articles on the *Factiva* database published about Waste Management during the 131-calendar-day Class Period.  *See* Feinstein Rpt. ¶101.

### (3)     *Cammer* Factor 3: Underwriters and Market Makers

There were at least 20 underwriters for the Notes, including some of Wall Street's largest and most prominent investment banks (*e.g.*, Bank of America, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, and JP Morgan).  Feinstein Rpt. ¶114.  These facts indicate an efficient market.  *Id.*  Underwriters "generally serve as market makers" for debt securities.  *Petrobras*, 312 F.R.D. at 366.  Further, at least three investment banks that published analyst reports about Waste Management (JP Morgan, RBC Capital Markets, and UBS) published reports expressly stating that they made a market in Waste Management securities.  Feinstein Rpt. ¶115.  This is also indicative of an efficient market.  *Id.* ¶116; *Petrobras*, 312 F.R.D. at 366 (an efficient notes market existed where there were 20 underwriters, including several that published reports about the company); *Vale S.A. Sec. Litig.*, 2022 WL 122593, at *15 (an efficient market where there were "at least 15 underwriters, including major investment banks which make a market in Vale Securities").[9]

### (4)     *Cammer* Factor 4: Form S-3 Eligibility

Waste Management was eligible to file Form S-3 during the Class Period, indicating market efficiency.  Feinstein Rpt. ¶122.  A company is eligible for S-3 registration when, among other things, it files Exchange Act reports for a specified length of time and has an outstanding float above a certain sizable value.  *Id*. ¶¶120-121.  Form S-3 registration eligibility demonstrates market efficiency because: (1) the filing requirement ensures that financial data is available to market participants; and (2) the "public float" requirement indicates that many market participants would examine the information.  *Id*.; *see also Cammer*, 711 F. Supp. at 1284-85.  Waste

---

[9]     FINRA TRACE data does not identify the market makers among the Class Period's 121 institutional investors in the Notes, all of which were broker-dealers.  Feinstein Rpt. ¶¶112-113.

Management far exceeded the public float condition ($44.02 billion vs. the required $75 million). *See* Feinstein Rpt. ¶122. Waste Management also issued regular financial reports during the Class Period. *Id.* Waste Management thus was eligible to file Form S-3 during the Class Period, further demonstrating that the Notes traded in an efficient market. *Id.* ¶123; *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2024 WL 1497110, at *11 (S.D.N.Y. Apr. 5, 2024) (continuous S-3 eligibility during the class period indicates an efficient market).

### (5)    *Cammer* Factor 5: The Notes Reacted to Company-Specific Information

The market for the Notes displayed a strong cause-and-effect relationship between unexpected material information and the prices of the Notes, providing direct empirical evidence that the Notes traded in an efficient market. Feinstein Rpt. ¶195. "The fifth *Cammer* factor that courts consider is whether the Plaintiff can demonstrate empirical facts that show a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the [security's] price." *Winstar*, 290 F.R.D. at 446; *see also Petrobras*, 862 F.3d at 276-77 ("The fifth *Cammer* factor, however, invites plaintiffs to submit direct evidence, consisting of empirical facts showing a cause and effect relationship between unexpected corporate events" and a change in the price of securities).

Dr. Feinstein conducted an event study to test whether there was a cause-and-effect relationship between unexpected material information and the prices of the Notes during the Class Period. Feinstein Rpt. ¶¶148-149. "An event study that examines the effect of disclosure of material information on the price of a security has been considered *prima facie* evidence of the existence of this causal relationship." *Winstar*, 290 F.R.D. at 448.

Dr. Feinstein's analysis proves to a high degree of statistical confidence that there was a cause-and-effect relationship between the release of new information and the prices of the Notes,

and that the Notes were sensitive and responsive to new material information, "which is the hallmark of an efficient market." Feinstein Rpt. ¶195. Dr. Feinstein's analysis demonstrates at a 99.9% confidence level that when, at the end of the Class Period on June 24, 2020, Defendants announced that Waste Management would trigger the SMR feature of the Notes and redeem the Notes at 101% of par, the Notes experienced immediate statistically significant price declines – *i.e.*, strong direct evidence of a price response to unexpected material information.[10] Feinstein Rpt. ¶193. Dr. Feinstein's analysis demonstrates further that during the Class Period prior to the June 24, 2020 announcement – a period in which no new Company-specific information material to the Notes was released – the prices of the Notes were highly responsive to changes in interest rates, providing further "compelling proof of the efficiency of the market for the Waste Management Notes throughout the Class Period." *Id*. ¶¶198-200.[11]

Dr. Feinstein's direct showing of a cause-and-effect relationship between new material information and the prices of the Notes is strong *prima facie* evidence of market efficiency here.

### (6)      *Krogman* Factor 1: Outstanding Par Value

The aggregate par value of the Notes indicates an efficient market. Feinstein Rpt. ¶124; *Vale*, 2022 WL 122593, at *15 (recognizing the aggregate par value of notes "is a measurement akin" to the *Krogman* market capitalization factor for stocks). "A larger amount of par value outstanding indicates that the bonds' underwriters were able to find investors willing to initially purchase a large amount of debt which demonstrates a greater amount of investor interest."

---

[10]      On June 24, 2020: (1) the LBF5 Notes fell from a price of $105.37 to $102.22, a statistically significant -3.02%; (2) the LBH1 Notes fell from a price of $108.27 to $102.31, a statistically significant -5.61%; (3) the LBG3 Notes fell from a price of $108.34 to $102.28, a statistically significant -5.57%; and (4) the LBJ7 Notes fell from a price of $110.53 to $107.08, a statistically significant 3.19%. Feinstein Rpt. ¶190.

[11]      *See generally In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 635-36 (N.D. Ala. 2009) ("in efficient capital markets, most of the variation in the price of investment-grade bonds comes from the fluctuations in economy-wide interest rates, as opposed to firm-specific information").

*Winstar*, 290 F.R.D. at 449. "Further, it is *prima facie* evidence of a more liquid market, because the more units of a security that are available to trade, the more likely that a potential buyer or seller is to find a counterparty willing to transact." *Id*. Here, the aggregate par value of the Notes totaled $3.0 billion. Feinstein Rpt. ¶127. This was larger than the respective market capitalizations of 81.6% of all companies listed on the NYSE, AMEX, NASDAQ and ARCA during the Class Period. *Id*. This is a strong indication of an efficient market. *See Petrobras*, 312 F.R.D. at 366-71 (an aggregate par value of notes larger than most market capitalizations of publicly listed companies indicates an efficient market); *Winstar*, 290 F.R.D. at 449 ($1.88 billion total par value of bonds indicates an efficient market).

### (7)     *Krogman* Factor 2: Narrow Bid-Ask Spread

The Notes had a narrow bid-ask spread ranging between 0.35% and 0.93% during the Class Period. Feinstein Rpt. ¶¶138-139.[12] This is indicative of an efficient market. *Id*. ¶¶140-142; *see also Martínek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *13-*14 (S.D.N.Y. Feb. 3, 2022) (finding market efficiency with bid-ask spreads ranging between 0.67% and 1.36%). The bid-ask spread is the difference between the highest price buyers are willing to pay for a security and the lowest price sellers are willing to accept. *See Krogman*, 202 F.R.D. at 478; *see also Pearlstein*, 2021 WL 253453, at *16, n.7 ("A bid-ask spread is the amount by which the asking price for an asset exceeds its bid price. This percentage reflects the difference between the highest price a buyer is willing to pay for an asset and the lowest price that a seller is willing to accept."). A market displaying a "large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.'" *Id*.; *see also Krogman*, 202 F.R.D. at 478 (same). In

---

[12]     Dr. Feinstein obtained this data from Bloomberg. Feinstein Rpt. ¶¶136-138. He obtained similar data from LSEG Workspace. *Id*. LSEG Workspace estimates a narrower range of 0.12% and 0.41%. *Id*.

contrast, the "markets for companies with . . . a smaller bid-ask spread are more likely to be efficient." *Strougo*, 312 F.R.D. at 317. In this case, the bid-ask spread of the Notes averaged 0.59%. *See* Feinstein Rpt. ¶138.[13] By way of comparison, this average is narrower than the 0.83% average spread for all stocks trading on U.S. exchanges during the Class Period – *i.e.*, the market for the Notes had narrower average bid-ask spreads than the average market for common stock, strongly supporting a finding of efficiency here. *Id.* ¶140; *see also HealthSouth Corp.*, 261 F.R.D. at 637 (a narrow bid-ask spread indicates an efficient notes market).[14]

### (8)    *Krogman* Factor 3: Float

The Notes' float was "extraordinarily large," another indication of market efficiency. Feinstein Rpt. ¶¶129-133. "Float" refers the outstanding amount of an issued security available for public trading minus any amount held by insiders or affiliates. *Id.* ¶129. "Because insiders may have private information that is not yet reflected" in a security price, the prices of securities "that have greater holdings by insiders are less likely to accurately reflect all available information about the security." *Krogman*, 202 F.R.D. at 478.

"The final Krogman factor . . . addresses the percentage of the [securities] held by investors unaffiliated with the issuer. This factor weighs in favor of market efficiency where most, if not all, of an issuer's [securities were] held by outsiders." *Martínek*, 2022 WL 326320, at *14 ("Here, the percentage of the Preferred Stocks held by outsiders ranged from 99.13% to 100%."). In this case, all (100%) of the Notes were held by outsiders, further supporting a finding of market efficiency. *See, e.g.*, *Petrobras*, 312 F.R.D. at 366 (an efficient market for notes existed where the

---

[13]    This figure is based on data that Dr. Feinstein obtained from Bloomberg. The LSEG Workspace data reflects a narrower average of 0.23%. *See* Feinstein Rpt. ¶138.

[14]    FINRA's TRACE database does not report this data. *Id*. ¶134; *HealthSouth Corp.*, 261 F.R.D. at 637 ("Corporate bond markets lack widely reported bid-ask spreads. . . . The lack of such readily-available information is not determinative of the efficiency of the market").

float was "equivalent to the aggregate par value" and "no substantial portion" was held by insiders).

Further, in absolute terms, the Notes' float of $3.0 billion in par value was larger than the common stock market capitalizations of at least 81% of all publicly traded companies during the Class Period, which likewise supports market efficiency here. *Id*.; *see, e.g.*, *Pearlstein*, 2021 WL 253453, at \*16 (a float larger than the total market capitalization of at least 80% of all other publicly-traded companies in the U.S. indicates an efficient market).

        **b.**        *Affiliated Ute*: **Lead Plaintiffs Are Entitled to a Presumption of Reliance Pursuant to *Affiliated Ute***

The Class is also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). The *Affiliated Ute* presumption applies to claims "involving primarily a failure to disclose." *Id*. at 153. Under *Affiliated Ute*, "positive proof of reliance is not a prerequisite to recovery." *Id.*; *Waggoner*, 875 F.3d at 95. Rather, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their investment] decision[s]." *Affiliated Ute*, 406 U.S. at 153-54.

As alleged in the complaint, Lead Plaintiffs' fraud claims are predicated, in part, upon omissions of material facts concerning the DOJ's antitrust review and the resulting renegotiation of the transaction, for which there was a duty to disclose. ¶¶2-12. Indeed, this court found that:

> The Complaint sufficiently pleads that Defendants made material omissions when they made certain statements about the acquisition completion time but failed to disclose that the $200 million Antitrust Revenue Threshold likely would not, and eventually did not, satisfy the DOJ's antitrust concerns, thereby necessitating the renegotiation of the merger.

ECF No. 58 at 8. Thus, the *Affiliated Ute* presumption of reliance applies here.

### c.    Damages Are Measurable on a Class-Wide Basis

Courts in this Circuit routinely find that the calculation of damages in securities fraud actions is common to all class members, as damages can be calculated on a class-wide basis through the application of the "out-of-pocket" damages methodology and an "event study" to measure the price impact of company-specific information disclosed to the public. *See, e.g.*, *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016); *see also Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 153 (2d Cir. 2017).[15]  Moreover, where, as here, liability can be proven on a class-wide basis, "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015); *see also, e.g.*, *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 271 (S.D.N.Y. 2014) ("[I]n light of the class-wide methodology for calculation of damages, any necessary individual inquiries are a far cry from the scope of individualized issues of proof that would defeat a finding of predominance . . . ."); *Barclays*, 310 F.R.D. at 74 ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases.").

Lead Plaintiffs have put forth a method for determining damages for all Class members that is consistent with its theory of liability.  Dr. Feinstein opines that the out-of-pocket damages methodology – which has been acknowledged as the appropriate damages model in case law and published legal scholarship – is used to compute damages in virtually all securities class action cases, and in particular, cases such as this one addressing Section 10(b) liability.  Feinstein Rpt.

---

[15]    *See also Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *14 (D. Conn. Apr. 13, 2023) ("[T]he out-of-pocket methodology is a recognized measurement of damages in Section 10(b) securities cases"); *Vale*, 2022 WL 122593, at *18, report and recommendation adopted, 2022 WL 969724 (holding that an event study "capable of disaggregating confounding information disclosed in the numerous purported corrective disclosures is the generally accepted method for measuring damages in a securities fraud class action"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019) (same).

¶¶211-212.  Under the out-of-pocket methodology, class-wide damages can be calculated in a straightforward manner common to all Class members.  *Id*.  Dr. Feinstein explains further that economic analyses, including valuation and empirical event study analysis, can be used to estimate the relationship between specific statements/omissions and their effect on securities prices, and opines that an event study can quantify the amount of artificial inflation that existed in the prices of the Notes on each day of the Class Period, which can then be used to calculate out-of-pocket damages for each Class member.  *Id*.

In sum, the calculation of each Class member's damages will be a mechanical arithmetic exercise for all Class members who transacted in the Notes during the Class Period, and thus is readily applicable on a Class-wide basis.

### 2.    Superiority: A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Adjudicating Class members' claims as "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Class action treatment is superior if it will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).  Securities suits "easily satisfy this requirement, as the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake."  *Chicago Bridge*, 2020 WL 1329354, at *11.  This rationale applies with equal force to bond purchasers claims.  *See, e.g.*, *Dynex*, 2011 WL 781215, at *8 ("Individual control of separate actions would not serve the class members' interests and class treatment in this case is the fairest and most efficient way to proceed.").

As explained in the Complaint, joinder of all Class members is impracticable because the proposed class – which includes well over 100 financial institutions (as well as their many clients, who are beneficial owners) – is numerous and geographically dispersed.  ¶¶118, 122.  Certifying this Class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.  ¶122.  The superiority requirement is therefore satisfied.[16]

### C.    The Court Should Appoint Robbins Geller as Class Counsel

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel."  Fed. R. Civ. P. 23(g)(1).  Lead Plaintiffs respectfully requests that the Court appoint Robbins Geller as Class Counsel.  In appointing Class Counsel, the Court should consider counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law" and "the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  As discussed *supra*, Lead Counsel is well-qualified to prosecute this case on behalf of Lead Plaintiffs and the other members of the Class, and has already undertaken a vigorous prosecution of this action, including conducting an extensive investigation of the claims, defeating Defendants' motion to dismiss, commencing discovery, and pursuing class certification.  Robbins Geller thus fulfills the requirements of Rule 23(g).  The Court should appoint Robbins Geller as Class Counsel.

---

[16]    The proposed Class is also ascertainable.  "The Second Circuit has recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable, often characterized as an 'ascertainability' requirement."  *Chicago Bridge*, 2020 WL 1329354, at *11.  A class "is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case."  *Id*.  Here, class membership can be readily ascertained by objective and administratively feasible criteria, such as transactions in the Notes during the Class Period.  *See, e.g.*, *id*. (class defined by acquisition of securities during a specified period was "sufficiently definite to determine whether any given individual or entity is a class member").

**V.      CONCLUSION**

This action satisfies the requirements of Rules 23(a) and (b), and Lead Plaintiffs and Robbins Geller will vigorously advocate for all Class members.  The Court should therefore grant the Motion in full.

DATED:  June 14, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON
NOAM MANDEL
DESIREE CUMMINGS
JONATHAN ZWEIG
CHRISTOPHER T. GILROY

*/s/ Noam Mandel*
NOAM MANDEL

420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  (212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
dcummings@rgrdlaw.com
jzweig@rgrdlaw.com
cgilroy@rgrdlaw.com

*Lead Counsel for the Class*