**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re WASTE MANAGEMENT SECURITIES LITIGATION | Case No. 1:22-cv-04838-LGS |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

BAKER BOTTS L.L.P.

David D. Sterling (admitted *pro hac vice*)
Amy Pharr Hefley
910 Louisiana Street
Houston, Texas 77002

James J. Beha II
30 Rockefeller Plaza
New York, New York 10112

**Attorneys for Defendants**

**TABLE OF CONTENTS**

INTRODUCTION..............................................................................................................................1

BACKGROUND ............................................................................................................................2

ARGUMENT..................................................................................................................................5

I.     **Individual questions of reliance will predominate.** ........................................................6

    A.  The Funds cannot invoke the *Basic* presumption because they failed to prove the
Notes traded in an efficient market. .......................................................................................6

        1.  The Funds failed to establish a causal connection between the release of new
relevant information and movement in the Notes' prices. .............................................8

        2.  The remaining "indirect" *Cammer* and *Krogman* factors also weigh against a
finding of market efficiency. ..........................................................................................13

    B.  The Alleged Misstatements Had No Price Impact. ...............................................................19

    C.  The *Affiliated Ute* presumption does not apply. ...................................................................21

II.    **Individual domesticity questions will predominate.** ......................................................21

III.   **The Funds fail to show that damages can be measured on a class-wide basis.** ...........24

CONCLUSION .............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)...............................................................................................2, 22

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972) ....................................................................................................2, 6, 21

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)...........................................................................................................6, 22

*Bell v. Ascendant Sols., Inc.*,
422 F.3d 307 (5th Cir. 2005) .................................................................................................9

*Bell v. Ascendent Solutions, Inc.*,
2004 WL 1490009 (N.D. Tex. July 1, 2004), *order aff'd and remanded*, 422 F.3d 307 (5th
Cir. 2005) ...........................................................................................................................12

*Bricklayers & Trowel Trades v. Credit Suisse LLC*,
752 F.3d 82 (1st Cir. 2014)..................................................................................................12

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ...........................................................7, 8, 13, 14, 15, 16, 17

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ............................................................................................21

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014).................................................................................................22

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)........................................................................................................2, 6, 24

*Cunha v. Hansen Nat. Corp.*,
2013 WL 12124073 (C.D. Cal. June 20, 2023) ....................................................................10

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).................................................................................................................6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
536 U.S. 804 (2011)...............................................................................................................19

*George v. China Auto. Sys., Inc.*,
2013 WL 3357170 (S.D.N.Y. Jul. 3, 2013) .........................................................7, 10, 13, 14

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
  594 U.S. 113 (2021)..................................................................................................19, 20, 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)......................................................................................................1, 6, 19

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
  2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ...........................................................................7

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  265 F.R.D. 157 (S.D.N.Y. 2010), *vacated and remanded on other grounds*, 689 F.3d 229 (2d
  Cir. 2012) ...........................................................................................................................15, 16

*In re Barclays*,
  126 F. Supp. 3d 342 (S.D.N.Y. 2015)....................................................................................21

*In re Barclays Bank PLC Sec. Litig.*,
  756 F. App'x. 41 (2d Cir. 2018) ...............................................................................................8

*In re BP p.l.c. Sec. Litig.*,
  2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).........................................................................25

*In re Countrywide Fin. Corp. Sec. Litig.*,
  273 F.R.D. 586 (C.D. Cal. 2009) ...........................................................................................12

*In re Federal Home Loan Mortgage Corp. (Freddie Mac) Sec. Litig.*,
  281 F.R.D. 174 (S.D.N.Y. 2012) ..............................................................................7, 8, 9, 13

*In re Glob. Brokerage, Inc.*,
  2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021) ......................................................15, 16, 17, 18

*In re HealthSouth Corp. Sec. Litig.*,
  261 F.R.D. 616 (N.D. Ala. 2009)............................................................................................18

*In re Initial Pub. Offering Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008)......................................................................................7

*In re Livent, Inc. Noteholders Sec. Litig.*,
  211 F.R.D. 219 (S.D.N.Y. 2002) ............................................................................................15

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) ............................................................................................19

*In re Northfield Labs. Inc. Sec. Litig.*,
  267 F.R.D. 536 (N.D. Ill. 2010)..............................................................................................11

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017)..............................................................................................22, 24

iv

*In re Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016), *aff'd in part, vacated in part*, 862 F.3d 250 (2d Cir. 2017)
   ....................................................................................................................................17, 22

*In re PolyMedica Corp. Sec. Litig.*,
   453 F. Supp. 2d. 260 (D. Mass. 2006) ...................................................................................10

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084 (S.D.N.Y. July 10, 2019), *appeal withdrawn*, 2020 WL 773018 (2d Cir.
   Jan. 16, 2020) ...............................................................................................................14

*In re Teva Sec. Litig.*,
   2021 WL 872156 (D. Conn. Mar. 9, 2021) .............................................................................16

*In re Vale S.A. Sec. Litig.*,
   2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) .............................................1, 11, 12, 15, 23, 24

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   2017 WL 2062985 (S.D.N.Y. May 15, 2017) .........................................................................19

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ...................................................................................8, 14, 16

*Krogman v. Sterrit*,
   202 F.R.D. 467 (N.D. Tex. 2001) ............................................................................7, 13, 17, 18

*Loginovskaya v. Batratchenko*,
   764 F.3d 266 (2d Cir. 2014).................................................................................................22

*Morrison v. National Australian Bank Ltd.*,
   561 U.S. 247 (2010)...............................................................................................21, 22, 23

*Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortgage Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018), *rev'd and remanded on other grounds*, 64
   F.4th 731 (6th Cir. 2023) .............................................................................1, 9, 10, 11, 24

*Seijas v. Repub. of Arg.*,
   606 F.3d 53 (2d Cir. 2010).....................................................................................................5

*Sicav v. James Jun Wang*,
   2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ...........................................................................24

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006).........................................................7, 15, 16, 17

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   546 F.3d 196 (2d Cir. 2008)......................................................................................1, 7, 8, 16

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) ..............................................................................................10

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)...................................................................................................14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...............................................................................................................6

## OTHER AUTHORITIES

17 C.F.R. § 240.15c3–1[c]8 (2006) ..............................................................................................16

Federal Rule of Civil Procedure 23 ....................................................................................... passim

## INTRODUCTION

Lead Plaintiffs the Seafarers Funds fail to "*prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23."[1] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*"). The Court should deny their motion for class certification.

***First***, the Funds cannot rely on *Basic Inc. v. Levinson*'s fraud-on-the-market presumption of class-wide reliance, 485 U.S. 224 (1988), because they failed to prove that the Notes traded in an efficient market. As a result, individual—and not common—questions of reliance predominate.

Empirical evidence of a "cause and effect relationship" between company disclosures and resulting movements in securities prices is the "most important" factor in assessing market efficiency. *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 200 (2d Cir. 2008). The unreliable event study of the Funds' expert, Dr. Steven Feinstein, fails to establish "cause and effect." Among other problems, Dr. Feinstein only analyzed price movement on ***one day***, which cannot possibly show market efficiency ***throughout*** the class period. And the day Dr. Feinstein chose was the day after the alleged class period—which the Funds selected as the corrective disclosure date precisely because Note prices fell. Dr. Feinstein offers no objective basis for this choice. His subjective selection of his ***only*** "event date" skews his results. Multiple courts have rejected his event studies under similar circumstances.[2] This Court should do the same.

---

[1] We refer to Waste Management, Inc. as "Waste Management" or "WM"; to Waste Management, James Fish, Devina Rankin, and John Morris as the "Defendants"; to Seafarers Officers & Employees Pension Plan, Seafarers Money Purchase Pension Plan, and United Industrial Workers Pension Plan as the "Funds"; to the Amended Complaint [Dkt. No. 40] as the "Complaint"; to Advanced Disposal Services as "ADS"; to WM's redeemable notes issued in May 2019 as the "Notes"; to the expert report of Steven P. Feinstein [Dkt. No. 73-2] as the "Feinstein Rpt."; to the expert report of Lucy P. Allen (submitted with this memorandum as Exhibit A) as the "Allen Rpt."; and to the April 14, 2019 agreement and plan of merger between WM and ADS as the "Merger Agreement."

[2] *See In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *16 (E.D.N.Y. Jan. 11, 2022) (Dr. Feinstein's "method for selecting event dates for the bond study was not … reliable…. [D]ue to its methodological deficiencies, the event study is entitled to no weight."), *R. & R. adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022); *Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortgage Corp.*, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ("Dr. Feinstein's opinions based on his single-date event study are based on insufficient facts."), *rev'd and remanded on other grounds*, 64 F.4th 731 (6th Cir. 2023) ("*OPERS*").

1

With no direct "cause and effect" evidence, the Funds' weak showing on other "indirect" indicia of efficiency fail.

*Second*, even if the Funds could show the Notes traded efficiency, the evidence shows that the alleged misrepresentations did not actually affect the price when they were made—i.e., they had no "price impact." Both experts agree the alleged misrepresentations did not increase the Notes' prices when they were made. (So there is no "front-end" evidence of price impact.) And the price decrease after the alleged June 24, 2020 corrective disclosure cannot establish price impact for several reasons. (So there is no "back-end" evidence of price impact, either.)

*Third*, the *Affiliated Ute* presumption of reliance in "pure omission" cases does not apply.

*Fourth*, because the Notes traded internationally in the over-the-counter market (not on a domestic U.S. exchange), each putative class member must present individualized evidence about its purchases—such as evidence "concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money," *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012)—to establish that it purchased Notes in a "domestic transaction." As a result, individual questions of domesticity will predominate.

*Finally*, the Funds failed to show how "damages are capable of measurement on a classwide basis … consistent with [their] liability case," as *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), requires. Dr. Feinstein speculates that a generic Section 10(b) stock-drop class action damages model will do the job. But his "method" does not fit the unique liability theory here.

For all these reasons, the Court should deny the Funds' motion for class certification.

## BACKGROUND

In April 2019, Waste Management agreed to acquire ADS for $4.9 billion, subject to obtaining antitrust clearance from regulators, including the U.S. DOJ. Compl. ¶¶ 26-29. The Merger Agreement required WM to agree to divestments of assets contributing up to $200 million

2

in annual revenues (the "Antitrust Revenue Threshold" or "ART") if necessary to obtain approval. *Id.* ¶¶ 3-4; 29-30. If regulators required divestments beyond the ART, however, WM had the option to terminate the deal by paying a $150 million fee. *Id.* ¶ 31.

To finance the transaction, in May 2019, WM issued five series of senior notes in principal amounts ranging from $500 million to $1 billion. *Id.* ¶ 32-35. Four of these series (the "Notes") were subject to a special mandatory redemption ("SMR") clause, requiring WM to redeem the Notes for 101% of par, plus accrued and unpaid interest, in the event the merger was not completed by July 14, 2020 (the "End Date"). *Id.* ¶ 33.

| Series | Principal Amount | Interest Rate | Due Date | CUSIP |
|---|---|---|---|---|
| 2.95% Notes | $750,000,000 | 2.95% | June 15, 2024 | 94106LBF5 |
| 3.20% Notes | $750,000,000 | 3.20% | June 15, 2026 | 94106LBH1 |
| 3.45% Notes | $1,000,000,000 | 3.45% | June 15, 2029 | 94106LBG3 |
| 4.00% Notes | $500,000,000 | 4.00% | July 15, 2039 | 94106LBJ7 |

The alleged class period begins on February 13, 2020, when WM released its 2019 financial results. Compl. ¶ 50. WM's Form 10-K discussed the ADS transaction, reporting that WM "anticipate[d]" obtaining antitrust regulatory approval by the end of March and closing "soon thereafter." *Id.* ¶¶ 58-60. The Complaint alleges that these statements were misleading because they concealed "the increasing likelihood that [the SMR] would be triggered by a failure to complete the ADS acquisition" by July 13. *Id.* ¶ 55. The Complaint also alleges that WM knew by February 2020 that the DOJ would require divestitures greater than the ART but failed to disclose this and "the likely resultant delays in completing the transaction." *Id.* ¶ 57.

A month later, on March 18, 2020, WM "update[d] [its] prior timing expectations," announcing that it now anticipated receiving DOJ approval "in the second quarter of 2020" (not in March) and "closing the Merger mid to late second quarter 2020." *Id.* ¶ 63. According to the

Complaint, this announcement was a "corrective disclosure" because WM allegedly "acknowledged that [its] prior statements about obtaining antitrust approval and closing the merger by the end of the March 2020 quarter were … false." *Id.* ¶ 110. According to the Complaint, this "corrective disclosure" caused the Notes' prices "to decline significantly," but the "prices soon rebounded based upon Defendants' assurances that DOJ approval and the merger closing would be completed by" July 13. *Id.*

On May 6, 2020, WM released its first quarter results. WM's Form 10-Q reported that the Company "currently anticipate[d] being in a position to receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020." *Id.* ¶ 67-68. The Complaint alleges this statement was misleading because WM failed to disclose that it allegedly "had been working with the DOJ on an alternative divestiture framework" and had "requested updated financial information from ADS" in connection with WM's "continued consideration of agreeing to divestitures in excess of the Antitrust Revenue Threshold at the request of the DOJ." *Id.* ¶ 73.

On May 22, 2020, WM released an investor presentation, which reported that WM was "making progress toward" obtaining regulatory approval for the ADS transaction but did not discuss the anticipated timing of approval or closing. *Id.* ¶ 75. The Complaint alleges that WM misleadingly failed to disclose that "the DOJ indicated it was not likely to approve the merger" before July 13 "without divestitures in excess of the Antitrust Revenue Threshold." *Id.*

On June 10, 2020, WM CFO Devina Rankin participated in an industry conference, where she answered questions about the ADS transaction. Asked about the ART and whether "[d]ivestment of … revenues of assets sold greater than $200 million … is a point in which you could revisit with Advanced Disposal and either change the terms or walk away from the deal," Ms. Rankin responded, "That's correct. The $200 million reference point on divestitures is

4

correct[.]" *Id.* ¶ 76. When asked whether the ADS transaction would "naturally terminate[]" if WM did not receive DOJ approval by July 13, Ms. Rankin responded that "what we've mentioned before is the Waste Management team works closely with the DOJ to continue to move the transaction forward, and that statement that we made about expected timing is the best that I have at this time." *Id.* ¶ 77. The Complaint alleges these statements were misleading because they failed to disclose that WM allegedly "knew the transaction would not be completed by" July 13. *Id.* ¶ 78.

On June 24, 2020, WM announced a revised agreement to acquire ADS at a lower price. WM reported it was "on track" to receive regulatory approval "in a timeframe … complementary to the expected completion of the [ADS] shareholder vote by the end of the third quarter." *Id.* ¶ 83. Due to "the updated transaction timing," WM expected the Notes would "be redeemed pursuant to" the SMR. *Id.* According to the Complaint, "[o]n this news, the market realized that the Notes were no longer a premium investment and Notes prices dropped to approximately 103 cents on the dollar in anticipation that they would likely be redeemed." *Id.* ¶ 84.

On July 20, 2020, WM redeemed the Notes at 101% of par pursuant to the SMR. *Id.* ¶ 89.

The Funds purchased $1,800,000 face amount of the 2024 Notes on May 21, 2020. *See* Dkt. 15-2 at 3, 5, 7. They now move to certify a class of "[a]ll persons who purchased or otherwise acquired any of the [Notes] between February 13, 2020 and June 23, 2020." Mot. at 2.

## ARGUMENT

Because the Funds seek class certification under Rule 23(b)(3), they must satisfy Rule 23(a)'s four basic requirements—(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation—and, in addition, must prove that "common questions of law or fact predominate" and that a "class action is the superior means of adjudicating the controversy fairly and efficiently." *Seijas v. Repub. of Arg.*, 606 F.3d 53, 57 (2d Cir. 2010). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively

5

demonstrate [its] compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Thus, the Funds "must actually ***prove***—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton II*, 573 U.S. at 275. Class certification "is proper only if the trial court is satisfied, after a rigorous analysis," that Rule 23's requirement are met. *Comcast*, 569 U.S. at 33.

## I.      Individual questions of reliance will predominate.

A plaintiff's reliance on the defendant's alleged misrepresentation is "an essential element" of a Section 10(b) claim. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 461 (2013). Proof of reliance "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury," *id.*, which is critical because Section 10(b) is intended "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

"The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a … transaction … based on that specific misrepresentation." *Halliburton II*, 573 U.S. at 267. But, if "every plaintiff ha[s] to prove direct reliance," individual issues "overwhelm[] the common ones,'" making class certification "inappropriate." *Id.* at 268. Thus, in a Section 10(b) case, class certification is "inappropriate" unless the class can invoke a class-wide presumption of reliance under *Basic* or *Affiliated Ute*.

### A.      The Funds cannot invoke the *Basic* presumption because they failed to prove the Notes traded in an efficient market.

In *Basic*, the Supreme Court held that Section 10(b) plaintiffs are entitled to a rebuttable presumption of reliance upon showing (among other things) that "the [securities] traded in an efficient market," *Halliburton II*, 573 U.S. at 278—that is, that the market price "consistently

responded to unexpected, material news." *In re Federal Home Loan Mortgage Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 180 (S.D.N.Y. 2012). Under *Basic*, the market for a security is efficient when the "market price fully reflects all publicly available information," *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887, at *6 (S.D.N.Y. Aug. 1, 2006), *aff''d*, 546 F.3d 196 (2d Cir. 2008), and "absorb[s] this information in a rational way in producing trading prices." *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 288 (S.D.N.Y. 2008). If the market price "consistently respond[s] to … material news," *Freddie Mac*, 281 F.R.D. at 180, then any material misstatement is presumptively reflected in the market price. But "[i]n the absence of an efficient market, … whether or not certain material information (including the alleged misstatements or omissions) was impounded into the [] price cannot be assumed—it may or may not have occurred." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *21 (S.D.N.Y. Oct. 29, 2013).

Plaintiffs "bear the burden of proving market efficiency." *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *9 (S.D.N.Y. Jul. 3, 2013). Thus, "[t]o defeat the presumption of reliance, defendants do not [] have to show an *in*efficient market." *Id*. They need only show that "plaintiffs' proffered proof … falls short of the mark." *Deutsche Bank*, 2013 WL 5815472, at *20.

When assessing market efficiency, courts in the Second Circuit consider the so-called *Cammer* and *Krogman* factors. *See Bombardier*, 546 F.3d at 204 n.11. The "*Cammer* factors" are: (i) average weekly trading volume, (ii) analyst reporting, (iii) number of market makers, (iv) eligibility to file SEC Form S-3, and (v) "empirical facts showing a cause and effect relationship between unexpected corporate events" and "an immediate response in the [security's] price." *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). The "*Krogman* factors" are: (i) market capitalization, (ii) bid-ask spread, and (iii) public float. *Krogman v. Sterrit*, 202 F.R.D. 467,

474 (N.D. Tex. 2001). The factors are "merely an analytical guide," not a checklist. *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 (S.D.N.Y. 2013). They are not all created equal.

### 1. The Funds failed to establish a causal connection between the release of new relevant information and movement in the Notes' prices.

The fifth *Cammer* factor—empirical evidence of a cause-and-effect relationship between price movements and the release of material information—is "the most important" factor because without "finding this causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price." *Winstar*, 290 F.R.D. at 437 (citing *Bombardier*, 546 F.3d at 207). As the *Cammer* court explained, the "cause and effect relationship" is "the essence of an efficient market and the foundation for the fraud on the market theory." 711 F. Supp. at 1287. The Funds fail to establish this essential cause-and-effect relationship.

The Funds offer Dr. Feinstein's event study as evidence of a cause-and-effect relationship. "An event study is an empirical statistical analysis by which experts may disentangle[] the effects of two types of information on [securities] prices—information that is specific to the firm ... and information that is likely to affect [] prices marketwide." *In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x. 41, 48 (2d Cir. 2018) (quotation omitted). Under the generally accepted event study method, the expert calculates the security's "expected" returns "based on the security's historical relationship to [] market [and industry] index[es]." *Freddie Mac*, 281 F.R.D. at 174. The difference between the actual price movement and the expected returns on a given day (the "abnormal" or "residual" returns) represents price movement "that cannot be explained by general market forces." *Barclays*, 756 F. App'x at 48. The expert can then test for market efficiency by identifying days when new material information is released to the market and examining the abnormal returns on those "event dates." *Id.* "In an efficient market, [securities] prices should show statistically significant abnormal returns on days in which unexpected, material information is released into

the market." *Freddie Mac*, 281 F.R.D. at 174, 178. Dr. Feinstein's unreliable analysis misses the mark for several reasons.

*First*, Dr. Feinstein's event study does not follow the accepted practice (and his own standard practice) of calculating the Notes' returns based on daily closing prices. *See* Allen Rpt. ¶¶ 19-24.[3] Instead, Dr. Feinstein considers the daily value weighted average price ("VWAP") for all Notes transactions during market hours on a given day. But when comparing the Notes' returns to the returns of various indices—to calculate the "expected" return based on non-firm specific price movement—Dr. Feinstein uses the indices' daily ***closing prices***. *Id.* ¶ 23. Dr. Feinstein provides no explanation for this choice. Neither the Funds nor Dr. Feinstein identifies any legal or academic authority suggesting that VWAP is the appropriate price to use when calculating daily returns or that it is appropriate to mix-and-match VWAP and closing prices when calculating expected returns. *Id.* Thus, Dr. Feinstein's calculation of actual, expected, and abnormal returns— the statistical lynchpin of any event study—is inaccurate and unreliable. *Id.* ¶ 23-24.

*Second*, while the Funds allege a four-month class period, Dr. Feinstein's event study tests the movement in the price of the Notes on only *one day*—the day after the alleged class period ends. *See* Feinstein Rpt. ¶ 160. But, "[a]s recognized by numerous courts, market efficiency across a lengthy class period cannot be assessed based upon a lone stock price reaction to news that concludes the class period." *OPERS*, 2018 WL 3861840, at *2 (rejecting Dr. Feinstein's event study and denying class certification). Evidence about price movements on June 24 cannot show the Notes traded efficiently in February. *See Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 316 (5th Cir. 2005) (a "single decline on the last day of the class period is plainly insufficient by itself to

---

[3] *See also* Bhagat, Sanjai, and Roberta Romano, "Event studies and the law: Part I: Technique and corporate litigation," 4 Am. Law and Economics Rev. 141, 145 (2002) ("After defining the event and announcement period, stock returns are measured for this period. ***If daily data are being used, this is straightforward: the return is measured using closing prices***.").

show market efficiency throughout the class period ….”). In fact, courts have rejected event studies analyzing ***many more days*** as insufficient. *See China Auto.*, 2013 WL 3357170, at \*12 (price reaction on seven days “is an insufficient foundation upon which to pronounce market efficiency”).[4] And Dr. Feinstein has conceded in the past that “a single [] price reaction … could not possibly demonstrate that [securities] traded in an efficient market [] months earlier.” *OPERS*, 2018 WL 3861840, at \*3.

Moreover, Dr. Feinstein finds evidence of a cause-and-effect relationship on the single date he considered only because, as discussed above, *supra* at 9, he improperly calculated the Notes’ returns. When returns are calculated in accordance with accepted event study methodology—by looking at daily closing prices—the price of the 4.0% Notes did ***not*** decrease in response to the June 24 announcement.[5] Allen Rpt. ¶¶ 33-35.

***Second***, even if a price movement on a single date were sufficient to establish market efficiency, Dr. Feinstein’s cherry-picking the day after the class period—the day the Complaint alleges a corrective disclosure “caus[ed] the prices of the Notes to decline significantly,” Compl. ¶ 110—as his single event date renders his entire analysis unreliable. *See Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 53 (S.D.N.Y. 2019) (“SQM claims that the analysis of [the last day of the alleged class period] in particular is cherry-picking. The Court agrees.”). As another court explained in excluding Dr. Feinstein’s analysis, “using the last day of a class period

---

[4] *See also In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d. 260, 278 (D. Mass. 2006) (“[E]vidence” that the “stock price responded to news on the five biggest news days within the Contested Period … is not a scientific analysis of the relationship between news and the stock price.”); *Cunha v. Hansen Nat. Corp.*, 2013 WL 12124073, at \*7 (C.D. Cal. June 20, 2023) (denying class certification where plaintiff’s expert “examined only three days”).

[5] The 4.0% Notes closed at $110.40 on June 23 (as publicly reported by *Bloomberg*). WM announced the revised Merger Agreement before the market opened on June 24. And most of the trades of the 4.0% Notes on June 24 were higher than the prior days closing price, with the Notes trading as high as $112.00 before closing at $110.80 (per *Bloomberg*). Only by ignoring publicly reported closing prices and looking instead at his own calculation of the Notes’ VWAP can Dr. Feinstein opine that the price fell on June 24. *See* Allen Rpt. ¶¶ 32-36. But even Dr. Feinstein’s VWAP was ***over $110*** on the day WM announced that it expected to redeem the Notes at $101. *Id.* None of these facts are consistent with market efficiency.

is not a scientifically valid way to test for market efficiency because … securities plaintiffs intentionally select such dates for purposes of increasing potential damages." *OPERS*, 2018 WL 3861840, at *2. The *OPERS* court explained that using a price movement on the plaintiff's chosen corrective disclosure date as a test of market efficiency is "entirely improper because you are supposed to hypothesize and then see your results. You are not supposed to know your results in advance." *Id.* at *7.

Moreover, Dr. Feinstein does not identify any objective principles justifying his selection of June 24 as the only event date in his study. He simply asserts that he "reviewed all Company news and analyst reports during and immediately following the Class Period" and concluded that "24 June 2020 was the only event that was of such import as to reasonably be expected to elicit a security price reaction over the threshold for statistical significance according to theoretical valuation principles." Feinstein Rpt. ¶ 160.[6] As another court recently explained, Dr. Feinstein's vague, subjective descriptions of his process for choosing event dates "substitutes shorthand, lingo, and jargon for explanation and methodology, and suggests that subjectivity and 'trust the expert because of his expertise' is a basis to infer that the study is reliable." *Vale*, 2022 WL 122593 at **13-14, 16.[7] Under these circumstances, the *Vale* court found that Dr. Feinstein's subjective, unscientific method for selecting event dates rendered his event study unreliable. *Id.* As a result, the court found Dr. Feinstein's "event study [wa]s entitled to no weight."[8] *Id.*

---

[6] Dr. Feinstein's unsupported conclusion that the June 24, 2020 disclosure was the only event important enough to prompt a statistically significant stock price movement, Feinstein Rpt. ¶ 160, is particularly curious given the Complaint's allegation that WM's March 18, 2020 announcement that it "anticipate[d]" receiving regulatory approval from DOJ "in the second quarter of 2020" (no longer by the end of March 2020) and "anticipate[d] closing the Merger mid to late second quarter 2020" (rather than shortly after receiving DOJ approval in March), was a "corrective disclosure." Compl. ¶ 63. *See infra* 12-13.

[7] In *Vale*, Dr. Feinstein used the same description of his process for choosing event dates that he uses here. *See* 2022 WL 122593, at *11 (describing Dr. Feinstein's "conclusory top-level descriptions of [his] methodology").

[8] Courts consistently discount event study evidence under similar circumstances. *See In re Northfield Labs. Inc. Sec. Litig.*, 267 F.R.D. 536, 548 (N.D. Ill. 2010) (selection of event dates "skew[ed]" analysis "toward a conclusion that

Notably, Dr. Feinstein opines that "[t]he likelihood and timing of the ADS acquisition [were] critically important to … the pricing of the Notes." Feinstein Report ¶ 40. And the Complaint alleges that WM's March 18 "update" of its "timing expectations" "caus[ed] the prices of the Notes to decline significantly." Compl. ¶¶ 64, 110. But Dr. Feinstein did not include March 18 as an event date and provides no explanation for why he did not consider the announcement that day to be "of such import as to be reasonably be expected to elicit a security price reaction." Feinstein Rpt. ¶ 160. Without such an explanation, one is left to conclude that Dr. Feinstein did not include March 18 as an event date because—as both experts now agree, *see* Allen Rpt. ¶ 32-33—the announcement that day did not, in fact, cause the price of the Notes to decline. *See Vale*, 2022 WL 122593, *11 ("for the events that he excluded—the dates he did not choose or which he excluded after review—[Dr. Feinstein] provides no detailed explanation at all as to why those news announcements were not worthy of inclusion"). Dr. Feinstein's failure to explain his omission of this date from his event study casts further doubt on the reliability of his methodology.

***Third***, while Dr. Feinstein did not include the March 18 alleged corrective disclosure as an "event date," the Feinstein event study shows—and Ms. Allen's alternative event study confirms—that the price reaction following the March 18 announcement was inconsistent with a finding of market efficiency. While the Complaint alleges that the Notes' prices "decline[d] significantly" that day, the experts agree that only the 3.20% Notes had statistically significant negative returns that day, while the 3.45% Notes had (non-significant) positive returns, and both the 2.95% and

---

the market was efficient"); *Bricklayers & Trowel Trades v. Credit Suisse LLC*, 752 F.3d 82, 91 (1st Cir. 2014) (plaintiff's expert "selected event dates based on unreliable criteria"); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 618 (C.D. Cal. 2009) ("events … should be selected using criteria that are as objective as possible" and "should be determined before looking at the result"); *Bell v. Ascendent Solutions, Inc.*, 2004 WL 1490009, at *3 (N.D. Tex. July 1, 2004) (selection of "dates that appear to be consciously chosen … to support his hypothesis of efficiency" rendered "testimony unreliable"), *order aff'd and remanded*, 422 F.3d 307 (5th Cir. 2005).

4.0% Notes had ***statistically significant positive returns***.[9] Allen Rpt. ¶¶ 32-33.

| | Reaction of SMR Note Prices to March 18, 2020 Alleged "Corrective Disclosure" | | | |
|---|---|---|---|---|
| **Note Series** | **Feinstein Event Study** | | **Allen Alternative Event Study** | |
| | **Price Reaction (%)** | **Statistically Significant?** | **Price Reaction (%)** | **Statistically Significant?** |
| 2.95% | + 0.84% | Yes (**Positive**) | + 3.30% | Yes (**Positive**) |
| 3.20% | - 1.69% | Yes (**Negative**) | - 4.86% | Yes (**Negative**) |
| 3.45% | + 0.15% | No | - 2.02% | No |
| 4.0% | + 6.68% | Yes (**Positive**) | +7.41% | Yes (**Positive**) |
| (Allen Rpt. ¶¶ 31-34.) | | | | |

***Finally***, the evidence shows other price movements inconsistent with market efficiency. For example, while Dr. Feinstein says notes trade at higher prices if "investors expect … a relatively high[er] coupon rate for a long[er] period of time," on several days, the Notes' respective prices crossed—meaning that Notes with ***lower*** coupon rates and ***shorter*** terms traded at ***higher*** prices. Allen Rpt. ¶¶ 37-39. Also, Dr. Feinstein often finds statistically significant price movements ***when there was no company-specific news***. *See* Allen Rpt. ¶ 44. If June 24 were "the only event" "reasonably [] expected" to affect prices, Feinstein Rpt. ¶ 120, then finding "numerous days … when … statistically significant price movement was not associated with a news event" is inconsistent with market efficiency. *China Auto.*, 2013 WL 3357170, at \*13.

### 2. The remaining "indirect" *Cammer* and *Krogman* factors also weigh against a finding of market efficiency.

The remaining *Cammer* and *Krogman* factors are "less important" because they provide only "indirect" evidence of efficiency. *Freddie Mac*, 281 F.R.D. at 182. Thus, courts will find efficiency despite no empirical evidence of a cause-and-effect relationship only where the showing

---

[9] The Notes prices similarly moved in opposite directions after *Bloomberg* reported on June 22 that the DOJ might require divestitures in excess of the ART. *See* Allen Rpt. ¶ 37.

on the remaining factors is "compelling." *Waggoner v. Barclays PLC*, 875 F.3d 79, 98 (2d Cir. 2017).[10] The Funds do not come close to such a "compelling" showing here.

**Trading Volume (*Cammer* Factor 1):** Dr. Feinstein analyzes average weekly turnover over the entire alleged class period, Feinstein Rpt. ¶¶ 79-81, which ignores the Notes' significantly lower trading volume the during the first half of the alleged class period. *See* Allen Rpt. ¶¶ 36-41. For example, during this period, the 4.0% Notes ***never*** experienced trading volume above *Cammer*'s 2% threshold and rarely above the 1% threshold. *Id.*



Higher trading volume in the later period cannot "make up" for low trading volume during the first two months of the class period. *See Winstar*, 290 F.R.D. at 449 ("Plaintiffs have only demonstrated [market efficiency] after October 16, 2000. Prior to this date, … [a]verage weekly trading … was much lower"). "[T]o take advantage of the *Basic* presumption, [the Funds] must

---

[10] *See also In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *13 (S.D.N.Y. July 10, 2019) ("[W]here the remaining four *Cammer* factors and the three *Krogman* factors ***all point toward market efficiency***, a court can dispose of *Cammer*'s fifth factor completely."), *appeal withdrawn*, 2020 WL 773018 (2d Cir. Jan. 16, 2020); *China Auto.*, 2013 WL 3357170, at *9 (denying class certification even though "defendants d[id] not contest any of the *Cammer* factors except for the last—the cause and effect relationship").

show that the market for the [Notes] was efficient ***throughout the entire [Class] Period***, not just for [] half of it." *In re Glob. Brokerage, Inc.*, 2021 WL 1160056, at *13 (S.D.N.Y. Mar. 18, 2021) (*Cammer* Factor 1 "militate[d] against a finding that the market … was efficient" where "evidence show[ed] that … average weekly trading volume … fell" during the second half of the class period), *R. & R. adopted*, 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021). Dr. Feinstein likewise ignores that the Notes did not trade ***at all*** on many days, *see* Allen Rpt. ¶ 34, which is inconsistent with market efficiency. *See In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 180-81 (S.D.N.Y. 2010), *vacated and remanded on other grounds*, 689 F.3d 229 (2d Cir. 2012). Finally, Dr. Feinstein fails to address the fact that the Notes traded over the counter, not on an exchange, which weighs against efficiency. *See In re Livent, Inc. Noteholders Sec. Litig.*, 211 F.R.D. 219, 222-23 (S.D.N.Y. 2002).

**Analyst Coverage (*Cammer* Factor 2)**: The Funds argue that analyst firms covered WM during the class period. Mot. at 14. But these firms covered WM's common stock, not the Notes. *See* Allen Rpt. ¶¶ 52-54. "[E]vidence of analyst coverage of the company at large—but not a specific security—is insufficient evidence to conclude that the particular security trades in an efficient market." *Vale*, 2022 WL 122593, at *15; *see also Teamsters*, 2006 WL 2161887, at *10 ("Teamsters has presented no evidence that analysts ***specifically followed the Certificates***…. The lack of analysts covering the Certificates supports a finding that the Certificates traded in an inefficient market[.]"); *Glob. Brokerage*, 2021 WL 1160056, at *14 (where "there are no analysts specifically following a given debt security," analyst coverage of the company's stock "'provides little support' for market efficiency" (quoting *AIG*, 265 F.R.D. at 177)).

Dr. Feinstein also notes that the three credit ratings agencies published credit ratings for WM's debt during the class period. Feinstein Rpt. ¶ 107; Mot. at 15. But the Second Circuit has

recognized that "rating agencies are not analogous to 'sell-side equity analysts' who follow equities, publish their research and earnings estimates, and 'provid[e] a valuable conduit for information to pass from companies to investors[.]'" *Bombardier*, 546 F.3d at 206 n. 12 (citation omitted). Thus, "[c]overage by credit rating agencies, on its own, has limited probative value with respect to [] market efficiency." *In re Teva Sec. Litig.*, 2021 WL 872156, at \*19 (D. Conn. Mar. 9, 2021); *Winstar*, 290 F.R.D. at 446 n.10 ("having all three ratings is not a strong indicator" of efficiency); *AIG*, 265 F.R.D. at 177 ("rating agencies rate bonds [if] they are paid by the issuer, regardless of market efficiency").

Thus, the second *Cammer* factor weighs against a finding of market efficiency.

**Market Makers (*Cammer* Factor 3)**: A "'market maker'" is "'a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers.'" *Bombardier*, 546 F.3d at 206 (quoting 17 C.F.R. § 240.15c3–1[c]8 (2006)). "Market makers promote [] efficiency" because "they 'react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.'" *Id.* (quoting *Cammer*, 711 F. Supp. at 1287).

The Funds present no evidence of ***any*** market markers for the Notes. Dr. Feinstein merely points out that the Notes were underwritten and that some broker-dealers held the Notes during the alleged class period and speculates that some of these firms may have acted as market makers. Feinstein Rpt. ¶¶ 110-16. This speculation does not suffice. *See Teamsters*, 2006 WL 2161887, at \*11 (expert's unsupported assertion that debt underwriters acted as market makers was "unavailing"); *Glob. Brokerage*, 2021 WL 1160056, at \*15 (courts cannot "simply assume that the

16

underwriters who 'typically [] serve as market makers for the notes' did so"). Because the Funds

failed to show "that there were market makers for each of the [Notes], this factor supports a finding

that the [Notes] traded in an inefficient market." *Teamsters*, 2006 WL 2161887, at \*11.

**Form S-3 Eligibility (*Cammer* Factor 4)**: WM was a Form S-3 filer, which "weighs, albeit

slightly, in favor of efficiency." *Glob. Brokerage*, 2021 WL 1160056, at \*16.

**Total Par Value of the Notes (*Krogman* Factor 1)**: The third *Krogman* factor considers

market capitalization. When assessing market efficiency for a debt security, courts modify this

factor to consider par value of the debt. *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 366 (S.D.N.Y.

2016), *aff'd in part, vacated in part*, 862 F.3d 250 (2d Cir. 2017). Here, the par value of the Notes

ranged from $500 million to $1 billion. Feinstein Rpt. ¶ 128. While Dr. Feinstein argues that these

amounts were larger than the market capitalization of some public companies, "comparing the par

value of the [Notes] to the market capitalization of other U.S. companies (rather than to the par

value of debt issued by other U.S. companies) is 'an apples-to-oranges comparison.'" *Glob.

Brokerage*, 2021 WL 1160056, at \*17. Dr. Feinstein provides no "comparative information that

might allow this Court to determine whether an issue of corporate debt with a par value of [$500

million] is large enough to imply an efficient market. Nor do [the Funds] point to any cases

supporting the proposition that *Krogman* Factor 1 could be satisfied by a [$500 million] issue." *Id.*

**Bid-Ask Spread (*Krogman* Factor 2)**: Dr. Feinstein did not analyze the bid-ask spread for

the bonds because data on bid-ask spreads for debt securities is not available. *See* Feinstein Rpt.

¶ 134 (noting "the bid-ask spreads for the Notes are not directly observable"). Because data on

bid-ask spreads for corporate debt securities is unreported, courts generally disregard this factor

when assessing the efficiency of corporate debt markets. *See Glob. Brokerage*, 2021 WL 1160056,

at \*18 ("I assess this factor as neutral, as do other courts attempting to determine the efficiency of

17

the market for debt securities"); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 637 (N.D. Ala. 2009) (because data on bid-ask spreads for corporate debt is generally unavailable, *Krogman* factor 3 "is not determinative of the efficiency of the market"). Nonetheless, Dr. Feinstein attempts to support his market efficiency opinion by relying on estimates of bid-ask spreads computed by *Bloomberg* and *LSEG Workspace*.[11] Feinstein Rpt. ¶¶ 134-42. But unsupported estimates from third-party sources do not support a finding of efficiency. *See Glob. Brokerage*, 2021 WL 1160056, at *18.

**Float (*Krogman* Factor 3)**: "The final factor considers the issuer's float – that is, the number of shares (or, in the case of debt securities, par value) available for trading by outside investors in the open market." *Id.* at *18 (citation omitted). Because WM's public filings did not indicate that any insiders held any of the Notes, Dr. Feinstein assumed that the Notes' public float equaled their total par value—between $500 million and $1 billion. Feinstein Rpt. ¶ 131. But, once again, Dr. Feinstein assesses the significance of these amounts using only an apples-to-oranges comparison with the market capitalization of U.S. public companies. *Id.* ¶¶ 131-32. Thus, "[o]nce again, … the record contains no comparative information or relevant case law supporting [the Funds'] position that a [$500] million float [for a debt security] is large enough to imply an efficient market." *Glob. Brokerage*, 2021 WL 1160056, at *18.

In sum, three of the indirect facts (trading volume, analyst coverage, and market makers) weigh ***against*** a finding of market efficiency; three (total par value of the Notes, bid-ask spread, and float) are, at most, neutral; and just one (eligibility to file on Form S-3) weighs, albeit slightly, in favor of market efficiency. This is hardly the "compelling" showing required.

---

[11] According to Dr. Feinstein, *Bloomberg*'s "estimated bid and ask quotes" use "an algorithm based on 'Direct Observations' and 'Observed Comparables'" and *LSEG Workspace* "arrives at estimates … by analyzing trade prices, broker quotes, the new issue market, and comparable securities." Feinstein Rpt. ¶ 135. But Dr. Feinstein provides no information about what data *Bloomberg* or *LSEG Workspace* considered or what analysis they applied.

### B.    The Alleged Misstatements Had No Price Impact.

*Basic*'s "fundamental premise" is that "an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 536 U.S. 804, 813 (2011) ("*Halliburton I*"). Accordingly, defendants may rebut the presumption by showing "the asserted misrepresentation … did not affect the market price," *i.e.*, "the misrepresentation had no 'price impact.'" *Halliburton II*, 573 U.S. at 283. "If a misrepresentation had no price impact, then *Basic*'s fundamental premise 'completely collapses, rendering class certification inappropriate.'" *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 119 (2021) (quoting *Halliburton II*, 573 U.S. at 283). In considering whether a defendant has successfully rebutted the *Basic* presumption, a "court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentation had a price impact." *Id.* at 126-27.

Even if the Funds had shown the Notes traded in an efficient market—and, again, they have not—they still could not invoke the *Basic* presumption because the evidence shows it is more likely than not that the alleged misrepresentations had no price impact.

In a typical case, price impact can be shown directly by a price increase when a misstatement is made, i.e., "front-end" price impact. *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011). Front-end price impact typically is shown by an event study finding statistically significant positive residual returns after the alleged misstatements. *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *6 (S.D.N.Y. May 15, 2017). Both experts agree that did not happen here. Allen Rpt. ¶ 87. So, there is no evidence of "front-end" price impact.

But some cases proceed on an "inflation maintenance theory," under which "a misrepresentation causes [the] price 'to *remain* inflated by preventing preexisting inflation from dissipating from the stock price.'" *Goldman*, 594 U.S. at 119-20 (citation omitted). If the

19

misrepresentation affects the stock price by artificially maintaining it rather than artificially inflating it, then one would not expect to see "front-end" price impact when the misstatement is made. Rather, "price impact is … the amount that the stock's price would have fallen 'without the false statement.'" *Id.* at 123 (citation omitted). In those cases, plaintiffs typically argue that the amount the price fell when the alleged misstatement was corrected "is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.* In other words, plaintiffs in "price maintenance" cases argue that "the back-end price drop equals front-end inflation." *Id.* But the June 24 price drop does not provide "back-end" evidence of price impact for several reasons.

*First*, the June 24 disclosure did not correct the February 13 alleged misstatement, so it cannot support a finding of price impact as to that statement. *See Goldman*, 594 U.S. at 123. As the Court explained in *Goldman*, if it is "less likely that the specific disclosure actually corrected the [earlier] misrepresentation," then "there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.* According to the Complaint, WM's February 13 statements—which allegedly falsely assured investors the ADS merger would receive regulatory approval by the end of March and close shortly thereafter, Compl. ¶¶ 50-52—were corrected on March 18, when WM updated its timing expectations. *Id.* ¶ 63. According to the Complaint, the March 18 statement revealed that WM's "prior statements about obtaining antitrust approval and closing the merger by the end of the March 2020 quarter were materially false and misleading." *Id.* ¶110. The June 24 announcement could not "correct" a statement that had already been "corrected" on March 18. *See Goldman*, 594 U.S. at 123. Any "back-end" price impact evidence for the February 13 statement would have to be seen on March 18. But the experts agree there were *no* statistically significant drops in the Notes' prices on March 18. Allen Rpt. ¶¶ 32-33. Thus, there is no evidence of price impact as to the February 13 statement.

20

*Second*, for the alleged misstatements after March 18, the Complaint expressly pleads price *inflation*, not price *maintenance*. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 87 (S.D.N.Y. 2015) (price maintenance theory must "fit[] the theory of plaintiffs' case"). Specifically, the Complaint alleges that after the March 18 announcement "caus[ed] the prices of the Notes to decline," the prices "rebounded based upon Defendants' assurances that … the merger[] … would be completed by the End Date." Compl. ¶ 110. Thus, the Complaint alleges that the post-March 18 statements impacted the price by causing it to "rebound[]," not by maintaining pre-existing inflation. *Id.* Under that theory, there must be some "front-end" evidence of price impact for the post-March 18 statements. But both experts agree there were no statistically significant stock price increases after any of the statements. Allen Rpt. ¶¶ 32-33.

*Third*, while "back-end" evidence of price impact depends on "a negative disclosure" and "an associated drop in … price," *Goldman*, 594 U.S. at 123, there was no drop in the price of the 4.0% Notes on June 24. *See supra* at 10. Thus, a purported drop in the price on June 24 cannot provide price impact evidence as to the 4.0% Notes for this additional reason.

### C.     The *Affiliated Ute* presumption does not apply.

In the alternative, the Funds invoke a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 158 (1972). But the *Affiliated Ute* presumption "is not available where," as here, "a plaintiff's theory is based … primarily[] on misrepresentations as opposed to omissions." *In re Barclays*, 126 F. Supp. 3d 342, 365 (S.D.N.Y. 2015).

## II.     Individual domesticity questions will predominate.

The federal securities laws reach only domestic U.S. securities transactions—either (1) "transactions in securities listed on domestic exchanges," and (2) "domestic transactions in other securities." *Morrison v. National Australian Bank Ltd.*, 561 U.S. 247, 255 (2010). "'*Morrison* makes clear that [determining] whether [federal securities law] applies to certain conduct is a

21

"merits" question.'" *In re Petrobras Sec.*, 862 F.3d 250, 271 (2d Cir. 2017) (quoting *Absolute Activist*, 677 F.3d at 67). "In other words, a putative class member only has a viable cause of action if the specific [Notes] sued upon were purchased in a qualifying 'domestic transaction.'" *Petrobas*, 862 F.3d at 271 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014)). And the plaintiff bears the burden to establish domesticity. *Morrison*, 561 U.S. at 254, 273.

Because the Notes traded over the counter—and not on a domestic U.S. exchange—"a plaintiff may demonstrate the domesticity of a particular transaction by producing evidence 'including, but not limited to, facts concerning the formation of the contracts, the placement o[f] purchase orders, the passing of title, or the exchange of money.'" *Petrobras*, 862 F.3d at 272 (quoting *Absolute Activist*, 677 F.3d at 70). Under these circumstances, "the investigation of domesticity" presents "an 'individual question' requiring putative class members to 'present evidence that varies from member to member,'" defeating class certification.[12]  *Id.*

The Second Circuit's *Petrobras* decision is squarely on point. The court vacated class certification for debt securities that traded over the counter, finding lack of predominance. *Id.* at 256-57. Applying *Morrison* and *Absolute Activist*, the court concluded that "the investigation of domesticity appears to be an 'individual question' requiring putative class members to 'present evidence that varies from member to member,'" including "transaction-specific facts" that "are not obviously 'susceptible to [] class-wide proof.'" *Id.* at 272 (internal quotation omitted). Because resolving extraterritoriality issues would require individualized evidence, the court concluded that "it cannot be said that the class members' *Morrison* inquiries will 'prevail or fail in unison.'" *Id.* at 273-74 (quoting *Amgen*, 568 U.S. at 460). And the court concluded that "the potential for

---

[12] Courts applying *Morrison* to over-the-counter transactions have required detailed evidence to prove domesticity. *See Loginovskaya v. Batratchenko*, 764 F.3d 266, 274-75 (2d Cir. 2014).

variation across putative class members" foreclosed predominance. *Id.* at 273.

Because the Petrobras bonds—like the WM Notes—traded entirely over the counter, "the fact-finder would have to look at *every class member's* transaction documents to determine who did and who did not have a valid claim." *Id.* at 273-74 (citation omitted). In some cases—if, for example, a U.S. investor purchased Notes from another U.S. investor in the U.S.—the analyses may be straightforward. But in many cases, it will not. The record here shows a significant number of putative class members will likely raise contested domesticity issues, as the Notes were sold outside the U.S. to non-U.S. investors from their initial offering and the offering was expressly structured "*to facilitate the initial issuance of any notes sold outside of the United States and cross-market transfers of the notes associated with secondary market trading*" Ex. B, WM Notes Prospectus at S-26. Moreover, at least 66 non-U.S. institutions (approximately 20% of all institutional holders) held Notes during the class period. *See* Allen Rpt. ¶¶ 92.

These facts sharply contrast with the record in *Vale*, where Vale's bonds were listed in the NYSE and traded both on the exchange and over the counter. The plaintiff sought to certify a class of "'all persons who purchased on the New York Stock Exchange ('NYSE')" or "'in a U.S. transaction.'" [13] *Vale*, 2022 WL 122593, at 17. While the court recognized that "over-the-counter trades" would "include some transactions that occurred abroad," it found that the need for individual proof of domesticity did not defeat predominance. *Id.* In doing so, the court noted that the plaintiffs "proffered a class definition that attempts to permit only eligible transactions to move forward;" that most trades likely occurred on the NYSE (and thus were plainly domestic); and that the defendants offered no "evidence that the number of non-eligible transactions … could not be

---

[13] By contrast, the Funds seek to certify a class of "[a]ll persons who purchased or otherwise acquired" the Notes. Mot. at 2. At a minimum, the class must be limited to those who purchased Notes *in a domestic U.S. transaction*. *See Vale*, 2022 WL 122593, at *17 (certifying a class of "all persons who purchased on the New York Stock Exchange ('NYSE') or other U.S. exchanges or in a U.S. transaction").

easily handled through a claims administration or trial management process." *Id.*

Here, *every* trade was executed over the counter, requiring individualized evidence of "transaction specific facts" not "'susceptible to [] class-wide proof.'" *Petrobras*, 862 F.3d at 272 (citation omitted). Moreover, the evidence confirms that the Notes traded internationally, and there were a significant number of non-U.S. holders. Allen Rpt. ¶ 92.  As a result, individual domesticity issues will predominate.

**III.    The Funds fail to show that damages can be measured on a class-wide basis.**

The Funds also must establish that damages can be calculated on a class-wide basis using a model consistent with their theory of liability. *Comcast*, 569 U.S. at 35. That requires a damages model that measures "only those damages attributable to that theory." *Id.* Although "[c]alculations need not be exact" at this stage, Rule 23(b) still requires "evidentiary proof"; it does not "set forth a mere pleading standard." *Id.* at 33, 35.

Rather than offer a damages model consistent with the Funds' theory of liability, Dr. Feinstein simply asserts that he would use the generic "out-of-pocket damages methodology" that "is used to compute damages in virtually all securities class action cases." Feinstein Rpt. ¶ 211. To be sure, some courts have found this generic description sufficient in a typical Section 10(b) stock-drop class action. But many have not. *See., e.g.*, *OPERS*, 2018 WL 3861840, at \*19 ("When a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts (as did Dr. Feinstein) that there are unspecified 'tools' available to measure damages … the class cannot be certified."); *Sicav v. James Jun Wang*, 2015 WL 268855, at \*\*3-4, 5-6 (S.D.N.Y. Jan. 21, 2015) (finding Dr. Feinstein's model failed under *Comcast*).

In any event, Dr. Feinstein's "model"—using the drop in the Notes' prices following the June 24disclosure to calculate the "artificial inflation" in the price throughout the class period, Feinstein Rpt. ¶ 219—is not consistent with the Funds' liability theory here. The Complaint

24

expressly alleges that WM concealed from investors "***the increasing likelihood***" that the SMR would be triggered. Compl. ¶ 55. In other words, the Funds claim WM "understated a known risk," *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *16 (S.D. Tex. Dec. 6, 2013)—the risk that the SMR would be triggered.

As Dr. Feinstein explains, the Funds' theory assumes that "[b]ecause the Notes were trading at a premium, the length of time the Notes would remain outstanding was a critically important piece of information for … the market price of the Notes." Feinstein Rpt. ¶ 40. Because of the unusual SMR feature, "[t]he likelihood and timing of the ADS acquisition, and information related thereto, thus became critically important to … the pricing of the Notes." *Id.* In short, the Funds' theory assumes that the market priced the Notes based on the likelihood that the SMR would be triggered. Thus, according to the Complaint, when WM announced that it "expect[ed]" the Notes "w[ould] be redeemed," the "Notes prices dropped to approximately 103 cents on the dollar in anticipation that [the Notes] would likely be redeemed." Compl. ¶¶ 83-84.

If, as the Complaint alleges, WM concealed the "increasing likelihood" that the SMR would be triggered, then the true likelihood necessarily must have been something less than 100% during the class period. Thus, if WM had accurately disclosed the supposedly "true" likelihood of redemption—which was allegedly higher than the market knew but less than 100%—then the prices would have fallen by some amount less than the prices fell on June 24, when the market learned the Notes would, in fact, be redeemed. By calculating artificial inflation based on the full June 24 price drop, Dr. Feinstein's model would "compensate[] investors for the full value of the [] price drop from the materialization of [the] risk, … overcompensat[ing] investors for their harm." *BP*, 2013 WL 638840, *16. Courts have rejected such damages theories. *Id.*

## CONCLUSION

The Court should deny the Funds' Motion for Class Certification.

25

Dated:  August 16, 2024

Respectfully submitted,

BAKER BOTTS L.L.P.

By*:  /s/ David D. Sterling*

David D. Sterling
Amy Pharr Hefley
910 Louisiana Street
Houston, Texas 77002
Tel:  (713) 229-1946
Fax: (713) 229-7946
david.sterling@bakerbotts.com
amy.hefley@bakerbotts.com

James J. Beha II
30 Rockefeller Plaza
New York, New York 10112
Tel:  (212) 408-2510
Fax: (212) 259-2510
jim.beha@bakerbotts.com

**ATTORNEYS FOR DEFENDANTS**

26