# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re WASTE MANAGEMENT SECURITIES LITIGATION

Case No: 1:22-cv-04838-LGS

**EXPERT REPORT**

**OF**

**LUCY P. ALLEN**

**August 16, 2024**

**CONFIDENTIAL**

**CONFIDENTIAL**

**TABLE OF CONTENTS**

I.     Scope of Assignment ..................................................................................................1

II.    Qualifications and Remuneration ............................................................................1

       A.  Qualifications...................................................................................................1

       B.  Remuneration...................................................................................................2

III.   Materials Considered ................................................................................................2

IV.    Background................................................................................................................3

       A.  Company Background .....................................................................................3

       B.  Summary of Allegations .................................................................................5

V.     The Feinstein Report Does Not Show that the SMR Notes Traded in Efficient
       Markets During the Alleged Class Period ..............................................................7

       A.  Dr. Feinstein's analysis of market efficiency completely fails to analyze the
           special mandatory redemption feature of the SMR Notes, which itself is the basis
           of the alleged fraud ..........................................................................................8

       B.  Dr. Feinstein's event study methodology is non-standard and unreliable ...................10

       C.  Dr. Feinstein fails to show that the SMR Notes pass the "most important" test of
           market efficiency, the cause-and-effect relationship between news and price
           movements .....................................................................................................15

       D.  Dr. Feinstein's contention that institutional ownership of the SMR Notes during
           the alleged Class Period is itself evidence of market efficiency is belied by
           contemporaneous complaints of those same institutions that there was a lack of
           transparency and market efficiency with notes featuring special mandatory
           redemptions.....................................................................................................25

       E.  Dr. Feinstein's claim that a statistically significant relationship between the SMR
           Notes' returns and changes in market interest rates is evidence of market
           efficiency is unfounded and unreliable ........................................................26

       F.  The SMR Notes fail the average weekly trading volume test for many of the
           weeks during the alleged Class Period..........................................................27

       G.  The SMR Notes fail the analyst coverage test – no analysts covered or issued
           reports on any of Waste Management's bonds, including the SMR Notes, and no
           equity analyst analyzed the special features of the SMR Notes ...................31

       H.  Dr. Feinstein fails to provide evidence that there was even one market maker for
           the SMR Notes during the alleged Class Period............................................33

       I.  Dr. Feinstein's analysis of the bid-ask spreads is unreliable and unhelpful; he has
           no data on actual bid-ask spreads of the SMR Notes, and there was no posting of
           spreads available during the alleged Class Period ........................................38

**CONFIDENTIAL**

J.  Dr. Feinstein fails to analyze short selling activity, a factor that he typically analyzes when testing market efficiency, and there is no evidence of short selling activity of the SMR Notes...................................................................................39

K.  Dr. Feinstein's analysis of the "Outstanding Par Value (*Krogman* Factor 1)" is inconsistent with his own claims that corporate bonds are very different than stocks..............................................................................................................40

VI.  Analysis of the Feinstein Report's Proposed Common Damages Methodology...............41

A.  Dr. Feinstein's common damages methodology cannot measure damages consistent with Plaintiffs' risk materialization theory of liability ...............................41

B.  Dr. Feinstein proposes a common damages methodology that is inappropriate given Plaintiffs' claims that the SMR Notes would have been redeemed...................45

VII.  There Is No Reliable Link Between the Alleged Misrepresentations and the Price Movements of the SMR Notes.........................................................................................48

A.  An analysis of the price reactions at the time of the alleged misrepresentations shows no statistically significant price increase from any of the alleged misrepresentations...................................................................................................48

B.  An analysis of the alleged corrective disclosures shows no reliable link between the alleged misrepresentations and price movements of the SMR Notes...................50

VIII.  There Were Numerous Foreign Institutions that Held the SMR Notes During the Alleged Class Period.......................................................................................................52

**CONFIDENTIAL**

## I.    SCOPE OF ASSIGNMENT

1.    I have been asked by counsel for Waste Management, Inc. ("Waste Management" or "the Company") to perform the following three tasks:

- Review and respond to the Report on Market Efficiency and Damages Methodology of Steven P. Feinstein, filed on June 14, 2024 ("Feinstein Report");

- Analyze whether there is a reliable link between the alleged misrepresentations and the price movement of each of the four debt securities issued by Waste Management that are part of this case: the 2.95% SMR Note,[1] the 3.2% SMR Note,[2] the 3.45% SMR Note,[3] and the 4% SMR Note (collectively the "SMR Notes");[4] and

- Analyze whether foreign investors held the SMR Notes between February 13, 2020 and June 23, 2020 (the alleged "Class Period").[5]

## II.    QUALIFICATIONS AND REMUNERATION

### A.    Qualifications

2.    I am a Senior Managing Director of NERA Economic Consulting ("NERA") and a member of NERA's Securities and Finance Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide. NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics, finance, and mathematics. The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

---

[1]    CUSIP 94106LBF5.

[2]    CUSIP 94106LBH1.

[3]    CUSIP 94106LBG3.

[4]    CUSIP 94106LBJ7.

[5]    Amended Complaint, ¶¶1-2.

1

**CONFIDENTIAL**

3.      I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues. In my over 25 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics. In the course of this work, I have analyzed the effect of information on security prices of hundreds of companies. My resume with recent publications and testifying experience is included as Appendix A.

## B.    Remuneration

4.      NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $1,200 per hour. NERA's fees are not in any way contingent upon the outcome of this matter.

## III.    MATERIALS CONSIDERED

5.      In preparing this report, I considered the following categories of materials (a complete list of materials considered is included as Appendix B):

    a)   Complaint for Violations of the Federal Securities Laws, filed June 9, 2022;

    b)   Amended Complaint for Violations of the Federal Securities Laws, filed January 17, 2023 ("Amended Complaint");

    c)   Opinion and Order, filed March 27, 2024;

    d)   Feinstein Report, including materials considered and turned over;

    e)   Expert reports of Dr. Feinstein over the past ten years;

    f)   Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed June 14, 2024;

**CONFIDENTIAL**

g)  Waste Management's filings with the Securities and Exchange Commission ("SEC") from 2019 to 2021;

h)  Waste Management's press releases and conference call transcripts from 2019 to 2021 from Factiva;

i)  Analyst reports on Waste Management from LSEG Data and Analytics and Dr. Feinstein's turnover;

j)  Analyst reports on Advanced Disposal Services, Inc. from LSEG Data and Analytics;

k)  Credit rating agency reports on Waste Management via Alacra, Inc. and Dr. Feinstein's turnover;

l)  News stories on Waste Management and Advanced Disposal Services, Inc. from Factiva, Bloomberg, and Google;

m)  Financial data from Bloomberg, L.P. and FactSet Research Systems, Inc.;

n)  Academic literature and textbooks on finance, securities, valuation, and statistics; and

o)  Complaints and court decisions in other matters.

## IV.   BACKGROUND

### A.   Company Background

6.      Waste Management provides comprehensive waste management environmental services for residential, commercial, industrial, and municipal customers.[6] As of 2019, Waste Management operated the largest network of landfills in North America and employed approximately 44,900 people.[7] Advanced Disposal Services, Inc. ("ADS," or "Advanced Disposal") was a "leading integrated provider of non-hazardous solid waste collection, transfer,

---

[6]   Waste Management FY19 Form 10-K, filed February 13, 2020, p. 3.

[7]   Waste Management FY19 Form 10-K, filed February 13, 2020, p. 3.

**CONFIDENTIAL**

recycling and disposal services."[8] On April 15, 2019, Waste Management announced it had entered into an agreement to acquire all the outstanding shares of ADS for $33.15 per share in cash, representing a total enterprise value of $4.9 billion (the "ADS Acquisition" or "Merger").[9] On May 14, 2019, Waste Management issued $4.0 billion of senior notes,[10] to "pay a portion of the consideration related to [Waste Management's] pending acquisition of Advanced Disposal."[11] The issuance consisted of five separate notes, four of which were subject to a "special mandatory redemption" ("SMR") feature. In particular, the special mandatory redemption feature required Waste Management to redeem the four SMR Notes at a redemption price equal to $101 if the ADS Acquisition was not completed on or prior to July 14, 2020. Specifically, according to the SMR Notes' prospectus:

> If we do not consummate the Merger on or prior to July 14, 2020, or if, on or prior to such date, the Merger Agreement is terminated for any reason, then, in either case, we must redeem all of the outstanding 2024 notes, 2026 notes, 2029 notes and 2039 notes at a redemption price equal to 101% of the aggregate principal amount thereof, plus accrued and unpaid interest to, but excluding, the redemption date. […] The 2049 notes are not subject to the special mandatory redemption, and we expect the 2049 notes to remain outstanding even if we do not consummate the Merger. [Waste Management Prospectus Supplement, filed May 16, 2019, S-3]

The table below lists the details for the five notes.

---

[8]   Waste Management Prospectus Supplement, filed May 16, 2019, S-3.

[9]   Waste Management Form 8-K, filed April 15, 2019, Exhibit 99.1.

[10]  Waste Management Prospectus Supplement, filed May 16, 2019.

[11]  Waste Management FY19 Form 10-K, filed February 13, 2020, p. 50.

**CONFIDENTIAL**

### Waste Management Notes

| | Coupon | Maturity Year | Amount Offered | SMR Feature? |
|---|---|---|---|---|
| 1. | 2.95% | 2024 | $750M | Yes |
| 2. | 3.20% | 2026 | $750M | Yes |
| 3. | 3.45% | 2029 | $1,000M | Yes |
| 4. | 4.00% | 2039 | $500M | Yes |
| 5. | 4.15% | 2049 | $1,000M | No |

**Source:** Waste Management Prospectus Supplement, filed May 16, 2019.

7.      On June 24, 2020, Waste Management announced an amended acquisition agreement to purchase ADS for $30.30 per share and that the acquisition would be completed by the end of the third quarter of 2020.[12] On the same day, Waste Management announced that they expected to redeem the SMR Notes.[13] On July 20, 2020, Waste Management redeemed the four SMR Notes.[14] On October 30, 2020, Waste Management completed the acquisition of ADS.[15]

### B.    Summary of Allegations

8.      Plaintiffs allege that Waste Management made misrepresentations regarding "the time for completion of Waste Management's acquisition of its competitor, ADS," which caused the SMR Notes to trade at "artificially inflated levels."[16] In general, Plaintiffs allege that information regarding the timing of the completion of the deal was "highly material" to SMR Notes' investors.[17] According to Plaintiffs, Waste Management "falsely assured investors" that the Company was on track to complete the deal, while concealing the truth regarding the DOJ's antitrust review of the ADS Acquisition and the resulting renegotiation of the transaction,

---

[12]   Waste Management Form 8-K, filed June 24, 2020, Exhibit 99.1.

[13]   Waste Management Form 8-K, filed June 24, 2020, Exhibit 99.1.

[14]   Waste Management Form 8-K, filed July 15, 2020.

[15]   Waste Management FY20 Form 10-K, filed February 22, 2021, p. 4.

[16]   Amended Complaint, ¶¶2, 109.

[17]   Amended Complaint, ¶2.

5

**CONFIDENTIAL**

including "the increasing likelihood that [the SMR] would be triggered by a failure to complete the ADS acquisition by the End Date," which "threatened to – and ultimately did – delay completion of the transaction, causing significant damage to [SMR] Notes investors."[18]

9.      According to the Amended Complaint, Waste Management made five alleged misrepresentations concerning the timing of the ADS Acquisition.[19] The Amended Complaint claims that the alleged misrepresentations were corrected on two dates, March 18, 2020 and June 24, 2020, which caused the SMR Notes' prices to "decline significantly."[20]

10.      The alleged corrective disclosures are described below:

1)  March 18, 2020: According to the Amended Complaint, on this date, the Company provided an update of its "'prior timing expectations' [for the deal], announcing that 'the Company now anticipates closing the [ADS Acquisition] mid to late second quarter 2020,'" rather than by the end of the first quarter 2020.[21] According to the Amended Complaint, as a result of this announcement, the prices of the SMR Notes declined "significantly."[22]

2)  June 24, 2020: According to the Amended Complaint, on this date, the Company announced a revised agreement for the ADS Acquisition, a delayed expected completion of the deal, and that the SMR Notes would be redeemed. According to the Amended Complaint, as a result of this announcement, the prices of the SMR Notes declined "significantly."[23]

11.      The chart below shows the prices and trading volume for the four SMR Notes during the alleged Class Period, along with the alleged misrepresentations and the alleged

---

[18]   Amended Complaint, ¶¶2-13, 55.

[19]   Amended Complaint, ¶¶8-11, 75.

[20]   Amended Complaint, ¶110.

[21]   Amended Complaint, ¶63.

[22]   Amended Complaint, ¶66.

[23]   Amended Complaint, ¶¶79-84, 110.

6

**CONFIDENTIAL**

corrective disclosures. Appendix C shows more detail on the prices and trading volume for each of the SMR Notes.



**V.      THE FEINSTEIN REPORT DOES NOT SHOW THAT THE SMR NOTES TRADED IN EFFICIENT MARKETS DURING THE ALLEGED CLASS PERIOD**

12.      Dr. Feinstein's analysis of market efficiency fails to analyze the "special mandatory redemption" feature of the SMR Notes, which itself is the basis for Plaintiffs' allegations. Dr Feinstein's own event study shows that the SMR Notes fail the most important test of market efficiency, the cause-and-effect relationship between news and price movements. In addition, there is substantial evidence contrary to market efficiency for the SMR Notes, particularly for the 4% SMR Notes. Moreover, many of Dr. Feinstein's other tests of market efficiency are misleading or not based on actual data and do not show that the SMR Notes traded in efficient markets during the alleged Class Period.

7

**CONFIDENTIAL**

    A.    **Dr. Feinstein's analysis of market efficiency completely fails to analyze the special mandatory redemption feature of the SMR Notes, which itself is the basis of the alleged fraud**

13.    Dr. Feinstein's market efficiency analysis completely fails to analyze the special mandatory redemption feature of the SMR Notes, which itself is the basis of the alleged fraud. This failure renders Dr. Feinstein's market efficiency analysis unreliable.

14.    The SMR Notes had a special mandatory redemption feature that required Waste Management to redeem the SMR Notes at 101% of par (or $101) if the Company terminated or did not complete the ADS Acquisition on or before July 14, 2020.[24] As Dr. Feinstein notes, the whole purpose of the SMR Notes was to finance Waste Management's acquisition of ADS if the deal was completed.[25] Specifically, given that the SMR Notes had the special mandatory redemption feature that hinged on whether the ADS Acquisition would be completed by July 14, 2020, news on the timing of the acquisition would be expected to affect the value of the SMR Notes. However, such news might not matter to Waste Management stockholders or other bondholders.[26] In other words, the SMR Notes were intrinsically and economically tied to the deal and its timing. Dr. Feinstein, although noting that the SMR Notes have this feature in his report, completely fails to analyze it in the context of his market efficiency analysis.

15.    Dr. Feinstein claims that his market efficiency analysis in this case gives "special attention to the distinctive feature of bonds, bond investing, and the bond market juxtaposed to common stock."[27] However, Dr. Feinstein's market efficiency analysis in this case fails to analyze the very special and relevant feature of the SMR Notes and instead largely follows his methodology of analyzing market efficiency of stocks (although as discussed below, without any explanation, he ignores certain tests and analyses that he typically performs).

16.    Dr. Feinstein's market efficiency analysis, while claiming to focus on the "distinctive feature" of bonds in general, completely ignores that these bonds not only trade on a

---

[24]  Waste Management Prospectus Supplement, filed May 16, 2019, S-3.

[25]  Feinstein Report, ¶¶26, 28.

[26]  Waste Management issued a fifth note in connection with the ADS Acquisition, with a coupon rate of 4.15% and maturity in 2049, but it did not have a special mandatory redemption feature. Waste Management Prospectus Supplement, filed May 16, 2019, S-3.

[27]  Feinstein Report, ¶76.

**CONFIDENTIAL**

distinctive feature, but also that bonds with this special mandatory redemption feature, like the SMR Notes, are very uncommon. According to FactSet Research Systems, Inc., bonds with a special mandatory redemption feature, like the SMR Notes, account for less than 1% (approximately 0.28%) of all U.S. dollar denominated corporate bond offerings in the past 25 years. Out of the 234,824 corporate bonds issued in the past 25 years, there have only been 656 bonds with a special mandatory redemption feature.[28]

17.     Not only are bonds with a special mandatory redemption feature are rare, but it is even rarer for bonds with a special mandatory redemption feature to be the subject of a securities class action. NERA has been collecting data on securities class actions for decades and has in its database approximately 4,000 securities class action filings from 2004 through the first half of 2024. Of all these class action filings, there was only one case other than this one that involved a bond with a special mandatory redemption feature.[29] Moreover, the allegations in that case did not involve the special mandatory redemption feature of the bond, and in fact, the special mandatory redemption feature of the bond in that case was not triggered. In addition, none of the securities class action cases involving bonds that Dr. Feinstein cites in his report involve a bond with a special mandatory redemption feature.[30]

18.     Thus, Dr. Feinstein's analysis of market efficiency completely fails to analyze the special mandatory redemption feature of the SMR Notes, which itself is the basis of the alleged fraud. Instead, Dr. Feinstein's analysis focuses on general characteristics of stocks and bonds without any justification for why those characteristics are relevant for analyzing the efficiency of the SMR Notes. Dr. Feinstein notes that bonds "will generally not react to company information in the same manner" as stocks.[31] However, his analysis ignores that because of the special

---

[28]    Data from FactSet Research Systems, Inc as of August 16, 2024. Based on the number of bonds issued in the last 25 years that according to FactSet Research Systems, Inc. were U.S. corporate bonds denominated in U.S. dollars and the subset of those bonds labeled as "Call Special Trigger Event Description" containing the words "special mandatory redemption."

[29]    Class Action Complaint, *William Dean v. City of Monticello, Minnesota*, No. 0:2014cv00376, (D.Minn. February 12, 2014).

[30]    Feinstein Report, ¶¶70-74. The cases are: *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 n.11 (2nd Cir. 2008), *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 663 (N.D. Ala. 2009), *In re Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016), *In re Vale 2019* WL 11032303, *In re Safety-Kleen Corp. Bondholders Litig.*, No. 3:00-1145-17, 2004 WL 3115870 (D.S.C. Nov. 1, 2004), and *In re Nii Holdings, Inc.*, 311 F.R.D. 401 (E.D. Va. 2015).

[31]    Feinstein Report, ¶57.

**CONFIDENTIAL**

mandatory redemption feature, the SMR Notes are intrinsically and economically tied to the deal and its timing, and thus would be expected to react to news about the deal and its timing. Dr. Feinstein cites several court decisions to support his criteria for assessing market efficiency of bonds, yet none of those decisions deal with cases of bonds with special mandatory redemption features.[32]

### B.    Dr. Feinstein's event study methodology is non-standard and unreliable

19.    Dr. Feinstein's analysis of market efficiency relies on a non-standard and unreliable event study methodology. Dr. Feinstein uses an event study to attempt to test whether the SMR Notes "responded to Company-specific information" and claims that this event study tests show that he "empirically demonstrate[d] market efficiency during the Class Period."[33]

20.    An event study can be used to test whether a security's price reacts after a particular announcement. An event study is a statistical analysis that measures the movement in a security's price after an event or public announcement, typically adjusting for the movement in the overall market and/or industry.[34] Academics often use an event study to determine how stock prices respond to new information.[35] An event study typically uses a statistical analysis called a regression to estimate the relationship between the company's daily stock price returns and the daily returns of market and/or industry indices over a control period.[36] Using the regression results and the returns of the indices, the predicted price movement and abnormal price movement (or the amount the price moves in excess of the predicted amount) can be calculated for the event/period being tested. Then, the statistical significance of the abnormal price movement can be tested based on the range of normal expected daily variation in prices. To

---

[32]  Feinstein Report, ¶¶70-74.

[33]  Feinstein Report, ¶21.

[34]  See, for example, Alexander, Janet C., "The Value of Bad News in Securities Class Actions," *UCLA Law Review*, 41: 1994; Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38: 1982; Dunbar, Frederick C., and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001), ch. 19.

[35]  See, for example, MacKinlay, Craig A., "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997; Bowman, Robert G., "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting*, 10(4): 1983.

[36]  Regression analysis is used to estimate the relationship between two or more variables. See, for example, Hogg, Robert V., and Elliot A. Tanis, *Probability and Statistical Inference*, (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997).

10

## CONFIDENTIAL

analyze the statistical significance of a price reaction to an event, the 5% statistical significance level (*i.e.*, the 95% statistical confidence level) is the commonly applied standard.[37] If a price reaction is *not* statistically significant, it means that the price reaction is within the range of normal expected daily variation in prices and cannot be statistically distinguished from zero.

21.    As is typical in event study models, Dr. Feinstein analyzes *daily* price returns. However, Dr. Feinstein's event study model does not use a standard measure of the daily prices.[38] Rather than using closing prices to measure a day's price, Dr. Feinstein's event study model uses a daily value weighted average price ("VWAP").[39] In particular, Dr. Feinstein calculates the daily VWAPs of the SMR Notes as the average price from all the trades within the U.S. stock market hours of 9:30 AM to 4:00 PM, weighted by the dollar value of each trade.[40] In contrast, Dr. Feinstein's event study model controls for market, industry, and interest rate movements using the closing prices, the standard measure, of the indices.[41]

22.    Dr. Feinstein's event study model controls for the market using the CRSP NYSE/AMEX/NASDAQ/ARCA index ("CRSP Market Index"), for the industry using the Dow Jones Waste & Disposal Services Index, and for interest rates using his "Benchmark Bond Index."[42] According to Dr. Feinstein, the CRSP Market Index is a "measure of the overall stock market performance,"[43] and the Dow Jones Waste & Disposal Services Index is a "representative" index of Waste Management's industry sector.[44] Dr. Feinstein claims to construct his Benchmark Bond Index using the returns of "a hypothetical bond with the same

---

[37]  The 5% level is the level most commonly applied by courts and academics to test statistical significance. Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: Federal Judicial), pp. 243-246.

[38]  See, for example, Bhagat, Sanjai, and Roberta Romano, "Event Studies and the Law: Part I: Technique and Corporate Litigation," *American Law and Economics Review* 4(1): 2002, pp. 141–168 at 145 ("After defining the event and announcement period, stock returns are measured for this period. If daily data are being used, this is straightforward: the return is measured using closing prices.").

[39]  Feinstein Report, Exhibits 7a and 7b.

[40]  Feinstein Report, ¶A1-14.

[41]  See, "FEINSTEIN0000006.XLS" and "FEINSTEIN0000007.XLSX."

[42]  Feinstein Report, ¶¶166, 168. Note Dr. Feinstein excludes Waste Management stock's returns from this index.

[43]  Feinstein Report, ¶166.

[44]  Feinstein Report, ¶167.

11

**CONFIDENTIAL**

coupon and maturity" as each SMR Note.[45] Dr. Feinstein's event study model uses a fixed control period of one-year before the June 24, 2020 alleged corrective disclosure (June 24, 2019 to June 23, 2020).[46]

23.     Dr. Feinstein's use of the SMR Notes' VWAPs in his event study model is inappropriate and unreliable. Dr. Feinstein's event study model uses VWAPs for the SMR Notes and closing prices for his control indices. Closing prices are as of one time during the day, and VWAPs are based on the volume and prices of all trades throughout the day. Dr. Feinstein's use of VWAPs for the SMR Notes and closing prices for his indices creates a mismatch of the timing reflected in the prices. For example, if a large amount of one of the SMR Notes were traded soon after the market opened, then the VWAP return for that note would largely reflect prices near market open, while the returns of his control indices would reflect prices at market close. Thus, Dr. Feinstein's event study model *cannot* control for market, industry, and interest rate returns concurrent with the SMR Notes' returns, which renders his event study unreliable. Moreover, Dr. Feinstein's use of VWAPs in his event study analyses to test market efficiency is non-standard, and he does not cite to any academic literature supporting this methodology of mixing VWAPs with closing prices in regression analyses.

24.     If VWAPs were appropriate daily prices to use for Dr. Feinstein's event study analyses, then the prices of the SMR Notes themselves would violate one of the key tenets of market efficiency — no autocorrelation (also known as no serial correlation). In particular, Dr. Feinstein's daily VWAPs prices do not follow a "random walk" but are instead autocorrelated.[47] In other words, the price movement of an autocorrelated SMR Note on one day can be used to predict the price movement the following day. An autocorrelation test is a commonly used test to

---

[45]    Feinstein Report, ¶169.

[46]    Feinstein Report, ¶174.

[47]    A security's prices follow a "random walk" when the price changes are random and unpredictable. See, for example, Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 10*th* ed., 2014), pp. 350-351 ("This is the essence of the argument that stock prices should follow a **random walk,** that is, that price changes should be random and unpredictable. Far from a proof of market irrationality, randomly evolving stock prices would be the necessary consequence of intelligent investors competing to discover relevant information on which to buy or sell stocks before the rest of the market becomes aware of that information. […] Indeed, if stock price movements were predictable, that would be damning evidence of stock market inefficiency, because the ability to predict prices would indicate that all available information was not already reflected in stock prices.").

12

**CONFIDENTIAL**

analyze market efficiency by academics and courts.[48] The test analyzes whether, during a specific period of time, security price returns, rather than following a "random walk" and being unpredictable, are correlated one day to the next. In an efficient market, a security's future price should not be predictable based on the security's prior prices.[49] However, testing for autocorrelation over the alleged Class Period using Dr. Feinstein's daily VWAP returns yields statistically significant autocorrelation for three out of four SMR Notes, which does not support a finding of market efficiency.[50] A summary of the autocorrelation tests of the SMR Notes during the alleged Class Period using Dr. Feinstein's VWAP returns is shown in Appendix D.

25.     Given the issues with Dr. Feinstein's event study, I constructed an alternative event study model. The alternative event study model uses the returns of the SMR Notes based on daily closing prices, not VWAPs.[51] The alternative event study controls for industry movements using the S&P 1500 Environmental & Facilities Services Index (the "S&P E&F Services Index"), an off-the shelf-stock index of companies within Waste Management's industry,[52] and for corporate bond market movements using the S&P 500 Investment Grade Corporate Bond Index (the "S&P Corporate Bond Index"), an index that "measure[s] the

---

[48]  For academics, see, for example, Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 10*th* ed., 2014), p. 364; see also, Rosenberg, Barr, and Andrew Rudd, "Factor-related and specific returns of common stocks: Serial correlation and market inefficiency," *The Journal of Finance*, 37(2): 1982, pp. 543-554 at 543 ("One of the most basic tests of market efficiency is the test for serial correlation [a/k/a autocorrelation] of returns."). Note while a more complete test of autocorrelation would account for transaction costs, this basic test, at a minimum, is not supportive of market efficiency.

For courts, see, for example *In re PolyMedica Corp. Sec. Lit.,* 453 F. Supp. 2d 260 (D. Mass. 2006).

[49]  See, for example, Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 10*th* ed., 2014), pp. 350-351.

[50]  Excludes dates for which Dr. Feinstein does not provide VWAP returns.

[51]  Data from Bloomberg, L.P.

[52]  The S&P E&F Services Index is a capitalization-weighted index of companies in the Environmental and Facilities Services GICS code (GICS Level 4) and its ticker on Bloomberg is S15ENVR. Based on data from Bloomberg, L.P.

GICS is a "four-tiered, hierarchical industry classification system." Level 4 is the "sub-industry" level, which in this case is Environmental and Facilities Services. See "The Global Industry Classification Standard (GICS)," *MSCI*, accessed at: https://www.msci.com/our-solutions/indexes/gics.

Waste Management was part of the S&P E&F Services Index, so the effects of the returns of Waste Management's stock price on the index were removed.

As a robustness check, I ran a modified version of the alternative event study methodology using Dr. Feinstein's "Benchmark Bond Index" to control for corporate bond market movements, in addition to the same industry index and control periods as specified by the alternative event study. These results still hold using the modified version of the alternative event study.

13

**CONFIDENTIAL**

performance of U.S. corporate debt issued by constituents in the S&P 500 with an investment-grade rating."[53] The returns of the S&P E&F Services Index and S&P Corporate Bond Index, like the returns for the SMR Notes, are calculated using closing prices; thus, unlike Dr. Feinstein's event study model, there is no mismatch between the timing of the prices.

26.     The alternative event study model is estimated over three different control periods depending on the event being tested to account for the substantial fluctuations in market volatility during the alleged Class Period that were caused in part by the COVID-19 ("Covid") pandemic.[54] In particular, for events between February 13 and March 10, 2020, a 6-month control period from September 18, 2019 to March 10, 2020, the day before the World Health Organization declared Covid a pandemic, is used;[55] for events between March 11, 2020 through March 31, 2020, a control period from March 11, 2020 to March 31, 2020 is used; and for events between April 1, 2020 and June 24, 2020, a control period from April 1, 2020 to July 16, 2020 (last date with SMR Note data) is used.[56]

---

[53]  "S&P 500® Investment Grade Corporate Bond Index," *S&P Global*, accessed at: https://www.spglobal.com/spdji/en/indices/fixed-income/sp-500-investment-grade-corporate-bond-index/#overview.

Investment-grade bonds are those with a rating no worse than BBB- on the scale of S&P and Fitch or Baa3 on the scale of Moody's. See, for example, "Bond ratings," *Fidelity*, accessed at: https://www.fidelity.com/learning-center/investment-products/fixed-income-bonds/bond-ratings. According to Dr. Feinstein, during the alleged Class Period, all SMR Notes were rated A- by S&P, BBB+ by Fitch, and Baa1 by Moody's, thus meeting the standard of investment-grade ratings. Feinstein Report, ¶109.

[54]  See, for example, "Dow Jones Today, Bear Market Worsens On Trump Response To Coronavirus Pandemic; Boeing Shares Collapse," *Investor's Business Daily*, March 12, 2020 ("Stocks ripped into new bear market lows Thursday, with Dow Jones industrials diving more than 2,000 points, after a Wednesday night speech from President Donald Trump ramped up the U.S. response to the coronavirus pandemic.").

The VIX, a commonly used measure of the stock market's expectation of volatility based on the S&P 500 Index options, reached an all-time high on March 16, 2020. See, for example, "How does this bear market compare," *USA Today*, March 18, 2020 ("In recent days the VIX has climbed to levels not even seen during the financial crisis in October 2008, signaling the continued uncertainty brought on by the coronavirus pandemic.") and "Traders Bet on Falling 'Fear Gauge'," *Dow Jones Institutional News*, March 17, 2020 ("The Cboe Volatility Index, or VIX, closed at its highest level in history Monday when U.S. shares recorded the steepest decline since the Black Monday stock-market crash of 1987 […] The VIX climbed to 82.69 Monday, topping its high of about 80 in 2008.").

[55]  "WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020," *World Health Organization*, accessed at: https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[56]  Excludes the dates of the alleged corrective disclosures.

Dr. Feinstein applies an additional "Newey-West procedure" to purportedly "accommodate and correct" changing volatility during his estimation period. However, according to academic literature, applying a Newey-

14

CONFIDENTIAL

**C.    Dr. Feinstein fails to show that the SMR Notes pass the "most important" test of market efficiency, the cause-and-effect relationship between news and price movements**

27.    Dr. Feinstein purports to analyze the fifth *Cammer* factor, "the cause-and-effect relationship between the release of company-specific information and movements in the security price," to support his finding of market efficiency.[57] The *Cammer* Court found that the fifth factor, which analyzes a "cause and effect relationship" between news and the price movements, is the "essence of an efficient market" and the "foundation of the fraud on the market theory."[58] Other courts have similarly stated that the fifth *Cammer* factor is the "most important" factor in determining whether a market is efficient.[59] Dr. Feinstein's test of this key *Cammer* factor is *solely* premised on the movement of the SMR Notes on one day, the June 24, 2020 alleged corrective disclosure, which ends the alleged Class Period.[60] This test using the last day of the alleged Class Period is non-standard, unscientific, unreliable, and biased.

28.    Dr. Feinstein's test of the fifth *Cammer* factor in this case is non-standard and unscientific because he cannot offer a reliable or objective criteria for selecting the single event date that he tests. Dr. Feinstein only tests the June 24, 2020 alleged corrective disclosure, the end of the alleged Class Period. It is not surprising to find statistically significant price drops on this date since Plaintiffs not only chose this date as an alleged corrective disclosure, but also

---

West correction to single-firm, single-event models like Dr. Feinstein's event study model is unreliable and will yield too many statistically significant results. A single-firm, single-event model is one which tests the price reaction of a given firm to a specific event. The academic paper "Robust inference in single firm/single event analyses," published in the *Journal of Corporate Finance,* finds that applying a Newey-West correction to single-firm, single-event studies generates erroneous results. In particular, the authors find that a single-firm, single-event study with a Newey-West correction "would almost always show a significant event effect, even if there is in fact no unusual abnormal return on the event days." In other words, the event study would yield too many statistically significant results even when nothing unusual has happened. Feinstein Report, ¶¶177-181. Elsas, Ralf, and Daniela S. Schoch, "Robust inference in single firm/single event analyses," *Journal of Corporate Finance*, March 6, 2023, pp. 7, 12.

[57]    Feinstein Report, ¶143.

[58]    *Cammer v. Bloom* ("*Cammer*"), 711 F. Supp. (D.N.J. 1989), p. 1264.

[59]    "The fifth factor (cause-and-effect relationship) is 'in many ways, the most important,' … and was recognized in *Cammer* itself as 'the essence of an efficient market and the foundation for fraud on the market theory[.]'" See *In re PolyMedica Corp. Litig.*, 453 F.Supp.2d 260, 266 (D. Mass. 2006). See also, *Loritz v. Exide Techs.*, 2015 WL 6790247, at *9-10 (C.D. Cal. July 21, 2015); *In re 2TheMart.Com, Inc. Sec. Litig.*, 114 F.Supp.2d 955, 964 (C.D. Cal. 2000); *Cammer*, 711 F.Supp. at 1287.

[60]    Feinstein Report, ¶160.

15

**CONFIDENTIAL**

specifically chose to end the alleged Class Period on this date. Further, Plaintiffs claim in the Amended Complaint that "[t]he June 24, 2020 announcement thus eviscerated the [SMR] Notes' premium, causing the price to drop to approximately 103 cents on the dollar in anticipation of the [special mandatory redemption.]"[61] Thus, from a simple review of the Amended Complaint, Dr. Feinstein would have known about the SMR Notes' price drops on June 24, 2020 before designing his market efficiency test.

29.    Moreover, large price drops often spur securities class action filings, and the dates alleged as corrective disclosures are presumably selected by plaintiffs' counsel to increase alleged damages. Thus, the choice of an alleged corrective disclosure is not a reliable and unbiased selection. Academic articles have found that it is unreliable for an expert to test price reactions on alleged corrective disclosure dates and use that as evidence of market efficiency. For example, an academic article that Dr. Feinstein has cited in many of his prior reports[62] (and is written by the same authors of another article that Dr. Feinstein cites in this report)[63] *explicitly* states that, when testing the stock's price reactions to information, one should exclude "those days alleged to be corrective disclosure(s)," as "plaintiffs would normally choose a class period where corrective disclosures coincide with large negative price movements; including those days in the analysis would bias the results."[64] Courts have similarly found that using a single alleged corrective disclosure date to test for market efficiency is not scientifically valid. For example, the court in *Ohio v. Freddie Mac* agreed with defendant's criticism of Dr. Feinstein's analysis in that case that "using the last day of a class period [which was an alleged corrective disclosure] is not

---

[61]    Amended Complaint, ¶13.

[62]    Many of Dr. Feinstein's prior expert reports cite "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases" by Paul Ferrillo, Frederick Dunbar, and David Tabak and published on *St. Johns Law Review*.

See, Report on Market Efficiency of Steven P. Feinstein in *In Re: Petrobras Securities Litigation*, dated October 15, 2015, ¶¶117, 146; Report on Market Efficiency of Steven P. Feinstein in *In Re American Realty Capital Properties Inc. Litigation*, dated March 15, 2017, ¶153; Report on Market Efficiency of Steven P. Feinstein in *Levin v. Resource Capital Corp. et al.*, dated March 15, 2017, ¶153; Report on Market Efficiency of Steven P. Feinstein in *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.* ("*Ohio v. Freddie Mac*"), dated June 7, 2017, ¶141; Report on Market Efficiency of Steven P. Feinstein in *In Re: Eletrobras Securities Litigation*, dated June 30, 2017, ¶174; Expert Report of Steven P. Feinstein in *In Re Aegean Marine Petroleum Network, Inc. Securities Litigation*, dated December 7, 2022, ¶¶127-128.

[63]    Feinstein Report, ¶174.

[64]    Ferrillo, Paul A., Frederick C. Dunbar, and David Tabak, "The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. Johns Law Review* 78: 2004, p. 119 and footnote 155.

16

**CONFIDENTIAL**

a scientifically valid way to test for market efficiency because, among other reasons, securities plaintiffs intentionally select such dates for purposes of increasing potential damages."[65]

30.     Dr. Feinstein's selection of June 24, 2020 as the only event to test for the fifth and "most important" *Cammer* factor is subject to statistical issues known as "data snooping" and selection bias. Data snooping means using "the results to determine the methodology," which "may invalidate the resulting statistical conclusions."[66] An analysis suffers from sample selection bias when the data used in the analysis is chosen (directly or indirectly) on the basis of the outcome that the analysis intends to show.[67] Dr. Feinstein's test, rather than analyzing if the SMR Notes traded in efficient markets where they "responded to Company-specific information," instead analyzes a single date that appears to have been chosen because there was a large price drop.

31.     Tellingly, Dr. Feinstein fails to test another date that Plaintiffs also allege as a corrective disclosure date in the Amended Complaint, a date when new information allegedly relevant to the price of the SMR Notes and their special mandatory redemption feature was released.[68] The Amended Complaint claims that there was an alleged corrective disclosure on

---

[65]  Memorandum of Opinion and Order, *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.*, No. 4:08CV0160, 5 (N.D. Ohio August 14, 2018).

See also, Report and Recommendation to the Honorable Ronnie Abrams by Barbara Moses, United States Magistrate Judge, *In Re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, No. 1:17-cv-00916-RA-BCM  (S.D.N.Y. March 18, 2021), pp. 33-34.

[66]  See, for example, Tabak, David, "*p*-Hacking and Event Studies in Securities Litigation," *NERA Economic Consulting*, 2023, p. 1. See also, Green, Michael D., D. Michal Freedman, and Leon Gordis, "Reference Guide on Epidemiology," *Reference Manual on Scientific Evidence* (Washington, D.C.: Federal Judicial Center, 3rd ed., 2011), p. 622, on "data dredging," a term synonymous to data snooping.

Courts have also found that "data snooping," "violates the axiom that research should not be 'motivated by […] past investigations [of the data].'" Memorandum of Opinion and Order, *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage* Corporation*, etc., et al.*, No. 4:08CV0160, 14 (N.D. Ohio August 14, 2018). In this case, the Court found that Dr. Feinstein's selection of dates to test for market efficiency "was entirely improper because you are supposed to hypothesize and then see your results" and "[y]ou are not supposed to know your results in advance."

[67]  See, for example, Stock, James H., and Mark W. Watson, *Introduction to Econometrics* (Pearson Education, Inc., Boston, MA, 2003), p. 250. Moreover, as Freedman, Pisani, and Purves explain in their textbook, *Statistics*, "Some samples are really bad. To find out whether a sample is any good, ask how it was chosen. Was there selection bias?" The authors state that, "A sampling procedure should be fair, selecting [data] for inclusion in the sample in an impartial way, so as to get a representative cross section[.]" Freedman, David A., Robert Pisani, and Roger Purves, *Statistics* (W. W. Norton & Company, Inc.: New York, 4*th* ed., 2007), pp. 335-336.

[68]  Feinstein Report, ¶147 and Amended Complaint, ¶¶9, 64-66, 110.

17

**CONFIDENTIAL**

March 18, 2020 that caused "the prices of the Notes to decline significantly."[69] The Amended Complaint claims that on March 18, 2020, the Company provided an update of its "'prior timing expectations,' announcing that 'the Company now anticipates closing the [ADS Acquisition] mid to late second quarter 2020," rather than by the end of the first quarter 2020.[70] Dr. Feinstein chose *not* to include the results of this date in his cause-and-effect relationship *Cammer* factor test, and the results of his event study on this date are inconsistent with Plaintiff's claim of market efficiency.

32.     According to Dr. Feinstein's event study model, the results of the test for the March 18, 2020 alleged corrective disclosure would *not* support market efficiency since the SMR Notes did *not* move in a direction consistent with the Amended Complaint's allegations and, in fact, moved in opposite directions to each other. The table below shows the SMR Notes' price reactions on March 18, 2020 according to Dr. Feinstein's event study. As shown in the table below, according to Dr. Feinstein's event study, both the 2.95% and 4% SMR Notes had statistically significant *positive* reactions, the 3.2% SMR Note had a statistically significant *negative* reaction, and the 3.45% SMR Note had a positive but not statistically significant reaction. Thus, these results do not support a conclusion of market efficiency – two of the notes moved in complete opposite directions in a statistically significant manner and only one of the four notes moved in the direction consistent with Amended Complaint's allegations.

---

[69]   Amended Complaint, ¶110.

[70]   Amended Complaint, ¶63.

18

**CONFIDENTIAL**

**Feinstein Event Study Price Reactions**
**to March 18, 2020 Alleged Corrective Disclosure**

| Note | Note Return | Market Return | Industry Return | Bond Index Return | Predicted Return | % Price Reaction | t-statistic | Stat. Sig. Reaction?[1] |
|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| 2.95% Note | -1.34% | -6.15% | -9.87% | -2.07% | -2.18% | 0.84% | 2.53 | Yes, Positive |
| 3.20% Note | -4.23% | -6.15% | -9.87% | -2.93% | -2.54% | -1.69% | -3.38 | Yes, Negative |
| 3.45% Note | -3.71% | -6.15% | -9.87% | -4.10% | -3.86% | 0.15% | 0.32 | No |
| 4.00% Note[2] | -7.00% | -0.97% | -0.98% | -12.23% | -13.69% | 6.68% | 7.00 | Yes, Positive |

**Notes and Sources:**

Data from Feinstein Report, Exhibits 10a-10d, and Exhibits 12a-12d.

[1] Significance is based on the price reaction's t-statistic, calculated as the price reaction divided by the standard error of the regression over the control period. "Yes" indicates significance at the 5% level.

[2] The Feinstein Report does not test the 4.00% Note's price reaction on March 18, 2020 as the note did not trade on the prior day. Price reaction calculated and tested using coefficients and standard error from Dr. Feinstein's event study and returns of Dr. Feinstein's Market Index, Industry Index, and Benchmark Bond Index from March 16 to March 18, 2020. The t-statistic is calculated as a 2-day cumulative reaction.

33.     Using the alternative event study in place of Dr. Feinstein's model, I find that the price reaction to the March 18, 2020 alleged corrective disclosure yields results that are similar and also contrary to Plaintiffs' claim of market efficiency: the SMR Notes did *not* move in a direction consistent with the Amended Complaint's allegations.  In particular, according to the alternative event study, both the 2.95% and 4% SMR Notes had a statistically significant *positive* reactions, the 3.2% SMR Note had a statistically significant *negative* reaction, and the 3.45% SMR Note had a positive but not statistically significant reaction. Thus, these results similarly do not support a conclusion of market efficiency. The table below shows the SMR Notes' price reactions on March 18, 2020 using the alternative event study.

19

**CONFIDENTIAL**

**Alternative Event Study Price Reactions**
**to March 18, 2020 Alleged Corrective Disclosure**

| Note | Note Return | Industry Return | Bond Index Return | Predicted Return | % Price Reaction | t-statistic | Stat. Sig. Reaction?[1] |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| 2.95% Note | -1.16% | -9.43% | -2.77% | -4.46% | 3.30% | 2.57 | Yes, Positive |
| 3.20% Note | -6.60% | -9.43% | -2.77% | -1.74% | -4.86% | -3.14 | Yes, Negative |
| 3.45% Note | -4.50% | -9.43% | -2.77% | -2.48% | -2.02% | -1.57 | No |
| 4.00% Note[2] | -6.76% | -2.12% | -5.33% | -14.17% | 7.41% | 2.98 | Yes, Positive |

**Notes and Sources:**

[1] Significance is based on the price reaction's t-statistic, calculated as the price reaction divided by the standard error of the regression over the control period. "Yes" indicates significance at the 5% level.

[2] Price reaction calculated and tested using coefficients and standard error from the Alternative event study and returns of the Industry Index and Bond Index from March 16 to March 18, 2020. The t-statistic is calculated as a 2-day cumulative reaction.

34.    Moreover, the results of Dr. Feinstein's cause-and-effect relationship test using the one day at the end of the alleged Class Period, despite the apparent "data snooping," are still inconsistent with a conclusion of market efficiency and Plaintiffs' claims. The price movements of the SMR Notes after the "truth" was allegedly fully revealed at the end of the alleged Class Period are inconsistent with Plaintiffs' theory of a cause-and-effect relationship. In particular, Plaintiffs claim that the "truth" was fully revealed on June 24, 2020, when the Company disclosed "a revised agreement to acquire ADS" and that the "Company would trigger the SMR requiring a mandatory redemption [of the SMR Notes] at 101% of par."[71] Thus, according to Plaintiffs' theory and claim of market efficiency, the prices of the SMR Notes should have gone immediately to $101 plus any accrued interest after the June 24, 2020 announcement, since the Company announced that it would redeem the SMR Notes at that price.[72] However, *none* of the prices of the SMR Notes actually went down to $101 (or $101 plus any accrued interest) on June 24, 2020: the 2.95% SMR Note closed at $102.50, the 3.2% SMR Note at $104.00, the 3.45% at

---

[71]  Amended Complaint, ¶79.

[72]  The coupons of all four SMR Notes were paid semi-annually. The last coupons of the 2.95%, 3.2%, and 3.45% SMR Notes had been paid on June 15, 2020, 10 days before the June 24, 2020 alleged corrective disclosure. The last coupon of the 4% SMR Note had been paid on January 15, 2020. See Waste Management Prospectus Supplement, filed May 16, 2019, S-5.

**CONFIDENTIAL**

$102.72, and the 4% SMR Note at $110.70.[73] The 4 % SMR Note actually closed higher than the prior day and almost 10% higher than the $101 redemption price announced on June 24, 2020.[74] To the extent that Plaintiffs claim that the price of the SMR Notes did not go to $101 on June 24 because there was speculation that Waste Management would not redeem the SMR Notes at $101, Plaintiffs have not provided any evidence of such speculation, and such a claim would contradict Plaintiffs' theory that the alleged fraud "artificially inflated the prices of the [SMR] Notes" until the end of the alleged Class Period.[75]

35.    Moreover, the majority of trades of the 4% SMR Note that occurred on June 24 were at similar or even higher prices than the prices on the prior day. The chart below shows the individual trades of the 4% SMR Note on June 23 and June 24, 2020, as well as the closing prices and Dr. Feinstein's VWAP on those dates. The blue dots in the chart show the price and time at which each individual trade of the 4% SMR Note occurred on June 23 and June 24, 2020. The orange dots show Dr. Feinstein's VWAP on each day, which he calculates as the average price of all trades from 9:30 AM to 4:00 PM weighted by the value of each trade. The purple dots show the closing price on each day according to Bloomberg. As can be seen in the chart, the 4% SMR Note traded only 14 times on June 24, 2020. All of those trades were at prices well above the $101 redemption price, ranging from $106 to $112. Furthermore, nine of those 14 trades (or 64%), including the last three trades of the day, were at prices around or above the prior day's closing price of $110.4 and VWAP of $110.5. The fact that the majority of the trades of the 4% SMR Note on June 24 were at prices around or above the prior day's prices is inconsistent with Plaintiffs' claim that "[t]he June 24, 2020 announcement thus eviscerated the [SMR] Notes' premium" and with Dr. Feinstein's conclusion of market efficiency, and

---

[73]   Data from Bloomberg, L.P.

[74]   Data from Bloomberg, L.P.

[75]   Amended Complaint, ¶108.

Note that the Amended Complaint cites to The Credit Roundtable Letter to Waste Management, dated June 29, 2020, six days after the end of the alleged Class Period: "The Credit Roundtable 'strongly recommend[ed] that WM attempt to pursue alternative courses before redeeming these bonds if the [ADS] acquisition is still pending'" (Amended Complaint, ¶86). There was no statistically significant price reaction for any of the SMR Notes on this date. Plaintiffs also claim that that on July 8, 2020, "Waste Management publicly responded to the Credit Roundtable, stating via email to Bloomberg News that 'upon conferring internally and with our counsel, we expect to proceed with the planned Redemption of the SMR notes, which is clearly and fully in compliance with the terms of the Notes'." (Amended Complaint, ¶87). There was no statistically significant price reaction for three of the four SMR Notes on this date.

21

**CONFIDENTIAL**

importantly, is contrary to efficiency relative to the kind of information that the alleged fraud is about.[76]



**Trading of 4.0% Note Before and After the 6/24/20 Alleged Corrective Disclosure**

Notes and Sources:
Trading data from the Feinstein Report turnover. Data on closing prices from Bloomberg, L.P.

36.    Even assuming that Dr. Feinstein's test of only one date were reasonable, Dr. Feinstein's event study using closing prices instead of VWAPs and the alternative event study both show that the price reaction for the 4% SMR Note on June 24, 2020 was not statistically significant. Thus, contrary to Plaintiffs' theory that the June 24, 2020 alleged corrective disclosure "cause[d] the Notes to decline in price," the price of the 4% SMR Notes did not react after this alleged corrective disclosure.[77] Thus the 4% SMR Note fails Dr. Feinstein's cause-and-effect relationship test even using only the one "cherry-picked" date.

37.    Further evidence that the SMR Notes did not trade consistent with Plaintiffs' claim of a cause-and-effect relationship (and importantly with cause and effect of news relevant

---

[76]    Amended Complaint, ¶13.

[77]    Amended Complaint, ¶¶13, 108.

**CONFIDENTIAL**

to the redemption) is the fact that the SMR Notes traded in opposite directions of each other on other days when news about the ADS Acquisition was released. For example, on June 18, 2020, *Bloomberg* reported that in connection with the ADS Acquisition, the DOJ may require Waste Management to make more-than-expected divestitures in Wisconsin.[78] According to Dr. Feinstein's event study, *none* of the four SMR Notes had price movements consistent with Plaintiffs' claim of a cause-and-effect relationship. In particular, on this date, according to Dr. Feinstein's event study, *none* of the SMR Notes had a statistically significant price decline.[79]

38.     As an alternative to Dr. Feinstein's non-standard, unscientific, unreliable, and biased test of only the last day of the alleged Class Period, I performed a systematic test of whether the SMR Notes reacted on news versus non news days, with a focus on the kind of news that is relevant to the alleged fraud in this matter. A "news versus non-news test" is a  commonly accepted way of statistically analyzing whether there is a cause-and-effect relationship between new news and the resulting security price movements.[80] In fact, in many other expert reports, Dr. Feinstein has used a news versus non-news test to analyze the cause and effect *Cammer* factor and test whether a security traded in an efficient market.[81] The news versus non-news test tests the difference in the proportion of days with significant price reactions for news versus non-news days.[82] I performed a news search on Factiva and Bloomberg for news on the ADS-

---

[78]  "ADSW Falls as CTFN Says DOJ Wants More Assets Sold in Wisconsin," *Bloomberg*, June 18, 2020.

[79]  Feinstein Report, Exhibits 12a-12d. Note the alternative event study yields similar results.

[80]  See, for example, Ferrillo, Paul A., Frederick C. Dunbar, and David Tabak, "The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. Johns Law Review* 78: 2004. Courts have accepted this test as a test of market efficiency. See, for example, Order and Opinion Granting in Part and Denying in Part Plaintiffs' Motion to Certify Class and Denying Motion to Strike in *Paul Lumen, et. al. v. Paul G. Anderson, et. al.*, No. 08-0514-CV-W-HFS (W.D. Mo. February 10, 2012). See also, Decision and Order in *McIntire v. China MediaExpress Holdings, Inc.*, No. 1:11-cv-00804-VM-GWG (S.D.N.Y. August 15, 2014).

[81]  See, for example, Report on Market Efficiency of Steven P. Feinstein in *In Re: Petrobras Securities Litigation*, dated October 15, 2015; Report on Market Efficiency of Steven P. Feinstein in *In Re American Realty Capital Properties Inc. Litigation*, dated March 15, 2017; Report on Market Efficiency of Steven P. Feinstein in *Levin v. Resource Capital Corp. et al.*, dated March 15, 2017; Report on Market Efficiency of Steven P. Feinstein in *Ohio v. Freddie Mac*, dated June 7, 2017; Report on Market Efficiency of Steven P. Feinstein in *In Re: Electrobras Securities Litigation*, dated June 30, 2017.

[82]  See, for example, Ferrillo, Paul A., Frederick C. Dunbar, and David Tabak, "The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. Johns Law Review* 78: 2004.

As Dr. Feinstein has acknowledged in many of his prior expert reports, "[t]he Z-test is a commonly used and widely accepted methodology for testing if the difference in the proportion of statistically significant

**CONFIDENTIAL**

Acquisition.[83] I found that there were 22 days with ADS-Acquisition specific news ("news days") and 68 days without any ADS-Acquisition specific news during the alleged Class Period ("non-news days"). Using Dr. Feinstein's event study and the alternative event study, a standard Z-test of difference in proportions finds that the difference in the proportion of days with significant price reactions for news versus non-news days is not statistically significant for any of the four SMR Notes. In other words, the reaction to news days is not statistically different to the reaction on non-news days.[84] The results of this test do not support a finding of market efficiency.

39.     As an alternative, I used a broader definition of news that not only included ADS-Acquisition specific news but also news about Waste Management and ADS and found similar results. In particular, I performed a news search on Factiva and Bloomberg for news on Waste Management and ADS. I found that there were 56 days with news and 34 days without news during the alleged Class Period.[85] Using Dr. Feinstein's own event study and the alternative event study, a standard Z-test of difference in proportions finds that the difference in the proportion of days with significant price reactions for news versus non-news days is not

---

observations for two samples is statistically significant." See, for example, Report on Market Efficiency of Steven P. Feinstein in *In Re: Petrobras Securities Litigation*, dated October 15, 2015, ¶146; Report on Market Efficiency of Steven P. Feinstein in *In Re American Realty Capital Properties Inc. Litigation*, dated March 15, 2017, ¶153.

83    The Factiva news search was based on Company Field: "Waste Management, Inc." or "Advanced Disposal Services, Inc." and not "Republic Services, Inc", Keywords: "Merger" or "Acquisition" or "Divest" or "DOJ", Sources: "Major News and Business Sources", Dates: "February 13, 2020 to June 23, 2020", and excludes stories categorized by Factiva as "recurring pricing and market data" or "obituaries, sports, calendars". The Bloomberg news search was based on Company Field: "Waste Management, Inc.", Keywords: "Merger" or "Acquisition" or "Divest" or "DOJ", Sources: "Bloomberg Only", Dates: "February 13, 2020 to June 23, 2020", and only includes stories with either "Waste Management, Inc.", "WM", "Advanced Disposal Services, Inc." or "ADS" in the headline. Analysis excludes March 18, 2020.

84    See Appendix E for more details.

85    The Factiva news search was based on Company Field: "Waste Management, Inc." or "Advanced Disposal Services, Inc." and not "Republic Services, Inc", Sources: "Major News and Business Sources", Dates: "February 13, 2020 to June 23, 2020", and excludes stories categorized by Factiva as "recurring pricing and market data" or "obituaries, sports, calendars". The Bloomberg news search was based on Company Field: "Waste Management, Inc.", Sources: "Bloomberg Only", Dates: "February 13, 2020 to June 23, 2020", and only includes stories with either "Waste Management, Inc.", "WM", "Advanced Disposal Services, Inc." or "ADS" in the headline. Analysis excludes March 18, 2020.

24

CONFIDENTIAL

statistically significant for any of the four SMR Notes. The results of this test do not support a finding of market efficiency.[86]

> ### D. Dr. Feinstein's contention that institutional ownership of the SMR Notes during the alleged Class Period is itself evidence of market efficiency is belied by contemporaneous complaints of those same institutions that there was a lack of transparency and market efficiency with notes featuring special mandatory redemptions

40.    Dr. Feinstein claims that the "broad institutional ownership of the Waste Management Notes supports the conclusion that the Notes traded in an efficient market throughout the Class Period."[87] However, Dr. Feinstein's claims are directly contradicted by the contemporaneous written complaints of the institutions holding the SMR Notes around the alleged Class Period. In particular, on June 29, 2020, just a few days after the end of the alleged Class Period, the Credit Roundtable, a group of large institutional investors, issued a letter (that Plaintiffs themselves cite in the Amended Complaint) complaining about market efficiency and transparency issues with the SMR Notes during the alleged Class Period.[88]

41.    The Credit Roundtable, formed in 2007, is "a group of large institutional fixed income managers including investment advisors, insurance companies, pension funds, and mutual fund firms, responsible for investing more than $3.8 trillion of assets."[89] According to the Credit Roundtable, its mission is to "improve risk assessment and management through education and seeks to benefit all bond market participants through increasing transparency, market efficiency, and liquidity."[90] The Credit Roundtable had been concerned with issues related to the use of special mandatory redemption features in bonds since at least 2018.[91]

42.    On June 29, 2020, six days after the end of the alleged Class Period, the Credit Roundtable issued a letter from its Special Mandatory Redemption Provision Working Group.[92]

---

[86]  See Appendix E for more details.

[87]  Feinstein Report, ¶99.

[88]  The Credit Roundtable Letter to Waste Management, dated June 29, 2020.

[89]  The Credit Roundtable Letter to Waste Management, dated June 29, 2020, footnote 1.

[90]  The Credit Roundtable Letter to Waste Management, dated June 29, 2020, footnote 1.

[91]  The Credit Roundtable SMR White Paper, dated June 8, 2018.

[92]  The Credit Roundtable Letter to Waste Management, dated June 29, 2020.

**CONFIDENTIAL**

Plaintiffs cite this letter in the Amended Complaint.[93] In this letter, the Credit Roundtable highlighted its "concern" that special mandatory redemption provisions in bonds had "become too flexible," "impose[d] greater deal risk on bond investors (given the lack of transparency of negotiations)," and increased investor exposure to "unhedgeable rate and refinancing risk."[94] The Credit Roundtable made certain recommendations regarding Waste Management's SMR Notes in the "spirit of enhancing market efficiency through greater transparency."[95]

43.     In an earlier white paper, the Credit Roundtable warned that there were market inefficiencies regarding the use of special mandatory redemption provisions in bonds and made recommendations for industry best practices. In particular, the Credit Roundtable stated: "Consistency and transparency are cornerstones of an efficient market. The goal of our proposed [special mandatory redemption] language is to utilize investment grade pricing conventions and reduce complexity in order to improve market efficiency and facilitate flexible M&A pre-funding in the unsecured markets."[96]

### E.     Dr. Feinstein's claim that a statistically significant relationship between the SMR Notes' returns and changes in market interest rates is evidence of market efficiency is unfounded and unreliable

44.     Dr. Feinstein claims that an additional, non-standard "test" using his Benchmark Bond Indices provides further evidence of market efficiency.[97] This claim is completely unfounded and unreliable. In particular, according to Dr. Feinstein's event study, his "Benchmark Bond" index is a statistically significant explanatory variable for the price movements of SMR Notes.[98] Dr. Feinstein claims that this is evidence of a "day-to-day cause-and-effect relationship […] between changes in market interest rates and the prices of the [SMR Notes]" and thus "compelling" proof of market efficiency.[99] However, Dr. Feinstein provides no academic support for his claim that this additional "test," which he typically does not perform in

---

[93]   Amended Complaint, ¶¶14, 85-86.

[94]   The Credit Roundtable Letter to Waste Management, dated June 29, 2020, p. 1.

[95]   The Credit Roundtable Letter to Waste Management, dated June 29, 2020, p. 1.

[96]   The Credit Roundtable SMR White Paper, dated June 8, 2018, p. 3.

[97]   Feinstein Report, ¶¶196-200.

[98]   Feinstein Report, ¶¶196-200.

[99]   Feinstein Report, ¶¶196-200.

26

**CONFIDENTIAL**

his expert reports on market efficiency in securities class actions, is accepted as evidence of market efficiency. Moreover, if anything, this "test" only shows that the prices of SMR Notes are correlated with market interest rates but does not show that the prices of SMR Notes reflect any company specific information. Dr. Feinstein's claim is akin to claiming that a stock is efficient merely because its price moves with the S&P 500 Index. But market efficiency for purposes of the fraud-on-the-market presumption is grounded in price movement in response to *company-specific news*. In fact, Dr. Feinstein himself cites the U.S. Supreme Court decision in *Basic v. Levinson* that "[t]he fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business,"[100] which clearly states that the test of the fraud-on-the-market presumption relies on establishing the link between the security's price and *company-specific news*, not broad market movements such as interest rate changes. At the extreme, if a company's stock price moved exactly like the S&P 500 Index, that would indicate that the company's stock price is *not responding to any company-specific news*. Thus, a correlation of movements with a market index could reflect a lack of attention to company-specific news and certainly does not provide any evidence in favor of a link with company-specific news.

**F.    The SMR Notes fail the average weekly trading volume test for many of the weeks during the alleged Class Period**

45.    Based on his analysis of the average weekly trading volume, Dr. Feinstein claims that the trading volume for the SMR Notes was "extraordinarily high" and "strong evidence of the efficiency of the market."[101] However, Dr. Feinstein's analysis ignores that all four of the SMR Notes had very low trading volume, which fails his test for many of the weeks during the alleged Class Period. Moreover, while Dr. Feinstein claims that the "high trading frequency" of the SMR Notes "is compelling evidence" of market efficiency,[102] he ignores that during the first half of the alleged Class Period, the 4% SMR Note did not trade *at all* on 40% of trading days.

---

[100]  Feinstein Report, ¶49.  *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988).

[101]  Feinstein Report, ¶¶80-81.

[102]  Feinstein Report, ¶85.

27

**CONFIDENTIAL**

46.    The Feinstein Report cites the following quote from the *Cammer* decision: "weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[103] Dr. Feinstein calculates that the "average weekly turnover" for the SMR Notes during the alleged Class Period ranged from 4.83% to 7.93%.[104] However, during the first half of the alleged Class Period, the SMR Notes' weekly trading volume as percentage of their outstanding issue was below the *Cammer* thresholds of 2% and 1% for a number of weeks.

47.    In the first half of the alleged Class Period, the trading volume of the 2.95% SMR Note was below the 2% *Cammer* threshold for a "strong presumption" of market efficiency in approximately one third of the weeks, the 3.2% SMR Note in approximately two thirds of the weeks, the 3.45% SMR Note in nearly 90% of the weeks, and the 4% SMR Note in *all* of the weeks. The weekly trading volume of the SMR Notes was also below the 1% *Cammer* threshold for a "substantial presumption" of market efficiency in many of the weeks during the first half of the alleged Class Period. During the first half the alleged Class Period, the average weekly trading volume of the 4% SMR Note was only 0.85% of its outstanding issue, below the 1% *Cammer* threshold for a "substantial presumption" of market efficiency.[105]

48.    The charts below show the SMR Notes' weekly trading volume as a percentage of their outstanding issue compared to the *Cammer* thresholds. The red bars correspond to weeks when the SMR Notes' weekly trading volume as a percentage of their outstanding issue was below the 2% *Cammer* threshold and the green bars correspond to weeks above the 2% *Cammer* threshold. As shown in the charts, the trading volume of the SMR Notes were below the 2% and 1% *Cammer* thresholds on many of the weeks during the first half of the alleged Class Period, and the 4% SMR Note was below the 2% *Cammer* threshold during every week in the first half of the alleged Class Period.

---

[103]  Feinstein Report, ¶80.

[104]  Feinstein Report, ¶79 and footnote 66. The Feinstein Report's calculated "average weekly turnover" of a Note is not based on any weekly trading volume data for the Note. Instead, it is calculated as the average *daily* trading volume for the Note multiplied by five, the number of trading days in a typical week.

[105]  Data from "FEINSTEIN0012966.XLSX."

28

**CONFIDENTIAL**



**SMR Notes Weekly Trading Volume as a Percentage of Outstanding Issue**
*Alleged Class Period*

**2.95% SMR Note**

First half of alleged Class Period:
- 33% of the weeks failed the 2% threshold
- 33% of the weeks failed the 1% threshold

**3.2% SMR Note**

First half of alleged Class Period:
- 67% of the weeks failed the 2% threshold
- 44% of the weeks failed the 1% threshold

**3.45% SMR Note**

First half of alleged Class Period:
- 89% of the weeks failed the 2% threshold
- 11% of the weeks failed the 1% threshold

**4% SMR Note**

First half of alleged Class Period:
- 100% of the weeks failed the 2% threshold
- 56% of the weeks failed the 1% threshold

**Notes and Sources:** Data from Feinstein Report turnover ("FENISTEIN0012966.xlsx"). A week is defined as five consecutive trading days from the beginning of the alleged Class Period. Percentage calculated by dividing the sum of each week's daily trading volume by the note's outstanding issue. Excludes last day of alleged Class Period as it is an incomplete week.

49.     Moreover, limiting the trading volume of the SMR Notes to market hours, as defined by Dr. Feinstein, results in even lower weekly trading volume relative to the *Cammer* thresholds in the first half of the alleged Class Period. In particular, limiting the trading volume of the SMR Notes to between 9:30 AM and 4:00 PM, the market hours Dr. Feinstein uses for his calculation of volume weighted average prices,[106] the trading volume of the SMR Notes was below the 2% *Cammer* threshold in 44% to 100% of the weeks and below the 1% *Cammer*

---

[106]  Feinstein Report, ¶A1-14.

**CONFIDENTIAL**

threshold in 33% to 78% of the weeks in the first half of the alleged Class Period. Appendix F illustrates these results.

50.    In addition to calculating the "average weekly turnover," Dr. Feinstein analyzes the trading frequency of the Notes and claims that the "average number of days between successive trades" was low and thus evidence of market efficiency.[107] However, Dr. Feinstein completely ignores the fact that during the first half of the alleged Class Period, the 4% SMR Note actually did not trade *at all* on many days. In particular, on 40% of the trading days during the first half of the alleged Class Period, there were no trades at all for the 4% SMR Note, directly contradicting Dr. Feinstein's claim that "the Waste Management Notes typically traded numerous times per day rather than once every few days."[108] Moreover, the 4% SMR Note did not even trade on February 13, 2020, the beginning of the alleged Class Period, and had *only one* trade on the May 6, 2020 alleged misrepresentation date, when the Company announced its 1Q20 results and allegedly "assured investors" about the ADS Acquisition approval.[109] Consistent with the fact that the 4% SMR Note did not trade at all on many days during the alleged Class Period, the 4% SMR Note had much lower trading volume than the other SMR Notes on the June 24, 2020 alleged corrective disclosure.[110]

51.    In sum, an examination of the trading volume of the SMR Notes during the first half of the alleged Class Period shows that, inconsistent with Dr. Feinstein's conclusion that the trading volume and trading frequency of the SMR Notes are evidence of market efficiency, the average weekly turnover for the Notes was below the *Cammer* thresholds of 2% and 1% during many weeks, and the 4% Note did not trade *at all* on 40% of the trading days.

---

[107]  Feinstein Report, ¶¶82-85.

[108]  Feinstein Report, ¶84.

[109]  Based on data from "FEINSTEIN0012966.xlsx" and Amended Complaint, ¶¶50-55, 67-73.

[110]  Based on data from "FEINSTEIN0012966.xlsx." In particular, on June 24, 2020, the trading volume was 38,560 for the 2.95% SMR Note, 17,333 for the 3.2% SMR Note, and 23,407 for the 3.45% SMR Note, while the trading volume for the 4% SMR Note was 635, representing only 0.1% of its notes outstanding.

**G.    The SMR Notes fail the analyst coverage test – no analysts covered or issued reports on any of Waste Management's bonds, including the SMR Notes, and no equity analyst analyzed the special features of the SMR Notes**

52.    Dr. Feinstein purports to examine the presence of analyst coverage of the SMR Notes and concludes that the "extensive coverage of Waste Management by professional securities analysts is compelling evidence" of market efficiency.[111] This analysis is misleading because during the alleged Class Period, *no* analysts covered any of Waste Management's bonds, including the SMR Notes. Moreover, *none* of the analysts who covered Waste Management's stock discussed or commented on the special mandatory redemption feature of the SMR Notes or on the impact on the SMR Notes of the ADS Acquisition failing to close by July 14, 2020.

53.    Dr. Feinstein and I were not able to find any professional securities analysts who covered any Waste Management bonds, including the SMR Notes, during the alleged Class Period.[112] According to the Feinstein Report, securities analysts "conduct research and provide valuation opinions, which help market participants acquire relevant information and understand the implications of that information for valuation and investment decisions."[113] However, the Feinstein Report ignores that during the alleged Class Period, there were no analysts conducting research and providing valuation opinions specifically on the Waste Management bonds, including the SMR Notes. Thus, there were no analysts that were helping investors of the SMR Notes interpret information relevant to their investments in the SMR Notes.[114]

---

[111]  Feinstein Report, ¶94.

[112]  Based on LSEG Data and Analytics.

[113]  Feinstein Report, ¶86.

[114]  Academic research discusses the impact of analyst coverage of bonds. See, for example, De Franco, Gus, Florin P. Vasvari, and Regina Wittenberg-Moerman, "The Informational Role of Bond Analysts," *Journal of Accounting Research* 47(5): 2009, pp. 1201-1248 at 1202 and 1233 ("Sell-side bond analysts, employed by brokerage firms, collect and interpret information about public corporate bond securities and the firms that issue them; they also provide investment recommendations to bond market participants. […] Bonds with complex features are difficult to value by investors, creating a demand for bond analysts' assistance in pricing the securities.")

Courts have found that a lack of analysts covering bonds "supports a finding that the [bonds] traded in an inefficient market." See, Opinion and Order in *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc. et al.* ("*Bombardier*"), No. 05 Civ. 1898 (SAS) (S.D.N.Y. August 1, 2006), pp. 38-39; Decision by Barrington D. Parker, Circuit Judge in *Bombardier*, No. 06-3794-cv (2nd Cir. October 14, 2008), pp. 15-17; Report and Recommendation to the Honorable Ronnie Abrams, *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, 17-CV-916 (RA) (BCM) (S.D.N.Y. March 18, 2021), pp. 27-29

**CONFIDENTIAL**

54.     Dr. Feinstein purports to support his finding of market efficiency by analyzing analyst coverage of the Waste Management *stock* during the alleged Class Period and claims that analyst reports on the stock "reported information relevant to the valuation of the Waste Management Notes."[115] This is erroneous, misleading, and inconsistent with Dr. Feinstein's own claims. Dr. Feinstein states that "price movements of corporate bonds […] typically differ markedly from those of common stock,"[116] but he fails to provide any support for why analysts who focused on Waste Management's stock price would also report information solely relevant to the SMR Notes' prices. Information that is considered important to the valuation of the SMR Notes, but not the stock, would not be expected to be disseminated by analysts covering the stock.

55.     Specifically, given that the SMR Notes had the special mandatory redemption feature that hinged on whether the ADS Acquisition would be completed by July 14, 2020, news on the timing of the acquisition, apart from news "affecting the Company's financial performance," would be expected to affect the value of the SMR Notes.[117] However, such news might not matter to Waste Management stockholders and thus not be considered as important by analysts covering the stock. For example, if the Company had stated during the alleged Class Period that they expected the ADS Acquisition to be completed on July 20, 2020 (six days after the July 14, 2020 Special Mandatory Redemption Date), while all other aspects of the acquisition would remain the same as previously expected, that news would imply that the SMR Notes would be redeemed at $101, while not having a substantial impact on Waste Management's stock. Thus, that news would be much less likely to be considered important by analysts covering Waste Management stock but would be considered important to an SMR Note investor..

56.     A detailed review of analyst reports covering the Waste Management stock identified in the Feinstein Report shows that throughout the alleged Class Period, analysts did *not* consider a potential redemption of the SMR Notes to be an important issue. While Dr. Feinstein claims some analyst reports "mentioned the pending acquisition of ADS and/or

---

[115]  Feinstein Report, ¶93.

[116]  Feinstein Report, ¶54.

[117]  Feinstein Report, ¶159.

32

discussed the Waste Management Notes,"[118] those analyst reports did not mention the redemption of the SMR Notes. In fact, *none* of the analyst reports on the Waste Management stock that were issued during the alleged Class Period that I was able to find or that Dr. Feinstein turned over mentioned the redemption of the SMR Notes.[119] Moreover, the fact that analysts merely "mentioned" a multi-billion-dollar acquisition does not prove that the markets for the SMR Notes were efficient.

57.     Dr. Feinstein purports to bolster his analysis of analyst coverage by claiming that the three major credit rating agencies – Fitch, Moody's, and S&P – "provided ongoing surveillance coverage [of the SMR Notes] throughout the Class Period."[120] This is also misleading. During the alleged Class Period, Fitch issued only one report on Waste Management, which focused on Waste Management's financial stability rather than on the SMR Notes or on the probability of a potential redemption of the SMR Notes.[121] Moody's issued one report on Waste Management during the alleged Class Period, but it is a "peer snapshot" that compared the financial performance of companies in the industry, without providing any information on the SMR Notes or a potential redemption of the SMR Notes.[122] S&P did not issue a single report on Waste Management during the alleged Class Period.[123] Thus, there is no evidence that credit rating agencies materially promoted the efficiency of the market for the SMR Notes.

### H.    Dr. Feinstein fails to provide evidence that there was even one market maker for the SMR Notes during the alleged Class Period

58.     Dr. Feinstein claims that "broker-dealers act as market makers by quoting prices at which they buy and sell a bond and facilitate trading in the bond" and that "[all] FINRA members are broker-dealers."[124] Based on these claims, Dr. Feinstein claims that FINRA members that traded the SMR Notes during the alleged Class Period were market makers for the

---

[118] Feinstein Report, ¶93 and Exhibit-5.

[119] Based on available analyst reports from LSEG Data and Analytics and Dr. Feinstein's turnover materials.

[120] Feinstein Report, ¶107.

[121] Fitch report on Waste Management, dated April 8, 2020.

[122] Moody's peer snapshot report, dated June 1, 2020.

[123] Based on information on S&P via Alacra, Inc.

[124] Feinstein Report, ¶¶111-112.

33

**CONFIDENTIAL**

SMR Notes.[125] However, Dr. Feinstein's claim is simply a blind assertion – he has not provided evidence that there was even one market maker for the SMR Notes during the alleged Class Period, let alone that "there were numerous market makers for the Waste Management Notes, thus satisfying the third *Cammer* Factor."[126] Dr. Feinstein's conclusion regarding market makers for the SMR Notes ignores the important differences between having designated market makers in stock exchanges versus having dealers in over-the-counter bond markets.

59.    As Dr. Feinstein acknowledges, "[m]arket makers are financial intermediaries who trade in a particular security, standing ready to buy and sell with individual investors, institutions, and other market makers," and "[a] large number of market makers for a particular security provides a high degree of liquidity."[127] For securities traded on many major exchanges, such as the NYSE, there are *designated* market makers that are obligated to provide liquidity and facilitate price discovery at all times, including during periods of market instability.[128] In his prior expert reports on market efficiency in securities class actions, Dr. Feinstein has repeatedly pointed to the existence of designated market makers to support his finding of market efficiency.[129]

60.    Unlike major stock exchanges, like the NYSE, over-the-counter bond markets, such as the markets where the SMR Notes at-issue traded during the alleged Class Period, do *not* have designated market makers. In fact, as a recently published article in the *Journal of Fixed Income* explains, since over-the-counter bond markets are less-transparent and less-liquid, market-making in over-the-counter bond markets is "dramatically different" than market-making

---

[125]  Feinstein Report, ¶112.

[126]  Feinstein Report, ¶116.

[127]  Feinstein Report, ¶110.

[128]  See, for example, "The NYSE Market Model," *NYSE*, accessed at: https://www.nyse.com/market-model.

[129]  See, for example, Report on Market Efficiency of Steven P. Feinstein in *In Re: Petrobras Securities Litigation*, dated October 15, 2015, ¶79. In his report in *In Re: Petrobras Securities Litigation*, a case cited in the Feinstein Report, Dr. Feinstein stated that the fact that the Petrobras ADRs traded in a market overseen by NYSE's designated market makers supported his finding of market efficiency ("The facts that it traded on the NYSE and had a large number of market makers are strong evidence that the Petrobras common ADRs traded in an efficient market throughout the Class Period. That the Petrobras common ADRs were listed on the NYSE gave its common ADRs access to a highly developed network of brokers with its market overseen by the NYSE [designated market makers]. These facts are compelling evidence of the efficiency of the market for Petrobras common ADRs.").

**CONFIDENTIAL**

in stock markets, and over-the-counter bond markets bear the "precarious" risk of thinning market-making activities in times of crisis:[130]

> Given the less-transparent and less-liquid nature of the [over-the-counter] trading markets, and given participants' limited knowledge of the embedded risk therein, market-making is dramatically different than in stock markets. Price discovery, one of the most important features of an efficient capital market, presumes liquidity and sizeable volumes that are available on both the bid and ask side. Additionally, continuous and consistent liquidity is typically provided by a diverse set of actively trading participants. If the number of counterparties that trade becomes limited, markets begin to thin, and a "ghost market" eventually emerges in times of crisis; this is the potentially precarious outcome of the risks in the fixed-income [over-the-counter] markets. [Zwirn, Daniel, Jim Kyung-Soo Liew, and Ahmad Ajakh, "This Time Is Different, but It Will End the Same Way: Unrecognized Secular Changes in the Bond Market since the 2008 Crisis That May Precipitate the Next Crisis," *The Journal of Fixed Income* 29(2): 2019, pp. 68-91.]

61.    Contrary to Dr. Feinstein's claim that in an over-the-counter bond market all broker-dealers act as market makers, this *Journal of Fixed Income* article specifies that to act as market makers in such a market, broker-dealers must "stand ready to make markets even in periods of market crisis."[131] However, according to empirical evidence shown in several academic papers, in recent years, due to regulation changes post the 2008 financial crisis, many dealers are less inclined to act as market makers for over-the-counter corporate bonds, especially

---

[130]  Zwirn, Daniel, Jim Kyung-Soo Liew, and Ahmad Ajakh, "This Time Is Different, but It Will End the Same Way: Unrecognized Secular Changes in the Bond Market since the 2008 Crisis That May Precipitate the Next Crisis," *The Journal of Fixed Income* 29(2): 2019, pp. 68-91 at 88.

[131]  Zwirn, Daniel, Jim Kyung-Soo Liew, and Ahmad Ajakh, "This Time Is Different, but It Will End the Same Way: Unrecognized Secular Changes in the Bond Market since the 2008 Crisis That May Precipitate the Next Crisis," *The Journal of Fixed Income* 29(2): 2019, pp. 68-91 at 68.

**CONFIDENTIAL**

during crises.[132] Based on those empirical findings, the *Journal of Fixed Income* article finds that market-making for over-the-counter corporate bonds may completely vanish during crises:[133]

> [W]hen a financial crisis strikes, the [over-the-counter] market for corporate bonds will completely vanish. That is, when a crisis occurs, no market-makers will be willing to take the other side of the trade and thus provide liquidity for the underlying constituents of the corporate mutual funds and ETFs. [Zwirn, Daniel, Jim Kyung-Soo Liew, and Ahmad Ajakh, "This Time Is Different, but It Will End the Same Way: Unrecognized Secular Changes in the Bond Market since the 2008 Crisis That May Precipitate the Next Crisis," *The Journal of Fixed Income* 29(2): 2019, pp. 68-91.]

62.     Despite the abundance of academic research on how over-the-counter bond dealers may not act as market makers and are less inclined to act as market makers in recent years, Dr. Feinstein blindly asserts that "there were numerous market makers for the Waste Management Notes,"[134] without providing any evidence that there was even one market maker for the SMR Notes during the alleged Class Period, and completely ignoring the difference between market makers and over-the-counter bond dealers. His assertion is wholly unsupported, which renders his conclusion of market efficiency based on this factor unreliable.

63.     Courts have found that blindly asserting the prevalence of market makers for over-the-counter bonds, without providing any evidence, is unavailing to support a conclusion of market efficiency. For example, in *Bombardier*, a case that similarly involved the analysis of market efficiency for over-the-counter traded bonds, the court found Plaintiffs incorrectly

---

[132] See, for example, Hendrik Bessembinder, et al., "Capital Commitment and Illiquidity in Corporate Bonds," *The Journal of Finance* 73(4): 2008, pp. 1615-1661 at 1618-1619 ("Bank-affiliated dealers in particular are less inclined to serve as traditional market-makers who commit capital to absorb customer order imbalances. This shift is especially apparent in the most recent period, when banks have become increasingly subject to the requirements of the Volcker Rule."); see also, Bao, Jack, Maureen O'Hara, and Xing Zhou, "The Volcker Rule and corporate bond market making in times of stress," *Journal of Financial Economics* 130: 2018, pp. 95-113 at 95 ("Focusing on downgrades as stress events that drive the selling of corporate bonds, we show that the illiquidity of stressed bonds has increased after the Volcker Rule. Dealers regulated by the rule have curtailed their market-making activities and non-Volcker- affected dealers have not offset the decreased activities of Volcker-affected dealers.").

[133] Zwirn, Daniel, Jim Kyung-Soo Liew, and Ahmad Ajakh, "This Time Is Different, but It Will End the Same Way: Unrecognized Secular Changes in the Bond Market since the 2008 Crisis That May Precipitate the Next Crisis," *The Journal of Fixed Income* 29(2): 2019, pp. 68-91 at 83.

[134] Feinstein Report, ¶116.

**CONFIDENTIAL**

asserted that a lead underwriter was a market maker and that Plaintiffs' failure to show the existence of any market maker supported a finding of an *inefficient* market:[135]

> "[Plaintiffs] Teamsters has failed to show that there were firms who would furnish bids and quotes on request and who would effect transactions for each Certificate. Teamsters' argument that the Certificates are like equity IPOs (in that the lead underwriter acts as a market maker is unavailing. Rather, as with the question of analyst coverage discussed above, Teamsters must independently address the efficiency of the Certificate market. Because Teamsters has failed to show that there were market makers for each of the Certificates, this factor supports a finding that the Certificates traded in an inefficient market. [Opinion and Order in *Bombardier*, No. 05 Civ. 1898 (SAS) (S.D.N.Y. August 1, 2006)]

64.    In addition, Dr. Feinstein makes no adjustment in his analysis to account for the fact that, in general, corporate bonds trade in less efficient markets than stocks. For example, corporate bonds, like the SMR Notes, may have many complex features that makes matching buyers and sellers of bonds harder than matching buyers and sellers of stocks. As PIMCO, an asset management company, explains: "The bond market has always been less liquid [than the stock market] because of the difficulty of matching bonds with the exact same characteristics, since bonds can vary so much in terms of maturity, coupon, duration and credit quality. Also, following the global financial crisis, new regulations have made it more difficult for financial institutions to trade risky assets. […] [I]t has also led to a reduction of some banks' bond trading desks, reducing overall market liquidity."[136] According to PIMCO, due to the "inherent complexity of the bond market" and the fact that most bonds trade over-the-market rather than on exchanges, bonds also get less media coverage than stocks.[137] Further, over-the-counter markets, such as the market where the SMR Notes were traded during the alleged Class Period,

---

[135]    Opinion and Order in *Bombardier*, No. 05 Civ. 1898 (SAS) (S.D.N.Y. August 1, 2006), p. 40. The District Court's finding that Plaintiffs failed to provide evidence that there were market makers was upheld by the United States Court of Appeals for the Second Circuit. Decision by Barrington D. Parker, Circuit Judge in *Bombardier*, No. 06-3794-cv (2nd Cir. October 14, 2008), p. 19 ("This finding was not erroneous. The district court considered Teamsters' evidence and found that it failed to show that firms engaged in either of the two activities identified by the SEC as defining a market maker.").

[136]    "The What, Why, and How of Investing in Bonds," *PIMCO*, accessed at: https://www.pimco.com/eu/en/resources/education/the-what-why-and-how-of-investing-in-bonds.

[137]    "The What, Why, and How of Investing in Bonds," *PIMCO*, accessed at: https://www.pimco.com/eu/en/resources/education/the-what-why-and-how-of-investing-in-bonds.

37

**CONFIDENTIAL**

are generally considered by academics as well as the finance industry as less transparent and less liquid than exchanges.[138]

### I.    Dr. Feinstein's analysis of the bid-ask spreads is unreliable and unhelpful; he has no data on actual bid-ask spreads of the SMR Notes, and there was no posting of spreads available during the alleged Class Period

65.    Dr. Feinstein's claims that an analysis of the SMR Notes' bid-ask spreads supports his finding of market efficiency.[139] However, Dr. Feinstein's tests of the SMR Notes' bid-ask spreads is based on non-replicable *estimates* from Bloomberg and LSEG Workspace, *not* actual bid-ask spreads.[140] Dr. Feinstein does not have any actual data on the SMR Notes' bid-ask spreads, and there was no posting of the SMR Notes' bid-ask spreads available during the alleged Class Period. Further, it is unclear how Bloomberg and LSEG Workspace estimated those quotes.

66.    Dr. Feinstein acknowledges that there were no reported bid and ask quotes for the SMR Notes during the alleged Class Period and that he was only able to obtain "estimated daily closing bid and ask quotes" from Bloomberg and LSEG Workspace.[141] Dr. Feinstein's estimated quotes are based on Bloomberg and LSEG Workspace's proprietary methods and thus they are not replicable. It is unclear how those quotes were estimated beyond a vague description provided by both sources that is listed in Dr. Feinstein's report;[142] thus, those estimates are not replicable.

---

[138] See, for example, Hendershott, Terrence, Dan Li, Dmitry Livdan, and Norman Schürhoff, "Relationship trading in over-the-counter markets," *The Journal of Finance* 75(2): 2020, pp. 683-734 at 684 ("[Corporate] bonds trade on decentralized over-the-counter (OTC) markets, which are less liquid than centralized exchanges due to search frictions arising from fragmentation and limited transparency."); see also, "OTC (Over-the-Counter) Markets and Securities," *Charles Schwab*, accessed at: https://www.schwab.com/stocks/understand-stocks/otc-stock ("[Over-the-counter] markets are generally less transparent and less regulated than conventional stock exchanges, which makes them riskier to invest in.").

[139] Feinstein Report, ¶¶134-142.

[140] Feinstein Report, ¶¶134-135.

[141] Feinstein Report, ¶¶134-135.

[142] Feinstein Report, ¶¶134-135 and footnotes 102 and 103.

38

**CONFIDENTIAL**

67.    Courts have found that using estimated data rather than actual data to analyze market efficiency is often inappropriate.[143] In this case, Dr. Feinstein's estimated bid-ask spreads are on their face inconsistent with the actual trading prices of the SMR Notes. For example, on June 24, 2020, Dr. Feinstein's Bloomberg estimated closing bid and ask quotes for the 4% SMR Note are $102 (bid) and $103 (ask), while the FINRA TRACE data Dr. Feinstein relies upon shows that all of the trades that were executed on that day for the 4% SMR Note were done at prices well above Bloomberg's estimated bid and ask quotes (the lowest price was at $106), and the closing price and last trade of the day were at $111, all substantially higher than the estimated closing bid and ask quotes.[144]

68.    Moreover, Dr. Feinstein's comparison of the estimated bid-ask spreads of the SMR Notes to the average bid-ask spread of all stocks and the bid-ask spread of the stock in the *Krogman* case is inconsistent with his own claim that corporate bonds are very different than stocks. Although Dr. Feinstein claims that corporate bonds "differ markedly" from stocks and that bonds have "various distinguishing features," including being less "sensitive" to news and having less "severe" returns than stocks, he provides no support or explanation why it is appropriate to compare the bid-ask spreads of the SMR Notes to the average of all stocks or the stock in the *Krogman* case.[145]

> **J.    Dr. Feinstein fails to analyze short selling activity, a factor that he typically analyzes when testing market efficiency, and there is no evidence of short selling activity of the SMR Notes**

69.    In prior expert reports on market efficiency in securities class actions, Dr. Feinstein claims that short selling activity indicates likely arbitrage activity and thus market efficiency. In fact, in those reports, Dr. Feinstein cites the *Cammer* court, stating that "the presence of arbitrageurs along with market makers" is an "indicator of market efficiency." [146]

---

[143]  See, for example, Decision by Barrington D. Parker, Circuit Judge in *Bombardier*, No. 06-3794-cv (2nd Cir. October 14, 2008), p. 23.

[144]  Note Dr. Feinstein does not provide his bid-ask estimates past June 23, 2020, but I was able to download the same data he uses from Bloomberg, L.P., and additionally for June 24, 2020.

[145]  Feinstein Report, ¶¶54, 57, 191

[146]  See, for example, Dr. Feinstein's report in *In re SolarWinds Securities Litigation*, dated September 30, 2022, ¶¶85-86. ("The *Cammer* court also cited the presence of arbitrageurs along with market makers as an indicator of market efficiency. […] As shown in Exhibit-6, which presents SolarWinds stock short interest data provided by Bloomberg, there was considerable SolarWinds stock short-selling activity over the course of the Class Period.")

**CONFIDENTIAL**

However, in this case, Dr. Feinstein is completely silent about arbitrage activity, including short selling activity, regarding the SMR Notes. Consistent with Dr. Feinstein's silence about this factor, I found no evidence of short selling activity of the SMR Notes during the alleged Class Period.[147]

> **K.    Dr. Feinstein's analysis of the "Outstanding Par Value (*Krogman* Factor 1)" is inconsistent with his own claims that corporate bonds are very different than stocks**

70.    Dr. Feinstein purports to analyze the "Outstanding Par Value (*Krogman* factor 1)" to support his finding of market efficiency.[148] Dr. Feinstein claims that analyzing the "size of the issuing company and the size of a note issue" is relevant for assessing market efficiency.[149] Dr. Feinstein compares the aggregate par value and individual par values of the SMR Notes to the market capitalizations of publicly traded companies. Dr. Feinstein's comparison of the *aggregate* par value of the SMR Notes (*i.e.*, the sum of the individual par values of all four of the SMR Notes) to the market capitalizations of *individual* publicly traded companies does not make any sense. Dr. Feinstein is adding up four different debt securities and comparing them to individual stocks, an analysis that is unsupported and on its face does not make sense. Further, although Dr. Feinstein claims that corporate bonds "differ markedly" from stocks and that bonds have "various distinguishing features,"[150] he provides no support or explanation why it is appropriate to compare the par value of even one of the SMR Notes to the market capitalization of individual stocks.

---

[147] Based on a search for data on short selling of the SMR Notes on Bloomberg, L.P. and FactSet Research Systems, Inc., as well as conversations with Bloomberg, L.P.

[148] Feinstein Report, ¶¶124-128.

[149] Feinstein Report, ¶124.

[150] The court in *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation* criticized Plaintiffs' expert for comparing the par value of bonds to companies' market capitalizations, stating that was an "apples-to-oranges comparison." See, Report and Recommendation to the Honorable Ronnie Abrams, *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, 17-CV-916 (RA) (BCM) (S.D.N.Y. March 18, 2021), p. 34.

CONFIDENTIAL

**VI.    ANALYSIS OF THE FEINSTEIN REPORT'S PROPOSED COMMON DAMAGES METHODOLOGY**

A.    **Dr. Feinstein's common damages methodology cannot measure damages consistent with Plaintiffs' risk materialization theory of liability**

71.    Plaintiffs' theory of liability in this case is based on their claims that the Notes were inflated during the alleged Class Period because Defendants misrepresented the likelihood that the ADS Acquisition would be completed by July 14, 2020. In particular, Plaintiffs claim that Defendants concealed from investors the truth regarding the DOJ's antitrust review of the ADS Acquisition and the resulting renegotiation of the transaction, including "the increasing likelihood that [the SMR] would be triggered by a failure to complete the ADS acquisition by the End Date," which "threatened to – and ultimately did – delay completion of the transaction, causing significant damage to Notes investors."[151] Plaintiffs claim that the "decline in the prices of the Notes after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market."[152] Thus, Plaintiffs are claiming that Defendants were concealing or understating the risk or "likelihood" that the ADS Acquisition would be completed by July 14, 2020 and that the information that was allegedly revealed in the alleged corrective disclosures is the *materialization* of those allegedly concealed or understated risks.

72.    In general, when an alleged corrective disclosure represents a materialization of an understated risk, the price decline at the alleged corrective disclosure (*i.e.*, at the "back end") would not be expected to equate to the price decline that would have occurred had the true degree of the understated risk been disclosed earlier (*i.e.*, at the "front end"). In general, the "back-end" price decline upon the materialization of the risk would be bigger than the decline at the "front end" if the true risk had been disclosed. The "back-end" price decline is a measure of the price reaction to a 100% change of the risk materializing, while the inflation at the time of the alleged misrepresentations should be based on the undisclosed risk, which would be less than 100%.

---

[151]  Amended Complaint, ¶¶2-13, 55.

[152]  Amended Complaint, ¶111.

41

**CONFIDENTIAL**

73.    To illustrate this principle, Judge Ellison in a prior securities class action referenced a "simplified example:"

> "Imagine that a company announced that it was going to draw a marble from an urn of 100 marbles, of which 99 were black and one was red. If the company drew a red marble, it would have to pay $1 million. Prior to finding out the outcome, the company's market value would reflect the expected loss from this lottery of 1% of $1 million, or $10,000. If the company subsequently drew a red marble, the market value would have fallen $990,000 to reflect the new information-the certainty of a $1 million loss. If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble), the share price would still have fallen when the company drew a red marble. In order to understand the value implication of the company's misstatement that [there] were was only one red marble, the relevant issue is what the market value would have been, prior to the drawing, had the company told the truth. In this case, the market value would have reflected an expected loss of $20,000, only $10,000 lower than the actual market value, not the $990,000 less that would be implied by looking at the reaction to the drawing of a red marble." (*In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 n.10 (S.D. Tex. May 20, 2014).)

74.    Thus, in such an alleged concealed risk scenario, measuring inflation by using the "back end" once a risk materializes, like what Dr. Feinstein's proposes, would generally *overstate* any alleged inflation. To address damages from a claim about concealed risks, a damages methodology needs to be able to separate the impact of the allegedly concealed risk (if any) from the impact of the materialization of that risk.

75.    In other words, since Plaintiffs' theory of liability in this case is based on an alleged concealment of risks, an observed "back-end" loss cannot equate or be the measurement of inflation or damages to shareholders stemming from the alleged misrepresentations of concealment of a risk.[153] Instead, given that Plaintiffs' theory of liability is based on allegedly concealing risks, calculating inflation would require measuring the difference in price at all times during the alleged Class Period of 1) what the price would have been if the actual risk was

---

[153]  As Judge Ellison noted in the *BP* case, "when [a] corrective event is the materialization of an understated risk, the stock price movement on the date of correction (i.e., on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent. If the probability is less than 100 percent, the stock price correction after the risk materializes will be larger than the pre-materialization inflation." (*In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 n.10 (S.D. Tex. May 20, 2014).)

42

**CONFIDENTIAL**

known at every point in time, and 2) what risk did the market actually think existed at every point in time.[154]

76.     Plaintiffs have not explained how they would calculate damages under a materialization of risk theory. As described by Dr. Feinstein, his methodology is merely that "out-of-pocket damages are measured as the difference between the amount of the security price inflation at purchase and the amount of inflation in the security price at sale or, if held, at the end of the Class Period[.]"[155] But this leaves open the critical question: how will Plaintiffs measure the "security price inflation at purchase?"  To do that consistent with Plaintiffs' theory of liability based on alleged concealment of risks, Plaintiffs must show that they have a model capable of measuring the actual likelihood that the risk would materialize on each date of the alleged Class Period and the likelihood of the risk materializing implied by the alleged misstatements disclosed to market participants on each date of the alleged Class Period.

77.     Neither Plaintiffs nor Dr. Feinstein have shown a method capable of doing this. While Dr. Feinstein makes a vague reference to using "standard tools of valuation analysis" as part of his method of measuring inflation, he has not specified how he would use any of these tools to measure the "true" risk (if it was concealed), or the degree to which the risk was underestimated by the market over time, or how it would be capable of converting these estimates into a measure of inflation in the Notes' prices.[156] Instead, Dr. Feinstein appears to be implicitly saying that he will figure it out sometime later. There is, however, no evidence that he will be able to do so. It is my understanding that at this stage of the case, Plaintiffs need to show an actual common damages methodology that would work with the specifics of the case and not just make a general claim that damages can be estimated on a class-wide basis.

78.     Moreover, measuring the alleged inflation is particularly problematic in this case because throughout the alleged Class Period, market evidence indicates there was a changing

---

[154]  Plaintiffs would then need to discount the full value of the "back-end" event by the difference between the "true" risk and the risk as known to market participants. For example, in Judge Ellison's example, once the true risk (2%) and the disclosed risk were calculated (1%), the difference between them (1%) was used to discount the full value of the back-end loss ($1,000,000) to generate the $10,000 damages figure. (*In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 n.10 (S.D. Tex. May 20, 2014).)

[155]  Feinstein Report, ¶214.

[156]  Feinstein Report, ¶215.

**CONFIDENTIAL**

understanding of the risks associated with the timing of the ADS Acquisition. For example, as discussed above, on March 18, 2020, the Company announced that it anticipated closing the ADS Acquisition in 2Q20, instead of 1Q20, due to the COVID-19 outbreak.[157] Analysts at Bank of America commented that ADS's stock price on March 18, 2020 was "the lowest since the deal was announced" and that merger arbitrage investors were "circling," indicating that there was increased deal risk.[158] As another example, analysts at RBC noted in April 2020 that "[d]eal timing uncertainty and COVID-19 introduce new deal risk."[159]

79.     Investors such as merger arbitrageurs attempt to profit from the dynamics of a merger/acquisition deal. In particular, merger arbitrageurs often try to profit from the arbitrage spread of a deal, *i.e.*, the difference between the current stock price of the target company and the offer price.[160] (In simpler terms, what the arbitrage spread measures is how different the target company's price is from the cash a target company shareholder would receive if the deal goes through.) For example, in a cash deal, such as the ADS Acquisition, if the stock price of the target company is below the offer price, a merger arbitrage investor that believed the deal would go through would buy the stock of the target. If the deal goes through, the investor would get the difference between the price at which he bought the stock and the offer price. Thus, the merger arbitrage spread can suggest the likelihood of a deal going through or not (a higher arbitrage spread would suggest a lower likelihood of the deal going through).[161] The chart below shows the arbitrage spread of the ADS Acquisition (blue line), the stock price of ADS (green line), and Waste Management's initial and revised offer prices for ADS (dotted line).[162] As shown in the chart and consistent with analyst commentary, the arbitrage spread fluctuated substantially during the alleged Class Period, implying that the probability that the ADS Acquisition would be

---

[157] Amended Complaint, ¶63.

[158] Bank of America analyst report on Waste Management, dated March 18, 2020, p. 1.

[159] RBC analyst report on Waste Management, dated April 9, 2020, p. 1.

[160] See, for example, Mitchell, Mark, and Todd Pulvino, "Characteristics of Risk and Return in Risk Arbitrage," *The Journal of Finance*, 56(6): December 2001, p. 2135.

[161] See, for example, Mitchell, Mark, and Todd Pulvino, "Characteristics of Risk and Return in Risk Arbitrage," *The Journal of Finance*, 56(6): December 2001, p. 2135.

[162] Note the arbitrage spread in the chart is based on the ADS Acquisition going through at the stated terms, not on the specifics of the dates that matter to the SMR Notes.

**CONFIDENTIAL**

completed at the initial offer price, or whether it would be completed at all, changed throughout the alleged Class Period.



**ADS Acquisition Arbitrage Spread, Acqusition Terms, and ADSW Stock Price**

Notes and Sources:
Data from Bloomberg L.P. and Waste Management's SEC Filings. Arbitrage spread calculated as (offer price minus ADSW price)/(ADSW price).

**B.** **Dr. Feinstein proposes a common damages methodology that is inappropriate given Plaintiffs' claims that the SMR Notes would have been redeemed**

80.     To the extent that Plaintiffs (and Dr. Feinstein) claim that they are not asserting a materialization of risk theory, and instead asserting that Waste Management knew throughout the alleged Class Period that the deal would not close by July 14, 2020, and the special mandatory redemption would be triggered, then Dr. Feinstein's damages methodology is still inappropriate given Plaintiffs' claims in this case and the particular features of the SMR Notes. Dr. Feinstein's damages methodology is based on the premise that "[a]rtificial inflation is the difference between the observed market price of a security and what that security price would have been but for the fraud."[163] The issue here is that, if Plaintiffs assert that Waste Management should have

---

[163]  Feinstein Report, ¶213.

45

**CONFIDENTIAL**

disclosed that the SMR Notes would be redeemed at the beginning of the alleged Class Period, then, but for the fraud, the SMR Notes would have been redeemed and thus would not have existed.[164] This is very different than in a typical securities class action.

81.    The overall structure of Dr. Feinstein's damages methodology could make sense in a traditional 10b-5 case involving a stock price that is allegedly inflated and where one could estimate the price at which plaintiffs would have purchased the stock had the truth been known. In other words, in a traditional 10b-5 case, in the but-for world, plaintiffs still would have purchased the stock but for the fraud but would have done so at uninflated prices. According to this typical case, then inflation would be the difference between the price the plaintiffs actually paid and the price they would have paid had the truth been known (the "uninflated" price).

82.    However, if Plaintiffs claim that Waste Management knew from the beginning of the alleged Class Period that the ADS Acquisition would not be completed by July 14, 2020, then, if the truth had been known at the beginning of the alleged Class Period, the special mandatory redemption of the SMR Notes would have been triggered, the SMR Notes would have been redeemed at $101, and the Notes would have ceased to exist.[165] Thus, Plaintiffs would not have been able to purchase the SMR Notes during the alleged class period at "uninflated" prices. In this but-for world, Dr. Feinstein's methodology becomes nonsensical because it is impossible to estimate the price of the SMR Notes had the truth been known since the Notes would have been redeemed and ceased to exist.

83.    According to the SMR Notes' Prospectus Supplement, "[u]pon the occurrence of a Special Mandatory Redemption Event, all of the outstanding 2024 notes, 2026 notes, 2029 notes and 2039 notes will be redeemed in whole at a special mandatory redemption price […] equal to 101% of the aggregate principal amount of such notes, plus accrued but unpaid interest on the principal amount of such notes."[166] A Special Mandatory Redemption Event includes the

---

[164] See, for example, Amended Complaint, ¶¶5, 12, 13.

[165] To the extent that Plaintiffs are claiming that there was an "increasing likelihood" throughout the alleged Class Period that the special mandatory redemption feature of the SMR Notes would be triggered rather than the special mandatory feature should have been triggered at the beginning of the alleged Class Period, Dr. Feinstein's common damages methodology cannot measure damages consistent with this risk materialization theory of liability. See Section VI.A. above.

[166] Waste Management Prospectus Supplement, filed May 16, 2019, S-19.

**CONFIDENTIAL**

deal not being completed by July 14, 2020.[167] According to the SMR Notes' Prospectus Supplement, Waste Management needs to notify noteholders of a Special Mandatory Redemption Event "promptly" and the mandatory redemption then needs to be completed "no later than 30 days" after notice to the noteholders of the Special Mandatory Redemption Event.[168] In short, according to the SMR Notes' Prospectus, the SMR Notes must be redeemed no later than 30 days after Waste Management notifies noteholders of a Special Mandatory Redemption Event.

84.    If Plaintiffs claim that Waste Management should have disclosed at the beginning of the alleged Class Period that the deal would not be completed by July 14, 2020, then that would have triggered a "Special Mandatory Redemption Event," requiring Waste Management to provide "prompt" notice and then to redeem the SMR Notes no later than 30 days after doing so.[169] Thus, to the extent that Plaintiffs are not asserting a risk materialization theory, then Plaintiffs' claim is that but for the alleged fraud, Waste Management would have redeemed the SMR Notes, at the latest, soon after the beginning of the alleged Class Period (within 30 days after giving prompt notice to noteholders), which means the SMR Notes would have ceased to exist and could not have bene purchased for most of the alleged Class Period.[170] Importantly, this is a situation that has no equivalent in a typical 10b-5 class action, and Dr. Feinstein's damages methodology does not account for these unique circumstances.

---

[167]  Waste Management Prospectus Supplement, filed May 16, 2019, S-19.

[168]  Waste Management Prospectus Supplement, filed May 16, 2019, S-20.

[169]  Waste Management Prospectus Supplement, filed May 16, 2019, S-19.

[170]  Given Plaintiffs' claims, determining the but-for world would require an individualized analysis. In Plaintiffs' but-for world, the SMR Notes would have ceased to exist, and proposed class members would have had to invest their money somewhere else. For example, some Plaintiffs might have looked for alternative bond investments with the same maturity and coupon, others would have looked for alternative investments that provided similar diversification, and others might have looked for other event-driven investments or merger arbitrage opportunities. Dr. Feinstein's methodology fails to address any of these issues.

47

**CONFIDENTIAL**

**VII.    THERE IS NO RELIABLE LINK BETWEEN THE ALLEGED MISREPRESENTATIONS AND THE PRICE MOVEMENTS OF THE SMR NOTES**

**A.    An analysis of the price reactions at the time of the alleged misrepresentations shows no statistically significant price increase from any of the alleged misrepresentations**

85.    It is my understanding that Plaintiffs are not claiming that the alleged misrepresentations caused an increase in the price of the SMR Notes when made. However, Plaintiffs claim that new information about the ADS Acquisition came out at the alleged misrepresentations and that analysts and market participants were actively asking about the timing of the ADS Acquisition at the alleged misrepresentations.[171] Therefore, to be thorough, as part of my price impact analysis, I analyzed the price reactions following the alleged misrepresentations, and found no evidence of a price reaction to the alleged misrepresentations when made.

86.    Plaintiffs claim that new information about the ADS Acquisition came out at the alleged misrepresentations.[172] For example, Plaintiffs claim that Waste Management's update about the anticipated timing of the deal announced on May 6, 2020 were alleged misstatements. In particular, Plaintiffs claim that Waste Management's announcement in its 1Q20 10-Q that the Company "anticipate[d] being in a position to receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020" was an alleged misstatement.[173] On the same day, Waste Management held a conference call where analysts asked about the timing of the deal. Plaintiffs claim that Waste Management's statements that they "expected the merger to close 'by the end of the second quarter or subsequent to that'" was also an alleged misstatement.[174] According to Plaintiffs, Waste Management's announcements on May 6, 2020 provided an update on the timing of the deal relative to the Company's March 18, 2020 announcement that deal was expected to close "mid to late second quarter 2020."[175] In other words, the May 6 announcement indicated that deal was expected to close later than what

---

[171]  Amended Complaint, ¶60.

[172]  Amended Complaint, ¶60.

[173]  Amended Complaint, ¶68.

[174]  Amended Complaint, ¶¶72-73.

[175]  Amended Complaint, ¶¶72-74.

**CONFIDENTIAL**

the Company had announced on March 18, and that the deal would close very close to the July 14, 2020 closing date required for the special mandatory redemption of the SMR Notes to not be triggered. Thus, according to Plaintiffs, the May 6, 2020 alleged misstatement provided new information about the timing of the deal, which according to Plaintiffs' theory would be relevant to the SMR Note investors. However, according to Dr. Feinstein's event study and the alternative event study, none of the SMR Notes had statistically significant price movements on May 6, 2020.[176]

87.    The table below shows the price reactions to all of Plaintiffs' alleged misrepresentations using Dr. Feinstein's event study and the alternative event study.[177] As the table shows, there were no statistically significant price increases to any of the alleged misrepresentations according to either Dr. Feinstein's event study or the alternative event study. The only exception is the March 18, 2020 alleged misrepresentation, when two of the four SMR Notes had statistically significant price increases. However, according to the Amended Complaint, March 18, 2020 was also a partial alleged corrective disclosure that cause "the prices of the [SMR] Notes [to fall] significantly."[178] Thus, a price increase on March 18, 2020 is contrary to Plaintiffs' pleaded theory and, as discussed below, the price reactions of the SMR Notes on March 18, 2020 are inconsistent with each other and inconsistent with Plaintiffs' allegations and thus sever the link between the alleged misrepresentations and the price movements of the SMR Notes.

---

[176]  Feinstein Report, Exhibits 12a-12d.

[177]  See Appendix G for more detail.

[178]  Amended Complaint, ¶66.

**CONFIDENTIAL**

---

**Feinstein Event Study and Alternative Event Study**
**Price Reactions to Alleged Misrepresentations**

| Reaction Date | Statistically Significant Increase According to Feinstein Event Study / Alternative Event Study?[1] | | | |
|---|---|---|---|---|
| | 2.95% Note | 3.20% Note | 3.45% Note | 4.00% Note |
| (1) | (2) | (3) | (4) | (5) |
| 2/13/20 | No / No | No / No | No / No | n/a / n/a [2] |
| 3/18/20 | Yes / Yes | No / No | No / No | Yes / Yes [3] |
| 5/6/20 | No / No | No / No | No / No | No / No |
| 5/22/20 | No / No | No / No | No / No | No / No |
| 6/10/20 | No / No | No / No | No / No | No / No |

**Notes and Sources:**

Data from Bloomberg, L.P. and Feinstein Report, Exhibits 10a-10d, and Exhibits 12a-12d.

[1] Significance is based on the price reaction's t-statistic, calculated as the price reaction divided by the standard error of the regression over the control period. "Yes" indicates significance at the 5% level.

[2] The 4.00% Note did not trade on February 13 or February 14, 2020.

[3] Price reaction calculated from March 16 to March 18, 2020. The t-statistic is calculated as a 2-day cumulative reaction.

---

**B.  An analysis of the alleged corrective disclosures shows no reliable link between the alleged misrepresentations and price movements of the SMR Notes**

88.  An analysis of the price reactions of the SMR Notes to the alleged corrective disclosures shows no reliable link between the alleged misrepresentations and price movements and thus no price impact from the alleged misrepresentations. The price reactions of the SMR Notes to the March 18, 2020 alleged corrective disclosure are inconsistent with each other and inconsistent with Plaintiffs' allegations and thus sever the link between the alleged misrepresentations and the price movements of the SMR Notes.

89.  Plaintiffs claim that Waste Management's statement on February 13, 2020 that the "Company anticipated it would obtain antitrust regulatory approval [for the ADS Acquisition] by the end of March 2020 and close the ADS transaction soon thereafter" was an alleged

misstatement.[179] Plaintiffs further claim that this alleged misstatement was corrected on March 18, 2020 and that this alleged corrective disclosure caused "the prices of the Notes to decline significantly."[180] In particular, Plaintiffs claim that on March 18, 2020, the Company provided an update of its "'prior timing expectations,' announcing that 'the Company now anticipates closing the [ADS Acquisition] mid to late second quarter 2020," rather than by the end of the first quarter 2020.[181]

90.     However, the price reactions of the SMR Notes to the March 18, 2020 alleged corrective disclosure are inconsistent with each other and inconsistent with Plaintiffs' allegations and thus sever the link between the alleged misrepresentations and the price movements of the SMR Notes and show no price impact from the February 13, 2020 alleged misrepresentation. According to Dr. Feinstein's event study, the SMR Notes did not move consistently with Plaintiffs' allegations on March 18, 2020. As discussed above, according to Dr. Feinstein's event study, two of the SMR Notes had a statistically significant *positive* reaction, another a statistically significant *negative* reaction, and the other one had positive but not statistically significant reactions.[182] The results are similar using the alternative event study.[183]

91.     Plaintiffs claim that the "truth" regarding the alleged fraud was fully revealed on the June 24, 2020 alleged corrective disclosure date, when the Company disclosed "a revised agreement to acquire ADS" and that the "Company would trigger the SMR requiring a mandatory redemption [of the SMR Notes] at 101% of par."[184] However, as discussed above, the 4% SMR Note did not have a statistically significant price decline on June 24, 2020. In particular, Dr. Feinstein's event study using closing prices instead of VWAPs and the alternative event study show that the price reaction on June 24, 2020 for the 4% Note was not statistically significant.

---

[179] Amended Complaint, ¶51.

[180] Amended Complaint, ¶110.

[181] Amended Complaint, ¶63.

[182] Feinstein Report, Exhibits 12a-12d and Sections V.C and VII. A above.

[183] Sections V.C and VII. A above.

[184] Amended Complaint, ¶79.

**CONFIDENTIAL**

## VIII. THERE WERE NUMEROUS FOREIGN INSTITUTIONS THAT HELD THE SMR NOTES DURING THE ALLEGED CLASS PERIOD

92.     I was asked to analyze whether foreign institutions held the SMR Notes during the alleged Class Period. Data from Bloomberg shows that 65 of the 361 institutions (or 18% of institutions) that held the SMR Notes during the quarters around the alleged Class Period (4Q19, 1Q20, and 2Q20) were foreign institutions.[185] Appendix H shows a detailed list of the US and foreign institutions that held the SMR Notes around the alleged Class Period.

_____

Lucy P. Allen

---

[185] Based on the institutions' headquarters using data from Bloomberg L.P., SEC filings, company websites, and company profiles from LinkedIn Corp.



**Lucy P. Allen**
Senior Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# Appendix A

## LUCY P. ALLEN
## SENIOR MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

**1994-Present**   **National Economic Research Associates, Inc.**
Senior Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
Managing Director (2016-2023).
Senior Vice President (2003-2016).
Vice President (1999-2003).
Senior Consultant (1994-1999).

**1992-1993**   **Council of Economic Advisers, Executive Office of the President**
Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force.

**1986-1988**   **Ayers, Whitmore & Company (General Management Consultants)**
**1983-1984**   Senior Associate. Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.

Lucy P. Allen

Diagnostic survey for auto parts manufacturer on growth obstacles. Marketing plan to increase international market share for major accounting firm.

Summer 1985        **WNET/Channel Thirteen, Strategic Planning Department**
Associate.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983          **Arthur Andersen & Company**
Consultant.  Designed, programmed and installed management information systems.   Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).   Designed customized tracking and accounting system for shipping company.

## Teaching
1989- 1992         **Teaching Fellow, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

2

Lucy P. Allen

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

"Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

"Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

3

Lucy P. Allen

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Testimony (4 years)

Deposition Testimony in private arbitration proceeding, *HBC US Holdings, LLC v. National Fire & Marine Insurance Company,* 2024.

Deposition Testimony before the United States District Court for the Southern District of Texas, Houston Division, in *In re Concho Resources Inc., Securities Litigation,* 2024.

Testimony before the District Court of Vermont, in *Vermont Federation of Sportsmen's Clubs et al. v. Matthew Birmingham, et al.*, 2024.

Testimony before the United States District Court for the Central District of California in *In re Prime Healthcare ERISA Litigation,* 2024.

Deposition Testimony before the Superior Court of the State of Delaware in *Janco FS 2, LLC et al. v. ISS Facility Services, Inc.,* 2024.

Deposition Testimony before the 139th Judicial District Court of Hidalgo County, Texas in *Doctors Hospital at Renaissance, Ltd. v. Employers Insurance Company of Wausau et al.,* 2024.

Deposition Testimony before the Superior Court of Fulton County, Georgia in *Corvex Master Fund LP et al. v. Mohawk Industries, Inc., et al., Value Recapture Partners LLC v. Mohawk Industries, Inc., et al., Incline Global Master LP et al. v. Mohawk Industries, Inc., et al., and Soroban Opportunities Master Fund LP v. Mohawk Industries, Inc., et al.,* 2024.

Deposition Testimony before the United States District Court for the Eastern District of Tennessee at Chattanooga in *City of Taylor General Employees Retirement System v. Astec Industries, Inc. and Benjamin G. Brock,* 2024.

Deposition Testimony before the United States District Court, Eastern District of Arkansas, in *Robert Murray v. EarthLink Holdings Corp., et al.,* 2023.

Deposition Testimony before the District Court of Harris County, Texas in *Houston Livestock Show and Rodeo, Inc. v. Hallmark Financial Services, Inc. D/B/A Hallmark Specialty Insurance Company, et al.,* 2023.

4

Lucy P. Allen

Testimony and Deposition before the United States District Court for the Southern District of Texas in *In re Apache Corp. Securities Litigation,* 2023.

Deposition Testimony before the United States District Court for the Central District of California in *In re Prime Healthcare ERISA Litigation,* 2023.

Deposition Testimony before the United States District Court for the Southern District of Texas in *Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation, et al.,* 2023.

Testimony and Deposition before the United States District Court for the District of Oregon in *Oregon Firearms Federation, Inc. et al. v. Tina Kotek et al.*, 2023.

Testimony and Depositions before the United States District Court for the Southern District of Texas, Houston Division in *Miriam Edwards, et al. v. McDermott International, Inc., et al.,* 2023.

Deposition Testimony before the District Court of Harris County, Texas in *Boxer Property Management Corp. et al. v. Illinois Union Ins. Co. et al.*, 2022.

Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2022.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

5

Lucy P. Allen

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *Miller et al. v. Becerra et al.*, 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

6

CONFIDENTIAL

## Appendix B – Materials Considered

**Case documents and filings in this matter**

1.  Complaint for Violations of the Federal Securities Laws, filed June 9, 2022
2.  Amended Complaint for Violations of the Federal Securities Laws, filed January 17, 2023
3.  Opinion and Order, filed March 27, 2024
4.  Report on Market Efficiency and Damages Methodology of Steven P. Feinstein, dated June 14, 2024, materials considered and turned over
5.  Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed June 14, 2024
6.  Declaration of David A. Rosenfeld in Support of Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel and Exhibit C, filed August 8, 2022

**Data from Bloomberg, L.P., and FactSet Research Systems, Inc.**

1.  Price and trading volume for SMR Notes
2.  Institutional holdings of SMR Notes
3.  Price and trading volume for Waste Management
4.  Price and trading volume for Advanced Disposal
5.  Price and total return data for the S&P E&F Services Index and S&P Corporate Bond Index
6.  Weights for Waste Management in the S&P E&F Services Index
7.  Bid and ask estimates for SMR Notes
8.  Data on U.S. dollar denominated U.S. corporate bonds

**Academic literature and textbooks on finance, securities, valuation, and statistics**

1.  Alexander, Janet C., "The Value of Bad News in Securities Class Actions," *UCLA Law Review*, 41: 1994
2.  Bao, Jack, Maureen O'Hara, and Xing Zhou, "The Volcker Rule and corporate bond market making in times of stress," *Journal of Financial Economics* 130: 2018
3.  Bhagat, Sanjai, and Roberta Romano, "Event studies and the Law: Part I: Technique and Corporate Litigation," *American Law and Economics Review* 4(1): 2002
4.  Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 10th ed., 2014)
5.  Bowman, Robert G., "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting* 10(4): 1983
6.  De Franco, Gus, Florin P. Vasvari, and Regina Wittenberg-Moerman, "The Informational Role of Bond Analysts," *Journal of Accounting Research* 47(5): 2009
7.  Dunbar, Frederick C., and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001)
8.  Elsas, Ralf and Daniela S. Schoch, "Robust inference in single firm/single event analyses," *Journal of Corporate Finance*, March 6, 2023
9.  Ferrillo, Paul A., Frederick C. Dunbar, and David I. Tabak, "The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. Johns Law Review* 78: 2004)

1

CONFIDENTIAL

# Appendix B – Materials Considered

10. Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38: 1982

11. Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: Federal Judicial)

12. Freedman, David A., Robert Pisani, and Roger Purves, *Statistics* (W. W. Norton & Company, Inc.: New York, 4th ed., 2007)

13. Green, Michael D., D. Michal Freedman, and Leon Gordis, "Reference Guide on Epidemiology," *Reference Manual on Scientific Evidence* (Washington, D.C.: Federal Judicial Center, 3rd ed., 2011)

14. Hendershott, Terrence, Dan Li, Dmitry Livdan, and Norman Schürhoff, "Relationship trading in over-the-counter markets," *The Journal of Finance* 75(2): 2020

15. Hendrik Bessembinder, et al., "Capital Commitment and Illiquidity in Corporate Bonds," *The Journal of Finance* 73(4): 2008

16. Hogg, Robert V., and Elliot A. Tanis, *Probability and Statistical Inference*, (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997)

17. MacKinlay, Craig A., "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997

18. Mitchell, Mark and Todd Pulvino, "Characteristics of Risk and Return in Risk Arbitrage," *The Journal of Finance* 56(6): December 2001

19. Rosenberg, Barr, and Andrew Rudd, "Factor-related and specific returns of common stocks: Serial correlation and market inefficiency," *The Journal of Finance 37*(2): 1982

20. Stock, James H. and Mark W. Watson, *Introduction to Econometrics* (Pearson Education, Inc., Boston, MA, 2003)

21. Tabak, David, "p-Hacking and Event Studies in Securities Litigation," *NERA Economic Consulting*, 2023

22. Zwirn, Daniel, Jim Kyung-Soo Liew, and Ahmad Ajakh, "This Time Is Different, but It Will End the Same Way: Unrecognized Secular Changes in the Bond Market Since the 2008 Crisis That May Precipitate the Next Crisis," *The Journal of Fixed Income* 29(2): 2019

**Analyst reports on Waste Management**

1. 2020.02.13 - Bank of America
2. 2020.02.13 - BMO (1)
3. 2020.02.13 - BMO (2)
4. 2020.02.13 - CFRA
5. 2020.02.13 - CIBC (1)
6. 2020.02.13 - CIBC (2)
7. 2020.02.13 - Deutsche Bank
8. 2020.02.13 - JPMorgan
9. 2020.02.13 - Morningstar (1)
10. 2020.02.13 - Morningstar (2)
11. 2020.02.13 - RBC (1)
12. 2020.02.13 - RBC (2)
13. 2020.02.13 - Scotiabank
14. 2020.02.13 - UBS
15. 2020.02.14 - Argus

CONFIDENTIAL

# Appendix B – Materials Considered

16.  2020.02.14 - Jefferies
17.  2020.02.14 - Oppenheimer
18.  2020.02.18 - JPMorgan
19.  2020.02.20 - Bank of America
20.  2020.02.21 - RBC
21.  2020.02.28 - Oppenheimer
22.  2020.03.04 - SADIF
23.  2020.03.09 - CIBC
24.  2020.03.10 - Zacks
25.  2020.03.18 - Bank of America
26.  2020.03.23 - CFRA
27.  2020.03.25 - Scotiabank
28.  2020.03.30 - JPMorgan
29.  2020.03.30 - Morningstar
30.  2020.03.31 - BMO
31.  2020.04.01 - BMO
32.  2020.04.01 - SADIF
33.  2020.04.02 - CIBC
34.  2020.04.07 - PriceTarget Research
35.  2020.04.09 - RBC (1)
36.  2020.04.09 - RBC (2)
37.  2020.04.13 - Zacks
38.  2020.04.14 - Jefferies
39.  2020.04.21 - WM - JPMorgan
40.  2020.04.23 - WM - Jefferies
41.  2020.04.27 - Oppenheimer
42.  2020.04.28 - Morningstar
43.  2020.05.04 - Deutsche Bank
44.  2020.05.06 - Bank of America
45.  2020.05.06 - BMO
46.  2020.05.06 - CIBC (1)
47.  2020.05.06 - CIBC (2)
48.  2020.05.06 - Deutsche Bank
49.  2020.05.06 - Jefferies
50.  2020.05.06 - JPMorgan
51.  2020.05.06 - RBC (1)
52.  2020.05.06 - RBC (2)
53.  2020.05.06 - Scotiabank
54.  2020.05.06 - UBS
55.  2020.05.07 - Bank of America
56.  2020.05.07 - BMO
57.  2020.05.07 - CFRA
58.  2020.05.07 - Morningstar
59.  2020.05.07 - Oppenheimer
60.  2020.05.08 - Jefferies
61.  2020.05.08 - JPMorgan

CONFIDENTIAL

## Appendix B – Materials Considered

62. 2020.05.10 - Deutsche Bank
63. 2020.05.10 - Jefferies
64. 2020.05.15 - Argus
65. 2020.05.15 - BMO
66. 2020.05.15 - Zacks
67. 2020.06.09 - Zacks
68. 2020.06.11 - CFRA
69. 2020.06.11 - Morningstar
70. 2020.06.11 - SADIF
71. 2020.06.23 - Jefferies
72. 2020.06.24 - Bank of America
73. 2020.06.24 - BMO
74. 2020.06.24 - Deutsche Bank (1)
75. 2020.06.24 - Deutsche Bank (2)
76. 2020.06.24 - RBC
77. 2020.06.24 - Scotiabank
78. 2020.06.24 - UBS
79. 2020.06.25 - BMO
80. 2020.06.25 - Jefferies

**Analyst Reports on Advanced Disposal**

1. 2020.02.20 - Morgan Stanley
2. 2020.02.20 - Oppenheimer
3. 2020.02.21 - UBS
4. 2020.05.07 - UBS
5. 2020.05.08 - Oppenheimer
6. 2020.05.20 - Morgan Stanley
7. 2020.06.24 - Morgan Stanley

**Reports from credit rating agencies on Waste Management**

1. 2020.04.08 - Fitch Report
2. 2020.06.01 - Moody's Peer Snapshot Report

**SEC filings on Waste Management from 2019 to 2021, including**

1. Form 8-K, filed April 15, 2019
2. Prospectus Supplement, filed May 16, 2019
3. FY19 Form 10-K, filed February 13, 2020
4. Form 8-K, filed June 24, 2020
5. Form 8-K, filed July 15, 2020
6. FY20 Form 10-K, filed February 22, 2021

**Presentations and conference calls from Waste Management from 2019 to 2021, including**

1. Q4 2019 Earnings Call, dated February 13, 2020

CONFIDENTIAL

## Appendix B – Materials Considered

2. Q1 2020 Earnings Call, dated May 6, 2020
3. Stifel Cross Sector Insight Conference, dated June 10, 2020


**News stories on Waste Management and Advanced Disposal from Bloomberg, L.P., FactSet Research Systems, Inc., and Google**

**Expert Reports of Steven P. Feinstein over past 10 years, including**

1. Report on Market Efficiency of Steven P. Feinstein in *In Re: Petrobras Securities Litigation*, dated October 15, 2015
2. Report on Market Efficiency of Steven P. Feinstein in *In Re American Realty Capital Properties Inc. Litigation*, dated March 15, 2017
3. Report on Market Efficiency of Steven P. Feinstein in *Levin v. Resource Capital Corp. et al.*, dated March 15, 2017
4. Report on Market Efficiency of Steven P. Feinstein in *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.,* dated June 7, 2017
5. Report on Market Efficiency of Steven P. Feinstein in *In Re: Eletrobras Securities Litigation*, dated June 30, 2017
6. Expert Report of Steven P. Feinstein in *In re SolarWinds Securities Litigation*, dated September 30, 2022
7. Expert Report of Steven P. Feinstein in *In Re Aegean Marine Petroleum Network, Inc. Securities Litigation*, dated December 7, 2022


**Complaints and court decisions in other matters, including**

1. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988)
2. *Cammer v. Bloom*, 711 F. Supp. (D.N.J. 1989)
3. *In re 2TheMart.Com, Inc. Sec. Litig.*, 114 F.Supp.2d (C.D. Cal. 2000)
4. *In re Safety-Kleen Corp. Bondholders Litig.*, No. 3:00-1145-17, 2004 WL 3115870 (D.S.C. Nov. 1, 2004)
5. *In re PolyMedica Corp. Sec. Lit.*, 453 F. Supp. 2d 260 (D. Mass. 2006)
6. Opinion and Order in *Bombardier*, No. 05 Civ. 1898 (SAS) (S.D.N.Y. August 1, 2006)
7. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008)
8. Decision by Barrington D. Parker, Circuit Judge in *Bombardier*, No. 06-3794-cv (2nd Cir. October 14, 2008)
9. *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 663 (N.D. Ala. 2009)
10. Order and Opinion Granting in Part and Denying in Part Plaintiffs' Motion to Certify Class and Denying Motion to Strike in *Paul Lumen, et. al. v. Paul G. Anderson, et. al.*, No. 08-0514-CV-W-HFS (W.D. Mo. February 10, 2012)
11. Class Action Complaint, *William Dean v. City of Monticello, Minnesota*, No. 0:2014cv00376, (D.Minn. February 12, 2014)
12. *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, (S.D. Tex. May 20, 2014)
13. Decision and Order in *McIntire v. China MediaExpress Holdings, Inc.*, No. 1:11-cv-00804-VM-GWG (S.D.N.Y. August 15, 2014)
14. *In re Nii Holdings, Inc.*, 311 F.R.D. 401 (E.D. Va. 2015).

5

CONFIDENTIAL

## Appendix B – Materials Considered

15. *Loritz v. Exide Techs.*, 2015 WL 6790247 (C.D. Cal. July 21, 2015)
16. *In re Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016)
17. Memorandum of Opinion and Order, *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.*, No. 4:08CV0160, (N.D. Ohio August 14, 2018)
18. *In re Vale 2019* WL 11032303
19. Report and Recommendation to the Honorable Ronnie Abrams, *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, 17-CV-916 (RA) (BCM), (S.D.N.Y. March 18, 2021).

**Data on the headquarters of institutional investors of the SMR Notes from Bloomberg L.P., SEC filings, company websites, and company profiles from LinkedIn Corp.**

**Miscellaneous**

1. "Bond ratings," *Fidelity*, accessed at: https://www.fidelity.com/learning-center/investment-products/fixed-income-bonds/bond-ratings
2. "Dow Jones Today, Bear Market Worsens On Trump Response To Coronavirus Pandemic; Boeing Shares Collapse," *Investor's Business Daily*, March 12, 2020
3. "How does this bear market compare," *USA Today*, March 18, 2020
4. "OTC (Over-the-Counter) Markets and Securities," *Charles Schwab*, accessed at: https://www.schwab.com/stocks/understand-stocks/otc-stock
5. "Market Maker," *Nasdaq*, accessed at: https://www.nasdaq.com/glossary/m/market-maker
6. "Market Makers," *Investor.gov*, accessed at: https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers
7. "S&P 500® Investment Grade Corporate Bond Index," *S&P Global*, accessed at: https://www.spglobal.com/spdji/en/indices/fixed-income/sp-500-investment-grade-corporate-bond-index/#overview
8. "Security Position Reports: One Time Special Security Position Report Cusip: 94106LBH1," dated June 12, 2020
9. "Security Position Reports: One Time Special Security Position Report Cusip: 94106LBJ7," dated June 12, 2020
10. "Security Position Reports: One Time Special Security Position Report Cusip: 94106LBF5," dated June 12, 2020
11. "Security Position Reports: One Time Special Security Position Report Cusip: 94106LBG3," dated June 12, 2020
12. The Credit Roundtable Letter to Waste Management, dated June 29, 2020
13. The Credit Roundtable SMR White Paper, dated June 8, 2018
14. "The Global Industry Classification Standard (GICS)," *MSCI*, accessed at: https://www.msci.com/our-solutions/indexes/gics
15. "The NYSE Market Model," *NYSE*, accessed at: https://www.nyse.com/market-model
16. "The What, Why, and How of Investing in Bonds," *PIMCO*, accessed at: https://www.pimco.com/eu/en/resources/education/the-what-why-and-how-of-investing-in-bonds
17. "Traders Bet on Falling 'Fear Gauge'," *Dow Jones Institutional News*, March 17, 2020
18. "Waste Management Note Orderbook," *Deutsche Bank*, dated May 14, 2019
19. "Waste Management Note Orderbook," *J.P.Morgan*, dated May 14, 2019

6

CONFIDENTIAL

## Appendix B – Materials Considered

20.    "WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020," *World Health Organization*, accessed at: https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020

# Waste Management's 2.95% SMR Note's Price and Trading Volume



**Sources:**
Data from TRACE, accessed via Bloomberg, L.P. Events from the Amended Complaint dated January 17, 2023.

## Waste Management's 3.20% SMR Note's Price and Trading Volume



**Sources:**
Data from TRACE, accessed via Bloomberg, L.P. Events from the Amended Complaint dated January 17, 2023.

# Waste Management's 3.45% SMR Note's Price and Trading Volume



**Sources:**
Data from TRACE, accessed via Bloomberg, L.P. Events from the Amended Complaint dated January 17, 2023.

**Confidential**

# Waste Management's 4.00% SMR Note's Price and Trading Volume



**Sources:**
Data from TRACE, accessed via Bloomberg, L.P. Events from the Amended Complaint dated January 17, 2023.

**Appendix D**

## Autocorrelation Test
## Using Feinstein's VWAP Returns
*During the Alleged Class Period*

| Note | Coefficient[1] | Stat. Sig.?[2] |
|---|---|---|
| (1) | (2) | (3) |
| 2.95% Note | 0.36 | Yes |
| 3.20% Note | 0.38 | Yes |
| 3.45% Note | 0.52 | Yes |
| 4.00% Note | -0.16 | No |

**Notes and Sources:**

Data from "FEINSTEIN0013259.xlsx."

[1] Uses a regression analysis to test whether there is a statistically significant relationship between current-day returns and prior-day returns.

[2] Significance is determined at the 5% level.

**Confidential**                                      **Appendix E**

# News vs. Non-News Test
## <u>Using Merger Search</u>
### *Alternative Event Study*

| Note | News[1] | | | Non-News | | | News vs. Non-News | |
| | # of Stat. Sig. Days[2] | # of Days[3] | Proportion of Stat. Sig. Days | # of Stat. Sig. Days[2] | # of Days[3] | Proportion of Stat. Sig. Days | z-statistic[4] | Stat. Sig.?[5] |
|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| | | | =(2)/(3) | | | =(5)/(6) | | |
| 2.95% Note | 1 | 22 | 5% | 6 | 68 | 9% | -0.65 | No |
| 3.20% Note | 0 | 22 | 0% | 8 | 66 | 12% | -1.71 | No |
| 3.45% Note | 1 | 22 | 5% | 6 | 68 | 9% | -0.65 | No |
| 4.00% Note | 0 | 15 | 0% | 6 | 41 | 15% | -1.57 | No |

**Notes and Sources:**

Data from Bloomberg, L.P. News stories from Factiva and Bloomberg. Factiva search was based on Company Field: "Waste Management, Inc." or "Advanced Disposal Services, Inc." not "Republic Services, Inc.", Keywords: "Merger" or "Acquisition" or "Divest" or "DOJ", Sources: "Major News and Business Sources", Dates: "February 13, 2020 to June 23, 2020", and excludes stories categorized by Factiva as "recurring pricing and market data" or "obituaries, sports, calendars." Bloomberg search was based on Company Field: "Waste Management, Inc." Keywords: "Merger" or "Acquisition" or "Divest" or "DOJ", Sources: "Bloomberg Only", Dates: "February 13, 2020 to June 23, 2020", and only includes stories with either "Waste Management, Inc.", "WM", "Advanced Disposal Services, Inc." or "ADS" in the headline. Analysis excludes March 18, 2020.

[1] Articles released after 4:00pm were counted as news for the following day. See Feinstein Report, ¶A1-14.

[2] Significance is based on the excess return t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. Significance is determined at the 5% level.

[3] Only includes days when the notes traded.

[4] Calculated as the difference between the proportion of news days with statistically significant excess returns and non-news days with statistically significant excess returns, divided by the standard error.

[5] "Yes" indicates that the z-statistic is significant at the 5% level, *i.e.*, the magnitude of the z-statistic is greater than 1.96.

**Confidential**    **Appendix E**

# News vs. Non-News Test
## Using Broad Search
*Alternative Event Study*

| | News[1] | | | Non-News | | | News vs. Non-News | |
|---|---|---|---|---|---|---|---|---|
| Note | # of Stat. Sig. Days[2] | # of Days[3] | Proportion of Stat. Sig. Days | # of Stat. Sig. Days[2] | # of Days[3] | Proportion of Stat. Sig. Days | z-statistic[4] | Stat. Sig.?[5] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| | | | =(2)/(3) | | | =(5)/(6) | | |
| 2.95% Note | 4 | 56 | 7% | 3 | 34 | 9% | -0.29 | No |
| 3.20% Note | 6 | 54 | 11% | 2 | 34 | 6% | 0.83 | No |
| 3.45% Note | 3 | 56 | 5% | 4 | 34 | 12% | -1.10 | No |
| 4.00% Note | 3 | 38 | 8% | 3 | 18 | 17% | -0.99 | No |

**Notes and Sources:**

Data from Bloomberg, L.P. News stories from Factiva and Bloomberg. Factiva search was based on Company Field: "Waste Management, Inc." or "Advanced Disposal Services, Inc." not "Republic Services, Inc.", Sources: "Major News and Business Sources", Dates: "February 13, 2020 to June 23, 2020", and excludes stories categorized by Factiva as "recurring pricing and market data" or "obituaries, sports, calendars." Bloomberg search was based on Company Field: "Waste Management, Inc.", Sources: "Bloomberg Only", Dates: "February 13, 2020 to June 23, 2020", and only includes stories with either "Waste Management, Inc.", "WM", "Advanced Disposal Services, Inc." or "ADS" in the headline. Analysis excludes March 18, 2020.

[1] Articles released after 4:00pm were counted as news for the following day. See Feinstein Report, ¶A1-14.

[2] Significance is based on the excess return t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. Significance is determined at the 5% level.

[3] Only includes days when the notes traded.

[4] Calculated as the difference between the proportion of news days with statistically significant excess returns and non-news days with statistically significant excess returns, divided by the standard error.

[5] "Yes" indicates that the z-statistic is significant at the 5% level, *i.e.*, the magnitude of the z-statistic is greater than 1.96.

**Confidential**                                                    **Appendix E**

# News vs. Non-News Test
## Using Merger Search
*Feinstein's Event Study*

| Note | News[1] # of Stat. Sig. Days[2] | # of Days[3] | Proportion of Stat. Sig. Days | Non-News # of Stat. Sig. Days[2] | # of Days[3] | Proportion of Stat. Sig. Days | News vs. Non-News z-statistic[4] | Stat. Sig.?[5] |
|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| | | | =(2)/(3) | | | =(5)/(6) | | |
| 2.95% Note | 2 | 22 | 9% | 7 | 68 | 10% | -0.16 | No |
| 3.20% Note | 0 | 22 | 0% | 8 | 66 | 12% | -1.71 | No |
| 3.45% Note | 2 | 22 | 9% | 8 | 68 | 12% | -0.35 | No |
| 4.00% Note | 2 | 13 | 15% | 4 | 32 | 13% | 0.26 | No |

**Notes and Sources:**

Data from "FEINSTEIN0013259.xlsx." News stories from Factiva and Bloomberg. Factiva search was based on Company Field: "Waste Management, Inc." or "Advanced Disposal Services, Inc." not "Republic Services, Inc.", Keywords: "Merger" or "Acquisition" or "Divest" or "DOJ", Sources: "Major News and Business Sources", Dates: "February 13, 2020 to June 23, 2020", and excludes stories categorized by Factiva as "recurring pricing and market data" or "obituaries, sports, calendars." Bloomberg search was based on Company Field: "Waste Management, Inc." Keywords: "Merger" or "Acquisition" or "Divest" or "DOJ", Sources: "Bloomberg Only", Dates: "February 13, 2020 to June 23, 2020", and only includes stories with either "Waste Management, Inc.", "WM", "Advanced Disposal Services, Inc." or "ADS" in the headline. Analysis excludes March 18, 2020.

[1] Articles released after 4:00pm were counted as news for the following day. See Feinstein Report, ¶A1-14.

[2] Significance is based on the excess return t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. Significance is determined at the 5% level.

[3] Only includes days when the notes traded.

[4] Calculated as the difference between the proportion of news days with statistically significant excess returns and non-news days with statistically significant excess returns, divided by the standard error.

[5] "Yes" indicates that the z-statistic is significant at the 5% level, *i.e.*, the magnitude of the z-statistic is greater than 1.96.

**Confidential**                                              **Appendix E**

# News vs. Non-News Test
## <u>Using Broad Search</u>
### *Feinstein's Event Study*

| Note | News[1] | | | Non-News | | | News vs. Non-News | |
|---|---|---|---|---|---|---|---|---|
| | # of Stat. Sig. Days[2] | # of Days[3] | Proportion of Stat. Sig. Days | # of Stat. Sig. Days[2] | # of Days[3] | Proportion of Stat. Sig. Days | z-statistic[4] | Stat. Sig.?[5] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| | | | =(2)/(3) | | | =(5)/(6) | | |
| 2.95% Note | 3 | 56 | 5% | 6 | 34 | 18% | -1.88 | No |
| 3.20% Note | 3 | 54 | 6% | 5 | 34 | 15% | -1.45 | No |
| 3.45% Note | 6 | 56 | 11% | 4 | 34 | 12% | -0.15 | No |
| 4.00% Note | 5 | 31 | 16% | 1 | 14 | 7% | 0.82 | No |

**Notes and Sources:**

Data from "FEINSTEIN0013259.xlsx." News stories from Factiva and Bloomberg. Factiva search was based on Company Field: "Waste Management, Inc." or "Advanced Disposal Services, Inc." not "Republic Services, Inc.", Sources: "Major News and Business Sources", Dates: "February 13, 2020 to June 23, 2020", and excludes stories categorized by Factiva as "recurring pricing and market data" or "obituaries, sports, calendars." Bloomberg search was based on Company Field: "Waste Management, Inc." Sources: "Bloomberg Only", Dates: "February 13, 2020 to June 23, 2020", and only includes stories with either "Waste Management, Inc.", "WM", "Advanced Disposal Services, Inc." or "ADS" in the headline. Analysis excludes March 18, 2020.

[1] Articles released after 4:00pm were counted as news for the following day. See Feinstein Report, ¶A1-14.

[2] Significance is based on the excess return t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. Significance is determined at the 5% level.

[3] Only includes days when the notes traded.

[4] Calculated as the difference between the proportion of news days with statistically significant excess returns and non-news days with statistically significant excess returns, divided by the standard error.

[5] "Yes" indicates that the z-statistic is significant at the 5% level, *i.e.*, the magnitude of the z-statistic is greater than 1.96.

Confidential  Case 1:22-cv-04838-LGS  Document 104-2  Filed 09/11/24  Page 79 of 90

Appendix F



**2.95% SMR Note Weekly Trading Volume as a Percentage of Outstanding Issue**
*Alleged Class Period*
*Using Feinstein's Market Hours*

First half of alleged Class Period:
- 44% of the weeks failed the 2% threshold
- 33% of the weeks failed the 1% threshold

**1% Cammer Threshold**

**2% Cammer Threshold**

**Notes and Sources:** Data from Feinstein Report, Exhibits 7a and 7b. A week is defined as five consecutive trading days from the beginning of the alleged Class Period. Percentage calculated by dividing the sum of each week's daily trading volume by the note's outstanding issue. Excludes last day of alleged Class Period as it is an incomplete week.



**3.2% SMR Note Weekly Trading Volume as a Percentage of Outstanding Issue**
*Alleged Class Period*
*Using Feinstein's Market Hours*

**Notes and Sources:** Data from Feinstein Report, Exhibits 7a and 7b. A week is defined as five consecutive trading days from the beginning of the alleged Class Period. Percentage calculated by dividing the sum of each week's daily trading volume by the note's outstanding issue. Excludes last day of alleged Class Period as it is an incomplete week.

### 3.45% SMR Note Weekly Trading Volume as a Percentage of Outstanding Issue
*Alleged Class Period*
*Using Feinstein's Market Hours*



**Notes and Sources:** Data from Feinstein Report, Exhibits 7a and 7b. A week is defined as five consecutive trading days from the beginning of the alleged Class Period. Percentage calculated by dividing the sum of each week's daily trading volume by the note's outstanding issue. Excludes last day of alleged Class Period as it is an incomplete week.

**Confidential**

Appendix F



**4% SMR Note Weekly Trading Volume as a Percentage of Outstanding Issue**
*Alleged Class Period*
*Using Feinstein's Market Hours*

First half of alleged Class Period:
- 100% of the weeks failed the 2% threshold
- 78% of the weeks failed the 1% threshold

1% Cammer Threshold

2% Cammer Threshold

**Notes and Sources:** Data from Feinstein Report, Exhibits 7a and 7b. A week is defined as five consecutive trading days from the beginning of the alleged Class Period. Percentage calculated by dividing the sum of each week's daily trading volume by the note's outstanding issue. Excludes last day of alleged Class Period as it is an incomplete week.

**Confidential**                                  **Appendix G**

### Feinstein Event Study and Alternative Event Study
### Price Reactions to Alleged Misrepresentations

| Reaction Date | Feinstein Event Study | | | | Alternative Event Study | | | |
|---|---|---|---|---|---|---|---|---|
| | % Price Reaction | $ Price Reaction | t-statistic | Stat. Sig. Increase?[1] | % Price Reaction | $ Price Reaction | t-statistic | Stat. Sig. Increase?[1] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| *2.95% Note* | | | | | | | | |
| 2/13/20 | 0.07% | $0.07 | 0.21 | No | -0.03% | -$0.03 | -0.15 | No |
| 3/18/20 | 0.84% | $0.85 | 2.53 | Yes | 3.30% | $3.32 | 2.57 | Yes |
| 5/6/20 | -0.02% | -$0.03 | -0.07 | No | 0.08% | $0.08 | 0.11 | No |
| 5/22/20 | -0.10% | -$0.10 | -0.29 | No | -0.06% | -$0.07 | -0.09 | No |
| 6/10/20 | -0.13% | -$0.14 | -0.38 | No | 0.24% | $0.26 | 0.35 | No |
| *3.20% Note* | | | | | | | | |
| 2/13/20 | 0.03% | $0.04 | 0.07 | No | 0.07% | $0.07 | 0.32 | No |
| 3/18/20 | -1.69% | -$1.69 | -3.38 | No | -4.86% | -$4.81 | -3.14 | No |
| 5/6/20 | 0.22% | $0.24 | 0.43 | No | 0.08% | $0.09 | 0.07 | No |
| 5/22/20 | -0.33% | -$0.35 | -0.65 | No | -0.33% | -$0.36 | -0.30 | No |
| 6/10/20 | 0.04% | $0.05 | 0.09 | No | 0.78% | $0.85 | 0.70 | No |
| *3.45% Note* | | | | | | | | |
| 2/13/20 | -0.01% | -$0.02 | -0.03 | No | 0.21% | $0.22 | 0.58 | No |
| 3/18/20 | 0.15% | $0.16 | 0.32 | No | -2.02% | -$2.08 | -1.57 | No |
| 5/6/20 | -0.86% | -$0.98 | -1.84 | No | -0.16% | -$0.18 | -0.19 | No |
| 5/22/20 | -0.49% | -$0.54 | -1.04 | No | -0.41% | -$0.45 | -0.49 | No |
| 6/10/20 | -0.06% | -$0.06 | -0.12 | No | -0.34% | -$0.38 | -0.40 | No |
| *4.00% Note* | | | | | | | | |
| 2/13/20 [2] | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3/18/20 | 6.68% [3] | $7.86 [3] | 7.00 [3] | Yes | 7.41% [4] | $8.42 [4] | 2.98 [4] | Yes |
| 5/6/20 | -0.08% | -$0.09 | -0.12 | No | 0.66% | $0.78 | 0.41 | No |
| 5/22/20 | -0.21% | -$0.25 | -0.32 | No | 0.21% | $0.24 | 0.13 | No |
| 6/10/20 | 0.83% | $0.96 | 1.23 | No | 0.47% | $0.54 | 0.29 | No |

**Notes and Sources:**

Data from Bloomberg, L.P. and Feinstein Report, Exhibits 10a-10d, and Exhibits 12a-12d.

[1] Significance is based on the price reaction's t-statistic, calculated as the price reaction divided by the standard error of the regression over the control period. "Yes" indicates significance at the 5% level.

[2] The 4.00% Note did not trade on February 13 or February 14, 2020.

[3] The Feinstein Report does not test the 4.00% Note's price reaction on March 18, 2020 as the note did not trade on the prior day. Price reaction calculated and tested using coefficients and standard error from Dr. Feinstein's event study and returns of Dr. Feinstein's Market Index, Industry Index, and Benchmark Bond Index from March 16 to March 18, 2020. The t-statistic is calculated as a 2-day cumulative reaction.

[4] Price reaction calculated and tested using coefficients and standard error from the Alternative Event Study and returns of the Industry Index and Bond Index from March 16 to March 18, 2020. The t-statistic is calculated as a 2-day cumulative reaction.

**Confidential**                    **Appendix H**

### Institutional Holdings of SMR Notes During Alleged Class Period
### and Institutional Headquarters

| Institution | Holdings 4Q19 | 1Q20 | 2Q20 | Headquartered in the U.S.? |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 1. 21st Century National Insurance Co | 80 | 80 | 80 | Yes |
| 2. AAA Life Insurance Co | 2,000 | 2,000 | 2,000 | Yes |
| 3. AAA Southern New England | 35 | 35 | 0 | Yes |
| 4. abrdn plc | 1,100 | 1,100 | 1,443 | No |
| 5. Aegon Ltd | 6,909 | 2,120 | 2,233 | No |
| 6. Aetna Health Inc/FL | 1,000 | 1,000 | 1,000 | Yes |
| 7. Aetna Inc | 2,740 | 2,740 | 2,740 | Yes |
| 8. Agri Insurance Exchange Risk Retention | 100 | 100 | 100 | Yes |
| 9. Alliance of Nonprofits for Insurance Risk Retention Group Inc | 10 | 10 | 10 | Yes |
| 10. Allianz SE | 2,453 | 1,894 | 1,103 | No |
| 11. Allstate Corp/The | 25,350 | 25,350 | 0 | Yes |
| 12. Amalgamated Life Insurance Co | 175 | 175 | 0 | Yes |
| 13. Ambac Assurance Corp | 575 | 0 | 0 | Yes |
| 14. American Access Casualty Co | 650 | 650 | 650 | Yes |
| 15. American Century Casualty Co | 160 | 160 | 160 | Yes |
| 16. American Equity Investment Life Insurance Co | 22,000 | 22,000 | 0 | Yes |
| 17. American Family Insurance Co | 6,630 | 6,630 | 5,225 | Yes |
| 18. American Health and Life Insurance Co | 1,670 | 1,670 | 1,670 | Yes |
| 19. American Inter-Fidelity Exchange | 125 | 125 | 125 | Yes |
| 20. American International Group Inc | 16,273 | 16,273 | 16,273 | Yes |
| 21. American National Group LLC | 0 | 0 | 5,000 | Yes |
| 22. Ameriprise Financial Inc | 100 | 576 | 576 | Yes |
| 23. AMG Funds III | 2,329 | 306 | 306 | Yes |
| 24. Antilles Insurance Co | 0 | 5 | 5 | Yes |
| 25. Arch Capital Group Ltd | 4,000 | 3,000 | 0 | No |
| 26. Ardellis Insurance Ltd | 0 | 200 | 200 | Yes |
| 27. Argenta Asset Management SA | 0 | 0 | 2,929 | No |
| 28. Argo Group International Holdings Inc | 75 | 75 | 75 | Yes |
| 29. Arkansas Health & Wellness Health Plan Inc | 250 | 250 | 250 | Yes |
| 30. Armco Insurance Group Inc | 31 | 5 | 5 | Yes |
| 31. Arrow Mutual Liability Insurance | 0 | 0 | 275 | Yes |
| 32. AssetMark Inc | 140 | 140 | 0 | Yes |
| 33. Assicurazioni Generali SpA | 3 | 0 | 0 | No |
| 34. Assurant Inc | 750 | 750 | 750 | Yes |
| 35. Aston Asset Management LLC | 525 | 525 | 400 | Yes |
| 36. Atlantic Specialty Insurance Co | 3,500 | 2,500 | 250 | Yes |
| 37. ATTORNEYS LIAB ASSUR SOCIETY LTD | 120 | 120 | 0 | Yes |
| 38. Automobile Club of Southern California | 2,000 | 2,000 | 2,000 | Yes |
| 39. Aviva PLC | 9,005 | 8,935 | 17,049 | No |
| 40. AXIS Specialty Insurance Co | 540 | 540 | 0 | No |
| 41. AXIS Surplus Insurance Co | 410 | 410 | 0 | No |
| 42. Baird Financial Group Inc/Wisconsin | 5,000 | 5,000 | 5,000 | Yes |
| 43. Bank of Montreal | 2,330 | 2,650 | 2,450 | No |
| 44. Berkshire Hathaway Inc | 1,503 | 2,653 | 0 | Yes |
| 45. BlackRock Inc | 72,921 | 92,370 | 109,063 | Yes |
| 46. Blue Cross & Blue Shield Association | 1,665 | 665 | 490 | Yes |
| 47. Blue Cross of Idaho Health Service Inc | 97 | 97 | 0 | Yes |
| 48. Blue Shield of California Life & Health Insurance Co | 35 | 35 | 0 | Yes |
| 49. BMO UCITS ETF ICAV | 118 | 118 | 0 | No |
| 50. BNP Paribas SA | 750 | 0 | 1,990 | No |
| 51. BrickStreet Mutual Insurance Co | 145 | 145 | 0 | Yes |
| 52. Brighthouse Life Insurance Co | 870 | 870 | 870 | Yes |
| 53. Brinker Capital LLC | 965 | 825 | 935 | Yes |

**Confidential**                                    **Appendix H**

### Institutional Holdings of SMR Notes During Alleged Class Period
### and Institutional Headquarters

| Institution | Holdings 4Q19 | 1Q20 | 2Q20 | Headquartered in the U.S.? |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 54. Builders Mutual Insurance Co | 360 | 360 | 360 | Yes |
| 55. Bunker Hill Preferred Insurance Co | 65 | 65 | 65 | Yes |
| 56. Bunker Hill Property Insurance Co | 65 | 65 | 65 | Yes |
| 57. Bunker Hill Security Insurance Co | 65 | 65 | 65 | Yes |
| 58. Burlington Insurance Co/The | 701 | 701 | 0 | Yes |
| 59. Callan LLC | 85 | 85 | 85 | Yes |
| 60. Cambia Health Solutions Inc | 1,965 | 1,965 | 0 | Yes |
| 61. Canadian Imperial Bank of Commerce | 1,100 | 0 | 0 | No |
| 62. Candriam Investors Group | 100 | 100 | 100 | No |
| 63. Capital Advantage Assurance Co | 295 | 0 | 0 | Yes |
| 64. Capital Blue Cross | 455 | 455 | 0 | Yes |
| 65. Capital Group Cos Inc/The | 16,440 | 16,440 | 5,665 | Yes |
| 66. Care 1st Health Plan | 100 | 100 | 0 | Yes |
| 67. Carolina Mutual Insurance Inc | 0 | 0 | 230 | Yes |
| 68. Catalyst Capital Advisors LLC | 500 | 0 | 0 | Yes |
| 69. Centre County Mutual Fire Insurance Co | 15 | 15 | 0 | Yes |
| 70. Charles Schwab Corp/The | 1,225 | 1,275 | 1,275 | Yes |
| 71. Charter Management Co Inc | 0 | 0 | 500 | Yes |
| 72. Chubb Ltd | 3,749 | 3,749 | 256 | No |
| 73. CI Investments Inc | 145 | 145 | 2,550 | No |
| 74. CLEARPATH INS CO | 290 | 290 | 290 | Yes |
| 75. Club Insurance Co | 600 | 1,000 | 1,000 | Yes |
| 76. Coast National Insurance Co | 370 | 0 | 0 | Yes |
| 77. College RRG Inc | 30 | 30 | 30 | Yes |
| 78. Colonial Life Insurance Co of Texas | 15 | 15 | 15 | Yes |
| 79. Colonial Lloyds | 15 | 15 | 15 | Yes |
| 80. Commonwealth Land Title Insurance Co/FL | 2,500 | 2,500 | 2,500 | Yes |
| 81. Connecticut General Life Insurance Co | 250 | 250 | 250 | Yes |
| 82. Conning Inc | 2,000 | 2,000 | 2,520 | Yes |
| 83. Consulting Group Advisory Services LLC | 325 | 503 | 590 | Yes |
| 84. Controlled Risk Insurance Co of Vermont Inc | 65 | 65 | 0 | Yes |
| 85. Cornerstone Advisors LLC/NC | 0 | 0 | 140 | Yes |
| 86. COSVI Cooperativa de Seguros de Vida de Puerto Rico | 0 | 0 | 600 | Yes |
| 87. Country Insurance & Financial Services | 3,500 | 3,500 | 3,500 | Yes |
| 88. Credit Agricole Group | 2,022 | 1,629 | 1,669 | No |
| 89. Credit Suisse Group AG | 2,433 | 2,640 | 2,670 | No |
| 90. Crossmark Global Holdings Inc | 14 | 7 | 7 | Yes |
| 91. CUNA Mutual Holding Co | 5,000 | 5,000 | 5,000 | Yes |
| 92. Danske Bank A/S | 0 | 0 | 200 | No |
| 93. Dealers Assurance Co | 450 | 450 | 450 | Yes |
| 94. DekaBank Deutsche Girozentrale | 2,200 | 2,200 | 2,200 | No |
| 95. Delaware Investment Advisers Inc | 110 | 110 | 110 | Yes |
| 96. Delaware Life Insurance Co | 250 | 250 | 250 | Yes |
| 97. Delta Dental of Washington | 50 | 50 | 0 | Yes |
| 98. Delta Dental Plan of Minnesota | 275 | 0 | 0 | Yes |
| 99. Denver Investment Advisors LLC | 0 | 0 | 586 | Yes |
| 100. Deutsche Bank AG | 2,765 | 2,203 | 1,928 | No |
| 101. Doctors Co An Interinsurance Exchange/The | 400 | 400 | 0 | Yes |
| 102. Doubleline Capital LP | 26,870 | 16,610 | 23,192 | Yes |
| 103. Eagle Life Insurance Co | 2,000 | 2,000 | 0 | Yes |
| 104. Educators Health Plans Health Inc | 375 | 430 | 430 | Yes |
| 105. Elevance Health Inc | 8,531 | 7,131 | 6,571 | Yes |
| 106. Endurance Assurance Corp | 1,686 | 2,671 | 1,250 | Yes |

**Confidential**                              **Appendix H**

**Institutional Holdings of SMR Notes During Alleged Class Period
and Institutional Headquarters**

| Institution | Holdings | | | Headquartered in the U.S.? |
|---|---|---|---|---|
| | 4Q19 | 1Q20 | 2Q20 | |
| (1) | (2) | (3) | (4) | (5) |
| 107. Enstar Group Ltd | 110 | 110 | 0 | No |
| 108. Enterprise Life Insurance Co | 500 | 500 | 500 | No |
| 109. Equitable Financial Life Insurance Co | 41,509 | 41,509 | 41,509 | Yes |
| 110. Equitable Financial Life Insurance Co of America | 4,000 | 2,900 | 0 | Yes |
| 111. Equitable Investment Management Group LLC | 55 | 0 | 55 | Yes |
| 112. Erie Family Life Insurance Co | 18,000 | 15,000 | 15,000 | Yes |
| 113. Erste Group Bank AG | 0 | 0 | 1,150 | No |
| 114. EULAV Asset Management | 0 | 0 | 900 | Yes |
| 115. Everest Denali Insurance Co | 250 | 250 | 250 | Yes |
| 116. Everest Premier Insurance Co | 250 | 250 | 250 | Yes |
| 117. Everest Reinsurance Co | 400 | 400 | 400 | Yes |
| 118. EVERLAKE LIFE INS CO | 9,900 | 9,900 | 0 | Yes |
| 119. Everspan Financial Guarantee Corp | 300 | 300 | 0 | Yes |
| 120. Fairfax Financial Holdings Ltd | 900 | 900 | 900 | No |
| 121. Farm Bureau New Horizons Insurance Co of Missouri | 0 | 0 | 4,000 | Yes |
| 122. Farmers Insurance Co of Oregon | 460 | 460 | 460 | Yes |
| 123. Farmers Insurance Co of Washington | 370 | 0 | 0 | Yes |
| 124. Farmers Insurance Exchange | 180 | 0 | 0 | Yes |
| 125. Farmers Mech Mutual Fire Insurance Co of West Virginia | 100 | 100 | 100 | Yes |
| 126. Farmers Mutual Fire Insurance Co of Salem County | 0 | 0 | 350 | Yes |
| 127. Farmers Reinsurance Co | 485 | 485 | 0 | Yes |
| 128. Federal Reserve Bank of New York | 0 | 0 | 3,000 | Yes |
| 129. FHM Insurance Co | 125 | 125 | 125 | Yes |
| 130. Fidelity National Financial Inc/US | 4,500 | 4,500 | 4,500 | Yes |
| 131. FIL Ltd | 12 | 12 | 1,842 | No |
| 132. Financial Guaranty Insurance Co | 1,805 | 1,805 | 0 | Yes |
| 133. Fire Insurance Exchange | 370 | 0 | 0 | Yes |
| 134. First American Bank | 0 | 0 | 4,860 | Yes |
| 135. FIRST ASSET EXCHANGE TRADED FUND | 1,635 | 1,635 | 1,635 | No |
| 136. First Asset Investment Management Inc | 0 | 0 | 430 | No |
| 137. First Medical Insurance Co Rrg | 95 | 95 | 0 | Yes |
| 138. First Protective Insurance Co | 0 | 0 | 500 | Yes |
| 139. First Symetra National Life Insurance Co of New York | 3,000 | 3,000 | 3,000 | Yes |
| 140. FirstCarolinaCare Insurance Co | 75 | 75 | 75 | Yes |
| 141. Fisch Asset Management AG | 1,300 | 1,600 | 800 | No |
| 142. FlexShares Trust | 0 | 150 | 150 | Yes |
| 143. Florida Lawyers Mutual Insurance Co | 125 | 125 | 0 | Yes |
| 144. FMR LLC | 21,495 | 20,647 | 19,326 | Yes |
| 145. Foremost Insurance Co | 370 | 0 | 0 | Yes |
| 146. Forethought Life Insurance Co | 3,375 | 13,375 | 0 | Yes |
| 147. Franklin Resources Inc | 30,503 | 39,423 | 44,903 | Yes |
| 148. FundRock Management Co SA | 0 | 280 | 0 | No |
| 149. GABLES RRG INC | 200 | 200 | 0 | Yes |
| 150. GAM Holding AG | 2,600 | 2,600 | 2,600 | No |
| 151. Genworth Financial Inc | 500 | 500 | 500 | Yes |
| 152. GLACIER INS CO | 35 | 35 | 35 | Yes |
| 153. Goldman Sachs Group Inc/The | 8,910 | 7,710 | 5,040 | Yes |
| 154. Goodville Mutual Casualty Co | 100 | 100 | 100 | Yes |
| 155. Government Pension Investment Fund Japan | 0 | 366 | 366 | No |
| 156. Grace Partners of DuPage LP | 500 | 500 | 3,335 | Yes |
| 157. Grange Mutual Casualty Co | 0 | 0 | 2,500 | Yes |
| 158. Greenwich Insurance Co | 800 | 800 | 800 | Yes |
| 159. Group Health Cooperative of Eau Claire | 213 | 0 | 103 | Yes |

**Confidential** **Appendix H**

### Institutional Holdings of SMR Notes During Alleged Class Period
### and Institutional Headquarters

| Institution | Holdings | | | Headquartered in the U.S.? |
| --- | --- | --- | --- | --- |
| | 4Q19 | 1Q20 | 2Q20 | |
| (1) | (2) | (3) | (4) | (5) |
| 160. Group Health Plan Inc | 235 | 0 | 0 | Yes |
| 161. Guardian Life Insurance Co of America/The | 7,250 | 7,250 | 7,250 | Yes |
| 162. GuideStone Capital Management LLC | 360 | 260 | 1,960 | Yes |
| 163. Hartford Financial Services Group Inc/The | 43,823 | 43,823 | 1,325 | Yes |
| 164. Hartford Fire Insurance Co | 8,000 | 8,000 | 0 | Yes |
| 165. Hartford Insurance Co of Illinois | 3,560 | 3,560 | 0 | Yes |
| 166. Hartford Underwriters Insurance Co | 1,400 | 1,400 | 0 | Yes |
| 167. HCSC Insurance Services Co | 1,857 | 1,857 | 675 | Yes |
| 168. HEALTH CARE INS RECIPROCAL | 70 | 70 | 70 | No |
| 169. HEALTH FIRST HLTH PLANS INC | 20 | 0 | 0 | Yes |
| 170. Health Options Inc | 250 | 0 | 0 | Yes |
| 171. Healthcare Professionals Insurance Co | 100 | 100 | 100 | Yes |
| 172. HealthPartners Inc | 695 | 80 | 80 | Yes |
| 173. Healthpartners Insurance Co | 365 | 485 | 485 | Yes |
| 174. Hereford Insurance Co | 250 | 250 | 250 | Yes |
| 175. High Point Safety & Insurance Co | 160 | 160 | 160 | Yes |
| 176. Highmark BCBSD Inc | 500 | 500 | 510 | Yes |
| 177. Highmark Health | 35 | 35 | 0 | Yes |
| 178. Hirtle Callaghan & Co LLC | 845 | 845 | 2,060 | Yes |
| 179. HISCOX INSURANCE GROUP | 665 | 665 | 0 | Yes |
| 180. Hometown Health Plan Inc | 0 | 0 | 30 | Yes |
| 181. Hospitals Insurance Co Inc | 0 | 250 | 0 | Yes |
| 182. HSBC Holdings PLC | 1,270 | 620 | 2,370 | No |
| 183. IDAHO STATE INSURANCE FUND | 0 | 0 | 150 | Yes |
| 184. Impax Asset Management Group PLC | 500 | 500 | 500 | No |
| 185. Independence Blue Cross | 0 | 395 | 0 | Yes |
| 186. INDEPENDENT LIFE INS CO | 25 | 25 | 25 | Yes |
| 187. Indian Harbor Insurance Co/DE | 1,825 | 1,825 | 1,825 | Yes |
| 188. Interinsurance Exchange of The Automobile Club | 610 | 145 | 6,250 | Yes |
| 189. Invesco Ltd | 409 | 279 | 309 | Yes |
| 190. Investeringsforeningen Portfoliomanager | 400 | 400 | 1,425 | No |
| 191. Jackson National Life Insurance Co | 13,322 | 13,322 | 14,000 | Yes |
| 192. JPMorgan Chase & Co | 9,297 | 9,357 | 47,159 | Yes |
| 193. KIN INTERINSURANCE NETWORK | 125 | 125 | 125 | Yes |
| 194. Kingdom of Sweden | 500 | 500 | 500 | No |
| 195. KLP Kapitalforvaltning AS | 1,000 | 1,000 | 1,000 | No |
| 196. Knights of Columbus Asset Advisors LLC | 3,500 | 3,500 | 3,500 | Yes |
| 197. Lattice Strategies LLC | 655 | 755 | 0 | Yes |
| 198. Lawyers Mutual Liability Insurance | 25 | 25 | 25 | Yes |
| 199. Lincoln National Corp | 19,623 | 19,623 | 19,623 | Yes |
| 200. Locorr Fund Management LLC | 2,870 | 2,870 | 2,870 | Yes |
| 201. Louisiana Health Service & Indemnity Co | 100 | 100 | 100 | Yes |
| 202. M Life Insurance Co | 500 | 500 | 500 | Yes |
| 203. M&T Bank Corp | 0 | 0 | 150 | Yes |
| 204. Macquarie Group Ltd | 45,253 | 47,613 | 31,532 | No |
| 205. MAG Mutual Insurance Co | 0 | 0 | 15 | Yes |
| 206. Manulife Financial Corp | 4,605 | 4,605 | 4,400 | No |
| 207. Marsh & McLennan Cos Inc | 230 | 230 | 230 | Yes |
| 208. Martingale National Insurance Co | 0 | 0 | 100 | Yes |
| 209. Mary Washington HealthCare Pension Plan | 50 | 50 | 50 | Yes |
| 210. Massachusetts Mutual Life Insurance Co | 1,435 | 1,335 | 2,357 | Yes |
| 211. Medica Health Plans | 0 | 0 | 55 | Yes |
| 212. Medica Insurance Co | 0 | 200 | 70 | Yes |

**Confidential**                    **Appendix H**

**Institutional Holdings of SMR Notes During Alleged Class Period
and Institutional Headquarters**

| Institution | Holdings | | | Headquartered in the U.S.? |
|---|---|---|---|---|
| | 4Q19 | 1Q20 | 2Q20 | |
| (1) | (2) | (3) | (4) | (5) |
| 213. Medical Security Insurance Co | 60 | 60 | 60 | Yes |
| 214. Mendota Insurance Co | 150 | 150 | 150 | Yes |
| 215. MetLife Inc | 12,427 | 12,427 | 12,427 | Yes |
| 216. Metropolitan Tower Life Insurance Co | 70 | 70 | 70 | Yes |
| 217. MID-Century Insurance Co | 370 | 0 | 0 | Yes |
| 218. Minnesota Mutual Cos Inc | 14,300 | 21,915 | 21,915 | Yes |
| 219. Mirabaud & Cie Banquiers | 3 | 0 | 300 | No |
| 220. MML Bay State Life Insurance Co | 100 | 100 | 100 | Yes |
| 221. Moda Health Plan Inc | 200 | 200 | 200 | Yes |
| 222. Morningstar Investment Management LLC | 217 | 497 | 190 | Yes |
| 223. Mount Carmel Health Plan Inc | 400 | 400 | 400 | Yes |
| 224. Mutual of America Capital Management LLC | 1,275 | 1,275 | 1,275 | Yes |
| 225. MutualAid eXchange | 100 | 100 | 100 | Yes |
| 226. National Bank of Canada | 0 | 0 | 104 | No |
| 227. National Public Finance Guarantee Corp | 2,720 | 2,720 | 2,720 | Yes |
| 228. Nationwide Fund Advisors | 85 | 85 | 85 | Yes |
| 229. Nationwide Life and Annuity Insurance Co | 14,500 | 14,500 | 14,500 | Yes |
| 230. Nationwide Life Insurance Co | 2,500 | 2,500 | 2,500 | Yes |
| 231. Nationwide Mutual Fire Insurance Co | 10,000 | 10,000 | 10,000 | Yes |
| 232. Natixis SA | 2,835 | 940 | 0 | No |
| 233. NCMIC Insurance Co | 0 | 1,000 | 1,000 | Yes |
| 234. New Jersey Manufacturers Insurance Co | 7,500 | 7,500 | 7,500 | Yes |
| 235. New York Life Insurance Co | 12,000 | 13,692 | 13,692 | Yes |
| 236. NGAM Canada LP | 435 | 435 | 435 | No |
| 237. Nomura Holdings Inc | 1,163 | 1,163 | 1,163 | No |
| 238. Nordea Bank Abp | 6,490 | 6,490 | 8,900 | No |
| 239. Northern Lights Fund Trust | 655 | 295 | 570 | Yes |
| 240. Northern Trust Corp | 1,001 | 890 | 890 | Yes |
| 241. Northwest Farmers Mutual Insurance Co | 7 | 0 | 0 | Yes |
| 242. Northwestern Mutual Life Insurance Co/The | 67,180 | 72,680 | 62,680 | Yes |
| 243. Old Republic General Insurance Corp | 1,000 | 1,000 | 1,000 | Yes |
| 244. Oldco LLC | 0 | 0 | 212 | Yes |
| 245. Olive Street Investment Advisers LLC | 940 | 0 | 940 | Yes |
| 246. One Compass Advisors | 60 | 60 | 60 | Yes |
| 247. PACIFIC LIFE INSURANCE COMPANY | 23,050 | 20,050 | 20,050 | Yes |
| 248. Palisades Insurance Co | 290 | 290 | 290 | Yes |
| 249. Palisades Property & Casualty Insurance Co | 145 | 145 | 145 | Yes |
| 250. Palisades Safety & Insurance Association | 2,125 | 2,125 | 2,125 | Yes |
| 251. Palmer Square Capital Management LLC | 0 | 0 | 2,750 | Yes |
| 252. Pelican Insurance Risk Retention Group | 10 | 0 | 20 | Yes |
| 253. Philadelphia Financial Life Assurance Co | 0 | 0 | 30 | Yes |
| 254. Philadelphia Life Assurance Co of New York | 0 | 0 | 10 | Yes |
| 255. Picton Mahoney Asset Management | 0 | 0 | 850 | No |
| 256. Pinnacle Consortium of Higher Education | 55 | 55 | 0 | Yes |
| 257. Plymouth Rock Assurance Corp | 1,080 | 1,080 | 1,080 | Yes |
| 258. POWER CORP OF CANADA | 2,170 | 2,170 | 2,030 | No |
| 259. PreferredOne Insurance Co | 0 | 0 | 20 | Yes |
| 260. Premera Blue Cross | 145 | 145 | 0 | Yes |
| 261. Prime Insurance Co | 250 | 250 | 250 | Yes |
| 262. Prime Property & Casualty Insurance Inc | 200 | 200 | 200 | Yes |
| 263. Principal Financial Group Inc | 24,145 | 24,145 | 22,405 | Yes |
| 264. ProAssurance Corp | 0 | 0 | 420 | Yes |
| 265. ProAssurance Indemnity Co Inc | 800 | 800 | 160 | Yes |

**Confidential**                                         **Appendix H**

### Institutional Holdings of SMR Notes During Alleged Class Period
### and Institutional Headquarters

| Institution | Holdings | | | Headquartered in the U.S.? |
| --- | --- | --- | --- | --- |
| | 4Q19 | 1Q20 | 2Q20 | |
| (1) | (2) | (3) | (4) | (5) |
| 266. ProAssurance Insurance Co of America | 665 | 665 | 665 | Yes |
| 267. Progressive Corp/The | 25,000 | 0 | 0 | Yes |
| 268. ProSight Specialty Insurance Group Inc | 850 | 850 | 420 | Yes |
| 269. Protective Insurance Corp | 2,250 | 2,250 | 2,250 | Yes |
| 270. Providence Health Assurance | 0 | 0 | 165 | Yes |
| 271. Providence Health Plan | 0 | 0 | 155 | Yes |
| 272. Prudential Financial Inc | 33,831 | 33,506 | 35,066 | Yes |
| 273. Prudential PLC | 10,556 | 10,556 | 761 | No |
| 274. Quilter PLC | 0 | 0 | 8 | No |
| 275. Reliance Standard Life Insurance Co | 5,340 | 3,340 | 3,160 | Yes |
| 276. Renaissance Reinsurance US Inc | 510 | 510 | 510 | Yes |
| 277. RGA Reinsurance Co | 5,000 | 5,000 | 5,000 | Yes |
| 278. RiverNorth Capital Management LLC | 685 | 685 | 610 | Yes |
| 279. Royal Bank of Canada | 1,600 | 1,600 | 2,100 | No |
| 280. SAIF Corp | 1,870 | 1,870 | 1,870 | Yes |
| 281. Schroders PLC | 400 | 1,600 | 1,600 | No |
| 282. Securian Life Insurance Co | 1,425 | 1,425 | 1,425 | Yes |
| 283. Security Health Plan of Wisconsin Inc | 140 | 220 | 200 | Yes |
| 284. SEI Investments Co | 3,235 | 3,085 | 2,660 | Yes |
| 285. Select Risk Insurance Co | 340 | 340 | 0 | Yes |
| 286. Selective Auto Insurance Co of New Jersey | 325 | 325 | 0 | Yes |
| 287. Selective Casualty Insurance Co | 375 | 375 | 375 | Yes |
| 288. Selective Fire & Casualty Insurance Co | 164 | 164 | 164 | Yes |
| 289. Selective Insurance Group Inc | 839 | 839 | 291 | Yes |
| 290. Sentruity Casualty Co | 20 | 20 | 0 | Yes |
| 291. Sentry Investments Corp | 225 | 225 | 225 | No |
| 292. SIMED | 75 | 0 | 0 | Yes |
| 293. Sompo America Fire & Marine Insurance Co | 24 | 24 | 0 | Yes |
| 294. Sompo America Insurance Co | 194 | 689 | 0 | Yes |
| 295. Southern Mutual Church Insurance Co | 0 | 0 | 250 | Yes |
| 296. St Denis J Villere & Co LLC | 1,055 | 1,055 | 1,055 | Yes |
| 297. St James's Place PLC | 9,450 | 9,450 | 9,450 | No |
| 298. St Lukes Health Network Insurance Co | 750 | 750 | 750 | Yes |
| 299. Standard Insurance Co | 2,000 | 2,000 | 2,000 | Yes |
| 300. STANDARD LIFE INVESTMENTS | 676 | 0 | 0 | No |
| 301. Starr Surplus Lines Insurance Co | 11,138 | 11,138 | 0 | Yes |
| 302. State Farm Life & Accident Assurance Co | 1,000 | 1,000 | 1,000 | Yes |
| 303. STATE FARM MUTUAL AUTO INS | 42,000 | 42,000 | 42,000 | Yes |
| 304. State of Florida | 4,227 | 6,564 | 4,587 | Yes |
| 305. State Street Corp | 6,982 | 7,356 | 7,468 | Yes |
| 306. State Workers Insurance Fund/The | 840 | 840 | 840 | Yes |
| 307. Sterling Capital Management LLC | 250 | 175 | 0 | Yes |
| 308. SWISS RE AG | 1,200 | 1,200 | 1,200 | No |
| 309. Swiss Rock Asset Management AG | 300 | 300 | 300 | No |
| 310. Symetra Life Insurance Co | 15,015 | 15,015 | 22,557 | Yes |
| 311. TCW Group Inc/The | 5 | 5 | 250 | Yes |
| 312. Teachers Auto Insurance Co of New Jersey | 50 | 50 | 50 | Yes |
| 313. Teachers Insurance & Annuity Association of America | 60,950 | 61,502 | 74,139 | Yes |
| 314. Tennessee Farmers Insurance Cos | 0 | 0 | 6,000 | Yes |
| 315. Texas Mutual Insurance Co | 926 | 926 | 425 | Yes |
| 316. Thrivent Financial for Lutherans | 11,000 | 11,000 | 11,000 | Yes |
| 317. Toa Reinsurance Co of America/The | 510 | 510 | 180 | Yes |
| 318. TORUS INSURANCE GROUP | 300 | 300 | 300 | Yes |

**Confidential**                              **Appendix H**

### Institutional Holdings of SMR Notes During Alleged Class Period
### and Institutional Headquarters

| Institution | Holdings | | | Headquartered in the U.S.? |
|---|---|---|---|---|
| | 4Q19 | 1Q20 | 2Q20 | |
| (1) | (2) | (3) | (4) | (5) |
| 319. Transamerica Financial Life Insurance Co | 360 | 360 | 360 | Yes |
| 320. Trans-Oceanic Life Insurance Co | 71 | 0 | 100 | Yes |
| 321. Travelers Cos Inc/The | 5,000 | 5,000 | 5,000 | Yes |
| 322. Tributary Capital Management LLC | 400 | 1,062 | 1,217 | Yes |
| 323. Triton Insurance Co | 665 | 665 | 665 | Yes |
| 324. Truck Insurance Exchange | 730 | 0 | 0 | Yes |
| 325. Twin City Fire Insurance Co | 1,406 | 1,406 | 0 | Yes |
| 326. UBS AG | 9,903 | 10,232 | 7,522 | No |
| 327. UCare Minnesota | 0 | 0 | 110 | Yes |
| 328. Union Investment Luxembourg SA | 300 | 300 | 300 | No |
| 329. United Automobile Insurance Group Inc | 225 | 225 | 225 | Yes |
| 330. United Educators Insurance R | 1,600 | 1,600 | 1,600 | Yes |
| 331. United Healthcare of Kentucky Inc/KY | 25 | 25 | 0 | Yes |
| 332. United Services Automobile Association | 32,000 | 32,000 | 32,000 | Yes |
| 333. UnitedHealth Group Inc | 4,900 | 4,175 | 2,350 | Yes |
| 334. Unum Group | 7,000 | 7,000 | 7,000 | Yes |
| 335. UPMC For You Inc | 24 | 24 | 0 | Yes |
| 336. Upmc Health Options Inc | 75 | 75 | 75 | Yes |
| 337. US BR SUN LIFE ASSUR CO OF CANAD | 23,000 | 25,415 | 25,415 | No |
| 338. Vanguard Group Inc/The | 128,720 | 136,420 | 206,742 | Yes |
| 339. VANTAGE RISK SPECIALTY INS COVAN | 30 | 30 | 0 | No |
| 340. Vermont Mutual Group Inc | 160 | 160 | 0 | Yes |
| 341. Victory Capital Management Inc | 150 | 150 | 150 | Yes |
| 342. Virginia Surety Co Inc | 750 | 750 | 750 | Yes |
| 343. Vontobel Holding AG | 2,000 | 2,000 | 1,000 | No |
| 344. Voya Retirement Insurance and Annuity Co | 3,035 | 3,035 | 3,035 | Yes |
| 345. W R Berkley Corp | 10,000 | 10,000 | 10,000 | Yes |
| 346. Warburg Invest KAG | 400 | 400 | 400 | No |
| 347. WEA Insurance Corp | 235 | 235 | 155 | Yes |
| 348. WellCare Health Plans Inc | 540 | 0 | 0 | Yes |
| 349. Wellmark Inc | 230 | 230 | 0 | Yes |
| 350. Western & Southern Financial Group Inc | 5,000 | 5,000 | 5,000 | Yes |
| 351. Western World Insurance Group Inc | 0 | 250 | 250 | Yes |
| 352. WILSHIRE ASSOCIATES INC | 45 | 45 | 0 | Yes |
| 353. Wisconsin Mutual Insurance Co | 150 | 150 | 150 | Yes |
| 354. WisdomTree Inc | 621 | 775 | 684 | Yes |
| 355. XL Insurance America Inc | 2,800 | 2,800 | 2,800 | Yes |
| 356. XL Insurance Co of New York Inc | 750 | 750 | 750 | Yes |
| 357. XL Reinsurance America Inc | 3,500 | 3,500 | 4,806 | Yes |
| 358. XL Select Insurance Co | 1,175 | 1,175 | 1,175 | Yes |
| 359. XL Specialty Insurance Co | 225 | 225 | 225 | Yes |
| 360. Zuercher Kantonalbank | 1,100 | 1,100 | 973 | No |
| 361. Zurich Insurance Group AG | 645 | 655 | 520 | No |

|  |  |
|---|---|
| **Total Non-U.S.:** | **65** |
| **Total:** | **361** |
| **% Foreign Institutions:** | **18%** |

**Notes and Sources:**

Data from Bloomberg L.P., SEC filings, company websites, and company profiles from LinkedIn Corp.