UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  | x |  |
| --- | --- | --- |
| In re WASTE MANAGEMENT SECURITIES LITIGATION | : | Civil Action No. 1:22-cv-04838-LGS |
|  | : | CLASS ACTION |
|  | x |  |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF LEAD PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS
REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

I.    THE MARKET FOR THE WASTE MANAGEMENT NOTES WAS
      EFFICIENT ...........................................................................................................................1

      A.    The Indirect Factors Support a Finding of Market Efficiency ..................................1

      B.    Dr. Feinstein's Event Study Is Reliable and Satisfies *Cammer* 5 ...........................5

II.   DEFENDANTS CANNOT MEET THEIR PRICE IMPACT BURDEN ..........................7

III.  DAMAGES ARE CALCULABLE CLASS-WIDE ............................................................8

IV.   DEFENDANTS' *MORRISON* AND *AFFILIATED UTE* ARGUMENTS FAIL ..............10

V.    CONCLUSION ..................................................................................................................10

## TABLE OF AUTHORITIES

**Page**

CASES

*Bell v. Ascendant Solutions, Inc.*,
422 F.3d 307 (5th Cir. 2005) ...........................................................................................6

*Bennett v. Sprint Nextel Corp.*,
298 F.R.D. 498 (D. Kan. 2014)..........................................................................................6

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ............................................................................... *passim*

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................................................9

*George v. China Automotive Systems, Inc.*,
2013 WL 3357170
(S.D.N.Y. July 3, 2013) .................................................................................................6, 7

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021)..........................................................................................................7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)..........................................................................................................7

*In re Allergan PLC Sec. Litig.*,
2021 WL 4077942
(S.D.N.Y. Sept. 8, 2021)...................................................................................................7

*In re Am. Realty Cap. Props., Inc. Litig.*,
2017 WL 3835881
(S.D.N.Y. Aug. 31, 2017) .................................................................................................6

*In re Barclays Liquidity Cross & High Frequency Trading Litigation*,
126 F. Supp. 3d 342 (S.D.N.Y. 2015)..............................................................................10

*In re BP p.l.c. Securities Litigation*,
2013 WL 6388408
(S.D. Tex. Dec. 6, 2013) ...................................................................................................9

*In re DVI Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008)........................................................................................2

*In re Dynex Cap., Inc. Sec. Litig.*,
2011 WL 781215
(S.D.N.Y. Mar. 7, 2011) ...........................................................................................2, 3, 4

**Page**

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ......................................................................4

*In re Glob. Brokerage, Inc.*,
2021 WL 1160056
(S.D.N.Y. Mar. 18, 2021) .....................................................................................2, 3

*In re HealthSouth Corp. Sec. Litig.*,
261 F.R.D. 616 (N.D. Ala. 2009)..............................................................................4

*In re Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016) ...........................................................................2, 4

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084
(S.D.N.Y. July 10, 2019) .......................................................................................1, 9

*In re Teva Securities Litigation*,
2021 WL 872156
(D. Conn. Mar. 9, 2021)............................................................................................3

*In re Vale S.A. Sec. Litig.*,
2022 WL 122593
(E.D.N.Y. Jan. 11, 2022) ...........................................................................................4

*In re Vale S.A. Sec. Litig.*,
2022 WL 969724
(E.D.N.Y. Mar. 31, 2022) ........................................................................................10

*In re Winstar Commc'ns Sec. Litig.*,
290 F.R.D. 437 (S.D.N.Y. 2013) ...............................................................................4

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001)...........................................................................1, 4

*Martinek v. AmTrust Fin. Servs., Inc.*,
2022 WL 326320
(S.D.N.Y. Feb. 3, 2022).............................................................................................7

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
2018 WL 3861840
(N.D. Ohio Aug. 14, 2018) ........................................................................................6

**Page**

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns*,
    967 F. Supp. 2d 1143 (N.D. Ohio 2013)..................................................................4

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)...................................................................................9

*Rougier v. Applied Optoelectronics, Inc.*,
    2019 WL 6111303
    (S.D. Tex. Nov. 13, 2019).......................................................................................9

*Schleicher v. Wendt*,
    618 F.3d 679 (7th Cir. 2010) ..................................................................................9

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
    2024 WL 1497110
    (S.D.N.Y. Apr. 5, 2024)..........................................................................................9

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) ............................................................................1

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015)......................................................................................9

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*,
    2006 WL 2161887
    (S.D.N.Y. Aug. 1, 2006) ..........................................................................................2

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)..................................................................................1, 9

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j ........................................................................................................................4

Federal Rules of Civil Procedure
    Rule 23 ....................................................................................................................9

Lead Plaintiffs respectfully submit this Reply Memorandum of Law in Further Support of their Motion for Class Certification.[1]

## I.  THE MARKET FOR THE WASTE MANAGEMENT NOTES WAS EFFICIENT

As explained in Lead Plaintiffs' Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification (the "Opening Brief" or "Opening Br." (ECF No. 102)) and further below, the substantial weight of the evidence, including all the relevant factors, shows that the Notes traded in an efficient market. Opening Br. at 13-21; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 97-98 (2d Cir. 2017) (courts must engage in a holistic analysis of efficiency factors). Defendants offer no valid evidence to the contrary. Lead Plaintiffs and the proposed Class are therefore entitled to the *Basic* presumption of class-wide reliance.

### A.  The Indirect Factors Support a Finding of Market Efficiency

The indirect factors – *Cammer* 1-4 and *Krogman* 1-3 – all show that the Notes traded in an efficient market. Opening Br. at 13-21. Numerous courts recognize that market efficiency can be established through the indirect factors alone.[2]

***Cammer* 1 (Trading Volume)**: The average weekly turnover of the Notes was 4.83% to 7.93% during the Class Period – well above of the 2% threshold that supports a strong presumption of market efficiency. Feinstein Rpt. ¶¶79-80, 85. This turnover is exceptionally high for bonds.

---

[1] All defined terms have the same definitions as in the Amended Complaint (the "Complaint") (ECF No. 40) unless otherwise noted. References to "¶" and "¶¶" are to the Complaint. "Opp." refers to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (ECF No. 104). "Feinstein Rpt." refers to Dr. Feinstein's Report on Market Efficiency and Damages Methodology dated June 14, 2024 (ECF No. 103-2)."Feinstein Reb. Rpt." refers to Dr. Feinstein's Rebuttal Report, attached as Ex. A to the Declaration of Noam Mandel ("Mandel Decl."), filed herewith. "Allen Tr." refers to the excerpted Deposition Transcript of Lucy P. Allen (Oct. 1, 2024), attached as Ex. B to the Mandel Decl. "Feinstein Tr." refers to the excerpted Deposition Transcript of Steven P. Feinstein (Sept. 27, 2024), attached as Ex. C to the Mandel Decl. "Allen Rpt." refers to the Expert Report of Lucy P. Allen dated August 16, 2024 (ECF No. 104-2). All emphasis is added and all internal citations and quotation marks are omitted unless otherwise noted.

[2] *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *13 (S.D.N.Y. July 10, 2019); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 320 (S.D.N.Y. 2016).

Feinstein Rpt. ¶80; Feinstein Reb. Rpt. ¶¶35, 37, n.58. There is also no dispute that the Notes traded at a high frequency. Feinstein Rpt. ¶¶82-85; Feinstein Reb. Rpt. ¶¶44-49. Unable to refute this reality, Defendants and their expert arbitrarily slice the Class Period in half and argue that lower trading volumes during the first half of the Class Period defeat efficiency. Opp. at 14-15; Allen Tr. at 203:21-207:24.[3] But even Defendants' expert admits that under her method the Notes met or exceeded the 1% *Cammer* 1 threshold for most of the eighteen weeks in the Class Period, supporting a substantial presumption of market efficiency. *Id.* at 208:4-218:13. *Cammer* 1 is therefore satisfied.[4]

**_Cammer_ 2 (Analyst Coverage)**: During the Class Period, at least 13 analysts reported on Waste Management, 17 provided consensus estimates, and 285 news articles from major sources covered the Company – all indicators of market efficiency. *See* Feinstein Rpt. ¶¶88, 91, 101. Ratings from Fitch, Moody's, and S&P at issuance, along with a Fitch report during the Class Period, further support efficiency. *See id.* ¶¶107-108.[5] Defendants argue wrongly that *Cammer* 2 is not satisfied because certain analyst reports covering the Company were called "equity" reports rather than specifically describing themselves as reports about the Notes. *See* Opp. at 15-16. The Court should reject this simplistic argument.[6] There is no dispute that information material to the Notes –

---

[3] Defendants' authorities do not support their arguments concerning the OTC bond market being inefficient or the Notes' trading volume failing to satisfy *Cammer* 1. *See* Opp. at 14-15. Dr. Feinstein cites finance literature showing that implementation of the TRACE system in July 2002 substantially increased the efficiency and transparency of OTC bond markets. *See* Feinstein Reb. Rpt. ¶¶87-90. All but one of the cases Defendants cite pre-date TRACE. Defendants' only post-TRACE case, *In re Glob. Brokerage, Inc.*, 2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021), involved notes that traded below 1% for 65% of the class period. Here, as confirmed by Ms. Allen, the Notes traded at or above 1% for most of the weeks in the Class Period. Allen Tr. at 208:4-218:13.

[4] *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 215 (E.D. Pa. 2008) (holding *Cammer* 1 satisfied even where notes did not trade for 48% of the class period); *In re Dynex Cap., Inc. Sec. Litig.*, 2011 WL 781215, at *4 (S.D.N.Y. Mar. 7, 2011) (finding active bond trading satisfies *Cammer* 1 despite criticisms similar to Defendants'); *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 366-67 (S.D.N.Y. 2016) (affirming Dr. Feinstein's volume methodology for notes and observing that "*Cammer* thresholds are designed for common stock, which trades more frequently than bonds").

[5] *See Petrobras*, 312 F.R.D. at 366 (recognizing similar news, analyst, and agency coverage as indicative of efficiency).

[6] The Court should also reject Defendants' reliance on *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006), an inapposite case involving asset-backed "Certificates" that were secured by mortgages on manufactured homes, not by the Bombardier corporation. *Id.* at *1, *10 (finding "no

- 2 -

including merger-related information and financial data pertinent to valuation – regularly reached the market during the Class Period through the extensive coverage of Waste Management by analysts, rating agencies, and the media. *See, e.g.*, Feinstein Reb. Rpt. ¶27(iii) and (v)-(vi). This coverage satisfies *Cammer* 2.[7]

**_Cammer_ 3 (Underwriters and Market Makers)**: The evidence presented by Lead Plaintiffs satisfies *Cammer* 3. *First*, there were at least 20 underwriters for the Notes. Opening Br. at 16. Defendants' expert appears to argue that there is "no evidence" of market makers because there are no "*designated*" market-makers in the over-the-counter bond market, but cannot refute that it is standard for bond underwriters to continue making a market for the bonds they underwrite. *See* Feinstein Rpt. ¶¶113-114; Feinstein Reb. Rpt. ¶¶78, 83-84; Allen Rpt. ¶58. *Second*, at least three investment banks, who covered and issued reports on Waste Management, explicitly stated that they made a market in Waste Management securities. Opening Br. at 16. *Third*, inter-broker dealer transactions in the TRACE data provided by FINRA indicate the presence of market makers. Feinstein Reb. Rpt. ¶¶80-81.

**_Cammer_ 4 (Form S-3)**: Defendants admit that Waste Management was eligible to file a Form S-3. The Court should reject Defendants' argument that this factor only "slightly" favors efficiency, which is based on an inapposite case involving unregistered bonds. Opp. at 17 (citing *Glob. Brokerage*, 2021 WL 1160056, at *16).

---

evidence that analysts specifically followed the Certificates, the value of which is tied to the performance of the underlying mobile homes, and only incidentally to the performance of BI or its subsidiaries"); *see also* Feinstein Reb. Rpt. ¶60.

[7] *See Dynex, 2*011 WL 781215, at *5 (sector-, as opposed to security-, specific coverage by agencies and analysts satisfies *Cammer* 2). Defendants' own authority supports Plaintiffs' position. Opp. at 16. In *In re Teva Securities Litigation*, 2021 WL 872156, at *19 (D. Conn. Mar. 9, 2021), the court held that ratings agency coverage alone is insufficient, but found that analyst coverage of the company and its equity supported efficiency for debt securities. *Id.* at *19, *42. *Teva* also supports the proposition that the involvement of underwriters supports efficiency. *Id.* at *20.

*Krogman* **1 (Par Value) and 3 (Float)**: The $3 billion aggregate par value of the Notes is another strong indicator of market efficiency. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 (S.D.N.Y. 2013) (total par value of $1.88 billion was "sufficiently large" to align with "a more liquid and efficient market"); *see also In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 637 (N.D. Ala. 2009); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 529 F. Supp. 2d 644, 756-57, 768 (S.D. Tex. 2006). Similarly, the Notes' $3 billion float supports efficiency. *See, e.g.*, *Petrobras*, 312 F.R.D. at 366-71.[8]

*Krogman* **2 (Bid-Ask Spread)**: The Notes' narrow bid-ask spread also demonstrates efficiency. Based on bid-ask quotes provided by Bloomberg and LSEG Workspace, the average bid-ask spread was between 0.35% and 0.93% and between 0.12% to 0.41%, respectively, well below the 4.34% threshold established in *Krogman*. *See* Feinstein Rpt. ¶¶138-139, 141. Defendants attempt to dismiss this data as "unsupported estimates from third-party sources," but Bloomberg and LSEG Workspace bond price computations (sometimes called "matrix" pricing) are based on reliable methods, are routinely relied upon by market participants and experts – Defendants' expert even used this data in preparing her alternative event study – and courts routinely accept such matrix pricing to analyze the efficiency of bond markets.[9] Opp. at 18; Feinstein Rpt. ¶135; Feinstein Reb. Rpt. ¶¶109-117; Allen Rpt. ¶25 n.51.

---

[8] Defendants do not dispute the Notes' $3 billion aggregate par value or float, instead criticizing Dr. Feinstein for comparing the Notes' outstanding par value to the market capitalization of publicly traded companies. *Id*. Courts have rejected similar critiques of Dr. Feinstein's analysis. *See, e.g.*, *Petrobras*, 312 F.R.D. at 366-71 (finding the indirect factors supported efficiency, including where Dr. Feinstein compared the par value and float of the Petrobras bonds to the market capitalization of public companies); *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *15 (E.D.N.Y. Jan. 11, 2022) (finding market efficiency where Dr. Feinstein compared the outstanding par value of the notes to the market capitalization of public companies). In all events, the outstanding par value and float of each of the Notes was also larger than the respective outstanding par value of 98% of the U.S. dollar denominated corporate bond issues outstanding on the first day of the Class Period. *See* Feinstein Reb. Rpt. ¶105.

[9] *See, e.g.*, *Dynex*, 2011 WL 781215, at *5 (endorsing the use of Bloomberg matrix prices as a proxy for actual transaction prices and recognizing that the Second Circuit has approved matrix prices); *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1152 (N.D. Ohio 2013) (affirming the use of estimated prices for bond valuations in a Rule 10b-5 class action).

### B. Dr. Feinstein's Event Study Is Reliable and Satisfies *Cammer* 5

Dr. Feinstein's event study provides empirical evidence that the Notes traded in an efficient market. Opening Br. at 17-18. After accounting for the unique features of the Notes, market and industry movements, and inflation, Dr. Feinstein concluded that the Notes experienced statistically significant price declines in the wake of the Company's June 24, 2020 disclosure, demonstrating a sensitivity and responsiveness to unexpected material information. *Id.*, Feinstein Rpt. ¶¶31, 33, 35, 37, 190-195. Additionally, Dr. Feinstein conducted an event study regression analysis demonstrating the Notes' responsiveness to interest-rate fluctuations throughout the Class Period, further confirming market efficiency. *See* Feinstein Rpt. ¶¶196-200.[10]

The Court should reject Defendants' meritless attacks on Dr. Feinstein's event study. *First*, Defendants' argue wrongly that Dr. Feinstein's use of VWAP "does not follow the accepted practice (and his own standard practice) of calculating the Notes' returns based on daily closing prices." Opp. at 9. This statement is false. VWAPs are the standard and accepted methodology for determining bond prices for purposes of measuring market efficiency, Dr. Feinstein routinely uses VWAPs to calculate daily bond returns in his event studies, and Defendants and their expert do not identify *any* academic literature that mandates (or even endorses) the use of closing prices to measure daily bond returns in an event study. *See id.*; Feinstein Reb. Rpt. ¶¶152-59; Allen Tr. at 79:24-80:4. Moreover, substantial academic literature supports the use of VWAPs to calculate daily bond price returns, and

---

[10] In contrast, and as detailed in Dr. Feinstein's Rebuttal Report, Ms. Allen's analysis suffers from a multitude of methodological errors that render it unreliable, including failing to adjust for "heteroscedasticity," improperly constructing her industry index by failing to correctly remove Waste Management, and incorrectly calculating two-day excess returns. *See* Feinstein Reb. Rpt. ¶¶166, 177, 186-201. Dr. Feinstein's Rebuttal Report provides a thorough discussion of the numerous errors he has identified to date in Ms. Allen's report. *See id.* ¶¶178-259. Along similar lines, although Ms. Allen incorrectly accuses Dr. Feinstein of creating a "synchroneity" problem, Dr. Feinstein explains that his analysis creates no such issue (because his timeframe for calculating VWAPs is identical to the timeframe of his comparator indices), whereas Ms. Allen's analysis in fact creates a synchroneity problem by comparing after-hours trading prices with bond, market, and sector indices that use closing prices as of 4:00 p.m. *Id.* ¶¶156, 181.

Defendants offer no evidence to the contrary. Feinstein Reb. Rpt. ¶153; Allen Tr. at 59:2-11, 60:16-18, 60:21-61:2, 61:6-21, 62:23-63:8, 64:14-65:3, 71:12-72:9, and 73:25-74:4.[11]

*Second*, the Court should reject Defendants' challenge to Dr. Feinstein's testing a single date in his event study. As Dr. Feinstein explained in his opening report (and explains further in his rebuttal), based on a review of news and analyst reports, consideration of the SMR feature of the Notes, and the content of the information released on June 24, 2020 and throughout the 92-trading day Class Period, Dr. Feinstein determined that June 24 was the only valid testable date for his event study – *i.e.*, that June 24 was the only date during the short Class Period on which there was clear and unconfounded information material to the Notes that could reasonably be expected to elicit a strong market response such that an expert could test market efficiency. Feinstein Rpt. ¶160; Feinstein Tr. at 98:24-102:6; Feinstein Reb. Rpt. ¶¶122-123.[12] Moreover, Defendants' criticism relies on out-of-circuit authority (*OPERs*) in which the court found a single-date event study insufficient to establish stock market efficiency for a far longer 15 month class period, while ignoring other authority from this district (*American Realty*) finding a single-date event study sufficient to demonstrate bond market efficiency for an even longer 29 month period.[13] Indeed,

---

[11] The Court should reject Ms. Allen's argument that VWAP prices are "autocorrelated," suggesting inefficiency. *See* Allen Rpt. ¶24. Ms. Allen failed to properly test for autocorrelation, failed to test whether the news or interest rates were autocorrelated, and improperly performed her autocorrelation tests on raw returns. Feinstein Reb. Rpt. ¶¶248-257; Allen Tr. at 93:2-20. Regardless, autocorrelation in bond markets is not indicative of inefficiency, and even the bond index that Ms. Allen used in her analysis showed autocorrelation. *Id.* ¶¶248-257; *see also Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 513 (D. Kan. 2014) ("serial correlation . . . was not unusual in the bond markets generally, and Dr. Bajaj's conclusion that such correlation demonstrates market inefficiency fails," including where the "benchmark bond index Dr. Bajaj measured, as a whole, exhibited significant serial correlation during the Class Period.").

[12] For example, Dr. Feinstein considered and determined that March 18, 2020 was not "a good candidate for a market efficiency event study" (even though Lead Plaintiffs alleged that date as a partial corrective disclosure) because of the mixed information that was disclosed on that date. Feinstein Tr. at 114:10-19, 122:17-124:21, 128:16-129:15.

[13] *Compare In re Am. Realty Cap. Props., Inc. Litig.*, 2017 WL 3835881 (S.D.N.Y. Aug. 31, 2017) (single-day event study sufficient to show bond market efficiency for twenty-nine month class period), *with Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) (fifteen-month class period) (cited at Opp. 9). Defendants also cite to *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307 (5th Cir. 2005), an out-of-circuit stock case, where plaintiffs, unlike here, sought to establish market inefficiency solely through an event study and did not analyze the other factors (*e.g.*, trading volume, market makers, and analyst coverage), and *George v. China Automotive Systems,*

"Defendants fail to identify any authority holding that an event study must evaluate a minimum number of dates to be reliable (or even probative), and the Court [should] decline[] to adopt such a baseline." *Martínek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *16 (S.D.N.Y. Feb. 3, 2022) (certifying one-year class period where event study used only three events).

## II.    DEFENDANTS CANNOT MEET THEIR PRICE IMPACT BURDEN

To rebut the *Basic* presumption of reliance, Defendants bear the burden of demonstrating the complete "absence of price impact." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278 (2014). "[D]efendant must 'in fact' 'seve[r] the link' between a misrepresentation and the price paid by the plaintiff" and "defendant's mere production of some evidence relevant to price impact would rarely accomplish that feat." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 125-26 (2021). Defendants have produced zero evidence relevant to price impact and they cannot satisfy their burden here.

Defendants' expert concedes that Dr. Feinstein's event study shows that all four of the Notes experienced statistically significant price declines on June 24, 2024, when the truth was revealed at the end of the Class Period. *See* Feinstein Rpt. ¶¶31, 33, 35, 37, 190-195; Allen Tr. at 223:23-224:4. On this basis alone, Defendants will be unable to prove a total absence of price impact. *See, e.g.*, *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *13 (S.D.N.Y. Sept. 8, 2021) ("As [defendant] has failed to prove by a preponderance of the evidence that the . . . main corrective disclosure according to [plaintiff] was *not* associated with a negative price impact, it has not succeeded in rebutting the *Basic* presumption.") (emphasis in original).[14] The Court should also reject

---

*Inc.*, 2013 WL 3357170 (S.D.N.Y. July 3, 2013), a case involving a twenty two-month class period where plaintiffs did not submit an event study and the *Cammer* 5 analysis was otherwise riddled with methodological flaws.

[14] Defendants argue only that the 4.0% Notes did not experience statistically significant declines on June 24, 2024 if calculated using closing prices rather than VWAPs. Opp. at 21. As explained *supra*, however, VWAPs are the standard and proper metric for such calculations. Regardless, even if Defendants could show that there is some legitimate dispute

Defendants' effort to twist the allegations concerning the March 18, 2024 disclosure into a price impact argument. Defendants first attempt to construct an argument based on the notion that the March 18th disclosure fully corrected earlier alleged misstatements, Opp. at 20, even though (as Defendants' own expert acknowledges) the Complaint alleges that the March 18 partial corrective disclosure updated "prior timing expectation" *and* "continued to mislead investors" by "advising the market that antitrust approval was expected by the End Date[.]" ¶¶9, 64; *see also* Allen Tr. at 146:15-24. Defendants build further on this mischaracterization by distorting language from the "loss causation" section of the Complaint to suggest that the Complaint pleads that "post-March 18 statements" caused the price to "rebound." Opp. at 21. But the Complaint pleads no such thing and the language that Defendants cite – stating that "prices soon rebounded based upon Defendants' assurances that DOJ approval and the merger closing would be completed by the End Date" – obviously refers to the March 18th statement itself, which misled investors by representing "that antitrust approval was expected by the End Date[.]" ¶¶9, 110. Accordingly, even if Defendants' convoluted price impact arguments based on the March 18th disclosure were legally viable – and Defendants present no remotely comparable authority in support – the arguments are based on obvious mischaracterizations of the Complaint and the Court should reject them.

## III.    DAMAGES ARE CALCULABLE CLASS-WIDE

As explained in Lead Plaintiffs' Opening Brief, damages are calculable class-wide. Opening Br. at 22-23. Lead Plaintiffs, who purchased Notes during the Class Period, allege that Defendants' misrepresentations and omissions created and maintained artificial inflation in the prices of the Notes, causing damage to Lead Plaintiffs and members of the Class when the truth was revealed. *Id.* at 8; *see, e.g.*, Feinstein Reb. Rpt. ¶¶286-287. Dr. Feinstein's out-of-pocket damages methodology

---

between the experts' competing methods for calculating the Notes' returns – and Defendants have made no such showing here – Defendants' preference for one method does not prove a total absence of price impact.

aligns with Lead Plaintiffs' theory of liability and is capable of uniformly calculating damages as the difference between the purchase price and the price that would have existed absent the alleged fraud. *See id*. Ms. Allen does not dispute that this methodology would apply to all Class members. *See* Feinstein Reb. Rpt. ¶288.

Defendants ignore binding Second Circuit precedent providing that Rule 23 "does not require a plaintiff to set forth a detailed model for calculating damages at the class certification stage" but rather only requires showing that Plaintiffs' "damages model 'measure[s] damages that result from the class's asserted theory of injury.'"[15] Defendants' argument amounts to little more than premature speculation that the level of artificial inflation varied during the Class Period, and conjecture that this possibility might later complicate damages calculations. Opp. at 24-25.[16] But the Second Circuit has "explicitly rejected the notion that *Comcast* requires 'that damage calculations [ ] be so precise' as to account for 'variations in inflation over time.'" *Signet Jewelers*, 2019 WL 3001084, at \*20 (quoting *Waggoner*, 875 F.3d at 106). Moreover, although a plaintiff must ultimately "prove economic loss, it need not do so at this juncture to establish that common issues relating to damages predominate." *Id*.

---

[15] *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc*., 2024 WL 1497110, at \*24 (S.D.N.Y. Apr. 5, 2024) (citing *Waggoner*, 875 F.3d at 105-06 (interpreting *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)); *Roach v. T.L. Cannon Corp*., 778 F.3d 401, 407 (2d Cir. 2015) (same); *see also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) ("All that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.").

[16] The Court should reject Defendants' strawman "materialization of the risk" argument, which is based on a misleading quotation of the phrase "increasing likelihood" which appears once in the Complaint. Opp. 24-25, *see also* ¶55. Moreover, the Court should reject Defendants' reliance on *In re BP p.l.c. Securities Litigation*, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) and its materialization of the risk analysis, as numerous courts have done. *See, e.g*., *Rougier v. Applied Optoelectronics, Inc*., 2019 WL 6111303, at \*15-\*18 (S.D. Tex. Nov. 13, 2019) (rejecting Defendants' reliance on the *BP* line of cases to recast Plaintiffs' fraud-on-the-market theory as a "materialization of risk" claim). *See also Schleicher v. Wendt*, 618 F.3d 679, 683-84 (7th Cir. 2010) ("Although 'materialization of risk' runs like a mantra through the parties' briefs, we do not think that it has any significance. . . . [T]he fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied."). Ms. Allen also speculates that an early Class Period announcement by the Company that it would not close by the end date would prospectively trigger the redemption of the Notes before the End Date. Allen Rpt. ¶84. This argument has no basis in the language of the SMR and Ms. Allen admits that she did not investigate what would trigger the SMR. Allen Tr. at 234:11-19. Dr. Feinstein nevertheless refutes Ms. Allen's argument in his report. *See* Feinstein Reb. Rpt. ¶¶299-301.

## IV. DEFENDANTS' *MORRISON* AND *AFFILIATED UTE* ARGUMENTS FAIL

The Court should reject Defendants' attempt to manufacture a "domesticity" issue. Defendants provide no evidence that foreign transactions accounted for any portion of the Class, instead speculating that some Notes transactions must have taken place outside the U.S. because some non-U.S. institutions may have held Notes during the Class Period. Opp. at 21-23. Obviously, non-U.S. institutions routinely purchase and sell securities within the U.S. and Defendants provide "no reason to speculate that individualized domesticity inquiries will predominate when the record does not indicate that foreign transactions account for a large proportion of the class." *See In re Vale S.A. Sec. Litig.*, 2022 WL 969724, at *5 (E.D.N.Y. Mar. 31, 2022).

As also explained in the Opening Brief, Lead Plaintiffs' claims are predicated on omissions of material facts. Opening Br. at 21. Thus, Lead Plaintiffs are entitled to the *Affiliated Ute* presumption of reliance.[17]

## V. CONCLUSION

For the foregoing reasons and those set forth in the Opening Brief, Lead Plaintiffs respectfully request that the Court grant the motion in full.

DATED: October 16, 2024    ROBBINS GELLER RUDMAN
                 & DOWD LLP
                CHAD JOHNSON
                NOAM MANDEL
                DESIREE CUMMINGS
                JONATHAN ZWEIG
                CHRISTOPHER T. GILROY

---

[17] Defendants cite to *In re Barclays Liquidity Cross & High Frequency Trading Litigation*, 126 F. Supp. 3d 342, 365 (S.D.N.Y. 2015), a motion to dismiss decision where the court declined to apply the *Affiliated Ute* presumption because the statements were all misrepresentations. Here, the Court has determined that the "Complaint sufficiently pleads that Defendants made material omissions when they made certain statements about the acquisition completion time but failed to disclose that the $200 million Antitrust Revenue Threshold likely would not . . . satisfy the DOJ's antitrust concerns[.]" MTD Opinion and Order (ECF No. 58) at 8.

*/s/ Noam Mandel*
NOAM MANDEL

420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
dcummings@rgrdlaw.com
jzweig@rgrdlaw.com
cgilroy@rgrdlaw.com

*Lead Counsel for the Class*