# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re WASTE MANAGEMENT SECURITIES LITIGATION | Civil Action No. 1:22-cv-04838-LGS |

REBUTTAL REPORT OF

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

October 16, 2024

## TABLE OF CONTENTS

I.     SCOPE OF PROJECT AND REPORT .......................................................................1

II.    SUMMARY OF CONCLUSIONS AND OPINIONS ...........................................................4

III.   CRITIQUE OF MS. ALLEN'S MARKET EFFICIENCY OPINIONS...........................10

     A.     Areas of Agreement ..............................................................................10

     B.     The *Cammer* and *Krogman* Factors Indicated That the Waste Management Notes Traded in an Efficient Market; All of Ms. Allen's Criticisms are Contrived and Specious ...........................................................................13

           1.     Trading Volume.......................................................................15

               a.    Par Value Traded and Average Weekly Turnover.......................15

               b.    Trade Frequency ..................................................................19

           2.     Analyst Coverage.....................................................................21

           3.     Institutional Ownership.............................................................30

           4.     Market Makers and Prominent Underwriters ................................34

           5.     Short Selling Activity ...............................................................40

           6.     Outstanding Par Value ..............................................................42

           7.     Bid-Ask Spread.......................................................................45

           8.     Empirical Demonstration of Market Efficiency .............................49

               a.    In Empirical Tests the Waste Management Notes Demonstrated Market Efficiency ....................................................................49

               b.    Event Selection ...................................................................50

               c.    The Number of Acceptable Candidate Events is Commonly Restricted by the Length of the Class Period...............................58

               d.    Use of Value Weighted Average Prices is the Generally Accepted and Widely Used Methodology, Dictated by Peer-Reviewed Published Research................................................59

               e.    Correction For Heteroskedasticity with the Newey-West Procedure is Necessary; I Executed the Procedure Correctly........62

               f.    The Waste Management Notes Demonstrated Efficiency by Reacting Continuously to Changes in Market Interest Rates ........66

     C.     Ms. Allen's Empirical Analyses are Flawed and Unreliable ...............................67

           1.     Ms. Allen Records Daily Note Prices in a Manner Rejected by Peer-Reviewed Authority.............................................................68

           2.     Heteroskedasticity Renders Ms. Allen's Event Study Results Flawed and Unreliable ...............................................................71

3.     Ms. Allen Made a Mistake When Constructing the Industry Index ..........73

4.     Ms. Allen Calculates Two-Day Excess Returns Incorrectly ....................74

5.     Ms. Allen Conducts Flawed Event Study Analysis and Misinterprets the Test Results..................................................................75

    a.     Analysis of 18 March 2020............................................................75

    b.     Analysis of 18 June 2020...............................................................78

    c.     Analysis of 24 June 2020...............................................................80

        (i)     Why the Note Prices Did Not Fall To \$101......................80

        (ii)    High Subsequent After-Hours Trading Prices for the LBJ7 Note Are Explainable...............................................82

        (iii)   The Properly Measured Note Prices Declined Significantly.......................................................................83

6.     Allen's Collective Test Examines Immaterial News ...............................84

7.     There is No Stable, Persistent, or Exploitable Autocorrelation; Autocorrelation Does Not Indicate Inefficiency......................................87

IV.    CRITIQUE OF MS. ALLEN'S PRICE IMPACT OPINION ..........................................91

    A.     Ms. Allen's Event Study Analysis on the Alleged Misrepresentation and Omission Dates Proves Nothing ................................................................92

    B.     Ms. Allen's Conclusion of No Price Impact on 18 March 2020 Is Erroneous .................................................................................................95

    C.     Ms. Allen's Price Impact Analysis Is Incomplete as It Excludes Consideration of the 24 June 2020 Corrective Disclosure....................................96

V.     CRITIQUE OF MS. ALLEN'S DAMAGES METHODOLOGY OPINION...................97

    A.     The Out-of-Pocket Damages Methodology Articulated in the Feinstein Report Is Common for All Class Members, Consistent with Lead Plaintiffs' Theory of Liability, and Feasible..........................................................97

    B.     Ms. Allen's Concerns About the Damages Methodology ...................................98

    1.     Plaintiffs Allege that Defendants Did Not Just Understate the Magnitude of a Known Risk, But Rather Concealed a Virtual Certainty....................................................................................................99

    2.     The Damages Methodology Accommodates Alternative Determinations About the Nature of the Concealed Certainty or Risk ...................................................................................................100

    3.     Ms. Allen Adopts Lead Plaintiffs' Theory of Liability, But Surprisingly Contends There Would Be No Damages ...........................101

VI.    LIMITING FACTORS AND OTHER ASSUMPTIONS..............................................102

## I.      SCOPE OF PROJECT AND REPORT

1.      Lead Plaintiffs' Lead Counsel, Robbins Geller Rudman & Dowd LLP, asked me to determine whether four debt securities issued by Waste Management, Inc. ("Waste Management" or the "Company") traded in an efficient market during the period from 13 February 2020 through 23 June 2020, inclusive (the "Class Period").

2.      On 14 June 2024, I submitted a report in this matter (the "Feinstein Report").[1] Based on the analyses presented in the Feinstein Report, I concluded that the Waste Management Notes did trade in an efficient market throughout the Class Period.[2] I further concluded that Section 10(b) damages can be computed for all Class members and for all of the Notes using a common methodology that is consistent with Lead Plaintiffs' theory of liability. That methodology is the out-of-pocket damages methodology, which is used in virtually all Section 10(b) class action securities cases.[3] In the Feinstein Report, I described the methodology and provided details about its implementation.[4]

3.      In the Feinstein Report, I showed that the Waste Management Notes satisfied all of the *Cammer* and *Krogman* factors. As explained and documented in the Feinstein Report, analysis of the *Cammer* and *Krogman* factors, including empirical event study analysis, is the generally accepted methodology for assessing market efficiency. While bonds and notes generally trade differently from stocks, with larger though less frequent trades, and economists and courts make accommodations for these differences when judging the efficiency of bond markets, the Waste Management Notes satisfied the *Cammer* and *Krogman* factors even when compared to the standards set for stocks. This finding compels the conclusion that the market for the Waste Management Notes was efficient over the course of the Class Period.[5]

---

[1] Unless otherwise indicated, capitalized terms used herein have the same definition and meaning ascribed to them in the Feinstein Report.

[2] Feinstein Report, ¶19.

[3] Feinstein Report, ¶23.

[4] Feinstein Report, §XII.

[5] Feinstein Report, ¶¶20, 21 and Feinstein Report, §IX.

4.    The Waste Management Notes were actively traded, with volume throughout the Class Period that was high even compared to the thresholds used to judge market efficiency for stocks.[6] The issuing company, Waste Management, enjoyed extensive analyst coverage, which constantly updated Note investors with information, analysis, and forecasts about the Company's revenue, profit, cash flow, credit worthiness, and importantly – progress towards completion of the ADS acquisition ("Acquisition").[7] Every available metric indicates that the market for the Waste Management Notes was served by numerous market makers, which facilitated the observably high trading volume.[8] The Company's qualification for S-3 registration establishes that the Company was large and well known, and information about it was continually provided to the market. Just as satisfaction of the S-3 eligibility *Cammer* factor indicates market efficiency for stocks, it also indicates market efficiency for the Notes. In fact, the SEC has specific eligibility conditions for S-3 issuance of bonds in particular, and Waste Management satisfied those conditions as well throughout the Class Period, in addition to the S-3 eligibility conditions for stocks which are used to assess the efficiency of a stock market.[9] Bid-ask spreads in the markets for the Waste Management Notes are observed and analyzed by reputable information service providers, and these services reported throughout the Class Period that the bid-ask spreads on the Waste Management Notes were narrow, even by standards used to judge stock market efficiency.[10] The size of the Note issues was extraordinarily large. The Note issues were so large that even if they were the only securities issued by Waste Management, the enterprise value that they would represent would rank Waste Management among the largest companies in the United States.[11] As none of the Notes was held by insiders, all of this massive outstanding issue was in the Notes' public float.[12]

---

[6] Feinstein Report, ¶80.

[7] Feinstein Report, ¶¶93 and 94.

[8] Feinstein Report, ¶112.

[9] Feinstein Report, ¶¶122 and 123.

[10] Feinstein Report, ¶¶138, 139 and 141.

[11] Feinstein Report, ¶127.

[12] Feinstein Report, ¶131.

5.   As would be expected from the *Cammer* and *Krogman* characteristics of the Waste Management Notes, the event study analysis proved that the Waste Management Notes responded swiftly and significantly to the Company announcement that the acquisition of ADS would not be completed by 14 July 2020 ("End Date"), which would trigger the mandatory redemption feature in the Notes.[13] This event study was conducted on the only event on which uncompromised, unconfounded news was provided to the market that according to valuation principles would reasonably have a large impact on the Note values. That is, the event study focused on the one acceptable candidate event for testing market efficiency. The news on 24 June 2020 was indisputably important and negative, and the Notes reacted to that news accordingly.

6.   The event study regression analysis also proved that the Notes reacted continuously and appropriately to changes in market interest rates over the course of the Class Period. These empirical demonstrations of market efficiency prove that the market for the Waste Management Notes was well developed, free of trading impediments, free of information impediments, and rational, such that it was an efficient market throughout the Class Period.[14]

7.   Following submission of the Feinstein Report, I provided deposition testimony in this case (the "Feinstein Deposition") on 27 September 2024.

8.   Lead Plaintiffs' Lead Counsel asked me to consider and evaluate the arguments and conclusions in the Expert Report of Lucy P. Allen, dated 16 August 2024 (the "Allen Report"), submitted by Defendants in this matter. I read and analyzed the Allen Report. I also reviewed the transcript of Ms. Allen's deposition, dated 1 October 2024 (the "Allen Deposition").

---

[13] Feinstein Report, ¶147.

[14] Feinstein Report, ¶¶205-207.

9. According to Ms. Allen, she was asked to (i) "Review and respond to the Report on Market Efficiency and Damages Methodology of Steven P. Feinstein, filed on June 14, 2024";[15] (ii) "Analyze whether there is a reliable link between the alleged misrepresentations and the price movement of each of the four debt securities issued by Waste Management that are part of this case";[16] and (iii) "Analyze whether foreign investors held the SMR Notes between February 13, 2020 and June 23, 2020."[17]

10. This rebuttal report presents my analysis and conclusions relating to the Allen Report and the issues raised therein. As of this juncture, I have not been asked to conduct an analysis of loss causation or to compute damages. I consequently do not offer a loss causation opinion or damage quantification in this report. Should I be asked to do so, I will comprehensively address loss causation and damages at the appropriate stage in this litigation.

11. Documents that I reviewed and relied upon in preparing this report in addition to those already cited in the Feinstein Report are listed in Exhibit-1 of this report. My credentials and compensation are presented in the Feinstein Report, as is a list of testimony I provided during the four years preceding that report. Testimony that I have provided since the Feinstein Report is identified in Exhibit-2 of this report.

## II.    SUMMARY OF CONCLUSIONS AND OPINIONS

12. The Allen Report provides no basis for revising my conclusion that the Waste Management Notes traded in an efficient market during the Class Period. I correctly conducted the widely used and generally accepted market efficiency analysis, and I applied generally accepted and well-supported standards. The findings clearly indicate that the Waste Management Notes traded in an efficient market throughout the Class Period.[18]

---

[15] Allen Report, ¶1.

[16] Allen Report, ¶1.

[17] Allen Report, ¶1.

[18] Feinstein Report, ¶¶19-22.

13.    Ms. Allen's conclusion that the evidence and my analysis do not indicate market efficiency is at odds with the financial literature, court decisions, and generally accepted methodologies for assessing market efficiency. Her purported empirical analysis is inconsistent with her own articulation of what information is important for the Notes, and also runs contrary to generally accepted principles of statistical inference. Ms. Allen's challenge to not only my work in this matter but also to the generally accepted and widely used market efficiency assessment methodology are at odds with the mainstream of academic and forensic economics. My analysis and the conclusion compelled by the evidence stand.

14.    The alternative event study analysis Ms. Allen conducts is invalid and unreliable on account of her disregarding the presence and effects of heteroskedasticity, which is a complexity in the data that requires advanced regression analysis to correct. Ms. Allen made no correction for heteroskedasticity, rendering her methodology deficient and outside generally accepted scientific norms. Because of the uncorrected heteroskedasticity in her statistical analysis, among other deficiencies, Ms. Allen's conclusions are unreliable. Unreliability of statistical inference when heteroskedasticity is present and uncorrected is a generally accepted principle in statistics.[19]

15.    In my analyses, presented in the Feinstein Report, I used the Newey-West methodology to correct for the heteroskedasticity in the Notes return data.[20] This methodology is well grounded in the statistics and econometrics literature and is a valid approach for correcting heteroskedasticity, which is necessary in this case. While Ms. Allen does not correct for heteroskedasticity at all, she mischaracterizes and evidently misunderstands the Newey-West methodology I employed, she nonetheless criticizes my use of it.[21]

---

[19] See e.g., *Econometric Models, Techniques, & Applications*, by Michael Intriligator, Prentice-Hall, 1978, p. 156.

[20] Feinstein Report, ¶180.

[21] Ms. Allen suggests that the Newey-West correction is unreliable as "the event study would yield too many statistically significant results even when nothing unusual has happened." Allen Report, FN 56. However, exhibits 12a – 12d of the Feinstein Report show the Newey-West $t$-statistics for the residual returns of all dates in the Estimation Period for each of the Notes. A count of the significant Newey-West residual $t$-statistics at the nominal 5% level (absolute value equal to or above 1.96) indicates that LBF5 Notes had 5 significant days out of 248 regression observations or 2.02%, LBG3 Notes had 11 significant days out of 250 observations or 4.40%, LBH1 Notes had 10 significant days out of 230 observations or 4.35%, and LBJ7 Notes had 6 significant days out of 131 observations or 4.58%. All these values are within reasonable margins of the tested nominal 5% significance level. That is, my

5

16.  Ms. Allen concurs that the primary factors affecting the value of the Notes were 1) Waste Management's credit rating, 2) how long the Notes would remain outstanding, and 3) market interest rates.[22] It is indisputable that the Company's credit rating did not change during the Class Period. In fact, the credit rating agency Fitch issued a report during the Class Period that concluded that despite the volatility and disruptions in the marketplace caused by Covid, the credit worthiness and therefore rating for Waste Management had not changed.[23] Regarding how long the Notes would remain outstanding, there was only one date when that factor changed, and that was 24 June 2020, when the Company announced it would miss the End Date for the Acquisition and therefore exercise the mandatory redemption option to call the Notes early. Throughout the Class Period, at every juncture, the Company reassured investors that it would complete the Acquisition on time and therefore not call the bonds early. These alleged misrepresentations are what this case is about. These alleged misrepresentations countervailed against every other announcement and development that might have indicated otherwise. Given these facts, the only valid and informative empirical test of the market efficiency for the Notes was an event study focused on the 24 June 2020 announcement date, and an examination of whether or not the Notes moved appropriately with the market interest rates continuously over the course of the Class Period. I executed that empirical analysis and found it to confirm market efficiency for all four Notes.[24]

17.  Ms. Allen, alternatively, ran event studies on dates when the news was either irrelevant to the Notes or so countervailed and conflicted that it would not a priori be expected to have either a positive or negative effect on the Notes. Choosing events that one knows in advance based on valuation principles would not affect the Note prices, and then finding that those events did not affect the prices of the Notes, as expected, is entirely uninformative about market efficiency. Essentially, Ms. Allen designed and ran tests that she knew in advance would give the spurious appearance of failure.

---

correction does not produce excessive finding of significant residual returns. Alternately, using an empirical histogram to identify significant date, would always result in 5% of total observations being significant.

[22] Allen Report, ¶55 and Allen Deposition at 21:20-23.

[23] Feinstein Report, ¶108.

[24] Feinstein Report, §X.

18. Ms. Allen's opinions regarding the damages methodology are limited to the following assertions: (i) certain difficulties emerge when valuing the Notes in the but-for scenario; and (ii) the eventual construction of the inflation ribbons in this case, and the resulting quantification of damages, may be computed incorrectly if they do not account for the potential valuation complexities she identifies.[25] However, none of the potential issues highlighted by Ms. Allen is a valid challenge to my conclusion that damages can be computed correctly using the out-of-pocket damages methodology, which is common for all Class members and consistent with Lead Plaintiffs' theory of liability.[26]

19. Ms. Allen does not dispute that the generally accepted and widely used out-of-pocket damages methodology exists. Ms. Allen does not dispute that the basis for damages according to the out-of-pocket damages methodology is the difference between the actual prices at which the Notes traded during the Class Period and what the prices would have been if there had been full, timely, truthful disclosure rather than alleged misrepresentations and omissions. Ms. Allen does not contend that it is impossible to correctly compute this difference, which is artificial inflation, for each Note and for each day during the Class Period. She merely offers that execution of the out-of-pocket damages methodology could potentially be done incorrectly. Of course it could be, but it could also be accomplished correctly. Her admonitions are not a valid criticism of the damages methodology. Her admonitions are tacit acceptance that the methodology exists, that it is common for all Class members, and that it can be executed correctly if mistakes are avoided.

20. Ms. Allen's opinion that the alleged misrepresentations and omissions had no price impact is also wrong. Notwithstanding the flaws in Ms. Allen's quantitative analysis, we both agree that for three of the four Waste Management Notes (LBF5, LBH1, and LBG3), the prices declined significantly in response to the Company's announcement on 24 June 2020, which Lead Plaintiffs allege was a corrective disclosure. Ms. Allen and I also agree that what caused the prices of these Notes to decline was the Company's announcement that it expected to redeem the Waste Management Notes for 101% of par value (a steep discount

---

[25] Allen Report, ¶¶76 and 77.

[26] Feinstein Report, ¶23.

from the previously prevailing market prices) pursuant to the special mandatory redemption feature.[27] In light of this undisputed fact, Ms. Allen's opinion that "There is no reliable link between the alleged misrepresentations and the price movements of the SMR Notes" is specious.[28] To draw this conclusion, Ms. Allen disregards generally accepted principles of bond valuation and the event study results, with which we both agree. These principles and the event study prove that the alleged misrepresentations and omissions did impact the prices of the LBF5, LBH1, and LBG3 Notes, when made, when maintained, and when corrected.

21. Ms. Allen's purported finding that the LBJ7 Notes did not fall significantly following the 24 June 2020 announcement is wrong.[29] Her erroneous finding is the result of methodological and data flaws. Ms. Allen's deviations from the correct and generally accepted methodology smack of results-driven data mining. Eschewing generally accepted event study methodology and rejecting the generally accepted methodology for measuring daily bond prices, for each day in her daily return event studies, Ms. Allen used individual trade prices from trades that occurred after the standard 4:00 PM market closing time. It is after the 4:00 PM market closing time when companies often make important announcements. This is also the time as of which the sector and bond indices used by Ms. Allen are computed.

22. The proper methodology for measuring bond prices for bond event studies, which I used but Ms. Allen did not, measures daily bond prices as the value weighted average price among transactions that took place during the 9:30 AM to 4:00 PM normal market trading hours. That this is the generally accepted and correct way to measure daily bond prices is explicated in the peer-reviewed literature and has been used and accepted consistently in class action securities cases involving bonds.[30]

---

[27] Allen Report, ¶91.

[28] Allen Report, §VII.

[29] Allen Report, ¶36.

[30] *See, e.g., In re Vale S.A. Sec. Litig.*, No. 19-CV-526-RJD-SJB (E.D.N.Y. Mar. 31, 2022); *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 93 Fed. R. Serv. 3d 1548 (S.D.N.Y. 2016); and *In re American Realty Capital Properties, Inc. Litigation*, 1:15-15-mc-00040 (AKH) (S.D.N.Y. Aug. 31 2017).

23. Ms. Allen's mismeasurement of daily note prices and inclusion of prices from trades that took place in after-hours trading, render her statistical analysis of 24 June 2020 for the LBJ7 Notes unreliable and her conclusion erroneous. Event study analysis that appropriately uses value weighted average prices ("VWAPs") and corrects for heteroskedasticity proves that the LBJ7 Note fell significantly on 24 June 2020, in response to the Company's announcement that it would miss the 14 July 2020 End Date for the Acquisition.[31]

24. To bolster her erroneous opinion that the misrepresentations did not impact the Note prices, Ms. Allen runs event studies focused on alleged misrepresentation dates and finds that the Notes did not move by statistically significant amounts on those dates.[32] This observation proves nothing. Announcements that are consistent with what the market was already told by a company do not change the mix of information and consequently do not usually elicit significant security price movements. Lack of a significant security price movement does not prove that the information was unimportant, or that the market was inefficient. Such a result is what one would expect in an efficient market when the announcement accords with what the market was already led to believe. The lack of a statistically significant price increase when a misrepresentation is made does not prove that the misrepresentation had no price impact.

25. The Feinstein Report explains that a misrepresentation or omission may have price impact and increase artificial inflation without causing a statistically significant security price increase. This result can occur for a number of reasons, including: i) when there is a release of countervailing negative news at the time of the positive misrepresentation; ii) when an omission or deception conceals new adverse conditions and thereby prevents an appropriate fall in security price; and iii) as discussed above, when the representation, though false, is consistent with the market's prior beliefs so that the mix of publicly available information has not materially changed.[33]

---

[31] Feinstein Report, ¶192.

[32] Allen Report, ¶87.

[33] Feinstein Report, ¶¶154 and 155.

26.    A statistically significant reaction to a misrepresentation or corrective disclosure can prove price impact, but non-significance does not prove there was no price impact. Believing otherwise is a logical and methodological error that pervades Ms. Allen's argument, report, and opinion. This error, together with Ms. Allen's flawed and invalid statistical analysis and her disregard for generally accepted principles of bond valuation, is responsible for Ms. Allen's erroneous proffered opinion. Correct analysis compels the conclusion that the alleged misrepresentations and omissions did impact the prices of the Waste Management Notes.

### III.    CRITIQUE OF MS. ALLEN'S MARKET EFFICIENCY OPINIONS

#### A.    Areas of Agreement

27.    Ms. Allen does not dispute any of my factual findings concerning the following *Cammer* and *Krogman* factors, which indicate the market for the Waste Management Notes during the Class Period was efficient:

i.    Trading Volume: The average weekly trading volume when measured over the Class Period for the Waste Management Notes exceeded the 2% turnover level, which was acknowledged by *Cammer* and numerous courts subsequently to be the threshold for a strong presumption of market efficiency.[34]

ii.    Trading Frequency: Among Waste Management Notes, the average number of days between successive trades ranged between 0.04 days and 0.32 days during the Class Period.[35] This frequency represents active trading according to the trading frequency results presented in the study conducted by Mahanti et al. [2008].[36]

---

[34] Feinstein Report, ¶¶79-81.

[35] Feinstein Report, ¶84.

[36] "Latent Liquidity: A New Measure of Liquidity, With an Application to Corporate Bonds," by Sriketan Mahanti et al., *Journal of Financial Economics*, vol. 88, no. 2, 2008, Table 11.

iii.  Analyst Coverage: During the Class Period, at least 13 analyst firms published reports on Waste Management, and at least 17 analyst firms provided consensus earnings estimates.[37] There were always far more than two analysts covering Waste Management, a threshold number which published research has found supports a conclusion of market efficiency.[38]

iv.  Institutional Ownership: At least 119 investment management companies and 121 FINRA member firms held one or more of the Waste Management Notes during the Class Period.[39]

v.  News Articles: There were at least 285 news articles published about the Company during the 132 calendar days of the Class Period.[40]

vi.  Coverage by Credit Rating Agencies: Fitch, Moody's, and S&P rated the Waste Management Notes when the Notes were issued. Fitch published a research report on Waste Management during the Class Period.[41]

vii.  Market Makers and Underwriters: 121 FINRA member firms transacted in the Waste Management Notes over the course of the Class Period. There were at least 20 underwriters of the Waste Management Notes.[42] Three investment banks that published analyst reports covering Waste Management stated in those reports that they serve as market makers for Waste Management securities.[43]

viii.  Form S-3 Registration Eligibility: Waste Management was eligible for Form S-3 registration for both stock and bonds throughout the Class Period.[44]

---

[37] Feinstein Report, ¶¶88 and 91.

[38] "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad Barber et al., *The Journal of Corporation Law*, 1994, pp. 310-311.

[39] Feinstein Report, ¶¶96-98.

[40] Feinstein Report, ¶101.

[41] Feinstein Report, ¶¶107 and 108.

[42] Feinstein Report, ¶¶112 and 114.

[43] Feinstein Report, ¶115.

[44] Feinstein Report, ¶122.

ix.  Outstanding Par Value: The Company's market capitalization averaged $44.1 billion, which size exceeded the respective market capitalizations of 97.8% of all publicly traded U.S. companies.[45] The aggregate par value of the Waste Management Notes totaled $3.0 billion, which is larger than the respective market capitalizations of 81.6% of all publicly traded U.S. companies.[46] Even the smallest issue among the Waste Management Notes (LBJ7 Notes) had a par value of $500 million, which was larger than the respective market capitalizations of 57.9% of all publicly traded U.S. companies.[47]

x.  Float: The Company's average float of $44.02 billion was larger than the entire respective market capitalizations of 97.8% of all publicly traded companies in the U.S.[48] None of the Notes were held by Company insiders, so all of the outstanding Notes were in their float. The float for the Waste Management Notes was thus their par value of $3.0 billion, which was larger than the respective common stock market capitalizations of at least 81.6% of all public U.S. companies.

xi.  Bid-Ask Spread: The estimated bid-ask spread averages during the Class Period across the four Notes ranged between 0.35% and 0.93% according to Bloomberg data, and between 0.12% and 0.41% according to LSEG Workspace. Both Bloomberg and LSEG are well respected information service providers that are commonly relied upon by market professionals. Bloomberg explains that it bases its measurement of the bid-ask spreads on a combination of observed trades, observed market maker quotes, and examination of similar bonds. The average bid-ask spreads on the Waste Management Notes were substantially narrower than the 0.83% average bid-ask spread of all publicly-traded U.S. companies during the Class

---

[45] Feinstein Report, ¶125.

[46] Feinstein Report, ¶127.

[47] Feinstein Report, ¶128.

[48] Feinstein Report, ¶130.

Period, and substantially narrower than the 4.34% average bid-ask spread that indicated market efficiency for common stocks when that determination was made by the *Krogman* court.[49]

28.    As for the empirical *Cammer* factor, Ms. Allen acknowledges the factual finding that "according to Dr. Feinstein's event study, his 'Benchmark Bond' index is a statistically significant explanatory variable for the price movements of the SMR Notes."[50] That is, the Note prices appropriately moved with market interest rates. Additionally, she does not dispute that the LBF5 Notes, LBH1 Notes, and LBG3 Notes declined by statistically significant amounts on 24 June 2020. Both Ms. Allen's event study analysis and mine find this result, an agreed-upon test result that proves that the price of these three Notes reacted to new, Company-specific information.

### B.    The *Cammer* and *Krogman* Factors Indicated That the Waste Management Notes Traded in an Efficient Market; All of Ms. Allen's Criticisms are Contrived and Specious

29.    In her report, Ms. Allen asserts without support that while the *Cammer* and *Krogman* factors are commonly used to assess the efficiency of markets for stocks and bonds they do not similarly provide compelling evidence of efficiency for the Waste Management Notes because the Notes had the special mandatory redemption feature.[51]

30.    Ms. Allen is wrong. The *Cammer* and *Krogman* factors indicate market efficiency because they address the market characteristics that could potentially make a market inefficient. The volume, market maker, and bid-ask spread factors consider, among other things, whether or not there are trading impediments that might prevent investors from trading on new information and bringing their assessments and information to the market. In the case of the Waste Management Notes, there were no such impediments. The analyst coverage, S-3 registration, and size factors, as well as the news coverage and institutional holding properties address whether there is an effective infrastructure for the dissemination of information, and if investors would be paying attention to the news. These factors and

---

[49] Feinstein Report, ¶¶138, 139 and 141.

[50] Allen Report, ¶44.

[51] Allen Report, ¶¶15-17.

properties indicate that information relevant to the Waste Management Notes was widely and easily available, and investors paid attention to it. For the Waste Management Notes, the *Cammer* and *Krogman* factors describe a well-developed market that is far more likely than not to be an efficient market, just as they would for any security if satisfied to the extent they were for the Waste Management Notes.

31. The Waste Management Notes are not extraordinarily strange and exceptional, as Ms. Allen would have you believe. The SMR feature in the Waste Management Notes is an event-triggered call option. Contrary to Ms. Allen's contention, embedded options in bonds are not rare. Many bonds have special option provisions. Some are convertible for stock, many are callable, some can be put back to the issuer for cash. According to Bloomberg, as of the first day of the Class Period, approximately 25% of all outstanding U.S. dollar denominated corporate bonds had a call provision.[52] There is no basis in the literature or financial principles that would require the assessment of the efficiency of the Waste Management Notes to be completely different from how market efficiency is evaluated for other securities. Ms. Allen cites to no such support.

32. As explained in the Feinstein Report, numerous courts have accepted and applied the *Cammer* and *Krogman* factors, with modification to some factors to address the structural differences between bonds and stocks, to assess the efficiency of markets for debt securities.[53] In fact Ms. Allen cites to many of those cases in her report where *Cammer* and *Krogman* factors were used to assess the market efficiency of debt securities.[54]

33. I agree with Ms. Allen that the SMR feature was important to investors and relevant to the valuation of the Notes. Ms. Allen states that the Waste Management Notes "were intrinsically and economically tied to the deal and its timing."[55] My event study focused on the only clearcut news announcement that unequivocally was new news affecting the value of the embedded SMR feature and in turn the value of the Notes. Ms. Allen's

---

[52] Bloomberg.

[53] Feinstein Report, §VIII.C. *See, e.g.*, *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676 (N.D. Ala. 2005); *In re Enron Corp. Securities*, 529 F. Supp. 2d 644 (S.D. Tex. 2006); *In re DVI Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008); *In re HealthSouth Corp. Securities Litigation*, 261 F.R.D. 616, 257 F.R.D. 260 (N.D. Ala. 2009).

[54] *See*, "Complaints and court decisions in other matters," Allen Report, Appendix B.

[55] Allen Report, ¶¶14 and 18.

assertion that I did not consider the SMR feature in my assessment of the efficiency of the market for the Notes is erroneous.

34.     Ms. Allen flails at the *Cammer* and *Krogman* analysis, levying every possible criticism she can muster. As shown next, all of these arguments are erroneous.

### 1.     Trading Volume

#### a.     Par Value Traded and Average Weekly Turnover

35.     In the Feinstein Report, I found that the trading volume of the Waste Management Notes was high. As shown in Table-1, which was also presented in the Feinstein Report, the average weekly trading volume and weekly turnover during the Class period for each of the Waste Management Notes was extraordinarily high.

**Table-1: Average Weekly Trading Volume and Percentage Turnover During the Class Period**

| Note | Average Weekly Par Value Trading Volume | Average Weekly Turnover |
|------|------------------------------------------|--------------------------|
| LBF5 Notes | $59.48 Million | 7.93% |
| LBH1 Notes | $47.26 Million | 6.30% |
| LBG3 Notes | $48.29 Million | 4.83% |
| LBJ7 Notes | $24.32 Million | 4.86% |

**Source:** TRACE data obtained from FINRA.

**Note:** Calculations performed by Crowninshield Financial Research.

36.     For each of the Notes, the average weekly turnover for all Notes, was well above the 2% turnover threshold that warrants a strong presumption of market efficiency even for stocks.[56] That is, even though notes are known not to trade as frequently as stocks, the Waste Management Notes satisfied the volume test even using the standard for stocks.

---

[56] Feinstein Report, ¶¶79 and 80.

37.    That the average weekly turnover of the Waste Management Notes was extraordinarily high compared to other bonds is confirmed by peer-reviewed studies published in the finance literature. Schestag et al. [2016] present average weekly turnover statistics for virtually the entire U.S. corporate bond market.[57] Schestag et al. [2016] explain that they examined "All bonds in the enhanced TRACE database after removing duplicates, withdrawn entries, and corrections," which amounted to a population of 63,829 bonds.[58] Table-2 below shows the average annual turnover statistics for U.S. corporate bonds presented in Schestag et al. [2016] and converts those figures to average weekly turnover by dividing the annual turnover by 52.

**Table-2: Annual Turnover and Weekly Turnover**

| Quintile | Annual Turnover (in %) | Weekly Turnover (in %)[1] |
|---|---|---|
| $Q_{0.05}$ | 1.24% | 0.02% |
| $Q_{0.25}$ | 14.60% | 0.28% |
| $Q_{0.50}$ | 34.23% | 0.66% |
| $Q_{0.75}$ | 87.28% | 1.68% |

**Source:** "Measuring Liquidity in Bond Markets," by Raphael Schestag et al., *The Review of Financial Studies*, vol. 29, no. 5, 2016, Table 1.
[1] Weekly Turnover is calculated as Annual Turnover divided by 52.

38.    Relative to the Schestag et al. [2016] data, all of the Waste Management Notes ranked high in the top quartile for average weekly turnover compared to other U.S. corporate bonds, confirming that the Waste Management Notes were actively traded during the Class Period.

39.    Ms. Allen cannot and does not dispute that for all of the Waste Management Notes the highly active trading over the course of the Class Period produced average weekly turnover well over the 2% threshold for a strong presumption of market efficiency. Nonetheless, Ms. Allen levies a criticism about volume, trying to argue nonetheless that the Waste Management Notes do not pass the volume *Cammer* factor despite their top-tier average

---

[57] "Measuring Liquidity in Bond Markets," by Raphael Schestag et al., *The Review of Financial Studies*, vol. 29, no. 5, 2016, pp. 1173-1174.

[58] "Measuring Liquidity in Bond Markets," by Raphael Schestag et al., *The Review of Financial Studies*, vol. 29, no. 5, 2016, pp. 1173-1174.

weekly turnover. Ms. Allen argues that examining volume on a week-by-week basis, rather than the weekly average for the Class Period, she can identify weeks when the turnover was below the 1% and 2% levels.[59]

40.    Ms. Allen's focus on individual weeks rather than the average for all weeks is misguided. The *Cammer* Court and commentators Bromberg and Lowenfels cited volume measured by average weekly turnover as the appropriate metric to indicate market efficiency, and for good reason.[60] High average weekly turnover proves that there were no impediments to trading the Notes. The market was sufficiently well developed to allow for high quantity trading. With this factor thusly satisfied, one can rule out potential market inefficiency due to difficulty of trading. That some weeks had higher or lower trading than other weeks is not unusual, and importantly, was clearly not due to any impediment to trading. Given that the high average volume proves the market infrastructure could handle high volume, the occasional week with low volume was reasonably due to the flow of information and the intentions of investors in those particular weeks. There is no requirement that turnover each week must be above the threshold for average weekly turnover to satisfy the volume *Cammer* factor. Ms. Allen apparently misunderstands why average weekly trading volume is indicative of market efficiency.

41.    Ms. Allen goes on to break the Class Period into two halves and presents a chart showing weekly turnover within each subperiod. She points out that the Waste Management Notes' turnover and volume were less in the first half of the Class Period than in the second half. The subperiod statistics are presented in Table-3.

---

[59] "SMR Notes Weekly Trading Volume as a Percentage of Outstanding Issue," Allen Report, charts, p. 29.

[60] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, §8.6 (Aug. 1988)).

**Table-3: Average Weekly Trading Volume and Percentage Turnover From 13 February 2020 to 19 April 2020, and 20 April 2020 to 22 June 2020**

| Note | 2/13/2020 - 4/19/2020 | | 4/20/2020 - 6/22/2020 | |
| --- | --- | --- | --- | --- |
| | Average Weekly Par Value Trading Volume | Average Weekly Turnover | Average Weekly Par Value Trading Volume | Average Weekly Turnover |
| LBF5 Notes | $24.06 Million | 3.21% | $89.18 Million | 11.89% |
| LBH1 Notes | $23.63 Million | 3.15% | $70.67 Million | 9.42% |
| LBG3 Notes | $16.69 Million | 1.67% | $71.38 Million | 7.14% |
| LBJ7 Notes | $4.23 Million | 0.85% | $34.16 Million | 6.83% |

**Source:** TRACE data obtained from FINRA.

**Note:** Calculations performed by Crowninshield Financial Research.

The average weekly turnover does not consider any trading that took place on 23 June 2020, the last day of the Class Period.

42. Observe that even during the lower volume first half of the Class Period, all of the Notes had weekly turnover well above the median turnover reported by Schestag et al. [2016]. Two of the Notes had weekly turnover during this subperiod that were in the top quartile, one was at the boundary of the top threshold, and even the Note with the lowest turnover was well above the median during the purportedly low volume first half of the Class Period.

43. Ms. Allen continues her misguided attack on the standard volume analysis, arguing that if one were to exclude all trades that occurred outside the hours of 9:30 AM to 4:00 PM, the average turnover numbers would be lower and the number of weeks with less than 1% or 2% turnover would be greater. Of course, it is true that if one excludes trades the resulting volume metric will be reduced. But it makes no sense to exclude volume when one wishes to assess how well developed the market was for handling volume. To gauge whether or not there was active trading in the Waste Management Notes, one should not exclude any trades.

18

### b.    Trade Frequency

44.    In the Feinstein Report, I reported that, among Waste Management Notes the average number of days between successive trades ranged between 0.04 days and 0.32 days during the Class Period and ranked among the first decile of average bond trade frequency reported in in the Mahanti et al. [2008] study.[61] Ms. Allen contends that the statistics in the Mahanti study are an inappropriate benchmark because the trade data examined in the Mahanti study was incomplete. However, contradicting Ms. Allen, Mahanti et al. [2008] concluded as follows:

> "Based on the above comparisons, we can conclude that our database is reasonably representative of the publicly traded market for US corporate bonds. This conclusion holds in terms of the broad characteristics of the bond market, both for the cross-sectional holdings of the bonds and the way this cross section moves through time. We conjecture, therefore, that the conclusions we draw from this database should have relevance for the market as a whole. … We see from this table that, across the years, few bonds trade every day in our sample."
> **"Latent Liquidity: A New Measure of Liquidity, With an Application to Corporate Bonds," by Sriketan Mahanti et al., *Journal of Financial Economics*, vol. 88, no. 2, 2008, p. 278.**

45.    Even if one were to discount the applicability of the quantitative metrics in the Mahanti study, given the qualitative conclusion of the study, the Waste Management Notes were extraordinary in terms of trade frequency.

46.    Moreover, the trade frequency statistics for all corporate bonds presented in other peer-reviewed published studies confirm this conclusion. Friewald et al. [2012] examined the TRACE transaction data for 34,822 bonds, representing the entire U.S. corporate bond market.[62] According to Friewald et al. [2012], the average time interval between trades of the top 5 percent of the most frequently traded U.S. corporate bonds was 1.5 days.[63] The

---

[61] Feinstein Report, ¶85.

[62] "Illiquidity or credit deterioration: A study of liquidity in the US corporate bond market during financial crises," by Nils Friewald et al., *Journal of Financial Economics,* vol. 105, issue 1, 2012, p. 22.

[63] "Illiquidity or credit deterioration: A study of liquidity in the US corporate bond market during financial crises," by Nils Friewald et al., *Journal of Financial Economics,* vol. 105, issue 1, 2012.

Waste Management Notes traded much more frequently than once every 1.5 days on average, ranking them among the upper most top echelon of most frequently traded bonds.

47. Ms. Allen notes that the LBJ7 Notes did not trade "on 40% of the trading days during the first half of the alleged Class Period," as if this were unusual and an indication of low bond trading activity and in turn evidence of inefficiency.[64] She is wrong.

48. First of all, the LBJ7 Notes traded on 60% of the trading days in the first half of the Class Period, 96% of the trading days in the second half, and 78% of the trading days in the entire Class period. All three of these numbers are greater than the median trade frequency for all corporate bonds reported in Edwards et al. [2007], which was 48%.[65] A study by Rossi [2014] concurs, finding that the typical corporate bond trades on less than 50% of trading days (median trading frequency is less than 49.5%).[66] That is while the median bond in both the Edwards et al. [2007] and Rossi [2014] studies traded on less than 50% of all trading days, even the least frequently traded of the Waste Management Notes traded far more frequently than that during the Class Period, and even during the subperiod Ms. Allen holds out as being a period of low trading activity. According to peer-reviewed finance literature therefore, the Waste Management Notes traded with much greater frequency than what is typical of corporate bonds.

49. The conclusion from all of this is inescapable. The Waste Management Notes had high trading activity, satisfying the trading volume *Cammer* factor, indicating market efficiency. This is a remarkable finding, especially given that the corporate bond market is known to have less active trading than do stocks, and the assessment of bond market efficiency often makes an accommodation for this fact. For example:

---

[64] Allen Report, ¶50.

[65] "Corporate Bond Market Transaction Costs and Transparency," by Amy Edwards et al., *The Journal of Finance*, vol. 62, issue 3, 2007, Table 2.

[66] "Realized Volatility, Liquidity, and Corporate Yield Spreads," by Marco Rossi, *The Quarterly Journal of Finance,* vol. 4, no. 1, 2014, Table 6.

> "Defendants argue that there was no active market since the 1997 Notes were left untraded for 48% of the trading days during the Class Period. However, the trading level of the Senior Notes must be viewed in the context of corporate bond market. The 1997 Notes were in the top 10% of all corporate bonds in terms of the fewest average days between trades, ranging between 1.92 to 4.63 days during the Class Period. (Hartzmark Report Ex. XIII.) Though such trading volume would not likely support a finding of an efficient market for equities, it is sufficient to support such a finding for corporate bonds. *See AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 685 (N.D. Ala. 2005) (noting that a debt security that traded on at least 75 days of 140 days was not thinly traded)."
> ***In re DVI Inc. Securities Litigation*, 249 F.R.D. 196, 215 (E.D. Pa. 2008).**

50.     Ms. Allen's criticisms provide no reason to revise my conclusion - a conclusion consistent with the *Cammer* opinion, economic theory, and empirical research. The active trading volume and high trading frequency of the Waste Management Notes is compelling evidence of the efficiency of its market over the course of the Class Period.

### 2.     Analyst Coverage

51.     Waste Management was extensively covered by professional sell-side investment analysts who contributed to consensus forecasts of revenue and earnings, and published analysis of the Company in widely disseminated reports throughout the Class Period. As reported in the Feinstein Report, I obtained published analyst reports from 13 analyst firms, and an additional four analysts were identified via their participation in Company conference calls.[67] Consensus earnings estimates reported by LSEG Workspace were based on a survey of 17 analysts covering Waste Management.[68] These analysts analyzed and reported the Company's leverage, liquidity, and ability to service debt. Importantly, they also tracked the status of the pending Acquisition.[69] This extensive coverage of Waste Management by professional securities analysts is compelling evidence of the efficiency of the markets for all of Waste Management's securities.

---

[67] Feinstein Report, ¶88.

[68] Feinstein Report, ¶¶90 and 91.

[69] Feinstein Report, ¶93.

52. Ms. Allen's criticism regarding analyst coverage is that the published analyst reports were labelled as equity analyst reports, as if the information relevant for assessing the valuation of Waste Management stock does not include the information relevant for assessing the Waste Management Notes.

53. Ms. Allen is wrong. Valuation of Waste Management stock requires more information and more detail than does the valuation of the Waste Management Notes. The information relevant for valuing the Waste Management Notes is a subset of the information and analysis that the published analyst reports provided about the Company. Stock (equity) is the residual claim on a company's cash flows after bond and note holders have been paid their contractual coupon and principal payments. Therefore, valuing stock requires detailed analysis of a company's business, and precise forecasts of revenue, earnings, and cash flow, in order to forecast what cash flows are left over after bond and note investors are paid. What is relevant for the valuation of bonds and notes is whether or not the company will generate sufficient cash flow to meet the contractually obligated cash flows to the bond and note holders.[70] The information relevant for the Notes, therefore, is a subset of the more detailed information provided in equity analyst reports for the analysis of the stock. Therefore, just as the extensive coverage of Waste Management by equity analysts promotes efficiency in the market for Waste Management stock, so too does this coverage serve to make the market for the Waste Management Notes efficient.

54. Specifically, the security of future bond and note payments is evaluated by calculating ratios such as interest coverage, leverage, and cash flow/total debt.[71]

---

[70] "Credit Analysis for Corporate Bonds," by Frank Fabozzi, Chapter 32 of *The Handbook of Fixed Income Securities*, 7th edition, edited by Frank Fabozzi and Steven Mann, McGraw-Hill, 2005, p. 734.

[71] "Credit Analysis for Corporate Bonds," by Frank Fabozzi, Chapter 32 of *The Handbook of Fixed Income Securities*, 7th edition, edited by Frank Fabozzi and Steven Mann, McGraw-Hill, 2005, p. 733.

"The second dimension of corporate bond credit analysis addresses the latter purpose of buying a bond. What is the likelihood of a change in credit quality that will affect the price of the bond? This second dimension deals primarily with the ratios and profitability trends, such as return on equity, operating margins, and asset turnover, generally associated with common stock analysis."

**"Credit Analysis for Corporate Bonds," by Frank Fabozzi, Chapter 32 of *The Handbook of Fixed Income Securities*, 7th edition, edited by Frank Fabozzi and Steven Mann, McGraw-Hill, 2005, p. 734.**

55. The published Waste Management analyst reports provided exactly this information and analysis of it. The following excerpts from Waste Management analyst reports demonstrate this fact:

"WM has been able to maintain leverage while growing EBITDA over the last five years. Debt to fund the ADSW acquisition was issued in Q2/19 – no major issuances expected near-term. Investment grade credit ratings, S&P: A- (Stable), Moody's: Baa1 (Stable) and Fitch: BBB+ (Stable). Access to broad range of credit markets a competitive advantage. New debt issuances were at attractive rates – we estimate current weighted average cost of debt of ~3% is down ~30bps Y/Y. Peak leverage estimate of ~3.2x still comfortably below WM's most restrictive covenant of 3.75x (4.25x for larger M&A)."

**"Waste Sector Primer: Key investment considerations and overview of the North American waste sector," by Walter Spracklin and Ryall Stroud, RBC Capital Markets, analyst report, 21 February 2020, p. 67.**

"We also like WM's strong free cash flow, which should provide resources for acquisitions and stock buybacks. The waste management industry is traditionally volatile, and WM's balance sheet has not been as strong as those of other companies, though debt-to-capital and operating expenses have improved."

**"Waste Management Inc" by David Coleman, Argus Research, analyst report, 14 February 2020, p. 1.**

"Waste Management carries a fair amount of leverage on its balance sheet, with approximately $13.5 billion of total debt at the end of first-quarter 2020 compared with a five-year average of about $9.5 billion. The company added $3.5 billion of debt in 2019 as it prepared to acquire all outstanding shares of Advanced Disposal for $33.15 per share in cash. The equity value of the deal is approximately $3 billion and the deal enterprise value is about $4.9 billion after including Advanced Disposal's $1.9 billion of debt, which Waste Management will assume. We estimate Waste Management's pro forma debt balance after the deal closes will approach $15.4 billion.

23

Management currently expects the Advanced Disposal acquisition to close during the second quarter of 2020 and result in a pro forma leverage ratio of 2.75/3, which is in line with our projected pro forma leverage ratio in 2021. Recurring revenue streams stemming from the company's traditional solid waste operations, along with very healthy free cash flow generation, make the debt load manageable, in our view."
**"Wide-Moat Waste Management Has a Resilient Business Model That Can Weather the Pandemic," by Brian Bernard, Morningstar, analyst report, 11 June 2020, p. 6.**

"Post ADSW, we think leverage at WM will be highest in the group based on a fall off of commercial volume in both WM and the ADSW portfolio. Having said that, we do not think there are covenant concerns with covenant being 3.75x (step up to 4.25x post ADSW close for a total of four quarters) but do highlight that names with leverage closer to mid 3x generally historically have traded at a ~15-20% discount to the group (ADSW and BIN are examples pre takeout)."
**"Commercial Waste Survey Shows Space Not as Defensive; Downgrading RSG," by Hamza Mazari et al., Jefferies, analyst report, 14 April 2020, p. 14.**

"We estimate leverage peaks at ~2.3x, with the company having no maturities in 2020E. The company also has ample liquidity, having come to market in Q1/20 raising approximately $1.1 billion in debt (with $325 million of cash on the B/S at the end of 2019)."
**"Downturn Resistant, but Not Downturn Proof," by Mark Neville and Vivek Sharma, Scotiabank, analyst report, 25 March 2020, p. 1.**

"Our financial strength rating on Waste Management is Medium-High. The company is rated Baa1/stable by Moody's, A-/stable by S&P, and BBB+/negative by Fitch. Net cash provided by operating activities fell to $765 million in 1Q20 from $890 million in 1Q19. Capital expenditures were $459 million, down from $471 million. Free cash flow was $318 million in 1Q20, down from $431 million a year earlier. The company believes that its investment-grade credit ratings, the value of its unencumbered assets, and modest leverage will enable it to obtain adequate financing despite disruptions from the COVID-19 pandemic."
**"Waste Management Inc," by David Coleman, Argus Research, analyst report, 15 May 2020, p. 2.**

56.    Ms. Allen asserts that the published analyst reports did not contain information relevant for the evaluation of the SMR feature. She is wrong again. The published reports from analysts covering Waste Management during the Class Period did discuss and comment on the Company's progress toward the ADS Acquisition and the expected timing of completion. The analysts covering Waste Management solicited this information from Company

24

management, and they disseminated the Company's information to the marketplace in their published reports.

57.  On both the earnings conference call held during the Class Period, analysts asked about the timing of the acquisition and the status of the divestitures.

> "**[Brian Maguire, Goldman Sachs analyst:]** First question just on the -- just some updated color on the ADS transaction. And initially, there was some enthusiasm it might be done a little bit sooner, seems like it's maybe taking just a little bit longer. Just wondering if you could comment on how the conversations are going and the remedy package or divestment package, what kind of reception you're getting in the market for that. And whether you think that might go to one person or maybe now we're in a situation where we're going to be talking about multiple buyers for that?
> **[John Morris, Waste Management, Executive VP & COO:]** So Brian, what I would tell you is, is that we announced the deal on April 14. So we're just come – we're not even at a year mark yet. And as Jim mentioned in his prepared comments, we're on a trajectory, we think, to get clearance from DOJ right towards the end of the quarter. And obviously, we're going to move to close quickly after that. In terms of the divestiture package, what I can tell you is, is that we've had a really robust lineup of suitors, kind of I said it's kind of like a line around the block of folks who are interested in these assets. So as we progressed with our conversations with the Justice Department, we've obviously continued to move that process along at the same pace."
> **"Q4 2019 Waste Management Inc Earnings Call,"** *Thomson Reuters*, **13 February 2020, p. 7.**

> "**[Noah Duke Kaye, Oppenheimer & Co. analyst:]** …Just I wanted to clarify from the prepared remarks on the ADSW timing, you said you're expecting receipt of regulatory approvals by the end of the second quarter and then moving to closing. Did you say you expect closing to occur in -- by the end of the second quarter or subsequent to that? I just wanted to understand.
> **[James Fish, Waste Management, President, CEO & Director:]** Well, no, I just said we anticipate being in a position to close by the end of the second quarter. I think it's important to point out that, look, when we first announced this deal, … 14, thank you. 14th of April, that we said it feels like the 14th of April 1990, honestly, because of this pandemic. But we said that it would take, we thought, between 12 and 15 months to close. We're at 13.5 or we will be, next week, so -- or 12.5. So we're within that window in terms of this being in anticipation or anticipating being in a position to close, so we're not worried about that."
> **"Q1 2020 Waste Management Inc Earnings Call,"** *Thomson Reuters*, **6 May 2020, pp. 13-14.**

58.    Virtually all (55 out of 56) of the Waste Management analyst reports that I reviewed related or were otherwise consistent with the Company's assurances that the Acquisition would close before the End Date. Below are representative excerpts from analyst reports issued during the Class Period that informed investors about the timing of the Acquisition, relating the Company's positive representations. These excerpts are additional proof that the analyst reports provided information relevant to the valuation of the Notes, and that the market was allegedly misinformed by the company's alleged misrepresentations and omissions.

> "ADSW update. Management now expects the deal to receive anti-trust approval by the end of March and close soon thereafter; it has initially stated expectations for a 1Q20 closing."
> **"4Q19 Takeaways: Lots of Noise, but Bullish Outlook; Adj. Ests. for Int. Exp.," by Jeffery Silber and Henry Chien, BMO Capital Markets, analyst report, 13 February 2020, p. 1.**

> "ADSW merger update. Management expects to receive final antitrust approval and proceed toward closing by the end of 2Q20."
> **"1Q20 Takeaways: Significant COVID-19 Impact; Mostly Raising Estimates," by Jeffery Silber and Henry Chien, BMO Capital Markets, analyst report, 7 May 2020, p. 1.**

> "According to the 8-K, both parties have been cooperating with the DOJ. The incremental is timing: WM now anticipated closing the merger mid to late second quarter, subject to obtaining final regulatory approval from the DOJ (which the Company currently anticipates receiving in the Q2'). This compares to WM's prior timeline: 'obtain antitrust regulatory approval by the end of March and close soon thereafter' (02/13)."
> **"Not advancing yet," by Michael Fengler et al., BofA Global Research, analyst report, 18 March 2020, p. 1.**

> "On the ADSW deal, the company is hopeful it closes by the end of Q2 and not surprisingly did not comment in a public forum whether they were looking to re-cut that deal."
> **"1Q20: The Good, the Bad and the Outlook," by Hamzah Mazari et al., Jefferies, analyst report, 6 May 2020, p. 3.**

> "ADS deal closing expected in late 1Q20. WM expects to receive regulatory approval for the ADS deal by the end of March. After closing on the deal, it would complete the necessary divestitures shortly thereafter."
> **"Pricing Strength Appears Resilient. Raising PT to $124," by Stephanie Yee, JPMorgan, analyst report, 18 February 2020, p. 1.**

26

59.    Consistent with generally accepted principles of bond valuation and financial economics, Courts have acknowledged that equity analyst reports provide information that is relevant for bond investors, and that the analyst coverage *Cammer* factor is satisfied by widespread analyst coverage, even if the analysts and reports focus primarily on a company's equity.

> "Our conclusion is mitigated, however, by the numerous reports produced by analysts covering DVI's common stock. Though equity analyst coverage is not a perfect substitute for debt analyst coverage, the equity reports nevertheless provided substantial information to the Senior Notes investors. Such information, particularly forecasts of DVI's financial prospects and condition, would likewise have allowed bond investors to better understand DVI's risk profile and its potential for default."
> **In re DVI Inc. Securities Litigation, 249 F.R.D. 196, 215 (E.D. Pa. 2008).**

> "Second, numerous courts recognize that substantial analyst coverage of a company's equity (and of the company more generally) is also somewhat probative of whether the market for that company's debt securities was efficient. *See, e.g., Petrobras I*, 312 F.R.D. at 366 (considering analyst coverage of Petrobras's securities in the debt securities market efficiency analysis); *Winstar*, 290 F.R.D. at 446 (noting that '[a]lthough courts tend to look at the number of analysts following a given security (as opposed to the company as a whole), . . . the number of analysts following the company as a whole is instructive' in evaluating bond market efficiency because '[t]he company's overall financial health impacted the price of both Winstar's stock and bonds'); *In re HealthSouth*, 261 F.R.D. at 635; Michael Hartzmark, Cindy A. Schipani, & H. Nejat Seyhun, *Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market*, 2011 COLUM. BUS. L. REV. 654, 697 (explaining why 'both equity and credit reports provide important and useful information' to bondholders)."
> **In re Teva Sec. Litig., No. 3:17-cv-558 (SRU) (D. Conn. Mar. 9, 2021), at 40-41.**

60.    Ms. Allen and Defendants cite to a decision in the *Bombardier* case, and a case referencing the *Bombardier* decision, *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, to argue that analyst reports that were not focused specifically on the security at issue may be of little value for fostering and/or indicating market efficiency for the security at issue.[72] But this citation is misleading. In the *Bombardier* case, the notes at issue

---

[72] Allen Report, ¶53 and FN 114; Opinion and Order in *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc. et al*. ("Bombardier"), No. 05 Civ. 1898 (SAS) (S.D.N.Y. August 1, 2006), pp. 38-39; Decision by Barrington D. Parker, Circuit Judge in *Bombardier*, No. 06-3794-cv (2nd Cir. October 14, 2008), pp. 15-17; Report

were not notes backed by the cash flows and credit of the company, Bombardier. Rather, they were asset-backed notes securitized by Bombardier that were backed by mortgages used to buy mobile homes. Those notes would default if the mobile home buyers defaulted, not if Bombardier defaulted. Of course, it follows that analysis of the credit worthiness of the company Bombardier would not be of upmost importance for evaluating those mobile home mortgage bonds. That situation is completely different from the case of the Waste Management Notes, where it is the economic condition and prospects of the issuing company, Waste Management, that is both relevant for evaluating the Notes, and is the information and analysis provided in the published reports.

61. The market for the Waste Management Notes benefited not only from coverage of Waste Management by 17 professional analyst firms, but also from coverage, rating, and surveillance by all three major credit rating agencies – S&P, Moody's, and Fitch. Nonetheless, Ms. Allen complains about this coverage, incorrectly contending it was inadequate because (i) "Fitch issued only one report on Waste Management, which focused on Waste Management's financial stability rather than on the SMR Notes or on the probability of a potential redemption of the SMR Notes"; (ii) Moody's issued one report on Waste Management, "but it is a 'peer snapshot' that compared the financial performance of companies in the industry, without providing any information on the SMR Notes or a potential redemption of the SMR Notes"; and (iii) "S&P did not issue a single report on Waste Management."[73]

62. Ms. Allen is wrong to assume that if no reports are issued, the credit rating agencies are not monitoring Waste Management on a continuous basis. After providing a rating for the Waste Management Notes at the time of issue, all three credit rating agencies "conduct ongoing surveillance." They generally only issue new reports when conditions have changed sufficiently to warrant one.

---

and Recommendation to the Honorable Ronnie Abrams, *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, 17-CV-916 (RA) (BCM) (S.D.N.Y. March 18, 2021), pp. 27-29

[73] Allen Report, ¶57.

63.    The credit rating agencies explain their process:

> "Conduct Ongoing Surveillance: Fitch's ratings are typically monitored on an ongoing basis and the review process is a continuous one. Monitored credit ratings are also subject to a review by a rating committee, at least once annually. … Analysts will convene a committee to review the credit rating instead of waiting for the next scheduled review if a business, financial, economic, operational or other development can reasonably be expected to result in a rating action."
> **"Fitch Ratings Process," Fitch Ratings, accessed at https://www.fitchratings.com/products/ratings-process.**

> "In its surveillance of a corporate issuer's ratings, for example, S&P Global Ratings may schedule periodic meetings with a company to allow management to: – Apprise agency analysts of any changes in the company's plans. – Discuss new developments that may affect prior expectations of credit risk. – Identify and evaluate other factors or assumptions that may affect the agency's opinion of the issuer's creditworthiness. As a result of its surveillance analysis, an agency may adjust the credit rating of an issuer or issue to signify its view of a higher or lower level of relative credit risk."
> **"Guide to Credit Rating Essentials – What are credit ratings and how do they work?" S&P Global Ratings, accessed at https://www.spglobal.com/ratings/_division-assets/pdfs/guide_to_credit_rating_essentials_digital.pdf.**

> "Ongoing monitoring: Surveillance and dialogue is maintained with organizations for timely and relevant ratings."
> **"The Rating Process," Moody's Ratings, accessed at https://ratings.moodys.io/ratings#rating-process.**

64.    The fact that the credit rating agencies did not change their ratings or issue new reports does not imply a lack of monitoring, but rather reflects the that the Company's credit condition was unchanged. That this was the case during the Class Period is explicitly explained in the report issued by Fitch on 8 April 2020.[74] Fitch analyzed Waste Management's business and reaffirmed the Company's senior unsecured rating at BBB+.[75]

---

[74] "Fitch Affirms Waste Management at 'BBB+'; Revises Outlook to Negative," Fitch Ratings, accessed at https://www.fitchratings.com/research/corporate-finance/fitch-affirms-waste-management-at-bbb-revises-outlook-to-negative-08-04-2020.

[75] "Fitch Affirms Waste Management at 'BBB+'; Revises Outlook to Negative," Fitch Ratings, accessed at https://www.fitchratings.com/research/corporate-finance/fitch-affirms-waste-management-at-bbb-revises-outlook-to-negative-08-04-2020.

There was no material change in the creditworthiness of the Notes that would have prompted a rating change, which reasonably is also the reason the two other credit rating agencies did not issue new reports or rating revisions. There was no inattention as Ms. Allen charges.

65. Courts have accepted that coverage by credit rating agencies weighs in favor of market efficiency.[76]

> "Coverage by the major credit rating agencies also provides information to the market and is relevant to a determination of a debt security's efficiency. Ratings agency coverage includes bottom-line ratings as well as other statements, such as that the agency may reconsider a rating. There are important limits to the rating agencies, however. The ratings agencies' reports appear to provide less nuanced information than analysts' reports, appear to issue less often than analysts' reports, and may lag behind the market's knowledge. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 206 n. 12 (2d Cir.2008). *See also* Carron Dep. At 41:5-44:23 (defense expert reviewing and discussing the report and opinions of plaintiff's expert on credit ratings). All the foregoing is to illustrate some types of relevant evidence and to elaborate on *PolyMedica*'s caution that there are no bright lines; rather, lines must be drawn, and factors weighed, sensibly and in the circumstances of the case. *Am. West*, 320 F.3d at 934; *PolyMedica*, 432 F.3d at 17; *Unger*, 401 F.3d at 323."
> **In re Countrywide Financial Corp. Securities Litigation, 273 F.R.D. 586, 615 (C.D. Cal. 2009).**

66. The ongoing surveillance by the three credit rating agencies, including Fitch affirming its credit rating during the Class Period, promoted the efficiency of the market for the Waste Management Notes. Together with the extensive coverage by sell-side analyst firms, the credit rating agency coverage supports the conclusion that the Waste Management Notes traded in an efficient market.

### 3.    Institutional Ownership

67. In the Feinstein Report, I stated that "broad institutional ownership of the Waste Management Notes supports the conclusion that the Notes traded in an efficient market throughout the Class Period."[77]

---

[76] *See also*, *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 366 93 Fed. R. Serv. 3d 1548 (S.D.N.Y. 2016).

[77] Feinstein Report, ¶99.

Ms. Allen does not dispute that a large number of institutions and investment management companies were holding the Waste Management Notes at some point during the Class Period. Rather, her attack on this probative factor is based on her misreading of the letter written by the Credit Roundtable, dates 29 June 2020 ("CRT Letter"). [78,79] The CRT Letter contains the following sentences:

> "In the spirit of enhancing market efficiency through greater transparency and clarity of outcomes, we also want to highlight a current SMR market event that has caught our attention."

> "Its [CRT's] mission is to improve risk assessment and management through education and seeks to benefit all bond market participants through increasing transparency, market efficiency, and liquidity."
> **CRT Letter to Waste Management, The Credit Roundtable, 29 June 2020, accessed at "https://cdn.ymaws.com/thecreditroundtable.org/resource/collection/5B910F04-FD7B-410D-8894-96FD8E276B0A/CRT_Letter_SMR.pdf.**

68.    Ms. Allen cynically misinterprets the CRT Letter to mean that the Credit Roundtable doubted the Note market's informational efficiency. The CRT Letter suggests no such thing. The CRT was clearly advocating for better transparency and more fulsome disclosure that would allow the market to know the true value of debt securities. The CRT Letter diplomatically explains that market prices would respond to more disclosure and responsible corporate behavior, and this platform implicitly acknowledges the informational efficiency of the bond market in general, and the market for the Waste Management Notes in particular.

---

[78] Allen Report, ¶40.

[79] The Credit Roundtable is "a group of large institutional fixed income managers including investment advisors, insurance companies, pension funds, and mutual fund firms, responsible for investing more than $3.8 trillion of assets." (CRT Letter to Waste Management, The Credit Roundtable, 29 June 2020, accessed at "https://cdn.ymaws.com/thecreditroundtable.org/resource/collection/5B910F04-FD7B-410D-8894-96FD8E276B0A/CRT_Letter_SMR.pdf.)

69. Contrary to Ms. Allen's misreading of the CRT Letter, the letter explicitly attributes the decline in the Waste Management Notes to the Company's announcement on 24 June 2020. According to the CRT Letter, when material negative information was disclosed by the Company, the information was not ignored by the market but was reflected in the price of the Waste Management Notes, which is the essence of market efficiency.

> "In a recent announcement, WM stated the ADSW acquisition will be delayed, and consequently that the company plans to redeem the 2024, 2026, 2029 and 2039 Notes pursuant to the Special Mandatory Redemption Provision ("SMR"). This has caused the price of these Notes to decline sharply given your high coupons, increasingly longer tenors, and the fixed 101% redemption price on all WM's SMR bonds."
> **CRT Letter to Waste Management, The Credit Roundtable, 29 June 2020, accessed at "https://cdn.ymaws.com/thecreditroundtable.org/resource/collection/5B910F04-FD7B-410D-8894-96FD8E276B0A/CRT_Letter_SMR.pdf.**

70. This contemporaneous observation and assessment by the Credit Roundtable is also additional support for my econometric results, which Ms. Allen fails to appreciate. The 24 June 2020 announcement did cause the prices of the Waste Management Notes to fall.

71. It is astonishing that Ms. Allen leans so heavily on the CRT Letter, as it also provides compelling evidence undercutting her price impact opinion. Not only does the CRT Letter state that the prices of the Notes fell when the Company announced it would miss the End Date for the Acquisition, but the CRT Letter further explains that alleged misrepresentations and omissions misled investors and thus caused investor losses.

> "This news came as a surprise to many bond investors, who have noted that on WM's first quarter earnings call on May 6th and as late as June 10th, your public statements were that the transaction was 'still on track to close by the end of the quarter.' We find the abrupt extension of the expected transaction, close to the end of the third quarter, inconsistent with that recent guidance."
> **CRT Letter to Waste Management, The Credit Roundtable, 29 June 2020, accessed at "https://cdn.ymaws.com/thecreditroundtable.org/resource/collection/5B910F04-D7B-410D-8894-96FD8E276B0A/CRT_Letter_SMR.pdf.**

72. Ms. Allen further states that in its 2018 white paper ("2018 CRT White Paper"), the Credit Roundtable "warned that there were market inefficiencies regarding the use of special mandatory redemption provisions in bonds and made recommendations for industry best practices."[80]

73. The 2018 CRT White Paper did not warn of informational inefficiency in the bond market, but rather highlighted that "Consistency and transparency are cornerstones of an efficient market."[81] Clearly, here, the Credit Roundtable was not opining that the bond market is informationally inefficient. Rather, it is obvious that the Credit Roundtable was explaining that because the market responds to what information is provided to it, market prices would be distorted by inconsistency, lack of transparency, and deception. Market prices would not reflect true values, and so they would not be fundamentally efficient if corporations conceal truthful material information.

74. The 2018 CRT White Paper proposed recommendations to reduce the interest rate risk associated with investing in SMR bonds. In no way does the 2018 CRT White Paper suggest that the market for SMR bonds is informationally inefficient. It does advocate that the market would be well served by more fulsome truthful disclosure and responsible corporate behavior.[82]

75. Ms. Allen levies no valid criticism of my conclusion that the widespread holding of the Waste Management Notes by numerous institutions is probative of market efficiency for the Notes.

---

[80] Allen Report, ¶43.

[81] "The Credit Roundtable: In association with the Fixed Income Forum," 8 June 2018, accessed at https://cdn.ymaws.com/thecreditroundtable.org/resource/collection/72F1E929-1587-4D1E-8477-E0BAC9F6436F/_CRTSMR_Credit_Roundtable_SMR_White_Paper_UPDA.pdf.

[82] "The Credit Roundtable: In association with the Fixed Income Forum," 8 June 2018, accessed at https://cdn.ymaws.com/thecreditroundtable.org/resource/collection/72F1E929-1587-4D1E-8477-E0BAC9F6436F/_CRTSMR_Credit_Roundtable_SMR_White_Paper_UPDA.pdf.

### 4.    Market Makers and Prominent Underwriters

76.    In the Feinstein Report, I concluded that "based on the number of broker-dealers that traded the Waste Management Notes, the number of investment banks that underwrote the Waste Management Notes offering, the fact that underwriters typically make markets in the securities they underwrite, and the disclosures that analyst firms were market makers in the market for Waste Management securities, it is apparent that there were numerous market makers for the Waste Management Notes, thus satisfying the third *Cammer* factor."[83] The high trading volume executed during the Class Period also indicates that there were an ample number of market makers.

77.    Ms. Allen claims that my conclusion is "a blind assertion" and that I have "not provided evidence that there was even one market maker for the SMR Notes during the alleged Class Period."[84] This is a preposterous assertion, at least for the reason that I cited 1) the large number broker-dealers that traded the Notes, 2) the large number of underwriters, 3) that at least three investment banks (JPMorgan, RBC Capital Markets, and UBS) identified themselves in analyst reports as market makers for Waste Management securities, and 4) the high trading volume as strong evidence that there were indeed a large number of market makers for the Waste Management Notes.

78.    Ms. Allen is correct that bonds do not have designated market makers as do stocks listed on an exchange.[85] However, what bonds do typically have, and the Waste Management Notes apparently had, is several trading firms that serve as market makers and compete for orders in the over-the-counter market.

79.    Ms. Allen asserts that market making firms may shy away from market making activity during times of crisis.[86] She provides no evidence that this occurred during the Class Period for the Waste Management Notes, and all evidence indicates it did not happen. As the analysis of trading volume indicates, there was above average trading in the Notes

---

[83] Feinstein Report, ¶116.

[84] Allen Report, ¶58.

[85] Allen Report, ¶60.

[86] Allen Report, ¶61.

throughout the Class Period, and Fitch reported that Waste Management's credit quality was not impacted by the Covid epidemic.

80.    To further address Ms. Allen's criticism that I did not name firms that certainly served as market makers, I reexamined the TRACE data, with an eye toward identifying firms by name that apparently did serve as brokers for customers or market makers. Market making and the brokerage business involves executing buy and sell trades to procure a note or bond for a client. Some brokers act as market makers, and brokers typically work with market makers to help customers find the securities they want or place the securities they wish to sell.

81.    In the TRACE data, one can identify transactions where FINRA member firms were not buying for their own accounts, but rather were acting as intermediaries. If a firm buys a specific quantify of Notes from one customer, and immediately sells that same quantity to another, that behavior indicates that the firm was acting as a market maker or broker. For example, on 20 March 2020, a FINRA member firm with market participant ID "VGRD" bought $10,000 par value of LBF5 Notes from another FINRA member firm with market participant ID "JPMS" and sold the same quantity of the same Notes to another customer. The transactions were simultaneous. This data indicates that VGRD was acting as a market intermediary, either as a broker or market maker. If VGRD (Vanguard) was acting as a broker, then the counterparty JPMS (JPMorgan Securities) from whom VGRD purchased the Note was most likely serving as a market maker who had the Note in inventory. JP Morgan describes itself as "a leading market maker and liquidity provider."[87] JPMorgan documentation states, "JPMS provides trade execution services to a variety of clients, including issuers, investment companies, banks, asset managers, hedge funds, brokers, dealers, market makers, principal trading firms, governments, and sovereign wealth funds. … JPMS offers a variety of electronic order execution services."[88] It is noteworthy that JPMorgan was one of the underwriters of the Notes and also one of the investment banks that disclosed in analyst reports that it makes a market in Waste Management securities.[89]

---

[87] "Data Products," *JPMorgan Chase & Co.*, accessed through https://markets.jpmorgan.com/data-and-analytics/data-solutions.

[88] "J.P. Morgan Securities LLC – Electronic Trading," *JPMorgan Chase & Co.*, October 2024, pp. 2-3.

[89] Feinstein Report, ¶¶114 and 115.

The TRACE data confirms that it also served as a market intermediary, as expected. Table-4A presents a list of the FINRA IDs of the firms that executed trades like this during the Class Period. Table-4B tabulates the number of such firms for each of the Notes.

**Table-4A: FINRA Members Who Engaged in Near Simultaneous Buy and Sell Trades During the Class Period**

**FINRA IDs**

| LBF5 Notes | | LBH1 Notes | | LBG3 Notes | | LBJ7 Notes |
|---|---|---|---|---|---|---|
| ACAD | MLWM | AEFA | NWML | DEAN | ETRS | BARD |
| BANK | MSCO | BARD | PARI | BARD | STFL | BCAP |
| BCAP | NBLB | BDDK | PERS | MLMA | UBSW | BDDK |
| BDDK | NFSC | BGCF | PWJC | YLPL | FBCO | BGIS |
| BGCF | NORC | BNDS | RAYG | TWDL | WRET | BNDS |
| BHII | NTRC | CFCO | SPGS | CHAS | MLWM | CHAS |
| BNDS | NWML | CHAS | STFL | NFSC | PATR | COAK |
| BOFA | OPCO | DBKS | SUFI | FIBS | NORC | EBKR |
| BROC | PARI | DEAN | SUSQ | PARI | BGCF | FATS |
| CHAS | PERS | FIBS | SWST | MKTX | RAJA | FIBS |
| COAK | PWJC | FISB | TDAR | JSEB | BOSC | FTSC |
| DEAN | RAJA | GRPS | TMCC | BDDK | SUSQ | HTPS |
| DNWL | RBCD | HDVS | TMID | JPMS | SEMT | IAAK |
| EDJO | RJFI | HRBF | TWDI | TWDS | MSCO | JSEB |
| FALC | RJFS | JSEB | TWDL | SPGS | DJST | MKTX |
| FATS | ROYL | KING | TWDS | TWDI | TMID | NFSC |
| FBCO | RREZ | MACC | TWOS | EDJO | IFSF | NTRC |
| FIBS | SPGS | MKTX | UBSW | BNDS | RBCD | PARI |
| FLWT | SUFI | MLMA | VABD | VABD | SSLL | STFL |
| FNET | SUSQ | MLWM | WCHV | TMCC | TDAR | TMCC |
| HTDX | SWST | MSCO | WRET | MACC | MAXM | TMID |
| IBKR | TDAR | NFSC | YLPL | IBKR | DADA | TWDI |
| JEFM | TMCC | | | SUFI | | TWDS |
| JPMS | TWDL | | | | | VABD |
| JSEB | UBSW | | | | | VGRD |
| JVBG | VABD | | | | | |
| LOOP | VGRD | | | | | |
| MACC | WRET | | | | | |
| MKTX | YLPL | | | | | |
| MLMA | | | | | | |

**Source:** TRACE data obtained from FINRA.

**Table-4B: Unique Market Makers during the Class Period**

| Note | Unique Market Makers |
|------|---------------------|
| LBF5 Notes | 59 |
| LBH1 Notes | 44 |
| LBG3 Notes | 45 |
| LBJ7 Notes | 25 |

**Source:** TRACE data obtained from FINRA.

**Note:** Calculations performed by Crowninshield Financial Research.

82.    Ms. Allen cites to the *Bombardier* decision, where "the court found Plaintiffs incorrectly asserted that a lead underwriter was a market maker and that Plaintiffs' failure to show the existence of any market maker supported a finding of an inefficient market."[90] As a preliminary matter, recall that the notes at issue in the *Bombardier* case were not notes issued to fund the Bombardier corporation, but rather notes that pooled and securitized mobile home loans. Bombardier was the originator, underwriter, and servicer of the asset-backed bonds at issue in that case. It is not surprising that while undertaking all of those roles, Bombardier would not also be a market maker. And, Bombardier is an exceptional case, dealing with asset-backed bonds rather than corporate bonds, and an underwriter that was an asset-backed securities originator and servicer, rather than in the business of market making.

83.    Ms. Allen disregards other decisions where courts have acknowledged that a large number of underwriters of corporate notes and bonds does indicate the likely presence of market makers for those securities. For example:

> "But courts regularly hold that that level of underwriter involvement in a notes offering can help weigh in favor of market efficiency. *See Petrobras I*, 312 F.R.D. at 366 (noting that "there were at least 20 underwriters of the Petrobras Bonds, including large and prominent investment banks"); *In re Enron*, 529 F. Supp. 2d at 770 (commenting that 'the direct involvement of an impartial, reputable underwriter' in a bond's initial public offering is an

---

[90] Allen Report, ¶63.

> indication of an efficient market) (quoting Robert G. Newkirk, Comment, *Sufficient Efficiency: Fraud on the Market In the Initial Public Offering Context*, 58 U. CHI. L. REV. 1393, 1414 (Fall 1991)). I hold that this factor weighs slightly in favor of market efficiency."
> **In re Teva Sec. Litig., No. 3:17-cv-558 (SRU) (D. Conn. Mar. 9, 2021), at 41.**

> "Specifically, Judge Bulsara found that the following facts were suggestive of market efficiency for the Notes: … The Notes were covered by 15 underwriters, which serve as market makers for bonds, including major investment banks. … The parties did not object to this portion of the R&R, and the Court agrees with Judge Bulsara's summation of the evidence."
> **In re Vale S.A. Sec. Litig., 19-CV-526 (RJD) (SJB) (E.D.N.Y. Mar. 31, 2022), at 8.**

84.    These determinations by courts reflect the fact as reported in the finance literature that underwriters typically continue to serve as market makers for bonds after the bonds are issued.[91]

85.    Ms. Allen contends that over-the-counter markets "are generally considered by academics as well as the finance industry as less transparent and less liquid than exchanges."[92] She cites to PIMCO, an asset management company, that wrote that the bond market making job can be difficult as it may be challenging to find bonds with the exactly specified characteristics desired, and that regulations imposed after the global financial crisis of 2008 may have made bond markets less liquid.[93] It is not surprising that a fixed income investment company may expound on the skill they need to do their job, but this one particular source is overwhelmed by a more comprehensive description of the U.S. bond market, which is a large, active market, with well-developed infrastructure for trading and the dissemination of information. According to information provided by the Securities Industry and Financial Markets Association, at the end of 2019, for example, the outstanding principal of bonds in the United States was approximately $44.1 trillion.[94] The

---

[91] See, "The Primary and Secondary Bond Markets," by Frank Fabozzi and Frank Jones, Chapter 3 of *The Handbook of Fixed Income Securities*, 7th edition, edited by Frank Fabozzi and Steven Mann, McGraw-Hill, 2005, p. 33. ("It would be a mistake to think that once the bonds are all sold, the investment banking firm's ties with the deal are ended. Those who bought the bonds will look to the investment banking firm to make a market in the issue. This means that the investment banking firm must be willing to take a principal position in secondary market transactions").

[92] Allen Report, ¶64.

[93] Allen Report, ¶64.

[94] www.sifma.org

corporate sector accounted for approximately $8.9 trillion of this total.[95] In its entirety, the size of the American bond market is actually greater than that of the U.S. stock market in terms of outstanding value.

86.    The size, activity, and infrastructure of the U.S. corporate bond market facilitated and enhanced the market efficiency of the Waste Management Notes. The features of the U.S. corporate bond market, in addition to the features already mentioned above, include regulatory oversight by the SEC, easy availability to investors of required filings, availability of pricing benchmarks, and access for investors to firm-specific and bond-specific information on systems such as Bloomberg. Each of these factors contributed to the efficiency of the market for the Waste Management Bonds.

87.    Moreover, TRACE was launched on 1 July 2002 to provide transparency and pricing data. It serves that purpose for bond market participants, just as it does for forensic analysts to analyze the behavior of the prices of the Waste Management Notes. All broker/dealers who are members of FINRA are required to report over-the-counter corporate bond transactions for eligible bonds to TRACE.[96]

88.    Academic research has found that with the advent of TRACE, trade execution costs fell by 50% for bonds that were eligible for TRACE (such as the Waste Management Notes).[97]

89.    Hotchkiss and Ronen [2002] conducted a study and found that, in general, the market for actively traded corporate bonds in the United States is informationally efficient.[98]

90.    In sum, Ms. Allen is wrong to characterize the over-the-counter bond market in the United States as lacking transparency, lacking liquidity, and generally inefficient. Ms. Allen's opinion is refuted by peer-reviewed published academic research.

---

[95] www.sifma.org

[96] TRACE Fact Book - 2014, accessed on 17 July 2015, (http://www.finra.org/sites/default/files/2014-TRACE-Fact-Book.pdf)

[97] "Market Transparency, Liquidity Externalities, and Institutional Trading Costs in Corporate Bonds," by Hendrik Bessembinder et al., *Journal of Financial Economics*, vol. 82, issue 2, 2006.

[98] "The Informational Efficiency of the Corporate Bond Market: An Intraday Analysis," by Edith Hotchkiss and Tavy Ronen, *The Review of Financial Studies*, vol. 15, issue 5, October 2002.

### 5.    Short Selling Activity

91.    Ms. Allen writes that in past reports I have analyzed short-selling activity and concluded that such activity "indicates likely arbitrage activity and thus market efficiency."[99] She claims that I am "silent about arbitrage activity, including short selling activity, regarding the SMR Notes."[100] Ms. Allen states that she "found no evidence of short selling activity of the SMR Notes during the alleged Class Period."[101]

92.    Ms. Allen is incorrect when she suggests that I have conducted such analysis for debt securities in the past. While short-selling information is available for stocks, I find that that information is unavailable for debt securities. I would agree that short-selling is far less common for notes and bonds than it is for stocks, but one must accept that this fact applies to all bonds, not just the Waste Management Notes. Therefore, while there is no evidence of short-selling to support a conclusion of market efficiency for the Waste Management Notes, neither does this lack of evidence indicate a greater likelihood of inefficiency compared to all other bonds. Courts have concurred that short-selling is an inapplicable consideration in the case of notes and bonds:

> "(6) Market Capitalization, Public Float, Short-selling Interest and Arbitrage Opportunities. These factors are not generally applicable to determining whether a debt security trades in an efficient market."
> *In re DVI Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008), at 216.

93.    Arbitrageurs are traders who attempt to profit from any mispricing of a security. Their trading quickly drives out any mispricing.[102] There is no publicly available data on the identities or activities of arbitrageurs in particular securities, but reasonable proxies do exist. Arbitrage opportunities tend to be short-lived, and because quickness matters and profit margins are small, arbitrage activity tends to be undertaken by large, well-

---

[99] Allen Report, ¶69.

[100] Allen Report, ¶69.

[101] Allen Report, ¶69.

[102] See, e.g., *Investments*, by Zvi Bodie et al., 12th Edition, McGraw-Hill Education, 2021, p. 311.

capitalized, sophisticated institutions.[103] Consequently, the number of major institutions who held Waste Management Notes and the number of institutions whose holdings changed during the Class Period provide a gauge of arbitrage activity in the market for Waste Management Notes.

94.    Supported by expert economic analysis, courts have acknowledged that the trading activity of large institutional investors serves a similar purpose as that of arbitrageurs.

> "Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading."
> **In re Countrywide Fin. Corp. Sec. Litig., 273 F.R.D. 586, 614 (C.D. Cal. 2009).**

95.    As stated in the Feinstein Report, I found that at least 121 financial institutions and 119 investment management companies held one or more of the Waste Management Notes at some point during the Class Period.[104]

96.    Further, I compared the institutional holdings of the Waste Management Notes before and after the Class Period to the institutional holdings as of 31 March 2020, the only reporting date during the Class Period for institutional holdings. According to the institutional holdings data obtained from Bloomberg, of all the institutions that held Waste Management Notes as of 31 March 2020, 20.5% to 38.3% reported a change from the number of Notes held as of 31 December 2019. From the March 2020 to the June 2020 reporting dates, 45.0% to 64.8% of the institutions reported a change in the number of Notes held. Quarterly institutional holdings figures are shown in Exhibit-3a through Exhibit-3d. Table-5 shows the percentage of institutions that reported a change in the number of Notes held from Q4 2019 to Q1 2020, and from Q1 2020 to Q2 2020.

---

[103] See, e.g., *Corporate Finance: Core Principles & Applications*, by Stephen Ross et al., 2nd Edition, McGraw-Hill/Irwin, 2008, p. 399.

[104] Feinstein Report, ¶¶97 and 98.

**Table-5: Percentage Change in Institutional Holdings**

| Note | % of Institutions That Reported A Change In Holdings From Q4 2019 to Q1 2020 | % of Institutions That Reported A Change In Holdings From Q1 2020 to Q2 2020 |
|---|---|---|
| LBF5 Notes | 38.3% | 45.0% |
| LBH1 Notes | 20.5% | 52.1% |
| LBG3 Notes | 32.6% | 60.1% |
| LBJ7 Notes | 35.1% | 64.8% |

**Source:** Bloomberg.

**Note:** Calculations performed by Crowninshield Financial Research.

97.     The data shows that as a group, major institutions were not inactive investors, but rather changed their positions. These changes are a marker of arbitrage or arbitrage-like activity.

98.     That many financial institutions and investment management companies held Waste Management Notes, and many increased or decreased the size of the positions they held, indicating active investment akin to arbitrage activity, is evidence that supports the conclusion that the well-developed market for Waste Management Notes was an efficient market throughout the Class Period.

### 6.     Outstanding Par Value

99.     The *Krogman* court noted that for stocks, "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[105] I explained in the Feinstein Report that just as "large market capitalization indicates the efficiency of a market for common stock, the size of the issuing company and the size of a note issue are factors that are relevant for assessing the efficiency of the market for a company's debt securities. Large size attracts attention and increases visibility for all of the company's securities."[106]

---

[105] *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

[106] Feinstein Report, ¶124.

100.  As established in the Feinstein Report, Waste Management was not a small obscure company that escaped the notice of investors and analysts. On the contrary, Waste Management was and is one of the largest companies in the world. As noted in the Feinstein Report, the market capitalization of Waste Management stock (the total value of all outstanding stock) was larger than the respective market capitalizations of 97.8% of all publicly traded companies in the U.S.[107] Waste Management's high profile, consequent visibility, and the attention it attracted from investors, analysts, and investment banks, fostered efficiency in the markets for all of its securities.

101.  Not only was Waste Management an extremely large company, but so too was the aggregate Note issue and each of the Note issues individually. The total par value of the Notes was $3 billion, which, as explained in the Feinstein Report, is larger than the respective market capitalizations of 81.6% of all public companies listed on the NYSE, AMEX, NASDAQ, and ARCA during the Class Period.[108] The $500 million par value of the LBJ7 Notes was greater than the respective market capitalizations of 57.9% of all public companies listed on American exchanges.[109] The $750 million par values of the LBF5 Notes and the LBH1 Notes, respectively, were greater than the respective market capitalizations of 64.2% of all public companies listed on American exchanges.[110] The $1 billion par value of the LBG3 Notes was greater than the respective market capitalizations of 67.8% of all public companies listed on American exchanges.[111]

102.  Ms. Allen suggests that note issues of $500 million, $750 million, and $1 billion might not be considered large. She protests that using market capitalizations of public companies as a benchmark "does not make any sense."[112] But it does make sense, and Ms. Allen offers no alternative benchmark for judging how big is big.

---

[107] Feinstein Report, ¶¶125 and 130.

[108] Feinstein Report, ¶127.

[109] Feinstein Report, ¶128.

[110] Feinstein Report, ¶128.

[111] Feinstein Report, ¶128.

[112] Allen Report, ¶70 (emphasis in original).

103.    Considering that equity markets are big, and large market capitalization is an accepted indicator of efficiency for common stock, it follows that note issues that are even larger than typical market capitalizations should be considered big and indicative of efficiency for those securities. Comparing the size of a debt issue to the average market capitalization of publicly-traded companies in the U.S. provides a context of how big is the debt issue.

104.    Considering that the Notes were trading at prices higher than par value on most days during the Class Period, my focus on outstanding par value rather than market value of the Notes is even conservative.

105.    To further establish that the $3 billion aggregate par value and the $500 million to $1 billion individual Note par values represent indisputably large sums, I compared these numbers against the par values of other corporate bond issues. According to Bloomberg, as of 13 February 2020, there were 506,093 U.S. dollar denominated corporate bond issues outstanding in the U.S. The outstanding par value of the Waste Management Notes were individually larger than the respective outstanding par values of 98% of all other U.S. dollar denominated corporate bond issues outstanding in the U.S. as of the first day of the Class Period.[113] This comparison should lay to rest the issue and establish that the Waste Management Note issues were large.

106.    Courts have accepted that the aggregate outstanding par value of notes is the appropriate analog to market capitalization for assessing whether notes satisfy the size *Krogman* factors (market capitalization and float). Courts have accepted that a large outstanding par value weighs in favor of a finding of market efficiency. For example:

> "As to the *Krogman* factors, the aggregate par value of the Vale Notes-which CAAT's expert suggests is a measurement akin to market capitalization when analyzing bonds-was $12.05 billion, a figure larger than the total market capitalization of many public companies. (Feinstein Rep. ¶¶ 255–58). Courts have credited similar analysis as supporting a finding of efficiency. *E.g., Petrobras*, 312 F.R.D. at 366–371 (noting that under the 'fist modified *Cammer* factor[,]' an 'aggregate par value of Petrobras Notes totaled $41.4 billion and was larger than 90% of all market capitalizations on the NYSE, Amex, and NASDAQ[,]'contributed in part to a finding that 'the indirect *Cammer* factors lay a strong foundation for a finding of

---

[113] According to Bloomberg, as of 13 February 2020, there were 5,717 issues with outstanding par value greater than $500 million, 3,220 issues with outstanding par value greater than $750 million, and 1,861 issues with outstanding par value greater than $1,000 million.

efficiency'); *Winstar*, 290 F.R.D. at 449 (finding that where the 'total par value of all three Winstar bonds was $1.88 billion. . . . [t]he sufficiently large issue size . . . [was] consistent with a more liquid and efficient market.').''

**Report & Recommendation by Judge Bulsara, *In re Vale S.A. Sec. Litig.*, 19-CV-526 (RJD) (SJB) (E.D.N.Y. Jan. 11, 2022), adopted by Judge Dearie in Memorandum and Order, *In re Vale S.A. Sec. Litig.*, 19-CV-526 (RJD) (SJB) (E.D.N.Y. Mar. 31, 2022), at 36-37.**

### 7.    Bid-Ask Spread

107.    In the Feinstein Report, I stated that "the Waste Management Note bid-ask spreads were narrow, supporting a conclusion of market efficiency."[114] I noted that I relied on Bloomberg's and LSEG Workspace's estimates of the bid-ask spreads.[115]

108.    Ms. Allen offers up the criticism that she is unable to verify or second-guess the Bloomberg and LSEG bid-ask spread estimates. She writes: "it is unclear how Bloomberg and LSEG Workspace estimated those quotes," and that the estimated quotes "are not replicable."[116]

109.    Ms. Allen is actually wrong about it being unclear how Bloomberg and LSEG Workspace estimate bid-ask spreads. Both information services provide detailed explanations of their methodologies.[117]

110.    Bloomberg explains that each estimated price is based on "Direct Observations" and/or "Observed Comparables."[118] Direct Observations use "trades and/or executable and/or indicative quotes on the target bond."[119] According to Bloomberg, TRACE, MIFID II and exchanges provide trade data, and global/regional banks, broker-dealers and exchanges

---

[114] Feinstein Report, ¶139.

[115] Feinstein Report, ¶136.

[116] Allen Report, ¶65.

[117] "Bloomberg Evaluated Pricing Service ("BVAL") Government, Supranational, Agency & Investment Grade Corporate Bonds Methodology," *Bloomberg*, 22 March 2024; and "Methodology Guide," *Refinitiv Evaluated Pricing Service*, Fixed income and Derivative Evaluated Pricing, version 6.2, December 2019.

[118] "Bloomberg Evaluated Pricing Service ("BVAL") Government, Supranational, Agency & Investment Grade Corporate Bonds Methodology," *Bloomberg*, 22 March 2024.

[119] "Bloomberg Evaluated Pricing Service ("BVAL") Government, Supranational, Agency & Investment Grade Corporate Bonds Methodology," *Bloomberg*, 22 March 2024.

provide "executable and/or indicative quotes" for a particular bond.[120] If there is limited or no direct observations, Bloomberg uses a "proprietary relative-value algorithm to price bonds."[121]

111.    For each of its bid and ask estimates, Bloomberg provides a BVAL score measured on a scale of 1 to 10. The BVAL score "provide[s] a window into the underlying data inputs used by BVAL in arriving at that price."[122] Bloomberg explains:

> "A BVAL score between 6 and 10 reflects that the BVAL price was generated by the Direct Observations model, using recent direct observations on the target bond such as trades, and/or with high corroboration across multiple executable or indicative data. A BVAL score of 5 or lower means the BVAL price was generated by the Observed Comparables model and/or by the Direct Observation model but with aged data. This would mean that the BVAL price was generated more heavily weighting the Observed Comparables model, by using data on comparable securities and/or data on the target bond that is aged and/or weakly corroborated."
> **"Bloomberg Evaluated Pricing Service ("BVAL") Government, Supranational, Agency & Investment Grade Corporate Bonds Methodology," *Bloomberg,* 22 March 2024.**

112.    The bid and ask quotes estimated by Bloomberg for the Waste Management Notes generally had a high BVAL score. Table-6 presents the distribution of the BVAL score between 6 and 10, and a BVAL score of 5 or lower for the bid-and ask quotes estimated by Bloomberg for each of the Notes during the Class Period.

---

[120] "Bloomberg Evaluated Pricing Service ("BVAL") Government, Supranational, Agency & Investment Grade Corporate Bonds Methodology," *Bloomberg*, 22 March 2024.

[121] "Bloomberg Evaluated Pricing Service ("BVAL") Government, Supranational, Agency & Investment Grade Corporate Bonds Methodology," *Bloomberg,* 22 March 2024.

[122] "Bloomberg Evaluated Pricing Service ("BVAL") Government, Supranational, Agency & Investment Grade Corporate Bonds Methodology," *Bloomberg,* 22 March 2024.

**Table-6: Summary of BVAL Scores**

| Note | Estimated Bids with BVAL Score Between 6 and 10 | Estimated Asks with BVAL Score Between 6 and 10 | Estimated Bids with BVAL Score of 5 or Below | Estimated Asks with BVAL Score of 5 or Below |
|---|---|---|---|---|
| LBF5 Notes | 91 | 91 | 0 | 0 |
| LBH1 Notes | 89 | 90 | 2 | 1 |
| LBG3 Notes | 90 | 91 | 1 | 0 |
| LBJ7 Notes | 90 | 87 | 1 | 4 |

**Source:** Bloomberg.

113. That such few estimated bid and ask quotes had a BVAL score of 5 or below, provides confidence that the estimated bid and ask quotes provided by Bloomberg were based on direct observations using market data rather than observed comparables.

114. LSEG Workspace explains that it uses market data to evaluate prices, where "the hierarchy of inputs includes trade prices, broker quotes, the new issue market, and comparable securities."[123]

115. Ms. Allen complains that she is unable to verify the bid-ask spreads provided by Bloomberg and LSEG Workspace. This is surprising as these two information services employ unsurpassed expertise and resources to produce these estimates. These are well respected information and data providers, and their estimates are widely relied upon by analysts and investors.

---

[123] "Methodology Guide," *Refinitiv Evaluated Pricing Service*, Fixed income and Derivative Evaluated Pricing, version 6.2, December 2019, p. 39. LSEG Workspace further describe their data sources and analysis as follows: "Broker/Dealer Quotes: Refinitiv has relationships with all the major broker/dealers who supply pricing levels and market information. The evaluation team is responsible for maintaining and growing the supply of broker/dealer quotes. Executable quotes are live tradable markets. Executable quotes are preferred inputs for most pricing processes but are typically not available for all but a few issues."

116. Courts have accepted the use of Bloomberg's bid-ask spread data and estimates for over-the-counter notes to evaluate market efficiency.[124] Ms. Allen herself relies on bid data and estimates provided by LSEG Workspace. For her event study regression, she uses the S&P 500 Investment Grade Corporate Bond Index as an explanatory variable. According to the S&P 500 Bond Index Methodology documentation, only bonds that are priced by LSEG Workspace are considered for inclusion in the index, and the index is calculated using bid prices provided by LSEG Workspace.[125] If one were to take Ms. Allen's criticism about the reliability of LSEG Workspace bid and ask data seriously, she would have to deem her own event study analyses unreliable.

117. Ms. Allen states that on 24 June 2020, the after the end of the Class Period, the Bloomberg estimated closing bid-ask spread for the LBJ7 Note was $102-$103, while the TRACE data showed that all trades executed that day "were done at prices well above Bloomberg's estimated bid and ask quotes."[126] This single observation is no reason to question the reliability of the Bloomberg estimates, especially because according to Bloomberg, the estimated bid and ask quotes on 24 June 2020 were based on indicative quotes from dealers which reasonably reflected their revaluation of the LBJ7 Note in light of the Company's announcement that it would miss the End Date for the Acquisition. If anything, Bloomberg's end-of-day bid-ask estimate on 24 June 2020 reflects how market makers update their valuations to incorporate new news. The International Capital Markets Association state that indicative quotes "are considered a basic indication of where a market might be in relation to a bond or bonds."[127]

---

[124] *See, In re Teva Sec. Litig.*, No. 3:17-cv-558 (SRU) (D. Conn. Mar. 9, 2021), at 42 ("The average daily bid-ask spread for the Notes ranged from 0.18 to 0.45 percent. See Ex. 9-c to Tabak Report, Doc. No. 419-5, at 244. … Thus, the first two *Krogman* factors weigh substantially in favor of market efficiency, and *Krogman* 3 is not applicable.)

[125] "S&P 500 Bond Index Methodology," *S&P Dow Jones Indices*, August 2024, p. 6.

[126] Allen Report, ¶67.

[127] "Industry guide to definitions and best practice for bond pricing distribution," *International Capital Market Association*, May 2021, p. 6. The International Capital Market Association is a non-profit organization with a mission "to promote the development of the international capital and securities markets, pioneering the rules, principles and recommendations which have laid the foundations for their successful operation," accessed at https://www.icmagroup.org/About-ICMA/.

118.    Finally, Ms. Allen contends that I "provide[] no support or explanation why it is appropriate to compare the bid-ask spreads of the SMR Notes to the average of all stocks or the stock in the Krogman case."[128] Ms. Allen fails to recognize that by comparing the bid-ask spreads in an over-the-counter note market to the narrow bid-ask spreads of exchange-listed stocks is a highly conservative approach, which, if anything would bias against a finding of market efficiency. That the bid-ask spreads of the Waste Management Notes compared favorably and were with but one exception narrower than the average bid-ask spread among publicly traded stocks during the Class Period is compelling evidence of the efficiency of the market for the Waste Management Notes.

### 8.    Empirical Demonstration of Market Efficiency

#### a.    In Empirical Tests the Waste Management Notes Demonstrated Market Efficiency

119.    As detailed in Feinstein Report, I conducted two empirical tests of the efficiency of the market for the Waste Management Notes. In both tests all four Notes demonstrated market efficiency.[129]

120.    The first test was an event study focused on the only date on which there was unequivocally net negative news that was valuation-relevant for the Waste Management Notes. All four Notes fell by statistically significant amounts in response to that news.[130] In the second test, I examined whether and how the Notes responded to day-to-day changes in market interest rates.[131] All four Notes exhibit statistically significant and directionally correct reactions to changing interest rates, continuously throughout the Class Period. These results are empirical demonstrations of market efficiency, satisfying the fifth *Cammer* factor for all four Notes.

---

[128] Allen Report, ¶68.

[129] Feinstein Report, ¶¶190-200.

[130] Feinstein Report, ¶¶190-195.

[131] Feinstein Report, ¶¶196-200.

121.    Ms. Allen challenges four aspects of my empirical tests. She questions the selection of the event for the event study.[132] She challenges my use of VWAPs.[133] She attacks the methodology I used to correct for heteroskedasticity (non-constant volatility) in the Note price series.[134] She asserts that the Note prices responding appropriately to changes in market interest rates is not evidence of market efficiency.[135] As discussed next, none of these challenges is valid. The tests I ran are standard and reliable, and I interpreted the results correctly.

### b.    Event Selection

122.    A properly conducted event study test of market efficiency first identifies events or groups of events on which the information disseminated is of such importance that according to economic principles it should cause a significant change in the valuation of the subject security. The event study then tests to see if the market price of the security changed significantly in response to the release of that new information. If a security price responds as economic principles and market efficiency dictates it should, then the result is a demonstration of market efficiency and is compelling evidence that the security trades in an efficient market.

123.    An ideal candidate for testing market efficiency is an event where the news is new, unexpected, relatively unconfounded, and most importantly, highly economically material according to valuation principles. With such a candidate event, one can test to see if the security price responded as it should have in an efficient market. A poor candidate event for testing market efficiency would be one where the news is a repeat of prior announcements, consistent with past expectations, confounded by countervailing components, of minor importance, or such that it would not be expected to elicit a statistically significant price reaction in an efficient market. That is because testing a poor candidate event of that sort would be uninformative. Whatever the security price did in

---

[132] Allen Report, ¶¶27-30.

[133] Allen Report, ¶¶19-23.

[134] Allen Report, FN 56.

[135] Allen Report, ¶44.

reaction to that news would be consistent both with efficiency and inefficiency, and so cannot differentiate the kind of market the security trades in.

124. When testing the efficiency of a stock market, the analyst generally has many good candidate events to test. Stock valuation is a function of, among other things, the expected future revenue, earnings, and cash flows of the issuing company, and these factors are influenced by many developments and details that did or can affect the company's performance. Earnings announcements are often the events of choice when testing the efficiency of a stock market, because on those events the company releases past performance data, guidance for the future, and makes important announcements relevant for assessing the company's ability to generate revenue, earnings and cash flows for the equity investors.

125. Notes and bonds, however, because they are a senior claim on a company's cash flows, are generally insensitive to all but the most dramatic news affecting a company's performance. Note and bond investors are concerned primarily with if and when they will be paid their contractually owed cash flows. They are less concerned with the fluctuations in company cash flows that do not change that overriding consideration. Consequently, there are typically few if any ideal candidate events to test.

126. That there may be no good candidate events for testing market efficiency does not mean the market is inefficient. Rather, it means that an event study test of market efficiency cannot be conducted. If there is only one good candidate event to test, it and only it should be tested. One must work with the history of the company as it happened. The analyst cannot manufacture good candidate events or do as Ms. Allen did, and focus on uninformative poor candidate events.

127. According to valuation principles, and Ms. Allen concurs, the primary factors affecting the value of the Notes were 1) Waste Management's credit rating, 2) how long the Notes would remain outstanding, and 3) market interest rates.[136] The Company's credit rating did not change during the Class Period. In fact, the credit rating agency Fitch issued a report during the Class Period confirming that despite the volatility and disruptions in the marketplace

---

[136] Allen Report, ¶55 and Allen Deposition at 21:20-23.

caused by Covid, the credit worthiness and rating of Waste Management had not changed.[137]

128.    The only other Company-specific news that would be expected to significantly alter the prices of the Notes was news about the possible early redemption of the Notes. However, throughout the entire Class Period, every single time there was news about the progress toward closing the Acquisition, there were reassurances from the Company that the Acquisition would close by the End Date. That the mix of news was always in accord with past representations, or inextricably confounded, made none of those events acceptable events for testing the efficiency of the market for the Waste Management Notes. Such announcements, consistent with existing expectations, or comprising a mix of positive and negative news, could not be expected a priori to elicit a significant Note price reaction in an efficient market. Therefore, testing those events is uninformative.

129.    The one date that was an acceptable event for testing market efficiency was 24 June 2020, when the Company announced it would miss the End Date for the Acquisition and therefore would exercise the mandatory redemption option to call the Notes early.[138] It was the only day when the news was new, not mixed, and highly valuation relevant. As explained in the Feinstein Report, these standards and considerations are what drove my event day selection for the market efficiency event study.

130.    Interest rates changed virtually every day during the Class Period. Consequently, I also tested to see if the Notes reacted properly to those changes. They did.

131.    Ms. Allen agrees that the news on 24 June 2020 was new, unexpected, and value relevant, but she argues that that day should be ignored nevertheless. She advocates for disposing of probative evidence.

---

[137] "Fitch Affirms Waste Management at 'BBB+'; Revises Outlook to Negative," Fitch Ratings, accessed at https://www.fitchratings.com/research/corporate-finance/fitch-affirms-waste-management-at-bbb-revises-outlook-to-negative-08-04-2020.

[138] "Waste Management and Advanced Disposal Announce Revised Terms of Acquisition and Agreement to Sell Substantially All Anticipated Regulatory Divestitures to GFL Environmental," Business Wire, Company press release, 24 June 2020 8:11AM.

132. Ms. Allen claims that testing "the last day of the alleged Class Period is non-standard, unscientific, unreliable, and biased."[139] Ms. Allen reasons that because an analyst might know before running a confirmatory statistical test that the important news on an event day caused a large security price reaction, the analyst must discard that event from consideration.[140] This is a preposterous notion. The analysis calls for assessing the news based on economic principles, assessing the security price reaction with a statistical test, and comparing the results of these two analyses. If the news is important and the reaction is significant, this relationship indicates market efficiency, even if the analyst might have known from news articles, analyst reports, the Complaint, or the CRT Letter that the event was deemed important and the security price fell.

133. Ms. Allen's erroneous accusation that I chose to test 24 June 2020 only because the Complaint alleged that the Waste Management Notes dropped that day is baseless. The day was chosen because it was indisputably an important news event that satisfied the articulated conditions for being an ideal event study event. Proof that her accusation is off base is the fact that while the Complaint alleged 18 March 2020 to be an important news day on which the Notes fell steeply, my analysis of the news event concluded it was a poor candidate event on account of the countervailing mix of news that day.

134. According to the Complaint:

> "As a result of the Company's March 18, 2020 disclosures, the prices of the Notes fell significantly. For example, the 3.45% Notes fell from 104% on March 17, 2020 to just 98% of par on March 18, 2020."
> **Complaint, ¶66.**

135. Ms. Allen alleges that my event selection blindly accepted representations such as this one in the Complaint. By her faulty logic, I would have deemed 18 March 2020 to be an acceptable event study event. But, I did not. My event selection was based on my analysis, which was conducted in accordance with my enumerated standards and replicable methodology.

---

[139] Allen Report, ¶27.

[140] Allen Report, ¶29.

136.   The criticisms that Ms. Allen flings with abandon are inconsistent with one another. She spends a considerable portion of her report claiming that my "market efficiency analysis completely fails to analyze the special mandatory redemption feature of the SMR Notes."[141] She repeatedly states that "the SMR Notes are intrinsically and economically tied to the deal and its timing, and thus would be expected to react to news about the deal and its timing."[142] But then she criticizes me for testing the most important day in the life of the Notes, 24 June 2020, when it was announced the deal timing would miss the End Date. It would be unreasonable not to test 24 June 2020, identified a priori as the most critical date in the life of the Notes.

137.   Ms. Allen is also wrong to suggest that I or anyone would know in advance whether statistical tests would find the residual returns of the Notes on 24 June 2020 to be statistically significant. She says that result was a foregone conclusion, while simultaneously denying that conclusion for the LBJ7 Note.[143] The event study comprises regression analysis and statistical testing to remove the effects of market, sector, and interest rates factors. One cannot know in advance of this econometrics what the residual return is and whether or not it is statistically significant. Of course, under the hypothesis that the market for the Notes was an efficient market one would expect the residual return to be statistically significant in reaction to such dramatic news as transpired on 24 June 2020, but the statistical test is run to prove or disprove that hypothesis. For Ms. Allen to claim that anybody would know the Note reaction to the 24 June 2020 news is implicitly an acknowledgement that anybody would reasonably expect the market for the Notes to be an efficient market.

---

[141] Allen Report, ¶13.

[142] Allen Report, ¶¶14 and 18.

[143] Allen Report, ¶¶28 and 30.

138.    Ms. Allen cites to the Ferrillo et al. [2004] law review article and certain court opinions to proffer that it is inappropriate to "to test price reactions on alleged corrective disclosure dates and use that as evidence of market efficiency."[144] But, Ms. Allen misunderstands the thesis articulated in Ferrillo et al. [2004], and she fails to comprehend why that thesis does not apply to the instant case.

139.    Ferrillo et al. [2004] say that testing the final corrective disclosure would "bias the results" towards finding market efficiency, since "plaintiffs would normally choose a class period where corrective disclosures coincide with large negative price movements."[145] That is, Ferrillo et al. [2004] conjecture that plaintiffs may claim a particular day was a corrective disclosure day only because the security at issue fell significantly on that day, and not because it truly was an important disclosure day. If this is the case, then the forensic analyst choosing that same date only because it was alleged to be a corrective disclosure day would be cherry picking by proxy. But that criticism does not apply in the instant case. The 24 June 2020 announcement was indisputably extremely important. It was selected because the news was important, not because it was alleged in the Complaint to be a corrective disclosure day.

140.    Analyst reports, the CRT Letter, objective analysis of the news, and even Ms. Allen herself point out that 24 June 2020 was a highly important news day with economically material implications for the valuation of the Notes.[146]

141.    There are additional reasons for not rejecting 24 June 2020 as an ideal candidate event for the event study. The *Cammer* court recognized that market efficiency is important insofar as it would indicate that the market was efficient with respect to the information or misinformation that is the subject of the litigation:

---

[144] Allen Report, ¶29.

[145] "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-On-The-Market Cases," by Paul Ferrillo et al., *St. John's Law Review*, vol.78, 2004, FN 155.

[146] Allen Report, ¶18; and CRT Letter to Waste Management, The Credit Roundtable, 29 June 2020, accessed at https://cdn.ymaws.com/thecreditroundtable.org/resource/collection/5B910F04-FD7B-410D-8894-96FD8E276B0A/CRT_Letter_SMR.pdf.

"The central question under the fraud on the market theory is whether the stock price, *at the time a plaintiff effected a trade*, reflected the 'misinformation' alleged to have been disseminated."
**Cammer, 711 F. Supp. at 1282 (emphasis in original).**

142. Testing an indisputably important corrective disclosure answers exactly that question.

143. Contrary to Ms. Allen's suggestion, there have been many class certification decisions that based at least in part on a cause-and-effect analysis related to allegation related disclosures.[147] For example, in *In re American Realty Capital Properties, Inc. Litigation* where the Court certified the class for ARCP bond investors, the event study focused only on the alleged corrective disclosure that ended the approximately two- and half-year long class period.[148] In that case, as in the instant case, there were no other acceptable event study candidates for testing bond market efficiency.

144. Ms. Allen contends that my event study analysis should also have tested 18 March 2020, because it is alleged to be a corrective disclosure date in the Complaint.[149] This is surprising as she argues both that one should and should not test the dates alleged in a complaint to be corrective disclosures.

145. What happened on 18 March 2020 was that the Company filed an 8-K announcing that it "anticipates closing the Merger mid to late second quarter 2020."[150] The announcement explained that despite "the effects from the Covid-19 outbreak" it was still intent on completing the Acquisition, and that while somewhat delayed, completion would still be before the End Date.[151]

---

[147] In *Gelt Trading Ltd. v. Co-Diagnostics, Inc.*, 2:20-CV-00368-JNP-DBP (D. Utah Aug. 18, 2023), Plaintiff's expert conducted an event study on an alleged misrepresentation date and the alleged corrective disclosure date. The Court certified the Class and stated "Fifth, there is ample evidence of a cause-and-effect relationship between unexpected news and stock-price changes."

[148] *In re Am. Realty Capital Props. Inc. Litig.*, Civil Action 1:15-mc-00040-AKH (S.D.N.Y. Aug. 31, 2017).

[149] Allen Report, ¶31.

[150] Waste Management, Inc., Form 8-K, filed 18 March 2020, accepted 8:49:48 AM.

[151] Waste Management, Inc., Form 8-K, filed 18 March 2020, accepted 8:49:48 AM.

146. This was not an acceptable event study event for testing market efficiency because the news was an inextricable mix of good and bad news. The delay was bad news for Note investors. However, the reassurance that the Company was committed to completing the merger despite Covid, and that the completion would be before the End Date such that the SMR option would not be exercised, was good news. As mixed news could elicit either a positive or negative response, or no net response at all in the Notes, makes the 18 March 2020 announcement a poor event study candidate. Whatever the Note residual price movement might be, would be consistent with both efficiency and inefficiency. Such a result would be entirely uninformative regarding market efficiency.

147. Moreover, this mixed news was released when the financial markets were experiencing exacerbated volatility due to the Covid pandemic.[152] The VIX, a measure of stock market volatility, reached an all-time high on 16 March 2020.[153] The yield on the ICE BofA BBB US Corporate Bond Index increased from 2.63% on 6 March 2020 to 5.56% by 23 March 2020. The yield curve steepened. Into this market beset by uncertainty and volatility, Waste Management made its announcement that it was committed to closing the Acquisition before the End Date, but the completion would be delayed. Consequently, one cannot predict ex ante whether the reaction among Note investors would be on net positive, on net negative, a mixed reaction, or buffered by the countervailing mix in an efficient market. Therefore, whatever one might find the actual reaction to have been would be no indication of efficiency or inefficiency.

---

[152] Ms. Allen concurs that this period experienced elevated uncertainty and volatility. Allen Deposition at 166:16.

[153] Allen Report, FN 54 ["See, for example, 'Dow Jones Today, Bear Market Worsens on Trump Response To Coronavirus Pandemic; Boeing Shares Collapse,' *Investor's Business Daily*, March 12, 2020 ('Stocks ripped into new bear market lows Thursday, with Dow Jones industrials diving more than 2,000 points, after a Wednesday night speech from President Donald Trump ramped up the U.S. response to the coronavirus pandemic.'). The VIX, a commonly used measure of the stock market's expectation of volatility based on the S&P 500 Index options, reached an all-time high on March 16, 2020. See, for example, 'How does this bear market compare,' *USA Today*, March 18, 2020 ('In recent days the VIX has climbed to levels not even seen during the financial crisis in October 2008, signaling the continued uncertainty brought on by the coronavirus pandemic.') and 'Traders Bet on Falling 'Fear Gauge',' *Dow Jones Institutional News*, March 17, 2020 ('The Cboe Volatility Index, or VIX, closed at its highest level in history Monday when U.S. shares recorded the steepest decline since the Black Monday stock-market crash of 1987 […] The VIX climbed to 82.69 Monday, topping its high of about 80 in 2008')."]

148. A date on which misrepresentations and omissions are corrected should be tested empirically to determine whether or not damages were sustained on that date as a result of the disclosure, but that same date may not be an appropriate candidate for testing market efficiency if the news was mixed. That is precisely the case here. As an event study on market efficiency compares how a security price did move to how it should have moved, the mix of news on 18 March 2020 made that date inappropriate for inclusion in the event study.

149. My event study had well-articulated criteria for event selection, and I followed the replicable methodology precisely. When there are no good candidate events for an event study, a forensic analyst cannot simply manufacture new events, or wish them into existence, or substitute poor events for good ones. The results of such an event study will be unreliable and uninformative. The forensic analyst must work with the company's historical experience as it happened and identify which, if any, events in the company's past constituted appropriate events for testing. For the Waste Management Notes, the disclosure event on 24 June 2020 was the only appropriate and informative event for testing market efficiency. Nonetheless, it was an ideal event for that purpose.

c.      The Number of Acceptable Candidate Events is Commonly Restricted by the Length of the Class Period

150. The number of acceptable candidate events one might find to test is generally a function of, among other things, the length of the class period. Long periods will typically have more acceptable event dates, while short class periods will have fewer.

151. The empirical analysis I conduced in the instant case is similar to the traditional analysis done in cases with longer class periods. Specifically, in a one-year class period for a stock, one would find four earnings announcements, which for stocks generally are good candidate events for testing market efficiency. In a class period of only approximately 90 days, such as the instant case, one might find only one or two ideal candidates for testing. The event selection in the instant case is in line with the approach taken in all other cases, including cases with longer class periods. There are numerous cases in which the number of events in the market efficiency event study was one or fewer per quarter of the class period. Examples of these include: *Martinek v. AmTrust Financial Services, Inc. et al*, No. 1:2019cv08030 (S.D.N.Y), *Jones v. Pfizer, Inc.*, 1:10-cv-03864 (S.D.N.Y), and *In re Silver*

*Wheaton Corp. Securities Litigation*, 2:15-cv-05146-Cas(Jemx) (Central District Of California).

### d.    Use of Value Weighted Average Prices is the Generally Accepted and Widely Used Methodology, Dictated by Peer-Reviewed Published Research

152.    Consistent with the methodology espoused in seminal peer-reviewed published articles, for each Note and for each day I used the value weighted average price as the measure of the market price of the Note that day. Ms. Allen criticizes my use of VWAPs and instead advocates for a methodology explicitly rejected by the peer-reviewed research.[154] Ms. Allen contends that one should instead use the last trading price reported by Bloomberg for the calendar day, which may be as late as 6:00 PM eastern time, two hours after the close of regular trading in the United States.

153.    The seminal article by Bessembinder et al. [2009] dictates that one should use VWAPs to measure the market's valuation of bond each day, not the last trade of the day.[155] Numerous subsequent studies have concurred and adopted the use of VWAPs for daily note and prices in empirical analyses of notes and bonds. DeCosta, et al. [2013], DeCosta, et al. [2017], and Leng and Noronha [2019] are examples.[156] My methodology, not Ms. Allen's, accords with the generally accepted and widely used methodology established by authorities in the published finance literature.

154.    As the name indicates, a VWAP is computed by averaging the trade prices that occurred each day, assigning each trading price a weight corresponding to how large the trade was. So that the VWAP represents a price contemporaneous with the information flow during trading hours, the VWAP includes only trades executed during the U.S. stock market trading hours of 9:30 AM to 4:00 PM.

---

[154] Allen Report, ¶21.

[155] "Measuring Abnormal Bond Performance," by Hendrik Bessembinder, et al., *Review of Financial Studies*, vol. 22, no. 10, 2009, pp. 4225 and 4226.

[156] "Minimum Maturity Rules: The Cost of Selling Bonds before Their Time," by Darrin DeCosta, et al., *Financial Analysts Journal*, vol. 69, number 3, 2013, p. 49; "On the Relative Performance of Investment-Grade Corporate Bonds with Differing Maturities," by Darrin DeCosta, et al., *Financial Management*, vol. 46, issue 4, 2017, p. 845; and "Relative value in corporate bond sectors," by Fei Leng and Gregory Noronha, *Review of Quantitative Finance and Accounting*, vol. 52, issue 3, 2019, p. 720.

155. Bessembinder et al. [2009] explains that using VWAPs is better than using the last trade of the day because the last trade of the day "could introduce excessive noise on days when the last trade is small," whereas VWAPs or trade-weighted prices "puts more weight on the institutional trades that incur lower execution costs and should more accurately reflect the underlying price of the bond."[157] For a decentralized market like the over-the-counter bond market, a value-weighted average provides a cleaner measure of the market price than a single trade price, which may be a small trade or an after-hour trade.

156. Ms. Allen claims that using VWAPs in an event study is "inappropriate and unreliable," because it "creates a mismatch of the timing reflected in the prices."[158] However, Ms. Allen is wrong. Her methodology of using the prices of small trades executed after hours is the methodology that has a synchroneity problem. Those small after-hour trades may reflect information that transpired after the normal trading hours, and they are misaligned with the day's 4:00 PM closing prices from which the market, sector, and interest rate indices are constructed. When a major announcement or development occurs after 4:00 PM, for example at 5:00 PM, that news would affect only the next day's market, sector, and interest rate indices, which are all computed as of 4:00 PM. Therefore, a 6:00 PM note price should rightfully be assigned to the next trading day, not the trading day that just passed. Ms. Allen's methodology would incorrectly assign the 6:00 PM note price to the just passed trading day, which would be out of step with the market, sector, and interest rate variables in the regression model.

157. Ms. Allen is apparently unfamiliar with the literature establishing VWAPs as the appropriate measure of note and bond prices for empirical note and bond research. Further, she is also unaware of any literature that suggests note prices should be computed her way.

---

[157] "Measuring Abnormal Bond Performance," by Hendrik Bessembinder, et al., *Review of Financial Studies*, vol. 22, no. 10, 2009, pp. 4225 and 4226.

[158] Allen Report, ¶23.

"Q. Are you aware of whether there is any peer-reviewed literature stating that an event study measuring daily returns on bonds requires the use of closing prices?

A. Oh, event study, I mean a literature isn't going to say you have to use a particular price. So there are event studies that might do, yeah, I mean that isn't the kind of thing that I could imagine there being a peer-reviewed literature on.

…

Q. Are you aware of any peer-reviewed articles saying that using for purposes of conducting an event study concerning bonds that using closing prices of the bonds is the only way to measure daily returns?

A. That wouldn't make any sense that somebody would say that."

**Allen Deposition at 63:23-64:8 and 64:14-64:20.**

158.    Adhering to standards and methodology established in the peer-reviewed finance literature, experts typically use VWAPs as the measure of daily note and bond prices in event studies in forensic applications, barring any case-specific complexities or idiosyncrasies.[159] I am unaware of any previous challenge to using VWAPs in an event study in a securities case. Courts have accepted the use of VWAPs.[160]

159.    Given that VWAPs are the correct methodology established in the literature, that they "more accurately reflect the underlying price of the bond,"[161] and that they capture the pricing of all, but only, those transactions that take place during normal U.S. trading hours, I stand by my use of VWAPs in my event study analyses.

---

[159] *See, e.g.,* Expert Report of Michael L. Hartzmark, Ph.D., *David M. Loritz, V. Exide Technologies, et al.*, No. 2:13-cv-02607-SVW-E, 5 October 2015, ¶134; Corrected Opening Report On Market Efficiency by Dr. Adam Werner, *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, No. 1: 17-cv-00916 (RA)(BCM), 10 January 2020, Appendix-B; Report On Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040-AKH, 15 March 2017, Appendix-3; Corrected Report On Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, *In re: Petrobras Securities Litigation*, No. 14-cv-9662 (JSR), 23 October 2015, Appendix-3; Report On Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, *In re: Eletrobras Securities Litigation*, No. 15-cv-5754-JGK, 30 June 2017, Appendix-2.

[160] *See, e.g., In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 93 Fed. R. Serv. 3d 1548 (S.D.N.Y. 2016); and *In re American Realty Capital Properties, Inc. Litigation*, 1:15-15-mc-00040 (AKH) (S.D.N.Y. Aug. 31, 2017).

[161] "Measuring Abnormal Bond Performance," by Hendrik Bessembinder, et al., *Review of Financial Studies*, vol. 22, no. 10, 2009, pp. 4225 and 4226.

> **e.** **Correction For Heteroskedasticity with the Newey-West Procedure is Necessary; I Executed the Procedure Correctly**

160.    Ms. Allen misunderstands and mischaracterizes my use of the Newey-West procedure to correct for the presence of heteroskedasticity in the regression analysis, and her criticism is consequently misguided.[162]

161.    As background, a prerequisite condition for valid Ordinary Least Squares ("OLS") regression analysis is that the residual returns (the returns after controlling for market, sector, and interest rate effects) have the same volatility throughout the estimation period.[163] This condition is known as homoskedasticity. Heteroskedasticity is the condition when residual return volatility is not constant. Without a correction for heteroskedasticity, inferences from OLS regressions are invalid and unreliable.[164] Virtually all econometrics textbooks explain the problem and the need for a correction. For example:

> "The problem of heteroskedasticity arises when the assumption of homoskedasticity – that the variances of the stochastic disturbance term [the residuals] are finite and constant over the sample – is not met. … Heteroskedasticity has two important implications for estimation. The first is that the least-squares estimators, while still linear and unbiased (in the case of finite but differing variances), are no longer efficient, no longer providing minimum-variance ('best') estimators among the class of linear unbiased estimators. The second implication is that ***the estimated variances of the least-squares estimators are biased, so the usual test of statistical significance, such as the t or F tests of the last chapter, are no longer of value***. It is thus important to test for and correct possible heteroskedasticity."
> ***Econometric Models, Techniques, & Applications*, by Michael Intriligator, Prentice-Hall, 1978, p. 156 (emphasis added).**

> "The assumptions for regression analysis also require that the residuals remain constant for all values of $Y'$. Recall that this condition is called homoscedasticity."
> ***Statistical Techniques in Business and Economics*, by Robert Mason et al., Irwin/McGraw-Hill, 10th edition, 1999, p. 487.**

---

[162] Allen Report, FN 56.

[163] OLS regression analysis is the simplest type of regression analysis, the type Ms. Allen used.

[164] *Econometric Models, Techniques, & Applications*, by Michael Intriligator, Prentice-Hall, 1978, p. 156; *Quantitative Methods and Economics*, Level 2 Curriculum, CFA Institute, 2022, pp. 92-93.

162.    The CFA Institute, the premier professional organization for financial analysts warns that "t-tests for the significance of individual regression coefficients are unreliable" when heteroskedasticity is present.

> "What are the consequences when the assumption of constant error variance is violated? Although heteroskedasticity does not affect the consistency of the regression parameter estimators, it can lead to mistakes in inference. When errors are heteroskedastic, the *F*-test for the overall significance of ***the regression is unreliable. Furthermore, t-tests for the significance of individual regression coefficients are unreliable because heteroskedasticity introduces bias into estimators of the standard error of regression coefficients***. If a regression shows significant heteroskedasticity, the standard errors and test statistics computed by regression programs will be incorrect unless they are adjusted for heteroskedasticity."
> **"Multiple Regression," by Richard DeFusco et al., Reading 2 of *Quantitative Methods and Economics*, Level 2 Curriculum, CFA Institute, 2022, pp. 92-93 (emphasis added).**

163.    NERA, the firm at which Ms. Allen is a Managing Director, recognizes that heteroskedasticity "would result in a non-normal distribution of the coefficient estimates," and endorses "adjusting the standard errors of the significance test, like those proposed by Newey and West (1987) … ."[165] That is, NERA acknowledges that heteroskedasticity is a problem that needs to be corrected in econometric work, and directs one to use the very correction I applied.

---

[165] "Response to Provisional Findings – Critique of CMA Analysis of Retail Price Increase of Durex Play Products," by Frank Maier-Rigaud and Felix Forster, *NERA*, 16 June 2015, pp. 12-13.

63

164.    In the instant matter, the Class Period spanned the Covid-19 pandemic, during which many securities began to exhibit elevated volatility.[166,167] Running the appropriate tests, I did detect heteroskedasticity in the Note residual return series.[168]

165.    Advanced regression techniques are required to correct for heteroskedasticity when it is present so that valid inferences can be made.[169] Newey-West is one procedure for correcting for heteroskedasticity. I used the Newey-West procedure to compute the standard error and corresponding *t*-statistic for each residual return in the Estimation Period.

166.    Ms. Allen makes two fundamental mistakes in her criticism of my use of the Newey-West procedure. First, she fails to appreciate that a correction for heteroskedasticity is necessary. She does not correct for heteroskedasticity, which renders all of her statistical inferences and conclusions invalid.

167.    Second, Ms. Allen incorrectly contends that the Newey-West procedure as I have applied it would result in far more than 5% of residual returns appearing to be statistically significant.[170] She cites to an article that suggests that such a problem could exist, but Ms. Allen never verifies whether or not my analysis did indicate too many statistically significant observations.[171] If Ms. Allen had checked, she would have seen that it did not. The problem cautioned about in the article Ms. Allen cites is not present.

---

[166] "Securities Litigation Event Studies in the Covid Volatility Regime," by Steven Feinstein and Miguel Villanueva, *Journal of Forensic Economics*, vol. 30, no. 1, 2022.

[167] On 30 January 2020, the Director-General of the World Health Organization declared the novel coronavirus outbreak a Public Health Emergency of International Concern. "WHO Director-General's statement on IHR Emergency Committee on Novel Coronavirus (2019-nCoV)," speech transcript, World Health Organization, 30 January 2020, https://www.who.int/director-general/speeches/detail/who-director-general-s-statement-on-ihr-emergency-committee-on-novel-coronavirus-(2019-ncov); and "Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV)," World Health Organization, 30 January 2020, https://www.who.int/news/item/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).

[168] Feinstein Report, ¶179.

[169] *Econometric Models, Techniques, & Applications*, by Michael Intriligator, Prentice-Hall, 1978, p. 156; Quantitative Methods and Economics, Level 2 Curriculum, CFA Institute, 2022, pp. 92-93.

[170] Allen Report, FN 56.

[171] "Robust inference in single firm/single event analyses," by Ralf Elsas and Daniela Schoch, *Journal of Corporate Finance*, 2023, pp. 7, 12.

168. Exhibits 12a – 12d of the Feinstein Report show the Newey-West *t*-statistics for all of the residual returns in the Estimation Period for each of the Notes. A count of the significant Newey-West *t*-statistics indicating statistical significance at the 5% significance level (equivalent to the 95% confidence level; absolute value equal to or above 1.96) indicates that the procedure did not make more than 5% of the observations appear to be statistically significant. The LBF5 Note had five significant days out of 248 days in the Estimation Period, which is 2.02%. The LBG3 Note had 11 significant days out of 250 observations, which is 4.40%. The LBH1 Note had ten significant days out of 230 observations, or 4.35%. The LBJ7 Note had six significant days out of 131 observations or 4.58%. My application of the Newey-West correction did not produce excessive finding of significant residual returns.

169. To confirm the statistical significance of Note residual returns on 24 June 2020, I also assessed statistical significance another way. I constructed the empirical histogram of the Newey-West corrected *t*-statistics for all residual return observations in the Estimation Period. For each Note, I then located where in the respective empirical distribution the 24 June 2020 residual return landed. Under this methodology, a particular residual return is deemed statistically significant if its *t*-statistic resides in either the positive or negative most extreme 2.5% tail of the empirical histogram. Using an empirical histogram to determine statistical significance makes it impossible for more than 5% of observations to be deemed statistically significant, because only 5% of observations can reside in the 5% most extreme tails of the distribution. This empirical histogram methodology accords with generally accepted practice explicated in published peer-reviewed research.[172]

170. The empirical histogram method conducted on Newey-West corrected t-statistics confirms the statistical significance of the price declines for all four Notes on 24 June 2020. In fact, for each Note, the residual price decline on 24 June 2020 was the most extreme residual price movement over the entire full year ending on that day.

---

[172] See *e.g.*, "Valid Inference in Single-Firm, Single-Event Studies," by Jonah Gelbach et al., *American Law and Economics Review*, vol. 15, no. 2, 2013; "A Note on the Asymptotic Distribution of Sample Quantiles," by A. M. Walker, *Journal of the Royal Statistical Society*, Series B, vol. 30, no. 3, 1968; and "Securities Litigation Event Studies in the Covid Volatility Regime," by Steven Feinstein and O. Miguel Villanueva, *Journal of Forensic Economics*, vol. 30, no. 1, 2022.

**f.**    **The Waste Management Notes Demonstrated Efficiency by Reacting Continuously to Changes in Market Interest Rates**

171.    Ms. Allen contends that the statistically significant positive relationship between the Note returns and the Benchmark Bond returns, which represent market interest rate changes, is not evidence of market efficiency.[173] Ms. Allen is wrong.

172.    Ms. Allen accepts that this test "shows that the prices of SMR Notes are correlated with market interest rates"[174] but she refuses to accept that this highly significant relationship indicates that the market continually updated the valuation of the Notes to reflect changes in economically material information.

173.    Ms. Allen's complaint is that this test does not prove the Notes were efficient specifically with respect to Company information as opposed to marketwide information.[175] Ms. Allen misses the point. Efficiency of the Notes with respect to marketwide information proves that the market for the Notes was well developed, there were no impediments to trading on new information, that investors were attentive and sophisticated, and that investors rationally updated valuations continuously throughout the Class Period. Virtually all of the potential reasons why a market may be inefficient are ruled out by this proof of efficiency with respect to marketwide information.

174.    Ms. Allen claims that "if a company's stock price moved exactly like the S&P 500 Index, that would indicate that the company's stock price is not responding to any company-specific news."[176]

175.    Academic literature as well as peer-reviewed published articles have noted that in efficient markets, the variation in bond prices and yields are most affected by three factors: "changes in risk-free Treasury rates of interest, changes in risk-premiums for similar-risk corporate bonds, and changes in the company's likelihood of default on its obligations."[177] Most of the price variation of investment grade bonds like the Waste Management Notes come from

---

[173] Allen Report, ¶44.

[174] Allen Report, ¶44.

[175] Allen Report, ¶44.

[176] Allen Report, ¶44.

[177] "Fraud on the Market: Analysis of The Efficiency of The Corporate Bond Market," by Michael Hartzmark, et al., *Columbia Business Law Review*, no. 3, 2011, p. 670.

changes in market interest rates, as opposed to company-specific information. In an efficient market, investors would notice market interest rate changes and such changes would be incorporated into the trading prices of the Notes. Ms. Allen accepts in her deposition that "interest rates generally drive bond prices."[178]

176. Ms. Allen is either disingenuous or flatly wrong when she says that I typically do not test for correlation with interest rates in my other expert reports on market efficiency in securities class actions.[179] Of course it would not be appropriate to run this test when assessing the efficiency of a market for a stock. But when the subject security is a note or a bond, I do run this test.[180] Moreover, courts have accepted that bond price reactions to changes in market interest rates is indicative of market efficiency.

> "Moreover, the results of Feinstein's regression analysis on the Petrobras Notes showed that the fixed-rate Petrobras bonds moved in response to market interest rates, indicating the market for Petrobras Notes was efficient. Feinstein Report ~ 288-91, Ex. 7c."
> **_In re Petrobras Sec. Litig.,_ 312 F.R.D. 354, 368 93 Fed. R. Serv. 3d 1548 (S.D.N.Y. 2016).**

### C.    Ms. Allen's Empirical Analyses are Flawed and Unreliable

177. In her effort to project doubts onto my findings and opinions, and to support her untenable opinion that the alleged misrepresentations and omissions had no price impact, Ms. Allen attempted to run alternative empirical analyses. However, her empirical analysis was rife with errors, rendering her findings unreliable and her conclusions erroneous. Also, the design of her collective event study is fatally flawed, making it entirely uninformative.

---

[178] Allen Deposition at 21:22-23.

[179] Allen Report, ¶44.

[180] Report On Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, *In re American Realty Capital Properties*, Inc. Litigation, No. 1:15-mc-00040-AKH, 15 March 2017; Report On Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, *In re: Eletrobras Securities Litigation,* No. 15-cv-5754-JGK, 30 June 2017; Corrected Report On Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, *In re: Petrobras Securities Litigation*, No. 14-cv-9662 (JSR), 23 October 2015; Corrected Report On Market Efficiency Professor by Steven P. Feinstein, Ph.D., CFA, *In re: Vale S.A. Securities Litigation*, No. 19-cv-526-RJD-SJB, 18 February 2021.

### 1.    Ms. Allen Records Daily Note Prices in a Manner Rejected by Peer-Reviewed Authority

178.    Ms. Allen chooses not to use VWAPs to record daily Note prices, which as noted above, is the methodology espoused in the literature. She instead uses last trade prices from Bloomberg, which can derive from small after-hours trades. The seminal Bessembinder et al. [2009] article proffers that using the last trade of the day "could introduce excessive noise on days when the last trade is small."[181] This is exactly what happened in Ms. Allen's study when she ignored the trading price of $106.314 on a $160,000 par value trade for the LBJ7 Note, in favor of using the different price of a $110.699 at 4:33 PM for $10,000 of par value. As the note market is a decentralized over-the-counter market, the methodology must take into account that there may be a range of prices on a given day, and the literature states that the proper methodology is to average those trading prices on a value-weighted basis. Ms. Allen does not do that, and she consequently arrives at anomalous results.

179.    According to Ms. Allen, the normal bond market trading hours go until 5:00 PM eastern time.[182]

> A. … The bond market is reported as going until 5. So the bond index that I use goes until 5, and if you look at the prices that you see for the notes, you'll see that they mostly go until 5.
> …
> Q. So the Bloomberg closing prices that you used cut off at 5 p.m.?
> A. They are closing prices as of 5, yes, because that is, as I said, the standard for when the bond market closes."
> **Allen Deposition at 164:23-165:19.**

180.    Ms. Allen mistakenly thought the Bloomberg prices that she used were also quoted as of 5:00 PM.[183]

---

[181] "Measuring Abnormal Bond Performance," by Hendrik Bessembinder, et al., *Review of Financial Studies*, vol. 22, no. 10, 2009, pp. 4225 and 4226.

[182] Allen Deposition at 164:23-165:19.

[183] Allen Deposition at 165:12-19.

"Q. Now the Bloomberg closing prices that you used what hours are they from?
A. They are from 5 as well.
Q. So the Bloomberg closing prices that you used cut off at 5 p.m.?
A. They are closing prices as of 5, yes, because that is, as I said, the standard for when the bond market closes."
**Allen Deposition at 165:12-19.**

181.    It is well known that the industry index in Ms. Allen's regressions is quoted as of the stock market closing time of 4:00 PM. Nonetheless, Ms. Allen was unconcerned by the timing mismatch between her Note price time and the industry index time. More damaging to Ms. Allen's statistical analysis, however, is that she is wrong about the timing of her Bloomberg Note prices, and the non-synchroneity problem that her error creates. Ms. Allen thought the Bloomberg prices were as of 5:00 PM, but in reality, they can be as late as 6:00 PM.[184] Those prices often represent after-hour trades.

A. And the bond index that I use are closing prices as of 5, and the Bloomberg prices for the notes are closing prices as of 5.
**Allen Deposition at 164:6-166:8.**

182.    Ms. Allen's understanding of the data she used is incorrect. Bloomberg Note prices are not from 5:00 PM or earlier, but rather are from trades that can be as late as 6:00 PM. Comparing the Bloomberg prices that Ms. Allen used with the transaction data obtained from TRACE, establishes that the Note prices Ms. Allen used were from trades that took place as late as 5:53 PM. That is, Ms. Allen rejected the generally accepted VWAP methodology for one that uses prices from after-hour transactions.

183.    Table-7 shows for each of the Notes the latest time of a price used by Ms. Allen, and the percentage of days in Ms. Allen's three control periods when the Note price she used was from an after-hours trade.

---

[184] Comparing the Bloomberg prices that Ms. Allen used with the transaction data obtained from FINRA TRACE, establishes that the Note prices Ms. Allen used were from trades that took place as late as 5:53 PM.

**Table-7: Time of Latest Transaction and % of Days When Bloomberg Price Was After 4PM**

| Note | Latest Time | % of Days When Bloomberg Price Was After 4PM |
|---|---|---|
| LBF5 Notes | 17:53:19 PM | 60.39% |
| LBH1 Notes | 17:53:19 PM | 54.68% |
| LBG3 Notes | 17:53:19 PM | 52.66% |
| LBJ7 Notes | 17:02:41 PM | 33.95% |

**Sources:** TRACE data obtained from FINRA, Bloomberg.

**Note:** Calculations performed by Crowninshield Financial Research.

184. Compounding Ms. Allen's data timing error, the S&P 500 Investment Grade Corporate Bond Index, which she used to represent daily market interest rates, is not quoted as of 5:00 PM, which she thought was the time of the quote, but rather is quoted as of 4:00 PM.[185] As the timing of the Bloomberg Note prices are not synchronous with the bond index and industry index Ms. Allen used, Ms. Allen's regression model (which is geared toward explaining after-hour Note prices) omits any control for interest rate and industry effects that occurs after the market's 4:00 PM close. This modeling error weakens the power of the explanatory variables and introduces noise into the estimated Note residual returns. This noise creates bias that renders tests of statistical significance unreliable.

185. Ms. Allen's deposition testimony made clear that she is unfamiliar with the data she used, unaware of the mistakes she made, and does not know of the extent to which they introduce error into her findings and conclusions.

---

[185] Allen Deposition at 165:4-7 ("Q. So the bond indices that you're using all go through 5 p.m.? A. I use one bond index, I believe, and it ends at 5 p.m.") and "Fixed Income Policies & Practices Methodology," S&P Dow Jones Indices: Index Methodology, June 2024, p. 41.

### 2. Heteroskedasticity Renders Ms. Allen's Event Study Results Flawed and Unreliable

186. Ms. Allen made no correction for the heteroskedasticity evident in her regression estimations. The Class Period spans the start of the Covid-19 pandemic, during which many securities began to exhibit elevated volatility.[186,187] Regressions during the Class Period would therefore likely exhibit heteroskedasticity.[188] Ms. Allen acknowledges that the Class Period overlapped the "COVID period, and the market did become more volatile with COVID."[189] Ms. Allen states in her report that her event study model is estimated over three different control periods "to account for the substantial fluctuations in market volatility during the alleged Class Period that were caused in part by the COVID-19 ('Covid') pandemic."[190] However, even after splitting the estimation period into three different control periods, Ms. Allen neglects to test and correct for heteroskedasticity.

187. I tested for heteroskedasticity in Ms. Allen's regressions, and as presented in Table-8, six of the 12 regressions that Ms. Allen ran had statistically significant heteroskedasticity.

---

[186] "Securities Litigation Event Studies in the Covid Volatility Regime," by Steven Feinstein and Miguel Villanueva, *Journal of Forensic Economics*, vol. 30, no. 1, 2022.

[187] On 30 January 2020, the Director-General of the World Health Organization declared the novel coronavirus outbreak a Public Health Emergency of International Concern. "WHO Director-General's statement on IHR Emergency Committee on Novel Coronavirus (2019-nCoV)," speech transcript, World Health Organization, 30 January 2020, https://www.who.int/director-general/speeches/detail/who-director-general-s-statement-on-ihr-emergency-committee-on-novel-coronavirus-(2019-ncov); and "Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV)," World Health Organization, 30 January 2020, https://www.who.int/news/item/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).

[188] Feinstein Report, ¶139.

[189] Allen Deposition at 166:16-17 and Allen Report, ¶26.

[190] Allen Report, ¶26.

**Table-8: Heteroskedasticity Test Results for Ms. Allen's Regressions**

| Note | Control Period[1] | White Test p-Value? | Stat. Sig. Heteroskedasticity?[2] |
|---|---|---|---|
| LBF5 Notes | 1 | 96.5% | No |
| | 2 | 0.0% | **Yes** |
| | 3 | 54.9% | No |
| LBH1 Notes | 1 | 0.0% | **Yes** |
| | 2 | 0.0% | **Yes** |
| | 3 | 81.5% | No |
| LBG3 Notes | 1 | 85.4% | No |
| | 2 | 2.1% | **Yes** |
| | 3 | 0.0% | **Yes** |
| LBJ7 Notes | 1 | 0.0% | **Yes** |
| | 2 | 85.6% | No |
| | 3 | 54.0% | No |

**Source:** The underlying regression models obtained from Allen Production "3 xlsx"

[1] Control Period 1 is from 18 September 2019 through 10 March 2020, Control Period 2 is from 11 March 2020 through 16 July 2020, and control period 3 is from 1 April 2020 through 16 July 2020.

[2] Statistical Significance is determined at the 95% Confidence Level.

188.  Heteroskedasticity renders statistical inference tests unreliable. With heteroskedasticity, one might compare a Note return from a date with low volatility to a control period with uncorrected higher volatility. This mistake biases the test against finding statistical significance.

189.  Nowhere in the Allen Report, or in the backup materials she produced, did Ms. Allen test for heteroskedasticity, let alone correct for it. In her deposition Ms. Allen admitted that she did not test for heteroskedasticity.[191] Despite the proof in the Feinstein Report that

---

[191] Allen Deposition at 188:9-13 ("Q. Did you test your three control periods for heteroscedasticity? A. No. I don't recall doing that. Q. Why not? A. I didn't see a reason to do that.")

72

heteroskedasticity was present,[192] and the application of the Newey-West procedure to correct for it in my regressions, Ms. Allen neglected to consider, test for, or correct for heteroskedasticity.

190.   Ms. Allen's failure to correct for the heteroskedasticity problem is not only contrary to professional norms, but it is inconsistent with routine practice at her own firm.[193]

### 3.    Ms. Allen Made a Mistake When Constructing the Industry Index

191.   It is inexplicable why Ms. Allen chose not to use the same industry sector index that I used, which was the same index that Waste Management identified as representative of its industry sector for SEC Regulation S-K disclosure purposes. Instead, Ms. Allen used an alternative index, the S&P E&F Services Index, which she had to modify by removing Waste Management from it.[194] Ms. Allen offers no explanation for the change.

192.   Even worse than eschewing the very index that the Company put forth, Ms. Allen erred when removing Waste Management from the S&P E&F Services Index for her purposes. Ms. Allen made a mathematical error.

193.   The subject company must be properly removed from the industry sector index in an event study regression, otherwise that index would reflect company information. Using that index in an event study would control for (that is, remove) the industry sector effects, but it would also remove to some extent the impact on the subject security of company information – the very information that is the focus of the test. For valid event study results investigating whether a security reacts to company information, one must not remove or reduce the impact of company information by allowing it to be controlled for via the industry sector index. One must therefore exclude the subject company from the sector index, and do so properly. Ms. Allen did not.

---

[192] Feinstein Report, ¶¶177-181.

[193] "Response to Provisional Findings – Critique of CMA Analysis of Retail Price Increase of Durex Play Products," by Frank Maier-Rigaud and Felix Forster, *NERA*, 16 June 2015, pp. 12-13; and "The Evidence for Differences in Risk for Fixed vs Mobile Telecoms," by Richard Hern et al., *NERA*, November 2017, p. 18.

[194] Allen Report, FN 52.

194. An important step for removing a constituent company from a sector or market index is to multiply the subject company's return on a particular day by the weight of that subject company in the index from the prior day. One would then subtract this weighted return from the returns of the index on that particular day. The new index returns are then scaled up such that the remaining constituents represent the entire index.

195. The correct formula for excluding Waste Management ("WM") from the sector index is as follows:

$$\text{Return}_{\text{Index}(t)} = [\text{Return}_{\text{Index}(t)} - (\text{Return}_{\text{WM}(t)} \times \text{Weight}_{\text{WM}(t-1)})] / (1 - \text{Weight}_{\text{WM}(t-1)})$$

196. The incorrect formula used by Ms. Allen is this one:

$$\text{Return}_{\text{Index}(t)} = [\text{Return}_{\text{Index}(t)} - (\text{Return}_{\text{WM}(t)} \times \text{Weight}_{\text{WM}(t)})] / (1 - \text{Weight}_{\text{WM}(t)})$$

197. Note that Ms. Allen uses weights from the wrong day (evident in the t subscript, rather than t-1). Ms. Allen incorrectly uses contemporaneous weights that pertain after the Company stock price has changed instead of the lagged weights that reflect the proper weight before the Company stock price change. She thereby incorrectly measures how much influence Waste Management had each day on the sector index. Ms. Allen's attempt to correct the index by removing Waste Management speaks to her appreciation of the importance of this step. Nonetheless, she executed it incorrectly.

### 4.   Ms. Allen Calculates Two-Day Excess Returns Incorrectly

198. Ms. Allen errs when computing two-day explained returns and two-day residual returns. This mistake affects the two-day residual return she computed for the LBJ7 Note over the two-day window from 16 March 2020 to 18 March 2020, for example.

199. The explained return over two days is correctly computed by adding: (i) two times the regression intercept term; (ii) the sector index return over the two days multiplied by the sector index regression coefficient; and (iii) the bond index return over the two days multiplied by the bond index regression coefficient.

200. Ms. Allen failed to multiply the regression intercept term by two, and thereby failed to correctly account for effect represented by the regression intercept term. Her computations of the explained return and residual return are thus quantitatively wrong.

201. Drawing valid inferences from statistical analysis requires that the statistical analysis be conducted correctly and with care. Ms. Allen's statistical work appears to be rife with errors.

### 5. Ms. Allen Conducts Flawed Event Study Analysis and Misinterprets the Test Results

202. Ms. Allen applies her unreliable statistical tests and incorrectly analyzes three days in the Class Period to conclude that the price reactions of the Waste Management Notes were "contrary to market efficiency."[195]

### a. Analysis of 18 March 2020

203. Ms. Allen claims that the Notes' price movements on 18 March 2020 are inconsistent with market efficiency because, according to her, the Notes that day "did *not* move in a direction consistent with the Amended Complaint's allegations and, in fact, moved in opposite directions to each other."[196] According to both her and my event studies, "the 2.95% and 4% SMR Notes had a statistically significant *positive* reactions, the 3.2% SMR Note had a statistically significant *negative* reaction, and the 3.45% SMR Note had a positive but not statistically significant reaction."[197] However, given the mixed nature of the Company's announcement that day, made in the midst of a volatile market, these mixed results are not inconsistent with market efficiency. Mixed news and high volatility reasonably beget mixed results.

204. As explained, above, what happened on 18 March 2020 was that the Company announced that it "anticipates closing the Merger mid to late second quarter 2020."[198] With this announcement, the Company simultaneously gave bad news that the completion of the Acquisition would be delayed, but also reassured the market that the Acquisition would be completed by the End Date. The announcement also provided reassurance that despite "the

---

[195] Allen Report, ¶12.

[196] Allen Report, ¶32.

[197] Allen Report, ¶33.

[198] Waste Management, Inc., Form 8-K, filed 18 March 2020, accepted 8:49:48 AM.

effects from the Covid-19 outbreak" the Company was still committed to the Acquisition and had no plans to scuttle or renegotiate the deal.[199]

205. This mixed announcement came in the midst of exacerbated volatility in the marketplace. Given the mixed nature of the news and the climate of uncertainty and volatility, any reaction from the Note holders would be consistent with market efficiency. Any reaction, positive, negative or neutral, would not be determinative of market efficiency or inefficiency.

206. As it turned out, the mixed news elicited mixed reactions. Ms. Allen contends a mixed reaction is evidence of inefficiency, but it is not. A mixed reaction is understandable given the climate of uncertainty and the mixed nature of the news.

207. Furthermore, each of the Waste Management Notes had different coupon rates and different maturity dates. Bonds from the same corporate issuer can have different price sensitivities and respond differently to information because of their coupon rates and time to maturity.[200]

208. If, counterfactually, directionality and price correctness were relevant considerations for testing market efficiency, then the analysis and debate between the experts would broaden to include arguments about which pricing model the security price ought to conform to, and precisely how investors and analysts should have interpreted the flow of news received on information event dates. Ms. Allen implies that the pricing model investors used for some of the Notes was wrong, or that they interpreted the news incorrectly. Ms. Allen is not questioning that the announcement reached the market, it clearly did. She is not disputing that it elicited a noticeable reaction in the Note's prices. So, she is not challenging informational efficiency. Rather, she is arguing that some of the Notes must have moved in a wrong direction, which is a consideration relevant only for fundamental efficiency.

---

[199] Waste Management, Inc., Form 8-K, filed 18 March 2020, accepted 8:49:48 AM.

[200] "Overview of the Types and Features of Fixed Income Securities," by Frank Fabozzi et al., Chapter 1 of *The Handbook of Fixed Income Securities*, 7th edition, edited by Frank Fabozzi and Steven Mann, McGraw-Hill, 2005, pp. 8-9.

209. Notwithstanding Ms. Allen's misguided focus on fundamental efficiency, the mixed reaction of the Notes to a mixed announcement in a volatile environment is not necessarily fundamentally wrong. An announcement that adds uncertainty and volatility to the price determination process can result in some prices going up and some going down.

210. Professor Fama explained that every test of fundamental market efficiency is also necessarily a joint test of the particular pricing model assumed ("Efficient Capital Markets: II," by Eugene Fama, *The Journal of Finance*, vol. 46, no. 5, December 1991). One cannot actually test fundamental efficiency therefore, because no test can determine whether an apparent perceived pricing error is because the market is wrong or alternatively the assumed pricing model is wrong. Ms. Allen testified that she believes the news on 18 March 2020 was absolutely negative. Apparently, some Note investors disagreed and concluded otherwise.

211. Recognizing that informational efficiency is the form of efficiency relevant to a class action securities case, and that any test of fundamental efficiency is necessarily also a test of a pricing model and the correctness of the forensic analysts own valuation opinion, the court in Petrobras (citing the Supreme Court in *Halliburton II*) found that the mixed reactions of the Petrobras notes on alleged corrective disclosure dates supported a conclusion of informational efficiency, even though some of the Petrobras notes moved in opposite directions on those dates.

> "However, Gompers identified three dates when some Notes had statistically significant price declines while other Notes had statistically significant price increases. … However, evidence of directionality or the degree of fit between expected and observed moves in a market need not be substantial to allow a finding of market efficiency. Such evidence goes to the accuracy of the price of a security, and the Supreme Court has explained that it is not the accuracy of a price as a reflection of underlying value but instead the sensitivity of the price to false statements that underlies the Basic presumption. See Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2410 (2014) ('That the price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss,' which is 'all that Basic requires.') (quoting Schleicher v. Wendt, 618 F.3d 679, 685 (7th Cir. 2010) (alteration in original))."
> *In re Petrobras Sec. Litig.*, **14-cv-9662 (JSR) (S.D.N.Y. Feb. 1, 2016).**

212.   It is noteworthy that the Note prices did uniformly fall on 18 March 2020 as the market interest rate rose. It was only the residual returns after controlling for the interest rate effect that were mixed. The raw returns of all four Waste Management Notes were negative. The LBF5 Notes fell 1.34%, the LBH1 Notes fell 4.23%, the LBG3 Notes fell 3.71%, and the LBJ7 Notes fell 8.14% (over two days from 16 March 2020 to 18 March 2020). Clearly, the news on this day was not ignored. The prices responded appropriately to the change in interest rates, and the residual returns were mixed, reflecting the mixed announcement made in a volatile market environment.

### b.      Analysis of 18 June 2020

213.   Ms. Allen conducts event study analysis focusing on 18 June 2020 and incorrectly concludes that the Notes did not react appropriately to the news that day. She writes that, "on June 18, 2020, Bloomberg reported that in connection with the ADS Acquisition, the DOJ may require Waste Management to make more-than-expected divestitures in Wisconsin."[201] Ms. Allen contends that the short Bloomberg article conveyed severely negative news for the Note holders and so the Note prices should have fallen.[202] Contrary to Ms. Allen's valuation expectations, "*none* of the SMR Notes had a statistically significant price decline."[203]

214.   As explained in the Feinstein Report, "an event study tests the joint hypothesis that: (i) the security trades in an efficient market; (ii) the disseminated information is economically material for that particular security; and (iii) the appropriate valuation impact of the information disseminated on the event date is of such a large magnitude as to exceed the threshold for statistical significance, according to valuation principles."[204]

215.   Contrary to Ms. Allen's personal assessment, the short Bloomberg article was not unequivocally severe negative news. It was an uncertain suggestion at best, of a possible development that reasonably would have no effect on the Acquisition completion date. The article only surmised that the "DOJ is asking for more assets to be divested in Wisconsin

---

[201] Allen Report, ¶37.

[202] Allen Report, ¶37.

[203] Allen Report, ¶37.

[204] Feinstein Report, ¶153.

in the department's review of Waste Management's planned purchase."[205] The article provided no certainty that such additional divestment would be necessary, or that that divestment was not already underway or even finished – just that the amount of divestment specifically in Wisconsin could possibly end up being more than what was originally expected. The article did not inform investors that End Date for the Acquisition would be missed. Such an interpretation would have been contrary to the repeated assurances from the Company that the Acquisition would be completed by the End Date.

216.    The uncertain and unverified information was reported by Bloomberg and not reported or verified by the Company itself, reducing its credibility and import. While Waste Management enjoyed extensive analyst coverage, with at least 17 professional analyst firms following the Company, none of the analysts reported on this news. This despite the fact that analysts routinely commented on news related to the Acquisition and its timing. No news article in the Factiva database of news articles reported that the DOJ may require more-than-expected divestitures in Wisconsin.

217.    The importance Ms. Allen attaches to the Bloomberg article may reflect her hindsight knowledge that the Acquisition was ultimately delayed and renegotiated. At the time, however, the article was seemingly benign. Contrary to Ms. Allen's view, the analyst community and the news media did not view the contents of the Bloomberg article to be important news.

218.    The Company had made reassuring representations to the market that the Acquisition was on track for on time completion as recently as 10 June 2020, eight days prior. For the article to elicit a significant Note price reaction, the article would have had to inform investors that they were being deceived by the Company about the timing of the Acquisition. That is a big ask from a short third-party article describing a mere possibility of greater-than-expected divestment in Wisconsin.

219.    In sum, the Bloomberg article was not considered at the time to be monumental news, and so it not only is a poor candidate event for an event study, but the lack of reaction in the Note prices is perfectly understandable and consistent with market efficiency.

---

[205] "ADSW Falls as CTFN Says DOJ Wants More Assets Sold in Wisconsin," by Joshua Fineman, *Bloomberg First Word*, 18 June 2020, 1:12 PM.

c.    **Analysis of 24 June 2020**

(i)    **Why the Note Prices Did Not Fall To $101**

220.    According to Ms. Allen, on 24 June 2020, when the Company announced that it would redeem the Waste Management Notes at $101 per $100 of par, none of the Waste Management Notes fell to the redemption price of $101. Ms. Allen contends that this fact contradicts market efficiency, because according to her, the Note prices should have fallen to the redemption price of $101 once it was announced that the End Date would be missed.[206]

221.    Ms. Allen overlooks two important facts. First, the VWAPs for all four Notes fell precipitously on the news that the Company would miss the End Date. While some small trades in (only) the LBJ7 Note may have been at prices higher than the previous day's VWAP, all of the VWAPs and all of the trading prices for the LBF5, LBH1, and LBG3 were substantially lower than the prior day's VWAP. The declines in the VWAPs were all statistically significant.

222.    Second, it is understandable that the Note prices did not fall all the way to the $101 redemption price. The announcement that the End Date would be missed did not make it certain that the Notes would be called at $101. Institutions organized and hoped to negotiate with the Company to prevent them from calling the Notes. The vice chair of the Credit Roundtable, David Knutson, announced that the CRT was "considering hosting a call in the coming days for bondholders to discuss their options."[207] Bloomberg stated that noteholders may request the Company to initiate "a consent solicitation to extend the deadline, perhaps without compensating creditors."[208]

---

[206] Allen Report, ¶34.

[207] "Waste Management Shakeup Revives Investor Rebuff to Prefund M&A," by Molly Smith, *Bloomberg News*, 25 June 2020.

[208] "Waste Management Shakeup Revives Investor Rebuff to Prefund M&A," by Molly Smith, *Bloomberg News*, 25 June 2020.

223. On 29 June 2020, CRT sent a letter to Waste Management requesting the Company to pursue "alternative courses", which included "a consent solicitation to modify the expiration of the SMR to move in lock step with dates in the amended ADSW merger agreement or an exchange offer to accomplish a similar outcome."[209]

224. That it was not a foregone conclusion that Company would call the Notes at $101 is evident in commentary by analysts, who considered the alternative courses of action the Company could take and discussed the recommendation by the CRT that the Notes not be called.[210] News media reported that investors were "still protesting the company's decision to buy back its debt."[211] Bloomberg specifically reported:

> "The problem is that bond investors didn't expect the deal to be delayed into the second half of the year. So in the span of two weeks, the bond prices slid sharply to reflect the likelihood that the company would buy them back at $1.01 per dollar."
> **"Waste Management Surprised Investors with a Huge Loss in Its Bonds -- Barrons.com," by Alexandra Scaggs, *Dow Jones Institutional News Feed,* 3 July 2020.**

225. Bloomberg also reported that Waste Management announced that its statement on 24 June 2020 "didn't constitute an official notice of redemption, so it could still change course."[212]

226. On 6 July 2020, the bond analysis company Covenant Review offered that if the Company decided to extend the date, all noteholders would not be required to be onboard, and the option could be exercised only by those noteholders who wished to extend the trigger date.[213]

---

[209] CRT Letter to Waste Management, The Credit Roundtable, 29 June 2020, accessed at https://cdn.ymaws.com/thecreditroundtable.org/resource/collection/5B910F04-FD7B-410D-8894-96FD8E276B0A/CRT_Letter_SMR.pdf.

[210] "Waste Management Should Redeem Bonds for Equity Return: Stifel," by Molly Smith, *Bloomberg News*, 30 June 2020.

[211] "Waste Management Surprised Investors with a Huge Loss in Its Bonds -- Barrons.com," by Alexandra Scaggs, *Dow Jones Institutional News Feed,* 3 July 2020.

[212] "Waste Management Surprised Investors with a Huge Loss in Its Bonds -- Barrons.com," by Alexandra Scaggs, *Dow Jones Institutional News,* 3 July 2020.

[213] "Waste Management Bondholders May Not Need Unanimity to Consent," by Molly Smith, *Bloomberg*, 6 July 2020.

227. It was more than two weeks later, on 8 July 2020, when the Company announced its decision to proceed with the redemption of the Waste Management Notes at $101.[214]

228. As long as there was a chance the Notes would not be redeemed at $101, principles of valuation dictate that the Note prices would reflect that potential upside and trade at prices higher than $101. That the Note prices did not fall to $101 on 24 June 2020 is evidence of efficiency, not inefficiency as Ms. Allen mistakenly opines.

### (ii)    High Subsequent After-Hours Trading Prices for the LBJ7 Note Are Explainable

229. Ms. Allen states that on 24 June 2020, the "majority of trades" of the LBJ7 Notes "were at similar or even higher prices than the prices on the prior day," ranging from $106 to $112.[215] Ms. Allen concludes that trading at such prices "is contrary to efficiency relative to the kind of information that the alleged fraud is about."[216]

230. Ms. Allen is disingenuously selective with the prices she selects, and she is wrong that the majority of LBJ7 trades were at higher prices than the prior day's price. As noted, the VWAP of the LBJ7 Note was statistically significantly lower than the VWAP from the previous day. Moreover, three LBJ7 Note trades that occurred after the Company's 8:11 AM announcement but before the 9:30 AM start of normal trading hours, were also at prices lower than the previous day's VWAP. Ms. Allen ignores these trades. Including the pre-market hour trades together with the trades executed during normal trading hours, along with the post-market hour trades Ms. Allen highlights, there were a total of 14 LBJ7 Note trades on the calendar day 24 June 2020. All three pre-market trades were at prices lower than the prior day's VWAP. Five of the market hour trades were similarly at lower prices. Thus, of the 14 LBJ7 trades that day, eight, a majority, were at lower prices than the prior day's VWAP.

---

[214] "Waste Management Plans to Redeem Bonds in Blow to Holders," by Molly Smith, *Bloomberg*, 8 July 2020.

[215] Allen Report, ¶35.

[216] Allen Report, ¶35.

231.    The higher prices Ms. Allen points to were on small after-hours trades. There were three such trades for par amounts of $10,000 each. The prices of these after-hour trades may very well have reflected the organizing efforts of Note investors to protest and prevent the Company from calling the Notes. The prices of after-hour trades would reasonably reflect late-day developments, and reflect not only the Company's early morning announcement, but also the subsequent effort to halt redemption. As noted above, Ms. Allen was unaware of the late timing of these Note prices.

### (iii)    The Properly Measured Note Prices Declined Significantly

232.    Ms. Allen offers that if her late day Bloomberg prices are used instead of VWAPs, the change in the LBJ7 Note price on 24 June 2020 would appear not to be statistically significant.[217]

233.    As noted above, Ms. Allen's statistical analysis is rife with errors, rendering any conclusions from it unreliable. The inferences and conclusions she draws from her analysis of the LBJ7 Note's behavior on 24 June 2020 are particularly erroneous on account of the errors in her analysis.

234.    As noted above, the VWAP is the proper measure of daily note prices according to the authoritative peer-reviewed finance literature.[218] The literature cautions that using a single trade price from the end of the day would introduce noise into the series.[219] Such noise would bias an event study away from detecting statistical significance.

235.    As shown in the Feinstein Report, if VWAPs are used to measure daily prices, the LBJ7 Note fell significantly in price on 24 June 2020. The LBJ7 Note fell from a VWAP of $110.53 on 23 June 2020 to $107.08 on 24 June 2020, which is a statistically significant residual return of -3.19%.[220]

---

[217] Allen Report, ¶36.

[218] "Measuring Abnormal Bond Performance," by Hendrik Bessembinder, et al., *Review of Financial Studies*, vol. 22, no. 10, 2009, pp. 4225 and 4226.

[219] "Measuring Abnormal Bond Performance," by Hendrik Bessembinder, et al., *Review of Financial Studies*, vol. 22, no. 10, 2009, pp. 4225 and 4226.

[220] Feinstein Report, ¶190.

236.    Further, the price for the LBJ7 Notes on 24 June 2020 provided by Bloomberg that Ms. Allen based her analysis on was a price for an after-hour 4:33 PM trade. Had Ms. Allen used the last trading price as of 4:00 PM, that price would have been much lower at $106.314 rather than $110.699.

237.    The LBJ7 residual decline on 24 June 2020 was extraordinarily severe for a debt instrument. In fact, this residual decline was the most extreme residual price movement for this Note over the course of the entire year preceding that date.

238.    These findings demonstrate a cause-and-effect relationship between the release of information and movements in the prices of the LBJ7 Notes, which is the hallmark of an efficient market.

### 6.    Allen's Collective Test Examines Immaterial News

239.    Ms. Allen sought to undertake two collective tests to determine "whether the SMR Notes reacted on news versus non news days."[221] For the first test, Ms. Allen defined news days as days "with ADS-Acquisition specific news,"[222] and for the second tests she used a "broader definition of news that not only included ADS-Acquisition specific news but also news about Waste Management and ADS."[223] Surprisingly, for both tests Ms. Allen choses to exclude 18 March 2020 from her analysis, a date she argues should have been tested as an event study date.[224]

240.    Ms. Allen found no difference in the frequency of statistically significant returns between the days she deemed to be news days versus the days she deemed to be non-news days. The information that was delivered to the market on what Ms. Allen called "news days" was information that would not cause a significant reaction in the Note prices according to principles of valuation. It is not surprising that there was only an ordinary frequency of statistically significant price movements among the group of so-called news days. With her

---

[221] Allen Report, ¶38.

[222] Allen Report, ¶38.

[223] Allen Report, ¶39.

[224] Allen Report, FN 83 and 85.

choice of events, Ms. Allen's tests were designed to fail. Consequently, these tests are uninformative about market efficiency.

241. In the Feinstein Report, I explained that an event study tests the joint hypothesis that (i) the security trades in an efficient market; (ii) the disseminated information is economically material for that particular security; and (iii) the appropriate valuation impact of the information disseminated on the event date is of such a large magnitude as to exceed the threshold for statistical significance, according to valuation principles.[225] Appropriate candidate events for inclusion in an event study testing for market efficiency are therefore events on which company-specific information was released that is new, unexpected, and of such import as to be reasonably expected to elicit a security price reaction over the threshold for statistical significance in an efficient market. Ms. Allen's choice of news event dates ran contrary to this screen.[226]

242. Ms. Allen purportedly found 56 days with news about Waste Management and ADS. But the news reported was not economically material for the Notes. For example, on seven of 56 dates, the news was only that Bloomberg Automation reported increased trading in the options of Waste Management.[227] This is not the kind of news that would reasonably elicit a statistically significant reaction in the Note prices. On three of the so-called news days, the only news was that Bloomberg Automation reported what was the level of implied volatility in Waste Management's options.[228] Again, this is not news that would significantly move the Note prices. On 27 February 2020, a day that Ms. Allen included in her group of so-called news days, the news was that a cruise ship had dumped 3.3 million

---

[225] Feinstein Report, ¶153.

[226] Ms. Allen incorrectly states that I did not articulate a replicable methodology for choosing event dates. I clearly did. However, Ms. Allen chose to ignore the articulated instructions.

[227] "Waste Management Reader Interest Increases; Option Volume High," *Bloomberg News*, 23 March 2020, 4:02 PM; "Waste Management Option Volume Surges," *Bloomberg News*, 6 April 2020, 10:00 AM; "Waste Management Option Volume Rises, Led by May 15, $115 Calls," *Bloomberg News*, 30 April 2020, 10:25 AM; "Waste Management Options Imply Elevated Post-Earnings Volatility," *Bloomberg News*, 5 May 2020, 2:31 PM; "Waste Management Option Volume Rises, Led by June 19, $110 Calls," *Bloomberg News*, 5 June 2020, 10:00 AM; "Waste Management Option Volume Rises, Led by June 19, $115 Calls," *Bloomberg News*, 8 June 2020, 10:00 AM; and "Waste Management Reader Interest Increases; Option Volume High," *Bloomberg News*, 22 June 2020, 8:29 AM.

[228] "Waste Management Implied Volatility Surges as Shares Fall," *Bloomberg News*, 24 February 2020, 1:15 PM; "Waste Management Implied Volatility Surges as Shares Fall," *Bloomberg News*, 25 February 2020, 3:15 PM; and "Waste Management Implied Volatility Up, Reaches 99th Percentile," *Bloomberg News*, 5 March 2020, 4:00 PM.

pounds of garbage in a landfill operated by Waste Management.[229] Such news is not germane to the pricing of the Waste Management Notes. Including such irrelevant news days among the group of so-called news days biases the test toward failure. It is wrong to suggest that the market for the Waste Management Notes may have been inefficient because their prices did not change significantly in response to news that a cruise ship dumped waste into a landfill operated by Waste Management.

243.    Many of the news days delivered only information about ADS that was similarly irrelevant for the Notes. For example, on five of the 56 days, the only news was that Bloomberg Automation reported block trades in ADS common stock.[230] The news on four of the dates was the scheduling of the Waste Management and ADS Q1 2020 earnings announcements, when Waste Management was going to hold its virtual shareholders meeting, and when Waste Management was going to present at the Stifel Conference.[231] Such scheduling news is not surprising and would not cause a significant reaction in the Note prices.

244.    The news on two of the dates was that Waste Management had announced its quarterly stock dividend.[232] On 5 March 2020, an automated report simply noted that as of that date Waste Management stock was now trading ex-dividend.[233] That information in that article was already well known to the market.

---

[229] "Cruise ships dumped over 3 million pounds of trash in Juneau," *The Associated Press*, 27 February 2020, 9:26 AM.

[230] "Advanced Disposal 514,500 Share Block Trades at $32.80," *Bloomberg News*, 16 March 2020, 4:02 PM; "Advanced Disposal 407,629 Share Block Trades at $32.45," *Bloomberg News*, 26 March 2020, 4:09 PM; "Advanced Disposal 562,700 Share Block Trades at $32.63," *Bloomberg News*, 9 April 2020, 4:02 PM; "Advanced Disposal 400,000 Share Block Trades at $32.33," *Bloomberg News*, 27 April 2020, 4:12 PM; and "Advanced Disposal 370,100 Share Block Trades at $31.34," *Bloomberg News*, 15 June 2020, 4:00 PM.

[231] "Waste Management Sets Date for First Quarter Earnings Release Conference Call," *Dow Jones Institutional News*, 26 March 2020, 4:48 PM; "Waste Management to Hold Virtual-Only Annual Meeting of Stockholder," *Dow Jones Institutional News*, 17 April 2020, 10:00 AM; "Advanced Disposal Sets Date for First Quarter 2020 Earnings Release," *Dow Jones Institutional News*, 20 April 2020, 11:25 AM; and "M&A Watch N.A.: Advanced Disposal, AMC Entertainment, Kemet," by Joshua Fineman, *Bloomberg First Word*, 10 June 2020, 8:22 AM.

[232] "Press Release: Waste Management Announces Cash Dividend," *Dow Jones Institutional News*, 18 February 2020, 5:42 PM; and "Press Release: Waste Management Announces Cash Dividend," *Dow Jones Institutional News*, 12 May 2020, 4:30 PM.

[233] "Waste Management Goes Ex-Dividend, Trades Without Payout," *Bloomberg,* 5 March 2020, 8:43 AM.

245.  The same Ferrillo et al. [2004] article that Ms. Allen musters to criticize my focus on 24 June 2020 instructs that when conducting a news vs. no-news test, one must "remove any stories that exist because they report on a price movement."[234] Ms. Allen failed to do so. For example, the news on 28 May 2020 reported that ADS common stock had fallen for the fourth day in a row.[235]

246.  Ms. Allen agrees that old news is not expected to move the price of securities.[236] But numerous days that Ms. Allen includes among the news days are days on which articles or analysts reiterated information or data that was already known to the market.

247.  Exhibit-4 presents all the 56 dates identified as news dates by Ms. Allen and a summary of the news on each date. None of Ms. Allen's so-called news days delivered news that reasonably would significantly affect the Note prices in an efficient market. Her tests are therefore completely uninformative with regard to market efficiency.

### 7.  There is No Stable, Persistent, or Exploitable Autocorrelation; Autocorrelation Does Not Indicate Inefficiency

248.  Ms. Allen states that the daily VWAPs "do not follow a 'random walk' but are instead autocorrelated," for three out of four Waste Management Notes, which does not support a finding of market efficiency.[237]

249.  Significant autocorrelation means that on average, each day's price return is correlated with the preceding day's return and the subsequent day's return. Significant autocorrelation can be an indication of market inefficiency if the returns are persistently correlated to such an extent that investors can become aware of it and then exploit it to make abnormally high profits. However, this was not the case with the Waste Management Notes during the Class Period.

---

[234] "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs In Fraud-On-The-Market Cases," by Paul Ferrillo et al., *St. John's Law Review*, vol.78, 2004, p. 120.

[235] "Advanced Disposal Falls for 4th Day; Trails Index by 10%," *Bloomberg News*, 28 May 2020, 2:07 PM.

[236] Allen Deposition at 56:13-25 ("Q. Go ahead. What were you going to say about repeated information? I would like to know. A. So it is new news that is expected. News that is not new is not expected to in efficient markets isn't expected to move the stock prices or securities prices. Q. So, for example, reiterating previous statements would in general not be expected to cause a security price to move? A. Sort of all things equal, new news doesn't move prices. Old news, repeating old news doesn't move prices. It is new news that moves prices.")

[237] Allen Report, ¶24.

250. Contrary to Ms. Allen's assertion, the finance literature is clear that statistically significant autocorrelation in a return series is not incompatible with market efficiency.[238] There are numerous benign reasons why a return series might exhibit autocorrelation that have nothing to do with market efficiency. The news driving the security prices might have happened to be autocorrelated, such as when a string of good or bad news arrives in succession, or when interest rates trend upward or downward over time. In an efficient market where the security price reacts to the news or interest rates, that pattern in the news will be reflected as autocorrelation in the security returns.

251. If the pattern of autocorrelation is not persistent or stable over time, it may not be exploitable. A pattern of autocorrelation is not useful and profitable to investors if, by the time that pattern can be recognized, it has changed. Autocorrelation that is not persistent and stable is no indication of market inefficiency.

252. Autocorrelation is not useful or profitable if it is only statistically significant, but not economically significant. That is, if the predictive power is weak, or the predicted movements are small they would not outweigh transactions costs or risk aversion, and so would be no indication of market inefficiency.

253. Ms. Allen did not show or even attempt to show that the autocorrelation she purportedly found constituted a profitable trading strategy. She admits to this in her deposition.

> "Q. Did you test to determine whether the autocorrelation you're describing was exploitable?
> A. I didn't do such a test. No.
> Q. Did you test to see if the autocorrelation you say you observed was observable such that arbitragers would have had time to exploit it to make money or profits?
> A. I didn't do those tests. There are other tests that I have done based on the data, but this particular test is merely testing autocorrelation."
> **Allen Deposition at 93:2-12.**

---

[238] "Stock Market Prices Do Not Follow Random Walks: Evidence from a Simple Specification Test," by Andrew Lo and Craig MacKinlay, *The Review of Financial Studies* 1.1 (1988): 41-66; and "Moment Risk Premia and Stock Return Predictability," by Zhenzhen Fan, et al., *Journal of Financial and Quantitative Analysis*, 57 (1) (2022), 67-93.

254. By contrast, I tested to determine if any evident autocorrelation was persistent and stable such that it could be both identified and then exploited by investors. I found that it was not. I split the Class Period into two halves (13 February 2020 through 19 April 2020 and 20 April 2020 through 22 June 2020), the same sub-intervals Ms. Allen uses to compare the trading activity of the Waste Management Notes.

255. There was no statistically significant autocorrelation exhibited by the LBJ7 Note in either the first or second half of the Class Period. The LBF5, LBH1, and LBG3 Notes exhibited statistically significant positive autocorrelation at the 5% level in the first half of the Class Period. However, in the second half of the Class Period, there was no significant autocorrelation in any of the Notes. Of note, in the second half of the Class Period, for the LBG3 Note and the LBH1 Note, while the autocorrelation was not significant, its direction had reversed, and the non-significant autocorrelation was actually in the *negative* direction.

256. These results show that there was no persistent or stable significant autocorrelation for any of the Notes. On account of this non-persistence, a trader who would have tried to construct a trading strategy based on autocorrelation identified in the LBF5 Note in the first half of the Class Period would not have profited from that strategy. In fact, that trader would have lost money when taking transaction costs into account. On account of both non-persistence and instability, a trading strategy constructed to attempt to exploit the positive autocorrelation identified in the LBG3 or LBH1 Note in the first half of the Class Period would have produced consistent trading losses in the second half of the Class Period, because the pattern reversed itself.

257. Ms. Allen did not check to see if the unstable nonpersistent autocorrelation she detected and highlights in her argument may have been due to serially correlated news or interest rates.[239] I ran the test that Ms. Allen should have run. I tested for autocorrelation in the Benchmark Bond Index as well as the S&P 500 Investment Grade Corporate Bond Index used by Ms. Allen. The interest rate indices all exhibited statistically significant autocorrelation during the Class Period. Efficient responses to market interest rates would

---

[239] Allen Deposition at 93:13-20 ("Q. Did you test to determine whether the news was serially correlated? A. I did not test whether the news was serially correlated, no. Q. Did you test whether interest rate movements were serially correlated? A. I did not test whether interest rate movements were serially correlated.").

transfer that autocorrelation to the Note returns. This is evidence of market inefficiency, not inefficiency.

258. Ms. Allen was not surprised to learn that S&P 500 Investment Grade Corporate Bond Index was autocorrelated during the Class Period.[240] Autocorrelation in the bond market is not unusual.[241] This common occurrence of autocorrelation does not demonstrate market inefficiency.

259. Importantly, the peer-reviewed academic literature states that the presence of autocorrelation does not imply that a market is inefficient. Much of the work of Professor Stephen LeRoy over the course of his career was dedicated to proving that autocorrelation is compatible with market efficiency.[242] Autocorrelation is neither proof nor a reliable indicator of market inefficiency. That this is now a generally accepted principle in financial economics is pervasively evident in the finance literature. For example:

> "[W]e show that autocorrelations of individual securities are generally negative. Of course, these results do not necessarily imply that the stock market is inefficient[.]"
> **"Stock Market Prices Do Not Follow Random Walks: Evidence from a Simple Specification Test," by Andrew Lo and Craig MacKinlay, *The Review of Financial Studies* 1.1 (1988): 41-66, p. 42.**

> "It has now been generally accepted that expected returns are time-varying and partially predictable even in an efficient market (See, for example, Campbell and Shiller (1988), Fama and French (1989), Kothari and Shanken (1997), and Cochrane (2008))."
> **"Moment Risk Premia and Stock Return Predictability," by Zhenzhen Fan, Xiao Xiao, and Hao Zhou, *Journal of Financial and Quantitative Analysis*, 57 (1) (2022), 67-93.**

---

[240] Allen Deposition at 94:6-11 ("Q. Did you test whether that index is serially correlated? A. I did not. Q. Would it surprise you to learn that it is? A. No.").

[241] *See, e.g*., "Bond Market Index Behavior: Applications for Bond Portfolio Management," by Frank Reilly and David Wright, Chapter 6 of *Yield Curve Dynamics: State-of-the-Art Techniques for Modeling, Trading and Hedging*, edited by Ronald Ryan, Glenlake, 1997, p. 96.

[242] See, for example, "Efficient Capital Markets and Martingales," by Stephen F. LeRoy, in *Journal of Economic Literature*, December 1989.

## IV.   CRITIQUE OF MS. ALLEN'S PRICE IMPACT OPINION

260.   Ms. Allen states that she was asked to "Analyze whether there is a reliable link between the alleged misrepresentations and the price movement of each of the four debt securities issued by Waste Management that are part of this case."[243] She concluded that "An analysis of the alleged corrective disclosures shows no reliable link between the alleged misrepresentations and price movements of the SMR Notes."[244]

261.   To arrive at her erroneous conclusion, Ms. Allen overlooks the obvious. According to principles of bond valuation, the maturity and remaining life of notes is highly economically material. The alleged misrepresentations and omissions allegedly misled investors about the remaining life of the Notes, and thus they necessarily impacted the prices of the Notes. Event study analysis, undisputed by Ms. Allen for three of the four Notes, proves that the Notes fell in value when the Company ultimately disclosed that the End Date for the Acquisition would be missed. This is empirical proof of price impact. Ms. Allen disregards the obvious proof.

262.   When conducted properly, an event study is essentially a controlled experiment that allows one to observe the market's valuation of a security with and without newly introduced information. Prior to an event, the security is valued in the marketplace without the new information. After the event, the security is valued with the new information. A significant security price change elicited by the disclosure reflects the effect of the new information.

263.   As noted herein, all four Waste Management Notes fell significantly when the Company finally disclosed what the Lead Plaintiffs allege could have been disclosed at the start of the Class Period, which is that the Acquisition would not be completed by the End Date. Ms. Allen does not dispute that three of the four Waste Management Notes' price (all but the LBJ7 Notes' price) declined by statistically significant amounts on 24 June 2020.[245] These results prove price impact.

---

[243] Allen Report, ¶1.

[244] Allen Report, VII B, p. 48.

[245] Allen Deposition at 225:12-15 ("Q. Are the other three notes statistically significant under your, either your alternative event study or the closing price switch? A. Yes, I believe they are.")

### A.    Ms. Allen's Event Study Analysis on the Alleged Misrepresentation and Omission Dates Proves Nothing

264.   Ms. Allen acknowledges that Lead Plaintiffs "are not claiming that the alleged misrepresentations caused an increase in the price of the SMR Notes when made."[246] Nonetheless, to challenge price impact she conducts event study analysis on five alleged misrepresentation dates: 13 February 2020, 18 March 2020, 6 May 2020, 22 May 2020, and 10 June 2020. These were days when the Company reiterated reassurances that the Acquisition would be completed by the End Date.

265.   As expected given the nature of the news, which was consistent with what investors and analysts had already been led to believe, and which according to Lead Plaintiffs and financial principles would therefore maintain artificial inflation in the Note prices, Ms. Allen "found no evidence of a price reaction to the alleged misrepresentations when made."[247]

266.   On 13 February 2020, the first day of the Class Period, the Company told investors that it expected to receive antitrust regulatory approval by the end of March 2020, and it expected to close the Acquisition soon thereafter.

> "We anticipate that we will obtain antitrust regulatory approval by the end of March 2020 and close the Advanced Disposal transaction soon thereafter."
> **Waste Management, Inc, Form 10-K for the fiscal year ended 31 December 2019, filed 13 February 2020.**

267.   On 18 March 2020, the Company announced that regulatory approval was delayed somewhat, but progress toward completion was continuing despite the Covid-19 outbreak, and completion of the Acquisition was still expected to be before the End Date.

---

[246] Allen Report, ¶85.

[247] Allen Report, ¶¶85 and 87.

"This Form 8-K is being filed to update our prior timing expectations. As a result of, and subject to any further effects from, the COVID-19 (coronavirus) outbreak, and subject to obtaining final regulatory approval from the DOJ (which the Company currently anticipates receiving in the second quarter of 2020), the Company now anticipates closing the Merger mid to late second quarter 2020."
**Waste Management, Inc., Form 8-K, filed 18 March 2020.**

268.    On 6 May 2020, the Company announced in its filed 10-Q that progress toward the Acquisition was continuing, despite Covid-19, and the Acquisition was expected to close by the end of Q2 2020.[248] On the conference call on 6 May 2020, the Company confirmed in no uncertain terms that it expected to close the Acquisition by the end of Q2 2020, before the End Date.

"Despite the general business disruption caused by COVID-19, we continue to make progress and currently anticipate being in a position to receive final antitrust regulatory approval and proceed toward closing by the end of the second quarter of 2020."
**Waste Management Inc, Form 10-Q for the quarter ended 31 March 2020, filed 6 May 2020, p. 19.**

"Finally, it's been about 1 year since we announced our acquisition of Advanced Disposal. Despite the general business disruption caused by COVID-19, we continue to make progress, and currently, anticipate being in a position to receive final antitrust regulatory approval and proceed towards closing by the end of second quarter of 2020. We're looking forward to completing this transaction, integrating the ADS team and operations and creating a long-term value for our shareholders."
**"Q1 2020 Waste Management Inc Earnings Call," *Thomson Reuters,* Conference Call, 6 May 2020, p. 4.**

**[Noah Duke Kaye, Oppenheimer & Co. analyst:]** …Just I wanted to clarify from the prepared remarks on the ADSW timing, you said you're expecting receipt of regulatory approvals by the end of the second quarter and then moving to closing. Did you say you expect closing to occur in -- by the end of the second quarter or subsequent to that? I just wanted to understand.
**[James Fish, Waste Management, President, CEO & Director:]** Well, no, I just said we anticipate being in a position to close by the end of the second quarter. I think it's important to point out that, look, when we first

---

[248] Waste Management Inc, Form 10-Q for the quarter ended 31 March 2020, filed 6 May 2020, p. 19.

announced this deal, … 14, thank you. 14th of April, that we said it feels like the 14th of April 1990, honestly, because of this pandemic. But we said that it would take, we thought, between 12 and 15 months to close. We're at 13.5 or we will be, next week, so -- or 12.5. So we're within that window in terms of this being in anticipation or anticipating being in a position to close, so we're not worried about that."

**"Q1 2020 Waste Management Inc Earnings Call,"** *Thomson Reuters*, **6 May 2020, pp. 13-14.**

269.    Ms. Allen contends that the 6 May 2020 alleged misrepresentation date "provided new information about the timing of the deal, which according to Plaintiffs' theory would be relevant to the SMR Note investors."[249] Ms. Allen suggests (though she never definitively opines) that the lack of statistically significant Note price movements on that day indicates that this and the other alleged misrepresentations and omissions had no price impact.[250]

270.    First, Ms. Allen misquotes the Company. She contends the Company said something to the effect of the Company "expected the merger to close by the end of the second quarter or subsequent to that."[251] The Company did not say that the closing would be subsequent to the second quarter. Rather, the Company said the closing would be by the end of the second quarter.[252]

271.    Second, Ms. Allen fails to consider that none of the Company's timing updates disclosed what the Lead Plaintiffs allegedly could have disclosed on the first day of the Class Period, which is that it was a virtual certainty that the Acquisition would not close by the End Date. Each update was modest, such that in an efficient market the updates would only cause a modest change in the Note prices at most, not a statistically significant change. But price impact is not the same thing as price movement. Each alleged misrepresentation reiterated that the Acquisition was on track, which was good news in the context of Covid-19, which otherwise could have caused investors to doubt that the Acquisition would occur at all, let alone on time. Reasonably, these misrepresentations had price impact by buoying up the Notes, countervailing against downward price pressure.

---

[249] Allen Report, ¶86.

[250] Allen Report, ¶86.

[251] Allen Report, ¶86.

[252] "Q1 2020 Waste Management Inc Earnings Call," *Thomson Reuters*, 6 May 2020, pp. 13-14.

272. Ms. Allen also fails to consider that the alleged misrepresentations served to conceal the omissions. If instead of announcing that the Acquisition was on track and would close before the End Date, the Company alternatively disclosed what they allegedly could have disclosed on 13 February 2020, that the End Date would be missed, the Note prices would have fallen with such a disclosure just as they did fall on 24 June 2020 when the disclosure was made.

273. Ms. Allen's finding that the Waste Management Notes did not react in a statistically significant fashion after the misrepresentations and omissions on 6 May 2020 proves nothing about price impact.

### B.    Ms. Allen's Conclusion of No Price Impact on 18 March 2020 Is Erroneous

274. Lead Plaintiffs allege that the Company's statements on 18 March 2020 constituted a misrepresentation as well as a partially corrective disclosure. The announced delay was an alleged partially corrective disclosure, but the reassurance of closing before the End Date was an alleged misrepresentation. Alleged material omissions remained undisclosed.

275. Ms. Allen observes that the price reactions among the four Notes on 18 March 2020 were mixed. She contends that the mixed reactions among the Notes undercuts the allegation that the Company's statements on this day had price impact.[253]

276. Again, Ms. Allen fails to consider that the March 18th alleged misrepresentation reiterated that the Acquisition was on track, which was good news in the context of Covid-19, which otherwise could have caused investors to doubt that the Acquisition would occur at all, let alone on time. Reasonably, this misrepresentation therefore had price impact by buoying up the Notes, countervailing against downward price pressure.

277. Ms. Allen also fails to consider that this alleged misrepresentation served to conceal the omissions. If instead of announcing that the Acquisition was on track and would close before the End Date, the Company alternatively disclosed that the End Date would be missed, the Note prices reasonably would have fallen on 18 March 2020 just as they did fall on 24 June 2020 when that disclosure was made.

---

[253] Allen Report, ¶¶87 and 90.

278. With respect to the corrective nature of the Company's statements, Ms. Allen fails to consider that the update on 18 March 2020 did not disclose what the Plaintiffs allegedly could have disclosed on the first day of the Class Period, which is that it was a virtual certainty that the Acquisition would not close by the End Date. Instead, the Company gave a mixed update that reaffirmed the alleged misrepresentations and continued to conceal the alleged omissions.

279. The announcements on 18 March 2020 were so mixed, and were made into an environment of high volatility, such that any reaction, positive, negative or neutral would be an appropriate reaction.

280. Ms. Allen's finding that the Waste Management Notes did not all move by statistically significant amounts and in the same direction on 18 March 2020 proves nothing about price impact.

### C.    Ms. Allen's Price Impact Analysis Is Incomplete as It Excludes Consideration of the 24 June 2020 Corrective Disclosure

281. While not offering a definitive opinion that the alleged misrepresentations and omissions had no impact on the prices of the Waste Management Notes, Ms. Allen offers the following hedged opinion:

> "An analysis of the price reactions of the SMR Notes to the alleged corrective disclosures shows no reliable link between the alleged misrepresentations and price movements and thus no price impact from the alleged misrepresentations."
> **Allen Report, ¶88.**

282. Ms. Allen's conclusion is unreliable because her analysis is blatantly incomplete. She disregards the corrective disclosure on 24 June 2020 when the Company finally admitted to the public what Lead Plaintiffs allege it could have disclosed since the start of the Class Period, which is that the End Date for the Acquisition would be missed. All four Waste Management Notes fell significantly in price after this disclosure.

283. Ms. Allen disputes that the LBJ7 Note fell significantly, but the reason for her doubt stems from the errors in her measurement of prices and the other errors in her econometrics laid out above.

284. Ms. Allen's opinion suggesting no price impact is astonishingly inconsistent with generally accepted valuation principles, even those she herself acknowledges. Ms. Allen wrote in her report that had the Company announced the truth on the first day of the Class Period, "the special mandatory redemption of the SMR Notes would have been triggered, the SMR Notes would have been redeemed at $101."[254] Considering all Notes were trading at prices higher than $101, Ms. Allen admits that if the truth had been announced on the first day of the Class Period, the prices of all Notes would have fallen. By Ms. Allen's own admission therefore, the Company's alleged concealment with misrepresentations and omissions of the fact that it would miss the End Date, had price impact.

285. In sum, Ms. Allen's conclusion of no price impact is unsupported and demonstrably incorrect.

## V.    CRITIQUE OF MS. ALLEN'S DAMAGES METHODOLOGY OPINION

### A.    The Out-of-Pocket Damages Methodology Articulated in the Feinstein Report Is Common for All Class Members, Consistent with Lead Plaintiffs' Theory of Liability, and Feasible

286. The Feinstein Report fully articulates the out-of-pocket damages methodology.[255] I explained that "out-of-pocket damages are measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale or, if held, at the end of the Class Period, taking into account formulaic prescriptions in relevant case law and statutes."[256] The out-of-pocket damages methodology is the same in virtually all class action securities cases alleging misrepresentations and omissions, and fits the facts, circumstances, and liability theory of the instant case. I explained that the calculation of each Class member's damages would be a mechanical arithmetic exercise, conducted the same way for all Class members, applying the results of the Class-wide analyses described in the Feinstein Report to each Class member's trading data.[257]

---

[254] Allen Report, ¶82.

[255] Feinstein Report, ¶¶218(i)-(viii).

[256] Feinstein Report, ¶214.

[257] Feinstein Report, ¶218.

287.  The out-of-pocket damages methodology measures the compensation that would place investors in a position commensurate to the economic condition they would have been in had there been no alleged fraud. It does so by measuring how much less investors would have paid for the Notes had there been no misrepresentations and omissions, such that the investors would not have overpaid and would not have sustained subsequent losses upon a later revelation of the truth. The methodology therefore measures exactly how much investors lost specifically due to the alleged fraud.[258] This damages methodology is therefore consistent with Lead Plaintiffs' theory of liability. The methodology is applied commonly for all Class members.

288.  Ms. Allen does not dispute the existence of the out-of-pocket damages methodology and does not dispute that it is widely used to compute damages in virtually all class action security cases, and that it is approved in published legal scholarship.[259] She does not dispute that the methodology can be applied commonly for all Class members.

### B.    Ms. Allen's Concerns About the Damages Methodology

289.  Ms. Allen raises two concerns regarding the damages methodology. First, she characterizes the instant case as potentially being a "materialization of the risk" case, and argues that I have not articulated how I would account for how the probability of missing the End Date purportedly changed over the course of the Class Period.[260] Ms. Allen asserts that the Note price declines that occurred when the certainty of failure to close the Acquisition on time was announced would not be the same price declines that would have occurred when earlier only a probability of such failure could have been announced.[261]

---

[258] "Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th Edition, edited by Roman Weil et al., John Wiley & Sons, Inc., 2017, p. 27.6 (internal citations omitted).

[259] See, e.g., "Cause for Concern: Causation and Federal Securities Fraud," by Jill Fisch, *Iowa Law Review*, vol. 94, 2009; and "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," by Daniel Fischel, *The Business Lawyer*, vol. 38, no. 1, 1982, p. 7 ("Isolating the effect of the alleged misconduct on the firm's stock price is required by the out-of-pocket measure of damages, the traditional method for computing damages in open market trading cases under the rule 10b-5, which limits recovery to the difference between the price paid or received, and the 'real' value of the security at the time of the purchase/sale").

[260] Allen Report, ¶75.

[261] Allen Report, ¶¶78-79.

290.    Second, Ms. Allen avers that if the Company had declared at the start of the Class Period that it would miss the End Date, then at the time of that announcement it would have had to call the Notes. In such a scenario, there would have been no Class investors and therefore no but-for prices to compare against actual prices for the purpose of computing artificial inflation and damages.[262]

### 1.    Plaintiffs Allege that Defendants Did Not Just Understate the Magnitude of a Known Risk, But Rather Concealed a Virtual Certainty

291.    Ms. Allen mischaracterizes Lead Plaintiffs' allegations. Lead Plaintiffs do not allege that the misrepresentations and omissions merely caused investors to underestimate the risk that the Acquisition would not close on time. Rather, Lead Plaintiffs allege that this failure was a virtual certainty, and Defendants' misrepresentations and omissions concealed this virtual certainty from the market.

292.    I understand that Lead Plaintiffs' intend to prove that the Company knew on the first day of the Class Period, that it was a virtual certainty that the Acquisition would not be completed by the End Date of 14 July 2020. Lead Plaintiffs' single theory of liability is that by concealing that the Acquisition would not close on time, Defendants' misrepresentations and omissions artificially inflated the price Class members paid for Waste Management Notes, such that investors overpaid for the security. Lead Plaintiffs allege that the truth that was revealed at the end of the Class Period, on 24 June 2020 was the same truth that could have been revealed at the start of or at any time during the Class Period.

293.    Therefore, the observed price reactions to the final corrective disclosure do reliably serve as a basis for determining how much the Note prices would have declined at the start of or at any time during the Class Period if the truth had been revealed then. Applying the standard, generally accepted, note pricing formula, one can easily compute the but-for price of the Notes at any time during the Class Period with the revealed true time to maturity input into the formula.

---

[262] Allen Report, ¶82.

294.    Ms. Allen inappropriately disputes the facts as alleged by Lead Plaintiffs. Lead Plaintiffs allege that the true probability of the Company completing the Acquisition by the End Date was always virtually zero during the Class Period, and that the Company knew this. Ms. Allen speculates that the probability varied during the Class Period.[263] Ms. Allen's first concern is baseless given the facts as alleged.

### 2.    The Damages Methodology Accommodates Alternative Determinations About the Nature of the Concealed Certainty or Risk

295.    Even if it were determined that the probability of failure to complete the Acquisition on time was not a virtual certainty and did change over time, the out-of-pocket damages methodology can still compute damages and would do so in a common manner for all Class members.

296.    The magnitude of risk that the public was aware of would have been reflected in the Note prices throughout the Class Period, because the Notes traded in an efficient market. Only the portion of the risk concealed by the misrepresentations and omissions would have been omitted from the Note prices. That understatement of the risk would have caused the Notes to be artificially inflated.

297.    Ms. Allen acknowledges that the out-of-pocket damages methodology accommodates materialization of both known and unknown risks, for all Class members commonly, given the liability theory and facts of this case.[264] But Ms. Allen's opinion on this point mischaracterizes the damages methodology as relying exclusively on the event study to measure artificial inflation. Ms. Allen overlooks that the Feinstein Report explains that the event study coupled with standard tools of valuation would be used, in concert, to construct the inflation ribbon and account for potential valuation complexities, including any difference between the disclosed and concealed likelihoods of a risk realization, if the evidence indicates a measurable difference.[265] For example, Ms. Allen mentions the arbitrage spread as seen in the ADS stock price. That arbitrage spread, analyst commentary,

---

[263] Allen Report, ¶78.

[264] Allen Report, ¶75.

[265] Feinstein Report, ¶217.

and other market indicators can be used to estimate the probability as assessed by market participants of the Acquisition being renegotiated or terminated, if required. Company documents that may be obtained during discovery would inform the level of risk being concealed.

298.    Whether any of this risk assessment analysis will even be necessary, however, depends on what the evidence ultimately indicates about the nature of the concealed information. Ms. Allen implicitly agrees that the analysis requires the full development of the record.[266] It is premature to address issues that Ms. Allen only speculates may be encountered but have not been encountered yet.

### 3.    Ms. Allen Adopts Lead Plaintiffs' Theory of Liability, But Surprisingly Contends There Would Be No Damages

299.    Ms. Allen backpedals on her mischaracterization of the case as being a materialization of the risk case. She asserts that if the Company had told the market at the start of the Class Period that it would miss the End Date, which Lead Plaintiffs allege could and should have been done, it follows that this announcement "would have triggered a 'Special Mandatory Redemption Event,' requiring Waste Management to provide 'prompt' notice and then to redeem the SMR Notes no later than 30 days after doing so."[267] Ms. Allen continues with, "[this] means the SMR Notes would have ceased to exist and could not have bene [sic] purchased for most of the alleged Class Period"[268]

300.    I am not a securities lawyer, and neither is Ms. Allen. But, my understanding is that her interpretation of the rules governing the special redemption are wrong. Certainly, the Note prices would have fallen on such an announcement, but if the Company announced that it would miss the End Date, the redemption would not have had to occur until after the Company did miss the End Date.

301.    Regardless of whether Ms. Allen is right or wrong about the rules and prescribed actions governing the SMR, this hypothetical does not present difficulties for the common computation of damages. If in this but-for scenario, no investors could have purchased the

---

[266] Allen Report, ¶¶76 and 77.

[267] Allen Report, ¶84.

[268] Allen Report, ¶84.

Notes, then it seems that the alleged misrepresentations and omissions would be responsible for all losses suffered by the Class members who in the real world bought the Notes during the Class Period. The out-of-pocket damages methodology would still be feasible and would provide a measure of damages commonly for all Class members, but that computation of damages would be a conservative measure.

## VI.    LIMITING FACTORS AND OTHER ASSUMPTIONS

302.    This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work in this matter.

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to those Cited in the Feinstein Report**

**CASE LEGAL DOCUMENTS**

- Report on Market Efficiency and Damages Methodology of Professor Steven P. Feinstein, Ph.D., CFA, dated 14 June 2024.
- Expert Report of Lucy P. Allen, dated 16 August 2024.
- Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, dated 16 August 2024.
- Videotaped Deposition of Steven Feinstein, Ph.D., CFA, dated 27 September 2024.
- Videotaped Deposition of Lucy P. Allen, dated 1 October 2024.

**NEWS ARTICLES AND PRESS RELEASES**

- "Press Release: Waste Management Announces Cash Dividend," *Dow Jones Institutional News*, 18 February 2020.
- "Waste Management Implied Volatility Surges as Shares Fall," *Bloomberg News*, 24 February 2020.
- "Waste Management Implied Volatility Surges as Shares Fall," *Bloomberg News*, 25 February 2020.
- "Cruise ships dumped over 3 million pounds of trash in Juneau," *The Associated Press*, 27 February 2020.
- "Waste Management Implied Volatility Up, Reaches 99th Percentile," *Bloomberg News*, 5 March 2020.
- "Waste Management Goes Ex-Dividend, Trades Without Payout," *Bloomberg,* 5 March 2020.
- "Dow Jones Today, Bear Market Worsens on Trump Response To Coronavirus Pandemic; Boeing Shares Collapse," *Investor's Business Daily*, 12 March 2020.
- "Advanced Disposal 514,500 Share Block Trades at $32.80," *Bloomberg News*, 16 March 2020.
- "Traders Bet on Falling 'Fear Gauge'," *Dow Jones Institutional News*, 17 March 2020.
- "How does this bear market compare," *USA Today*, 18 March 2020.
- "Waste Management Reader Interest Increases; Option Volume High," *Bloomberg News*, 23 March 2020.
- "Advanced Disposal 407,629 Share Block Trades at $32.45," *Bloomberg News*, 26 March 2020.
- Waste Management Sets Date for First Quarter Earnings Release Conference Call," *Dow Jones Institutional News*, 26 March 2020.

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to those Cited in the Feinstein Report**

- "Waste Management Option Volume Surges," *Bloomberg News*, 6 April 2020.
- "Advanced Disposal 562,700 Share Block Trades at $32.63," *Bloomberg News*, 9 April 2020.
- "Waste Management to Hold Virtual-Only Annual Meeting of Stockholder," *Dow Jones Institutional News*, 17 April 2020.
- "Advanced Disposal Sets Date for First Quarter 2020 Earnings Release," *Dow Jones Institutional News*, 20 April 2020.
- "Advanced Disposal 400,000 Share Block Trades at $32.33," *Bloomberg News*, 27 April 2020.
- "Waste Management Option Volume Rises, Led by May 15, $115 Calls," *Bloomberg News*, 30 April 2020.
- "Waste Management Options Imply Elevated Post-Earnings Volatility," *Bloomberg News*, 5 May 2020.
- "Press Release: Waste Management Announces Cash Dividend," *Dow Jones Institutional News*, 12 May 2020.
- "Advanced Disposal Falls for 4th Day; Trails Index by 10%," *Bloomberg News*, 28 May 2020.
- "Waste Management Option Volume Rises, Led by June 19, $110 Calls," *Bloomberg News*, 5 June 2020.
- "Waste Management Option Volume Rises, Led by June 19, $115 Calls," *Bloomberg News*, 8 June 2020.
- "M&A Watch N.A.: Advanced Disposal, AMC Entertainment, Kemet," by Joshua Fineman, *Bloomberg First Word*, 10 June 2020.
- "Advanced Disposal 370,100 Share Block Trades at $31.34," *Bloomberg News*, 15 June 2020.
- "ADSW Falls as CTFN Says DOJ Wants More Assets Sold in Wisconsin," by Joshua Fineman, *Bloomberg First Word*, 18 June 2020.
- "Waste Management Reader Interest Increases; Option Volume High," *Bloomberg News*, 22 June 2020.
- "Waste Management Shakeup Revives Investor Rebuff to Prefund M&A," by Molly Smith, *Bloomberg News*, 25 June 2020.
- "Waste Management Should Redeem Bonds for Equity Return: Stifel," by Molly Smith, *Bloomberg News*, 30 June 2020.
- "Waste Management Surprised Investors with a Huge Loss in Its Bonds -- Barrons.com," by Alexandra Scaggs, *Dow Jones Institutional News Feed*, 3 July 2020.
- "Waste Management Bondholders May Not Need Unanimity to Consent," by Molly Smith, *Bloomberg*, 6 July 2020.
- "Waste Management Plans to Redeem Bonds in Blow to Holders," by Molly Smith, *Bloomberg*, 8 July 2020.

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to those Cited in the Feinstein Report**

**ACADEMIC AND PROFESSIONAL LITERATURE**

- Bessembinder, Hendrik, Kathleen Kahle, William Maxwell, and Danielle Xu, "Measuring Abnormal Bond Performance," *Review of Financial Studies*, vol. 22, no. 10, 2009.
- Bessembinder, Hendrik, William Maxwell, and Kumar Venkataraman, "Market Transparency, Liquidity Externalities, and Institutional Trading Costs in Corporate Bonds," *Journal of Financial Economics*, vol. 82, no. 2, 2006.
- Bromberg & Lowenfels, *Securities Fraud and Commodities Fraud*, §8.6 (Aug. 1988)).
- DeCosta, Darrin, Fei Leng, and Gregory Noronha, "Minimum Maturity Rules: The Cost of Selling Bonds before Their Time," *Financial Analysts Journal*, vol. 69, no. 3, 2013.
- DeCosta, Darrin, Fei Leng, and Gregory Noronha, "On the Relative Performance of Investment-Grade Corporate Bonds with Differing Maturities," *Financial Management*, vol. 46, no. 4, 2017.
- DeFusco, Richard, Dennis McLeavey, Jerald Pinto, and David Runkle, "Multiple Regression," *Quantitative Methods and Economics*, Level 2 Curriculum, *CFA Institute*, 2022.
- Edwards, Amy, Lawrence Harris, and Michael Piwowar, "Corporate Bond Market Transaction Costs and Transparency," *The Journal of Finance*, vol. 62, no. 3, 2007.
- Elsas, Ralf, and Daniela Schoch, "Robust inference in single firm/single event analyses," *Journal of Corporate Finance*, 2023.
- Fabozzi, Frank and Steven Mann, "Credit Analysis for Corporate Bonds," Chapter 1 and Chapter 32 of *The Handbook of Fixed Income Securities*, 7th edition, edited by Frank Fabozzi and Steven Mann, McGraw-Hill, 2005.
- Fan, Zhenzhen, Xiao Xiao, and Hao Zhou, "Moment Risk Premia and Stock Return Predictability," *Journal of Financial and Quantitative Analysis*, vol. 57, no. 1, 2022.
- Ferrillo, Paul, Frederick Dunbar, and David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-On-The-Market Cases," *St. John's Law Review*, vol.78, 2004.
- Friewald, Nils, Rainer Jankowitsch, and Marti Subrahmanyam, "Illiquidity or Credit Deterioration: A Study of Liquidity in the US Corporate Bond Market during Financial Crises," *Journal of Financial Economics,* vol. 105, no. 1, 2012.
- Intriligator, Michael, "Econometric Models, Techniques, & Applications," *Prentice-Hall*, 1978.
- Leng, Fei and Gregory Noronha, "Relative value in corporate bond sectors," *Review of Quantitative Finance and Accounting*, vol. 52, no. 3, 2019.
- LeRoy, Stephen, "Efficient Capital Markets and Martingales," *Journal of Economic Literature*, December 1989.

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to those Cited in the Feinstein Report**

- Lo, Andrew and Craig MacKinlay, "Stock Market Prices Do Not Follow Random Walks: Evidence from a Simple Specification Test," *The Review of Financial Studies*, vol. 1, no. 1, 1988.
- Mason, Robert, Douglas Lind, and William Marchal, "Statistical Techniques in Business and Economics," *Irwin/McGraw-Hill*, 10th edition, 1999.
- Reilly, Frank and David Wright, "Bond Market Index Behavior: Applications for Bond Portfolio Management," Chapter 6 of *Yield Curve Dynamics: State-of-the-Art Techniques for Modeling, Trading and Hedging*, edited by Ronald Ryan, Glenlake, 1997.
- Rossi, Marco, "Realized Volatility, Liquidity, and Corporate Yield Spreads," *Quarterly Journal of Finance (QJF)*, World Scientific Publishing Co., vol. 4, no. 1, 2014.
- Ross, Stephen, Randolph Westerfield, Jeffrey Jaffe, and Bradford Jordan, "Corporate Finance: Core Principles & Applications, 2nd Edition, *McGraw-Hill/Irwin*, 2008.
- Schestag, Raphael, Philipp Schuster, and Marliese Uhrig-Homburg, "Measuring Liquidity in Bond Markets," *The Review of Financial Studies*, vol. 29, no. 5, 2016.


**LEGAL CASES**

- *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676 (N.D. Ala. 2005).
- *In re American Realty Capital Properties, Inc. Litigation*, 1:15-15-mc-00040 (AKH) (S.D.N.Y. Aug. 31, 2017).
- *In re Countrywide Financial Corp. Securities Litigation*, 273 F.R.D. 586 (C.D. Cal. 2009).
- *Gelt Trading Ltd. v. Co-Diagnostics, Inc*., 2:20-CV-00368-JNP-DBP (D. Utah Aug. 18, 2023).
- *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, 17-CV-916 (RA) (BCM) (S.D.N.Y. March 18, 2021).
- *Jones v. Pfizer, Inc.*, 1:10-cv-03864 (S.D.N.Y).
- *Martínek v. AmTrust Financial Services, Inc. et al*, No. 1:2019cv08030 (S.D.N.Y).
- *In re Silver Wheaton Corp. Securities Litigation*, 2:15-cv-05146-Cas(Jemx), Central District Of California.
- *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc. et al*., No. 05 Civ. 1898 (SAS) (S.D.N.Y. August 1, 2006).
- *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc. et al*., No. 06-3794-cv (2nd Cir. October 14, 2008).
- *In re Teva Securities Litigation*, No. 3:17-cv-558 (SRU) (D. Conn. Mar. 9, 2021).

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to those Cited in the Feinstein Report**

**OTHER**

- "Bloomberg Evaluated Pricing Service ('BVAL') Government, Supranational, Agency & Investment Grade Corporate Bonds Methodology," *Bloomberg*, 22 March 2024.
- Corrected Opening Report On Market Efficiency by Dr. Adam Werner, *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, No. 1: 17-cv-00916 (RA)(BCM), 10 January 2020.
- Corrected Report On Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, *In re: Petrobras Securities Litigation*, No. 14-cv-9662 (JSR), 23 October 2015.
- Corrected Report On Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, *In re Vale S.A. Securities Litigation*, No. 19-cv-526-RJD-SJB, 18 February 2021.
- "The Credit Roundtable: In association with the Fixed Income Forum," 8 June 2018, accessed at https://cdn.ymaws.com/thecreditroundtable.org/resource/collection/72F1E 929-1587-4D1E-8477-E0BAC9F6436F/_CRTSMR_Credit_Roundtable_SMR_White_ Paper_UPDA.pdf.
- CRT Letter to Waste Management, The Credit Roundtable, 29 June 2020, accessed at "https://cdn.ymaws.com/thecreditroundtable.org/resource/collection/5B910F04-FD7B-410D-8894-96FD8E276B0A/CRT_Letter_SMR.pdf.
- Expert Report of Michael L. Hartzmark, Ph.D., *David M. Loritz, V. Exide Technologies, et al.*, No. 2:13-cv-02607-SVW-E, 5 October 2015.
- "Fitch Ratings Process," Fitch Ratings, accessed at https://www.fitchratings.com/ products/ratings-process.
- "Fixed Income Policies & Practices Methodology," *S&P Dow Jones Indices: Index Methodology*, June 2024.
- "Guide to Credit Rating Essentials – What are credit ratings and how do they work?" S&P Global Ratings, accessed at https://www.spglobal.com/ratings/_division-assets/ pdfs/guide_to_credit_rating_essentials_digital.pdf.
- Hern, Richard, Marija Spasovska, and Aldo Motta, "The Evidence for Differences in Risk for Fixed vs Mobile Telecoms," *NERA*, November 2017.
- "Industry guide to definitions and best practice for bond pricing distribution," *International Capital Market Association*, May 2021.
- Maier-Rigaud, Frank and Felix Forster, "Response to Provisional Findings – Critique of CMA Analysis of Retail Price Increase of Durex Play Products," *NERA*, 16 June 2015.
- "Methodology Guide," *Refinitiv Evaluated Pricing Service*, Fixed Income and Derivative Evaluated Pricing, version 6.2, December 2019.
- Report On Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040-AKH, 15 March 2017.

107

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to those Cited in the Feinstein Report**

- Report On Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, *In re: Eletrobras Securities Litigation*, No. 15-cv-5754-JGK, 30 June 2017.
- "The rating process," Moody's Ratings, accessed at https://ratings.moodys.io/ ratings#rating-process.
- "Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV)," World Health Organization, 30 January 2020, https://www.who.int/news/item/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).
- S&P 500 Bond Index Methodology," *S&P Dow Jones Indices*, August 2024.
- TRACE Fact Book - 2014, accessed at http://www.finra.org/sites/default/files/2014-TRACE-Fact-Book.pdf
- "WHO Director-General's statement on IHR Emergency Committee on Novel Coronavirus (2019-nCoV)," speech transcript, World Health Organization, 30 January 2020, https://www.who.int/director-general/speeches/detail/who-director-general-s-statement-on-ihr-emergency-committee-on-novel-coronavirus-(2019-ncov).
- www.sifma.org.
- Any other documents cited in the report.

**Exhibit-2**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Subsequent to the Feinstein Report**

In re Vale S.A. Securities Litigation
Case No. 19-cv-526-RJD-SJB
United States District Court
Eastern District of New York
Deposition Testimony
March 2021
Deposition Testimony
October 2023
Testimony at Evidentiary Hearing
August 2024

Alicia Marshall, et al v. Prestamos CDFI, LLC
Case No. 5:21-ev-04337-JMG
United States District Court
Eastern District of Pennsylvania
Deposition Testimony
August 2024

In re Cassava Sciences, Inc. Securities Litigation
Master File No. 1:21-cv-00751-DAE
United States District Court
Western District of Texas
Austin Division
Deposition Testimony
June 2024
Deposition Testimony
September 2024

In re Waste Management Securities Litigation
Civil Action No. 1:22-cv-04838-LGS
United States District Court
Southern District of New York
Deposition Testimony
September 2024

**Exhibit-3a**

**Institutional Holdings of LBF5 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| 20 GATES MANAGEMENT LLC | 361 | 361 | 361 |
| abrdn plc | 600 | 600 | 943 |
| AEGON ASSET MANAGEMENT | 7 | 0 | 0 |
| Aegon Ltd | 294 | 294 | 294 |
| Aetna Capital Management LLC | 1,000 | 1,000 | 1,000 |
| Albion Investors LLC | 700 | 700 | 700 |
| AllianceBernstein Holding LP | 700 | 700 | 1,146 |
| Allianz SE | 5,790 | 5,740 | 5,188 |
| Allspring Global Investments Holdings LLC | 1,553 | 546 | 318 |
| Allstate Investments LLC | 10,250 | 10,250 | 0 |
| Amalgamated Bank of Chicago | 25 | 25 | 25 |
| American Family Insurance Co | 90 | 90 | 90 |
| American International Group Inc | 8 | 8 | 8 |
| Angelo Gordon & Co LP | 28 | 28 | 28 |
| Antilles Insurance Co | 0 | 5 | 5 |
| Apogem Capital LLC | 714 | 714 | 714 |
| Apollo Asset Management Inc | 28 | 28 | 28 |
| Arch Capital Group Ltd | 667 | 500 | 0 |
| ARES ASIP VII MANAGEMENT LP | 85 | 85 | 85 |
| Aristotle Capital Management LLC | 49 | 49 | 0 |
| Artisan Partners Ltd | 685 | 612 | 612 |
| Asset Allocation & Management Co LLC | 1,149 | 1,549 | 1,549 |
| Associated Trust Co NA | 1 | 11 | 11 |
| Aviva PLC | 9,005 | 8,935 | 17,049 |
| AXA SA | 1,400 | 1,400 | 1,400 |
| AXIS SPECIALTY | 90 | 90 | 0 |
| Bain Capital Credit LP | 57 | 57 | 57 |
| Baird Financial Group Inc/Wisconsin | 1 | 11 | 11 |
| Bank of Montreal | 130 | 150 | 150 |
| Bank of New York Mellon Corp/The | 825 | 826 | 0 |
| Barings LLC | 447 | 132 | 132 |
| Berkshire Hathaway Inc | 123 | 123 | 590 |
| BlackRock Inc | 28,462 | 40,144 | 42,771 |
| Blackstone Inc | 4,335 | 4,335 | 4,758 |
| BMO UCITS ETF ICAV | 36 | 36 | 0 |
| Boston Partners Global Investors Inc | 2,020 | 2,020 | 2,020 |
| Breckinridge Capital Advisors Inc | 5 | 5 | 5 |
| Brigade Capital Management LP | 0 | 0 | 446 |
| Brinker Capital LLC | 140 | 0 | 110 |
| Brookfield Corp | 25 | 25 | 25 |
| Brookfield Public Securities Group LLC | 25 | 25 | 25 |

**Exhibit-3a**

**Institutional Holdings of LBF5 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Brown Brothers Harriman & Co | 0 | 1 | 0 |
| Canadian Imperial Bank of Commerce | 575 | 0 | 0 |
| Capital Group Cos Inc/The | 14,300 | 14,300 | 3,525 |
| Carlyle Aviation Group LLC | 28 | 28 | 28 |
| Carlyle Global Credit Investment Management | 700 | 700 | 700 |
| CARLYLE INV MGMT LLC | 8 | 8 | 8 |
| Causeway Capital Management LLC | 130 | 57 | 57 |
| Centerbridge Partners LP | 28 | 28 | 28 |
| Charles Schwab Corp/The | 375 | 375 | 375 |
| CI Financial Corp | 446 | 446 | 1,176 |
| CI INVESTMENTS INC | 75 | 75 | 75 |
| Clarion Partners LLC | 315 | 0 | 0 |
| Cliffwater LLC | 104 | 104 | 104 |
| Cohen & Steers Inc | 332 | 2,229 | 2,229 |
| Commonwealth of Pennsylvania Public School | 168 | 168 | 168 |
| CONNING & CO | 78 | 78 | 0 |
| Conning Inc | 539 | 539 | 539 |
| Consulting Group Advisory Services LLC | 0 | 178 | 0 |
| Cornerstone Advisors Asset Management LLC | 49 | 49 | 0 |
| Credit Agricole Group | 800 | 700 | 700 |
| Credit Suisse Group AG | 710 | 760 | 760 |
| Crestline Management LP | 15 | 15 | 15 |
| Curi RMB Capital LLC | 9 | 9 | 9 |
| CVC Credit Partners LLC | 333 | 250 | 0 |
| Dana Investment Advisors Inc | 5 | 0 | 0 |
| Delaware Investment Advisers Inc | 110 | 110 | 110 |
| Deutsche Bank AG | 2,517 | 993 | 813 |
| Dodge & Cox | 125 | 125 | 125 |
| Doubleline Capital LP | 12,130 | 1,870 | 10,277 |
| DWS INVESTMENT MGMT AMERICAS | 120 | 120 | 120 |
| Eagle Point Credit Management LLC | 798 | 632 | 104 |
| Eaton Vance Corp | 556 | 556 | 556 |
| Ellington Global Asset Management LLC | 108 | 108 | 75 |
| Endurance Services Ltd | 104 | 104 | 104 |
| Equitable Agrifinance LLC | 700 | 700 | 700 |
| Equitable Investment Management Group LLC | 700 | 700 | 700 |
| Fairfax Financial Holdings Ltd | 223 | 223 | 223 |
| Farmers Insurance Exchange | 539 | 153 | 153 |
| Federal Reserve Bank of New York | 0 | 0 | 3,000 |
| FIL Ltd | 12 | 12 | 12 |
| First American Bank | 0 | 0 | 4,860 |

111

**Exhibit-3a**

**Institutional Holdings of LBF5 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| FIRST ASSET EXCHANGE TRADED FUND | 695 | 695 | 695 |
| First Citizens Investor Services Inc | 9 | 9 | 9 |
| Fisch Asset Management AG | 1,300 | 1,600 | 800 |
| FMR LLC | 20,605 | 20,597 | 16,956 |
| Fractal Investments LLC | 28 | 28 | 28 |
| Franklin Resources Inc | 891 | 2,805 | 4,442 |
| Frontier Capital Management Co LLC | 0 | 0 | 446 |
| FundRock Management Co SA | 0 | 280 | 0 |
| GALLIARD CAPITAL MANAGEMENT | 1 | 11 | 33 |
| Galliard Capital Management LLC | 136 | 68 | 68 |
| Garcia Hamilton & Associates LP | 10 | 10 | 0 |
| GC Advisors LLC | 700 | 700 | 700 |
| Geneva Capital Management LLC | 0 | 0 | 446 |
| Goldman Sachs Group Inc/The | 5,832 | 5,257 | 4,560 |
| Government Pension Investment Fund Japan | 0 | 131 | 131 |
| Gramercy Funds Management LLC | 5,000 | 5,000 | 5,000 |
| GREAT-WEST CAPITAL MANAGEMENT | 28 | 28 | 28 |
| Greystone Consulting Group The Inc | 134 | 134 | 134 |
| Guardian Life Insurance Co of America/The | 5,250 | 5,250 | 5,250 |
| Guggenheim Partners LLC | 630 | 630 | 552 |
| GuideStone Capital Management LLC | 0 | 0 | 1,700 |
| Harding Loevner LP | 556 | 556 | 556 |
| Hartford Financial Services Group Inc/The | 5,365 | 5,365 | 0 |
| HIGHMARK HEALTH | 125 | 125 | 125 |
| Hiscox Underwriting Group Services Ltd | 665 | 665 | 0 |
| HPS Investment Partners LLC | 1,070 | 1,070 | 1,070 |
| HSBC Holdings PLC | 777 | 377 | 170 |
| IndexIQ Advisors LLC | 714 | 714 | 714 |
| INDUSTRY FUNDS MANAGEMENT PTY LT | 361 | 361 | 361 |
| Insight Investments LP | 1,160 | 1,160 | 1,160 |
| Insight North America LLC | 951 | 951 | 903 |
| Intact Investment Management Inc | 125 | 125 | 125 |
| Invesco Ltd | 163 | 104 | 94 |
| Jefferies Finance LLC | 28 | 28 | 28 |
| JPMorgan Chase & Co | 1,819 | 1,867 | 28,358 |
| Kohlberg Kravis Roberts & Co LP | 3,885 | 3,885 | 3,788 |
| Lattice Strategies LLC | 170 | 170 | 0 |
| Locorr Fund Management LLC | 2,870 | 2,870 | 2,870 |
| Longfellow Investment Management Co LLC | 0 | 1 | 0 |
| Loomis Sayles & Co LP | 329 | 256 | 256 |
| Lord Abbett & Co LLC | 111 | 104 | 104 |

**Exhibit-3a**

**Institutional Holdings of LBF5 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Mackay Shields UK LLP | 714 | 714 | 714 |
| Macquarie Group Ltd | 20,669 | 24,953 | 20,168 |
| Manulife Financial Corp | 400 | 400 | 400 |
| Marsh & McLennan Cos Inc | 1 | 11 | 11 |
| Massachusetts Financial Services Co | 1,556 | 1,556 | 1,556 |
| Massachusetts Mutual Life Insurance Co | 104 | 104 | 104 |
| Merganser Capital Management Inc | 70 | 8 | 8 |
| Meridian Investment Advisors Inc | 100 | 100 | 100 |
| MetLife Investment Management LLC | 4,071 | 3,749 | 3,871 |
| Mirabaud & Cie Banquiers | 3 | 0 | 300 |
| Morgan Stanley | 10 | 10 | 0 |
| Morningstar Investment Management LLC | 0 | 180 | 0 |
| National Public Finance Guarantee Corp | 2,720 | 2,720 | 2,720 |
| NB Alternatives Advisers LLC | 278 | 278 | 200 |
| Neuberger Berman Group LLC | 230 | 223 | 669 |
| NEUBERGER BERMAN INVESTMENT ADV | 664 | 664 | 631 |
| New York Life Insurance Co | 857 | 857 | 857 |
| Nomura Holdings Inc | 231 | 231 | 231 |
| Nordea Bank Abp | 145 | 145 | 145 |
| Northern Lights Fund Trust | 555 | 295 | 485 |
| Northern Trust Co/The | 1 | 11 | 11 |
| Northern Trust Corp | 7,376 | 7,376 | 7,376 |
| NORTHWESTERN MUTUAL INV SVCS | 3,576 | 3,576 | 3,576 |
| NYL Investors LLC | 714 | 714 | 714 |
| Oaktree Capital Group Holdings LP | 25 | 25 | 471 |
| OCTAGON CREDIT INVESTORS | 90 | 90 | 0 |
| OLD Republic Asset Management Corp | 1,000 | 1,000 | 1,000 |
| Oldco LLC | 0 | 0 | 7 |
| Pavilion Advisory Group Inc | 130 | 57 | 57 |
| Payden & Rygel | 0 | 0 | 468 |
| Penn Mutual Asset Management LLC | 0 | 1 | 0 |
| PFM Asset Management LLC | 50 | 50 | 50 |
| Picton Mahoney Asset Management | 0 | 0 | 850 |
| PNC Financial Services Group Inc/The | 8 | 8 | 8 |
| PNC INSTITUTIONAL ASSET MANAGEME | 5 | 5 | 5 |
| POMONA MANAGEMENT COMPANY INC | 759 | 759 | 759 |
| Prima Capital Advisors LLC | 28 | 28 | 0 |
| Principal Bank | 130 | 57 | 79 |
| Principal Financial Group Inc | 7,556 | 7,556 | 7,879 |
| Prisma Capital Partners LP | 294 | 294 | 294 |
| PROGRESSIVE CAPITAL MANAGEMENT | 10,000 | 0 | 0 |

**Exhibit-3a**

**Institutional Holdings of LBF5 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Prudential Financial Inc | 2,680 | 3,278 | 2,597 |
| Prytania Investment Advisors LLP | 0 | 1 | 0 |
| R4 CAPITAL FUNDING | 57 | 57 | 57 |
| REAMS ASSET MANAGEMENT CO INC | 250 | 250 | 250 |
| Resolution RE Ltd | 0 | 0 | 212 |
| Riverbridge Partners LLC | 130 | 57 | 57 |
| Royal Bank of Canada | 1,024 | 1,000 | 1,000 |
| RV Kuhns & Associates Inc | 10 | 10 | 0 |
| Securian Asset Management Inc | 417 | 2,320 | 2,320 |
| SEI Investments Co | 30 | 0 | 0 |
| Selective Insurance Group Inc | 616 | 616 | 291 |
| SEXTANT INVESTMENT ADVISORS LLC | 0 | 1,000 | 1,000 |
| Shenkman Capital Management Inc | 745 | 578 | 0 |
| Silvercrest Asset Management Group LLC | 130 | 57 | 57 |
| Sky Harbor Capital Management LLC | 90 | 90 | 0 |
| SLC Management LLC | 258 | 258 | 168 |
| Sound Point Capital Management LP | 333 | 250 | 0 |
| SRB Corp | 2,063 | 2,063 | 2,063 |
| STANDARD LIFE INVESTMENTS | 676 | 0 | 0 |
| State of Florida | 0 | 2,337 | 2,737 |
| State Street Corp | 6,349 | 1,735 | 2,505 |
| Sterling Capital Management LLC | 250 | 175 | 0 |
| Stonebridge Capital Advisors LLC | 37 | 49 | 49 |
| Sumitomo Mitsui Trust Holdings Inc | 37 | 37 | 37 |
| Sun Life Financial Inc | 3,685 | 3,519 | 3,009 |
| Sustainable Growth Advisers LP | 49 | 49 | 0 |
| SWEETBAY CAPITAL MANAGEMENT LLC | 9 | 9 | 9 |
| Symetra Investment Management Co | 0 | 0 | 212 |
| T Rowe Price Group Inc | 540 | 540 | 780 |
| Teachers Insurance & Annuity Association of | 6,864 | 6,864 | 6,864 |
| Thrivent Financial for Lutherans | 2,000 | 2,000 | 2,000 |
| Tortoise Capital Advisors LLC | 0 | 0 | 212 |
| Tpcg Valores Sociedad de Bolsa SA | 207 | 207 | 0 |
| Travelers Cos Inc/The | 5,000 | 5,000 | 5,000 |
| Tributary Capital Management LLC | 400 | 1,062 | 1,217 |
| TRUIST ADVISORY SERVICES INC | 200 | 200 | 0 |
| Truist Investment Services Inc | 5 | 0 | 0 |
| UBS AG | 0 | 79 | 0 |
| US Bancorp Investments Inc | 1 | 11 | 11 |
| Vanguard Group Inc/The | 30,414 | 32,217 | 59,637 |
| Varadero Capital LP | 28 | 28 | 0 |

**Exhibit-3a**

**Institutional Holdings of LBF5 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Varagon Capital Partners LP | 8 | 8 | 8 |
| Victory Capital Management Inc | 150 | 150 | 150 |
| Victory Park Capital Advisors LLC | 25 | 25 | 25 |
| Virtus Investment Partners Inc | 46 | 0 | 0 |
| Voya Investment Management LLC | 837 | 837 | 759 |
| Wellington Management Group LLP | 5,570 | 5,480 | 5,279 |
| Wells Fargo & Co | 143 | 143 | 165 |
| Wilmington Trust Co | 100 | 100 | 100 |
| Wilmington Trust Investment Management LLC | 140 | 140 | 125 |
| Zazove Associates LLC | 75 | 75 | 75 |
| Zuercher Kantonalbank | 500 | 500 | 500 |
| ZURICH ALTERNATIVE ASSET MANAGME | 37 | 37 | 37 |
| Zurich Global Investment Management Inc | 37 | 37 | 37 |

**Source:** Bloomberg.

**Exhibit-3b**

**Institutional Holdings of LBH1 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| 20 GATES MANAGEMENT LLC | 2361 | 2361 | 2361 |
| abrdn plc | 1 | 1 | 1 |
| ACORE Capital LP | 1 | 1 | 1 |
| Acres Capital LLC | 1 | 1 | 1 |
| Advent Capital Management LLC | 23 | 23 | 128 |
| Aegon Ltd | 5017 | 228 | 228 |
| Affinius Capital Advisors LLC | 18 | 18 | 5 |
| AGG CAPITAL MANAGEMENT LTD | 18 | 18 | 5 |
| AllianceBernstein Holding LP | 33 | 0 | 0 |
| Allianz Capital Partners of America Inc | 271 | 271 | 271 |
| Allianz SE | 5790 | 5176 | 4759 |
| Allspring Global Investments Holdings LLC | 541 | 557 | 356 |
| Allstate Investments LLC | 12600 | 12600 | 0 |
| Amalgamated Bank of Chicago | 50 | 50 | 50 |
| American Family Ventures | 18 | 18 | 5 |
| American Health and Life Insurance Co | 1670 | 1670 | 1670 |
| American International Group Inc | 193 | 193 | 193 |
| Apogem Capital LLC | 829 | 1070 | 1070 |
| Apollo Asset Management Inc | 3,412 | 3,412 | 2,093 |
| Apollo Global Securities LLC | 754 | 754 | 754 |
| Arena Capital Advisors LLC | 164 | 164 | 1 |
| Arena Investors LP | 2 | 2 | 2 |
| ARES ASIP VII MANAGEMENT LP | 18 | 18 | 5 |
| Ares Capital Management LLC | 278 | 278 | 278 |
| Ares Management LLC | 1025 | 1025 | 754 |
| Argenta Asset Management SA | 0 | 0 | 1418 |
| Ariel Investments LLC | 118 | 118 | 0 |
| Artisan Partners Ltd | 444 | 444 | 444 |
| Asset Allocation & Management Co LLC | 783 | 783 | 908 |
| AssetMark Inc | 105 | 105 | 0 |
| Associated Trust Co NA | 3 | 3 | 3 |
| Audax Credit BDC Inc | 18 | 18 | 5 |
| AUSBIL INVESTMENT MGMT LTD | 400 | 400 | 400 |
| AXA SA | 1167 | 1167 | 1167 |
| Baird Financial Group Inc/Wisconsin | 41 | 41 | 7 |
| Balbec Capital Management LP | 1 | 1 | 1 |
| Bank of America Corp | 806 | 788 | 750 |
| Bank of Montreal | 900 | 1100 | 1000 |
| Bank of New York Mellon Corp/The | 240 | 240 | 185 |
| Barings LLC | 821 | 821 | 785 |
| Barrow Hanley Mewhinney & Strauss LLC | 18 | 18 | 5 |

116

**Exhibit-3b**

**Institutional Holdings of LBH1 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
| --- | --- | --- | --- |
| Bell State Bank & Trust | 125 | 143 | 143 |
| Berkshire Hathaway Inc | 864 | 864 | 65 |
| BlackRock Inc | 34225 | 37447 | 40133 |
| Blackstone Inc | 4921 | 4921 | 5754 |
| BMO UCITS ETF ICAV | 32 | 32 | 0 |
| BNY Mellon Wealth Management | 113 | 113 | 113 |
| Boston Partners Global Investors Inc | 18 | 18 | 5 |
| Bridge Investment Group LLC | 3 | 3 | 3 |
| Brigade Capital Management LP | 33 | 0 | 0 |
| Brighthouse Funds Trust II | 6 | 6 | 6 |
| Brookfield Infrastructure Partners LP | 3 | 3 | 3 |
| Brown Advisory Inc | 18 | 18 | 5 |
| Brown Brothers Harriman & Co | 120 | 120 | 120 |
| BTIM Corp | 3 | 3 | 3 |
| Burgundy Asset Management Ltd | 21 | 21 | 0 |
| Cadence Bank NA | 248 | 248 | 182 |
| Calamos Partners LLC | 280 | 280 | 182 |
| Canada Life Asset Management Ltd | 3 | 3 | 3 |
| Canada Life Assurance Co/The | 3 | 3 | 3 |
| Canada Life European Real Estate Ltd | 3 | 3 | 3 |
| Candriam Investors Group | 100 | 100 | 100 |
| Capital Group Cos Inc/The | 5417 | 5417 | 5417 |
| Carlyle Global Credit Investment Management | 88 | 88 | 88 |
| CARLYLE INV MGMT LLC | 123 | 123 | 110 |
| CBRE Group Inc | 0 | 0 | 21 |
| Cerberus Capital Management LP | 1 | 1 | 1 |
| Charles Schwab Corp/The | 275 | 300 | 300 |
| CHURCHILL ASSET MANAGEMENT LLC | 1351 | 1351 | 1338 |
| CI Financial Corp | 33 | 0 | 0 |
| Clarion Partners LLC | 18 | 18 | 5 |
| Cliffwater LLC | 36 | 36 | 0 |
| Comvest Advisors LLC | 273 | 273 | 273 |
| Confluence Investment Management LLC | 0 | 0 | 117 |
| Conning Inc | 432 | 415 | 348 |
| Consulting Group Advisory Services LLC | 110 | 110 | 80 |
| Country Trust Bank | 1000 | 1,000 | 1,000 |
| CQS US LLC | 1 | 1 | 1 |
| Credit Agricole Group | 200 | 100 | 140 |
| Credit Suisse Group AG | 2231 | 2281 | 1744 |
| Crestline Management LP | 18 | 18 | 5 |
| DELPHI CAPITAL MANAGEMENT | 1 | 1 | 1 |

**Exhibit-3b**

**Institutional Holdings of LBH1 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Denver Investment Advisors LLC | 0 | 0 | 586 |
| DePrince Race & Zollo Inc | 31 | 31 | 0 |
| Deutsche Bank AG | 3,762 | 3,778 | 3,600 |
| Dimensional Fund Advisors LP | 18 | 18 | 5 |
| Dodge & Cox | 0 | 0 | 3 |
| Doubleline Capital LP | 1 | 1 | 22 |
| DWS INVESTMENT MGMT AMERICAS | 30 | 0 | 21 |
| Eagle Point Credit Management LLC | 37 | 37 | 1 |
| Earnest Partners Ltd LLC | 1 | 1 | 1 |
| Eaton Vance Corp | 444 | 444 | 719 |
| Ellington Global Asset Management LLC | 176 | 176 | 66 |
| Elliott Investment Management LP | 18 | 18 | 5 |
| Empower Capital Management LLC | 3 | 3 | 3 |
| EnCap Investments LP | 18 | 18 | 5 |
| Endurance Services Ltd | 85 | 85 | 0 |
| ERIE INDEMNITY COMPANY | 500 | 500 | 500 |
| EULAV Asset Management | 0 | 0 | 900 |
| Farmers Group Inc Employees' Pension Plan | 162 | 162 | 0 |
| Fidelity National Financial Inc/US | 2,500 | 2,500 | 2,500 |
| First Eagle Alternative Credit LLC | 271 | 271 | 271 |
| Flaherty & Crumrine Inc | 1 | 1 | 1 |
| FMR LLC | 63 | 63 | 63 |
| Fort Washington Investment Advisors Inc | 272 | 272 | 0 |
| Franklin Resources Inc | 9672 | 9288 | 9,297 |
| Frontier Capital Management Co LLC | 33 | 0 | 0 |
| GALLIARD CAPITAL MANAGEMENT | 3 | 3 | 3 |
| Galliard Capital Management LLC | 3 | 3 | 3 |
| GAM Holding AG | 2600 | 2600 | 2600 |
| GC Advisors LLC | 18 | 18 | 5 |
| Geneva Capital Management LLC | 306 | 272 | 0 |
| GLOBAL INFRASTRUCTURE MANAGEMENT | 271 | 271 | 271 |
| Goldman Sachs Group Inc/The | 12,014 | 11,026 | 7,252 |
| Government Pension Investment Fund Japan | 0 | 235 | 235 |
| Grace Partners of DuPage LP | 500 | 500 | 500 |
| Gramercy Funds Management LLC | 278 | 278 | 278 |
| Group Health Cooperative of Eau Claire | 213 | 0 | 103 |
| GrowthCurve Capital LP | 18 | 18 | 5 |
| Guggenheim Partners LLC | 2760 | 2760 | 2606 |
| GuideStone Capital Management LLC | 110 | 110 | 110 |
| Hamilton Lane Advisors LLC | 760 | 760 | 760 |
| Hancock Whitney Bank | 16 | 16 | 16 |

118

**Exhibit-3b**

**Institutional Holdings of LBH1 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Harding Loevner LP | 444 | 444 | 444 |
| Hartford Financial Services Group Inc/The | 27310 | 27310 | 462 |
| Heitman Real Estate Securities LLC | 18 | 18 | 5 |
| HIG Capital LLC | 1 | 1 | 1 |
| HIGHMARK HEALTH | 0 | 0 | 3 |
| Hilton Capital Management LLC | 38 | 38 | 0 |
| HPS Investment Partners LLC | 2,362 | 2,378 | 2,362 |
| HSBC Holdings PLC | 500 | 250 | 2000 |
| Income Research & Management | 275 | 275 | 24 |
| IndexIQ Advisors LLC | 829 | 1070 | 1070 |
| Industrial Alliance Investment Management Inc | 113 | 113 | 113 |
| INDUSTRY FUNDS MANAGEMENT PTY LT | 2361 | 2361 | 2361 |
| Innovative Capital Advisors LLC | 125 | 143 | 143 |
| Insight Investments LP | 152 | 152 | 0 |
| INSIGHT MANAGEMENT | 233 | 233 | 166 |
| Intact Investment Management Inc | 1,625 | 1,125 | 0 |
| Invesco Ltd | 59 | 0 | 0 |
| Investeringsforeningen Portfoliomanager | 400 | 400 | 400 |
| JPMorgan Chase & Co | 6885 | 7140 | 6487 |
| Kayne Anderson Capital Advisors LP | 1 | 1 | 1 |
| Kingdom of Sweden | 500 | 500 | 500 |
| Knighthead Capital Management LLC | 18 | 0 | 0 |
| Kohlberg Kravis Roberts & Co LP | 4427 | 4427 | 4000 |
| Lattice Strategies LLC | 370 | 450 | 0 |
| Lincoln Investment Management Co | 754 | 754 | 754 |
| Longfellow Investment Management Co LLC | 3 | 3 | 3 |
| Loomis Sayles & Co LP | 1608 | 1608 | 1596 |
| Lord Abbett & Co LLC | 36 | 36 | 0 |
| M&T Bank Corp | 0 | 0 | 150 |
| Mackay Shields UK LLP | 429 | 670 | 670 |
| Macquarie Group Ltd | 982 | 982 | 982 |
| Macquarie Private Debt Asset Management LLC | 6 | 6 | 6 |
| Manulife Financial Corp | 155 | 155 | 0 |
| Manulife Investment Management Private Markets | 3 | 3 | 3 |
| Marsh & McLennan Cos Inc | 3 | 3 | 3 |
| Massachusetts Financial Services Co | 1644 | 1644 | 1644 |
| Massachusetts Mutual Life Insurance Co | 176 | 176 | 140 |
| MC Credit Partners LP | 3 | 3 | 3 |
| MetLife Investment Management LLC | 5308 | 5324 | 4610 |
| Milliman Inc | 1238 | 1238 | 38 |
| Morgan Stanley | 20 | 20 | 7 |

**Exhibit-3b**

**Institutional Holdings of LBH1 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| MORGAN STANLEY REAL ESTATE | 312 | 312 | 312 |
| Morningstar Investment Management LLC | 40 | 40 | 40 |
| Natixis SA | 2835 | 940 | 0 |
| NB Alternatives Advisers LLC | 658 | 308 | 308 |
| Neuberger Berman Group LLC | 164 | 131 | 0 |
| NEUBERGER BERMAN INVESTMENT ADV | 619 | 619 | 509 |
| New Jersey Manufacturers Insurance Co | 5000 | 5000 | 5000 |
| New Mountain Net Lease Partners II LP | 3 | 3 | 3 |
| New York Life Insurance Co | 1309 | 1550 | 1550 |
| Newport Global Advisors LP | 2,500 | 2,500 | 2,500 |
| NGAM Canada LP | 435 | 435 | 435 |
| Ninety One UK Ltd | 278 | 278 | 278 |
| Nomura Holdings Inc | 115 | 115 | 115 |
| Northern Trust Co/The | 3 | 3 | 3 |
| Northern Trust Corp | 8,310 | 8310 | 7943 |
| NORTHWESTERN MUTUAL INV SVCS | 3000 | 3000 | 3000 |
| Northwestern Mutual Investment Management Co | 18 | 18 | 5 |
| Nuveen Alternatives Advisors LLC | 1333 | 1333 | 1333 |
| NYL Investors LLC | 829 | 1070 | 1070 |
| OAK STREET INVESTMENT | 1 | 1 | 1 |
| Oaktree Capital Group Holdings LP | 33 | 0 | 0 |
| Oceanview Asset Management LLC | 1 | 1 | 1 |
| Oldco LLC | 0 | 0 | 205 |
| One Compass Advisors | 30 | 30 | 30 |
| Oppenheimer Investment Management LLC | 415 | 415 | 348 |
| PACIFIC LIFE INSURANCE COMPANY | 30 | 30 | 30 |
| Palisade Capital Management LLC | 152 | 152 | 0 |
| Palmer Square Capital Management LLC | 0 | 0 | 2750 |
| Park Square Capital LLP | 3 | 3 | 3 |
| Partners Group USA Inc | 18 | 18 | 5 |
| Patterson Capital Corp/The | 118 | 118 | 0 |
| Payden & Rygel | 33 | 0 | 0 |
| PineBridge Investments LLC | 341 | 311 | 271 |
| PNC INSTITUTIONAL ASSET MANAGEME | 26 | 0 | 0 |
| Polen Capital Management LLC | 31 | 31 | 0 |
| Power Corp of Canada | 105 | 105 | 0 |
| PPM America Inc | 2652 | 2652 | 1333 |
| Principal Financial Group Inc | 4289 | 4289 | 3470 |
| Prisma Capital Partners LP | 228 | 228 | 228 |
| PROGRESSIVE CAPITAL MANAGEMENT | 5000 | 0 | 0 |
| PROPHET CAPITAL ASSET MGMT LP | 1 | 1 | 1 |

**Exhibit-3b**

**Institutional Holdings of LBH1 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Prudential Financial Inc | 11521 | 11507 | 11413 |
| Prudential PLC | 3931 | 3931 | 292 |
| Raymond James Financial Inc | 0 | 0 | 175 |
| RCG Longview Management LLC | 1 | 1 | 1 |
| REAMS ASSET MANAGEMENT CO INC | 1 | 1 | 1 |
| Regions Bank/Birmingham AL | 7 | 7 | 7 |
| Regions Financial Corp | 248 | 248 | 182 |
| Resolution RE Ltd | 583 | 583 | 1000 |
| Royal Bank of Canada | 250 | 250 | 250 |
| RREEF AMERICA  LLC | 3 | 3 | 3 |
| RREEF AMERICA LLC | 3 | 3 | 3 |
| RV Kuhns & Associates Inc | 252 | 252 | 100 |
| Sage Advisory Services Ltd Co | 0 | 0 | 175 |
| San Luis Wealth Advisors LLC | 113 | 113 | 113 |
| Schroders PLC | 38 | 38 | 38 |
| Securian Asset Management Inc | 500 | 500 | 315 |
| SEI Investments Co | 2345 | 2345 | 1900 |
| Serone Capital Management LLP | 1 | 1 | 1 |
| Shenkman Capital Management Inc | 20 | 20 | 7 |
| Silchester International Investors LLP | 18 | 18 | 5 |
| Sit Fixed Income Advisors II LLC | 1 | 1 | 1 |
| Sixth Street Advisers LLC | 480 | 480 | 467 |
| Sprucegrove Investment Management Ltd | 20 | 20 | 7 |
| SSI Investment Management Inc | 31 | 31 | 0 |
| St Denis J Villere & Co LLC | 1055 | 1055 | 1055 |
| St James's Place PLC | 9,450 | 9,450 | 9,450 |
| State of Florida | 392 | 392 | 150 |
| State Street Corp | 6492 | 1484 | 1919 |
| Sterling Capital Management LLC | 376 | 376 | 309 |
| Stifel Nicolaus & Co Inc | 7 | 0 | 0 |
| Sumitomo Mitsui Trust Holdings Inc | 0 | 16 | 0 |
| Sun Life Financial Inc | 3,966 | 3,966 | 3,887 |
| Symetra Investment Management Co | 1333 | 1333 | 1750 |
| T Rowe Price Group Inc | 2394 | 2361 | 2361 |
| Talcott Resolution Distribution Co Inc | 271 | 271 | 271 |
| TCW Asset Management Co LLC | 1 | 1 | 1 |
| TCW GROUP | 5 | 5 | 5 |
| Teachers Insurance & Annuity Association of | 2561 | 2561 | 2561 |
| Tortoise Capital Advisors LLC | 601 | 601 | 1005 |
| Triton Insurance Co | 665 | 665 | 665 |
| UBS AG | 3030 | 3030 | 1030 |

**Exhibit-3b**

**Institutional Holdings of LBH1 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Union Investment Luxembourg SA | 300 | 300 | 300 |
| US Bancorp | 106 | 106 | 0 |
| US BANCORP INVESTMENTS | 312 | 312 | 312 |
| US Bancorp Investments Inc | 3 | 3 | 3 |
| US Bank | 125 | 125 | 125 |
| Value Credit Partners LP | 400 | 400 | 400 |
| Vanguard Group Inc/The | 41324 | 45699 | 61484 |
| Verde Asset Management SA | 1 | 1 | 1 |
| Victory Park Capital Advisors LLC | 50 | 50 | 50 |
| Virtus Investment Partners Inc | 19 | 19 | 0 |
| Vontobel Holding AG | 2000 | 2000 | 1000 |
| Voya Financial Advisors Inc | 500 | 500 | 500 |
| Voya Investment Management LLC | 254 | 254 | 188 |
| WBC Holdings LP | 3 | 3 | 3 |
| Wellington Asset Management Ltd | 1 | 1 | 1 |
| Wellington Management Group LLP | 8,182 | 7,299 | 6081 |
| Wells Fargo & Co | 361 | 361 | 464 |
| Westwood Management Corp/IL | 3 | 3 | 3 |
| WH Reaves & Co Inc | 7 | 7 | 7 |
| Willow Tree Credit Partners LP | 271 | 271 | 271 |
| Wilmington Trust Co | 0 | 0 | 117 |
| Wilmington Trust Investment Management LLC | 0 | 0 | 43 |
| XL Group Investments Ltd | 1167 | 1167 | 1,167 |
| Zazove Associates LLC | 67 | 67 | 0 |
| ZURICH ALTERNATIVE ASSET MANAGME | 0 | 16 | 0 |
| Zurich Global Investment Management Inc | 30 | 16 | 0 |

**Source:** Bloomberg.

**Exhibit-3c**

**Institutional Holdings of LBG3 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| 20 GATES MANAGEMENT LLC | 5 | 5 | 9 |
| abrdn plc | 1500 | 1125 | 1125 |
| Advent Capital Management LLC | 2 | 2 | 85 |
| AEGON ASSET MANAGEMENT | 29 | 0 | 0 |
| Aegon Ltd | 410 | 410 | 410 |
| Aetna Inc | 1250 | 1250 | 1250 |
| Affinius Capital Advisors LLC | 5,860 | 5,860 | 5,858 |
| AGG CAPITAL MANAGEMENT LTD | 10 | 10 | 8 |
| Albion Investors LLC | 4251 | 4031 | 3451 |
| AllianceBernstein Holding LP | 4421 | 4201 | 3611 |
| Allianz Capital Partners of America Inc | 82 | 82 | 82 |
| Allianz SE | 5,231 | 5,157 | 5,037 |
| Allspring Global Investments Holdings LLC | 882 | 918 | 88 |
| Allstate Investments LLC | 1250 | 1250 | 0 |
| American Family Ventures | 10 | 10 | 8 |
| Ameriprise Financial Inc | 100 | 576 | 576 |
| AMG Funds III | 2329 | 306 | 306 |
| Angelo Gordon & Co LP | 5 | 5 | 9 |
| Apollo Asset Management Inc | 2,681 | 2,306 | 4,356 |
| Apollo Global Securities LLC | 385 | 385 | 385 |
| Arena Capital Advisors LLC | 1 | 43 | 1 |
| Arena Investors LP | 1 | 1 | 1 |
| ARES ASIP VII MANAGEMENT LP | 14 | 14 | 17 |
| Ares Management LLC | 414 | 644 | 414 |
| Argenta Asset Management SA | 0 | 0 | 1511 |
| Aristotle Capital Management LLC | 36 | 36 | 0 |
| ARISTOTLE PACIFIC CAPITAL LLC | 6000 | 5625 | 5625 |
| ARROWMARK PARTNERS GP LLC | 125 | 125 | 125 |
| Artisan Partners Ltd | 889 | 556 | 556 |
| Asset Allocation & Management Co LLC | 214 | 198 | 683 |
| AssetMark Inc | 35 | 35 | 0 |
| Associated Trust Co NA | 5 | 5 | 5 |
| Assurant Asset Management | 125 | 125 | 125 |
| Audax Credit BDC Inc | 10 | 10 | 8 |
| AXA SA | 10,528 | 10,088 | 9364 |
| Baird Financial Group Inc/Wisconsin | 5015 | 5015 | 5013 |
| Bank of America Corp | 75 | 75 | 100 |
| Bank Of Burlington | 19 | 19 | 0 |
| Bank of Montreal | 1329 | 1429 | 1300 |
| Bank of New York Mellon Corp/The | 1003 | 640 | 212 |
| Barings LLC | 418 | 500 | 422 |

123

**Exhibit-3c**

**Institutional Holdings of LBG3 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Barrow Hanley Mewhinney & Strauss LLC | 10 | 10 | 8 |
| Basis Management Group LLC | 125 | 125 | 125 |
| Berkley Capital LLC | 2500 | 2500 | 2500 |
| Berkley Dean & Co Inc | 2500 | 2500 | 2500 |
| BERKLEY VENTURES LTD | 2500 | 2500 | 2500 |
| Berkshire Hathaway Inc | 1501 | 1961 | 1465 |
| BlackRock Inc | 43263 | 46004 | 51988 |
| Blackstone Inc | 6785 | 6785 | 6785 |
| BMO UCITS ETF ICAV | 50 | 50 | 0 |
| BNP Paribas SA | 750 | 0 | 1990 |
| Boston Partners Global Investors Inc | 1010 | 1010 | 305 |
| Boys Arnold & Co Inc | 5 | 5 | 5 |
| Bricktown Capital LLC | 1000 | 0 | 0 |
| Bridge Investment Group LLC | 2 | 2 | 2 |
| Brigade Capital Management LP | 10 | 10 | 0 |
| Brighthouse Funds Trust II | 3 | 3 | 3 |
| Brinker Capital LLC | 825 | 825 | 825 |
| Broadridge Business Process Outsourcing LLC | 29 | 29 | 0 |
| Brookfield Corp | 1000 | 667 | 625 |
| Brookfield Infrastructure Partners LP | 2 | 2 | 2 |
| Brown Advisory Inc | 10 | 10 | 8 |
| Brown Brothers Harriman & Co | 163 | 198 | 241 |
| BTIM Corp | 2 | 2 | 2 |
| Cadence Bank NA | 0 | 0 | 61 |
| Calamos Partners LLC | 0 | 0 | 61 |
| Callan LLC | 50 | 50 | 50 |
| Canada Life Asset Management Ltd | 2 | 2 | 2 |
| Canada Life Assurance Co/The | 2 | 2 | 2 |
| Canada Life European Real Estate Ltd | 2 | 2 | 2 |
| Canadian Imperial Bank of Commerce | 525 | 0 | 0 |
| Capital Group Cos Inc/The | 11,723 | 11,723 | 11,723 |
| CARDINAL INVESTMENT ADVISOR LLC | 29 | 29 | 0 |
| Carlyle Aviation Group LLC | 5 | 5 | 9 |
| Carlyle Global Credit Investment Management | 3451 | 3451 | 3451 |
| Carlyle Group Inc/The | 2600 | 2600 | 2600 |
| CARLYLE INV MGMT LLC | 10 | 10 | 8 |
| CastleOak Securities LP | 0 | 36 | 0 |
| Causeway Capital Management LLC | 34 | 0 | 0 |
| Centerbridge Partners LP | 5 | 5 | 9 |
| Champlain Investment Partners LLC | 14 | 14 | 14 |
| Charles Schwab Corp/The | 325 | 250 | 250 |

**Exhibit-3c**

**Institutional Holdings of LBG3 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Choreo LLC | 7 | 7 | 0 |
| CHURCHILL ASSET MANAGEMENT LLC | 4093 | 4093 | 4091 |
| CI Financial Corp | 140 | 140 | 2190 |
| CI INVESTMENTS INC | 70 | 70 | 70 |
| Cigna Holding Co | 250 | 250 | 250 |
| Clarion Partners LLC | 10 | 10 | 8 |
| Cliffwater LLC | 0 | 82 | 0 |
| Cohen & Steers Inc | 29 | 0 | 0 |
| Commonwealth Equity Services LLC | 0 | 0 | 230 |
| Comvest Advisors LLC | 85 | 85 | 85 |
| Concord Advisory Group Ltd/The | 14 | 14 | 14 |
| Conning Inc | 1043 | 1043 | 357 |
| Consulting Group Advisory Services LLC | 110 | 110 | 80 |
| Cornerstone Advisors Asset Management LLC | 36 | 36 | 0 |
| Cornerstone Advisors LLC/NC | 10 | 0 | 20 |
| Country Trust Bank | 1250 | 1250 | 1250 |
| Credit Agricole Group | 482 | 389 | 389 |
| Credit Suisse Group AG | 1512 | 1318 | 1766 |
| Crestline Management LP | 10 | 10 | 8 |
| Crossmark Global Holdings Inc | 14 | 7 | 7 |
| Davis Advisors | 29 | 29 | 29 |
| DekaBank Deutsche Girozentrale | 1700 | 1700 | 1700 |
| Deutsche Bank AG | 1,028 | 1,016 | 943 |
| Dimensional Fund Advisors LP | 10 | 10 | 8 |
| Doubleline Capital LP | 13 | 13 | 13 |
| Eagle Point Credit Management LLC | 0 | 82 | 0 |
| Eaton Vance Corp | 908 | 575 | 556 |
| Edgewood Management LLC | 857 | 857 | 0 |
| Elliott Investment Management LP | 10 | 10 | 8 |
| Empower Capital Management LLC | 2 | 2 | 2 |
| EnCap Investments LP | 10 | 10 | 8 |
| Endurance Services Ltd | 0 | 206 | 0 |
| Equitable Agrifinance LLC | 5,251 | 4,656 | 4,076 |
| Equitable Investment Management Group LLC | 3451 | 3451 | 3451 |
| Erste Group Bank AG | 0 | 0 | 1,150 |
| Fidelity National Financial Inc/US | 1000 | 1000 | 1000 |
| FIL Ltd | 0 | 0 | 1830 |
| FIRST ASSET EXCHANGE TRADED FUND | 940 | 940 | 940 |
| First Eagle Alternative Credit LLC | 82 | 82 | 82 |
| FlexShares Trust | 0 | 150 | 150 |
| FMR LLC | 848 | 8 | 2328 |

125

**Exhibit-3c**

**Institutional Holdings of LBG3 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Fractal Investments LLC | 5 | 5 | 9 |
| Franklin Resources Inc | 10,860 | 10699 | 20460 |
| Frontier Capital Management Co LLC | 10 | 10 | 0 |
| Fuller & Thaler Asset Management Inc | 34 | 0 | 0 |
| GALLIARD CAPITAL MANAGEMENT | 39 | 5 | 5 |
| Galliard Capital Management LLC | 5 | 5 | 5 |
| Garcia Hamilton & Associates LP | 30 | 30 | 0 |
| GC Advisors LLC | 3,489 | 3,489 | 3,487 |
| GEM Realty Capital Inc | 8 | 8 | 8 |
| Geneva Capital Management LLC | 10 | 10 | 0 |
| GLOBAL INFRASTRUCTURE MANAGEMENT | 82 | 82 | 82 |
| Goldman Sachs Group Inc/The | 10290 | 12996 | 10290 |
| Golub Capital BDC Inc | 8 | 8 | 8 |
| Gramercy Funds Management LLC | 5000 | 5000 | 5000 |
| Grange Insurance | 0 | 0 | 1500 |
| GREAT-WEST CAPITAL MANAGEMENT | 5 | 5 | 9 |
| Greystone Consulting Group The Inc | 857 | 857 | 0 |
| GrowthCurve Capital LP | 160 | 160 | 158 |
| Guardian Life Insurance Co of America/The | 2000 | 2000 | 2000 |
| Guggenheim Partners LLC | 11 | 93 | 11 |
| GuideStone Capital Management LLC | 220 | 120 | 120 |
| Hamilton Lane Advisors LLC | 388 | 388 | 388 |
| Hancock Whitney Bank | 18 | 18 | 11 |
| Harding Loevner LP | 923 | 556 | 556 |
| Hartford Financial Services Group Inc/The | 24733 | 24733 | 82 |
| Heitman Real Estate Securities LLC | 10 | 10 | 8 |
| HIGHMARK HEALTH | 12 | 12 | 0 |
| Hilton Capital Management LLC | 0 | 42 | 0 |
| Hirtle Callaghan & Co LLC | 0 | 0 | 1215 |
| HPS Investment Partners LLC | 3463 | 3463 | 3466 |
| Impax Asset Management Group PLC | 500 | 500 | 500 |
| Income Research & Management | 94 | 94 | 2 |
| INDUSTRY FUNDS MANAGEMENT PTY LT | 5 | 5 | 9 |
| INSIGHT MANAGEMENT | 0 | 0 | 135 |
| Insight North America LLC | 36 | 36 | 0 |
| Invesco Ltd | 220 | 208 | 252 |
| Janney Montgomery Scott LLC | 0 | 0 | 250 |
| Jefferies Finance LLC | 5 | 5 | 9 |
| JP MORGAN INVESTMENT MGMT INC | 29 | 29 | 29 |
| JPMorgan Chase & Co | 13649 | 16391 | 12,779 |
| KeyCorp | 0 | 0 | 67 |

126

**Exhibit-3c**

**Institutional Holdings of LBG3 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| KLP Kapitalforvaltning AS | 1000 | 1000 | 1000 |
| Knighthead Capital Management LLC | 0 | 0 | 25 |
| Kohlberg Kravis Roberts & Co LP | 3,800 | 6,300 | 3,800 |
| Lattice Strategies LLC | 115 | 135 | 0 |
| Lincoln Investment Management Co | 1985 | 1,985 | 1,985 |
| Logan Capital Management Inc | 14 | 14 | 14 |
| London Co of Virginia/The | 857 | 857 | 0 |
| Longfellow Investment Management Co LLC | 3 | 2 | 2 |
| Loomis Sayles & Co LP | 331 | 331 | 179 |
| Lord Abbett & Co LLC | 41 | 95 | 13 |
| Los Angeles Capital Management LLC | 13 | 13 | 13 |
| M&T INVESTMENT GROUP | 19 | 19 | 0 |
| Macquarie Group Ltd | 25896 | 25876 | 16110 |
| Macquarie Private Debt Asset Management LLC | 3 | 3 | 3 |
| Manulife Financial Corp | 50 | 50 | 0 |
| Manulife Investment Management Private Markets | 2 | 2 | 2 |
| Marsh & McLennan Cos Inc | 264 | 264 | 235 |
| Massachusetts Financial Services Co | 3289 | 2956 | 2956 |
| Massachusetts Mutual Life Insurance Co | 210 | 292 | 1,189 |
| MC Credit Partners LP | 2 | 2 | 2 |
| Merastar Insurance Co | 217 | 217 | 217 |
| MetLife Investment Management LLC | 8227 | 10964 | 8201 |
| Milliman Inc | 5305 | 5305 | 305 |
| Morgan Stanley | 61 | 26 | 24 |
| Morningstar Investment Management LLC | 40 | 40 | 40 |
| Mutual of America Capital Management LLC | 1275 | 1275 | 1275 |
| Muzinich & Co Inc | 14 | 14 | 14 |
| Nationwide Fund Advisors | 85 | 85 | 85 |
| NB Alternatives Advisers LLC | 86 | 86 | 86 |
| Nebrodi Partners LLC | 1250 | 1250 | 1250 |
| Neuberger Berman Group LLC | 1,044 | 1015 | 1000 |
| NEUBERGER BERMAN INVESTMENT ADV | 889 | 556 | 556 |
| New Jersey Manufacturers Insurance Co | 2500 | 2500 | 2500 |
| New Mountain Net Lease Partners II LP | 2 | 2 | 2 |
| New York Life Insurance Co | 30 | 30 | 0 |
| Newport Global Advisors LP | 1000 | 1000 | 1000 |
| Newport Trust Co | 903 | 903 | 0 |
| NISA Investment Advisors LLC | 29 | 47 | 15 |
| Nomura Holdings Inc | 817 | 817 | 817 |
| Northern Trust Co/The | 5 | 5 | 5 |
| Northern Trust Corp | 10274 | 10163 | 9423 |

**Exhibit-3c**

**Institutional Holdings of LBG3 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| NORTHWESTERN MUTUAL INV SVCS | 3,800 | 3,800 | 3,800 |
| Northwestern Mutual Investment Management Co | 10 | 10 | 8 |
| Nuveen Alternatives Advisors LLC | 5083 | 4708 | 4708 |
| OAK STREET INVESTMENT | 1 | 1 | 1 |
| Oaktree Capital Group Holdings LP | 39 | 39 | 29 |
| Olive Street Investment Advisers LLC | 940 | 0 | 940 |
| One Compass Advisors | 30 | 30 | 30 |
| Oppenheimer Investment Management LLC | 0 | 0 | 61 |
| Pacific Life Fund Advisors LLC | 6000 | 5625 | 5625 |
| PACIFIC LIFE INSURANCE COMPANY | 5020 | 5020 | 5020 |
| Park Square Capital LLP | 2 | 2 | 2 |
| Partners Group USA Inc | 10 | 10 | 8 |
| Payden & Rygel | 10 | 52 | 0 |
| Penn Mutual Asset Management LLC | 1 | 0 | 0 |
| PineBridge Investments LLC | 82 | 82 | 82 |
| PNC CAPITAL ADVISORS LLC | 133 | 169 | 133 |
| Power Corp of Canada | 35 | 35 | 0 |
| PPM America Inc | 2788 | 2788 | 3333 |
| Principal Financial Group Inc | 1838 | 1504 | 646 |
| PROGRESSIVE CAPITAL MANAGEMENT | 2250 | 2250 | 2250 |
| Providence St Joseph Health | 0 | 0 | 133 |
| Providence St Joseph Health Long Term Portfolio | 0 | 0 | 55 |
| Prudential Financial Inc | 18161 | 18126 | 18814 |
| Prudential PLC | 6625 | 6625 | 469 |
| Prytania Investment Advisors LLP | 1 | 0 | 0 |
| Radcliffe Capital Management LP | 0 | 36 | 0 |
| Ramirez Asset Management Inc | 0 | 36 | 0 |
| Regions Bank/Birmingham AL | 13 | 13 | 13 |
| Regions Financial Corp | 0 | 0 | 61 |
| Renaissance Group LLC/The | 73 | 73 | 73 |
| Renaissance Reinsurance US Inc | 73 | 73 | 73 |
| Renaissance Services of Europe Ltd | 73 | 73 | 73 |
| ROTHSCHILD ASSET MANAGEMENT LTD | 34 | 0 | 0 |
| Royal Bank of Canada | 475 | 475 | 475 |
| RREEF AMERICA  LLC | 2 | 2 | 2 |
| RREEF AMERICA LLC | 2 | 2 | 2 |
| Schroders PLC | 400 | 1600 | 1600 |
| Securian Asset Management Inc | 367 | 367 | 482 |
| SEI Investments Co | 570 | 520 | 560 |
| Shenkman Capital Management Inc | 869 | 869 | 10 |
| Silchester International Investors LLP | 29 | 29 | 8 |

128

**Exhibit-3c**

**Institutional Holdings of LBG3 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Sit Investment Associates Inc | 5 | 5 | 76 |
| Sixth Street Advisers LLC | 92 | 92 | 90 |
| Sprucegrove Investment Management Ltd | 12 | 12 | 10 |
| SSI Investment Management Inc | 0 | 0 | 71 |
| Starr Insurance Holdings Inc | 857 | 857 | 0 |
| State of Florida | 3795 | 3795 | 1700 |
| State Street Corp | 3475 | 3780 | 3300 |
| STEAMBOAT ASSET MANAGERS | 2500 | 2500 | 2500 |
| Sterling Capital Management LLC | 13 | 13 | 73 |
| Stonebridge Advisors LLC | 5 | 5 | 5 |
| Sumitomo Mitsui Trust Holdings Inc | 13 | 13 | 15 |
| Sun Life Financial Inc | 7210 | 7228 | 7344 |
| Sustainable Growth Advisers LP | 36 | 36 | 0 |
| Swiss Rock Asset Management AG | 300 | 300 | 300 |
| T Rowe Price Group Inc | 30 | 30 | 0 |
| Talcott Resolution Distribution Co Inc | 82 | 82 | 82 |
| TCW Asset Management Co LLC | 0 | 19 | 11 |
| TCW GROUP | 29 | 29 | 389 |
| Teachers Insurance & Annuity Association of | 21,903 | 22,255 | 34,892 |
| Thompson Siegel & Walmsley LLC | 0 | 0 | 71 |
| Thrivent Financial for Lutherans | 9000 | 9000 | 9000 |
| Tortoise Capital Advisors LLC | 15 | 15 | 13 |
| UBS AG | 6783 | 7033 | 6492 |
| US Bancorp | 0 | 36 | 0 |
| US Bancorp Investments Inc | 5 | 5 | 5 |
| Vanguard Group Inc/The | 42346 | 45543 | 69592 |
| Victory Capital Management Inc | 2750 | 2750 | 2750 |
| Voya Investment Management LLC | 1202 | 1202 | 406 |
| Wallachbeth Capital LLC | 857 | 857 | 0 |
| Warburg Invest KAG | 400 | 400 | 400 |
| WBC Holdings LP | 17 | 17 | 2 |
| Weaver C Barksdale and Associates Inc | 0 | 36 | 0 |
| Wellington Asset Management Ltd | 1 | 1 | 1 |
| Wellington Management Group LLP | 6845 | 6555 | 4722 |
| Wells Fargo & Co | 10 | 10 | 8 |
| Westwood Management Corp/IL | 2 | 2 | 2 |
| WH Reaves & Co Inc | 13 | 13 | 13 |
| Willow Tree Credit Partners LP | 82 | 82 | 82 |
| Winslow Capital Management LLC | 34 | 0 | 0 |
| WisdomTree Inc | 451 | 580 | 684 |
| XL Group Investments Ltd | 2027 | 2027 | 2462 |

**Exhibit-3c**

**Institutional Holdings of LBG3 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Zazove Associates LLC | 34 | 34 | 83 |
| Zuercher Kantonalbank | 600 | 600 | 473 |
| ZURICH ALTERNATIVE ASSET MANAGME | 13 | 13 | 15 |
| Zurich Global Investment Management Inc | 13 | 13 | 15 |

**Source:** Bloomberg.

**Exhibit-3d**

**Institutional Holdings of LBJ7 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| 26north Partners LP | 1571 | 1571 | 0 |
| abrdn plc | 177 | 111 | 105 |
| ACORE Capital LP | 177 | 111 | 105 |
| Acres Capital LLC | 177 | 111 | 105 |
| Advent Capital Management LLC | 12 | 12 | 6 |
| Aegon Ltd | 0 | 0 | 113 |
| Aetna Inc | 120 | 120 | 120 |
| Affinius Capital Advisors LLC | 1400 | 1400 | 1400 |
| Allianz Capital Partners of America Inc | 840 | 840 | 840 |
| Allianz SE | 5,026 | 6,079 | 3549 |
| Allspring Global Investments Holdings LLC | 187 | 121 | 113 |
| American Family Insurance Co | 500 | 500 | 500 |
| American International Group Inc | 2,885 | 2,885 | 2,885 |
| American National Group Inc | 1905 | 1905 | 0 |
| American National Group LLC | 0 | 0 | 5,000 |
| Apollo Asset Management Inc | 3969 | 3969 | 2398 |
| Apollo Global Securities LLC | 1 | 1 | 1 |
| Arena Capital Advisors LLC | 5 | 5 | 3 |
| Arena Investors LP | 7 | 7 | 4 |
| Ares Capital Management LLC | 1,905 | 1,905 | 0 |
| Ares Management LLC | 1 | 1 | 1 |
| ARROWMARK PARTNERS GP LLC | 150 | 150 | 150 |
| Asset Allocation & Management Co LLC | 0 | 6 | 5 |
| Associated Trust Co NA | 9 | 9 | 6 |
| Assurant Asset Management | 150 | 150 | 150 |
| Aston Asset Management LLC | 525 | 525 | 400 |
| Baird Financial Group Inc/Wisconsin | 9 | 9 | 6 |
| Balbec Capital Management LP | 177 | 111 | 105 |
| Bank of New York Mellon Corp/The | 40 | 15 | 6 |
| Barings LLC | 2,019 | 2,019 | 115 |
| Basis Management Group LLC | 150 | 150 | 150 |
| BlackRock Inc | 12,473 | 14,119 | 11,329 |
| Blackstone Inc | 5,797 | 6897 | 4897 |
| Bridge Investment Group LLC | 12 | 12 | 6 |
| Brighthouse Funds Trust II | 63 | 63 | 63 |
| Brookfield Corp | 1571 | 1571 | 0 |
| Brookfield Infrastructure Partners LP | 12 | 12 | 6 |
| Brookfield Public Securities Group LLC | 1571 | 1571 | 0 |
| Brown Brothers Harriman & Co | 3 | 3 | 0 |
| BTIM Corp | 12 | 12 | 6 |
| Callan LLC | 35 | 35 | 35 |

**Exhibit-3d**

**Institutional Holdings of LBJ7 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Canada Life Asset Management Ltd | 1 | 1 | 1 |
| Canada Life Assurance Co/The | 1 | 1 | 1 |
| Canada Life European Real Estate Ltd | 1 | 1 | 1 |
| Carlyle Group Inc/The | 1400 | 1400 | 1400 |
| CARLYLE INV MGMT LLC | 2885 | 2885 | 2885 |
| Catalyst Capital Advisors LLC | 500 | 0 | 0 |
| Cerberus Capital Management LP | 177 | 111 | 105 |
| Charles Schwab Corp/The | 250 | 350 | 350 |
| CHURCHILL ASSET MANAGEMENT LLC | 3,300 | 3,300 | 3,300 |
| CI Financial Corp | 0 | 0 | 140 |
| Cohen & Steers Inc | 3250 | 3250 | 3250 |
| Comvest Advisors LLC | 852 | 852 | 846 |
| CONNING ASSET MANAGEMENT COMPANY | 1,571 | 1,571 | 0 |
| Consulting Group Advisory Services LLC | 105 | 105 | 430 |
| Cornerstone Advisors LLC/NC | 0 | 0 | 140 |
| CQS US LLC | 177 | 111 | 105 |
| Credit Agricole Group | 540 | 440 | 440 |
| Credit Suisse Group AG | 83 | 133 | 133 |
| Danske Bank A/S | 0 | 0 | 200 |
| DekaBank Deutsche Girozentrale | 500 | 500 | 500 |
| DELPHI CAPITAL MANAGEMENT | 177 | 111 | 105 |
| Detalus Advisors LLC | 0 | 0 | 4000 |
| Deutsche Bank AG | 0 | 50 | 50 |
| Doubleline Capital LP | 14917 | 14851 | 13020 |
| Eagle Asset Management Inc | 25 | 0 | 0 |
| Eagle Point Credit Management LLC | 177 | 111 | 105 |
| Earnest Partners Ltd LLC | 177 | 111 | 105 |
| Ellington Global Asset Management LLC | 177 | 111 | 105 |
| Empower Capital Management LLC | 1 | 1 | 1 |
| Equitable Investment Management Group LLC | 55 | 0 | 55 |
| First Eagle Alternative Credit LLC | 840 | 840 | 840 |
| Flaherty & Crumrine Inc | 177 | 111 | 105 |
| Fort Washington Investment Advisors Inc | 5000 | 5000 | 5000 |
| Franklin Resources Inc | 16896 | 25936 | 19767 |
| GALLIARD CAPITAL MANAGEMENT | 9 | 9 | 6 |
| Galliard Capital Management LLC | 9 | 9 | 6 |
| GC Advisors LLC | 177 | 111 | 105 |
| Generali | 3 | 0 | 0 |
| GLOBAL INFRASTRUCTURE MANAGEMENT | 840 | 840 | 840 |
| Goldman Sachs Group Inc/The | 2485 | 2968 | 2968 |
| Grace Partners of DuPage LP | 0 | 0 | 2835 |

**Exhibit-3d**

**Institutional Holdings of LBJ7 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Guggenheim Partners LLC | 302 | 236 | 230 |
| GuideStone Capital Management LLC | 30 | 30 | 30 |
| Hamilton Lane Advisors LLC | 65 | 65 | 65 |
| Hartford Financial Services Group Inc/The | 1090 | 1090 | 1090 |
| HIG Capital LLC | 177 | 111 | 105 |
| Hirtle Callaghan & Co LLC | 845 | 845 | 845 |
| HPS Investment Partners LLC | 177 | 111 | 105 |
| HSBC Holdings PLC | 200 | 200 | 200 |
| Income Research & Management | 110 | 12 | 6 |
| Insight North America LLC | 125 | 125 | 125 |
| Investeringsforeningen Portfoliomanager | 0 | 0 | 1025 |
| JPMorgan Chase & Co | 6,130 | 6,063 | 14,319 |
| Kayne Anderson Capital Advisors LP | 177 | 111 | 105 |
| Knights of Columbus Asset Advisors LLC | 3500 | 3500 | 3500 |
| Kohlberg Kravis Roberts & Co LP | 3728 | 4828 | 2828 |
| Lincoln Investment Management Co | 1 | 1 | 1 |
| Longfellow Investment Management Co LLC | 15 | 15 | 6 |
| Loomis Sayles & Co LP | 322 | 322 | 278 |
| Macquarie Group Ltd | 4781 | 4781 | 3251 |
| Macquarie Private Debt Asset Management LLC | 63 | 63 | 63 |
| Madison Investment Holdings Inc | 2500 | 2500 | 2500 |
| Manulife Financial Corp | 4000 | 4000 | 4000 |
| Manulife Investment Management Private Markets | 12 | 12 | 6 |
| Marsh & McLennan Cos Inc | 9 | 9 | 6 |
| Massachusetts Financial Services Co | 0 | 483 | 483 |
| Massachusetts Mutual Life Insurance Co | 595 | 495 | 475 |
| MC Credit Partners LP | 12 | 12 | 6 |
| MetLife Investment Management LLC | 6140 | 6140 | 4,235 |
| Milliman Inc | 31 | 31 | 31 |
| Morgan Stanley | 267 | 267 | 96 |
| Morningstar Investment Management LLC | 137 | 237 | 110 |
| National Bank of Canada | 0 | 0 | 104 |
| NB Alternatives Advisers LLC | 903 | 903 | 903 |
| Nebrodi Partners LLC | 120 | 120 | 120 |
| New Mountain Net Lease Partners II LP | 12 | 12 | 6 |
| NISA Investment Advisors LLC | 0 | 6 | 5 |
| Nordea Bank Abp | 6345 | 6345 | 8755 |
| Northern Lights Fund Trust | 100 | 0 | 85 |
| Northern Trust Co/The | 9 | 9 | 6 |
| NORTHWESTERN MUTUAL INV SVCS | 3,060 | 4,160 | 2,160 |
| Nuveen Alternatives Advisors LLC | 3633 | 3633 | 3633 |

**Exhibit-3d**

**Institutional Holdings of LBJ7 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| OAK STREET INVESTMENT | 5 | 5 | 3 |
| Oaktree Capital Group Holdings LP | 1571 | 1571 | 0 |
| Oceanview Asset Management LLC | 177 | 111 | 105 |
| Octagon Credit Investors LLC | 1571 | 1571 | 0 |
| Park Square Capital LLP | 12 | 12 | 6 |
| Penn Mutual Asset Management LLC | 3 | 3 | 0 |
| PINEBRIDGE INVESTMENTS | 333 | 333 | 333 |
| PineBridge Investments LLC | 840 | 840 | 840 |
| PNC Financial Services Group Inc/The | 1979 | 1979 | 1979 |
| Power Corp of Canada | 500 | 500 | 500 |
| Pretium Residential Credit Management LLC | 1905 | 1905 | 0 |
| Principal Financial Group Inc | 4675 | 4675 | 4675 |
| PROPHET CAPITAL ASSET MGMT LP | 177 | 111 | 105 |
| Provident Investment Management LLC | 2333 | 2333 | 2333 |
| Prudential Financial Inc | 3481 | 2439 | 3933 |
| Prytania Investment Advisors LLP | 3 | 3 | 0 |
| Quilter PLC | 0 | 0 | 8 |
| RCG Longview Management LLC | 177 | 111 | 105 |
| REAMS ASSET MANAGEMENT CO INC | 177 | 111 | 105 |
| Regions Bank/Birmingham AL | 10 | 10 | 9 |
| Resolution RE Ltd | 668 | 668 | 668 |
| RGA Enterprise Services Co | 2500 | 2500 | 2500 |
| RiverNorth Capital Management LLC | 685 | 685 | 610 |
| Royal Bank of Canada | 0 | 0 | 500 |
| RREEF AMERICA  LLC | 12 | 12 | 6 |
| RREEF AMERICA LLC | 12 | 12 | 6 |
| RV Kuhns & Associates Inc | 98 | 0 | 0 |
| Securian Asset Management Inc | 4675 | 4675 | 4675 |
| SEI Investments Co | 290 | 220 | 200 |
| Serone Capital Management LLP | 177 | 111 | 105 |
| Shenkman Capital Management Inc | 12 | 12 | 6 |
| Sit Fixed Income Advisors II LLC | 177 | 111 | 105 |
| Sixth Street Advisers LLC | 1090 | 1090 | 1090 |
| SLR Capital Management LLC | 2500 | 2500 | 2500 |
| Sprucegrove Investment Management Ltd | 12 | 12 | 6 |
| STANDARD MANAGEMENT CORPORATION | 333 | 333 | 333 |
| State of Florida | 40 | 40 | 0 |
| State Street Corp | 902 | 560 | 395 |
| Sterling Capital Management LLC | 10 | 10 | 9 |
| Sun Life Financial Inc | 0 | 1455 | 1454 |
| Symetra Investment Management Co | 668 | 668 | 668 |

**Exhibit-3d**

**Institutional Holdings of LBJ7 Notes**

| Institution | 31 December 2019 | 31 March 2020 | 30 June 2020 |
|---|---|---|---|
| Talcott Resolution Distribution Co Inc | 840 | 840 | 840 |
| TCW Asset Management Co LLC | 177 | 117 | 110 |
| Teachers Insurance & Annuity Association of | 12600 | 12800 | 12800 |
| Tennessee Farmers Insurance Cos | 0 | 0 | 6000 |
| Tortoise Capital Advisors LLC | 668 | 668 | 668 |
| UBS AG | 115 | 90 | 0 |
| US Bancorp Investments Inc | 9 | 9 | 6 |
| Vanguard Group Inc/The | 14787 | 13034 | 16119 |
| Varagon Capital Partners LP | 1,979 | 1,979 | 1,979 |
| Verde Asset Management SA | 177 | 111 | 105 |
| Voya Investment Management LLC | 2118 | 2118 | 547 |
| WBC Holdings LP | 12 | 12 | 6 |
| Wellington Asset Management Ltd | 5 | 5 | 3 |
| Wellington Management Group LLP | 3741 | 4853 | 2846 |
| Westwood Management Corp/IL | 12 | 12 | 6 |
| WH Reaves & Co Inc | 10 | 10 | 9 |
| Willow Tree Credit Partners LP | 840 | 840 | 840 |
| Wilshire Advisors LLC | 45 | 45 | 0 |
| WisdomTree Inc | 170 | 195 | 0 |

**Source:** Bloomberg.

## Exhibit-4

### Category and Content of News in Allen Selected News Dates

| No. | Date | ADS-Acquisition Specific News | Category | News |
|---|---|---|---|---|
| 1 | 2/13/2020 | Yes | Earnings Announcement<br>Research | Waste Management Announces Q4 2019 Results<br>BI Research by Industry Analyst |
| 2 | 2/14/2020 | Yes | Research | BI Research by Industry Analyst |
| 3 | 2/18/2020 | | Research | BI Research by Industry Analyst |
| 4 | 2/19/2020 | | Earnings Outlook<br>Dividend | Q4 2019 Earnings Outlook for ADS<br>Waste Management Announces Cash Dividend |
| 5 | 2/21/2020 | Yes | Earnings Announcement | ADS Announces Q4 2019 Results |
| 6 | 2/24/2020 | | Price/Volume/Volatility Data | Waste Management Implied Volatility Surges as Shares Fall |
| 7 | 2/25/2020 | | Price/Volume/Volatility Data | Waste Management Implied Volatility Surges as Shares Fall |
| 8 | 2/27/2020 | | Unrelated<br>Insider Sales | Cruise ships dumped over 3 million pounds of trash in Juneau<br>Waste Management CFO Rankin Sells $1 Million of Shares |
| 9 | 2/28/2020 | | Price/Volume/Volatility Data | Waste Management Drops to Lowest in !! Weeks; Volume Quadruples |
| 10 | 3/2/2020 | | Reader Interest | Waste Management Reader Interest Increases |
| 11 | 3/4/2020 | | Analyst Recommendation | Waste Management Raised to Buy at UBS |
| 12 | 3/5/2020 | | Dividend | Waste Management Goes Ex-Dividend, Trades Without Payout |
| 13 | 3/6/2020 | | Price/Volume/Volatility Data | Waste Management Implied Volatility Up, Reaches 99th Percentile |
| 14 | 3/13/2020 | | Analyst Recommendation | Waste Management Cut to Neutral at Goldman; PT $115 |
| 15 | 3/17/2020 | | Price/Volume/Volatility Data | Advanced Disposal 514,500 Share Block Trades at $32.80 |
| 16 | 3/24/2020 | | Reader Interest<br>Price/Volume/Volatility Data | Waste Management Reader Interest Increases; Option Volume High |
| 17 | 3/27/2020 | | Event Date Announcement<br>Price/Volume Volatility Data | Waste Management Sets Date for First Quarter Earnings Release Conference Call<br>Advanced Disposal 407,629 Share Block Trades at $32.45 |

136

**Exhibit-4**

**Category and Content of News in Allen Selected News Dates**

| No. | Date | ADS-Acquisition Specific News | Category | News |
|---|---|---|---|---|
| 18 | 3/30/2020 | | Interview | Wall Street Journal Interviews Waste Management's CFO |
| 19 | 4/6/2020 | Yes | Price/Volume/Volatility Data Research | Waste Management Option Volume Surges<br>BI Research by Industry Analyst |
| 20 | 4/8/2020 | Yes | Credit Ratings | *Fitch Affirms Waste Management at 'BBB+'; Revises Outlook to Negative |
| 21 | 4/9/2020 | Yes | Old Information | N.A. M&A Weekly Agenda: Advanced Disposal, Tallgrass Energy |
| 22 | 4/13/2020 | Yes | Reader Interest<br>Price/Volume/Volatility Data<br>BI Research | Advanced Disposal Reader Interest Increases<br>Advanced Disposal 562,700 Share Block Trades at $32.63<br>BI Research by Industry Analyst |
| 23 | 4/17/2020 | | Event Date Announcement | Waste Management to Hold Virtual-Only Annual Meeting of Stockholder |
| 24 | 4/20/2020 | Yes | Event Date Announcement | Advanced Disposal Sets Date For First Quarter 2020 Earnings Release |
| 25 | 4/22/2020 | | Institutional Holdings | MassMutual Select Growth Opportunities Adds Waste Management |
| 26 | 4/23/2020 | | Institutional Holdings | Waste Management Inc, Inst Holders, 1Q 2020 (WM) |
| 27 | 4/28/2020 | | Price/Volume/Volatility Data | Advanced Disposal 400,000 Share Block Trades at $32.33 |
| 28 | 4/30/2020 | | Price/Volume/Volatility Data | Waste Management Option Volume Rises, Led by May 15, $115 Calls |
| 29 | 5/4/2020 | | Earnings Outlook | Waste Management Inc expected to post earnings of 90 cents a share - Earnings Preview |
| 30 | 5/5/2020 | | Price/Volume/Volatility Data Research | Waste Management Options Imply Elevated Post-Earnings Volatility<br>BI Research by Industry Analyst |

**Exhibit-4**

**Category and Content of News in Allen Selected News Dates**

| No. | Date | ADS-Acquisition Specific News | Category | News |
|---|---|---|---|---|
| 31 | 5/6/2020 | Yes | Earnings Outlook<br>Earnings Announcement<br>Research | Q1 2020 Earnings Outlook for ADS<br>Waste Management Announces Q1 2020 Results<br>BI Research by Industry Analyst |
| 32 | 5/7/2020 | Yes | Earnings Announcement<br>Interview | Advanced Disposal Services Inc: Profits of 4 cents announced for first quarter<br>Bloomberg TV &Video Interviews Waste Management CEO |
| 33 | 5/11/2020 | Yes | Old Information<br>Research<br>Unverified Company Information | Business News: Waste Management Bids to Raise Fees for Home Pickup<br>BI Research by Industry Analyst<br>Advanced Disposal/WM Will Need Upfront Buyers for DOJ OK: CTFN |
| 34 | 5/13/2020 | | Dividend | Waste Management Announces Cash Dividend |
| 35 | 5/14/2020 | | Institutional Holdings | Bnp Paribas Arbitrage Cuts Advanced Disposal 1st Time in 5 Qtrs |
| 36 | 5/15/2020 | Yes | Unverified Company Informati | Waste Management Close to Agreement With Divestiture Buyer: CTFN |
| 37 | 5/19/2020 | | Price/Volume/Volatility Data | Waste Management Bond Trading Jumps to More Than Twice Average |
| 38 | 5/20/2020 | | Reader Interest<br>Price/Volume/Volatility Data | Advanced Disposal Reader Interest Increases; Option Volume High |
| 39 | 5/22/2020 | Yes | Unverified Company Information<br>Price/Volume/Volatility Data | Waste Management Has Yet to Clinch Divestment Buyer: CTFN<br>Advanced Disposal Shares Down Most in More Than Nine Weeks |
| 40 | 5/26/2020 | | Price/Volume/Volatility Data | Waste Management Bond Trading Jumps to More Than Twice Average |

138

**Exhibit-4**

**Category and Content of News in Allen Selected News Dates**

| No. | Date | ADS-Acquisition Specific News | Category | News |
|---|---|---|---|---|
| 41 | 5/28/2020 | | Price/Volume/Volatility Data | Advanced Disposal Falls for 4th Day; Trails Index by 10% |
| 42 | 5/29/2020 | | Analyst Recommendation | Waste Management Rated New Outperform at Baird; PT $115 |
| 43 | 6/3/2020 | Yes | Unverified Company Information Research | Waste Management Making Progress With Divestiture Buyer: CTFN BI Research by Industry Analyst |
| 44 | 6/4/2020 | | Research | BI Research by Industry Analyst |
| 45 | 6/5/2020 | | Price/Volume/Volatility Data | Waste Management Option Volume Rises, Led by June 19, $110 Calls |
| 46 | 6/8/2020 | | Price/Volume/Volatility Data | Waste Management Option Volume Rises, Led by June 19, $115 Calls |
| 47 | 6/10/2020 | Yes | Expected Information Event Date Information | Waste Management Reiterates Timing for ADSW Deal Close: Conf M&A Watch N.A.: Advanced Disposal, AMC Entertainment, Kemet |
| 48 | 6/11/2020 | Yes | Expected Information Old Information | Waste Management, Inc. Presents at Stifel 2020 Cross Sector Insight Conference (Transcript) Waste Management Reiterates Comment on ADSW Deal Close: Conf (1) |
| 49 | 6/12/2020 | Yes | Unverified Company Informati | DOJ Vetting Buyer for Advanced Disposal/WM Divestiture: CTFN |
| 50 | 6/15/2020 | | Unrelated Research | Waste Management Worker Denied Age, Race, Disability Bias Trial BI Research by Industry Analyst |
| 51 | 6/16/2020 | Yes | Research Price/Volume/Volatility Data | BI Research by Industry Analyst Advanced Disposal 370,100 Share Block Trades at $31.34 |
| 52 | 6/17/2020 | Yes | No News | No News |

## Exhibit-4

**Category and Content of News in Allen Selected News Dates**

| No. | Date | ADS-Acquisition Specific News | Category | News |
|---|---|---|---|---|
| 53 | 6/18/2020 | Yes | Price/Volume/Volatility Data<br>Unverified Company Information | Advanced Disposal Shares Down Most in Three Months<br>ADSW Falls as CTFN Says DOJ Wants More Assets Sold in Wisconsin |
| 54 | 6/19/2020 | Yes | Price/Volume/Volatility Data | Waste Management Bond Trading Jumps to More Than Twice Average |
| 55 | 6/22/2020 | Yes | Unverified Company Information<br>Reader Interest<br>Price/Volume/Volatility Data | *WM May Have To Divest $350M-$370M For ADSW DOJ Approval: Stifel<br>Waste Management Reader Interest Increases; Option Volume High |
| 56 | 6/23/2020 | | Analyst Recommendation | U.S. Research Roundup-Apple, Campbell Soup, Carmax |

**Sources:** Allen Production "4.xlsx" and "_News.pdf".

140