# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x

In Re WASTE MANAGEMENT SECURITIES   Civil Action No.
    LITIGATION                1:22-cv-04838-LGS

----------------------------------x

October 1, 2024
9:42 a.m.

Videotaped Deposition of LUCY P. ALLEN,

taken by Plaintiffs, pursuant to Notice, held

at the offices of Baker Botts LLC, 30 Rockefeller

Plaza, New York, New York, before Joseph R. Danyo,

a Shorthand Reporter and Notary Public within and

for the State of New York.

HUDSON COURT REPORTING & VIDEO   (212) 273-9911

Page 2

A P P E A R A N C E S :
    ROBBINS GELLER RUDMAN & DOWD LLP
    Attorneys for the Plaintiff Class
       420 Lexington Avenue, Suite 1832
       New York, New York 10170

    By:   NOAM MANDEL, ESQ.
          DESIREE CUMMINGS, ESQ.
          MIA BORNSTEIN, ESQ.
          CHRISTOPHER T. GILROY, ESQ.

    LAW OFFICE OF DAVID HARRISON PLLC
    Attorneys for Lead Plaintiff
       600 Mamaroneck Avenue
       4th Floor
       Harrison, New York
    By:   DAVID HARRISON, ESQ.

    BAKER BOTTS LLC
    Attorneys for Defendant and the Witness
       30 Rockefeller Plaza
       New York, New York 10112-4498

    By:   JAMES J. BEHA II, ESQ.


Also Present:
    DANIEL S. BENNENCOURT (Via Zoom)
    KEVIN MARTH, Videographer
              ~oOo~

Page 3

Allen

THE VIDEOGRAPHER:  Good morning.  We are on the record at 9:42 a.m. Eastern Time on October 1, 2024 for the stenographically reported and videotaped deposition of Ms. Lucy Allen taken in the action In Re Waste Management Securities Litigation.

My name is Kevin Marth, the legal video specialist today.  Our court reporter is Joseph Danyo.  We are both representing Hudson Reporting & Video Nationwide.

The deposition today is being held at the New York City offices of Baker Botts located at 30 Rockefeller Plaza in New York, New York.

Counsel's appearances will be noted on the stenographic record.  At this time, the court reporter will swear in the witness and we may proceed.

L U C Y  P.  A L L E N, having been first duly sworn by Joseph R. Danyo, a Notary Public, was called as a witness and testified as follows:
EXAMINATION BY MR. MANDEL:

Q.  Good morning, Ms. Allen.  How are you today?

Page 4

Allen

A.  Fine, thanks.

Q.  I am Noam Mandel.  We have met before. We were talking before the deposition.  I am going to be taking your deposition today.  Did you do anything to prepare for your deposition today, Ms. Allen?

A.  Yes.

Q.  What did you do to prepare?

A.  I reviewed some materials.  I had some discussions with my teammates, team.  And I had a call with counsel.

Q.  Which counsel did you speak with?

A.  With Jim Beha.

Q.  Did you discuss this deposition with any other counsel to prepare?

A.  No, I don't believe so.

Q.  When you say you met with your team, this is your team at NERA?

A.  That's correct.

Q.  Can you tell me the names of the members of the team that you worked with in preparation for this deposition.

A.  So I can tell you who were members of my team that helped me with a report and I believe

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 21

Allen

the debt ultimately can be paid off.  So, you know, whether you see that difference or not, it doesn't mean that it can't affect the debt as well, but I would agree that, you know, sort of for more basic bonds and sort of typical bonds that information that doesn't generally affect the probability of solvency of the bond getting paid off wouldn't tend to in most cases have an effect on the price of the bonds.

Q.   Now in such instances where the information concerning company performance would not affect the probability of the bond getting paid off, what are the principal factors that drive bond prices according to economics?

MR. BEHA:  Objection to form.

A.   Well, interest rates drive bond prices the same way, you know, yes, interest rates can drive bond prices.

Q.   Interest rates are a factor driving bond prices?

A.   Yes.  Interest rates generally drive bond prices.

Q.   Any other factors that are major drivers of bond pricing?

Page 22

Allen

A.   I think lots of things can affect the other factors that we have already talked about so things can affect interest rates and those can affect bonds.  Lots of these factors can be interrelated.

Q.   What about maturity dates?  Are maturity dates a factor that tend to drive bond prices?

A.   Typically the maturity date is constant with a given bond, so, when a bond is issued, it has a maturity date.  It doesn't tend to change.  So typically that isn't a factor that changes bond prices because it doesn't change for typical bonds.

Q.   Are there bonds where the maturity dates can change?

A.   Yes, there are lots of different features and complications that bonds can have, but typically a bond has a set maturity date.

Q.   So, typically, just to clarify, maturity dates remain constant.  Is that right?

A.   Typically.  For sort of the most vanilla type bond I think has a fixed maturity.

Q.   So, from one day to the next, the maturity date doesn't normally change with a bond.  Is that right?

Page 23

Allen

A.   The time to maturity will change as time progresses, but the actual date of maturity typically stays fixed.

Q.   So, in effect, maturity dates by not changing just remain constant with existing market expectations.  Is that fair?

A.   No, I think the expectation -- I don't think there are expectations that the maturity date of a bond typically changes.  The most vanilla type bond has a date, and that stays fixed.

Q.   Do bonds with different maturities -- if you had two bonds that were equal in every respect except their maturities, would the different maturities tend to drive different prices of those bonds?

MR. BEHA:  Objection to form.

A.   Is your question about the movement of the bond prices?

Q.   Well, no.  I'm asking just generally what are the major factors that determine or drive bond prices, right?  So we said interest rates.

A.   I thought we were talking about bond price movements.  So then the actual --

Q.   Well, is there a difference?

Page 24

Allen

A.   Sure.

Q.   I mean the pricing of a bond on day 1 and the pricing of a bond on day 2, there's a movement from day 1 to day 2, they are both prices of bonds, so, if we are asking, you know, what drives the pricing of bonds, what are the factors that impact the pricing of bonds?  I'm not sure I see a distinction between what's moving them and what is causing their pricing in the first instance.  If there is a change in one of the factors, it might cause movement.  It might not, but I'm asking about the pricing.

So I think we said before that interest rates are a major factor that goes into the pricing of bonds?

MR. BEHA:  Objection to form.

A.   I don't think I have said those things.  You started with a question of whether day-to-day movements in the business of a company affect the price of bonds, and now that you're telling me you're not talking about movements of bonds, but you're talking about the actual level of bonds to start with, then I think that the day-to-day business of a company actually does affect the

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 53

Allen

price reacts to news and whether it reacts to news versus non-news is to have an objective way of determining news and test whether the reaction to news dates is different than the reaction to non-news dates. So that is one form of a test that can be used.

Q. Can I ask a question about that, or are you continuing?

A. I'm done.

Q. So, if the news dates you are selecting are news dates that would not reasonably be expected to cause the security price to move in the first place, does testing those dates tell you anything about the cause and effect relationship?

MR. BEHA: Objection to form.

A. I guess the cause and effect relationship is about news. It is about new company-specific news, and I think if the question is does the stock price react to new company-specific news and you are telling me that you wouldn't expect it to, then I think you already have the answer to your Cammer criteria sort of tautologically you are telling me it doesn't react to news. You are telling me that if you select

Page 54

Allen

news dates, it wouldn't be expected to react to news. Well, then I think your answer to the Cammer criteria is you have already just set up a hypothetical where you don't even expect it to react to newspapers, so, by your own hypothetical, you have now picked a security that doesn't react to news, so I think it fails the Cammer criteria by your hypothetical.

Q. For purposes of conducting these tests, do you need to select event dates to test that would be reasonably expected to cause the price of the security to move?

A. I think the question is the Cammer criteria is does it react to news and if you are saying it doesn't react to news, then I think it fails the Cammer criteria.

Q. I'm saying no such thing.

MR. BEHA: Please.

A. If it does react to news, if you do expect it to react to news, then select dates that are whatever it is you are trying to test. So whatever the type of news that you are trying to test if it is not just company-specific news in general, then you could perform a test that is --

Page 55

Allen

but, if your hypothesis is that or your belief in your hypothetical this is a company or these are securities that do not react to news, then I think you have already come to the conclusion that it fails the Cammer test.

Q. Just to clarify, my hypothetical does not involve a security that doesn't react to news. My hypothetical involves testing to see whether a security reacts to news, and the question is, to test whether a security reacts to news, do you have to test the news that the security would be reasonably, do you have to test news that is reasonably expected in the first place to move the security?

MR. BEHA: Objection to form.

A. I think it depends on what it is you are testing. If your question is does it react to company-specific news, and it depends on what it is you are trying to test. If you have a specific type of news that you are trying to test, then I think you do need to have that type of news to test it, so in this instance if this is news about the timing and the timing of the deal and whether the deal will happen before July 14 and news about the

Page 56

Allen

timing of the deal would be relevant including the date that Plaintiffs allege as an alleged corrective disclosure in which the timing of the deal was pushed back and that would be relevant news, news relevant to the timing of the deal.

Q. Is new information that is consistent with the market's existing expectations reasonably expected to cause a security price to move in general?

A. Repeated information, maybe you could repeat that question.

Q. Go ahead. What were you going to say about repeated information? I would like to know.

A. So it is new news that is expected. News that is not new is not expected to in efficient markets isn't expected to move the stock prices or securities prices.

Q. So, for example, reiterating previous statements would in general not be expected to cause a security price to move?

A. Sort of all things equal, new news doesn't move prices. Old news, repeating old news doesn't move prices. It is new news that moves prices.

Pages 53 to 56

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 57

Allen

Q. How can you tell whether news is new news?

A. One way to tell is whether, you know, was it previously said before? Was it public before?

Q. So you said repeating old news doesn't move prices.

A. Yeah, typically. We have to talk about, but generally in an efficient market what you would say is it is new news that has an effect, and old news isn't new news.

Q. So, if news is consistent with old news, is it new news?

A. It depends on the situation. So it can be new news because if the world has changed and you know, you say before some enormous hurricane, we have no flooding and our lights are all on and things are good, it really doesn't tell you anything and then after some terrible hurricane you say we have no flooding and our lights are still on and things are good, that actually could be exactly what was before, so now that actually is news.

Q. Why is that second piece of information news now that there's a hurricane?

Page 58

Allen

A. Because the world has changed in between, and so that has perhaps changed, and so now that could tell you something new.

Q. Would the hurricane create an expectation that the lights were no longer on?

A. That is possible.

Q. And so once the hurricane starts stating the lights are still on is to tell the market something different from its existing expectations. Is that right?

A. That is possible.

Q. And that is why it would be new news. Is that right?

A. I don't know.

Q. In your hypothetical.

A. I mean it is possible.

Q. Let's talk for a little bit about VWAPs, and we'll probably come back to the some of the stuff we were just talking about, but let's turn to the subject of VWAPs, volume weighted average prices. What is a VWAP other than the words I just said?

A. It's just that. It's taking an average that is volume-weighted.

Page 59

Allen

Q. Are you arguing that VWAPs are always an inappropriate measure for measuring daily bond prices?

A. I'm not saying that.

Q. I just want to clarify, because I just want to make sure. So it is not your argument, am I right, that VWAP is in all circumstances an inappropriate metric for measuring daily bond prides?

A. I have not said that.

Q. VWAPs are commonly used for measuring daily bond prices by financial professionals. Is that correct?

A. I don't know if that is true. They are not used as -- Dr. Feinstein has an event study model that uses a regression. He takes the historical relationship of the note prices to other indices, and in performing his event study and his regression model he is using instead of using closing prices which is the standard in event studies, the kind of event study that he is doing with a regression model, you know, using daily returns, he is instead putting into his regression model not the closing prices of the notes, but

Page 60

Allen

using prices throughout the day and taking a volume-weighted average of them and that is what is non-standard.

Q. This is exactly the point I was trying to clarify. I was a little confused reading your opinion, and I just want to clarify. You are not saying that VWAPs in general are inappropriate for measuring bond prices. You are saying, although VWAPs might in general be appropriate to measure bond prices, you are arguing that Dr. Feinstein should not be using VWAPs in his event study for specific reasons in this case. Is that right?

MR. BEHA: Objection for form.

A. In his event study model. It is not for this particular case, but yes. I am not saying one could not calculate a volume-weighted average price. I am saying that it is non-standard and inappropriate to use that in his regression model that is part of his event study.

Q. So you are not saying that VWAPs are a non-standard measure of daily bond prices in general, are you?

A. I'm not saying one way or the other how one might report or for what purposes one might

Pages 57 to 60

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 61

Allen

report bond prices. I am saying that for the regression analysis and event study analysis that Dr. Feinstein has done, it is inappropriate, non-standard and unreliable.

Q. Okay. So just VWAPs in and of themselves, are they a standard measure of bond prices?

A. I think you asked me that question.

Q. And what is your answer?

A. I think that VWAPs are -- it is, they are calculated in taking an average over a day of a bond price. If you want to know the average price over a day for a bond price, I do think VWAPs are used.

Q. VWAPs are a standard measure for determining a bond price over a day. Is that right?

MR. BEHA: Objection to form.

A. I think they give you an average price over the day, and they are used with bonds.

Q. People on Wall Street use VWAPs for this purpose?

A. For what purpose?

Q. For measuring daily bond prices.

Page 62

Allen

A. I don't know what you mean by measuring daily bond prices. I think people do use VWAPs. I don't know. I think if you want an average price over a day, volume weighting it is, yeah, I think that is done.

Q. Now are you aware of any peer-reviewed literature stating that an event study concerning bonds requires the use of closing prices to measure daily returns?

A. I'm not aware of any published literature that says that is consistent with what Dr. Feinstein has done. So --

Q. Any question --

MR. BEHA: Excuse me. Don't interrupt her, please.

A. So there be published literature that mentions the number of issues that occur with what Dr. Feinstein has done. Dr. Feinstein is like mixing and matching a bunch, I think you have to repeat your question. Now that I have lost where I was going with that.

Q. Are you aware of whether there is any peer-reviewed literature stating that an event study measuring daily returns on bonds requires the

Page 63

Allen

use of closing prices?

A. Oh, event study, I mean a literature isn't going to say you have to use a particular price. So there are event studies that might do, yeah, I mean that isn't the kind of thing that I could imagine there being a peer-reviewed literature on.

Q. So just to be clear, you are not aware of any peer-reviewed literature stating that it is appropriate to measure daily returns on bond prices through an event study by using closing prices of the bond being measured. Is that right?

A. Oh. That is a different question. First of all, there is no peer-reviewed literature that I am able to find or that Dr. Feinstein has been able to cite that supports the method that he has done and that is consistent with the method that he has used. Most event study, so there is a bunch of event study literature that might look at, that might not use daily returns, you know, that might use monthly returns or that might be intraday or, but typically literature has a method and does it. It doesn't say here are things that someone shouldn't do. Most event study peer-reviewed

Page 64

Allen

academic literature is using an event study to test whether, you know, whether securities react to something or do something else so they apply the event study methodology and don't say, by the way, you shouldn't do this. They just use a methodology and do it.

So I'm not sure I have seen peer-reviewed event study methodology that says and by the way, don't do this, but I have seen no academic literature that uses the method that Dr. Feinstein has used in this case and he is not able to cite any. He has failed to cite any.

Q. Are you aware of any peer-reviewed articles saying that using for purposes of conducting an event study concerning bonds that using closing prices of the bonds is the only way to measure daily returns?

A. That wouldn't make any sense that somebody would say that.

Q. So it doesn't exist in your view?

A. I don't know whether it exists.

Q. That you are aware of?

A. That is not the sort of thing that someone would write an article about. I can't

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 65

Allen

quite imagine how you could write an article about that.

Q. Fair.

MR. MANDEL: Let's mark this just to put it in the record. This will be Exhibit 3.

(Allen Exhibit 3, Article entitled Measuring Abnormal Bond Performance by Hendrik Bessembinder, was so marked for identification, as of this date.)

Q. This is an article entitled Measuring Abnormal Bond Performance by Hendrik Bessembinder, et al., and I know you were listening on the deposition on Friday of Dr. Feinstein, and Dr. Feinstein was asked similar questions. Dr. Feinstein referenced this article over the weekend. Jim e-mailed us asking us if we can share the article. We shared it yesterday. So I am just putting it here in the record.

Are you familiar with this article?

A. I am.

Q. Were you familiar with this article before we provided it to you after Dr. Feinstein's deposition?

A. Yes.

Page 66

Allen

MR. BEHA: Objection to form. You didn't provide it to her.

Q. Were you familiar with this article before Friday's deposition?

A. Yes.

Q. Now earlier you said something to the effect that academic literature usually doesn't you know state that one shouldn't do tests a certain way. Is that right? Is that a fair characterization of what you were saying. We can go back and find the exact language if you would like.

A. I don't think that is quite right, but.

Q. So if we look on page 4025 of this exhibit.

A. Okay.

Q. You see that paragraph beginning with the words "Given the institutional"?

A. Yes.

Q. You see the sentence where it says, "A simple approach of constructing daily returns from the TRACE data by relying on the last trade of the day could introduce excessive noise on days when the last trade is small." Do you see that?

Page 67

Allen

A. Yes.

Q. Do you take that to be a criticism of using last trade of the day or closing price for purposes of conducting an event study?

A. So this is not describing event studies of the kind that Dr. Feinstein has done. Dr. Feinstein is trying to test whether the bonds are reacting to information and he is using regression analysis, so he is using a control period and he is using a regression analysis. This paper is not doing what he is doing at all. This paper is in fact saying things like you should get rid of all the small trades, so get rid of the trades that are not done by institutions.

So, if you did something along the lines of this paper, you would get rid of more than half of the trades that occurred during the class period. So, according to this paper, more than half of the trades during the class period shouldn't even count. So this paper completely is not consistent with not only the methodology that Dr. Feinstein is doing, but is actually completely not consistent with plaintiff's claims in this case that there aren't class conflicts and that this

Page 68

Allen

is -- so this is saying get rid of these what Dr. Feinstein calls small and anomalous trades so that would be getting rid of more than half of the trades or the potential Plaintiffs in this case, and saying they are small and anomalous and those don't really count. They are moving anomalously to the actual value of the bonds. So this is not something that supports his analysis or his conclusions. This paper is for one, not doing an event study methodology that is anything like what Dr. Feinstein has done. There is no regression analysis. There is no control period. They are comparing the prices to other prices at the same time and they are saying let's, they are saying the bond market is very illiquid.

So Dr. Feinstein is saying the bond market is efficient. This is not saying that. It is saying it is very illiquid, and it is saying there are lots of small and anomalous trades. So, if you use the closing price, you are not going to get a good value of actual price because you could just get some small anomalous trade. Well, that small anomalous trade is more than half of the trades in your securities class action. So this

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 69

Allen

paper would say let's just throw out all those people. They don't even count. They were not really telling you the real price. That is not saying that the bond prices are efficient. This paper is not only not supporting his actual regression analysis and his event study analysis. It is completely making Plaintiffs' claims in this case problematic from class certification. So.

Q. Are you done with your answer?

A. I think so.

Q. My question was whether this statement here saying that the simple approach of constructing daily returns from TRACE data by relying on the last trade of the day could introduce excessive noise, et cetera. Is that a criticism of your suggested methodology of using closing prices to conduct the event study here?

A. Absolutely not. It is not a criticism of that. My test is an event study to test the price reaction to news, and it is a test of the Cammer 5 and alternative to what Dr. Feinstein has done. This is saying that there are so few trades and bonds, and the market is so illiquid. Illiquid is not something that is consistent so in a very

Page 70

Allen

efficient market you don't expect it to be illiquid. Illiquid is saying you are having trouble buying and selling. It is not very easy to buy and sell, and this is saying because bond markets are so illiquid and there can be these small trades where the transaction prices are different, that you can't get a good sense of the actual value of the bond because there is lots of trades that are not trading at the appropriate price.

So this is really saying because of inefficiencies, if you want to get a sense of a price, don't look at the last trade, but, if you are testing market efficiency and seeing whether it is reacting to prices, then, so this is not at all a criticism of anything that I have done. I would say this paper is completely inconsistent with what Dr. Feinstein has done. It does not suggest using a methodology that Dr. Feinstein has done. He is not using the methodology that they suggest here. He is not throwing out the trades that are done by non-institutions.

They don't ever do the kind of control period and regression analysis that he is doing and

Page 71

Allen

they are using, anyway, this is not the same method, but what this paper says is that because the bond market is so illiquid and because the prices move around so much, not consistent with the underlying value to get rid of some of that noise and get rid of some of the small and anomalous trades as Dr. Feinstein describes them, you can't look at every trade. You need to take some sort of an average. That is one of the things that this paper is saying.

Q. So in a subsequent paragraph you see it refers to "the naive strategy of using the last price reported to TRACE to calculate daily returns." Did I read that correctly?

A. Sorry. Can you tell me the page.

Q. 4225. The beginning of the subsequent paragraph. "The naive strategy of using the last price reported in TRACE to calculate daily returns."

A. Yes.

Q. I read that correctly?

A. Yes.

Q. So this is saying measuring daily returns by using the last price reported is naive.

Page 72

Allen

A naive strategy. Is that right? Is that what it says?

MR. BEHA: Watch your tone. Alright?

A. It uses the term "naive."

Q. It's using the term "naive" to describe the strategy of using the last price reported in TRACE to calculate daily returns. Is that correct?

A. It says that.

Q. Do you think this is a criticism of using closing prices for purposes of calculating daily returns?

A. It is saying that if you want to see the actual effect overall of the bond, that because the bonds are ill liquid and because for a number of other reasons there can be these trades small and anomalous trades or trades that are, it is saying that you may not get full impression of how the underlying bond value may have changed because a lot of the trades are not at the actual value of the bond.

So they are saying because of inefficiencies, every price doesn't actually reflect the value and to better reflect the value you need to, they are basically saying because of

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 73

Allen

inefficiencies in the bond prices, you need to average across and do that.

So this is again absolutely not supporting what Dr. Feinstein is doing. This is contrary. First of all, it is not using an event study methodology that is the same. Dr. Feinstein's event study methodology is not consistent with this paper and this paper is saying because of the illiquid nature and because of inefficiencies with the bond prices, you need to ignore or weight the bond prices differently, and many of the prices can be anomalous is what it's saying.

Q. Are you aware of any peer-reviewed academic literature leveling similar criticisms at the use of VWAPs for purposes of measuring daily bond returns?

A. Similar criticisms to whom.

Q. This calls it a naive strategy. Are you aware of any paper similarly critiquing the use of VWAPs for purposes of measuring daily bond returns?

A. It doesn't make sense to me what you just said.

Q. Well, are you aware of any other papers

Page 74

Allen

that call the method using VWAPs to calculate daily bond returns a naive strategy?

A. I'm not particularly aware of that. No.

Q. Are you aware of any peer-reviewed papers lobbying any other criticism at the use of VWAPs for measuring daily bond returns?

A. So the question isn't whether to use a VWAP to calculate a return. The question is whether when doing an event study to see whether the notes are efficient, should you use or when testing market efficiency, doing an event study the way Dr. Feinstein has done it with a regression analysis and a control period, is it appropriate? I'm not aware of any academic literature that supports Dr. Feinstein's method and his method is not consistent with any academic literature.

MR. BEHA: We have gone about an hour 10. Why don't we take a break now. We will take a break now.

MR. MANDEL: That's fine.

THE VIDEOGRAPHER: We are going off the record at 12:10.

(Lunch Recess: 12:10 p.m.)

Page 75

Allen

Afternoon Session

1:21 p.m.

THE VIDEOGRAPHER: The time is 1:21 p.m. We are back on the record.

L U C Y  P.  A L L E N, having been previously sworn, testified further as follows:

EXAMINATION (Continued)

BY MR. MANDEL:

Q. Ms. Allen, before the lunch break we were talking about the Bessembinder article that is in the record now. Are you familiar or aware of any other peer-reviewed literature that relies on the Bessembinder article and to use VWAPs for purposes of calculating daily bond returns?

A. Not for doing an event study the way Dr. Feinstein has, so I looked to see whether I could find any literature where anyone does what Dr. Feinstein has done.

Q. Are you aware of any -- sorry.

A. That is what I have looked at. I have looked at whether anyone does an event study using his model, his type of model with a regression analysis and whether they do it the way he has done it, and I have not seen anything, so, as we

Page 76

Allen

discussed, the Bessembinder article is not doing that, so that's what I have looked for.

Q. So today are you aware of any peer-reviewed articles relying on the Bessembinder article to use VWAPs for purposes of calculating daily bond returns?

A. I don't know. I can tell you what I have looked for specifically.

Q. Are you familiar with any works by Darren DaCosta that rely on Bessembinder's work to use VWAPs for purposes of calculating daily returns?

A. I don't know. If you showed me, if you showed me a paper, I might be familiar with it. I don't know off the top of my head if I am.

Q. Fair enough. How about work by Sey Leung and Gregory Naronha? Are you familiar with any of their work relying on Bessembinder's article to use VWAPs for purposes of calculating daily bond returns?

A. Again, if you showed me their work, I possibly might. What I'm aware of is I could find nobody who supports using VWAPs in an event study model such as Dr. Feinstein has used.

Pages 73 to 76

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 77

Allen

Q.   Okay.  Are you aware of any case in which Dr. Feinstein used closing prices rather than VWAP to measure daily returns in bond prices?

A.   I don't know.

Q.   Can you identify any such case?

A.   You're asking me whether Dr. Feinstein himself has been consistent in using VWAPs?  Is that your question?

Q.   It goes to that.  I'm asking whether he has daily prices, daily returns in bond prices.

A.   So I am aware that someone who worked for Dr. Feinstein did use daily closing prices instead of VWAPs for calculating bond returns.  That is my recollection.  So some part of his -- he has a small team.  So someone from his, my recollection is someone who worked for him did use daily closing prices instead of VWAPs is my recollection.

Q.   Do you have any more specific information about that?

A.   I don't particularly.

Q.   Did you review a number of Dr. Feinstein's previous expert reports in preparing your report?

Page 78

Allen

A.   So I mention some of his prior reports and say what he has done here is not consistent with what he has previously done.  So I do discuss that.  So, yes, I do think I cite some of his prior reports and say that his analysis here is not consistent with what he has previously done.

Q.   So, in any of those reports, can you identify any of those reports in which he used closing prices rather than VWAPs to measure the daily returns in bond prices?

A.   I don't know as I sit here.  I do not have a good recollection of all of his prior work or what prior work of his.  I have cited some of his prior work, and I have cited that his work here is not consistent with what he has done in prior cases, but I don't believe I particularly cite that on the topic of VWAPs.

Q.   So let's just be clear.  Are you accusing Dr. Feinstein of doing something different in this case by using VWAPs to measure daily returns on bond prices than he has done in any other case?

MR. BEHA:  Objection to the form.

A.   I am saying that what he has done here

Page 79

Allen

is not consistent with what he has previously done.  I am saying that his use of VWAPs is not consistent with what the academic literature says that his event study is not standard and reliable.  I have not particularly said that his use of VWAPs here is inconsistent with his use of VWAPs or non-use of VWAPs in other cases, but I do believe that people who have worked for him and while they were working for him used closing prices rather than VWAPs is my recollection.

Q.   Okay, but after having reviewed numerous of his reports for purposes of preparing yours, you are unable to identify a single instance in which Dr. Feinstein issued a previous report and used VWAPs for purposes -- used closing prices rather than VWAPs for purposes of calculating bond prices in an event study, daily returns on bond prices in an event study?

MR. BEHA:  Objection to form.

A.   I don't know if I am able or unable.  I do not in my report, I do not recall that, and I do not mention that in my report is my recollection.

Q.   Fair enough.  So does your report provide a basis for arguing that Dr. Feinstein is

Page 80

Allen

using VWAPs in this case, but has done something different in other cases?

MR. BEHA:  Objection to form.

A.   It might have that basis.  I don't think I particularly spell out that point.

Q.   Well, is that point in your report at all?

MR. BEHA:  Objection to form.

A.   I am making the point that what he has done in this case is not consistent with what he has done in other cases.  I am also making the point that what he has done here is not consistent with the literature or the literature he cites, and let's see.  I do believe that someone who worked for him used closing prices rather than VWAP.

Q.   So do you have some reason to believe that for measuring daily returns on bond prices it is Dr. Feinstein's standard practice to use closing prices?

MR. BEHA:  Objection to form.

A.   Well, so the question is what to do in an event study such as the one that he has done which is testing market efficiency.  I mean it appears based on what I heard from his deposition

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 93

Allen

Q. Did you test to determine whether the autocorrelation you're describing was exploitable?

A. I didn't do such a test. No.

Q. Did you test to see if the autocorrelation you say you observed was observable such that arbitragers would have had time to exploit it to make money or profits?

A. I didn't do those tests. There are other tests that I have done based on the data, but this particular test is merely testing autocorrelation.

Q. Did you test to determine whether the news was serially correlated?

A. I did not test whether the news was serially correlated, no.

Q. Did you test whether interest rate movements were serially correlated?

A. I did not test whether interest rate movements were serially correlated.

Q. You used to construct your event study an index for corporate bonds. It's the -- tell me if I'm getting the name right -- the Standard & Poor's Investment Grade Corporate Bond Index?

A. I think that's right. I think that is

Page 94

Allen

right. I don't know if I have a page cite where I can get the exact name.

Q. Paragraph 25 on page 13 refers to it.

A. Yes.

Q. Did you test whether that index is serially correlated?

A. I did not.

Q. Would it surprise you to learn that it is?

A. No.

Q. Why would that not surprise you?

A. I'm not sure how to say why something doesn't surprise me. It just doesn't.

Q. Was it consistent with your expectations?

A. I wouldn't know one way or the other.

Q. Are you familiar with academic literature saying that serial correlation is not incompatible with market efficiency?

A. No, not that I recall.

Q. Are you familiar with the work of Stephen LeRoy on this topic?

A. Not that I recall.

Q. How about Richard Roll's work on this

Page 95

Allen

topic?

A. I'm familiar with Richard Roll. I don't particularly recall any -- his work saying that serial correlation is not an indication of market inefficiency.

Q. So let's turn back to your news versus non-news test. Your report indicates that you ran two news versus non-news tests. Is that right?

A. I have two alternative ways of testing for news.

Q. One of the tests you used broader criteria for including events, and then the other one you used a more narrow criteria for including events. Is that fair?

A. That's true. I would say that's true.

Q. In the broader test, you identified event dates by searching for news articles that basically reference either the names of the companies, Waste Management or ADS. Is that basically correct?

A. That's right, I think. I mean it's a little more specific than that, but I think that is generally right. In major news business publications I think is what I restricted it to or

Page 96

Allen

Bloomberg, which is already quite business-focused. Let me just find the exact. Do you have a page? You're very good at telling me where I am in the report.

Q. Page 24. I can't take credit for it.

A. Thank you. So you're talking about the broader one?

Q. Well, I'm just trying to sort of lay a little bit of a foundation with you here. I understand you ran two tests, and, you know, how did you select the events for each one.

A. Right. So it's not just two tests. I used two different ways of identifying news.

Q. Same test, two different ways?

A. No. I have multiple tests that I did, so I tried a bunch of different actual tests and variations of the tests, but there are two different methods I used for selecting news versus non-news, and one is news related to the ADS acquisition, and I have like the specific words that I use, you know, how the search was done, but I am looking through Factiva as well as Bloomberg for news.

So one set of news is using news that's

Pages 93 to 96

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 145

Allen

not critical to others, and this makes the probability of meeting that July 14th date less likely.

The closer, the more you delay, the less likely that you can meet a date. That's just -- it's not going to make it more likely that you're going to be able to meet it. It has to make it less likely, and it's a substantial difference. It's a substantial delay.

Q. And nevertheless anticipated to close before the end date. No?

A. Is that a question?

Q. Are you seriously testifying that the company did not say in the March 18th 8-K that it anticipated closing the merger mid to late second quarter 2020?

A. It says, subject to a number of issues, the company now has -- they have now delayed the timing, and they now anticipate a later date, which is mid to late second quarter, but, yes. So that would increase the likelihood that it would not close by July 14th, which is only a couple of weeks after the end of the second quarter.

So now you only have a two-week buffer

Page 146

Allen

whereas before you had, I can't think how many weeks there are, we're doing a whole quarter, so how many weeks are in a quarter. You have a whole quarter's 3 times 4, 12. You have maybe 13 weeks.

MR. BEHA: Plus the two weeks.

THE WITNESS: Plus the two weeks.

A. So you had 15 weeks buffer to begin with. So what they're saying is, rather than a buffer of 15 weeks before the drop dead date, we now have a two-week, we're now telling you a two-week buffer. That is clearly increasing the likelihood that you're not going to make it, and it's -- I mean that is just life I'm afraid.

Q. Did the Plaintiffs in this case allege that this March 18th date was a corrective disclosure?

A. Yes. They said that it was a corrective disclosure and that the price of the notes dropped as a result of this.

Q. Did the Plaintiffs in this case also plead that the March 18th date was a material misrepresentation?

A. Yes, because they said you knew you weren't even going to -- you knew that even this

Page 147

Allen

wasn't going to happen, so, rather than saying that there was just a delay and it was less likely, they're saying, you know, you knew it was even less likely or something.

Q. Now Dr. Feinstein did not test this date. Is that correct?

A. He did test this date. His tests show that this date is not statistically significant. So he does have tests for this date. When he did his Cammer 5, he ignores the results on this date, but he does actually test the date.

Q. Does he test every date of the class period?

A. No. He doesn't test every date of the class period, because the bonds don't even trade enough for him to be able to test every date of the class period.

Q. Well, does he test every date of the class period for which there is data?

A. I guess that's a question. He does test the dates of the class period for which he has prices.

Q. And you criticized Dr. Feinstein for not using March 18th as an event date. Is that fair?

Page 148

Allen

A. One of the things that I criticize him for is saying that he is looking -- he's testing whether it reacts to news, and he fails to include this in his test of reactions to news.

Q. You listened to Dr. Feinstein's testimony this past Friday, right? You were on the phone, right?

A. Yes.

Q. Did you hear him testify that he rejected this allegation in the complaint, or he didn't agree with it?

A. I don't think he said it wasn't a corrective disclosure. I think what he rejects is that the stock price, the prices of the notes actually dropped on this date.

Q. Oh, no. Did Dr. Feinstein testify on Friday that he rejected this as a testable corrective disclosure? He testified that he thought this was mixed information, didn't he?

A. He did not disagree that this was a corrective disclosure. He did not say he didn't agree that this was a corrective disclosure. He said -- he did not disagree with the complaint that there was negative news about the timing of the

Pages 145 to 148

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 161

Allen

MR. MANDEL:  I can use a break too. Give me one second.

Q.   This announcement on March 18th was saying that there was a delay.  It was coupling that announcement with a reassurance that the anticipated closing was in the end date.  Do you disagree with that?

A.   I disagree with that.  You have used the word "reassurance."  They do not use the word "reassurance."  The analysts that issue reports do not say reassurance.  Reassurance is not -- this is saying exactly the same words they had previously said.  They're adding a delay.

They're saying what we previously said now we've extended the time period, and now we have a much smaller buffer to the drop dead date for the notes.

Q.   So we're delayed, but we still expect to close before the end date.  Is that a fair characterization of the March 18th disclosure?

A.   That is not a fair characterization.

Q.   Why not?

A.   I think you're asking me the same questions over and over.  They are saying this is

Page 162

Allen

being filed to update our prior timing expectations, and all they are doing is pushing it out and saying there is a delay with our prior timing expectations.  The only new information here is timing, and the timing is substantially later and much, much closer to the drop dead date for the SMR notes.

Q.   And does the company also say that, despite the delay, they still anticipate closing before the end date?

A.   No.

Q.   The company does not say that in this 8-K?  That's your testimony?

A.   They do not say, despite the delay, we now anticipate closing.  They say we are updating our prior timing expectations.  The words then are the same as what they previously have said.  The language is very carefully worded.  "Subject to obtaining final regulatory approval from the DOJ, which the company currently anticipates receiving in the second quarter of 2020."

So that's very carefully worded language that isn't saying we are expecting something to happen.  It is saying the company currently

Page 163

Allen

anticipates receiving.  So "anticipates" is different than "expects," and so this is very carefully worded, and it's the same language that the company had previously said.

Q.   Just to be clear, they don't say they anticipate receiving something, right?  They say they anticipate closing the merger.

MR. BEHA:  Subject to obtaining regulatory approval, which they anticipate receiving.

MR. MANDEL:  Jim, are you a witness here?

MR. BEHA:  Well, she just said that, and then you're turning --

A.   It does say that.  It says, "which the company currently anticipates receiving in the second quarter of 2020."

Q.   Right.  Then it goes on to say that they anticipate closing a merger mid to late second quarter, and you're saying it doesn't say that or it doesn't mean what it says.  We can take the break.

THE VIDEOGRAPHER:  The time is 4:11 p.m. We are off the record.

Page 164

Allen

(Recess taken)

THE VIDEOGRAPHER:  The time is 4:45 p.m. we are back on the record.

BY MR. MANDEL:

Q.   So Dr. Feinstein conducted his event study, used VWAPs between the hours of 9:30 and 4:00 p.m. on market days.  Is that right?

A.   Yeah, he calculated the volume weighted average price over that time period.

Q.   Over the 9:30 to 4:00 p.m. time period?

A.   That's right.

Q.   Dr. Feinstein for his event study compared that with certain indices.  Is that right?

A.   Yes, which were closing prices.  So he compared an average over the day to closing prices that were at the end of the day.

Q.   Understood, and the indices that he used to compare the daily bond prices of the specific SMR bonds were also indices from within the hours of 9:30 to 4, is that right?

A.   That's what he says.  He has a bond index that he's using.  The bond market is reported as going until 5.  So the bond index that I use goes until 5, and if you look at the prices that

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Allen

you see for the notes, you'll see that they mostly go until 5.

Q. So the bond indices that you're using all go through 5 p.m.?

A. I use one bond index, I believe, and it ends at 5 p.m.

Q. And do you know what time that bond index started in the day?

A. I think it starts the same as the rest of the market. So I think it's 9:30 to 5.

Q. Now the Bloomberg closing prices that you used what hours are they from?

A. They are from 5 as well.

Q. So the Bloomberg closing prices that you used cut off at 5 p.m.?

A. They are closing prices as of 5, yes, because that is, as I said, the standard for when the bond market closes.

Q. So, just to be clear, it's your testimony that your Bloomberg closing prices are 9:30 to 5, and the indices you're comparing that to are also 9:30 to 5?

A. So they are closing prices. Mine are not -- he's doing an average over the day. I am

Allen

looking at the closing price.

Q. Fair enough.

A. And the bond index that I use are closing prices as of 5, and the Bloomberg prices for the notes are closing prices as of 5.

Q. Understood. Okay.

A. p.m.

Q. Now let's turn to my favorite new word, heteroscedasticity, which I practiced pronouncing for this deposition.

So in your report, or do you agree that during the class period there was a lot of market volatility at play?

MR. BEHA: Objection to form.

A. It includes, you know, a COVID period, and the market did become more volatile with COVID.

Q. You write in paragraph 26 of your report that you took steps to account for the "substantial fluctuations in market volatility during the alleged class period." That's kind of what I'm referring to. You found that there was substantial fluctuations in market volatility during the class period that required some adjustment. Is that right?

Allen

A. Well, I used, so I used different control periods rather than one control period for everything. So the control period is you over the control period test the reaction of the note at issue to changes in the market and industry and then use the estimated relationship to test on a particular date is how the event study is done.

Q. So Dr. Feinstein used the Newey-West methodology to test and correct for that market volatility. Is that right?

A. So he does apply a Newey-West procedure on top of applying another procedure, and what he does, as I mention in footnote 56, is not reliable as the academic literature says in a single firm single event study a Newey-West correction would almost always show a significant event even if there is in fact no unusual abnormal return on the event date.

So the academic literature has found that the methodology that he is using is inappropriate in a single firm single event study.

Q. And this is the point you make entirely in footnote 56. Is that right?

MR. BEHA: Objection to form.

Allen

A. It's a point I make in that footnote.

Q. Now I'll turn back to the critique you just specified from that footnote in a moment, but you did not perform any Newey-West procedure to test or correct for heteroscedasticity, did you?

A. I do not do what Dr. Feinstein -- I replicated what Dr. Feinstein did, and I have various points in my report where I show the results using his event study methodology as well as using an alternative event study methodology. In the alternative event study methodology, I do not do the procedure that the academic literature has said is incorrect and that Dr. Feinstein has done.

Q. So you say in footnote 56 that the Newey-West methodology is incorrect, because it will yield too many statistically significant results. Is that the gist of the critique?

A. I say the authors of the academic study have found that it's inappropriate in single firm single event studies, and one of the things that they say is that it would almost always show the significant event effect even if there is in fact no unusual abnormal return on the event days.

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Page 185

Allen

answer there, go ahead.

A. No.

Q. Focusing on what you do, breaking it up into and measuring three control periods, I'm just trying to ask a simple question. The purpose of doing that was to correct for market volatility. Is that right?

MR. BEHA: Objection to form.

A. I think you've asked me that question now many times. In doing an event study, you have a control period where you're testing how the security at issue reacts to market and industry. To the extent that there is a change in how that is happening, you want a longer control period, because you have more data, and you have more information, but you want a period that is consistent with the time period that you're studying or close in time to the period that you're studying.

One of the things that happened during the class period is COVID, and so one of the things I have done is to divide it into a pre-COVID and a post-COVID period, and the beginning of COVID was a time that was also more different than by

Page 186

Allen

July 16th, which is the last date that I had data. So one of the things that I did is for the earliest days in March so the first from March 11th to the end of March I used a shorter control period rather than going all the way through the end of the data. I just went -- let me just see.

Q. I just want to put an objection on the record to this entire testimony being non-responsive and time-wasting. Continue, Ms. Allen.

A. For the later period -- I actually misspoke. For the later period from April, I did not include as a control the March 11th to March 31st, because that period was more at the beginning of COVID and more volatile. So that's really what I did. I just excluded that from the third period.

Q. Okay.

A. But the presence of COVID within the period is the main reason that I divided -- I used different control periods.

Q. The presence of COVID is why you broke this up into --

A. Yeah.

Page 187

Allen

Q. -- control periods at all?

A. COVID happened, and the market became more volatile and more unpredictable.

Q. So this procedure you used was intended to address that volatility. Is that right?

MR. BEHA: Objection to form.

A. I don't know if I would say address the volatility.

Q. Correct the volatility?

A. It's not correcting the volatility. It's to make a control period that's more consistent with the conditions in the market on the date that an event is being tested.

Q. So is it to account for the conditions of volatility that existed in the market at that time? Is that a fair --

MR. BEHA: Objection to form.

A. To have a period that more properly controls and that is more consistent with the conditions that existed at the date of the event itself. So I want to --

Q. Which conditions are those?

MR. BEHA: Please let her finish.

A. Whatever they are. I want to test an

Page 188

Allen

event, and I want to compare what happened on that day to some control period, and I want the control period to look as much like the event itself other than the event, and that's what I'm trying to do, and one of the things that changed during the class period is COVID and the World Health Organization declaring COVID a pandemic.

Q. Did you test your three control periods for heteroscedasticity?

A. No. I don't recall doing that.

Q. Why not?

A. I didn't see a reason to do that.

Q. Let's move on to a different point now. Just to ask some basic questions. In an event study, you compare the movement, just in general terms, you're comparing the movement of a subject security against various indices. Is that right?

MR. BEHA: Objection to form.

A. No. I would say what you're doing is you use a control period, and you predict how the security would move, given the movement in the industry and in the market, and then you compare your prediction of how it would move, given the movement in the industry and in the market to what

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Page 201

Allen

MR. BEHA:  Objection to form.

A.   No, I think he's taking an average of the daily trading volume.  He's taking the whole period, and he's doing the daily, and then he's multiplying by five.  So he's not averaging -- he's not looking at a week and averaging a week.

Q.   So let's look more closely at this chart that you created on page 29.  Now the chart shows the 1 percent threshold and the 2 percent threshold, and then it has bars for each of the weeks of the class period that show where the volume fell in relation to those 1 and 2 percent thresholds.  Is that a fair description?

A.   It shows you what the volume is for the week.  The weekly volume as a percent of outstanding issue.

Q.   Yet in your argument -- I'm sorry.  Did you have more to say?

A.   No.  No.

Q.   In your argument, you take this period of 18 weeks and divide it in half and then present calculations for the first half of the class period.  Is that right?

MR. BEHA:  Objection to form.

Page 202

Allen

A.   I don't know if it's 18 weeks, but one of the things I do is I do give results for the first half of the class period.

Q.   I count 18 bars here.  You can double-check me if you would like.

A.   Yeah.

Q.   So why did you divide it in half?

A.   What do you mean why did I divide it?  I'm saying that during the first half of a class period.

Q.   Well, there's the standard average weekly volume for the class period, and you choose to divide the class period in half and present some calculations pertinent to one half of the class period.  Why did you make a decision to cut it in half?

MR. BEHA:  Just objection to form.  You just said the standard is average weekly trading volume.  Nobody has established that -- the weekly trading volume is the standard.  You have not established that average weekly turnover is the standard.  The quote from the Cammer decision is weekly trading.  It does not say average over the

Page 203

Allen

entire class period.

Q.   Okay.  Regardless.  Dr. Feinstein is presenting what he described as average weekly trading volume.  You were taking his numbers, presenting them here in this bar graph and then cutting the period in half and assessing the percentage of weeks in a half that met or failed the threshold.  Is that right?

A.   No.  I am showing every week in the class period, and I am showing whether that week meets a 1 or 2 percent Cammer threshold, and as you can see, for the first half of the class period, there is a lot of red, and you can see that the volume in the second half of the class period is bigger than in the first half of the class period.

Q.   So my question is --

A.   And I am saying that in the first half of the class period there are a lot of weeks where it is not meeting the Cammer threshold.

Q.   And so my question is why do you divide it in half to do this analysis?

A.   Because you can see that the first half of the class period looks different than the second half of the class period.  The volume is smaller.

Page 204

Allen

I'm saying that in the first half I'm just telling you how many of the weeks is the weekly volume below the threshold.

Q.   There's some objective basis for cutting the class period in half?

MR. BEHA:  Objection to form.

A.   Well, there might be an objective basis for cutting the class period in half.  I'm saying Plaintiffs are unable to prove market efficiency for the first half of the class period, because, look, they're below the Cammer threshold.  I am reporting the information and saying there are many weeks where the bonds are trading below the threshold, and I am showing you what the weeks are.

Q.   But you make a point of setting forth calculations regarding the first half of the class period, and I am trying to understand whether dividing the class period in half for this purpose is rooted in any objective criteria or reasoning?

A.   Yes.  Simple observation tells you that the first half of the class period looks different than the second half of the class period.  I think anyone could look at this and see the second half looks different.  There's more red in the first

Pages 201 to 204

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 205

Allen

half.  The volume is bigger for the notes in the second half.  I'm merely saying there's a substantial difference between the first half and the second half, and I'm reporting the numbers.  I'm showing you each of the weeks, and I am reporting the numbers for the first half.

Q.  So it's your professional judgment as an economist that looking at this in halves is helpful and reliable information?

A.  I think you can look at this and see that there's a difference between the first half and the second half.

Q.  Well, I'm not an economist.  You're an economist.

A.  I don't think it takes -- I think you could -- I think a small child could see that there is a difference between the first half and the second half and that there are taller greens and more greens in the second half than there are in the first half.

Q.  Would a small child's ability to observe this have some bearing on your selection of criteria for providing your analysis?

A.  You're asking why have I shown numbers

Page 206

Allen

for the first half?  Because simple observation shows you that the first half looks different than the second half.

Q.  Why didn't you divide it into quarters?

A.  Simple observation doesn't tell you something about the quarters.

Q.  Well, if you divided it into quarters, wouldn't the percentages be different as well?

A.  This is just showing you.  Just look at this.  There are more reds, and the volume is smaller in the first half than the second half.  I'm just doing the math for you and showing you what you can see from looking at this.  This is just, these are the number, I'm just showing you what number of weeks are below the weekly threshold.

Q.  I understand all that.  You're a economist.  You wrote a report here, and in your report you conducted an analysis that divided this period in half and then measured percentages for the first half, and I'm trying to understand whether you had a basis in economics for dividing it in half or whether it's just a casual observation like a small child could make?

Page 207

Allen

A.  So I think a small child could make the observation that the first half looks different than the second half, and you can see that there is a lot of red in the first half.  You can see that the volume and the green bars are bigger in the second half.

I'm just what I think is helpful helpfully giving what are the percent of weeks that are below the threshold for the first half.

Q.  Well, it's 18 weeks.  Why not divide it into 18?

A.  This is divided into 18.  I am showing you.  That is exactly, the criteria is weekly volume.  I am showing you each of the weeks.  That is what I have done.  I am showing you each of the weeks.  That is exactly what I have done, and then what you can see from this is that there is a difference between the first half and the second half, and there are bigger green bars in the second half and more red bars in the first half, and so I am what I think is helpful showing you for the first half how many of the weeks are below the threshold.

Q.  So --

Page 208

Allen

A.  And what percentage that is.  I mean it's --

Q.  So let's look at them together.  Now the 2.95 percent SMR note.  Let's not talk about the halves.  Let's talk about all 18 weeks of the class period.  Now this is 18 weeks.  How many of the weeks show the 2.95 percent SMR note exceeding the 1 percent threshold?

A.  So there are three that are green and -- I mean three that are red, and you're telling me there are 18, so I'm going to go with 15, but I could count.

Q.  Now I'm just going to make a confession here.  I'm somewhat colorblind, so when you refer to red and green, it's a little bit difficult for me.  I think I know what you mean.

A.  Okay.

Q.  But the one for 4 -- I just can't tell -- the one for April 13, '20, is that at the 1 percent or below the 1 percent?  It's just so close, it's difficult to see.

A.  It's red.

Q.  So it's red, so that means it's below?

A.  It's below.

Pages 205 to 208

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 209

Allen

Q. Got it.

A. So I should have said a child who is not colorblind would be able to see this.

Q. I appreciate that. So, for the 2.95 percent bond, 15 of the 18 weeks of the class period show volume above the 1 percent threshold. Is that right?

A. Yes. I believe that's right.

Q. Alright. Let's do the same thing for the 3.2 percent, bearing in mind that I might have trouble seeing it. So, of the 3.2 percent SMR note, how many of the 18 weeks are above the 1 percent threshold?

A. Nine.

Q. Are you sure about that?

A. No.

Q. I'm looking at this chart. I'm not sure if the coloring tells it, because I'm asking about the 1 percent threshold, which is that lower line, not the 2 percent threshold.

A. Oh. I think the red is from the 2 percent, so I can tell you how many are green.

Q. I count 13 out of 18 are above the 1 percent threshold. Tell me if you disagree.

Page 210

Allen

A. Yeah, I don't know, it's hard to tell. I can tell you below the 2 percent, because that's what the colors show.

Q. Well, you created this chart in your expert report to show me what's above the 1 and 2 percent thresholds. I sort of expected you to be able to answer the question about what's above the 1 percent threshold. If I zoom in on it here, would that make it easier, like this?

A. I don't know. I mean I would have trouble saying that. I can tell you because I can see the colors, and the colors relate to the --

Q. Let's do it one by one. The week of February 28, 2020, that's above the 1 percent, yes?

A. I don't know. Where are you? Which bond are you on?

Q. With regard to the 3.2 percent SMR note.

A. Okay. So the first one is below.

Q. Right. The second is below?

A. The second one is below.

Q. The third is above?

A. The third one --

Q. Is clearly above.

A. Okay.

Page 211

Allen

Q. The fourth one is above obviously?

A. The fourth is above.

Q. The fifth one you tell me.

A. It looks like it's below.

Q. Fair. The next one is above?

A. Yep. The next one is below.

Q. Below, and then above?

A. Above.

Q. Above?

A. Above the 1 percent, but below the 2 percent.

Q. I'm only talking about the 1 percent.

A. Okay. The next one is above the 1 percent, but below the 2 percent.

Q. We're now on April 20th, '20, right?

A. Yep.

Q. Okay. The next one is clearly below. 4/27 is clearly below it looks to me.

A. Okay.

Q. 5/4/20 is above?

A. Yep.

Q. Then all the remainder are clearly above, right?

A. Yes.

Page 212

Allen

Q. That's 13 out of 18 are above the 1 percent. Do you agree with me?

A. I don't know. I told you there were 9, and then 10, 11, I think it's only 12 is what I'm seeing.

Q. Well --

A. So there were nine green ones, and I see between the two 1 and 2 percent.

Q. 9 plus 4.

A. Okay.

Q. 13, right?

A. Okay.

Q. So 13 out of 18 for the 3.2 percent SMR note are above the 1 percent threshold. Is that right?

A. I'm not sure, but.

Q. Well, based on your chart, you're not sure that 13 out of -- we just counted them.

A. I know, but it is hard to see. It is small, and it is hard to see. So.

Q. Well, let's do it again. We said there were nine that are green, right, that are clearly above, right?

A. Yep.

Pages 209 to 212

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 213

Allen

Q. And then February 28, April 13, April 20th and May 4th are above. Yes?

A. I think that's correct.

Q. So that's 13 out of 18 above the 1 percent threshold. Is that right?

A. I believe that is correct.

Q. Okay. Let's look at the 3.45 percent note on the bottom left. How many of these 18 weeks are above the 1 percent Cammer threshold?

A. So you're on just the 1 percent. So.

Q. That's all I'm asking about.

A. Okay. So the first one looks like it's above it. The second one looks like it's above it. The third one looks like it's above it. The fourth one looks like it's below it. The fifth one looks like it's above it. The sixth one looks like it's below it.

So it looks like at least two are below it, and maybe the others are above it, and the green ones are above it.

Q. So 16 out of 18 above the 1 percent threshold. Is that right?

A. I have the numbers for the first half. I have the picture. I think that's correct, but it

Page 214

Allen

isn't -- the colors are designed for the 2 percent threshold, so it's very easy to see the colors, if you can see the colors, but it's not as easy to. So I think you're correct.

Q. The only question in my mind is is it 16 out of 18 or 17 out of 18? The March 6th one is so close to the 1 percent from the graph it's hard to tell, but I'll give you that one. 16 out of 18. Can we agree?

A. I'm just telling you I think it's a little hard to see, so, you know.

Q. So it's at least 16 out of 18, is that right?

A. I just don't -- I'm -- these are --

Q. I mean this is your chart.

A. This is my chart. What I have given you is the percentage that fail for the first half, and I have colored them, so I know whether they fail for the 2 percent threshold.

The difference is so big between the first half of the class period and the second half of the class period that it means that the bars are very small in the first half of the class period that it's hard for me to see whether they go over

Page 215

Allen

the line or under the line on the 1 percent.

So, given the difference, it's hard to read off of this chart. I have tried to make the chart as meaningful as possible, but you're now asking me something that is not as easy to read from the chart.

Q. Well, so you're agreeing with me that it's 16 out of 18?

A. I'm agreeing that I cannot see very clearly whether a bar is between the 1 percent and the 2 percent threshold. I can tell you whether it meets the 2 percent threshold, because I have colored it. I can tell you it's not that easy for me to read this chart and tell you, so I'm not going to be definitive about any of these.

Q. Which bar are you having trouble telling whether it's above the 1 percent line or not?

A. All the ones that are close are 3/6, 3/20, 4/11.

Q. 4/11 is not on this.

A. Well, I can't even read the numbers. So not only can I not see whether it's 4/13? Is that it?

Q. There's a 4/13. Yes.

Page 216

Allen

A. Yeah. I mean it's small.

Q. Okay. Well, I'm going to represent to you that this bar graph that you included here for the 3.45 percent SMR note shows 16 out of 18 of the weeks above the 1 percent threshold, and there's another week that maybe also does. It's not clear. I agree on that one. And do you think I'm wrong in what I just said?

MR. BEHA: Objection to form. You just said you were going to represent something to her, and then you're asking her if she thinks what you're representing --

MR. MANDEL: I'm representing something to her about a graph that she included in her report.

MR. BEHA: I know, but what does it mean if you're representing it and then you're asking her if it's wrong?

A. I can tell you the meaning of the chart, and I can tell you what I have tried to convey in the chart.

Q. No, no. I'm not asking that. I'm asking --

A. You said the meaning, but I can also

Pages 213 to 216

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Page 217

Allen

tell you it's very little and it's hard for me to see. I have colored them when they are below the 2 percent Cammer threshold, so I can see the difference in the color. It's very hard for me to see. I can't -- I also have trouble reading the date. So it is small, and it is hard for me to tell, so I don't know one way or the other.

Q. Okay.

A. But I can tell you I can count the green ones. I can count the red ones. I'm having trouble deciding whether the red ones are above or below the 1 percent threshold.

Q. Alright. Let's look at the 4 percent note. Now 18 weeks. Let's count how many of them are above the 1 percent threshold based on your bar graph. There are nine green ones, right, and another four that are above the 1 percent threshold clearly in your chart. Do you agree with me?

A. I would say three look to me like they're above. One I can't tell that well.

Q. Which is the one you're close on?

A. The date that seems April.

Q. April 13th again.

A. April 13th. Okay. I thought you told

Page 218

Allen

me that wasn't a date.

Q. No, no. April 11th you said before.

A. Okay.

Q. If I zoom in like this on my iPad, can you see that 4/13 is above the 1 percent line you prepared?

A. It does look like that.

Q. Yeah. So, counting that one, 13 out of 18 weeks above the 1 percent threshold for the 4 percent. Is that right?

A. It looks like that based on what you're showing me.

MR. BEHA: Whenever you're done going through the chart, because we've been going for about an hour.

MR. MANDEL: I think it's a solid place for a break right now. I agree.

MR. BEHA: Could we try not to have a half hour break?

MR. MANDEL: Yes, please.

MR. BEHA: That's what you've been doing.

MR. MANDEL: We come back here sometimes and the rooms are empty, you know. There

Page 219

Allen

was a lot of long breaks on Friday too, Jim. Don't try to ding us for that. Let's be fair here.

THE VIDEOGRAPHER: The time is 6:07 p.m. We are off the record.

(Recess taken)

THE VIDEOGRAPHER: The time is 6:23 p.m. We are back on the record.

BY MR. MANDEL:

Q. So I would like to ask you a few questions about price impact, the price impact portion of your report. That begins on page 48 of the report.

Now in your report you present two price impact arguments on page 48. Under A, you're discussing front-end price impact, so-called front-end price impact, and section B starting on page 50 you address so-called back-end price impact. Is that right?

A. I wouldn't use those terms. So it's an analysis of price impact.

Q. Rather than argument you mean? Did I say argument?

A. No. The question isn't whether there

Page 220

Allen

is -- the question is whether the alleged misrepresentations impacted the price when made. One way of analyzing that is looking at analysis when misrepresentation is made. Another way of looking at it is analyzing that when corrective disclosures of the alleged misrepresentations are made. So it's not analysis of price impact at the back end. It's analysis of looking at the back end whether there is price impact from the alleged misrepresentations.

Q. So in section A what I'm describing as focusing on front-end price impact, I just want to ask about that. So is your point that there are -- are you arguing that there's no statistically significant price movements on the dates of the misrepresentations and that therefore you find that there's no evidence of price impact on those dates?

A. No.

Q. So can you summarize briefly your argument in section A on what I'm calling front-end price impact?

MR. BEHA: Objection to form.

A. I'm not agreeing with your

Pages 217 to 220

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 221

Allen

characterization.  What section A describes is analysis of the price reactions at the time the alleged misrepresentations were made, and what I find using Dr. Feinstein's event study as well as an alternative event study there's no statistically significant price increase from any of the alleged misrepresentations.

Q.   Thank you.  In your opinion, does the absence of statistically significant price movements on these dates of alleged misrepresentations prove the absence of price impact?

A.   From the alleged misrepresentations. No.  Not alone.  So, to the extent that the company is making statements that are affirmative that are misrepresentations, then I think this would be evidence that that affirmative misstatement didn't impact the stock price when made.

To the extent that Plaintiffs are alleging that it's the failure to say bad information or negative information, then I think the lack of a price reaction or statistically significant reaction to an alleged misrepresentation can't really tell you anything in

Page 222

Allen

general.

So and I think the way the complaint is written, it would appear to me that Plaintiffs are more alleging that it's the failure to say the negative information rather than affirmatively saying positive information.

Q.   So there can still be price impact even if there's no statistically significant price movement from the alleged misrepresentations.  Is that right?

A.   Well, no, because I mean ultimately the alleged misrepresentations as to how price impact have to be causing some impact on the price. That's what price impact means.  The price impact of the alleged misrepresentations is did the alleged misrepresentations impact the price, and if the alleged misrepresentation rather than saying something affirmative and positive that's a misrepresentation, it could be the failure to say something negative that is the misrepresentation.

So the price impact at the time of the misrepresentation would be the difference between what the price is and if they had said the negative information that Plaintiffs allege they failed to

Page 223

Allen

say, and so that is what you would be meaning by price impact, and, if they had said this negative information at the time the Plaintiffs allege they should have said it, would it have had an actual impact on the price, and one way that one could examine that is to look at later time periods, typically a later time period when the alleged information that should have been announced earlier was in fact announced and look at whether that changed the price when it was made and disclosed.

Q.   So, just to simplify things, is it correct that just because there's no statistically significant price movements on the dates of the misrepresentation that there still can be price impact?

A.   Yes, in general I think that it is possible that there can be price impact from alleged misrepresentations, and there could not be a statistically significant price movement at the time a misrepresentation is made.  I think that it is possible.

Q.   Does Dr. Feinstein's event study conclude that there were statistically significant price movements for all four bonds on June 24,

Page 224

Allen

2020?

A.   I believe that's what he says his conclusion is.

Q.   Now I understand you conducted an alternative event study using closing prices rather than VWAPs.  In your alternative event study, is it correct that three of the four bonds showed statistically significant price movements on June 24, 2020?

A.   Do you have a page in my report just to make that easier for me?

Q.   Well, in paragraph 91 of your report, you specify that one of the notes did not have a statistically significant price decline on June 24, 2020, which I take to mean that the others did have a statistically significant decline, but I am asking you.

A.   So it's both for the alternative event study, which is the way I have done it, as well as for Dr. Feinstein's event study and using closing prices in Dr. Feinstein's event study instead of the VWAP.  Both the alternative event study as well as his event study if you merely switch and use closing prices instead of the VWAPs, and I think,

Pages 221 to 224

Page 225

Allen

so you had said using the alternative event study. I have called the alternative event study not doing any of the things that Dr. Feinstein has done, but doing something different, whereas, in addition, I have used his actual event study and merely switched the closing prices, merely switched to using closing prices instead of VWAPs.

So both of those methods, using both of those methods the 4 percent note is not statistically significant.

Q.   Are the other three notes statistically significant under your, either your alternative event study or the closing price switch?

A.   Yes, I believe they are.

Q.   So, with respect to the issue of common damages methodology, it's Plaintiffs' intention in this case to prove that throughout the class period from the start of the class period there was a virtual 100 percent certainty that this deal wouldn't close by the end date.  If the Plaintiffs are successful in proving that, do you believe there is a common methodology problem in this case?

A.   Yes.  So one issue is if Plaintiffs are alleging that as of the beginning of the class

Page 226

Allen

period the company knew that and should have announced that the deal would not happen by the date, so trigger the special redemption feature, then the notes would have been redeemed, and then that is a very different situation than any other securities class action, because you don't have, you have the actual security just disappearing.

So you're not saying the price would have been different.  You're saying it just wouldn't have existed.

Q.   Based on what do you conclude that the note would have been redeemed prior to the end date?

A.   If the company announces, if what you're saying is the company knew and the but for world is -- so the damages are the difference between the actual world and the but for world, so, if in the but for world, what happens is the company instead of making misrepresentations says what Plaintiffs allege is the truth, which is that they know the deal will not close by the end date, that would then trigger the special redemption, special mandatory redemption feature, and the bonds would be redeemed.

Page 227

Allen

Q.   So, to understand, if the company announced that they would not be able to close by the end date in advance, are you saying that would trigger the redemption at the moment of the announcement?

A.   That would be a trigger for the special mandatory redemption.

Q.   So, to understand, if the company merely announced that they would not be closing by the end date prospectively, are you saying that would trigger a redemption at that time?

A.   That would trigger the redemption. That's my understanding.

Q.   How did you come to conclude that?

A.   If we don't consummate it before this and the merger is terminated for any reason, then we must redeem at a redemption price.  So if they know they're not going to consummate it, then they know it has to be redeemed, and, if it's not, the actual terms are renegotiated, so, if the terms were renegotiated, then the merger agreement would also be terminated.

So what actually happens is the terms are renegotiated, and it's not -- the merger goes

Page 228

Allen

through at a different price.

Q.   So, again, you seem to be assuming that the redemption would occur prior to the end date if the company announced that it would not close by the end date.  Did counsel tell you to assume that?

A.   That's my understanding.  My understanding, and my understanding is, when they said it was not going to happen at the end of the class period, they began -- that triggered the event, and they began the redemption proceedings, and that in itself takes some time period.

Q.   And you came to this understanding by yourself?

MR. BEHA:  I'm just going to caution you.  You asked a very specific question before.  Did counsel tell you to assume that, and that is a fair question.  If we gave her assumptions to make, then that's a fair question, but beyond that, I'm going to ask her not to get into discussions with counsel.

So if you were directed by counsel to make an assumption, then you can say that, but, otherwise, you shouldn't discuss the

Pages 225 to 228

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Page 233

Allen

A. No. It takes some time for that to actually happen, but they are announcing that it is happening, and I think it happened as soon as it could within the time period. I think there's some and I think that my -- there's some time period by which after announcing the redemption I think it has to occur by, I think there's some time frame.

Q. So it's your understanding that the June 24th announcement triggered the redemption?

MR. BEHA: Objection to form.

A. I mean they're announcing a mandatory redemption. I think that's the same. I don't know if there's a difference between that.

Q. Do you know how long the period of time before triggering the redemption and the actual redemption needed to be?

MR. BEHA: Objection to form.

A. I did know that. I did see that. I thought I had a footnote about that actually, but I've not seen that. I did see something about the timing, but I don't see the -- I thought I might have included some of that.

MR. BEHA: Why don't you look at

Page 234

Allen

paragraph 83 of your report.

A. "Upon the occurrence, all outstanding 2024 notes, '26 notes will be redeemed in whole at a special mandatory redemption price." According to the notes, Waste Management needs to notify shareholders promptly, "and the mandatory then needs to be completed no later than 30 days after notice to the noteholders of the special mandatory redemption event." So that's the 30 days.

Q. So did you take any steps to determine the definition of a special mandatory redemption event when you prepared this opinion?

A. No.

Q. So did you check whether announcing that the company wouldn't close by the end date constituted a special mandatory redemption event before you issued your opinion?

A. I don't recall doing so.

Q. Now, with respect to common methodology, in addition to your argument about the redemption causing the bonds to cease to exist during the class period, you presented an argument about varying levels of inflation during the class period. Is that right?

Page 235

Allen

A. If the bonds were redeemed, they would not exist during the class period, so it's not an argument. I think you said something like if they were redeemed. I'm saying that they would not exist during the class period. I think that's what redeemed is. I think that's just the meaning.

Q. Well, you've got an argument that --

A. It's not an argument.

Q. You present a position of yours in your report that we were just discussing that, you know, Feinstein can't show a common methodology, because, as you say, certain factors might have caused the bonds to be redeemed during the class period. I just want to move past that argument for a moment.

MR. BEHA: Objection to form.

A. Again, I'm not agreeing with the way you characterized that.

Q. I understand. I understand. I'm just shorthand --

A. Whatever, which I did not agree with.

Q. In addition to that argument, based on the contractual terms of the SMR, you present an argument about varying levels of inflation during the class period, is that right?

Page 236

Allen

MR. BEHA: Objection to form.

A. That I don't agree with, no.

Q. You do not present an argument concerning the potential for varying levels of inflation during the class period?

MR. BEHA: Objection to form.

A. So I have a section in my report that says, "Dr. Feinstein's common damages methodology cannot measure damages consistent with Plaintiffs' risk materialization theory of liability."

I have another section of my report that says, "His common damages methodology is inappropriate, given Plaintiffs' claim that the SMR notes would have been redeemed," and I think we have had a discussion about part B of my analysis of his proposed common damages methodology, and maybe now you'd like to discuss part A.

Q. I'm asking you about part A. In part A, do you present an argument that there might be varying levels of artificial inflation in the SMR bonds during the class period?

MR. BEHA: Objection to form.

A. I say that his common damages methodology is not consistent with Plaintiffs' risk

Pages 233 to 236

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078