# EXHIBIT C

# In the Matter Of:

*In Re: Waste Management Securities Litigation*

## STEVEN FEINSTEIN

*September 27, 2024*



1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK


IN RE:                          :
                                :   Case No.
WASTE MANAGEMENT SECURITIES     :
LITIGATION,                     :   1:22-cv-04838-LGS
                                :
                                :
                                :
- - - - - - - - - - - - - - - - - - - - - -


** CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF

STEVEN P. FEINSTEIN

FRIDAY, SEPTEMBER 27, 2024

9:15 a.m.

Reported by:  NICOLE KOCHY, CCR, RPR, CRR

Job No. 2024-958362

Page 2

DEPOSITION of STEVEN P. FEINSTEIN, taken stenographically in the above-entitled matter, as taken by and before NICOLE KOCHY, a Certified Court Reporter, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New York, held at ROBBINS GELLER RUDMAN & DOWD LLP, 420 Lexington Avenue, New York, New York, on September 27, 2024, commencing at 9:15 a.m.

Page 3

A P P E A R A N C E S:

ROBBINS GELLER RUDMAN & DOWD LLP
420 LEXINGTON AVENUE
NEW YORK, NEW YORK 10170
Noam@rgrdlaw.com
BY:  NOAM MANDEL, ESQ.
     CHRISTOPHER T. GILROY, ESQ.
     DESIREE CUMMINGS, ESQ.
     MIA S. BORNSTEIN, ESQ.
        AND
LAW OFFICES OF DAVID HARRISON
BY:  DAVID HARRISON, ESQ.
Attorneys for Plaintiffs

BAKER BOTTS L.L.P.
30 ROCKEFELLER PLAZA
NEW YORK, NEW YORK 10112
Jim.beha@bakerbotts.com
BY:  JAMES J. BEHA, II, ESQ.
Attorneys for Defendants

ALSO PRESENT:
JONATHAN JUAREZ, Videographer

Page 4

I N D E X
WITNESS                                          PAGE

STEVEN P. FEINSTEIN

   Examination By Mr. Beha                       5


                E X H I B I T S

NUMBER          DESCRIPTION                        PAGE

Exhibit 1     Deposition Excerpt                     7
Exhibit 2     List of Testimony in Last Four        19
              Years

Exhibit 3     Excerpt of report                     48

Exhibit 4     June 14, 2024 Expert Report           55

Exhibit 5     Amended Complaint                    113

Exhibit 6     Bank of America equity               145
              research report
Exhibit 7     Fidelity Document                    174
Exhibit 8     Vale Report                          189
Exhibit 9     Vale Report and Recommendation       194
Exhibit 10    J.P. Morgan North America            244
              Research Report

Exhibit 11    OPERS Opinion                        262

Exhibit 12    Mahanti Article                      266

Exhibit 13    Lucy Allen Report                    280

Page 5

THE VIDEOGRAPHER:  We are now on the record.  My name is Jonathan Juarez.  I am a legal videographer for Lexitas.  Today's date is September 27, 2024, and the time is 9:15 a.m.  This deposition is taking place at 420 Lexington Avenue, New York, New York, in the matter of In Re: Waste Management Securities Litigation.  The deponent is Dr. Steven Feinstein.

All counsel will be noted on the stenographic record.

The court reporter is Nicole Kochy.

S T E V E N   F E I N S T E I N, having been duly sworn, was examined and testified as follows:

EXAMINATION BY MR. BEHA:

     Q.     Good morning, Dr. Feinstein.
     A.     Good morning.
          MR. MANDEL:  Do we want to do counsel, just announce on the record?  I just want to know for --
          THE VIDEOGRAPHER:  I apologize.
          MR. MANDEL:  I assumed that we would, that's why.  I was waiting for it.
          MR. BEHA:  Yes.  I'm James Beha, on behalf of the defendants, of Baker Botts.

Page 98

Q. What's your basis for saying that?

A. Well, I asked them what -- what it was about.

Q. What did they tell you?

A. That it had to do with mediation and damages.

Q. So were you retained for this before or after they did that work?

A. After. I mean, I became -- I got involved in this after that.

Q. So -- so you said that the -- we agreed that the timing of the closing of the ADS merger and, in particular, whether it would close by the end dates under the special mandatory redemption feature, that that was critical to the valuation of the notes here; is that right?

MR. MANDEL: Object to the form.

A. Whether or not they would close before the end date was important.

BY MR. BEHA:

Q. That 160, paragraph 160 of your complaint -- of your report on page 48; do you see that?

A. Yes.

Q. This is the process, I think, that we

Page 99

were starting to talk about. It says, "To identify potential dates for a Waste Management note study test of market efficiency, I reviewed all company news and analyst reports during and immediately following the class period. My review and analysis indicated that the information announced on June 24, 2020, was the only event that was of such import as to reasonably be expected to elicit a security price reaction over the threshold for statistical significance according to theoretical evaluation principles"; is that accurate?

A. Yes.

Q. So you review and analyze company news seeking to identify events where there is new news of some import as to reasonably be expected to elicit a security price reaction over the threshold for statistical significance, according to theoretical valuation principles?

A. Right, with the emphasis on the valuation principles. We weren't looking to see what would be statistically significant, of course. We were looking to see what kind of news would affect the valuation so much that, in an efficient market, you would then have a significant price movement.

Q. Okay. And what valuation principles do

Page 100

you use to do that?

A. Well, I think they're explicated in paragraph 157. Bonds have fairly straightforward valuation formulas. They're a function of the cash flows, which is a function of the coupon rate and the maturity, and they're a function of interest -- market -- of -- of the discount rate, which is a function of the market interest rate and the credit rating.

In this case, they're also a function of whether or not the deal would close by the end date, because that would effect, essentially, the maturity date.

Q. So for these bonds, news about whether the deal would close by the end date was relevant under theoretical evaluation principles?

MR. MANDEL: Object to the form.

A. Yeah. Information that would change the market's opinion about whether or not the deal would close by the end date was important. And I think that's in the complaint. That's why the alleged misrepresentations and omissions were so important.

BY MR. BEHA:

Q. Was the announcement on June 24th the only event that had information about whether --

Page 101

about the likelihood that the merger would close by the event date?

MR. MANDEL: Object to the form.

A. No, but it was the only unambiguous, unconfounded announcement or signal that was public about whether or not the deal would close by the end date. There were -- there were other -- well, there were several statements by the company, and by analysts, that reconfirmed what the market had already been led to believe. So that was important information.

But it wouldn't -- according to valuation principles, wouldn't change the valuation of the notes because it was consistent with what the market was already led to believe. And then there were other days where there was a mix of good news and bad news, such that it couldn't be determined a priori whether it was on net good or on net bad, and whether the mix -- and it could be determined that the mix was such that it wouldn't be expected to change the price.

I want to emphasize here, because the language is -- sometimes could be misinterpreted or misunderstood, that the screen is based on valuation principles, not whether I think a date is going to

## Page 102

result -- not whether or not a date will result in a significant movement or not.  It's based on valuation principles that indicate whether it should cause a significant movement if the market, in fact, were efficient, but might not cause a significant movement if the market is not efficient.

Q.    Okay.

A.    So one doesn't know that until one does the empirical test.

Q.    And you concluded that June 24th was the only event that was of such import, as you put it, that it would be reasonably expected to elicit a security price reaction.

How do you determine whether news that's valuation relevant is of such import that it would cause a price movement?

A.    Well, I mean, one way is -- first of all, let's point -- there were only -- I think there were 92 trading days in the class period.  So it's not like we had three in 200 -- 365 or 252 or, in some cases, a thousand days to choose from.  There were 92 days to choose from, you know, to examine. There were 92 days to examine and understand what happened on those days.

And there are applicable valuation

## Page 103

principles that come from the science of financial economics.  If it's old news that is consistent with what the market has already been led to believe, it's important news, but will not change, will not -- cannot reasonably be expected, in an efficient market, to change the valuation.

If it's confounded news, a mix of good and bad, then it's difficult to ascertain ex ante whether it's on net good or on net negative.  So that would not be a good candidate, generally.

If the news is picked up by many analysts who say, "We have now changed our opinion about this important factor," that's an indicator that it was important news.  And if it relates to one of the variables that's in the valuation formula, it would probably then satisfy that screen.

So those are the kind of things that --

Q.    And for this one, it's sort of unique, right, because we're really just talking about one issue, which is news about the market's understanding of the likelihood that this merger closes by the end date, right?

MR. MANDEL:  Object to the form.

A.    Yes.  And then there was a -- there's a substantial amount of background of volatility, as

## Page 104

there always is in the return series and the series of percent price changes in the securities.  The valuation change prompted, according to -- you know, that reasonably should be prompted or could be prompted by the information, would have to be two standard deviations big in order to provide an indicator or signal that it was the news and not just random volatility that it was causing the price change.

BY MR. BEHA:

Q.    So is it your view that at the beginning of the class period, the market's understanding is that the merger would -- would close by the end date?

A.    Yes.  The company said so, and analysts repeated it.

Q.    So I'm just trying to get -- the concept of good news, here, versus bad news, and confounding in that sense, there's -- you know, confirmatory news, you say, doesn't change the market price, but there can't be new good news, right?  Because it's just -- the expectation is already that it's going to close.

MR. MANDEL:  Object to the form.

A.    I think it's fair to say that it might not have been 100 percent in the minds of the

## Page 105

analysts and investors, that they understood there were some risks.  There's some risk of it not closing, notwithstanding that the company said it would.

So I think there could have been -- there could have been good news, but generally, a repetition of old news is not valuation-impactful announcements.

BY MR. BEHA:

Q.    And something that the market assessed as reducing the likelihood that the transaction would close by the end date, that would be relevant to the value of these notes, right?

MR. MANDEL:  Object to the form.

A.    Well, if there was any indicator that the announcement did change the market's assessment of that probability significantly enough to move the stock price two standard deviations, or to elicit a stock return reaction that's two standard deviations away from the mean, then conceivably, yes.

BY MR. BEHA:

Q.    So I just want to make a distinction. There are two different concepts, I guess, in my mind.  One is whether it is relevant, and the second whether it's of sufficient import, I guess.

Page 114

Q. Do you recognize Exhibit 5?

A. Yes.

Q. So if you turn to paragraph 63 -- let me just back up.

So is it -- is it true that under valuation principles, if there's some confounding news, that an event can't be an appropriate event date?

MR. MANDEL: Object to form.

A. No. Then it takes some judgment -- it takes some judgment as to how mixed the news is. So if a company, on the one hand, says the deal will be delayed but it assures that it will still be before the end date, it's a wash. I mean, if anything that -- would indicate that the deal would be delayed, or might be delayed, is countervailed by an assurance from the company that it won't be delayed, it does not become a good candidate for a market efficiency event study.

BY MR. BEHA:

Q. So going to paragraph 63, it says, "Then, on March 18, 2020, Waste Management filed a current report on Form 8-K to update its prior timing expectations, announcing that the company now anticipates closing the merger mid-to-late second

Page 115

quarter 2020."

A. Right.

Q. Right? So -- and before that, the expectation had been by the end of the first quarter; is that right?

A. I forgot. March? Was it -- no, it couldn't have been March. I thought it was -- maybe May. I know they delayed it. I don't remember what the original date was.

Q. Okay.

A. I'm sure it's in here.

Q. Yeah. Let's --

A. As you get closer to the day, you're able to estimate more precisely. And that's what happened here, apparently.

Or at least that's what one would have thought.

Q. Give me one moment.

Well, the March 18th announcement says, "We now anticipate closing mid-to-late second quarter 2020," right?

A. Right.

Q. Paragraph 63.

A. Let me refresh my memory about this.

Q. So just go up --

Page 116

A. One moment. I just want to check a few things.

Q. If you'll go to paragraph 62.

A. All right.

Q. So paragraph 62, and this is discussing the Q4 2019 earnings call, which was on February 13th, the start of the class period.

A. Okay.

Q. And it quotes RBC Capital Markets saying it "came away increasingly confident with WM's progress surrounding the closing of the pending ADSW acquisition. Management provided largely upbeat commentary on progress surrounding the pending acquisition of Advanced Disposal, noting that they expect the DoJ clearance by the end of March with anticipated closing shortly thereafter."

Do you see that?

A. Right. So the end of March or thereafter --

Q. So this says, "End of March and close soon thereafter"?

A. Right.

Q. And do you recall what the end date was?

A. I think it was July 14th. I think it was July 14, 2020.

Page 117

Q. So it's got to close by mid July in order for the notes to retain their value?

A. Right.

Q. Right? So it's March 18, 2020. The expectation in the market is that the deal will close -- that they'll get approval by late March and close soon thereafter?

A. Right.

Q. Right? So now paragraph 63. It's March 18th. So the expectation is that this deal is going to close in the next two weeks or so; is that fair? Or at least receive approval in the next two weeks or so; is that right?

MR. MANDEL: Object to the form.

A. Which paragraph are you on?

BY MR. BEHA:

Q. 63.

A. 63.

Q. And if you just go up a few lines before that, where it says, "Waste Dive, a leading waste industry publication, had reported, per recent comments from Waste Management executives, regulators could approve the deal by late March 2020."

So it's now March 18th, and the expectation is approval by late March. So approval

## Page 122

MR. MANDEL:  Object to form.

A.    I think that's fair to say.  Okay.  I mean, as I sit here now.  I'm not offering -- I think that might call for a legal conclusion.  But what you said sounds reasonable, that they anticipate it's going to close mid-to-late second quarter 2020, and they're not going to miss the deadline.

BY MR. BEHA:

Q.    And do you think going from March 18th and thinking that regulatory approval will be obtained in the next 13 days, and the merger will close soon thereafter, and then it is changed from that to the company now anticipates closing the merger mid-to-late second quarter, does that change the likelihood that it will close by the end date?

MR. MANDEL:  Object to form.

A.    Well, I mean -- I couldn't -- I studied this date carefully.  I thought good and hard about it, and I had discussions with my team about it.  And I came to the conclusion that it was so mixed, it could not be a good event study candidate event.

I mean, if the company had only said, "We're going to be delayed," that would have been unambiguous bad news.  But by coupling that with the assurance -- or the reassurance that they anticipated

## Page 123

to hitting the deadline anyway, you know, it confounds it.  So it's a mix of positive and negative news.  I remember having discussions with my team as to which was the bigger news, the delay or reassurance on this day that they were going to hit the deadline.  If the company said on that day, "We're going to make the deadline," that would have been good news.  If the company had said, "We have an extensive delay," that would have been bad news.

But to say that, "We have a delay but it's not such a delay that will cause us to miss the deadline," makes it almost no news at all with respect to whether or not the bonds should be revalued.

BY MR. BEHA:

Q.    So you -- you looked at this date very closely and thought through the balance of this stuff to determine whether it should be an event date?

A.    Right.  I did that work without looking at how the market reacted.  Because the choice of which dates to focus an event study on is done before -- the identification of good event dates is done before looking at the results.

Q.    And you discussed this with your team?

A.    Yeah.  I mean, it's altogether possible

## Page 124

that the market thought this was horrible news and the bond prices collapsed.  But ex ante -- based on valuation principles, I couldn't offer an ex ante opinion.  That's why it was not used in the event study.

It could have been the market might have disagreed with my assessment and thought this was terrible news, and the bond prices might have collapsed that day.  But I did not know that at the time I made that decision.

Q.    And -- but the plaintiffs treated this date as a partial corrective disclosure in the complaint, correct?

A.    My understanding is it's a misrepresentation date and a disclosure date.

Q.    Yeah.  So it is a disclosure date, yes?

A.    Right, and I rejected it as an event date for the market efficiency event study.

Q.    And so --

A.    For the reasons we've been talking about.

Q.    Are there any objective principles that somebody else could apply to evaluate your determination?

MR. MANDEL:  Object to the form.

## Page 125

A.    Sure.

BY MR. BEHA:

Q.    What are those?

A.    Well, they could look to see whether the event is confounded or not.  If it's seriously confounded, it's an impaired date.

Q.    How do you decide if it's seriously confounded?

A.    If there's a mix of positive and negative news.  That's an objective determination, and here there is.  Nobody can look at this date and say it's all bad or all good.

Q.    So if you go to paragraph 109 on page 37 --

A.    And, by the way, it has to be added that nobody can look at June 24th and say that, objectively, that was a bad day for the bondholders based on the news.

Q.    Yeah.  So there's two questions.  One, there's the selection of which events will be chosen as event dates, and then there's a question of which will not be chosen, right?

MR. MANDEL:  Object to form.

A.    Well, there's a decision, a judgment, an analysis which events are informative about market

Page 126

efficiency. If the news is mixed, it's not an informative date. If the news is mixed, and the stock doesn't move or the bond doesn't move, it could be because the news is mixed, not because the market is inefficient. So whatever -- you know, ex ante, that whatever the event study would show, whatever the statistics would show, it would be ambiguous. It would be indeterminate because you wouldn't know whether the movement or nonmovement was because of the nature of the news or efficiency or inefficiency of the market.

BY MR. BEHA:

Q.    I --

A.    That's why it's not a good market efficiency event date candidate.

Q.    Okay. I wasn't asking that. I was just asking, to say that June 24th was a good date --

A.    Yes.

Q.    -- was the right -- that doesn't say anything about whether you -- whether other determinations as to other days were appropriate?

MR. MANDEL: Object to form.

A.    Oh, I see. That's why you're asking these questions.

BY MR. BEHA:

Page 127

Q.    Yeah.

A.    You're probing why I thought the other dates were not good candidates.

Q.    Exactly.

A.    I'll answer those questions all day.

Q.    I don't think that -- that anyone is questioning that that date was a value-relevant date, June 24th?

A.    Great.

Q.    The question is: How do you make the decision as to other dates?

So we were on paragraph 109, "Loss causation." Do you see that?

A.    I do.

Q.    "As a result of their purchases of the note during the class period, lead plaintiff and other class members suffered economic loss, i.e., damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused the notes to trade at artificially inflated levels throughout the class period, including, at times, more than 120 percent of par.

On March 18, 2020, defendants acknowledged that their prior statements about

Page 128

obtaining antitrust approval and closing the merger by the end of March 2020 quarter were materially false and misleading, causing the prices of the notes to decline significantly."

That's the allegation in the complaint, right?

A.    Yes.

Q.    And you determined that that wasn't the case?

A.    Which part?

Q.    That -- well, you looked at the statement and you did not think that it was likely to cause the prices of the notes to decline significantly?

MR. MANDEL: Object to form.

A.    No. I think I said -- okay. It's that -- I identified that, because of the mixed nature of the news, that if it did cause the price to decline significantly -- no. Actually, I'll put it this way.

I looked at the nature of the news, and I determined if it didn't cause the price to decline significantly, that wouldn't tell me anything. Because it would either be because of inefficiency or because of the mixed nature of the news, and that's

Page 129

what made it not a good candidate for an event study testing market efficiency.

Basically, I didn't know -- I didn't know the -- which way it would move or should move, according to valuation principles.

BY MR. BEHA:

Q.    This loss causation section of the complaint, you understand that the complaint is alleging that the March 18th statement caused losses for the plaintiff class?

MR. MANDEL: Object to form.

BY MR. BEHA:

Q.    Is that your understanding?

A.    Seems to be, yes.

Q.    And that economic loss caused damages?

A.    That's their allegation.

Q.    That's their allegation?

A.    And I haven't confirmed that or refuted it.

Q.    In doing a damages analysis, would you perform a regression to see what actually happened on that day and determine whether there were losses caused?

MR. MANDEL: Object to form.

A.    Probably, as well as other analyses.