# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE:                              :
                                    :   Case No.
WASTE MANAGEMENT SECURITIES         :
LITIGATION,                         :   1:22-cv-04838-LGS
                                    :
                                    :
                                    :
- - - - - - - - - - - - - - - - - - - - - -

** CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF

STEVEN P. FEINSTEIN

FRIDAY, SEPTEMBER 27, 2024

9:15 a.m.

Reported by:  NICOLE KOCHY, CCR, RPR, CRR

Job No. 2024-958362

Case 1:22-cv-04838-LGS   Document 121-1   Filed 10/29/24   Page 3 of 16
In Re: Waste Management Securities Litigation                Steven Feinstein
Confidential                                September 27, 2024

34

that, but it has happened.

Q.    That's a case in which you submitted a report and testified?

A.    No.

Q.    Okay.  Is there any case in which you have submitted a report and testified where you were retained by a party other than a plaintiff?

A.    Ever?  You mean in 28 years?

Q.    Yeah.  To the extent you remember.

A.    I think I have -- I can't recall -- I know I've done consulting work for defendants.  I can't recall that I've written a report and submitted a report over -- in the last 28 years, pursuant to an engagement with defendants.  I don't think I have.

Q.    Okay.  And you said that you have offered the opinion that the market had not been proven to be efficient, correct?

A.    That's right.

Q.    So that's a rebuttal opinion?  There's another expert who has offered an opinion, and then you say that opinion -- that that expert has not proven that the market is efficient?

MR. MANDEL:  Object to the form.

A.    I think so.

BY MR. BEHA:

42

A.    Or -- I mean, by "try," we mean conduct the analysis to assess?

BY MR. BEHA:

Q.    Yes.  You didn't assess it.  That's a better way to put it.  I don't want to suggest that you're trying to reach a result --

A.    I think that's fair to say.  I think from memory, from recollection, which is imperfect sometimes, I think that's fair to say.

Q.    But every engagement in which you've issued a report or testified in which you assessed market efficiency, you found that the market was efficient?

MR. MANDEL:  Object to form.

A.    That's correct.

BY MR. BEHA:

Q.    So you never found --

A.    Wait.  No, that's not correct.  Did you say if I've offered a report?

Q.    If you've offered a report.  Every report where --

A.    Or testified.  That's right.

Q.    -- you've offered where you assessed market efficiency --

A.    Right.

In Re: Waste Management Securities Litigation   Steven Feinstein
Confidential   September 27, 2024

45

the opinion that the market is efficient?

MR. MANDEL:   Object to form.

A.   I don't know that.  I mean --

BY MR. BEHA:

Q.   Has there ever been a case where you concluded that you couldn't prove market efficiency where you then were hired to give an expert opinion on market efficiency?

A.   I've already answered that question, but you know, the salient point here is that it's not up to me.  I arrive at my opinions, and the chips lie where they may.

Q.   So you've been --

A.   I just want to add, I'm not afraid to offer that negative opinion or inform people if I've ever arrived at that conclusion.  That doesn't -- I think that's the responsible thing to do, is to say what I've found after I've conducted analysis. Whether my opinion is that the market can be proved efficient or cannot be proved efficient, I'll let people know that.

Q.   You've been paid millions of dollars over the last decade in cases where you assessed market efficiency and found that you could prove it to be efficient; is that fair to say?

46

MR. MANDEL:  I'm going to object to the form.

A.     I founded a consulting firm that does research and analysis in this area, and the firm is appropriately compensated within industry standards, consistent with industry standards, for the work I do.  That's how I'd answer that question.

BY MR. BEHA:

Q.     And that appropriate compensation has been millions of dollars over the last decade?

MR. MANDEL:  Object to form.  Asked and answered multiple times.  Come on.

A.     Yes.

BY MR. BEHA:

Q.     What compensation has Crowninshield received in cases where you found that efficiency could not be established?

MR. MANDEL:  Object to form.

A.     I -- just as I said I didn't review the compensation records for this case, I certainly didn't review the compensation records for those cases.  But an invoice goes out and we collect --

BY MR. BEHA:

Q.     Receivables?

A.     -- our receivables.  Yes.

65

way you asked the question is a little bit ambiguous.

I have offered more evidence than I know that courts

have expressed they've looked for.  I've offered more

than that.  And I would likely reach the conclusions

that I've reached in this case without some of the

factors, even though the securities satisfied all of

the factors.

But I offer what I think is -- if I

reached a conclusion, and I'm confident that I've

reached a correct conclusion, I'll express it and the

support for it, regardless of whether it's more than

or less than what courts have expressed they're

looking for.

BY MR. BEHA:

Q.    Okay.  But are you offering an opinion

about what courts have expressed that they're looking

for?

A.    I described it.  I know what they -- you

know, I know what courts have asked, and I described

in this report that if one were to judge my work on

that standard, it would pass.

Q.    Well, I guess that's my question.

What -- are you offering an opinion about what courts

have accepted?

A.    No.  It's not an opinion, it's a fact.

I've reached a conclusion based on financial economics, generally accepted methodologies, and -- and the results as they're expressed in my report.

I've also expressed that if the courts are looking to specific factors, those factors are satisfied, and those same factors actually support my conclusion.  And I've got a published article on exactly that subject, that the Cammer-Krogman factors are correct in that they do indicate market efficiency.

Q.   Okay.  So I think what you said, "I've also expressed that if the courts are looking to specific factors, those factors are satisfied."

A.   Maybe I should have said it differently.

Q.   I'm still on the question.

Are you offering -- are you offering an opinion about what factors the courts have looked at?

MR. MANDEL:  Object to form.

A.   It's not an opinion.  I'm not offering any legal opinions.

BY MR. BEHA:

Q.   So --

A.   I do observe, and I expressed in the report what I observed.  And -- but it's -- but it's not a legal opinion.

In Re: Waste Management Securities Litigation                    Steven Feinstein
                          Confidential                          September 27, 2024

93

market, changes in those things is what generally

changes the market price.

BY MR. BEHA:

Q.    And -- but in this case, they had that

redemption feature, correct?

A.    That's right.

Q.    And so there was another factor in this

case?

A.    That's right.

Q.    And, in fact, the value of these bonds

was highly dependent on whether or not the merger

closed by the end date?

MR. MANDEL:  Object to the form.

BY MR. BEHA:

Q.    Right?

A.    Right.  Highly dependent on what -- on

the market's expectation, or understanding of whether

or not the merger would close by the end date.

That's right.

Q.    So for a typical bond, you wouldn't

expect the markets to be reacting to every bit of

news about the company unless it affected their

credit risk; is that fair?

A.    Yes.

Q.    For this particular bond, that was true

122

MR. MANDEL:  Object to form.

A.    I think that's fair to say.  Okay.  I mean, as I sit here now.  I'm not offering -- I think that might call for a legal conclusion.  But what you said sounds reasonable, that they anticipate it's going to close mid-to-late second quarter 2020, and they're not going to miss the deadline.

BY MR. BEHA:

Q.    And do you think going from March 18th and thinking that regulatory approval will be obtained in the next 13 days, and the merger will close soon thereafter, and then it is changed from that to the company now anticipates closing the merger mid-to-late second quarter, does that change the likelihood that it will close by the end date?

MR. MANDEL:  Object to form.

A.    Well, I mean -- I couldn't -- I studied this date carefully.  I thought good and hard about it, and I had discussions with my team about it.  And I came to the conclusion that it was so mixed, it could not be a good event study candidate event.

I mean, if the company had only said, "We're going to be delayed," that would have been unambiguous bad news.  But by coupling that with the assurance -- or the reassurance that they anticipated

In Re: Waste Management Securities Litigation          Steven Feinstein
Confidential                                           September 27, 2024

131

Q.      Okay.  Does he work -- do others at your firm work supporting him on that?

A.      Yes.

Q.      When you discussed with your team which dates would be appropriate candidates to be event dates, did you discuss that with Dan Bettencourt?

A.      I don't recall that I did.

Q.      Did anyone on the team -- did you discuss this question with anybody who had access to or involvement in the work that was done in connection with the mediation?

A.      Yes.

Q.      So if there was a regression analysis done, there were people who were involved in the process of choosing the event date who knew the result?

MR. MANDEL:  Object to the form.

A.      I wouldn't know what they knew or didn't know.  And we understood that there's this issue -- we anticipated your questions, you know, that are happening here in this deposition.  We anticipated them months ago.  And we have a firewall that -- you know, that mediation work is separate from the expert testimony work.

BY MR. BEHA:

132

Q.    But there were people that were involved in your work who were involved in that work.  How is that a firewall?

MR. MANDEL:  Object to form.

A.    They don't share with me their findings.

BY MR. BEHA:

Q.    But they share with you their views about what is appropriate as an event date, and it is informed by the knowledge that they have.

MR. MANDEL:  Object to the form, assumes facts, misstates testimony.

A.    I can't speak -- I -- you know, everyone understands the rules and I can't speak to whether they violated them.  But, you know, what I would -- the opinions that I was expressing are -- the issues that I was articulating during these discussions was that the one thing that might have made more events good events was being -- is what the case was -- is what the alleged misrepresentations and omissions were refuting or undermining or countervailing throughout the entire class period.

And, therefore, I should look for an unconfounded disclosure about whether or not the deal would be closed by the deadline, and there was only one such date.

155

Q.      So you've -- I'm trying to use a neutral term.  You have determined what appropriate candidates there are, or whatever it is, and then the next step is you do a regression analysis; is that correct?

A.      Yes.

Q.      And how does that -- how does that regression analysis -- or mechanically, what do you do in order to perform the regression analysis?

MR. MANDEL:  Object to form.

A.      Well, a regression analysis involves constructing a linear model of what reasonably, according to principles, drives price changes in the subject security, which I did.  I used the model that is almost always used for this purpose, a model where the returns to the notes is the left-hand dependent variable, and a number of right-hand-side explanatory variables are put forth and are put into the model.

In this case, I used the -- well, how much detail do you want here?  Do you want me to tell you why I chose the right-hand-side variables?

BY MR. BEHA:

Q.      No.  I think you -- I guess, one thing mechanically.  Do you -- do you run the regression yourself or are there people on your team who sort of

163

impact of small trades or anomalous trades that, for one reason or another, might be anomalous.

Other authors have said the same thing. It's the industry -- I think it's the standard. It's in the literature that this is a legitimate and, in many cases, preferred way to do bond market econometric analysis.

Q. Okay. Is it the preferred way to assess the efficiency of bond markets?

A. Yes. In my -- yes. It's the way I've always done it in all of my cases involving bonds. And other experts, too, Hartzmark, for example, same thing.

Q. Is there any peer-reviewed study or article that says that that's how an event study should be done to assess the efficiency of bond markets?

MR. MANDEL: Object to form.

A. There's literature that says that this is the preferred way to assess the market's valuation of a security on a particular day. Bessembinder, for one. DeCosta, for another. And there are others.

BY MR. BEHA:

Q. Okay. That wasn't my question. My question was, is there any peer-reviewed literature

164

that says that this is the appropriate way to assess

market efficiency in the market for a bond?

MR. MANDEL:  Object to the form.

A.      You're narrowing it down.  I mean,

it's --

BY MR. BEHA:

Q.      I am --

A.      It varies --

Q.      -- a narrow question that I've asked

you.

A.      I'm not sure that there's any

peer-reviewed literature that spells out exactly how

an event study of -- for market efficiency in a

securities litigation case ought to be conducted.

But the literature does say how to measure the

market's valuation of bonds and what kind of -- and

that the VWAP is the preferred way, the preferred

variable for that valuation, for that price.

And there's other literature that

explains -- that does explain how to do a market

efficiency event study.  And explains that -- that

the analysis requires a reliable measure of the

market's price.

Q.      So there --

A.      So, I mean, putting the pieces together,

165

yes.  The peer-reviewed literature supports my methodology.

Q.    So there's peer-reviewed literature that discusses how to conduct a market efficiency event study?

MR. MANDEL:  Object to form.

A.    Yes.  Or any event study.  Any event study.

BY MR. BEHA:

Q.    And does that -- any study on how to do that with respect to bonds?

MR. MANDEL:  Object to form.

A.    I know that Hartzmark addresses it, but I think his is a law review article.

I mean, what forensic finance is, is taking the tools of the finance profession in academic finance and applying it to a question that's relevant for forensics, for litigation.  My methodology was not invented for litigation.  My methodology came from the generally accepted finance methodologies and then is applied to litigation.

So I don't think there's any -- I'm not aware, as I sit here now, that there are articles that design an event study methodology just for litigation for bonds, involving bonds.