**BAKER BOTTS** L.L.P.

30 ROCKEFELLER PLAZA
NEW YORK, NEW YORK
10112-4498

TEL  +1 212.408.2500
FAX +1 212.408.2501
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
HOUSTON
LONDON

**NEW YORK**
PALO ALTO
RIYADH
SAN FRANCISCO
SINGAPORE
WASHINGTON

November 1, 2024

Hon. Lorna G. Schofield
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

James J. Beha II
TEL: 2124082510
FAX: 2122592510
jim.beha@bakerbotts.com

Re:    In re Waste Management Sec. Litig., 1:22-cv-4838-LGS

Dear Judge Schofield,

We write on behalf of Defendants Waste Management, Inc. ("WM"), James Fish, Devina Rankin, and John Morris to respond to Lead Plaintiffs' (the "Funds") October 24 letter (Dkt. #117) requesting a pre-motion conference concerning a motion to compel the production of documents. In response to the Funds' document requests, WM agreed to produce documents from January 1– July 15, 2020—beginning a month-and-a-half before the alleged class period starts and ending after the final corrective disclosure. WM spent months collecting, reviewing, and producing documents from that period. Now, after the deadline for substantial completion of document production, the Funds belatedly file a request to vastly expand the production period to March 1, 2019 (almost a year before the start of the class period) through July 31, 2020 (more than a month after it ends). The Funds fail to justify the significant expansion of the discovery period they request or the substantial burden it would impose on WM. Their request is overbroad, unduly burdensome, and disproportionate to the needs of the case.

For context, we first correct the record as to the course of document discovery to date:

- The Funds served document requests on **May 15, 2024**, including twenty-three separate requests seeking production of "any" and "all" documents related to various broad, multi-part topics during a roughly *six-year-period* from August 1, 2018–May 2024 (the "Requests").

- On **June 14, 2024**, WM served timely responses and objections to the Requests (the "Response"), objecting to the Requests' unreasonable and overbroad "Relevant Time Period" and responding WM would conduct a reasonable search for documents related to the February 13–June 23, 2020 putative class period. The Funds did not raise any complaints or seek to meet-and-confer regarding those responses and objections.

- In an effort to meet the October 18, 2024 substantial completion deadline for document production, WM proceeded to search for responsive documents consistent with its Response and *broadened* the period for its collection to January 1–July 15, 2020, encompassing documents created roughly a month before and after the class period. WM's search parameters netted a universe of more than **110,000 documents** that WM reviewed for production.

- The Funds did not contact Defendants to inquire about their document collection and review parameters until *August 15, 2024*—after WM had completed its collection and begun its review and a mere two months before the substantial completion deadline.

- After the Funds belatedly inquired about WM's document collection parameters, WM met and conferred in good faith. WM ultimately agreed to some of the Funds' requests to expand the

**BAKER BOTTS** LLP

Hon. Lorna G. Schofield                                  - 2 -                                  November 1, 2024

scope of document production but confirmed by letter on **September 24, 2024** that it would not agree to expand the period for its document collection.

- On **October 25**—four months after WM first objected to the overbroad Requests, more than a month after WM confirmed that it would not agree to expand the its document collection period, and a week *after the deadline for substantial completion of document production*—the Funds initiated a motion to compel WM to collect, review, and produce documents for a period beginning almost a year before the alleged class period through a month after it ends.

The Funds' requests for discovery of documents dating from 2019 rests entirely on unsupported speculation that (a) Defendants *knew* from the inception of the ADS transaction that the DOJ would require divestitures of the combined company exceeding the Antitrust Revenue Threshold ("ART"), and (b) such a requirement would necessarily delay the transaction's closing beyond the end date and thus trigger the redemption of the notes. But nothing in the record supports the notion WM knew from the outset that divestitures in excess of the ART would be required. More to the point, the Funds' unfounded assumption that such a requirement would necessarily delay the closing past the end date misapprehends how the ART actually worked. Thus, the Funds provide no basis to conclude that WM's collection and review of nine-months-worth of documents from 2019 would be likely to net documents relevant to "falsity and scienter" in connection with certain statements made in 2020.

To clarify, the April 14, 2019 merger agreement between WM and ADS required WM to agree to sell or divest assets of the combined companies up to the ART—assets defined in the agreement as generating EBITDA of $200M—if necessary to obtain DOJ approval for the transaction. *See* Am. Compl. ¶¶ 3-4. In other words, WM could not terminate the transaction based on the fact that the DOJ required divestitures up to the $200M ART. But if the DOJ required the divestiture of assets that would exceed the ART, WM had the contractual right, *but not the obligation*, to terminate the agreement by paying ADS a $150M termination fee. *See id.* ¶ 31.

Thus, even if WM knew or expected the DOJ would require divestures exceeding the ART, which would give WM the right to terminate the transaction and pay a termination fee, it does not follow that WM necessarily would choose that option and pay the $150M break fee. And, even if there were evidence WM knew in February 2020 that it would seek to renegotiate, that hardly means WM knew the parties would ultimately agree to new economic terms, or that any such renegotiation would only be completed when it would no longer be possible to close by the end date. Thus, regardless of what WM expected about the required divestitures, the Funds point to nothing that suggests WM did not reasonably believe it could negotiate an acceptable divestiture package to allow regulatory approval by the end date or that WM was not, in fact, working in good faith to do so. In other words, the Funds fail to articulate how WM's supposed awareness in February 2020 that the divestitures would exceed the ART translates into knowledge the transaction would not close by the end date. And the Funds utterly fail to tie WM's supposed recognition *in February 2020* that divestitures would exceed the ART to the Funds' demand for discovery of documents dating back to *March 2019*.

The Funds point to two documents: (1) a February 9, 2020 John Morris email stating, "The $200 mm that everyone has focused on was never a threshold for revenue divested" and "Our ability to negotiate that number as low as we did w/ ADS gave us a low threshold to 'walk' from

**BAKER BOTTS** LLP

Hon. Lorna G. Schofield                         - 3 -                    November 1, 2024

the deal *if we chose to*"; and (2) February 17, 2020 WM Board meeting minutes reflecting the Board's authorizing divestitures "materially higher than the $200M threshold disclosed to the investing public." Dkt. #117 (emphasis added), But neither Mr. Morris's plain description of the ART mechanics nor the WM Board's approval of "materially higher" divestitures means Defendants wanted or planned to use the ART as a pretext to terminate the deal in February 2020, let alone that Defendants harbored such intent as early as March 1, 2019. Indeed, a plain reading of the two documents refutes the Funds' proffered inference. The Morris email makes clear the ART was never intended to set a limit on divestitures at which point the transaction would make no economic sense; rather, it was set at a level, *negotiated with the seller*, at which point WM would gain an expensive *option* to terminate if it believed the deal no longer worked given the lost revenues. The Board minutes, in turn, make clear that Defendants were willing (and authorized) to continue with the transaction even at materially higher levels of required divestitures (*i.e.*, that the ART was *not* an impediment to closing).

Tellingly, the Funds identify no documents suggesting Defendants knew at the time of WM's February 13, 2020 10-K that the deal would not close by the end date, let alone that they knew that at the time of the notes' issuance in May 2019. The Funds instead point to documents from February 2020 and ask the Court to draw unsupported, speculative inferences about what WM must have known or believed in 2019. But documents from January 2020 produced in discovery make clear that WM was, in fact, working in good faith towards a spring 2020 closing at that time.[1]

Finally, the Funds fail to provide any support for extending the end of the relevant period to July 31, 2020. The Complaint alleges that on June 24, 2020, WM announced revised merger terms that extended the closing date so as to trigger the notes' redemption terms, and after certain investors urged WM to explore alternatives to triggering the notes' redemption clause, "[o]n July 8, 2020, WM publicly stated that it would "proceed with the planned redemption of the SMR notes, which is clearly and fully in compliance with the terms of the Notes.'" Am. Compl. ¶¶ 34-35. Thus, according to the Complaint, the supposed "truth" was fully revealed with that statement on July 8, 2020. No basis exists for requiring WM to search for documents beyond that date.

Respectfully,

/s/ James J. Beha II
James J. Beha II

cc: all counsel of record (by ECF)

---

[1] For example, on January 13, 2020, John Morris drafted a note to WM's employees regarding a hiring pause to assess ADS's employees with respect to positions at the combined company, writing: "While we announced this planned acquisition almost nine months ago*, we know that the amount of time between now and close is likely fairly short.*" WM-0018749 (emphasis added); *see also* WM-0018748 (WM's VP of operations writing Morris, Rankin, and others about integration costs, "My thought is to see run rate by discipline….That will help inform us on what will likely continue post April/May and with whom we need to consult regarding post-closure needs for support.").