# EXHIBIT B

**In the Matter Of:**

*In Re: Waste Management Securities Litigation*

*STEVEN FEINSTEIN*

*September 27, 2024*



1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE:                              :
                                    :    Case No.
WASTE MANAGEMENT SECURITIES         :
LITIGATION,                         :    1:22-cv-04838-LGS
                                    :
                                    :
                                    :
- - - - - - - - - - - - - - - - - - - - -

** CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF

STEVEN P. FEINSTEIN

FRIDAY, SEPTEMBER 27, 2024

9:15 a.m.

Reported by:  NICOLE KOCHY, CCR, RPR, CRR

Job No. 2024-958362

Page 2

DEPOSITION of STEVEN P. FEINSTEIN, taken stenographically in the above-entitled matter, as taken by and before NICOLE KOCHY, a Certified Court Reporter, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New York, held at ROBBINS GELLER RUDMAN & DOWD LLP, 420 Lexington Avenue, New York, New York, on September 27, 2024, commencing at 9:15 a.m.

Page 4

I N D E X

WITNESS                                              PAGE

STEVEN P. FEINSTEIN

Examination By Mr. Beha                               5

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Deposition Excerpt | 7 |
| Exhibit 2 | List of Testimony in Last Four Years | 19 |
| Exhibit 3 | Excerpt of report | 48 |
| Exhibit 4 | June 14, 2024 Expert Report | 55 |
| Exhibit 5 | Amended Complaint | 113 |
| Exhibit 6 | Bank of America equity research report | 145 |
| Exhibit 7 | Fidelity Document | 174 |
| Exhibit 8 | Vale Report | 189 |
| Exhibit 9 | Vale Report and Recommendation | 194 |
| Exhibit 10 | J.P. Morgan North America Research Report | 244 |
| Exhibit 11 | OPERS Opinion | 262 |
| Exhibit 12 | Mahanti Article | 266 |
| Exhibit 13 | Lucy Allen Report | 280 |

Page 3

A P P E A R A N C E S:

ROBBINS GELLER RUDMAN & DOWD LLP
420 LEXINGTON AVENUE
NEW YORK, NEW YORK 10170
Noam@rgrdlaw.com
BY:  NOAM MANDEL, ESQ.
     CHRISTOPHER T. GILROY, ESQ.
     DESIREE CUMMINGS, ESQ.
     MIA S. BORNSTEIN, ESQ.
        AND
LAW OFFICES OF DAVID HARRISON
BY:  DAVID HARRISON, ESQ.
Attorneys for Plaintiffs

BAKER BOTTS L.L.P.
30 ROCKEFELLER PLAZA
NEW YORK, NEW YORK 10112
Jim.beha@bakerbotts.com
BY:  JAMES J. BEHA, II, ESQ.
Attorneys for Defendants

ALSO PRESENT:
JONATHAN JUAREZ, Videographer

Page 5

THE VIDEOGRAPHER:  We are now on the record.  My name is Jonathan Juarez.  I am a legal videographer for Lexitas.  Today's date is September 27, 2024, and the time is 9:15 a.m.  This deposition is taking place at 420 Lexington Avenue, New York, New York, in the matter of In Re: Waste Management Securities Litigation.  The deponent is Dr. Steven Feinstein.

All counsel will be noted on the stenographic record.

The court reporter is Nicole Kochy.

S T E V E N   F E I N S T E I N, having been duly sworn, was examined and testified as follows:

EXAMINATION BY MR. BEHA:

    Q.    Good morning, Dr. Feinstein.

    A.    Good morning.

        MR. MANDEL:  Do we want to do counsel, just announce on the record?  I just want to know for --

        THE VIDEOGRAPHER:  I apologize.

        MR. MANDEL:  I assumed that we would, that's why.  I was waiting for it.

        MR. BEHA:  Yes.  I'm James Beha, on behalf of the defendants, of Baker Botts.

Page 62

most dispute between experts.  No matter what is the structure of the event study, one party or the other will criticize it to no end for even the most ridiculous, minute reasons.

And so we try to -- you know, experts try to choose the methodology -- whereas all the methodologies can be valid, depending on the facts and circumstances, we -- I might choose the methodology that is most easy to defend against, or that has the least -- is the most objective and, therefore, has the least opportunity for the dispute that courts have expressed concern about.

BY MR. BEHA:

Q.    Okay.  So you want it to be the most objective --

A.    If possible.  If possible.

Q.    Because you understand that in academia, maybe, that, you know, people -- you don't assume that people are trying to reach some result or another.  But in a litigation, the parties certainly have an interest in what the answer is.  And so the more subjectivity there is, there is a question about whether that subjectivity is used to bias towards one conclusion or another.

MR. MANDEL:  I'm going to object.  I'm

Page 63

not hearing a question.

BY MR. BEHA:

Q.    Well, you said you try to be the most objective partially because -- to avoid criticism, because it's litigation and the parties fight over the event studies, and then the judges have expressed concerns about subjectivity.  So -- well, withdrawn.  I'm not being -- I'm not asking a good question.

So --

A.    I mean, I can give an example, I mean, if you want.

Q.    There's no question.  He wants me to ask a different question.  So we'll just have my bumbling be on the transcript forever.

So you are -- you're not a lawyer, right?

A.    That's right.

Q.    And you're not offering legal opinions?

A.    Correct.

Q.    Now, obviously, your opinion is being used in a legal proceeding; you understand that, right?

A.    Yes.

Q.    And, sensibly, if there's some factor that you thought, as a financial economist, was very indicative of market efficiency, but the courts all

Page 64

said they don't agree, you probably wouldn't focus on that, right?

A.    No.  That's not true.

MR. MANDEL:  Object to form.

BY MR. BEHA:

Q.    Well, I guess --

A.    That's not true.  I mean, I've got -- I've got factors described in my report that are not Cammer-Krogman factors, but I believe they support my conclusion that these bonds traded in an efficient market.

Q.    You -- you're offering a finance and economics opinion that is a matter of financial economics, these securities traded in an efficient market, correct?

A.    Yes.

Q.    You are not offering a legal opinion that they traded in an efficient market, correct?

A.    I'm not offering any legal opinions.

Q.    And so the fact that courts have accepted some evidence or not other evidence, that's not relevant to the opinion that you are offering as a matter of financial economics, right?

MR. MANDEL:  Object to form.

A.    The way you asked the question -- the

Page 65

way you asked the question is a little bit ambiguous.  I have offered more evidence than I know that courts have expressed they've looked for.  I've offered more than that.  And I would likely reach the conclusions that I've reached in this case without some of the factors, even though the securities satisfied all of the factors.

But I offer what I think is -- if I reached a conclusion, and I'm confident that I've reached a correct conclusion, I'll express it and the support for it, regardless of whether it's more than or less than what courts have expressed they're looking for.

BY MR. BEHA:

Q.    Okay.  But are you offering an opinion about what courts have expressed that they're looking for?

A.    I described it.  I know what they -- you know, I know what courts have asked, and I described in this report that if one were to judge my work on that standard, it would pass.

Q.    Well, I guess that's my question.  What -- are you offering an opinion about what courts have accepted?

A.    No.  It's not an opinion, it's a fact.

## Page 122

MR. MANDEL:  Object to form.

A.    I think that's fair to say.  Okay.  I mean, as I sit here now.  I'm not offering -- I think that might call for a legal conclusion.  But what you said sounds reasonable, that they anticipate it's going to close mid-to-late second quarter 2020, and they're not going to miss the deadline.

BY MR. BEHA:

Q.    And do you think going from March 18th and thinking that regulatory approval will be obtained in the next 13 days, and the merger will close soon thereafter, and then it is changed from that to the company now anticipates closing the merger mid-to-late second quarter, does that change the likelihood that it will close by the end date?

MR. MANDEL:  Object to form.

A.    Well, I mean -- I couldn't -- I studied this date carefully.  I thought good and hard about it, and I had discussions with my team about it.  And I came to the conclusion that it was so mixed, it could not be a good event study candidate event.

I mean, if the company had only said, "We're going to be delayed," that would have been unambiguous bad news.  But by coupling that with the assurance -- or the reassurance that they anticipated

## Page 123

to hitting the deadline anyway, you know, it confounds it.  So it's a mix of positive and negative news.  I remember having discussions with my team as to which was the bigger news, the delay or reassurance on this day that they were going to hit the deadline.  If the company said on that day, "We're going to make the deadline," that would have been good news.  If the company had said, "We have an extensive delay," that would have been bad news.

But to say that, "We have a delay but it's not such a delay that will cause us to miss the deadline," makes it almost no news at all with respect to whether or not the bonds should be revalued.

BY MR. BEHA:

Q.    So you -- you looked at this date very closely and thought through the balance of this stuff to determine whether it should be an event date?

A.    Right.  I did that work without looking at how the market reacted.  Because the choice of which dates to focus an event study on is done before -- the identification of good event dates is done before looking at the results.

Q.    And you discussed this with your team?

A.    Yeah.  I mean, it's altogether possible

## Page 124

that the market thought this was horrible news and the bond prices collapsed.  But ex ante -- based on valuation principles, I couldn't offer an ex ante opinion.  That's why it was not used in the event study.

It could have been the market might have disagreed with my assessment and thought this was terrible news, and the bond prices might have collapsed that day.  But I did not know that at the time I made that decision.

Q.    And -- but the plaintiffs treated this date as a partial corrective disclosure in the complaint, correct?

A.    My understanding is it's a misrepresentation date and a disclosure date.

Q.    Yeah.  So it is a disclosure date, yes?

A.    Right, and I rejected it as an event date for the market efficiency event study.

Q.    And so --

A.    For the reasons we've been talking about.

Q.    Are there any objective principles that somebody else could apply to evaluate your determination?

MR. MANDEL:  Object to the form.

## Page 125

A.    Sure.

BY MR. BEHA:

Q.    What are those?

A.    Well, they could look to see whether the event is confounded or not.  If it's seriously confounded, it's an impaired date.

Q.    How do you decide if it's seriously confounded?

A.    If there's a mix of positive and negative news.  That's an objective determination, and here there is.  Nobody can look at this date and say it's all bad or all good.

Q.    So if you go to paragraph 109 on page 37 --

A.    And, by the way, it has to be added that nobody can look at June 24th and say that, objectively, that was a bad day for the bondholders based on the news.

Q.    Yeah.  So there's two questions.  One, there's the selection of which events will be chosen as event dates, and then there's a question of which will not be chosen, right?

MR. MANDEL:  Object to form.

A.    Well, there's a decision, a judgment, an analysis which events are informative about market

## Page 154

Q.    So one way or another, this announcement was value-relevant for the ADS stock, at least this suggests that it was?

MR. MANDEL:  Object to form.

A.    I'd have to do that analysis to see what the -- if there was a significant decline on the ADSW stock.  I didn't do that study.  I was focused on the Waste Management note, so I did an event study on the appropriate days for the Waste Management notes.

BY MR. BEHA:

Q.    Did this suggest to you that March 18th might be an appropriate date for the Waste Management notes?

A.    Absolutely.  I considered it.  But even what you have underlined -- is this your own underlining or is this the --

Q.    No, no.  This is in the document.

A.    What they underlined is what caused me to reject this date.  Yes, it's not good news for the notes that they pushed the closure out.  But it was great news for the notes that they were still anticipating closure before the end date, and that they reassured and reaffirmed that.  That -- "they" being Waste Management management.  Yeah, Waste Management management.

## Page 155

Q.    So you've -- I'm trying to use a neutral term.  You have determined what appropriate candidates there are, or whatever it is, and then the next step is you do a regression analysis; is that correct?

A.    Yes.

Q.    And how does that -- how does that regression analysis -- or mechanically, what do you do in order to perform the regression analysis?

MR. MANDEL:  Object to form.

A.    Well, a regression analysis involves constructing a linear model of what reasonably, according to principles, drives price changes in the subject security, which I did.  I used the model that is almost always used for this purpose, a model where the returns to the notes is the left-hand dependent variable, and a number of right-hand-side explanatory variables are put forth and are put into the model.

In this case, I used the -- well, how much detail do you want here?  Do you want me to tell you why I chose the right-hand-side variables?

BY MR. BEHA:

Q.    No.  I think you -- I guess, one thing mechanically.  Do you -- do you run the regression yourself or are there people on your team who sort of

## Page 156

do the actual process of running the regression?

MR. MANDEL:  Object to form.

A.    Well, I design it.  I design the model, I pick the variables, I make the decisions about the variables, the data, how the data are handed.  Miguel Villanueva presses the buttons, if that's what you're asking.

BY MR. BEHA:

Q.    Okay.  Okay.

Did Mr. Villanueva work with Mr. Bettencourt on the other engagement?

A.    I don't know.  I mean, I really don't know what happened.  That was kept entirely secret from me.  I don't know exactly who worked on it and when they worked on it and exactly what they worked on, and I certainly don't know anything about the results.

Q.    But you know Mr. Bettencourt worked on it?

A.    Yeah, that's right.

Q.    And he also worked on this report?

A.    No.  I mean, I said it -- I think the language I used earlier today was he pitched in at the end.  I mean, he reads the report for editing purposes.  He's not making the decisions about the

## Page 157

analysis or the conclusions.

He's basically like our chief operating officer.  So he'll help assign people to the team, for example, and make sure the deadlines are met and that sort of work.

Q.    I'll be taking his deposition next week in another case, so I'll tell him you said hello.  You'll probably see him before I do, though.

And the -- the regression involves controlling for noncompany-specific price movement to try to identify the price movement that is company specific; is that fair?

MR. MANDEL:  Object to form.

A.    Almost would have been, but then you added the second half of your statement.  I can correct it for you, if you like.

BY MR. BEHA:

Q.    Well -- so, let's go to 150 of your -- of your report.  It says, "An event study measures how much security" --

A.    Paragraph 150?

Q.    Paragraph 150.

-- "price rises or falls in response to new company-specific information."

A.    Right.  And that's valuable in its own

Page 298

just as a matter of the --

A.    17 analysts covering this company, not one of them said that.

Q.    Are you -- do you have any awareness of the regulatory requirements involved with the public company merger?

A.    I have a lot of awareness.

Q.    So --

A.    I'm not an expert in underwriting.  I'm not an expert in the legal -- you know, I'm not a securities lawyer, put it that way.  But I am a finance professor and a finance expert, and I also read the analyst reports and not a single analyst said that.

Q.    We're not talking about the analysts.  Set it aside.  We're not talking about Waste Management.

Just if two public companies agree to a merger, they need to sign a merger agreement, then they need to send a proxy to shareholders to get shareholder approval.  Then there is some amount of time that needs to happen between when the proxy gets sent out and when the shareholder vote is, so the shareholders have sufficient notice before they vote on the merger.

Page 299

Is that your understanding of how that process works?

MR. MANDEL:  Object to form.

A.    It is, and I've seen acquisitions occur very quickly.  There have been acquisitions that are announced and they close really soon thereafter.  If there's the desire to close quickly, there's usually the wherewithal to close quickly.

BY MR. BEHA:

Q.    How soon?

A.    I don't recall, but I didn't see a single analyst say that there were -- I saw one analyst say they might have some concerns that there might be a delay into third quarter, and not even missing the end date in July.  I saw no analysts say that they were sure it was going to happen, or that they doubted the company.

Aside from the one that we looked at.

MR. BEHA:  All right.  Why don't we go off the record.

THE VIDEOGRAPHER:  The time right now is 6:22 p.m., and we're off the record.

(Recess taken from 6:22 p.m. to 6:48 p.m.)

THE VIDEOGRAPHER:  The time right now is

Page 300

6:48 p.m., and we're back on the record.

BY MR. BEHA:

Q.    Can you turn to Exhibit 12A, which is --

A.    Of my report?

Q.    From your report, yeah.  And go to March 18, 2020.

A.    Okay.

Q.    Or -- and for the LBF5 note, you have a statistically significant positive residual return on that date, right?

A.    Yes.

Q.    And can you turn to Exhibit 12C and look at March 18th?

A.    Yes.

Q.    And you have --

A.    I'm at March 18th.

Q.    -- positive residual return that is not statistically significant, correct?

A.    Right.  Right.

Q.    And if you go to 12D, can you find what it did on March 18th?

A.    There's no trade on March 18th.

Q.    There's no trade on March 18th.

So fair to say that if you had concluded that March 18th was an appropriate event date, that

Page 301

these results would not have supported a finding of market efficiency?

MR. MANDEL:  Object to form.

A.    No, I don't believe that.

BY MR. BEHA:

Q.    So if you had concluded, "This is a significant value-relevant event that I think what I should see is statistically significant downward movement," and you had no trades at all in one, and statistically significant increase in another, that would not be inconsistent with a finding of efficiency?

MR. MANDEL:  Object to form.

A.    Well, it was a mixed-news day.

BY MR. BEHA:

Q.    I understand.  My hypothetical was, if --

MR. MANDEL:  Let him answer.

BY MR. BEHA:

Q.    -- you had concluded that it was a day that you expected to see statistically significant downward movement.

A.    But I didn't.

BY MR. BEHA:

Q.    I know.