# Exhibit 2

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK


IN RE:                              :
                                    :   Case No.
WASTE MANAGEMENT SECURITIES         :
LITIGATION,                         :   1:22-cv-04838-LGS
                                    :
                                    :
                                    :
- - - - - - - - - - - - - - - - - - - - - -


** CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF

STEVEN P. FEINSTEIN

FRIDAY, SEPTEMBER 27, 2024

9:15 a.m.


Reported by:  NICOLE KOCHY, CCR, RPR, CRR

Job No. 2024-958362

73

A.    What it is based on is generally accepted principles in the financial profession, research by other academics, and my research that was published and cited in this report.  That's what proves it.

Q.    So I understand you've -- you've cited your article.  Setting that article aside, is there any peer-reviewed economics literature that says that the Cammer and Krogman factors are indicative of market efficiency?

A.    Yes.  Usually the other articles focus on one factor at a time, and I have that in my report.  You want me to show you?

Q.    No.  I'm sure we will get to that.

So when were you retained for this matter?

A.    I don't recall.  As I said, the firm was retained to do work without me for a while.  So we've been -- I just don't recall.  Clearly before the date of the report, but I don't -- I don't remember how much before the date of the report.

Q.    Had -- had others at your firm conducted a regression analysis of the price of these notes before you began your work?

A.    I don't know.  The work they did without

74

me, I did not look at.

Q.    You never -- you know nothing about it?

A.    Correct.

Q.    So you submitted this report on June 14th, correct?

A.    That's right.

Q.    Do you know, roughly, when you began work on it?

A.    Well, that depends what you mean by "begin work on it."  I mean, the engagements have a similar pattern.  I will ask -- we'll form a team of analysts and myself, and I'll ask them to do the data dump.  We call it the data dump.  It's to get the documents -- all the documents that are in -- I believe it's Exhibit 1 in this report.  So that takes them some time, and they let me know when that's done.

I just don't know exactly when all that was done.

Q.    And then so --

A.    I mean, so that's -- I'm involved.  I'm directing what they do, but I'm not sure if that is what you were asking.  I mean, it's not when I began reading the documents.  It's not when I began running the tests.

75

Q.    So you read documents.  Was that the first thing that you did?

A.    That's what I usually do, yeah.

Q.    Okay.  Who were the analysts working with you on this matter?

A.    Chief analyst was a woman, Rashi Agarwal.

Q.    Anyone else?

A.    Miguel Villanueva.  It was chiefly them for most of the engagement, but then everyone pitches in.  I can name the rest of the folks.  Rashi has her assistant, Luke, and then Luca Avila.

And Dan Bettencourt always steps in to help.

Q.    Okay.  You started by reading documents; is that fair?

A.    That's right.  The complaint.  First thing I'll read is the complaint.

Q.    First thing you do is read the complaint.

Then after you read the complaint, what did you do?

A.    Had a discussion with the team about what -- what analysis we needed to do.  I directed them to do -- well, together, we did the standard

96

company about.

Q.    Have you ever written a report assessing the efficiency in the market for bonds or notes with an SMR feature?

A.    Not an SMR feature linked to an acquisition.  But convert features, call features, I have.

MR. MANDEL:  Jim, we've been going a little over an hour here.

MR. BEHA:  Sure.

MR. MANDEL:  The next time it makes sense to take a break, let's take a few just --

MR. BEHA:  Now is fine.

THE VIDEOGRAPHER:  The time right now is 11:23 a.m. and we're off the record.

(Recess taken from 11:23 a.m. to 11:43 a.m.)

THE VIDEOGRAPHER:  The time right now is 11:43 a.m., and we're back on the record.

BY MR. BEHA:

Q.    Dr. Feinstein, I would just like to go back to the process.  So you read the complaint and you're working with your team.  And I had Rashi Agarwal, Miguel Villanueva, Luca Avila, Dan Bettencourt.

97

Anyone else work with you at Crowninshield on this engagement?

A.    Well, most -- one more person joined for deposition preparation.

Q.    Okay.

A.    His name is Parth Hemani, H-e-m-a-n-i.

Q.    How many employees does -- do you have at Crowninshield?

A.    12.

Q.    The earlier engagement that you discussed in connection with this case, who from Crowninshield worked on that engagement?

A.    Dan Bettencourt.

Q.    Okay.

A.    He -- he headed it up.  He put a team together.

Q.    So the team that supported you on this was involved in the earlier work?

A.    That's right.

Q.    So you don't know what that work was, but they do?

A.    That's accurate.

Q.    Was that work related to assessing market efficiency?

A.    I don't think so.

Case 1:22-cv-04838-LGS   Document 129-2   Filed 11/08/24   Page 8 of 11
In Re: Waste Management Securities Litigation                Steven Feinstein
Confidential                                    September 27, 2024

98

Q.    What's your basis for saying that?

A.    Well, I asked them what -- what it was about.

Q.    What did they tell you?

A.    That it had to do with mediation and damages.

Q.    So were you retained for this before or after they did that work?

A.    After.  I mean, I became -- I got involved in this after that.

Q.    So -- so you said that the -- we agreed that the timing of the closing of the ADS merger and, in particular, whether it would close by the end dates under the special mandatory redemption feature, that that was critical to the valuation of the notes here; is that right?

MR. MANDEL:  Object to the form.

A.    Whether or not they would close before the end date was important.

BY MR. BEHA:

Q.    That 160, paragraph 160 of your complaint -- of your report on page 48; do you see that?

A.    Yes.

Q.    This is the process, I think, that we

130

BY MR. BEHA:

Q.    Did members of your team do a regression analysis in order to prepare material to quantify damages for mediation?

MR. MANDEL:  Object to the form, and also just to the extent that you're asking about confidential mediation discussions and such.

MR. BEHA:  We can mark the transcript confidential.

MR. MANDEL:  Oh, I mean, we would be marking the transcript confidential anyway.

A.    I don't know.  I mean, because of the sensitivity, care was taken to keep me ignorant about what they were doing and what they had done.  Because we understood that I should not know what they were finding.

BY MR. BEHA:

Q.    Have you done -- I know that you've done formal expert reports on questions of damages.  Have you conducted damages analyses for purposes of mediation?

MR. MANDEL:  Object to form.

A.    Rarely.  That's Dan Bettencourt's purview.

BY MR. BEHA:

131

Q.    Okay.  Does he work -- do others at your firm work supporting him on that?

A.    Yes.

Q.    When you discussed with your team which dates would be appropriate candidates to be event dates, did you discuss that with Dan Bettencourt?

A.    I don't recall that I did.

Q.    Did anyone on the team -- did you discuss this question with anybody who had access to or involvement in the work that was done in connection with the mediation?

A.    Yes.

Q.    So if there was a regression analysis done, there were people who were involved in the process of choosing the event date who knew the result?

MR. MANDEL:  Object to the form.

A.    I wouldn't know what they knew or didn't know.  And we understood that there's this issue -- we anticipated your questions, you know, that are happening here in this deposition.  We anticipated them months ago.  And we have a firewall that -- you know, that mediation work is separate from the expert testimony work.

BY MR. BEHA:

132

Q.    But there were people that were involved in your work who were involved in that work.  How is that a firewall?

MR. MANDEL:  Object to form.

A.    They don't share with me their findings.

BY MR. BEHA:

Q.    But they share with you their views about what is appropriate as an event date, and it is informed by the knowledge that they have.

MR. MANDEL:  Object to the form, assumes facts, misstates testimony.

A.    I can't speak -- I -- you know, everyone understands the rules and I can't speak to whether they violated them.  But, you know, what I would -- the opinions that I was expressing are -- the issues that I was articulating during these discussions was that the one thing that might have made more events good events was being -- is what the case was -- is what the alleged misrepresentations and omissions were refuting or undermining or countervailing throughout the entire class period.

And, therefore, I should look for an unconfounded disclosure about whether or not the deal would be closed by the deadline, and there was only one such date.