UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ X
                                                             :
                                                             :          22 Civ. 4838 (LGS)
                                                             :
In re Waste Management Securities Litigation                 :        OPINION AND ORDER
                                                             :
                                                             :
------------------------------------------------------------ X
```

LORNA G. SCHOFIELD, District Judge:

Lead Plaintiffs the Seafarers Funds ("Plaintiffs") are holders of certain notes issued by Defendant Waste Management, Inc. ("WM"). Plaintiffs, on behalf of themselves and a putative class, assert that WM and the individual Defendants, who were officers of WM, made misrepresentations and omissions about whether a proposed acquisition would be completed before the date that would trigger mandatory redemption of the notes at a price just above par value. Plaintiffs move to certify a class of noteholders under Rule 23(b)(3) and seek appointment of class counsel pursuant to Rule 23(g). Fed. R. Civ. P. 23(b)(3), 23(g). Defendants oppose, move to exclude the opinions of Plaintiffs' expert and present their own expert. For the following reasons, Plaintiffs' motions to certify the class and appoint class counsel are granted. Defendants' motion to exclude Plaintiffs' expert is denied.

## I.    BACKGROUND

Familiarity with the underlying facts and procedural history is assumed. *See United Indus. Workers Pension Plan v. Waste Mgmt., Inc.*, No. 22 Civ. 4838, 2022 WL 17342492 (S.D.N.Y. Nov. 30, 2022) (appointing lead plaintiff); *United Indus. Workers Pension Plan v. Waste Mgmt., Inc.*, No. 22 Civ. 4838, 2024 WL 1312593 (S.D.N.Y. Mar. 27, 2024) (denying motion to dismiss except as to one defendant). The following facts are undisputed and taken from the Amended Complaint and the parties' submissions on the motions.

In May 2019, WM issued five series of senior notes to fund its acquisition (the "Acquisition") of Advanced Disposal Services, Inc. Four of the series, with a coupon rate of 2.95% ("2.95% Notes"), 3.20% ("3.20% Notes"), 3.45% ("3.45% Notes") and 4.00% ("4.00% Notes") respectively (collectively, the "Notes"), contain a special mandatory redemption provision. The provision requires that, if WM does not complete the Acquisition by July 14, 2020 (the "End Date"), WM must redeem the Notes at 101% of their par value.

WM made a series of public statements during the putative class period, which begins February 13, 2020, and ends June 23, 2020 (the "Class Period"), anticipating that WM would complete the Acquisition before the End Date. On June 24, 2020, WM disclosed that it would not meet the End Date and, pursuant to the mandatory redemption provision, would redeem the Notes at 101% of par, a price lower than the market price at the time. On July 20, 2020, WM redeemed the Notes.

In support of their class certification motion, Plaintiffs submitted the expert report of Steven P. Feinstein (the "Feinstein Report"), which analyzes the efficiency of the market for the Notes and proposes a damages model. In opposition, Defendants submitted an expert report by Lucy P. Allen (the "Allen Report"). Each expert submitted a rebuttal report. Defendants move to exclude Feinstein's opinions and testimony under Federal Rule of Evidence 702.

## II.    DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT

Defendants challenge the admissibility of Plaintiffs' expert's opinions under Federal Rule of Evidence 702 on the ground that they are biased, unscientific and unreliable. District courts play a "'gatekeeping' function" under Rule 702 and "are charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 122-23 (2d Cir.

2020) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  A Rule 702 inquiry focuses on three issues: (1) whether a witness is qualified as an expert, (2) whether the witness's "opinion is based upon reliable data and methodology" and (3) whether "the expert's testimony (as to a particular matter) will assist the trier of fact."  *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005);[1] *accord Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 19 Civ. 7998, 2024 WL 4476088, at *6 (S.D.N.Y. Oct. 11, 2024).  The party proffering the expert bears the burden of establishing Rule 702's requirements by a preponderance of the evidence.  *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020).

*Daubert* and Rule 702's concepts of "gatekeeping" and admissibility are ill-suited for a class certification motion, which is determined by courts.  There is no admission or exclusion of testimony before a jury and no "gate" requiring threshold reliability determinations.  In substance, every objection goes to the weight of the testimony.  "The Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage[,]" but has "offered limited dicta suggesting that a *Daubert* analysis may be required at least in some circumstances."  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013); *accord Set Cap. LLC v. Credit Suisse Grp. AG*, No. 18 Civ. 2268, 2023 WL 2535175, at *3 (S.D.N.Y. Mar. 16, 2023).

Defendants' motion to exclude Feinstein's testimony is denied.  As discussed in detail below, Feinstein's analysis and opinions are inconclusive on the issue of market efficiency and helpful on the issues of price impact and damages.  Ultimately, Defendants' challenges to Feinstein's opinions go to their weight, not admissibility.  His report references legal tests and

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

evidence accepted by courts to provide context for his analysis. These references are not improper legal opinion because they provide "helpful information beyond a simple statement on how [the fact finder's] verdict should read." *Fiataruolo v. United States*, 8 F.3d 930, 942 (2d Cir. 1993) (distinguishing useful context from "simple bald assertion[s] of the law" and statements "designed to invade the province of the trial court"); *accord In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 32 (S.D.N.Y. 2020), *aff'd*, No. 21-643, 2023 WL 7180648 (2d Cir. Nov. 1, 2023) (summary order). Feinstein's opinions are not excluded and are considered to the extent they are helpful, as discussed below.

## III. CLASS CERTIFICATION

Plaintiffs' motion to certify the class is granted in part under Rule 23(b)(3) with the clarification set forth below. Plaintiffs have established that all of the prerequisites in Rule 23(a) and Rule 23(b)(3) are met and that the proposed class is ascertainable.

### A. Rule 23 Requirements

Federal Rule of Civil Procedure 23(a) states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Where, as here, class certification is sought pursuant to Rule 23(b)(3), a plaintiff also must show (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," (the "predominance requirement") and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the "superiority requirement"). Fed. R. Civ. P. 23(b)(3). The Second Circuit "has also recognized an implied requirement of ascertainability in Rule 23, which demands that a class be sufficiently

definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobras Sec.*, 862 F.3d 250, 260, 267-70 (2d Cir. 2017) ("*Petrobras II*").

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met." *Elisa W. v. City of New York*, 82 F.4th 115, 127 (2d Cir. 2023). Although "a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," courts may consider merits questions only to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013); *accord Belendez-Desha v. JAF Commc'ns, Inc.*, No. 24 Civ. 741, 2024 WL 5155748, at *2 (S.D.N.Y. Dec. 18, 2024).

### B.    Class Certification Analysis

Defendants do not dispute that Plaintiffs have met their burden of showing that Rule 23(a) requirements of numerosity, commonality, typicality and adequacy, as well as the Rule 23(b)(3) requirement of superiority, and the implied requirement of ascertainability, are satisfied. At least 121 financial institutions held one or more of the Notes during the Class Period; the issues of misrepresentation, materiality, scienter and causation are common to all putative class members; Plaintiffs assert typical claims and have no conflict of interest; and the class is defined by objective criteria that are administratively feasible to apply.

Defendants dispute only the predominance requirement of Rule 23(b)(3). "Th[is] requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if

these particular issues are more substantial than the issues subject only to individualized proof." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020). "Rule 23(b)(3) does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to class-wide proof. What the rule does require is that common questions predominate over any questions affecting only individual class members." *Petrobras II*, 862 F.3d at 268.

Defendants argue that, instead of the common issues referenced above -- misrepresentation, materiality, scienter and causation -- three individualized questions predominate: (1) whether each class member relied on the alleged misrepresentations or omissions, (2) the amount of damages that each class member sustained and (3) whether each class member purchased the Notes in a domestic transaction. These arguments are unpersuasive.

### 1.    Reliance

To pursue a claim under Section 10(b) and Rule 10b-5, "a private plaintiff must prove . . . the plaintiff's reliance on [the defendant's material] misrepresentation or omission." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021) ("*Goldman I*"). The element of reliance does not defeat predominance in this case because an individual inquiry as to each investor is unnecessary. As explained below, because Plaintiffs have shown that the market for the Notes is efficient, all class members are presumed to have relied on public information affecting the price of the Notes during the Class Period. Defendants did not prove a lack of price impact and thus have failed to rebut that presumption of class-wide reliance.

### a.    Invoking the *Basic* Presumption

In lieu of showing reliance for each class member, a plaintiff can show class-wide reliance by invoking a rebuttable presumption, approved by the Supreme Court in *Basic Inc. v.*

*Levinson*, 485 U.S. 224 (1988), "based on the fraud-on-the-market theory." *Goldman I*, 594 U.S. at 118. Under this theory, if a security trades in an efficient market, its price will incorporate "all public, material information -- including material misrepresentations." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80 (2d Cir. 2023) ("*Goldman II*"). Because "investors rely on the integrity of the market price when they choose to buy or sell that stock," they also indirectly rely on the misrepresentations incorporated in the price. *Id.* "The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case" -- where the purchasers rely on the stock price -- "is no less significant than in a case of direct reliance on misrepresentations." *Basic*, 485 U.S. at 242. A plaintiff can invoke the *Basic* presumption at the class certification stage if the plaintiff can show by a preponderance of the evidence (1) that a defendant made a public misrepresentation, (2) that the security traded in an efficient market and (3) the class members traded during the relevant period "between the time the misrepresentation was made and when the truth was revealed." *See Goldman I*, 594 U.S. at 118-19 (noting that the plaintiff needs not show that the misrepresentation is material at class certification).

If a plaintiff successfully invokes the *Basic* assumption, a defendant may rebut it "at class certification by showing that an alleged misrepresentation did not actually affect the market price of the stock." *Id.* at 119. "The defendant[] bears the burden of persuasion to prove a lack of price impact." *Id.* at 126. Where, as here, the plaintiff alleges that the defendant concealed negative news from the market and kept the price artificially inflated -- a theory known as "inflation maintenance" -- the defendant must establish by a preponderance of the evidence that the disclosure of the truth did not cause a price drop. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258-60 (2d Cir. 2016); *Goldman II*, 77 F.4th at 80 (observing that the so-called back-end price drop operates as an indirect proxy for the front-end inflation in cases where the earlier,

price-propping misrepresentation "is precisely negated, or rendered false, by the later [truth-revealing] news"). "In assessing price impact at class certification, courts should be open to *all* probative evidence on that question -- qualitative as well as quantitative -- aided by a good dose of common sense." *Goldman I*, 594 U.S. at 122.

Defendants do not dispute two of the three prerequisites to invoke the presumption of reliance -- that Defendants' alleged misrepresentations were public and that class members traded the Notes during the relevant period. Defendants challenge only the remaining prerequisite, asserting that Plaintiffs have not shown an efficient market for the Notes during the Class Period.

### i.      Common Factors of Market Efficiency

"An efficient market is one in which the prices of the stock [or bonds] incorporate most public information rapidly." *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017). The Second Circuit "has not adopted a test for the market efficiency of stocks or bonds." *Petrobras II*, 862 F.3d at 276. But courts in this Circuit have "routinely applied" the so-called *Cammer* and *Krogman* factors to determine market efficiency. *Id.* (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001)).[2]

One of these factors provides direct evidence of market efficiency -- empirical evidence of a cause-and-effect relationship between unexpected news and immediate response in price. *Cammer*, 711 F. Supp. at 1286-87. To establish this direct factor, a plaintiff's expert typically

---

[2] The *Cammer* factors are: (1) average weekly trading volume, (2) analyst coverage, (3) number of market makers, (4) SEC Form S-3 filing eligibility and (5) empirical evidence of cause-and-effect relationship between unexpected news and immediate response in price. 711 F. Supp. at 1286-87. The *Krogman* factors are: (1) market capitalization, (2) bid-ask spread and (3) float, which is the number of shares available for trading by outside investors in the open market. 202 F.R.D. at 474.

conducts an event study, which shows through a regression analysis that the security's price "tends to respond to pertinent publicly reported events." *Waggoner*, 875 F.3d at 94. Such direct evidence "may be more critical" when the indirect factors of market efficiency "are less compelling." *Id.* at 98. On the other hand, "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence . . . ." *Id.* at 97. Where direct evidence is not entirely dispositive, "[i]ndirect evidence is particularly valuable . . . ." *Petrobras II*, 862 F.3d at 278.

In contrast to empirical evidence, the remaining *Cammer* and *Krogman* factors examine indirect indicia of market efficiency. *See Waggoner*, 875 F.3d at 94. Several of these indirect factors focus on the liquidity of the market for the security at issue -- higher trading volume, float (or the number of shares available for trading) and par value of bonds. More trading implies that the market price processes and reflects information more quickly. *See Cammer*, 711 F. Supp. at 1286 (noting that high trading volume implies "a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information"). Conversely, less frequent trading means slower incorporation of new information into the market. Other indirect indicia of market efficiency -- analyst coverage and market makers -- reflect investor attention and bear on the amount and speed of public information reaching the market. *See id.* at 1286-87 (noting that analyst coverage implies close review of company information by investment professionals and market making facilitates swift reaction to company news).

### ii.    Market Efficiency Factors as Applied to Bonds

The *Cammer* and *Krogman* factors were developed to assess the market efficiency of equity securities. *See Cammer*, 711 F. Supp. 1282-83; *Krogman*, 202 F.R.D. at 474. Courts have, and the parties do not dispute that they should, modify these factors when applying them to debt securities, such as the Notes in this case, and assessing their market efficiency. The market

for debt securities differs from that for equity securities in two important ways. First, bond markets are generally considered less liquid than stock markets, in part because most bonds are traded over the counter rather than on "a central stock exchange with a board posting prices," resulting in less price transparency, higher transaction costs and lower trading volumes. *See In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 760, 766-67 (S.D. Tex. 2006). Second, bonds are priced differently from stocks because of the fundamental difference between debt and equity. The parties' experts generally appear to agree that the valuation of bonds is a function of (1) their terms, such as coupon rate and maturity date; (2) the market interest rate; (3) the company's ability to pay and (4) any special features, such as the mandatory redemption provision here. The valuation of common stock, on the other hand, is often calculated by "the present value of all future monetary benefits," which relies intimately on the current and future business and financial performance of the company. *United States v. Guo*, No. 23 Crim. 118, 2024 WL 3104538, at *2 (S.D.N.Y. June 24, 2024) (noting that this method "is widely accepted in business literature and caselaw"). The price of bonds is thus usually less sensitive to fluctuations in a company's business performance and financial health than that of stocks. *In re Teva Sec. Litig.*, No. 3:17 Civ. 558, 2021 WL 872156, at *18 (D. Conn. Mar. 9, 2021) ("[T]he prices of debt securities are less likely to be affected by news that does not have as large of an impact on [the company]."). These differences between stocks and bonds do not mean that the presumption of reliance is unavailable in a bond market. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 210 (2d Cir. 2008) (noting that a refusal to apply the relevant *Cammer* factors to bond markets due to its different nature "is throwing out oranges because they are not apples"). "*Basic*'s presumption of reliance thus does not rest on a 'binary' view of market efficiency [and instead] is a matter of degree . . . ." *Halliburton Co. v. Erica P. John*

*Fund, Inc.*, 573 U.S. 258, 272 (2014).  Numerous courts have found market efficiency when the securities at issue were bonds.  *See, e.g.*, *In re Vale S.A. Sec. Litig.*, No. 19 Civ. 526, 2022 WL 122593, at *16 (E.D.N.Y. Jan. 11, 2022) ("*Vale II*"), *report and recommendation adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) ("*Vale III*"); *Teva*, 2021 WL 872156, at *36; *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 371 (S.D.N.Y. 2016) ("*Petrobras I*"), *aff'd in relevant part, vacated in part sub nom. Petrobras II*, 862 F.3d 250.

As the Court in *Cammer* said, "[t]he issue here is whether . . . the market for [the relevant security], provided a sufficiently fluid and informed trading environment so that when material information about [that security] was disseminated, investors had available to them an opportunity to trade at informed, and therefore appropriate, bid and asked prices."  711 F. Supp. at 1282-83.  Here, the question is whether the market for the Notes was sufficiently efficient that information pertinent to the Notes was reflected in their prices during the Class Period.  As discussed below, Plaintiffs have shown that it is more likely than not (i.e., by a preponderance of the evidence) that the answer is yes.

### iii.    Assessing the Indirect Evidence of Market Efficiency

The indirect factors support a finding of market efficiency.  As noted above, "[a]n efficient market is one in which the prices of the stock [or bonds] incorporate most public information rapidly."  *Waggoner*, 875 F.3d at 94.  Some of the indirect evidence focuses on the liquidity of the market for the security at issue -- higher trading volume, higher trading frequency, the bid-ask spread, float (or the number of Notes available for trading) and the par value of the Notes.  More liquidity implies market efficiency.  *See Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 (S.D.N.Y. 2013); *In re Vale S.A. Sec. Litig.*, No. 15 Civ. 9539, 2019 WL 11032303, at *14 (S.D.N.Y. Sept. 27, 2019) ("*Vale I*").

### 1)      Liquidity of the Notes as Evidence of Market Efficiency

*Average Weekly Trading Volume*.  The average weekly trading volume of the securities during the proposed class period is a factor proposed in *Cammer*.  711 F. Supp. at 1286.  This factor strongly suggests that the market for the Notes was efficient.  "A large weekly volume of trades suggests an efficient market because it implies significant investor interest in the company, which implies, in turn, that many investors are executing trades on the basis of newly available or disseminated corporation information."  *Martínek v. AmTrust Fin. Servs., Inc.*, No. 19 Civ. 8030, 2022 WL 326320, at *10 (S.D.N.Y. Feb. 3, 2022).

The Notes had a comparatively high weekly trading volume.  Even for equities, which trade more frequently than bonds, an average weekly trading turnover of 2% or more "justif[ies] a strong presumption" of market efficiency, and a turnover of 1% or more "justif[ies] a substantial presumption."  *Cammer*, 711 F. Supp. at 1293.  Throughout the Class Period, the 2.95% Notes, 3.20% Notes, 3.45% Notes and 4.00% Notes had an average weekly turnover of 7.93%, 6.30%, 4.83% and 4.86%, respectively.  These numbers comfortably exceed both *Cammer* thresholds.  *See Petrobras I*, 312 F.R.D. at 366-67 (finding that bonds with trading volumes of over 1% favors efficiency because bonds usually trade less frequently than stocks).

Defendants do not dispute these percentages but argue that the Notes had a lower trading volume during the first half of the eighteen-week Class Period, suggesting an inefficient market during that time.  However, even during this two-month period, the Notes had a trading volume over 1% in most weeks, and the 4.00% Notes, the least-traded series, exceeded the 1% threshold for 44% of the weeks.  Defendants' argument might be more persuasive if applied to a longer class period and accompanied by other evidence suggesting that splitting the Class Period is

appropriate.  But given the trading volume as a whole over this period, this factor strongly favors finding market efficiency.

Both cases cited by Defendants are distinguishable because, in each case, an exceptional circumstance or event caused a spike in trading and skewed the average weekly trading volume. In *In re Global Brokerage, Inc.,* the average trading volume was less than 1% in 90 weeks or about 65% of the class period and the average over the class period was "skewed" upward by a spike in trading activity occasioned by "isolated outlier events."  *In re Glob. Brokerage, Inc. f/k/a FXCM Inc. Sec. Litig.*, *f/k/a FXCM Inc. Sec. Litig.*, No. 17 Civ. 916, 2021 WL 1160056 at *9 n.13, *13 (S.D.N.Y. Mar. 18, 2021), *report and recommendation adopted*, No. 17 Civ. 916, 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021).  In *Winstar*, the bonds were first issued to, and could only be traded by, qualified institutional investors with over $100 million in fixed-income investments, and only later became publicly registered, leading to a spike in trading volume.  *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 442 (S.D.N.Y. 2013).  Defendants point to no similar unique circumstances that make the Notes' weekly average trading volume an unreliable metric of market efficiency.

*Trading Frequency*.  Trading frequency is a factor discussed in *Cammer* and *Enron* and applied in *Petrobras I.  Cammer*, 711 F. Supp. at 1276 n.17 (defining a "developed market" as one with " a relatively high level of activity and frequency"); *Enron*, 529 F. Supp. 2d at 760 (noting "the relative infrequency of bond trades compared with the frequency of stock trades"); *Petrobras I*, 312 F.R.D. at 366 (addressing trading frequency alongside trading volume).  As *Petrobras I* noted, "relatively few corporate bonds trade more frequently than 200 days in a year."  312 F.R.D. at 367.  Here, "the average number of days between successive trades in the Notes ranged from" 0.04 days to 0.32 days, placing the Notes among the first decile of bond

trade frequency.  *See id.* at 366-67 (finding a range of 0.02 to 0.418 days between successive trades suggesting frequent trading in support of efficiency).

Defendants argue that the 4.00% Notes did not trade on 40% of the days in the first half of the Class Period.  In his rebuttal, Feinstein explained that studies show that "the typical corporate bond trades on less than 50% of trading days."  The trading frequency of the least traded 4.00% Notes -- trading on 60% of the trading days in the first half of the Class Period and on 78% of the trading days during the entire Class Period -- surpasses the average for corporate bonds and favors a finding of market efficiency.

*Par Value*.  The Notes' par value weighs in favor of finding market efficiency.  A large par value of debt securities is viewed as evidence of an efficient market, comparable to a company's market capitalization as evidence of an efficient market for the company's stock.  *See Vale II*, 2022 WL 122593, at *15 (finding that notes' par value of $12.05 billion weighed in favor of market efficiency); *Winstar*, 290 F.R.D. at 449 (finding that where the "total par value of all three Winstar bonds was $1.88 billion," "[t]he sufficiently large issue size [was] consistent with a more liquid and efficient market").

The Notes had a par value of $3.0 billion in total.  A company with a similar market capitalization would place in the top 20% of all public companies listed on the major exchanges.  *See Enron*, 529 F. Supp. 2d at 756-57, 768 (finding expert made a prima facie showing of market efficiency, relying in part on the nineteen bonds' market value of over $3 billion in total and subsequently twenty-two bonds' market value of $5.9 billion in total, as an indicator of efficiency).  The smallest series, the 4.00% Notes, had a market value of over $500 million (the par value), which is still higher than the market capitalization of half of all public companies

listed on the major exchanges.  *See id.* (noting the market values of each series that ranged from $27.6 million to $636.5 million).

*Float.*  The float, meaning the amount of a security not held by insiders, is also a factor proposed in *Krogman*.  202 F.R.D. at 474.  High float is consistent with market efficiency "[b]ecause insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security."  *Enron*, 529 F. Supp. 2d at 757.  Plaintiffs assert, and Defendants do not dispute, that the Notes' public float is likely close to their total par value because WM's filings do not indicate *any* insider ownership.  This factor weighs heavily in support of a finding of market efficiency.  *See Petrobras I*, 312 F.R.D. at 365-66 (finding market efficiency, relying in part on float equivalent to the total par value).

*Bid-Ask Spread*.  The bid-ask spread, a factor proposed in *Krogman*, is the difference between the price a buyer is willing to pay and the price a current holder is willing to sell. *Krogman*, 202 F.R.D. at 478.  This factor is inconclusive in finding market efficiency.

In the equity context, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."  *Id.*  Courts have rarely analyzed this factor for bonds because bid-ask spreads "are typically unknown or unreported with regard to corporate bond markets."  *Glob. Brokerage*, 2021 WL 1160056, at *18.  As a workaround, Feinstein calculated the bid-ask spread using Bloomberg and LSEG Workspace's "estimated daily closing bid and ask quotes."  These estimates are inconclusive because the lack of reported data makes the estimates difficult to verify.  *Cf. In re Dynex Cap., Inc. Sec. Litig.*, No. 05 Civ. 1897, 2011 WL 781215, at *5-6 (S.D.N.Y. Mar. 7, 2011) (crediting Bloomberg's simulated

"matrix prices" because they can be verified against actual, reported transaction prices to see whether they "generally moved in the same direction").

*S-3 Eligibility*.  Whether the issuer is eligible to use SEC Form S-3 when issuing new securities is a factor proposed in *Cammer*.  711 F. Supp. at 1284.  This factor weighs slightly in favor of finding market efficiency.  The SEC permits a company to file Form S-3, a short-form registration statement, to issue securities with no amount cap if "the aggregate market value of . . . common equity held by non-affiliates . . . is $75 million or more."  17 C.F.R. § 239.13(b)(1) (2025).  This simplified procedure reflects "the SEC's belief that the market operates efficiently for these companies, i.e., that the disclosure . . . and other communications by the [company] . . . has already been disseminated and accounted for by the market place."  *Teva*, 2021 WL 872156, at *8.  The parties do not dispute that WM is eligible to file Form S-3.  During the Class Period, WM had a market capitalization of over $30 billion, far exceeding the threshold for eligibility.  This factor, however, carries less weight as to the Notes because the information bears less on the price of the Notes than it does for stock.

### 2)    Information Conveyors as Evidence of Market Efficiency

As noted above, the factors of analyst coverage and market makers reflect investor attention and bear on the amount and speed of public information reaching the market.  An efficient market requires "a sufficiently fluid and informed trading environment so that when material information [is disseminated,] investors . . . trade at informed, and therefore appropriate, bid and asked prices."  *Cammer*, 711 F. Supp. at 1282-83.

*Analyst Coverage*.  The number of analysts following a company and reporting on it is a factor proposed in *Cammer*.  711 F. Supp. at 1286.  This factor weighs in favor of finding an efficient market due to the substantial analyst coverage of the Acquisition's progress, which was

relevant to the pricing of the Notes.  In the equity context, "a significant number of securities analysts follow[ing] and report[ing] on a company's stock . . . would imply [that] the [company's] reports," such as financial statements and public announcements, "were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."  *Id.*  Through this process, the stock price "would be bid up or down to reflect the financial information contained in the [company's] reports, as interpreted by the securities analysts."  *Id.*  Not all company information, however, bears on the bond price.  During the Class Period, WM was financially healthy.  Except for information about the Acquisition's progress, which was directly relevant to the Notes' value, information about WM's business affairs and short-term financial results was largely irrelevant.  *See Teva*, 2021 WL 872156, at *18 ("[T]he prices of debt securities are less likely to be affected by news that does not have as large of an impact on [the company].");  *Winstar*, 290 F.R.D at 446 (treating "analysts following the company as a whole" as "instructive" for evaluating bond efficiency).

WM's substantial analyst coverage of the Acquisition progress favors a finding of market efficiency.  Plaintiffs argue, and Defendants do not dispute, that thirteen analyst firms published a total of fifty-six reports on WM during the Class Period that mentioned the Acquisition or discussed the Notes.  Four of the reports expressly referenced the Acquisition in their titles.  One analyst also specifically asked about the Acquisition's closing timeline at WM's conference call following a 10-Q filing during the Class Period.

<u>*Market Makers*</u>.  Market makers are a factor proposed in *Cammer*.  711 F. Supp. at 1286-87.  The limited record on market making for the Notes neither supports nor undercuts a finding of market efficiency.  Plaintiffs assert, but do not provide direct evidence, that the twenty underwriters of the Notes, including prominent investment banks, likely continued making a

market in the Notes. *Cf. Winstar*, 290 F.R.D. at 447 (relying on evidence of "six large, reputable banks that served as market makers"); *Dynex*, 2011 WL 781215, at *5 (S.D.N.Y. Mar. 7, 2011) (same). The other evidence Plaintiffs proffer is also inconclusive. Published analyst reports of three investment banks state that they made a market in WM securities but did not specify that they did so for the Notes. While 121 broker-dealers traded in the Notes during the Class Period, the data do not specify which firms were acting as market makers and which were trading for their own accounts. These observations support the inference that the Notes have some number of market makers, but do not establish how many or who. *See Glob. Brokerage*, 2021 WL 1160056, at *15 (declining to assume the underwriters served as market makers and the dealers did more than facilitating trades without identifiable market makers). While "there need only be some market makers that existed to satisfy this factor," *Winstar*, 290 F.R.D. at 447, the record is too lean to ascribe any weight to this factor.

### iv.       Assessing the Direct Evidence of Market Efficiency

One factor, proposed in *Cammer*, evaluates direct evidence of market efficiency -- i.e., "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." 711 F. Supp. at 1287. This factor is inconclusive because the circumstances of this case make event studies, despite being the "standard operating procedure in federal securities litigation," less informative. *Vivendi*, 838 F.3d at 253.

To satisfy this factor, a plaintiff usually introduces an expert's "event study," which is a "regression analys[i]s that seek[s] to show that the market price of the defendant's [security] tends to respond to pertinent publicly reported events." *Waggoner*, 875 F.3d at 94. The analysis proceeds in three steps. First, the expert "isolates the [security] price movement attributable to a

company []as opposed to market-wide or industry-wide movements[.]" *Goldman II*, 77 F. 4th at 86 n.5.  If the difference between these two, called residual return, "is outside the range of typical random [security] price fluctuations observed for that [security]," this suggests that the security responded to company news that day.  *Id.*  Second, the expert identifies the days on which "pertinent" events became public (the "news days") and predicts the direction in which the security price would move if the market is efficient.  *Waggoner*, 875 F.3d at 94.  This step is necessarily subjective because the expert must exercise judgment to identify events that are pertinent and what effects they have, but the expert cannot cherry pick days with significant movements.  *See Petrobras I*, 312 F.R.D. at 368 ("There is always some subjectivity in analyses of this nature . . . .").  The third step can proceed in either of two ways.  The expert can assess whether on news days, the residual return moved in the expected direction in a statistically significant manner.  Alternatively, the expert can compare the price movements on news days with those on days when no such pertinent news was released (the "non-news days") to determine if the former are statistically significant.  The latter approach is more probative because it eliminates the possibility that the security price is volatile on non-news days as well, which would signal market inefficiency.  *See generally Teva*, 2021 WL 872156, at *21 (comparing the two approaches to conducting event studies and noting criticisms of the former approach).

The Feinstein Report submitted by Plaintiffs contains one event study.  It identifies as the only news day June 24, 2020, when Defendants announced that the Acquisition would not close by the End Date and WM would redeem the Notes at 101% of par.  The Feinstein Report predicts that this pertinent event would lead to a price decline and concludes at a 99.9% confidence level that the Notes experienced immediate and statistically significant price declines

because of the Acquisition news; i.e., Feinstein concludes that the likelihood of the returns being

caused solely by random volatility is less than 0.1%.[3]

This event study is helpful in suggesting a cause and effect relationship between the

corrective disclosure and drop in the Notes' price but has limited probative value in proving

market efficiency for several reasons.  First, the event study analyzes only June 24, 2020.  While

this sole selection is justifiable considering the Notes' insensitivity to less significant events and

the short duration of the eighteen-week Class Period, the "small sample size[] may limit

statistical power."  *Petrobras II*, 862 F.3d at 278-79.  Second, June 24, 2020, is the day of the

alleged corrective disclosure and therefore falls immediately after, not during, the Class Period,

which ends June 23, 2020.  Third, the event study evaluates only the movement on a news day

and does not compare it with movement on non-news days.  Fourth, as Defendants' expert

pointed out, Feinstein's calculation of residual returns contains a mismatch.  To determine the

actual price changes on June 24, 2020, and conduct the regression analysis to generate explained

returns, Feinstein used value weighted average prices ("VWAPs"), which are calculated by

assigning the price of each trade that occurred that day a weight corresponding to the size of the

trade and averaging the weighted prices, for the Notes.  The indices Feinstein used to run the

regression analysis, however, are based on closing prices of the securities included in the indices.

While using VWAPs for the Notes makes sense considering their benefit of ameliorating

---

[3] The Feinstein Report also states that, absent release of information pertinent to the Notes, the
price movement of the Notes tracks changes in market interest rates.  This observation generally
supports market efficiency.  The market interest rate and the difference between it and a bond's
coupon rate are key to a bond's valuation.  The price sensitivity of the Notes to the market
interest rate suggests that the Notes holders were attentive and reacted rationally to market
information.  However, this analysis does not conclusively establish market efficiency as relevant
here because it does not focus on the Notes' price reactions to company-specific news like
"unexpected corporate events or financial releases."  *Cammer*, 711 F. Supp. at 1287.

"excessive noise on days when the last trade is small," this mismatch with the prices used in the indices diminishes the study's probative value.

Defendants offer their own event study in the Allen Report. The Allen Report also calculates residual returns but uses closing prices. It identifies twenty-two days with news regarding the Acquisition and, in the alternative, fifty-six days with news regarding the Acquisition, WM and Advanced Disposal Services, Inc. The Allen report then compares the price movement between news days and non-news days and concludes that the difference between the two is not statistically significant.

The primary problem with Defendants' event study is its overly expansive selection of news days. This factor from *Cammer* assesses price movement in response to only "pertinent" events. *Waggoner*, 875 F.3d at 94. Because the price of the Notes responds to only some of WM's public information, events not expected to shift the market one way or another are not pertinent to the efficiency of the market in which the Notes are traded. These events may include financial data that do not affect WM's ability to meet its payment obligations on the Notes or mixed messages that the market may perceive and react to in varied ways. The Allen Report itself identifies only five days out of the twenty-two or fifty-six news days on which WM made public representations about the Acquisition's progress, and Plaintiffs correctly observe that those representations were mixed. Because the news released on a majority, if not all, of the news days Allen selected is not suitable for this event study, the lack of price movement on the purported news days does not disprove market efficiency. Overall, the direct evidence factor is inconclusive.

v.        **Weighing the Evidence of Market Efficiency**

The indirect indicia of market efficiency demonstrate by a preponderance of the evidence that the Notes traded in an efficient market.  *See, e.g.*, *Waggoner*, 875 F.3d at 91, 97-98 (affirming district court's finding of market efficiency solely "based on the showing . . . on all the indirect factors"); *Vale II*, 2022 WL 122593, at *16 (finding the Notes traded in an efficient market based on the indirect indicia despite "no direct evidence").  "An efficient market is one in which the prices of the stock [or bonds] incorporate most public information rapidly." *Waggoner*, 875 F.3d at 94.  The indirect factors show that the market for the Notes was both liquid and informed.  The Notes' significant trading volume, high trading frequency, large par value and high public float are strong evidence of a liquid market -- one that processes and reflects information quickly.  The substantial analyst coverage shows that public material information, such as news of the Acquisition, would rapidly reach the market for the Notes.  Together this evidence strongly supports a finding of an efficient market.

The other factors, which are neutral or inconclusive, do not detract from this finding.  WM's eligibility to file Form S-3 weighs slightly in favor.  The bid ask spread and market maker factors are neutral because of the lack of available evidence.  No indirect factor suggests that the market for the Notes was inefficient.  The lack of empirical evidence of price impact is inconclusive primarily because of the short class period, resulting in an insufficient number of days with news events to measure.  Weighing all of the factors qualitatively, Plaintiff is entitled to the presumption that the price of the Notes during the Class Period incorporated "all public, material information -- including material misrepresentations."  *Goldman II*, 77 F.4th at 80.

Plaintiffs thus have made a prima facie showing of market efficiency.  The parties do not dispute that Plaintiffs have satisfied the other two requirements to invoke the *Basic* presumption

of reliance -- that Defendants' alleged misrepresentation was public, and that the putative class members traded during the relevant period between the time when the misrepresentation or omission was made and when the truth was revealed.

### b.    Rebutting the Presumption of Reliance -- No Price Impact

#### i.    Applicable Law and Summary of Defendants' Arguments

At the class certification stage, if a plaintiff successfully invokes the presumption of reliance, the defendant has the ultimate burden of persuasion to "rebut the *Basic* presumption by disproving reliance by a preponderance of the evidence." *Waggoner*, 875 F.3d at 99. To do so, a defendant must "do more than merely produce evidence that might result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the stock's price by a preponderance of the evidence." *Id.* at 101.

Defendants argue that the alleged misstatements had no price impact because (1) there is no evidence that the alleged misstatements increased the price of the Notes; (2) the price decline on June 24, the date of the corrective disclosure, does not (as Plaintiffs assert) show that the price of the Notes had been inflated by the concealed information, because the misstatements were fully corrected on March 18, 2020; and (3) the 4.00% Notes did not experience a decline following the June 24 disclosure. These arguments are unavailing. The first argument is a strawman that ignores Plaintiffs' theory of liability that Defendants fraudulently maintained the price of the Notes at an inflated level during the Class Period, when they allegedly became aware but concealed that the Acquisition would not be accomplished by the End Date. Defendants' second argument does deal with Plaintiffs' theory but is unpersuasive as discussed below. The third argument is contradicted by Plaintiffs' evidence and does not carry Defendants' burden of persuasion.

### ii. Plaintiffs' Theory of Liability -- Price Maintenance

Plaintiffs allege a price maintenance theory, meaning that Defendants allegedly withheld negative news once they discovered it to keep the price of the Notes from dropping. *See Vivendi*, 838 F.3d at 257-59 (holding that a misstatement may be actionable based on either theory of "inflation maintenance" or "inflation introduction"). Defendants allegedly knew throughout the Class Period that the Acquisition likely would not be completed by the End Date, resulting in the mandatory redemption of the Notes. Defendants allegedly withheld this information from the public and kept the price of the Notes artificially high until June 24, 2020, when WM disclosed that it would redeem the Notes and their market price dropped. *See generally Goldman II*, 77 F.4th at 97-99 (summarizing inflation-maintenance jurisprudence in the Second Circuit).

Contrary to Defendants' characterization, the February 13, 2020, and March 18, 2020, disclosures about the Acquisition do not transform Plaintiffs' claims into one of "inflation introduction." *Vivendi*, 838 F.3d at 259. These disclosures, while adjusting the expected timeline for the Acquisition, affirmed the noteholders' fraudulently induced belief that the Acquisition would be completed by the End Date.

### iii. The Parties' Respective Expert Reports

To prove a lack of price impact in an inflation-maintenance case, the defendant must sever the causal link between the disclosure of the truth and the price drop. To do so, a defendant may conduct an event study to show that the residual return on the day of the corrective disclosure "falls [within] the range of typical random [security] price fluctuations." *Goldman II*, 86 n.5. If so, the stock price movement is not "statistically significant" and "cannot be attributed to company-specific information announced on the event date." *Id.*

Defendants do not put forward an event study for the June 24, 2020, disclosure but critique Plaintiffs' study that addresses price impact.  As discussed above, the Feinstein study concludes that, on June 24, 2020, the residual returns of all four Notes fell below "the range of typical random [security] price fluctuations" and this drop was 99.9% likely to have resulted from WM's disclosure.  *Id.*  While this event study has limited probative value as direct evidence of market efficiency, as discussed above, the analysis does support a finding of price impact.  The issues with the study -- the small sample size, the event date after the Class Period and the lack of comparison with non-news days -- do not pertain to evaluating whether the revelation on June 24, 2020, caused irregular price movement.

### iv.    The March 18, 2020, Statement

Defendants argue that March 18, 2020, instead of June 24, 2020, is the proper corrective disclosure date because WM disclosed the delay of the Acquisition on March 18, 2020, and that disclosure had no price impact.  This argument is unpersuasive because the March 18 disclosure conveyed at most a mixed message to the noteholders.  On March 18, 2020, WM filed its Form 8-K, stating that, "subject to obtaining regulatory approval . . . anticipated in the second quarter of 2020[], [WM] now anticipates closing the [Acquisition] mid to late second quarter 2020."  If this expectation were accurate, the Acquisition would be completed before the July End Date, and the Notes would not be subject to mandatory redemption.  While the fact of a delay is negative news, the reaffirming of completion before the End Date is positive.  The lack of significant price movement on that day thus does not establish a lack of price impact.

### v.    The 4.00% Notes

Defendants do not dispute that three of the four Notes had a statistically significant price drop on the corrective disclosure date, but argue that the 4.00% Notes did not for two reasons.

First, the 4.00% Notes closed at $110.70 on June 24, 2020, higher than the closing price of $110.42 on the prior day.  Second, while the 4.00% Notes had a VWAP[4] of $107.08 on June 24, 2020, lower than the VWAP of $110.53 on the prior day, VWAP is an improper metric to use because it "ignore[s] . . . small trades."  These arguments are unavailing because Defendants have not shown that the use of the closing price for comparison is necessarily superior to the use of the VWAP.  On June 24, 2020, the 4.00% Notes were traded fourteen times with a total volume of $635,000.  The closing price Defendants rely on comes from the last two trades of only $10,000 each -- their combined size representing only approximately 3% of the turnover that day.  In contrast, the two largest trades of $160,000 each -- accounting for approximately half of the turnover -- were executed at $106.31, a price significantly lower than either the prior day's closing price of $110.42, or its VWAP of $110.53.  Overall, while the VWAP tends to skew towards larger trades due to its weight calculation, closing prices are also prone to "excessive noise on days when the last trade is small," especially considering that bonds are traded less frequently than stocks.

Because Defendants failed to prove that the alleged misstatements had no price impact, Plaintiffs are entitled to rely on the class-wide presumption of reliance.

2.    **Damages**

Class members' damages are susceptible to class-wide calculations using the out-of-pocket methodology.  At the class certification stage, Plaintiffs need show only that their model "actually measure[s] damages that result from the class's asserted theory of injury," and need not be precise.  *Waggoner*, 875 F.3d at 106.  As discussed above, the Amended Complaint asserts an

---

[4] As discussed above, the VWAP is calculated by assigning the price of each trade that occurred that day a weight corresponding to the size of the trade and averaging the weighted prices.

inflation-maintenance claim.  Plaintiffs allege that if WM had made accurate and timely disclosure about the delay of the Acquisition beyond the End Date, the price of the Notes would not have been inflated throughout the Class Period.

Plaintiffs propose an "out-of-pocket damages methodology," which measures the difference between "the amount of the security price inflation at purchase" -- meaning the price paid by the Notes' purchaser minus the actual value of the Notes when bought -- and the amount of inflation either at sale, or, if not sold, at the end of the Class Period.  "This methodology has been endorsed repeatedly by courts in this Circuit."  *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, No. 18 Civ. 12084, 2024 WL 1497110, at *24 (S.D.N.Y. Apr. 5, 2024); *see, e.g.*, *Waggoner*, 875 F.3d at 106; *Vale II*, 2022 WL 122593, at *18.  This approach conforms to Plaintiffs' theory of injury that the Notes investors would have paid less had there been no misleading statements.  Defendants rely on only one in-circuit case, *Sicav v. James Jun Wang*, No. 12 Civ. 6682, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015), which is inapposite because the *Sicav* plaintiffs, unlike Plaintiffs here, could not pinpoint a price drop and sought to rely instead on a novel damages theory based on "mechanics by which shares of stock were priced . . . ." *Sicav*, 2015 WL 268855, at *1-2.

Defendants' argument that the measure of damages for individual investors may vary is unpersuasive.  Defendants' statements during the Class Period may have affected the amount of inflation in the price of the Notes, but a common methodology can be used to calculate the inflated amount for each Note and for each day during the Class Period.  This variation does not defeat class certification.  *See Waggoner*, 875 F.3d at 106 ("[E]ven accepting the [d]efendants' premises that inflation would have varied during the class period in this case and that such variation could not be accounted for, the [d]efendants' argument fails.").

### 3.    Domestic Transactions

Defendants argue that predominance is defeated by the necessity to inquire whether each class member engaged in a domestic traction.  "[A] putative class member only has a viable cause of action [under U.S. securities law] if the specific [securities] sued upon were purchased in a qualifying domestic transaction."  *Petrobras II*, 862 F.3d at 271.  While this requirement presents an individual question, it does not predominate over the common questions.

When examining predominance, courts assess (1) "the elements of the claims and defenses to be litigated," (2) whether the elements can be proved on a class-wide basis and (3) whether the common issues predominate over, or "will be overwhelmed by[,] individual issues."  *Scott*, 954 F.3d at 512.  "This analysis" of whether common or individual issues predominate "is more qualitative than quantitative, and must account for the nature and significance of the material common and individual issues in the case."  *Petrobras II*, 862 F.3d at 271.

Almost all of the "elements and defenses" of the Complaint's § 10(b) and § 20(a) claims are "susceptible to generalized class-wide proof."  *Id.* at 270; *see generally Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) (elements of a § 10(b) claim); *accord Goldman II*, 77 F.4th at 85 n.3 (same); *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 59 (2d Cir. 2025) (elements of a § 20(a) claim).  Plaintiffs submit, and Defendants do not meaningfully contest, that the elements of materiality, loss causation and scienter are common questions.  As discussed above, reliance is common to all class members under the *Basic* presumption, and the damages model proposes a common methodology that is sufficient for class certification.  The remaining elements, such as certain Defendants' control over WM and liability under § 20(a), are also common to the entire class.  These questions go to the heart of Plaintiffs' claims and "can profitably be tried on a class-wide basis."  *Scott*, 954 F.3d at 512.

The domestic transaction issue, in contrast, is less significant in this case because nothing in the record suggests that "foreign transactions account for a large proportion of the class" and are not subject to U.S. securities law. *Vale III*, 2022 WL 969724, at *5. Unlike the cases on which Defendants rely, this case involves a U.S. company -- not a foreign issuer -- allegedly withholding or misstating information about a merger with another U.S. waste disposal company. *Cf. Morrison v. Nat'l Australian Bank Ltd.*, 561 U.S. 247, 269 (2010) (an Australian bank); *Petrobras II*, 862 F.3d at 256, 258 (a Brazilian company); *Vale II*, 2022 WL 122593, at *1 (a Brazilian company). Of the institutional investors that held the Notes during the Class Period, a great majority (296 of 361 or 82%) are headquartered in the U.S. While the class definition should be modified to clarify that only noteholders who acquired the Notes in domestic transactions may be class members, *see Petrobras II*, 862 F.3d at 271, the domestic transaction issue does not defeat predominance.

## IV.    CLASS COUNSEL

"[A] court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). Plaintiffs request that Robbins Geller be appointed as Class Counsel. Defendants do not oppose this request. Courts must consider "the work counsel has done," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law" and "the resources that counsel will commit." *Id*. Robbins Geller has been lead counsel in this case for over two years. *See United Indus. Workers Pension Plan*, 2022 WL 17342492, at *1 (appointing Robbins Geller as lead counsel in November 2022). Robbins Geller has substantial experience in prosecuting securities fraud class actions, having served as lead or co-lead counsel in many securities class actions. *See, e.g.*, *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 59 (S.D.N.Y.

2019) (appointing Robbins Geller as class counsel after noting its "extensive experience in securities class actions and complex litigation"). Robbins Geller is appointed Class Counsel.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion to certify the class is **GRANTED** in part.

This action is **CERTIFIED** to proceed as a class action on behalf of the following class:

> All persons who purchased or otherwise acquired any of the following Waste Management redeemable senior notes, between February 13, 2020 and June 23, 2020, inclusive, in one or more domestic transactions, and were damaged thereby: (i) 2.95% Senior Notes due 2024; (ii) 3.20% Senior Notes due 2026; (iii) 3.45% Senior Notes due 2029; or (iv) 4.00% Senior Notes due 2039. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

Plaintiffs are **APPOINTED** as Class Representatives of the class as defined above. Robbins Geller is **APPOINTED** as Class Counsel. Defendants' *Daubert* motion is **DENIED**.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 71 and 119.

Dated:  March 31, 2025
       New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE