UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re WASTE MANAGEMENT SECURITIES
LITIGATION

— x
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
— x

Civil Action No. 1:22-cv-04838-LGS

<u>CLASS ACTION</u>

DECLARATION OF NOAM MANDEL IN
IN SUPPORT OF: (1) LEAD PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND
APPROVAL OF PLAN OF ALLOCATION;
AND (2) LEAD COUNSEL'S MOTION FOR
AN AWARD OF ATTORNEYS' FEES AND
EXPENSES AND AWARDS TO LEAD
PLAINTIFFS PURSUANT TO 15 U.S.C.
§78U-4(A)(4)

4935-4465-1384.v1

I, NOAM MANDEL, declare as follows:

1.      I am a partner of Robbins Geller Rudman & Dowd LLP ("Robbins Geller").  The Court appointed Robbins Geller as Lead Counsel and Seafarers Officers & Employees Pension Plan, Seafarers Money Purchase Pension Plan, and United Industrial Workers Pension Plan as Lead Plaintiffs in the above-captioned action (the "Action" or "Litigation").[1]

2.      I have been the lead attorney responsible for the prosecution and resolution of this Action since Robbins Geller was appointed Lead Counsel on November 30, 2022.  (ECF 33).  Based on my personal involvement in this matter and my supervision of and communications with other lawyers and staff assigned to this case, I have knowledge of the matters set forth herein.  I believe the information contained herein to be accurate based on my personal knowledge, as well as information provided to me by others.

3.      I respectfully submit this declaration in support of: (i) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation; and (ii) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards to Lead Plaintiffs pursuant to 15 U.S.C. §78u-4(a)(4).

## I.      INTRODUCTION

4.      The Settlement resolves this securities class action asserting claims against Waste Management, Inc. ("Waste Management," "WM," or the "Company"), James C. Fish, Jr., John J. Morris, and Devina A. Rankin (collectively, the "Defendants") for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder.

---

[1]    Unless otherwise specified, all capitalized terms used herein have the meanings provided in the Stipulation of Settlement, dated July 10, 2025 (ECF 146-1) (the "Stipulation").

4935-4465-1384.v1

5.      The Settlement provides the Class with a substantial and immediate benefit – a cash payment of $30,000,000 (the "Settlement Amount") – in exchange for a release of the Released Plaintiffs' Claims against the Defendants' Released Persons.  The Settlement is the result of Lead Plaintiffs' and Lead Counsel's vigorous and diligent prosecution of this Action for nearly three years.  By the time the parties reached an agreement in principle to settle the Action, litigation was well underway and Lead Counsel had, among other things: (i) conducted an extensive factual and legal investigation; (ii) successfully opposed Defendants' motion to dismiss (except as to former defendant Leslie Nagy); (iii) obtained class certification over Defendants' strenuous opposition, including a sur-reply and a motion to exclude the opinions of Lead Plaintiffs' class certification expert; (iv) participated in extensive document discovery; (v) served and responded to discovery requests on behalf of Lead Plaintiffs; (vi) served and received responses to document requests, interrogatories, and request for admission; (vii) reviewed and analyzed over 18,000 documents (totaling more than 107,000 pages); (viii) deposed multiple fact witnesses; (ix) taken or defended the depositions of the parties' expert witnesses at class certification; and (x) retained and consulted with a damages expert in support of class certification and on damages issues.

6.      The Settlement is the result of two in-person mediation sessions, two Zoom sessions, and subsequent arm's-length negotiations facilitated by Jed Melnick of JAMS, Inc., an experienced mediator with extensive experience with complex securities actions.  The parties mediated in person on July 31, 2024 and April 15, 2025.  In addition, the parties conducted two mediation sessions via Zoom on April 10 and 18, 2025.

7.      On May 8, 2025, the eve of Lead Plaintiffs' deposition of Defendant Devina Rankin, the parties agreed to accept a mediator's proposal to settle the Litigation for $30 million.  Thereafter,

- 2 -

the parties worked to memorialize their agreement, executing a term sheet on May 21, 2025.  The

parties notified the Court of their agreement in principle to resolve the Action on May 23, 2025.

8.      Lead Plaintiffs' and Lead Counsel's decision to settle the Action was informed by

Lead Counsel's investigation, the results of discovery, and consideration of the Settlement's benefits

and the risks of continued litigation, including the risk of adverse outcomes at summary judgment or

trial on issues such as falsity, scienter, loss causation, and damages.  In addition, there was the risk

that the Class could be decertified.  On April 15, 2025, Defendants filed a petition with the United

States Court of Appeals for the Second Circuit seeking leave to appeal the Court's March 31, 2025

order granting class certification.  Defendants' petition was pending when the parties reached the

proposed Settlement.

9.      The Court sustained Lead Plaintiffs' claims (except as to former defendant Leslie

Nagy) at the motion to dismiss stage.  However, those claims would have been subjected to a more

exacting standard at summary judgment and trial.  Throughout the Litigation, Defendants argued that

their statements concerning the U.S. Department of Justice's ("DOJ") antitrust view and the

anticipated timing of the closing of the Advanced Disposal Services, Inc. ("ADS") transaction were

inactionable forward looking subject to the Private Securities Litigation Reform Act of 1995's

("PSLRA") safe harbor or opinion statements, and that the facts failed to establish a strong inference

of scienter.  In addition, Defendants argued that Waste Management never guaranteed that it would

close the merger by the end date, and warned investors of the risks that the ADS transaction might

not close on time, including because of the DOJ's review and later because of the COVID-19

pandemic.

10.     Lead Counsel and Lead Plaintiffs disputed (and continue to dispute) these arguments,

including because Defendants knew that the DOJ was requiring divestitures in excess of the $200

- 3 -

4935-4465-1384.v1

million Antitrust Revenue Threshold by February 2020 and were negotiating a revised merger agreement by late April 2020. Nevertheless, there remained substantial risk that Defendants would prevail on their likely motion for summary judgment or at trial in this complex securities class action.

11.     Based on my experience litigating securities class actions, the complexities of this Litigation, and the substantial risks of continued litigation, I firmly believe that the $30,000,000 Settlement represents an outstanding recovery – one that eliminates the risk of the Class receiving no or a substantially smaller recovery at trial – and is in the best interests of the Class.

## II.     THE ACTION

### A.     The Commencement of the Action and Appointment of Lead Plaintiffs

12.     United Industrial Workers Pension Plan, one of the three Court-appointed Lead Plaintiffs, commenced this Action with the filing of a complaint on June 9, 2022. (ECF 1). On November 30, 2022, the Court appointed United Industrial Workers Pension Plan, Seafarers Officers & Employees Pension Plan, and Seafarers Money Purchase Pension Plan as Lead Plaintiffs and approved their selection of Robbins Geller Rudman & Dowd LLP as Lead Counsel. (ECF 33).

### B.     Lead Counsel's Investigation and Filing of the Amended Complaint

13.     Prior to and following the filing of the initial complaint, Lead Counsel conducted an extensive factual and legal investigation into the securities law claims and possible defenses. This investigation included, among other things: (i) reviewing WM's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) reviewing press releases, earnings calls transcripts, and presentations by WM and ADS; (iii) reviewing reports and commentary by securities analysts covering WM and ADS; and (iv) consulting with an expert on damages.

4935-4465-1384.v1

14.    On January 17, 2023, Lead Plaintiffs filed the operative amended complaint (the "Complaint") asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder. (ECF 40). Lead Plaintiffs allege, among other things, that the Defendants made materially false and misleading statements and/or omissions concerning the timing of Waste Management's acquisition of ADS. Specifically, Lead Plaintiffs allege that throughout the Class Period, Defendants represented that the DOJ's review for antitrust approval was progressing as expected and that Waste Management was on track to complete its acquisition of ADS by July 14, 2020, the end date that would trigger Waste Management's obligation to redeem the WM Notes at 101% of par if the ADS transaction was not complete by that time. Lead Plaintiffs further allege that Defendants' statements were materially false and misleading, including because they failed to disclose that the DOJ was requiring divestitures in excess of the $200 million Antitrust Revenue Threshold set forth in the merger agreement between Waste Management and ADS as early as February 2020, and that Waste Management was renegotiating the terms of the ADS transaction by late-April 2020. Lead Plaintiffs further allege that the WM Notes traded at artificially inflated prices as a result of Defendants' misrepresentations and/or omissions during the Class Period, and that the price of the WM Notes declined when Waste Management announced, on June 24, 2020, a revised merger agreement that would not close by the July 14, 2020 end date, and the impending redemption of the WM Notes at 101% of par as a result.

### C.    Defendants' Motion to Dismiss, the Court's Decision Denying that Motion to Dismiss, and Subsequent Events

15.    On April 6, 2023, Defendants moved to dismiss the Complaint (the "Motion to Dismiss"). (ECF 49). In support of the Motion to Dismiss, Defendants argued that Lead Plaintiffs had failed to plead any actionable misstatements or omissions. Specifically, Defendants argued that their statements concerning the anticipated timing of WM's acquisition of ADS were non-actionable

- 5 -

4935-4465-1384.v1

forward-looking statements protected by the PSLRA's safe harbor, and/or opinion statements, and that Lead Plaintiffs could not establish that the challenged statements were materially false or misleading. In addition, Defendants argued that the Complaint did not raise a strong inference of scienter.

16.    On May 3, 2023, Lead Plaintiffs filed a brief in opposition to the Motion to Dismiss (the "MTD Opposition Brief"). (ECF 51). In the MTD Opposition Brief, Lead Plaintiffs argued that Defendants' assurances regarding the timing of the Company's acquisition of ADS were not protected forward-looking statements, including because they incorporated then-existing facts, omitted known risks, and were not accompanied by sufficiently meaningful cautionary language concerning the specific danger that the DOJ would require divestitures in excess of the $200 million Antitrust Revenue Threshold. Lead Plaintiffs further argued that the allegations in the Complaint raised a strong inference of scienter, pointing to particularized facts demonstrating that Defendants knew or recklessly disregarded the risk that the DOJ's demands would exceed the Antitrust Revenue Threshold set forth in the merger agreement, including the DOJ's request for an upfront buyer and Defendants' negotiation of the sale of assets to GFL Environmental Inc. at least as early as March 2020.

17.    On May 16, 2023, Defendants filed a reply brief in further support of the Motion to Dismiss. (ECF 52). In their reply brief, Defendants reiterated their arguments regarding forward-looking statements and asserted that Lead Plaintiffs failed to allege that Defendants did not genuinely believe their opinion statements concerning the anticipated timing of the closing of the ADS acquisition, and therefore failed to plead falsity with specificity. Defendants also argued that Lead Plaintiffs failed to allege facts to support a strong inference of scienter, pointing to the Complaint's purportedly thin allegations concerning Defendants' motive to defraud or recklessness.

4935-4465-1384.v1

18.    On March 27, 2024, the Court denied the Motion to Dismiss (except as to former defendant Leslie Nagy). (ECF 58). The Court held that the Complaint adequately alleged material omissions and that Defendants "created an impression that the acquisition would be approved before the End Date when Defendants knew the acquisition was likely to be delayed due to the DOJ's objections." *Id.* at 8. The Court further held that the Complaint adequately alleged scienter as to Defendants James C. Fish, Jr., Devina A. Rankin, and John J. Morris. *Id.* at 18. The Court also held that the Complaint had adequately pleaded claims under §20(a). *Id.*

19.    On April 17, 2024, the parties filed a proposed Civil Case Management Plan and Scheduling Order (the "Scheduling Order"), which the Court entered on April 24, 2024. (ECF 64).[2]

20.    Defendants answered the Complaint on May 10, 2024. (ECF 67).

**D.    Class Certification**

21.    On June 14, 2024, Lead Plaintiffs moved to certify a class of investors who purchased WM Notes between February 13, 2020 and June 23, 2020 (the "Class Certification Motion"). (ECF 71). In support of the Class Certification Motion, Lead Plaintiffs submitted the expert report of Dr. Steven P. Feinstein, who opined on market efficiency, price impact, and a common damages methodology that was consistent with Lead Plaintiffs' theory of liability.

22.    On August 16, 2024, Defendants filed a brief in opposition to the Class Certification Motion, along with the expert report of Lucy P. Allen. (ECF 104, ECF 104-2). Ms. Allen opined that Dr. Feinstein failed to demonstrate that the WM Notes traded in an efficient market and that his out-pocket-damages methodology was inconsistent with Lead Plaintiffs' theory of liability.

23.    On September 27, 2024, Defendants' Counsel deposed Dr. Feinstein.

---

[2]    On December 9, 2024, the parties requested an extension of the discovery deadlines set forth in the Scheduling Order. (ECF 132). The Court granted the parties' request on December 11, 2024. (ECF 134).

4935-4465-1384.v1

24.     On October 1, 2024, Lead Counsel deposed Ms. Allen.

25.     On October 16, 2024, Lead Plaintiffs filed a reply brief in further support of the Class Certification Motion, along with the rebuttal report of Dr. Feinstein.  (ECF 108, ECF 109-1).

26.     On October 21, 2024, Defendants filed a pre-motion letter seeking permission to file a motion to exclude the opinions of Lead Plaintiffs' class certification expert (the "*Daubert* Motion"). (ECF 113).  On October 22, 2024, the Court set a briefing schedule for the *Daubert* Motion.  (ECF 114).  On October 29, 2024, Defendants filed the *Daubert* Motion.  (ECF 119, 120).

27.     On October 30, 2024, Defendants filed a letter motion seeking leave to file a sur-reply on the issue of price impact in opposition to the Class Certification Motion.  (ECF 122).  The Court granted Defendants' motion on November 6, 2024.  (ECF 127).

28.     On November 5, 2024, Lead Plaintiffs filed a brief in opposition to the *Daubert* Motion.  (ECF 125).  Defendants filed a reply brief in further support of the *Daubert* Motion on November 8, 2024.  (ECF 128).

29.     On March 31, 2025, the Court issued an Opinion and Order granting class certification for investors who purchased or otherwise acquired the WM Notes in a domestic transaction during the period between February 13, 2020 and June 23, 2020, inclusive, and denying the *Daubert* Motion.  (ECF 139).  The Court held that Lead Plaintiffs "demonstrate[d] by a preponderance of the evidence that the Notes traded in an efficient market," *id.* at 22, and were therefore "entitled to the presumption that the price of the Notes during the Class Period incorporated 'all public, material information—including material misrepresentations.'"  *Id.*  The Court further held that "[c]lass members' damages are susceptible to class-wide calculations using the out-of-pocket methodology."  *Id*. at 26.  In certifying the Class, the Court appointed Seafarers

Officers & Employees Pension Plan, Seafarers Money Purchase Pension Plan, and United Industrial Workers Pension Plan as Class Representatives and Robbins Geller as Class Counsel.

30.    On April 15, 2025, Defendants filed a petition with the United States Court of Appeals for the Second Circuit seeking leave to appeal the Court's class certification decision pursuant to Rule 23(f) of the Federal Rules of Civil Procedure (the "Petition").  On April 24, 2025, Lead Plaintiffs filed a brief in opposition to the Petition.  On May 1, 2025, Defendants filed a motion seeking leave to file a reply brief in further support of the Petition.  The Petition was pending when the parties reached the proposed Settlement.

**E.    Discovery**

31.    On May 7, 2024, Lead Plaintiffs subpoenaed the Financial Industry Regulatory Authority, Inc. ("FINRA") for trade data concerning the Waste Management Notes.  On May 15, 2024, the parties served each other with requests for production of documents.  On May 31, 2024, FINRA produced documents in response to Lead Plaintiffs' subpoena.  On June 14, 2024, the parties served responses and objections to each other's requests for production of documents.  In response to Lead Plaintiffs' requests for production of documents, Defendants produced over 18,000 documents, totaling more than 107,000 pages, including internal and external emails, board minutes and materials, and transaction-related communications and documents.  In response to Defendants' request for production of documents, Lead Plaintiffs produced over 250 documents, totaling more than 22,400 pages.  Defendants also served third-party subpoenas on fourteen financial institutions, and re-produced to Lead Plaintiffs documents produced in response to those subpoenas.

32.    On November 15, 2024, Lead Plaintiffs served Defendants with Lead Plaintiffs' First Set of Interrogatories to All Defendants (the "First Set of Interrogatories") and Lead Plaintiffs' First Set of Requests for Admission to All Defendants (the "RFAs").  On December 16, 2024, Defendants

- 9 -

served Lead Plaintiffs with their responses and objections to the First Set of Interrogatories and the RFAs.

33.    During the period October 2023 through February 2024, the parties worked to resolve disputes and reach agreement on the search parameters (*i.e.*, the custodians, search terms, and date range) for Defendants' collection and production of Electronically Stored Information.

34.    To facilitate the orderly review of documents, Lead Counsel loaded party and non-party document productions to Relativity, a document hosting, management, and review platform maintained in-house by Robbins Geller.  Loading documents to Relativity allowed Lead Counsel to search for and code documents by custodian, date, and issue.

35.    Lead Counsel also organized a team of attorneys, from its New York and other offices, who were responsible for reviewing and identifying notable documents.

36.    Discovery continued until May 2025.  During that time, the parties met and conferred on numerous occasions, including about the scope of Defendants' discovery obligations and Defendants' waiver of the attorney-client privilege concerning certain subject matters.  During this time, Lead Plaintiffs successfully moved to compel the production of documents dating back to March 2019, reviewed documents produced by Defendants and numerous third parties, served additional interrogatories[3], and took the depositions of four Waste Management fact witnesses.

## III.    THE RISKS OF LITIGATION

37.    At the time the Settlement was reached, Lead Plaintiffs faced significant litigation, trial, and appellate risk, including risks associated with establishing liability and damages.  These

---

[3]    On April 23, 2025, Lead Plaintiffs served Defendants with Lead Plaintiffs' Second Set of Interrogatories.  The parties reached an agreement in principle before Defendants were scheduled to respond to Lead Plaintiffs' Second Set of Interrogatories.

4935-4465-1384.v1

risks were amplified by, among other things, the nature of the allegedly false and misleading statements and the security at issue.

38.    This Litigation arose from alleged misrepresentations that were all arguably forward looking statements and/or statements of opinion concerning WM's expectations concerning the future timing of the closing of the Company's acquisition of ADS, which presented significant challenges to establishing liability here.    Although Lead Plaintiffs would have emphasized Defendants' access to information that ran contrary to the alleged misstatements, Defendants would have presented strong counterarguments that they had no definitive knowledge of the future closing date, that they subjectively believed the opinions they expressed, and that there was little evidence of any personal motive or other intent to defraud.    Defendants would have also pointed to the COVID-19 pandemic as an unprecedented event that arguably impacted the timing of the ADS transaction and the related regulatory review, and argued that they could not be held responsible for failing to foresee that outcome.    Thus, the facts and circumstances of this case presented noteworthy additional obstacles beyond the inherent difficulties of proving elements such as material misrepresentations and scienter.

39.    This Litigation also involved complex debt (as opposed to equity) securities that traded in the over-the-counter market, which made establishing market efficiency for purposes of the *Basic* presumption of reliance and the requisite causal connection between the June 24, 2020 corrective disclosure and the decline in the trading price of the WM Notes more difficult and required extensive expert analysis and opinion, which a jury could have rejected or significantly discredited.

40.    At the motion to dismiss stage, Defendants vehemently contested Lead Plaintiffs' ability to satisfy the elements of falsity and scienter, arguing that their statements regarding the DOJ

review and the timing of the completion of Waste Management's acquisition of ADS were not false and/or misleading and that the documentary record demonstrated a lack of intent to defraud, conscious misbehavior, or recklessness on the part of Defendants. At summary judgment and/or trial, Defendants would have undoubtedly re-litigated these issues and challenged Lead Plaintiffs' ability to establish loss causation. In challenging loss causation, Defendants would have also pointed to the COVID-19 pandemic, the resulting market disruption, and the increasing uncertainty around the timing of the DOJ's review process.

41.     While Lead Plaintiffs and Lead Counsel firmly believe in the merits of the claims asserted in this Litigation, they acknowledge that continued litigation was not without risks. Indeed, if the Defendants defeated any element of Lead Plaintiffs' securities claims, then the Class stood to recover little or no damages. Even if Lead Plaintiffs defeated Defendants' liability arguments at summary judgment, litigating the case through trial and post-trial appeals would have delayed recovery, if any, by the Class.

42.     Moreover, even if Lead Plaintiffs established liability, the risk of proving causation and damages remained, including because the case involved complex non-exchange-traded debt securities in the context of the COVID-19 pandemic and associated market disruption. Lead Plaintiffs would have argued that damages were significant and that all four Notes experienced a statistically significant price decline on June 24, 2020, when the Company announced a revised merger agreement with ADS, and as a result, that the Notes would be redeemed pursuant to the special mandatory redemption feature. Nevertheless, Lead Plaintiffs' ability to establish damages would have turned on a classic "battle of the experts," and a jury could have credited Defendants' and their expert's positions, resulting in minimal or no damages.

4935-4465-1384.v1

43.    The risks extended beyond trial, as Defendants would likely have appealed any verdict in Lead Plaintiffs' favor.  In fact, at the time the agreement in principle was reached, Defendants had already petitioned the Second Circuit pursuant to Rule 23(f) of the Federal Rules of Civil Procedure for leave to appeal the Court's order granting class certification.  If successful, the Class could have been decertified, preventing any Class recovery.

44.    In light of the foregoing, the $30 million Settlement provides an immediate, concrete, and substantial monetary benefit while eliminating the risks and uncertainties of continued litigation.

## IV.    SETTLEMENT NEGOTIATIONS AND THE SETTLEMENT

45.    The Settlement is the result of arm's-length negotiations conducted by experienced counsel and overseen by Jed Melnick, a nationally recognized mediator.  Before mediating on July 31, 2024, the parties exchanged opening mediation statements, setting forth their respective positions on liability and damages.  The parties engaged in good-faith negotiations, but were unable to reach a settlement on July 31, 2024, and litigation continued.

46.    Following the initial mediation session, the parties continued to engage in settlement negotiations facilitated by Mr. Melnick, including a second in-person mediation session on April 15, 2025, and two videoconference sessions held on April 10 and 18, 2025.  On May 8, 2025, the parties accepted a mediator's proposal to settle the Litigation for $30 million.  Thereafter, and over the course of several weeks, Lead Counsel drafted and worked with Defendants' Counsel to memorialize the terms of the proposed Settlement, executing a term sheet and Stipulation of Settlement ("Stipulation") on May 21, 2025 and July 10, 2025, respectively.  The Stipulation, along with the Notice, Summary Notice, Proof of Claim and Release form, and Postcard Notice, were

- 13 -

4935-4465-1384.v1

submitted with Lead Plaintiffs' Motion for Preliminary Approval of Settlement and Approval of Notice to the Class (*See* ECF 146-1).[4]

47.    The Court held a preliminary approval hearing on August 18, 2025.  On August 26, 2025, the Court granted preliminary approval of the Settlement and approved notice to the Class. (ECF 154).  The Court also scheduled a settlement hearing for final approval on December 16, 2025, at 2:30 p.m.  *Id.*

48.    The Stipulation provides for the release of the Released Plaintiffs' Claims against the Defendants' Released Persons in exchange for Defendants' cash payment of $30,000,000 (the "Settlement Amount").  Pursuant to ¶2.2 of the Stipulation, Defendants deposited the Settlement Amount into an escrow account (the "Escrow Account") within twenty-one (21) calendar days of entry of the Preliminary Approval Order.  The Settlement Amount, together with any interest earned thereon, constitutes the "Settlement Fund" to be administered under the continuing supervision of the Court.

49.    If the Court approves the Settlement, Authorized Claimants will receive distributions from the Net Settlement Fund in accordance with a Court-approved Plan of Allocation.

### A.    The Settlement Is in the Best Interests of the Class and Warrants Final Approval

50.    Lead Plaintiffs' damages expert estimates that potential recoverable damages ranged from approximately $56.2 million to $79 million.  Based on these estimates, the $30 million Settlement Amount is an excellent recovery for the Class – representing a recovery of between 38% and 53.4% of estimated recoverable damages.

---

[4]    Following the August 18, 2025 preliminary approval hearing, Lead Counsel submitted a revised Notice, Summary Notice, Proof of Claim and Release form, and Postcard Notice. (ECF 153-1, 153-2, 153-3, and 153-4).

51.     The proposed Settlement was reached after nearly three years of litigation, including motion practice, class certification proceedings, extensive document discovery from parties and non-parties, the depositions of four Waste Management fact witnesses, and arm's-length negotiations.  At the time the proposed Settlement was reached, Lead Plaintiffs and Lead Counsel were well aware of the case's strengths and potential weaknesses.

52.     Lead Plaintiffs and Lead Counsel believe that they would have defeated Defendants' liability and damages' arguments, and prevailed at trial.  Defendants were equally resolute in their position that they would prevail at trial.  As a result, there was a real possibility that a jury could find in Defendants' favor on any one of a number of contested issues.

53.     Based on the foregoing, including consideration of Defendants' defenses and the costs and risks of continued litigation, the proceedings to date, and counsel's extensive experience litigating federal securities class actions, Lead Counsel supports the proposed Settlement as fair, reasonable, and adequate, and in the best interest of the Class.

54.     As of the date of this declaration, there have been no objections to the proposed Settlement.[5]

## V.     THE PRELIMINARY APPROVAL ORDER AND NOTICE PROGRAM

55.     On August 26, 2025, the Court preliminarily approved the class action settlement and authorized notice to the Class (the "Preliminary Approval Order").  (ECF 154).  In the Preliminary Approval Order, the Court determined, among other things, that the proposed Settlement "falls within a range of reasonableness warranting final approval and has no obvious deficiencies and is

---

[5]    Defendants' Counsel received correspondence from Jovelle E. Brockway, a putative Class Member, requesting to comment.  A copy of this correspondence is attached as Ex. B to the Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation ("Settlement Memorandum").

4935-4465-1384.v1

sufficiently reasonable and adequate to the Class . . . and warrants notice" to the Class. *Id.* at 2. In addition, the Court appointed Verita Global ("Verita") as the Claims Administrator to "supervise and administer the notice procedure" and "the processing of Claims." *Id.* at 3.

56.     The Preliminary Approval Order directed that notice be disseminated to the Class. The Preliminary Approval Order also set November 21, 2025, as the deadline for Class Members to submit Proofs of Claim, November 25, 2025, as the deadline for Class Members to submit requests for exclusion from the Class and objections to the Settlement, the Plan of Allocation, and/or Lead Counsel's application for attorneys' fees and litigation expenses, and December 16, 2025, as the date for the Settlement Hearing.

57.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed Verita to disseminate the Postcard Notice via mail or email, publish the Summary Notice in *The Wall Street* and over a national newswire service, and to post the Stipulation and downloadable copies of the Notice and Claim Form online at www.WasteManagementSettlement.com (the "Settlement Website"). The Postcard Notice and Notice directed Class Members to the Settlement Website for additional information regarding the Settlement, including how to file a claim and access to downloadable versions of the Notice and Proof of Claim and Release form.

58.     The Court-approved Notice disclosed, among other things: (a) the amount of the proposed Settlement (*i.e.*, $30 million in cash); (b) the proposed Plan of Allocation; (c) that Lead Counsel would apply for an award of attorneys' fees on behalf of Lead Plaintiffs' Counsel in an amount not to exceed 33-1/3% of the Settlement Fund, payment of litigation expenses in an amount not to exceed $1.0 million, and for an award to Lead Plaintiffs not to exceed an aggregate amount of $60,000; (d) that any Class Member could request exclusion from the Class or object to the

- 16 -

4935-4465-1384.v1

Settlement, Plan of Allocation, and/or Lead Counsel's request for attorneys' fees and expenses; and

(e) that the Settlement Hearing would be held on December 16, 2025.

59.     Verita has administered the notice process.  On September 23, 2025, Verita published the Summary Notice in *The Wall Street Journal* and over *Business Wire*.  Verita has sent Postcard Notices by first-class mail or email to potential Class Members and nominees, coordinated with brokers and nominees to facilitate notice to beneficial owners, and maintained records of its efforts. In addition, Verita has set up and maintained a case-specific toll-free telephone helpline and Settlement Website, where Class Members can access the Notice, Claim Form (which Class Members have the option of submitting online), Stipulation, and Preliminary Approval Order.  *See* Declaration of Ross. D. Murray, submitted herewith.

60.     To date, there have been no objections from any Class Members, with respect to the Settlement, the Plan of Allocation, or the maximum amounts listed in the Notice that Lead Counsel would seek for an award of attorneys' fees and litigation expenses and an award to Lead Plaintiffs pursuant to the PSLRA.  Consistent with the Preliminary Approval Order, Lead Counsel will file reply papers addressing any requests for exclusion or objections received after the date of this declaration by December 9, 2025.

## VI.    THE PLAN OF ALLOCATION

61.     The proposed Plan of Allocation was developed in consultation with Lead Plaintiffs' damages expert, and is attached as Exhibit A to the Notice.

62.     Pursuant to the proposed Plan of Allocation, the Recognized Loss Amount for an Authorized Claimant who sold his, her, or its WM Notes prior to the corrective disclosure date of June 24, 2020 is zero.  The Recognized Loss Amount for an Authorized Claimant who purchased or otherwise acquired WM Notes during the Class Period and sold or otherwise disposed of WM

- 17 -

Notes during the period June 24, 2020 through July 20, 2020, is the least of: (a) the decline in inflation per $100 of par; (b) the purchase price minus the sale price; or (c) the purchase price minus the average price between June 24, 2020 and the date of sale. The proposed Plan of Allocation is consistent with the allegations in the Complaint in that it provides for distributions to investors in the WM Notes who were allegedly harmed by Defendants' materially false and misleading statements and/or omissions during the Class Period.

63.     The proposed Plan of Allocation provides that the Net Settlement Fund will be distributed to Authorized Claimants on a *pro rata* basis based on the relative size of an Authorized Claimant's Recognized Claim. The amount distributed to each Authorized Claimant is calculated by dividing an Authorized Claimant's Recognized Claim by the total Recognized Claims of all Authorized Claimants and multiplying the total amount in the Net Settlement Fund. In addition, for administrative efficiency, no distribution will be made to Authorized Claimants whose recovery would be less than $10.00, as the cost of issuing such payments would exceed their value.

64.     In Lead Counsel's judgment, the method set forth in the proposed Plan of Allocation equitably distributes the Net Settlement Fund among those investors in WM Notes who suffered economic losses attributable to the alleged misconduct.

65.     To date, there have been no objections to the Plan of Allocation.

66.     For these and the reasons set forth in the accompanying Settlement Memorandum, I believe the Plan of Allocation is fair and reasonable, and should be approved by the Court.

## VII.   LEAD COUNSEL'S ATTORNEYS' FEES

67.     Lead Counsel respectfully requests that the Court award attorneys' fees equal to 33-1/3% of the $30 million Settlement Amount and $946,662.31 for litigation expenses incurred in

- 18 -

4935-4465-1384.v1

the prosecution of this Action, plus the interest earned thereon at the same rate for the same period as that earned on the Settlement Fund until paid.

68.    I believe that the requested amounts are reasonable and appropriate in light of the substantial time and resources Lead Plaintiffs' Counsel devoted to the prosecution of this Action, the inherent risk associated with pursuing the Action on a purely contingency basis, and the outstanding recovery Lead Plaintiffs' Counsel obtained for the Class.

69.    The arguments and authorities supporting the requested fees and expenses are detailed in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards to Lead Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Fee Memorandum").

### A.    Time, Labor, and Fee Percentage Requested

70.    Lead Plaintiffs' Counsel have devoted a significant amount of time and resources to the investigation, prosecution, and resolution of this Action.

71.    Lead Plaintiffs' Counsel have considerable experience representing individual and institutional investors in complex securities class actions, including in this District.  Background information concerning my firm and its partners is attached as Exhibit F to the Declaration of Noam Mandel Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Fee Decl."), submitted herewith, and the accompanying Declaration of David C. Harrison in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards to Lead Plaintiffs ("Harrison Decl.").

72.    Lead Plaintiffs' Counsel's representation of the Class in this Action included, among other things:

- 19 -

4935-4465-1384.v1

(a)      conducting an extensive factual and legal investigation into the claims and defenses;

(b)      filing the initial complaint;

(c)      moving the Court to appoint Seafarers Officers & Employees Pension Plan, Seafarers Money Purchase Pension Plan, United Industrial Workers Pension Plan as Lead Plaintiffs;

(d)      filing the amended complaint;

(e)      largely defeating Defendants' motion to dismiss;

(f)      taking the deposition of Defendants' expert witness in connection with class certification;

(g)      defending the deposition of Lead Plaintiffs' class certification expert;

(h)      successfully moving for class certification;

(i)      defeating Defendants' motion to exclude Lead Plaintiffs' class certification expert;

(j)      conducting substantial document discovery;

(k)      propounding document requests, interrogatories, and request for admission and reviewing and analyzing over 18,000 documents, totaling over 107,000 pages, produced by Defendants and third parties;

(l)      responding to Defendants' discovery requests;

(m)      participating in numerous discovery conferences;

(n)      deposing four Waste Management fact witnesses;

(o)      scheduling and preparing for additional fact witness depositions that were forthcoming at the time of Settlement;

(p)      consulting with internal and external damages experts;

- 20 -

4935-4465-1384.v1

(q)    drafting mediation statements;

(r)    preparing for and participating in two in-person and two remote mediation sessions and conducting additional settlement negotiations;

(s)    drafting and negotiating the parties' term sheet;

(t)    drafting and negotiating the Stipulation and the exhibits attached thereto; and

(u)    obtaining preliminary approval of the Settlement.

73.    Lead Plaintiffs' Counsel's diligence, experience, and advocacy were instrumental in convincing the Court to deny Defendants' motion to dismiss and to grant the Class Certification Motion, and to convincing Defendants, their insurers, and the mediator that Defendants faced real litigation risks.

74.    A set forth in the Fee Memorandum, Lead Counsel's request for a fee of 33-1/3% of the Settlement Amount reflects an upward adjustment to the baseline of 25% awarded in cases involving recoveries of a similar size according to empirical data from National Economic Research Associates, Inc.  *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review*, at 30 (NERA Jan. 22, 2025), attached as Ex. D to the Fee Memorandum.  This adjustment is warranted based on the result obtained, the risks of this Litigation, the quality of Lead Counsel's representation, and the advanced stage of the Litigation, and is consistent with fees awarded in this District under similar circumstances.

75.    Lead Counsel's fee request is also supported by the lodestar crosscheck.  The collective number of hours expended by Lead Plaintiffs' Counsel in this Action on behalf of Lead Plaintiffs and the Class is 10,730.65.  A breakdown of the lodestar from Lead Plaintiffs' Counsel is provided in Exhibit A to the Robbins Geller Fee Declaration and in the Harrison Declaration.  The lodestar amount for attorney/paraprofessional time, based on Lead Plaintiffs' Counsel's current or

4935-4465-1384.v1

2023 rates is $7,925,752, which translates to a modest multiplier of approximately 1.26 if the Court grants Lead Counsel's fee request of 33-1/3% of the Settlement Amount.

76.    Lead Plaintiffs support Lead Counsel's request for an award of attorneys' fees and expenses. *See* accompanying Declaration of Leslie Tarantola (the "Tarantola Decl."). To date, there have been no objections to Lead Counsel's fee and expense request.

**B.    Risk, Magnitude, and Complexity of the Litigation**

77.    As set forth in the accompanying application for attorneys' fees and expenses, determining a fair fee should include consideration of the contingent nature of the fee and the complexity of the action.

78.    This Litigation involved complex factual and legal issues under §§10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, including disputes concerning falsity, scienter, market efficiency for debt securities, price impact, loss causation, and damages. Further, this Litigation involved significant additional challenges of evidence and proof because it revolved around a regulatory process that was conducted principally through outside counsel, and much of the discovery was therefore shrouded in potential privileges, presenting significant additional risks to Lead Plaintiffs' ability to prove the claims at issue. Defendants vigorously contested liability and damages, filing a motion to dismiss, opposing class certification, submitting multiple expert reports on price impact, and disputing the alleged falsity of their statements. Lead Plaintiffs faced substantial risk that their claims could be reduced or disposed of at summary judgment or trial.

79.    Lead Plaintiffs' Counsel undertook the prosecution of this Litigation on a fully contingent basis. Without any assurance of compensation, Lead Plaintiffs' Counsel devoted significant time and resources over the course of nearly three years, ultimately securing a $30,000,000 Settlement for the benefit of the Class. Had a settlement not been reached, Lead

Plaintiffs' Counsel were prepared to continue litigating through expert discovery, summary judgment, trial, and a likely appeal, all of which would have involved additional risk, expense, and delay, with no guarantee of success or payment.

### C.    Quality of the Representation

80.    Before filing the initial and amended complaints, Lead Plaintiffs' Counsel conducted extensive factual and legal investigations into the claims asserted in those pleadings. Thereafter, Lead Counsel devoted a significant amount of time and resources to defending against Defendants' motion to dismiss, moving for class certification, including consulting with its expert on damages, and aggressively pursuing and responding to party discovery.

81.    The $30 million Settlement is directly attributable to the skill, hard work, advocacy, and reputation of Lead Plaintiffs' Counsel.  Lead Counsel is among the most experienced securities and complex litigation practitioners in the country.

82.    The skill and reputation of opposing counsel is also important in evaluating the quality of the worked performed by Lead Counsel.  Defendants were represented by highly experienced attorneys from Baker Botts L.L.P., a nationally recognized defense firm with skilled attorneys that vigorously defended this complex securities class action at every stage of the litigation.  The ability of Lead Counsel to obtain a favorable settlement in the face of such opposition demonstrates the quality and effectiveness of its representation on behalf of the Class.

## VIII.   THE REQUESTED EXPENSES ARE FAIR AND REASONABLE

83.    Lead Counsel seeks an award of $946,662.31 for its reasonable expenses incurred in connection with the prosecution of the Action.  Those expenses and charges are summarized by category in Exhibit B to the Robbins Geller Fee Declaration.

- 23 -

4935-4465-1384.v1

84.     These expenses are: (i) reflected in the books and records maintained by Lead Counsel; and (ii) accurately recorded in the Robbins Geller Fee Declaration.  These expenses include: (a) expert expenses; (b) filing and other fees; (c) travel expenses; (d) online factual and legal research costs; (e) mediation fees; (f) document management and hosting costs; and (g) costs associated with requesting court hearing transcripts and conducting depositions.

85.     The expenses are reasonable and were necessary for the successful prosecution of this Action.

## IX.    REIMBURSEMENT OF THE LEAD PLAINTIFFS' COSTS AND EXPENSES IS FAIR AND REASONABLE

86.     Lead Counsel also requests that the Court award each Lead Plaintiff $10,000 in connection with its representation of the Class pursuant to 15 U.S.C. §78u-4(a)(4).  As set forth in the Fee Memorandum and the Tarantola Declaration, both filed herewith, Lead Plaintiffs committed significant time to prosecuting this Action and overseeing Lead Counsel.

87.     Lead Plaintiffs actively monitored the progress of the case and participated in numerous discussions with Lead Counsel regarding discovery, case strategy and developments, and settlement negotiations.  Lead Plaintiffs also reviewed court filings, and gathered and provided documents in response to Defendants' discovery requests.  Lead Plaintiffs also prepared for and provided deposition testimony.  *See* Tarantola Decl., ¶¶5-8.

88.     Lead Counsel respectfully submits that Lead Plaintiffs made significant contributions to the prosecution of this Action and that an award of $10,000 to each Lead Plaintiff is fair and reasonable, and fully supported by Lead Plaintiffs' efforts and the benefit those efforts conferred upon the Class.

4935-4465-1384.v1

## X.    CONCLUSION

89.    For the reasons set forth above and in the accompanying Settlement and Fee Memorandums, I respectfully submit that: (i) the Settlement and Plan of Allocation should be approved; (ii) the Court should award attorneys' fees of 33-1/3% of the Settlement Amount and $946,662.31 in litigation expenses, plus interest earned thereon at the same rate and for the same period as that earned on the Settlement Amount until paid; and (iii) the Court should award each Lead Plaintiff $10,000 in connection with its representation of the Class pursuant 15 U.S.C. §78u-4(a)(4).

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10th day of November 2025, at New York, New York.

_s/ Noam Mandel_
NOAM MANDEL

4935-4465-1384.v1